Adam J. Goldberg
Tianjiao ("TJ") Li
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  adam.goldberg@lw.com
            tj.li@lw.com

Jeramy D. Webb (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email:   jeramy.webb@lw.com

Benjamin Roth (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email:  ben.roth@lw.com

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>New Look Financing plc,[1]<br><br>    Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 20-12297 (MEW) |

## VERIFIED PETITION UNDER CHAPTER 15 FOR
## RECOGNITION OF A FOREIGN MAIN PROCEEDING AND RELATED RELIEF

Richard John Collyer, in his capacity as the duly authorized foreign representative (the

"Foreign Representative") of New Look Financing plc (the "Debtor"), which is the subject of a

proceeding (the "English Proceeding") currently pending before the Business and Property Courts

of the High Court of Justice of England and Wales (the "High Court") concerning a scheme of

---

[1]  The last four digits of the Debtor's England and Wales company registration number are 1640. The location of the
   Debtor's registered office is New Look House, Mercery Road, Weymouth, Dorset, DT3 5HJ, United Kingdom.

arrangement (the "Scheme")[2] under Part 26 of the Companies Act 2006 of the United Kingdom (as modified, amended, or re-enacted from time to time, the "Companies Act"), respectfully submits this verified petition (the "Verified Petition" together with the Form of Voluntary Petition [Docket No. 1], the "Petition").

In support of the Petition, the Foreign Representative respectfully submits the (a) *Declaration of Richard John Collyer in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* (the "Collyer Declaration") and (b) the *Declaration of Yen Sum in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* (the "Sum Declaration" together with the Collyer Declaration, the "Declarations"), each of which has been filed contemporaneously with the Verified Petition and is incorporated herein by reference as if fully set forth here.  In further support of the relief requested herein, the Foreign Representative respectfully represents as follows:

## **PRELIMINARY STATEMENT**

1.     The Debtor, a public limited liability company incorporated in England and Wales, seeks to adjust its secured debt through the Scheme to be approved by a requisite majority of the affected creditors and ultimately sanctioned by the High Court under the Companies Act.  By filing this Petition to seek recognition and enforcement of the Scheme in the territorial jurisdiction of the United States, the Foreign Representative seeks to mitigate against the risk of a dissenting creditor suing under the Indenture (as defined below) in a U.S. court to frustrate the Debtor's successful financial restructuring under the Scheme.

---

[2]  A copy of the Scheme is annexed hereto as **Exhibit B**. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Scheme or in the explanatory statement for the Scheme (the "Explanatory Statement"), which is attached hereto as **Exhibit C**.

2.    The Debtor is a wholly-owned indirect subsidiary of New Look Retail Holdings Limited (the "Parent" together with its direct and indirect subsidiaries, including the Debtor, the "Group").  The Group operates a British fashion retail business based in the United Kingdom (the "UK") that offers clothing, footwear, and accessories at competitive prices.  Following its founding 50 years ago in England, the Group is now considered one of the market leaders in the value fashion space in the UK.

3.    The ongoing COVID-19 pandemic has caused a rapid and unprecedented impact on the global retail industry and has significantly impacted the Group's business.  During March 2020, the Group experienced a significant decline in foot traffic within its stores, with like-for-like sales declining 32% in UK retail stores compared to the prior year.  On March 20, 2020, the Group's management team voluntarily decided to close all stores in the Republic of Ireland.  On March 21, 2020, all stores in the UK were also closed in light of safety concerns for their staff and customers, as well as the reduced foot traffic in the preceding weeks.

4.    In the wake of the official lockdown imposed by the government of the UK on March 23, 2020 and of the Republic of Ireland on March 24, 2020, the Group's revenue from its stores fell to zero.  Thus, the impact of the COVID-19 pandemic on the revenue of the Group has been significant.  Throughout the closure of the Group's stores, the Group was only able to trade through its e-commerce channels, which historically had accounted for approximately 22% of the Group's revenue.  Phased store re-openings began on June 1, 2020.

5.    Notwithstanding the measures taken to date by the Group, the COVID-19 pandemic is expected to have a permanent impact on its business.  The Group has forecasted that, as a result of a permanent structural shift in consumer behavior from stores to online, in-store foot traffic and

sales will significantly reduce and likely result in the unprofitability of many stores, without securing significant changes to the Group's liabilities (including financial and lease liabilities).

6.      As a result, the Group is implementing a comprehensive recapitalization transaction that will extend the Group's banking and operational facilities, deliver a new money investment of £40,000,000, and significantly deleverage its balance sheet.  As part of its turnaround strategy, on August 13, 2020 the Debtor and its key constituents entered into a lock-up agreement (the "Lock-Up Agreement") under which creditors and other stakeholders agreed to support, implement, and consummate the Scheme.

7.      The Scheme is an integral component of the restructuring and will deleverage the Group's balance sheet, significantly reduce debt service costs, and facilitate the injection of the new money investment.  The Scheme is in the best interests of the Group's creditors, as it provides them with the opportunity to benefit from the Group's turnaround strategy.

8.      To implement the Scheme, the Debtor commenced the English Proceeding to obtain the approval of the High Court to convene a scheme meeting (the "Scheme Meeting") of the Debtor's Scheme Creditors (as defined below) to vote on, and ultimately to sanction, the Scheme. The Debtor also commenced this chapter 15 case (the "Chapter 15 Case") to obtain recognition of the English Proceeding as a foreign main proceeding and related relief.[3]  For the reasons set forth below, the Foreign Representative respectfully requests that this Court grant the relief requested herein.

---

[3] The Foreign Representative is not seeking provisional relief at this time because he is not aware of any imminent threat to the Debtor's assets located within the territorial jurisdiction of the United States or to the English Proceeding by virtue of actions in the United States. If circumstances change or the Foreign Representative becomes aware of additional facts, the Foreign Representative reserves all rights to seek provisional relief pursuant to section 1519 or other applicable sections of the Bankruptcy Code to protect the Debtor and its assets.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska,

C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District

pursuant to 28 U.S.C. § 1410 because the Debtor's principal tangible asset in the United States—

the Retainer Account (as defined below)—is located in this District.  Moreover, the Debtor is party

to the Indenture, which is governed by New York law and contains a New York forum selection

clause.  *See* Collyer Declaration ¶ 11.  The statutory bases for relief are sections 105(a), 1504,

1507, 1509, 1515, 1517, 1520, and 1521 of the Bankruptcy Code.

## RELIEF REQUESTED

10.     The Foreign Representative respectfully requests the entry of an order, substantially

in the form attached hereto as **Exhibit A** (the "Proposed Order"):

  a.    finding that (i) the Debtor is eligible to be a "debtor" under chapter 15 of
        the Bankruptcy Code, (ii) the English Proceeding is a "foreign main
        proceeding" within the meaning of section 1502 of the Bankruptcy Code,
        (iii) the Foreign Representative satisfies the requirements of a "foreign
        representative" under section 101(24) of the Bankruptcy Code, and (iv) the
        Petition was properly filed and meets the requirements of section 1515 of
        the Bankruptcy Code;

  b.    granting recognition of the Scheme as a "foreign main proceeding" under
        sections 1517 and 1520 of the Bankruptcy Code;

  c.    granting all relief afforded to foreign main proceedings under section 1520
        of the Bankruptcy Code;

  d.    recognizing, granting comity to, and giving full force and effect within the
        territorial jurisdiction of the United States to the English Proceeding, the
        Scheme and the order of the High Court sanctioning the Scheme (the
        "Sanction Order"), including giving effect to the releases set forth in the
        Scheme (the "Releases");

  e.    permanently enjoining all parties from commencing or continuing any
        action or proceeding in the United States against the Debtor or its assets

located within the territorial jurisdiction of the United States that is inconsistent with the Scheme (the "Injunction");

f.   waiving the 14-day stay of effectiveness of the Proposed Order; and

g.   granting related relief.

11.   The Foreign Representative submits that the relief requested herein should be granted, as "[r]ecognition and enforcement of schemes of arrangement sanctioned by UK courts has become commonplace in chapter 15 cases in the United States . . . ." *In re Avanti Communs. Grp. plc*, 582 B.R. 603, 608 (Bankr. S.D.N.Y. 2018).

## **BACKGROUND**

12.   The following is an overview of the Debtor, the events leading up to the Scheme, the origins and development of the Scheme, and the filing of the English Proceeding as of the date of the filing of the Petition.   The Foreign Representative respectfully refers the Court to the Declarations for additional information.

## I.   **Introduction to the Group and the Debtor**

### A.   **The Group**

13.   The Group is a leading multichannel retailer operating in the value segment of the clothing and footwear market in the UK and Republic of Ireland.  The "New Look" brand is distinct and trusted in the UK, and is one of the market leaders in the value-fashion category for women aged 18 to 44 by value.  As of August 25, 2020, the Group had 11,261 employees.

14.   The Group principally sells clothing, footwear, and accessories in the UK and Republic of Ireland.  The Group operates a multichannel model which includes:

a.   496 New Look-branded directly operated stores in the UK and Republic of Ireland, with a broad geographical coverage, as of August 25, 2020;

b.   the Group's e-commerce platform serving customers in around 68 countries across the globe; and

c.      the third-party e-commerce arrangements through which the Group sells its products on websites of key third-party e-commerce retailers, including ASOS and Zalando, and which currently serve customers worldwide, and through franchise partners covering Malta, Libya, and Tunisia.

**B.      The Debtor**

15.      In 2019, the Debtor was incorporated as a public limited company under the laws of England and Wales to incur debt for the purpose of refinancing the Group's financial indebtedness.  The Debtor has no non-managerial employees and no material assets, other than an intercompany receivable owed to it by the Parent and its interests in the Retainer Account.

16.      The Debtor's registered office and headquarters are located in England, as are the Debtor's senior management (including its Chief Executive Officer, Non-Executive Chairman, Chief Financial Officer, and other senior members of management).  All key corporate activities for the Debtor, including meetings of the board of directors, occur in England.  The Debtor's debt documents and other public filings made by the Debtor typically state that the Debtor is incorporated in England and Wales and that its registered office is located in the UK.

17.      The Debtor has connections to the United States.  As further explained below, the indenture governing the primary debt obligations to be compromised under the Scheme is governed by New York law and contains a New York forum selection clause.  The Debtor also has assets in the United States in the form of interests in a $50,000 retainer with the New York office of Latham & Watkins LLP, which is being held in a client trust account located in New York (the "Retainer Account").

**C.      Overview of the Group's Capital Structure**

18.      On March 29, 2019, New Look Secured Issuer plc ("NLSI"), which at the time was an affiliate of certain members of the Group but has since been dissolved, filed an application under Part 26 of the Companies Act, thereby commencing a proceeding in the High Court

concerning a scheme of arrangement with respect to £525 million (out of £700 million) of its 6.5% senior secured notes due July 1, 2022 and €311 million (out of €415 million) of its floating rate senior secured notes due July 1, 2022 (the "2019 Scheme"). In exchange for such notes and pursuant to the 2019 Scheme, NLSI's creditors would receive the Sterling SSNs, as described in further detail below, and subscription rights in the ordinary equity of the Debtor's indirect parent, representing 20% of its post-restructuring share capital on a fully-diluted basis.

19.      On April 2, 2019, the High Court held a convening hearing and entered an order (a) authorizing NLSI to convene a Scheme Meeting, (b) approving the appointment of Richard John Collyer as foreign representative, and (c) authorizing the foreign representative to seek recognition of NLSI's English Proceeding. On the same date, NLSI filed a verified chapter 15 petition for the recognition of NLSI's English Proceeding in this Court. On April 30, 2019, the High Court entered an order sanctioning the 2019 Scheme (including the releases therein) (the "2019 Sanction Order"), and on May 3, 2019, this Court entered an order (x) recognizing such proceeding, (y) granting comity to the 2019 Scheme and 2019 Sanction Order, and (z) giving full force and effect in the United States to the 2019 Scheme and the 2019 Sanction Order.

20.      As a result of the 2019 Scheme, the Debtor was formed and issued the senior secured notes (the "Sterling SSNs")[4] and  other senior secured notes (the "Euro SSNs"[5] together with the Sterling SSNs, the "SSNs") pursuant to an indenture dated as of May 3, 2019 (as amended and supplemented from time to time, the "Indenture"), by and among the Debtor; New Look Bonds Limited, New Look Limited, and New Look Retailers Limited ("NLRL"), as guarantors; GLAS

---

[4] Under the Sterling SSNs, a total principal amount of £400,131,636 is outstanding as of the date of filing the Petition.

[5] Under the Euro SSNs, a total principal amount of £45,209,687 is outstanding as of the date of filing the Petition.

Trustees Limited, as trustee (the "Trustee"); and GLAS Trust Corporation Limited, as security

agent (the "Security Agent").

21.    NLRL is the borrower on:

  a.    a £100 million revolving credit facility (the "RCF") pursuant to a senior facilities agreement dated as of June 25, 2015 (as amended and/or restated from time to time, the "Senior Facilities Agreement"); and

  b.    up to £65 million of operating facilities (the "Operating Facilities") incurred under a trade finance facilities agreement dated as of March 16, 2018 between, amongst others, NLRL, New Look Bonds Limited, HSBC Bank plc as Facility Agent (in such capacity, the "Facility Agent"), and HSBC Bank plc as Issuing Bank (as amended and/or restated from time to time) (the "TFFA").

22.    As of August 22, 2020, the Group's total financial indebtedness incurred under the

SSNs, the RCF and the Operating Facilities was approximately £595,328,087, consisting of the

following:

| Instrument | Amount Outstanding (GBP as of August 22, 2020) |
|---|---|
| Senior Facilities Agreement | £100,000,000 |
| TFFA | £44,000,000 (rounded) |
| Overdraft (incurred under the TFFA) | £10,000,000 (rounded) |
| Buyer's Agreement | £500,000 (rounded)[6] |
| Sterling SSNs | £400,131,636 |
| Euro SSNs | £40,696,451 |
| **Total:** | **£595,328,087** |

---

[6] A buyer's agreement dated as of February 10, 2010 by and among NLRL and HSBC Invoice Finance (UK) Limited (as amended and/or restated from time to time) has been terminated.

## II.    **The Group's Financial Restructuring**

23.    On August 13, 2020, the Parent, the Debtor, and other companies in the Group entered into the Lock-Up Agreement.  The parties to the Lock-Up Agreement, including the Group's lenders under the RCF and the Operating Facilities, have agreed to support, implement, and consummate the proposed transaction on the terms set out in the steps plan and the equity and debt term sheets attached to the Lock-Up Agreement.

24.    All Scheme Creditors (extending to those that were not already party to the Lock-Up Agreement) were given the opportunity to accede to the Lock-Up Agreement and were provided with instructions for doing so and contact details for any queries.  As of the date of filing the Petition, over 92% of the Scheme Creditors have consented to the financial restructuring to be implemented pursuant to the Scheme (the "Financial Restructuring") and entered into or acceded to the Lock-Up Agreement (the "Consenting SSN Holders").

25.    Pursuant to the Lock-Up Agreement, Consenting SSN Holders are, amongst other things, required to take all actions that are necessary or reasonably desirable to support, facilitate, implement, consummate, or otherwise give effect to the Financial Restructuring, including voting in favor of any scheme of arrangement proposed by any member of the Group.  This includes voting in favor of the Scheme at the Scheme Meeting.

26.    The Financial Restructuring consists of:

    a.    the exchange of the SSNs in consideration for:

       (1)    the incurrence by a newly-incorporated direct subsidiary of the Parent and holding company for the remaining members of the Group (the "New HoldCo") of a £40 million nine-year subordinated shareholder loan on a cashless basis (the "Shareholder Loan"); and

       (2)    the issuance by the Parent of B ordinary shares (which shall be non-voting shares) representing 20% of the post-Financial Restructuring share capital of the Parent on a fully-diluted basis (subject to the allocation of the MIP set out in paragraph (f) below),

in each case to the holders of the SSNs (the "<u>SSN Holders</u>"), ratably in proportion to the amount of SSNs held by each SSN Holder (the "<u>SSN Exchange</u>");

b.      a seven-year new-money term loan which will be cash funded in an amount equal to £40 million (the "<u>New Money Term Loan</u>") shall be borrowed by the New HoldCo and provided by (i) SSN Holders who agreed to participate in the New Money Term Loan as contemplated by the Lock-Up Agreement on or prior to the end of a subscription period beginning on the date of the Lock-Up Agreement and ending on September 14, 2020 (as extended pursuant to the terms of the Lock-Up Agreement) and (ii) to the extent that not all SSN Holders participate in the New Money Term Loan, certain backstop parties that agreed to participate the New Money Term Loan pursuant to a backstop letter dated 13 August 2020 (together, the "<u>New Money Lenders</u>");

c.      the Parent shall issue A ordinary shares (which shall be voting shares) representing 80% of the post-Financial Restructuring share capital of the Parent on a fully diluted basis (subject to the allocation of the MIP set out in paragraph (f) below) to the New Money Lenders ratably in proportion to their commitment under the New Money Term Loan;

d.      the RCF will be converted into a term loan, the termination date under the RCF shall be extended from June 25, 2021 to June 30, 2024, and certain other amendments to the RCF shall be made in accordance with the debt term sheet attached as Appendix B to the practice statement letter (the "<u>Debt Term Sheet</u>");

e.      the Operating Facilities shall be extended to June 30, 2023 and the aggregate commitment shall be increased to £70 million (which will be subject to certain step downs from June 30, 2021) and other amendments shall be made as set out in more detail under the Debt Term Sheet; and

f.      the existing management incentive plan will be replaced with a new management incentive plan (the "<u>MIP</u>") whereby certain of the management of the Group will be entitled to C ordinary shares of the Parent, which shall represent 5% of the post-Financial Restructuring ordinary share capital of the Parent on a fully diluted basis (and diluting the A ordinary shares of the Parent and the B ordinary shares of the Parent on a pro rata basis) and D ordinary shares of the Parent, which shall entitle holders to 2% of the equity value of the Group upon an exit above a threshold of £300,000,000 (and such entitlement shall dilute the entitlement of the A ordinary shares of the Parent and the B ordinary shares of the Parent on a pro rata basis) as more particularly set out in the Debt Term Sheet.

III.    **The Scheme**

27.    The primary objective of the Scheme will be to facilitate the implementation of the SSN Exchange and the Financial Restructuring with respect to the SSNs. The Scheme will alter the rights of the common depositary as holder of the SSNs, the Trustee, and the SSN Holders (collectively, the "Scheme Creditors").

28.    The Scheme will provide for:

a.    the SSN Exchange;

b.    each Scheme Creditor releasing (pursuant to the Scheme) any and all claims against the Debtor and each of the following (in each case, in their capacities as such):

- the Guarantors;

- the advisors to the Debtor, the Scheme Creditors and other Scheme parties in interest;

- the Information Agent;

- the Trustee;

- the Security Agent;

- the paying agent for the SSNs;

- the facility agent for the Shareholder Loan; and

- any other Scheme Creditor (or its nominee) or such Scheme Creditor's affiliated entities

in connection with the finance and security documents in respect of the SSNs (collectively, the "SSN Finance Documents"), the Scheme Creditors' claims against the Debtor in connection with the SSN Finance Documents, the negotiation and implementation of the Scheme and the Group's restructuring; and

c.    authority to the Security Agent to enter into the documentation relating to the Financial Restructuring on behalf of the lenders under the Shareholder Loan.

## IV.    Effectiveness of the Scheme

29.    For the Scheme to become effective in accordance with its terms and legally binding on the Debtor and the Scheme Creditors:

      a.    the Scheme must be approved by a majority in number (*i.e.*, more than 50%) representing at least 75% in value of each class of Scheme Creditors present and voting, either in person or by proxy, at the Scheme Meeting convened for the purpose of considering and, if thought fit, approving the Scheme;

      b.    the Scheme must be sanctioned by the High Court; and

      c.    an office copy of the High Court order sanctioning the Scheme must be delivered to the Registrar of Companies for England and Wales.

30.    If the Scheme becomes effective, it will affect all Scheme Creditors.  All Scheme Creditors (including those who did not vote in favor of the Scheme or those who did not vote at all) will be bound by the terms of the Scheme as a matter of English law, irrespective of the jurisdiction in which such Scheme Creditors resides or has their seat, along with the Debtor and the entities whose guarantee liabilities will be compromised under the Scheme as third parties.

## V.    Commencement of the English Proceeding under Part 26 of the Companies Act

31.    On September 2, 2020, Lucid Issuer Services Limited, the Debtor's information agent (the "Information Agent"), notified the Scheme Creditors of the date, time, and location of the convening hearing (the "Convening Hearing") regarding the Scheme through the website maintained by the Information Agent in respect of the Scheme (the "Scheme Website").  To implement the Scheme, on September 2, 2020, the Information Agent made available the practice statement letter, the applicable term sheets, and other documents relating to the Scheme (collectively, the "PSL") on the Scheme Website.  On September 18, 2020, the Debtor filed an application under Part 26 of the Companies Act, thereby commencing the English Proceeding and requesting that the High Court approve the Debtor's request to convene the Scheme Meeting of the Scheme Creditors.

32.     On September 23, 2020, the High Court held the Convening Hearing.   On September 24, 2020, the High Court entered an order (the "Convening Order") authorizing the Debtor to convene the Scheme Meeting on October 16, 2020.   On September 24, 2020, the Information Agent published the Scheme and related documents on the Scheme Website.

33.     The Scheme and accompanying documents contemplate that the Debtor will seek recognition of the Scheme under chapter 15 of title 11 of the United States Code (the "Bankruptcy Code").    To that end, the Convening Order approved the appointment of the Foreign Representative and authorized the Foreign Representative to seek chapter 15 recognition of the English Proceeding.

34.     A notice of the Scheme Meeting, together with the Scheme and the Explanatory Statement, has been made available to the Scheme Creditors.  Following the Scheme Meeting and upon receiving the necessary votes in favor of the Scheme, the High Court will conduct a hearing to consider sanctioning (*i.e.*, approval) of the Scheme on or around October 23, 2020 (the "Sanction Hearing").  The Debtor requests that the relief requested herein be heard on October 26, 2020 or as soon as practicable thereafter subject to the Court's availability.

## BASIS FOR RELIEF

### I.      The Debtor Is Eligible to Be a "Debtor" Under Chapter 15 of the Bankruptcy Code

35.     The Debtor qualifies as a "debtor" as that term is defined in section 1502(a)(1) of the Bankruptcy Code because it is an "entity," which includes corporations.  *See* 11 U.S.C. §§ 101(15) (definition of "entity," which includes a "person") and 101(41) (definition of "person," which includes a "corporation").  The Debtor is incorporated in England and Wales as a public limited company, which is a corporation under English law.  *See* Sum Declaration ¶¶ 1, 2.

36.     The Debtor has property in the United States for purposes of being eligible under section 109(a) of the Bankruptcy Code, which requires that a debtor must either reside or have a

domicile, a place of business, or property in the United States. 11 U.S.C. § 109(a); *see Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013) (holding that section 109(a) applies to chapter 15 debtors).  Section 109(a) of the Bankruptcy Code does not require a specific quantum of property in the United States, nor does it state when or for how long that property must be located within the United States.  *See In re Berau Capital Res. Pte. Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015).  Accordingly, courts in this District have required that the debtor have only nominal property in the United States to be eligible to file a chapter 15 case.  *See, e.g.*, *In re B.C.I. Finances Pty Ltd.*, 583 B.R. 288, 293 (Bankr. S.D.N.Y. 2018) ("[C]ourts that have construed the 'property' requirement in Section 109 with respect to foreign corporations and individuals have found the eligibility requirement satisfied by even a minimal amount of property located in the United States.") (citation and internal quotation omitted); *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 249 (S.D.N.Y. 2004) ("For a foreign corporation to qualify as a debtor under Section 109, courts have required only nominal amounts of property to be located in the United States, and have noted that there is 'virtually no formal barrier' to having federal courts adjudicate debtors' bankruptcy proceedings."); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) ("There is no statutory requirement as to the property's minimum value.").

37.    Here, the Debtor meets the flexible threshold for having property in the United States as required under section 109(a) because it owns the funds in the Retainer Account that are held in New York.  *See, e.g.*, *In re Poymanov*, 571 B.R. 24, 30 (Bankr. S.D.N.Y. 2017) ("A debtor's funds held in a retainer account in the possession of counsel to a foreign representative constitute property of the debtor in the United States and satisfy the eligibility requirements of section 109(a)."); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372-374 (Bankr. S.D.N.Y. 2014)

(noting the "line of authority that support the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States" and holding that cash in a client trust account maintained by U.S. counsel to the foreign representative satisfied section 109(a). Moreover, the Debtor is issuer under the Indenture, which is governed by New York law and contains a New York forum selection clause. *See, e.g., In re Avanti Communs. Grp. plc*, 582 B.R. at 613 (holding that debt documents governed by New York law and containing New York forum selection clauses satisfied the eligibility requirements under section 109(a)); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017) (same); *In re Berau*, 540 B.R. at 82-84 (same). Accordingly, the Debtor is eligible to be a chapter 15 debtor.

## II.    The English Proceeding Is a Foreign Main Proceeding

38.    The English Proceeding is entitled to recognition as a foreign main proceeding under chapter 15 of the Bankruptcy Code. Section 1517(a) of the Bankruptcy Code provides that, subject to section 1506 of the Bankruptcy Code, a court "shall" enter an order granting recognition of a foreign proceeding if:

> (1)    such foreign proceeding is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code;
>
> (2)    the foreign representative applying for recognition is a person or body; and
>
> (3)    the petition meets the requirements of section 1515 of the Bankruptcy Code.

11 U.S.C. § 1517(a); *see* H.R. Rep. No. 109-31, pt. 1, at 113 (2005) ("The decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings . . . [t]he requirements of this section... are all that must be fulfilled to attain recognition."). Section 1517(b) of the Bankruptcy Code provides that a foreign proceeding "shall be recognized . . . (1) as a foreign main proceeding if it is pending in the country where the debtor

16

has the center of its main interests." 11 U.S.C. § 1517(b)(1).  Here, all of the requirements for

recognition of the English Proceeding as a foreign main proceeding are satisfied.

### A.      The English Proceeding Constitutes a "Foreign Proceeding"

39.      The English Proceeding is a "foreign proceeding" under chapter 15 of the

Bankruptcy Code.  Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets and
> affairs of the debtor are subject to control or supervision by a foreign
> court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).  Based on this definition, courts have held that a "foreign proceeding" is one:

a.      in which acts and formalities are set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;

b.      that has either a judicial or an administrative character;

c.      that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

d.      that is located in a foreign country;

e.      that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.      in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

g.      that is for the purpose of reorganization or liquidation.

*See Armada (Singapore) Pte Ltd. v. Shah* (*In re Ashapura Minechem Ltd.*), 480 B.R. 129, 136

(S.D.N.Y. 2012) (*citing In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In*

*re Overnight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525 (Bankr. S.D.N.Y. 2008)

(discussing factors).

40.    Courts in this District and elsewhere routinely recognize schemes of arrangement

under UK law as foreign proceedings in chapter 15 cases.  *See, e.g.*, *In re New Look Secured Issuer*

*plc*, No. 19-11005 (SMB) [Docket No. 14] (Bankr. S.D.N.Y. May 3, 2019); *In re Noble Grp. Ltd.*,

No. 18-13133 (SMB) [Docket No. 30] (Bankr. S.D.N.Y. Nov. 15, 2018); *In re Stripes US Holding,*

*Inc.*, No. 18-12388 (CSS) (Bankr. D. Del. Nov. 13, 2018); *In re Lehman Bros. Int'l (Europe) (in*

*administration)*, No. 18-11470 (SCC) [Docket No. 15] (Bankr. S.D.N.Y. June 19, 2018); *In re*

*Avanti Commns. Grp. plc*, No. 18-10458 (MG) [Docket No. 15] (Bankr. S.D.N.Y. Apr. 6, 2018);

*In re Bibby Offshore Servs. Plc*, No. 17–13588 (MG) [Docket No. 16] (Bankr. S.D.N.Y. Jan. 18,

2018); *In re Metinvest B.V.*, No. 17-10130 (LSS) [Docket No. 19] (Bankr. D. Del. Feb. 8, 2017);

*In re DTK Fin. (plc)*, No. 16-13521 (SHL) [Docket No. 15] (Bankr. S.D.N.Y. Jan. 18, 2017); *In*

*re EnQuest PLC*, No. 16-12983 (MEW) [Docket No. 14] (Bankr. S.D.N.Y. Nov. 17, 2016); *In re*

*Abengoa Concessions Inv. Ltd.*, No. 16-12590 (KJC) [Docket No. 19] (Bankr. D. Del. Dec. 8,

2016); *In re YH Ltd.*, No. 16-12262 (SCC) [Docket No. 14] (Bankr. S.D.N.Y. Sep. 8, 2016); *In re*

*Codere Fin. (UK) Ltd.*, No. 15-13017 (JLG) [Docket No. 16] (Bankr. S.D.N.Y. Dec. 22, 2015);

*In re Towergate Fin. plc*, No. 15-10509 (SMB) [Docket No. 16] (Bankr. S.D.N.Y. Mar. 27, 2015);

*In re New World Resources N.V.*, No. 14-12226 (SMB) [Docket No. 20] (Bankr. S.D.N.Y. Sept.

9, 2014); *In re Zlomrex Int'l Fin. S.A.*, No. 13-14138 (SHL) [Docket No. 17] (Bankr. S.D.N.Y.

Jan. 31, 2014); *In re Magyar Telecom B.V.*, No 13-13508 (SHL) [Docket No. 26] (Bankr. S.D.N.Y.

Dec. 11, 2013).

41.    The Declarations provide the factual basis to support a finding that the Debtor's

English Proceeding constitutes a "foreign proceeding" under section 101(23).

42.    First, the English Proceeding is a proceeding commenced pursuant to Part 26 of the

Companies Act, an English law that governs corporate reorganizations and that is frequently used

in a restructuring context.  *See* Sum Declaration ¶¶ 8-10.  For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets."  *In re Betcorp Ltd.*, 400 B.R. at 278.

43.    Second, the proceeding is "judicial," as it is commenced before the High Court and thereafter is subject to the supervision of the High Court.  *See* Sum Declaration ¶ 13.  The High Court entered the Convening Order to commence the English Proceeding, and the Scheme must be approved by the High Court for it to be effective.  *See* Collyer Declaration ¶¶ 3, 24.  Therefore, the English Proceeding is a "judicial" proceeding.  *See In re Avanti Communs. Grp. plc*, 582 B.R. at 613 (finding that an English proceeding "is a judicial proceeding—it required the Convening Order to convene the Debtor's Scheme Meeting and required the Sanction Order for the Scheme to be sanctioned, each issued by the UK Court."); *see also In re ABC Learning Ctrs. Ltd.,* 445 B.R. 318, 328 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3rd Cir. 2013) (a proceeding is judicial when a "[c]ourt exercises its supervisory powers.").

44.    Third, the English Proceeding is collective in nature, as it affects all Scheme Creditors and requires approval by a majority in number of the voting Scheme Creditors representing at least 75% in amount of the Scheme claims voted in each class of creditors in order for the Scheme to proceed.  *See* Sum Declaration ¶ 15.  The Scheme is intended to benefit creditors based on their collective rights, rather than to benefit any single creditor alone.  *Id*. ¶ 11.  Accordingly, the Scheme is collective in nature.  *See In re Avanti Communs. Grp. plc*, 582 B.R. at 614 (finding that an English proceeding "fits the definition of a 'foreign proceeding' . . . as a collective proceeding . . . ."); *In re Betcorp*, 400 B.R. at 281 (a proceeding is collective where it "considers the rights and obligations of all creditors" in contrast to a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor").

45.     Fourth, the English Proceeding is being administered by the High Court in London, England.  *See* Sum Declaration ¶ 10.

46.     Fifth, the English Proceeding is administered under Part 26 of the Companies Act, which is an English law that governs, among other things, the adjustment of creditors' rights and the Debtor's liabilities, as contemplated by the Scheme that the Debtor is seeking to implement with the approval of the High Court.  *See* Sum Declaration ¶ 9.  Therefore, the English Proceeding is conducted under a law related to insolvency or the adjustment of debt.  *See In re Avanti Communs. Grp. plc*, 582 B.R. at 614 ("The UK Proceeding is pending in a foreign country under a law that allows companies to effectuate binding compromises or arrangements, including the restructuring of liabilities owed to their members or creditors (or any class of them) (*i.e.*, Part 26 of the Companies Act) and is therefore an 'adjustment of debt.'"); *see also In re Millard*, 501 B.R. 644, 649-50 (Bankr. S.D.N.Y. 2013) ("[t]he words 'under a law relating to insolvency or adjustment of debt' [in section 101(23)] emphasize that chapter 15 is available not only to debtors that are technically insolvent or facing liquidation, but also to debtors who are in financial distress and may need to reorganize.").

47.     Sixth, pursuant to Part 26 of the Companies Act, the Debtor's assets and affairs are subject to the supervision of the High Court during the pendency of the English Proceeding.  *See* Sum Declaration ¶ 8.

48.     Seventh, the objective of the English Proceeding is reorganization, as the English Proceeding will enable the Debtor to deleverage its balance sheet through a global restructuring of its debt obligations.  *Id*. ¶ 2; *see In re Overnight & Control Comm'n of Avánzit, S.A.*, 385 B.R. at 533-34 (recognizing a "financial restructuring" as a "reorganization" for purposes of the sections 101(23) and 1517 analysis).

49.     Accordingly, the Foreign Representative respectfully requests that the Court find
that the English Proceeding constitutes a "foreign proceeding."

**B.     The English Proceeding Is a "Foreign Main Proceeding"**

50.     The English Proceeding also qualifies as a "foreign main proceeding," which is
defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor
has the center of its main interests." 11 U.S.C. § 1502(4).   The relevant time period to determine
the location of a debtor's "center of main interests" ("COMI") is the date on which the chapter 15
petition is filed.   *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d
127, 137 (2d Cir. 2013).

51.     While the Bankruptcy Code does not expressly define COMI, it provides that, in
the absence of evidence to the contrary, a debtor's registered office is presumed to be its COMI.
*See* 11 U.S.C. § 1516(c); *see also In re Gerova Fin.  Grp., Ltd.*, 482 B.R. 86, 91 (Bankr. S.D.N.Y.
2012); *In re Tri-Continental Exch.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006) ("In effect, the
registered office . . . is evidence that is probative of, and that may in the absence of other evidence
be accepted as proxy for, 'center of main interest.'").  Here, the Debtor's registered office is located
in London, England.   *See* Collyer Declaration ¶ 10.   Accordingly, the Debtor is entitled to the
statutory presumption that its COMI is located in England.

52.     In addition, courts consider the following factors relevant to the determination of a
debtor's COMI:

> the location of the debtor's headquarters; the location of those who
> actually manage the debtor...; the location of the debtor's primary
> assets; the location of the majority of the debtor's creditors or of a
> majority of the creditors who would be affected by the case; and/or
> the jurisdiction whose law would apply to most disputes.

*In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 654 (Bankr. S.D.N.Y. 2016) (internal
citations omitted); *see In re Fairfield Sentry Ltd.*, 714 F.3d at 130 ("Among other factors that may

be considered [in determining COMI] are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes."); *In re Avanti Communs. Grp. plc*, 582 B.R. at 614 (concluding that the UK constituted the debtor's "center of main interests" where "the Debtor is incorporated in the UK and its registered offices and headquarters are in London.").

53.     Under all of the relevant criteria, the Debtor's COMI is located in England.  The Debtor's registered office and headquarters are located in England, as is the Debtor's senior management (including its Non-Executive Chairman, Chief Financial Officer and other senior members of management).  *See* Collyer Declaration ¶ 10.  All of the Debtor's key corporate activities, including meetings of the board of directors, occur in England.  *Id*.  The Debtor's debt documents and other public filings made by the Debtor typically state that the Debtor is incorporated in England and Wales and that its registered office is located in the UK.  *Id*.

54.     Accordingly, the Debtor's COMI in England is well-known and readily ascertainable by third parties.  *See In re Fairfield Sentry Ltd.*, 714 F.3d at 130 ("The relevant principle [to determine a debtor's COMI] is that COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties...."); *In re OAS S.A.*, 533 B.R. 83, 103 (Bankr. S.D.N.Y. 2015) (chapter 15 debtor's COMI was readily ascertainable as Brazil, among other reasons, because note purchasers understood that their investment was in a Brazil-based business and expected to receive payment from cash generated by a Brazilian entity).  As the English Proceeding is pending in the Debtor's COMI, the English Proceeding should be recognized as a foreign main proceeding.

**III.     The Foreign Representative Satisfies the Requirements of a "Foreign Representative" Under Section 101(24) of the Bankruptcy Code**

55.     For recognition under chapter 15, a foreign proceeding must also have a foreign representative.  *See* 11 U.S.C. § 1517(a)(2).  The Foreign Representative submits that this Chapter

15 Case was commenced by a duly appointed and authorized "foreign representative" within the

meaning of section 101(24) of the Bankruptcy Code.  Section 101(24) of the Bankruptcy Code

provides as follows:

> The term "foreign representative" means a person or body, including
> a person or body appointed on an interim basis, authorized in a
> foreign proceeding to administer the reorganization or the
> liquidation of the debtor's assets or affairs or to act as a
> representative of such foreign proceeding.

11 U.S.C. § 101(24).

56.    Moreover, the Debtor has commenced the English Proceeding, and the High Court

has approved the appointment of the Foreign Representative in the Convening Order entered by

the High Court following the Convening Hearing held on September 23, 2020.  *See* Collyer

Declaration ¶ 3.  Thus, Richard John Collyer has met the requirements of section 101(24) of the

Bankruptcy Code and is the Debtor's "foreign representative" as defined thereunder.  *See In re*

*SPhinX, Ltd.*, 351 B.R. 103, 116-17 (Bankr. S.D.N.Y. 2006) *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007)

(noting that the foreign representatives had submitted a "copy of the Cayman Court's order

appointing them to administer the Debtors' winding up under the Companies Law and authorizing

their commencement of these chapter 15 cases, thereby satisfying Bankruptcy Code

sections 101(24) and 1515(c).").  In addition, on March 19, 2019, by written resolution, the board

of directors of the Debtor appointed the Foreign Representative to act on behalf of the Debtor in

this Chapter 15 Case.  *See In re Cell C Proprietary Ltd.* 571 B.R. 542, 553 (Bankr. S.D.N.Y. 2017)

(recognizing that "a board of directors may authorize a person to act as the corporation's foreign

representative in a chapter 15 proceeding"); *see also In re OAS S.A.*, 533 B.R. at 98 (holding that

individual appointed by board qualified as a "foreign representative"); *In re Compania Mexicana*

*de Aviacion, S.A. de C.V.*, No. 10-14182 (MG), 2010 WL 10063842 at *2 (Bankr. S.D.N.Y. Nov.

8, 2010) (same).

**IV.    The Petition Was Properly Filed and Satisfied the Requirements of Section 1515 of the Bankruptcy Code**

57.    The Foreign Representative duly and properly commenced this Chapter 15 Case in accordance with sections 1504 and 1509 of the Bankruptcy Code, which require the filing of a petition for recognition under section 1515 of the Bankruptcy Code. *See* 11 U.S.C. §§ 1504, 1509(a).    In accordance with section 1515(b)(1) of the Bankruptcy Code, the Foreign Representative attached to the *Chapter 15 Petition for Recognition of a Foreign Proceeding* (the "Voluntary Petition") [Docket No. 1] a certified copy of the Convening Order commencing the English Proceeding and appointing Richard John Collyer as foreign representative with respect thereto.    In accordance with section 1515(c) of the Bankruptcy Code, the Foreign Representative also submitted a declaration attached to the Voluntary Petition containing a statement identifying the English Proceeding as the only known pending "foreign proceeding" with respect to the Debtor.    Accordingly, the requirements of section 1515 have been satisfied.

**V.    The Debtor Is Entitled to Automatic Relief Under Section 1520 of the Bankruptcy Code**

58.    Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign main proceeding, including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property located within the territorial jurisdiction of the United States. *See* 11 U.S.C. 1520(a).

59.    Given that the protections set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding under section 1517, the Foreign Representative respectfully submits that no further showing is required to the extent the Court recognizes the English Proceeding as a foreign main proceeding.

## VI.    Certain Additional Relief Upon Recognition Is Both Necessary and Appropriate to Implement the English Proceeding and Should be Granted

60.    In addition to recognition of the English Proceeding as a foreign main proceeding, the Foreign Representative submits that any relief sought in the Petition that does not flow automatically from section 1520(a), including (a) enforcement of the Scheme and the Releases contained therein and the Sanction Order within the territorial jurisdiction of the United States and (b) approval of the Injunction, is authorized under sections 105(a), 1507, and 1521 of the Bankruptcy Code and is consistent with well-established principles of international comity.

61.    Chapter 15 of the Bankruptcy Code empowers "courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity." *In re Rede Energia S.A.*, 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014) (*citing In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333-34 (S.D.N.Y. 2008)); *see In re SPhinX, Ltd.*, 351 B.R. at 112 ("chapter 15 maintains – and in some respects enhances – the 'maximum flexibility' . . . that section 304 provided bankruptcy courts in handling ancillary cases in light of principles of international comity and respect for the laws and judgments of other nations.") (internal citations omitted); *see also* 11 U.S.C. § 1501 (stating that the purpose of chapter 15 is to provide mechanisms for cooperation and comity between courts dealing with cross-border insolvency cases).  As this Court has explained:

> While recognition of the foreign proceeding turns on the objective criteria under § 1517, relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity.  Once a case is recognized as a foreign main proceeding, chapter 15 specifically contemplates that the court will exercise its discretion consistent with the principles of comity.

*In re Sino-Forest Corp.*, 501 B.R. 655, 664 (Bankr. S.D.N.Y. 2013) (internal citations and quotations omitted).  Here, the Court should exercise its discretion under sections 1507 and 1521 of the Bankruptcy Code, consistent with the principles of comity, to recognize and enforce the

Scheme, including the Releases, and the Sanction Order and approve the Injunction.[7] *See, e.g.*, *In re Avanti Communs. Grp. plc*, 582 B.R. at 616 ("Cases have held that in the exercise of comity that appropriate relief under section 1521 or additional assistance under section 1507 may include recognizing and enforcing a foreign plan confirmation order.").

**A.     The Scheme and the Sanction Order Should Be Recognized and Enforced**

**1.     Recognition and Enforcement of the Scheme and the Sanction Order Is Warranted Under Section 1521 of the Bankruptcy Code**

62.     Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors[,]" including any relief that may be available to a trustee or debtor-in-possession, subject to certain exceptions that do not apply here.  11 U.S.C. § 1521(a); *In re Daebo Int'l Shipping Co., Ltd.*, 543 B.R. 47, 52–53 (Bankr. S.D.N.Y. 2015); *Hosking v. TPG Capital Mgmt. (In re Hellas Telecomms. (Lux.) II SCA)*, 535 B.R. 543, 586 (Bankr. S.D.N.Y. 2015) ("a foreign representative may obtain relief available to a trustee under the Bankruptcy Code...."); *see also In re ABC Learning Centres Ltd.*, 728 F.3d at 306 ("Foreign Representatives can access U.S. courts to request enforcement of orders of the foreign proceeding and to stay actions against foreign debtors' property in the United States."); *In re Energy Coal S.P.A.*, 582 B.R. 619, 628 (Bankr. D. Del. 2018) ("Section 1521 contains a non-exhaustive list of types of relief that may be appropriate in a given proceeding.").

63.     Recognition and enforcement of the Scheme and the Sanction Order is "appropriate relief" under section 1521(a) of the Bankruptcy Code because that relief is necessary to ensure that

---

[7]  The relief requested herein is also consistent with section 1525(a) of the Bankruptcy Code, which provides that "[c]onsistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee." 11 U.S.C. § 1525(a).

the Scheme, which has the support of the vast majority of Scheme Creditors, can be implemented without disruption or adverse actions being brought against the Debtor or its assets in the United States.  Specifically, enforcement of the Scheme, including the Releases contained therein, and the Sanction Order is appropriate because certain Scheme Creditors may seek to obtain judgments in the United States against the Debtor under the Indenture to obtain better treatment than they will receive under the Scheme.  If those Scheme Creditors can effectively evade the terms of the Scheme by commencing actions in the United States, the purpose of the Scheme could be thwarted, and the Debtor would be required to defend those proceedings at considerable expense to the Debtor, its creditors and the broader Group.

64.     Courts in this District and elsewhere routinely grant recognition and enforcement of foreign court orders approving a foreign debtor's scheme of arrangement.  *See, e.g.*, *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 167-68 (3d Cir. 2018) (affirming bankruptcy court order enforcing releases in foreign debtor's Canadian plan of arrangement); *In re Avanti Communs. Grp. plc*, 582 B.R. at 619 (recognizing and enforcing UK scheme and order of English court sanctioning same); *In re Cell C Proprietary Ltd.*, 571 B.R. at 554 (recognizing and enforcing order of South African Court sanctioning a scheme of arrangement); *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) [Docket No. 14] (Bankr. S.D.N.Y. May 3, 2019); *In re Lehman Bros. Int'l (Europe) (in administration)*, No. 18-11470 (SCC) [Docket No. 15] (Bankr. S.D.N.Y. June 19, 2018) (recognizing and enforcing UK scheme and order of English court sanctioning same); *In re Bibby Offshore Servs. Plc*, No. 17–13588 (MG) [Docket No. 16] (Bankr. S.D.N.Y. Jan. 18, 2018) (same); *In re Ocean Rig UDW Inc.*, No. 17-10736 (MG) [Docket No. 153] (Bankr. S.D.N.Y. Sept. 20, 2017) (recognizing and enforcing Cayman schemes and orders of Cayman court sanctioning same); *In re Boart Longyear Ltd.*, No. 17-11156 (MEW) [Docket No. 45] (Bankr. S.D.N.Y. Aug.

30, 2017) (recognizing and enforcing order of Supreme Court of New South Wales sanctioning Australian schemes of arrangement); *In re EnQuest PLC*, No. 16-12983 (MEW) [Docket No. 14] (Bankr. S.D.N.Y. Nov. 17, 2016) (recognizing and enforcing UK scheme and UK scheme sanction order); *In re YH Ltd.*, No. 16-12262 (SCC) [Docket No. 14] (Bankr. S.D.N.Y. Sept 8, 2016) (recognizing and enforcing UK scheme and order of English court sanctioning same).

65.    Further, the Releases are an integral part of the Scheme and are consistent with English law. "[T]hird-party non-debtor releases are common in schemes sanctioned under U.K. law." *In re Avanti Communs. Grp. plc*, 582 B.R. at 618. Moreover, courts in this District and elsewhere routinely enforce third-party releases in foreign proceedings. *See, e.g.*, *In re Arctic Glacier Int'l, Inc.*, 901 F.3d at 167-68; *In re Avanti Communs. Grp. plc*, 582 B.R. at 618 (recognizing and enforcing UK scheme and sanction order that provided third-party non-debtor guarantor releases); *In re Ocean Rig UDW Inc.*, 570 B.R. at 702 (recognizing and enforcing scheme of arrangement that released affiliate guarantees); *In re Sino–Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (enforcing foreign order containing third-party releases); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) (concluding that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian Orders, even if those provisions could not be entered in a plenary chapter 11 case."); *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) [Docket No. 14] (Bankr. S.D.N.Y. May 3, 2019) (recognizing and enforcing UK scheme and sanction order that provided third-party releases); *In re Lehman Bros. Int'l (Europe) (in administration)*, No. 18-11470 (SCC) [Docket No. 15] (Bankr. S.D.N.Y. June 19, 2018) (same); *In re Bibby Offshore Servs. Plc*, No. 17–13588 (MG) [Docket No. 16] (Bankr. S.D.N.Y. Jan. 18, 2018) (same).

66.     Here, the Releases pertain to claims of the Scheme Creditors against the Debtor and guarantors of the SSNs for the full amount of the SSNs in connection with the SSN Exchange. *See* Collyer Declaration ¶ 25.  The Releases are narrow in scope and are consistent with the types of releases and exculpations that are generally provided (and approved) in chapter 11 cases.  The only parties giving the Releases under the Scheme are Scheme Creditors, and those Releases will only become effective if the Scheme is approved by a majority in number of voting Scheme Creditors representing at least 75% in amount of Scheme claims voted. *See id.*; Sum Declaration ¶ 15.  The Releases, therefore, are narrowly tailored to achieve the purpose of the Scheme—to facilitate the SSN Exchange and release the Debtor and other members of the Group from certain guarantee obligations and claims under the SSNs.

67.     The Foreign Representative, therefore, respectfully requests that the Court recognize and enforce the Scheme, including the Releases contained therein, and Sanction Order to ensure that the Scheme is successfully implemented across jurisdictions, including the United States.

**2.      Recognition and Enforcement of the Scheme and the Sanction Order is Also Authorized Under Section 1507 of the Bankruptcy Code**

68.     The Court may also grant relief pursuant to section 1507, which authorizes the Court to provide "additional assistance" to a foreign representative under the Bankruptcy Code or other U.S. law at any time after recognition.  *See* 11 U.S.C. § 1507(a).  Recognition and enforcement of the Sanction Order is authorized as "additional assistance" under section 1507 of the Bankruptcy Code.  Under section 1507(b) of the Bankruptcy Code, in considering a request for additional assistance consistent with principles of comity, the Court also considers whether the requested relief will ensure:

(1)     just treatment of all holders of claims against or interests in the debtor's property;

(2)     protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3)     prevention of preferential or fraudulent dispositions of property of the debtor;

(4)     distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5)     if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

69.     The Foreign Representative submits that the additional assistance sought here does not run afoul of any of the principles set forth in section 1507(b) of the Bankruptcy Code. Section 1507(b)(1) is satisfied because the Companies Act provides a comprehensive procedure for the orderly compromise of claims with equal application to all Scheme Creditors. *See* Sum Declaration ¶ 11; *In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 170 (2d Cir. 2008) (*quoting* 2 COLLIER ON BANKRUPTCY ¶ 304.08 (15th ed. 2007) ("The just treatment factor is satisfied upon a showing that the applicable law provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors.")). Section 1507(b)(2) is satisfied because the Scheme does not create additional burdens for U.S. holders of SSNs. Section 1507(b)(3) is inapplicable because there are no preferential or fraudulent dispositions of property.

70.     Section 1507(b)(4) is satisfied because the Scheme provides for uniform treatment of all Scheme Creditors—the SSN Exchange and the Parent's issuance of B ordinary shares will be implemented ratably in proportion to the amount of the SSNs that each Scheme Creditor holds. *See* Collyer Declaration ¶ 22. Such treatment is substantially similar to the treatment that separate classes would receive under chapter 11. *See Telecom Arg.*, 528 F.3d at 170 n.9 (noting that "the priority rules of a foreign jurisdiction need not be identical to those of the United States") (*citing*

*Schimmelpenninck v. Byrne* (*In re Schimmelpenninck*), 183 F.3d 347, 364 (5th Cir. 1999)); *In re*

*Rede Energia S.A.*, 515 B.R. at 97; *In re Manning*, 236 B.R. 14, 25 (9th Cir. B.A.P. 1999) (citation

omitted). Importantly, to approve the Scheme, the High Court must find that the creditors were

fairly represented and that Scheme Creditors' approval of the Scheme was reasonable. *See* Sum

Declaration ¶ 18. Accordingly, the distributions under the Scheme are consistent with U.S. law.

Section 1507(b)(5) is inapplicable because the Debtor is not an individual.

### 3. The Scheme and the Sanction Order Are Entitled to Recognition and Enforcement as a Matter of Comity

71.     In determining whether to recognize and enforce a foreign judgment, courts also

consider general comity principles. *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R.

at 698 (*citing Hilton v. Guyot*, 159 U.S. 113, 166 (1895); *Pariente v. Scott Meredith Literary*

*Agency, Inc.*, 771 F. Supp. 609, 615 (S.D.N.Y. 1991)). In *Hilton v. Guyot*, the Supreme Court held

that if the foreign court provides "a full and fair trial abroad before a court of competent

jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary

appearance of the defendant, and under a system of jurisprudence likely to secure an impartial

administration of justice between the citizens of its own country and those of other countries, and

there is nothing to show either prejudice in the court, or in the system of laws under which it is

sitting," the foreign judgment should be enforced and not "tried afresh." *Hilton*, 159 U.S. at

202-03.

72.     "Federal courts generally extend comity whenever the foreign court had proper

jurisdiction and enforcement does not prejudice the rights of United States citizens or violate

domestic public policy." *In re Atlas Shipping A/S*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009)

(citations omitted); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico S.A.*, 412 F.3d

418, 424 (2d Cir. 2005) ("[D]eference to the foreign court is appropriate so long as the foreign

proceedings are procedurally fair and... do not contravene the laws or public policy of the United States."); *Universal Cas. & Sur. Co. v. Gee (In re Gee)*, 53 B.R. 891, 902, 904 (Bankr. S.D.N.Y. 1985) (noting that if the bankruptcy court is satisfied with the procedural fairness of the foreign proceeding, it "should not sit as an appellate court over the foreign proceedings.").

73.    Extending comity to orders confirming foreign plans of reorganization is particularly significant given the importance of "assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *Atlas Shipping*, 404 B.R. at 737 (internal citation omitted); *see also Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly and systematic manner, rather than in a haphazard, erratic or piecemeal fashion.").

74.    "[P]rinciples of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of [provisions in foreign court orders], even if those provisions could not be entered in a plenary chapter 11 case." *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 696. The "relief granted in [a] foreign proceeding and the relief available in a U.S. proceeding need not be identical[,]" and U.S. bankruptcy courts are "not required to make an independent determination about the propriety of individual acts of a foreign court." *Id*. at 697 (*citing In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 391 (Bankr. S.D.N.Y. 2004)). Rather, "[a]s long as the manner in which the scheme acquired statutory effect comports with our notions of procedural fairness, comity should be extended to it." *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 238 B.R. 25, 56–61 (Bankr. S.D.N.Y. 1999), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002) (citations omitted).

75.     Here, the United States and the UK share the same common law traditions and fundamental principles of law.  All Scheme Creditors will have a full and fair opportunity to vote on the Scheme at the Scheme Meeting, in each case, after ample notice and adequate disclosure of the Scheme terms.  *See* Sum Declaration ¶¶ 14, 15.  Specifically, on September 2, 2020, the Information Agent made the PSL available on the Scheme Website.  *See* Collyer Declaration ¶ 26.  On September 2, 2020, the Information Agent notified the Scheme Creditors of the date, time, and location of the Convening Hearing regarding the Scheme through the Scheme Website so that the Scheme Creditors could attend the Convening Hearing and raise objections or responses to the proposed classification of Scheme Creditors.  *See id.*; Sum Declaration ¶ 10.  On September 18, 2020, the Debtor filed the application under Part 26 of the Companies Act requesting that the High Court convene the Scheme Meeting.  *See* Collyer Declaration ¶ 3.  The Information Agent published the Scheme and related documents on the Scheme Website on September 24, 2020 and notified the Scheme Creditors that these documents were available there.  *Id.* ¶ 26.  The published information included copies of the Scheme, notice of the Scheme Meeting and the Explanatory Statement which, like a disclosure statement in a chapter 11 case, provides detailed information on the effects of the Scheme for Scheme Creditors to enable those Scheme Creditors to make a reasonable decision about whether to vote in favor of the Scheme.  *Id.* ¶ 27.  It also describes the Releases being provided under the Scheme.  *Id.*  Here, no creditors objected to any aspect of the Scheme at the Convening Hearing.  *Id.*

76.     All Scheme Creditors have the right to vote on the Scheme at the Scheme Meeting convened by order of the High Court.  Sum Declaration ¶ 15.  The Scheme must be approved by the requisite percentages of the number of creditors and total value.  *Id.*  In addition, Scheme Creditors are entitled to appear and object to the Scheme at the Convening Hearing and Sanction

Hearing.  *Id.* ¶¶ 15, 17.  The High Court retains independent and final authority to review and approve the Scheme before implementation.  *Id.* ¶ 19.  All creditors will have had a full and fair opportunity to be heard in the English Proceeding under a sophisticated insolvency regime before an impartial court in accordance with fundamental standards of due process.  Accordingly, the Court should recognize and enforce the Scheme and the Sanction Order (including the Releases), consistent with the principles of comity.

> **4.      Recognition of the Scheme and Sanction Order, Including the Releases, Comports with the Bankruptcy Code and is Consistent with U.S. Public Policy**

77.      Although section 1506 places a limitation on relief available under chapter 15 if such relief is manifestly contrary to U.S. public policy, this exception is narrowly construed.  *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 697 (*citing In re Ephedra Prods.  Liab. Litig.*, 349 B.R. 333 (S.D.N.Y. 2006)); *see also In re Poymanov*, 571 B.R. at 38 (noting that the public policy exception "is to be applied sparingly"); *In re OAS S.A.*, 533 B.R. at 103 (recognizing that the public policy exception "requires a narrow reading") (internal citation and quotations omitted).  "[T]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States."  *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 697 (internal citation omitted).

78.      Nothing in the Scheme or the Sanction Order (including the Releases) is manifestly contrary to U.S. public policy.  The Scheme provides for a comprehensive resolution of the Debtor's obligations under the SSNs, and the Shareholder Loan and the B ordinary shares to the Parent (representing 20% of the post-Financial Restructuring share capital of the Parent on a fully diluted basis) will be distributed in proportion to the amount of the SSNs.  This result is substantially similar to the result that would be achieved under the Bankruptcy Code.  The High Court's exercise of jurisdiction over, and supervision of, the Debtor was proper under the

34

Companies Act, which provides for a fundamentally fair process that "accords with the source of civilized jurisprudence." *In re Rede Energia*, 515 B.R. at 98. And this Court has repeatedly held that third-party releases in foreign restructuring plans are not manifestly contrary to public policy. *See, e.g., In re Avanti Communs. Grp. plc*, 582 B.R. at 618 ("[S]chemes of arrangements sanctioned under UK law that provide third-party non-debtor guarantor releases should be recognized and enforced under chapter 15 of the Bankruptcy Code."); *In re Sino-Forest Corp.*, 501 B.R. at 665 (enforcing foreign order containing third-party releases, noting that, in the Second Circuit, "where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy"). Accordingly, the public policy exception does not apply.

**B.** **Granting a Permanent Injunction Is Necessary to Enforce the Scheme and the Sanction Order**

79.     To the extent not otherwise stayed under sections 1520 and 362 of the Bankruptcy Code, the Foreign Representative also seeks the Injunction to prevent any parties from attempting to continue or commence actions or assert claims in the United States against the Debtor or its property inconsistent with the Scheme or the Sanction Order. The Injunction requested herein is necessary to ensure that the Scheme can be implemented successfully and will ensure that no party may take actions adverse to the Debtor or its property located within the territorial jurisdiction of the United States in an effort to gain an unfair advantage over other parties in interest subject to the Scheme.

80.     This Court has the authority to grant the Injunction in this Chapter 15 Case. *See, e.g., Can. S. Ry. Co. v. Gebhard*, 109 U.S. 527, 539 (1883) (actions brought in the United States by bondholders who did not participate in the Canadian insolvency proceedings of a Canadian railroad could not be maintained, even though the bonds were payable in New York); *In re Arctic*

*Glacier Int'l, Inc.*, 901 F.3d at 167-68 (giving *res judicata* effect to releases under foreign plan of arrangement); *In re Avanti Communs. Grp. plc*, 582 B.R. at 619 (permanently enjoining any action inconsistent with UK scheme, including scheme releases, and order of English court sanctioning same); *In re Energy Coal S.P.A.*, 582 B.R. at 628 (permanently enjoining collection or enforcement actions against the debtor in connection with recognition and enforcement of Italian plan and homologation order); *In re CGG S.A.*, 579 B.R. 716, 720 (Bankr. S.D.N.Y. 2017) (granting permanent injunctive relief in respect of French plan and order of French court approving same); *In re Metcalfe & Mansfield Alternative Inv.*, 421 B.R. at 700 (granting permanent injunctive relief in chapter 15 case in respect of Canadian plan); *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) [Docket No. 14] (Bankr. S.D.N.Y. May 3, 2019); (permanently enjoining any action inconsistent with UK scheme, including scheme releases); *In re Lehman Bros. Int'l (Europe) (in administration)*, No. 18-11470 (SCC) [Docket No. 15] (Bankr. S.D.N.Y. June 19, 2018) (same); *In re Bibby Offshore Servs. Plc*, No. 17–13588 (MG) [Docket No. 16] (Bankr. S.D.N.Y. Jan. 18, 2018) (same); *In re YH Ltd.*, No. 16-12262 (SCC) [Docket No. 14] (Bankr. S.D.N.Y. Sept 8, 2016) (same).[8]

81.    The standards, procedures, and limitations applicable to an injunction apply to relief sought under section 1521(a) of the Bankruptcy Code. *See* 11 U.S.C. § 1521(e). Generally, to obtain a permanent injunction, a movant must demonstrate the likelihood of irreparable harm. *See*

---

[8]    *See also In re Ocean Rig UDW Inc.*, No. 17-10736 (MG) [Docket No. 153]; *In re Boart Longyear Ltd.*, No. 17-11156 (MEW) [Docket No. 45] (Bankr. S.D.N.Y. Aug. 30, 2017); *In re Abengoa, S.A.*, No. 16-10754 (KJC) [Docket No. 169] (Bankr. D. Del. Dec. 8, 2016); *In re Groupo Isolux Corsán, S.A.*, No. 16-12202 (SHL) [Docket No. 50] (Bankr. S.D.N.Y. Nov. 17, 2016); *In re Pac. Expl. & Prod. Corp.*, No. 16-11189 (JLG) [Docket No. 31] (Bankr. S.D.N.Y. Oct. 3, 2016); *In re EnQuest PLC*, No. 16-12983 (MEW) (Bankr. S.D.N.Y. Nov. 17, 2016) [Docket No. 14]; *In re Winsway Enters. Holdings Ltd.*, No. 16-10833 (MG) [Docket No. 22] (Bankr. S.D.N.Y. June 16, 2016); *In re Zlomrex Int'l Financing S.A.*, No. 13-14138 (SHL) [Docket No. 17] (Bankr. S.D.N.Y. Jan. 31, 2014); *In re BTA Bank JSC*, No. 12-13081 (JMP) [Docket No. 20] (Bankr. S.D.N.Y. Jan. 3, 2013); *In re Highlands Ins. Co.* (U.K.) Ltd., No. 07-13970 (MG) [Docket No. 40] (Bankr. S.D.N.Y. Aug. 18, 2009); *In re Castle Holdco 4*, Ltd., No. 09-11761 (REG) [Docket No. 25] (Bankr. S.D.N.Y. May 7, 2009); *In re Gordian RunOff (UK) Ltd.*, No. 06-11563 (RDD) [Docket No. 14] (Bankr. S.D.N.Y. Aug. 29, 2006).

*Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995).  Irreparable harm in the chapter

15 context may exist if there is a risk of disruption to the orderly and fair distribution of assets

through dissenting creditor actions to the detriment of other creditors.  *See, e.g.*, *Victrix S.S. Co.,*

*S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 714-15 (2d Cir. 1987); *In re CGG S.A.*, 579 B.R. at

720 (permanent injunctive relief in respect of French plan was "warranted under section 1521(e)

of the Bankruptcy Code to prevent any parties from gaining an unfair advantage over other parties

in interest subject to the [foreign plan].");  *In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y.

2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the

orderly reconciliation of claims and fair distribution of assets in a single, centralized forum.")

(quoting COLLIER ON BANKRUPTCY ¶ 304.05 (15th ed.  Rev. 2003)); *In re MMG LLC*, 256 B.R.

544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the

foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other

creditors."); *In re Petition of Brierley*, 145 B.R. 151, 168 (Bankr. S.D.N.Y. 1992) ("Harm to the

estate exists from the failure to grant injunctive relief in the form of disruption of an orderly

determination of claims and the fair distribution in a single case.") (internal citation and quotations

omitted).

82.    The risk of irreparable harm exists here because dissenting creditors may seek

judgments in the United States against the Debtor and its property located in the United States in

an effort to obtain more than the pro rata treatment to which they are entitled under the Scheme.

As stated above, the Indenture is governed by New York law and contains a New York forum

selection clause.  Implementation of the Scheme and the restructuring of the Existing SSNs are

central to the success of the overall restructuring of the Group.  If Scheme Creditors could

effectively circumvent the terms of the Scheme by commencing actions in the United States, the

purpose of the Scheme could be undermined, and the Debtor would be left to defend against these lawsuits, however meritless, which would be a tremendous waste of time and resources.  Those collateral attacks could also jeopardize the successful implementation of the Scheme and the broader restructuring of the Group.  The Injunction will help to ensure the fair and efficient implementation of the Scheme and to bind all of the Debtor's creditors to the terms of the Scheme, as approved by the Sanction Order.

83.    Absent permanent injunctive relief, the Debtor's efforts to effect the SSN Exchange and consummate the overall restructuring could be thwarted by the actions of dissenting creditors, a result that is inconsistent with the Bankruptcy Code.  The interests of affected parties under the Scheme are sufficiently protected under section 1522(a) of the Bankruptcy Code by the treatment afforded to them in the English Proceeding because all similarly situated parties will be treated equally and fairly.  The Injunction also will not cause undue hardship or prejudice to the rights of any U.S.-based creditors and is consistent with principles of comity.  Accordingly, the Injunction should be granted.

## VII.    Waiver of the Stay Is Appropriate to Ensure Expeditious Implementation of the Scheme

84.    The Foreign Representative respectfully requests that, to the extent applicable, the Court cause the Proposed Order to become effective immediately upon entry, notwithstanding the 14-day stay of effectiveness of the order imposed by operation of the Bankruptcy Code or the Bankruptcy Rules, including Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014.  Such a waiver is appropriate in these circumstances to allow the Debtor to proceed immediately with consummation of the Scheme and execution of the Group's restructuring.  *See* Collyer Declaration ¶ 33.  The Group believes that it is critical for the Group to implement its restructuring as soon as possible to maintain confidence with its suppliers and customers.  *See id.*  Further delay in

implementing the restructuring could result in loss of market confidence, which may seriously impact the viability of the Group's business. *See id.* For these reasons and in light of the high degree of creditor support for the Scheme, granting a waiver of the 14-day stay of effectiveness period is appropriate so that the Scheme can be implemented as soon as possible.

85.     Courts in this District routinely provide full or partial waivers of the 14-day stay of effectiveness period in chapter 15 cases. *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) [Docket No. 14] (Bankr. S.D.N.Y. May 3, 2019); *In re Lehman Brothers Int'l (Europe)*, No. 18-11470 (SCC) [Docket No. 15] (Bankr. S.D.N.Y. June 19, 2018); *In re Avanti Communs. Grp. plc*, No. 18-10458 (MG) [Docket No. 15] (Bankr. S.D.N.Y. Apr. 6, 2018); *In re Bibby Offshore Servs. Plc*, No. 17–13588 (MG) [Docket No. 16] (Bankr. S.D.N.Y. Jan. 18, 2018); *In re CGG S.A.*, No. 17-11636 (MG) [Docket No. 25] (Bankr. S.D.N.Y. Dec. 21, 2017); *In re Boart Longyear Ltd.*, No. 17-11156 (MEW) [Docket No. 45] (Bankr. S.D.N.Y. Aug. 30, 2017); *In re Pac. Expl. & Prod. Corp.*, No. 16-11189 (JLG) [Docket No. 31] (Bankr. S.D.N.Y. Oct. 3, 2016); *In re Landsbanki Islands HF.*, No. 08-14921 (RDD) [Docket No. 65] (Bankr. S.D.N.Y. Mar. 17, 2016); *In re Metcalfe & Mansfield Alternative Invs.*, No. 09-16709 (MG) [Docket No. 28] (Bankr. S.D.N.Y. Jan. 5, 2010); *In re Quebecor World Inc.*, No. 08-13814 (JMP) [Docket No. 12] (Bankr. S.D.N.Y. July 1, 2009).

## NOTICE

86.     Notice of this Petition has been provided to: (a) the United States Trustee for the Southern District of New York; (b) the Scheme Creditors; (c) counsel to the lenders and the agent under the RCF; (d) counsel to the lenders and the Facility Agent under the Operating Facilities; (e) the Information Agent; (f) counsel to the Security Agent; (g) counsel to the Trustee; and (h) all parties that have filed a notice of appearance in this Chapter 15 Case.  The Foreign Representative submits that no other or further notice of this Petition is necessary or required.

### NO PRIOR REQUEST

87.    No prior request for the relief sought in this Petition has been made to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

**WHEREFORE**, the Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

Dated: September 28, 2020
      New York, New York

Respectfully submitted,

*/s/ Adam J. Goldberg*
Adam J. Goldberg
Tianjiao ("TJ") Li
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  adam.goldberg@lw.com
       tj.li@lw.com

– and –

Jeramy D. Webb (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email:  jeramy.webb@lw.com

– and –

Benjamin Roth (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email:  ben.roth@lw.com

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| New Look Financing plc,[1] | Case No. 20-12297 (MEW) |
| Debtor in a Foreign Proceeding. | |

<div align="center">

**<u>STATEMENT OF VERIFICATION</u>**

</div>

Pursuant to 28 U.S.C. § 1746, Richard John Collyer hereby declares as follows under penalty of perjury:

1.    I am a director of the Debtor and the Chief Financial Officer of the Group, and I am the Debtor's duly authorized foreign representative.  I am duly authorized to file this Petition and to commence and act in this Chapter 15 Case.

2.    I have read the foregoing Petition and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

3.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated:  September 28, 2020          */s/ Richard John Collyer*
London, United Kingdom           Richard John Collyer
                                 Director
                                 Group Chief Financial Officer

---

[1]  The last four digits of the Debtor's England and Wales company registration number are 1640. The location of the Debtor's registered office is New Look House, Mercery Road, Weymouth, Dorset, DT3 5HJ, United Kingdom.

**Exhibit A**

**Proposed Recognition Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| New Look Financing plc,[1] | Case No. 20-12297 (MEW) |
| Debtor in a Foreign Proceeding. | |

<div align="center">

**[PROPOSED] ORDER RECOGNIZING**
**FOREIGN PROCEEDING AND GRANTING RELATED RELIEF**

</div>

Upon the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* [Docket No. 2] (the "Verified Petition")[2] of Richard John Collyer, in his capacity as the duly authorized foreign representative (the "Foreign Representative") of New Look Financing plc (the "Debtor"), which is the subject of proceedings under English law (the "English Proceeding") currently pending before the Business and Property Courts of the High Court of Justice of England and Wales (the "High Court") concerning a scheme of arrangement (the "Scheme") under Part 26 of the Companies Act 2006 of the United Kingdom, in support of entry of an order:

      a.      finding that (i) the Debtor is eligible to be a "debtor" under chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), (ii) the English Proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code, (iii) the Foreign Representative satisfies the requirements of a "foreign representative" under section 101(24) of the Bankruptcy Code, and (iv) the Petition was properly filed and meets the requirements of section 1515 of the Bankruptcy Code;

      b.      granting recognition of the English Proceeding as a "foreign main proceeding" under sections 1517 and 1520 of the Bankruptcy Code;

---

[1]  The last four digits of the Debtor's England and Wales company registration number are 1640. The location of the Debtor's registered office is New Look House, Mercery Road, Weymouth, Dorset, DT3 5HJ, United Kingdom.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition.

    c.       granting all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code;

    d.       recognizing, granting comity to, and giving full force and effect within the territorial jurisdiction of the United States to the English Proceeding, the Scheme and the order of the High Court sanctioning the Scheme (the "Sanction Order"), including giving effect to the releases set forth in the Scheme (the "Releases");

    e.       permanently enjoining all parties from commencing or continuing any action or proceeding in the United States against the Debtor or its assets located within the territorial jurisdiction of the United States that is inconsistent with the Scheme (the "Injunction");

    f.       waiving the 14-day stay of effectiveness of the order; and

    g.       granting related relief;

and upon the record of this case and the hearing held on _____, 2020 (the "Hearing") on the Petition and this Court's review and consideration of the Petition, the Collyer Declaration, and the Sum Declaration; and the Court having found and determined that the relief sought in the Petition is consistent with the purposes of chapter 15 of the Bankruptcy Code and is in the best interests of the Debtor and its creditors; and after due deliberation and sufficient cause appearing therefor; and for the reasons stated on the record at the Hearing;

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.      This Court has jurisdiction to consider the Petition and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431 from the U.S. District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).

---

[3] The findings and conclusions set forth herein and on the record of the Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

B.      The consideration of the Petition and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b), and this Court may enter a final order consistent with Article III of the United States Constitution.

C.      Venue is proper before this Court pursuant to 28 U.S.C. § 1410(1) because (i) the Debtor has U.S. assets that are located within this District and (ii) the Indenture is governed by New York law and contains a New York forum selection clause.

D.      Good, sufficient, appropriate, and timely notice of the filing of the Petition and the Hearing has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1011(b) and 2002(q) and the *Order Scheduling a Hearing on Chapter 15 Petition for Recognition and Related Relief and Specifying the Form and Manner of Service of Notice* [Docket No.____] to (i) the United States Trustee for the Southern District of New York; (ii) the Scheme Creditors; (iii) counsel to lenders under the RCF; (iv) counsel to lenders under the Operating Facilities; (v) counsel to the Facility Agent; (vi) counsel to the Information Agent; (vii) counsel to the Security Agent; (viii) counsel to the Trustee; and (ix) all parties that have filed a notice of appearance in this Chapter 15 Case.  In light of the nature of the relief requested and prior orders of this Court, no other or further notice is required.

E.      No objections or responses were filed that have not been overruled, withdrawn, or otherwise resolved.

F.      The Debtor has property located in this District, and therefore, the Debtor is "eligible" to be a debtor in this Chapter 15 Case pursuant to sections 109 and 1501 of the Bankruptcy Code.

G.      The English Proceeding is a "foreign proceeding" as such term is defined in section 101(23) of the Bankruptcy Code.

H.      The English Proceeding is pending in England, which is where the Debtor has its "center of main interests" as referred to in section 1517(b)(1) of the Bankruptcy Code. As such, the English Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code, is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code and is entitled to all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code.

I.      The Foreign Representative is a "person" as such term is defined in section 101(41) of the Bankruptcy Code and has been duly appointed and designated as the "foreign representative" of the Debtor as such term is defined in section 101(24) of the Bankruptcy Code.

J.      This Chapter 15 Case was properly commenced pursuant to sections 1504 and 1509 of the Bankruptcy Code, and the Petition satisfies the requirements of section 1515 of the Bankruptcy Code.

K.      The Foreign Representative and the Debtor, as applicable, are entitled to the additional assistance and discretionary relief requested in the Petition (including recognition and enforcement of the Scheme and the Sanction Order and the Releases contained therein) under sections 1507 and 1521 of the Bankruptcy Code.

L.      The relief granted herein is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 1504, 1507, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code and will not cause hardship to any party in interest. To the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Foreign Representative, the Debtor, its creditors, and other parties in interest.

M.      The relief granted herein is necessary to effectuate the purposes and objectives of

chapter 15 of the Bankruptcy Code and to protect the Debtor and the interests of its creditors and

all parties in interest.

N.      Absent the relief granted herein, the Scheme, the English Proceeding, and the

Debtor's efforts to consummate the restructuring set forth in the Scheme may be thwarted by the

actions of certain creditors, which would be at odds with the purpose of chapter 15 of the

Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code.  Such results

could threaten, frustrate, delay, and ultimately jeopardize the implementation of the restructuring

set forth in the Scheme.  Absent the Injunction, the Debtor and its assets may be subject to the

prosecution of judicial, quasi-judicial, arbitration, administrative, or regulatory actions or

proceedings in connection with claims under the English Proceeding against the Debtor and its

assets located within the territorial jurisdiction of the United States, thereby interfering with and

causing irreparable harm to the Debtor, its creditors and other parties in interest.

O.      The Injunction contained herein (i) is within the Court's jurisdiction to grant; (ii) is

essential to the success and objectives of the Scheme and the English Proceeding; and (iii) confers

material benefits on, and is in the best interests of, the Debtor, its creditors, and all other parties in

interest.

P.      In accordance with section 1507(b) of the Bankruptcy Code, the relief granted

herein will reasonably assure: (i) the just treatment of all holders of claims against or interests in

the Debtor's property; (ii) the protection of claim holders in the United States against prejudice

and inconvenience in the processing of claims in the English Proceeding; (iii) the prevention of

preferential or fraudulent dispositions of property of the Debtor; and (iv) the distribution of

proceeds of the Debtor's property substantially in accordance with the order prescribed in the Bankruptcy Code.

Q.    All creditors and other parties in interest, including the Debtor, are sufficiently protected in the grant of the relief ordered hereby in compliance with section 1522(a) of the Bankruptcy Code.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

1.    The Petition and the relief requested therein are granted, and any objections or responses thereto that have not been withdrawn or resolved are overruled with prejudice.

2.    The English Proceeding is recognized as a "foreign main proceeding" under sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

3.    The Foreign Representative is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the English Proceeding.

4.    All relief and protection afforded to a foreign main proceeding under section 1520 of the Bankruptcy Code is hereby granted to the English Proceeding, the Debtor, and the Debtor's assets located in the United States, as applicable, including, without limitation, the application of the automatic stay under section 362 of the Bankruptcy Code to the Debtor and its property located in the territorial jurisdiction of the United States.

5.    As of the effective date of the Scheme (the "Restructuring Effective Date"), the Scheme and the Sanction Order (including the Releases) granted in the English Proceeding are hereby recognized, granted comity, and given full force and effect in the United States and are binding and fully enforceable in accordance with their terms pursuant to sections 105(a), 1507, 1521, and 1525 of the Bankruptcy Code on all entities (as that term is defined in section 101(15) of the Bankruptcy Code) whose claims or interests are affected by the Scheme and each of their

6

respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys, beneficiaries, guardians and similar officers, or any persons claiming through or in the right of any such persons or entities (collectively, other than the Debtor and its expressly authorized representatives and agents, the "Affected Entities"), whether or not the Affected Entity consented to be bound by or participated in the Scheme.

6.       As of the Restructuring Effective Date, except as expressly permitted by the Scheme, all Affected Entities are hereby permanently enjoined from asserting any debt, claim, or interest affected by the Sanction Order and the Scheme, including, without limitation:

a.       executing against any of the Debtor's assets;

b.       commencing or continuing, including issuing or employing process, of a judicial, quasi-judicial, administrative, regulatory, arbitral, or other action or proceeding, or to recover a claim, including, without limitation, any and all unpaid judgments, settlements or otherwise against the Debtor, its property, or any direct or indirect transferee of or successor to any property of the Debtor, or any property of such transferee or successor, or the seeking of any discovery related to any of the foregoing, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the English Proceeding, English law or the implementation or consummation of the Sanction Order or the Scheme (including the Releases);

c.       taking or continuing any act to create, perfect or enforce a lien or other security interest, setoff or other claim against the Debtor or any of its property or proceeds thereof, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the English Proceeding, English law or the implementation or consummation of the Sanction Order or the Scheme (including the Releases);

d.       transferring, relinquishing or disposing of any property of the Debtor to any entity other than the Foreign Representative and his authorized representatives and agents or taking or continuing any act to obtain possession of, commingle, or exercise control over, such property, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the English Proceeding, English law or the implementation or consummation of the Sanction Order or the Scheme (including the Releases);

e.  commencing or continuing in any manner, directly or indirectly, an individual action or proceeding concerning the Debtor's assets, rights, obligations or liabilities, or to resolve any dispute arising out of any provision of the Scheme, including the Releases, or English law relating to the Scheme, in each case, to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code; and

f.  declaring or considering the filing of the English Proceeding, the Scheme, the Sanction Order or this Chapter 15 Case a default or event of default under any agreement, contract or arrangement;

*provided*, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States.

7.      As of the Restructuring Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the liability of the Debtor or any other person released under the Scheme pursuant to the Releases, with respect to any debt cancelled, discharged or restructured under the Scheme, or as a result of English law relating to the Scheme, is unenforceable in the United States, in each case, to the extent inconsistent with the Scheme, the Sanction Order or such law.

8.      The Foreign Representative and the Debtor are authorized and empowered to, and may in their discretion and without further delay, (a) execute and deliver documents to effectuate the Scheme (including the Releases) and take any action and perform any act necessary to implement and effectuate the terms of this Order, the Sanction Order and the Scheme and (b) exercise all consent and approval rights provided for in the Scheme in the manner set forth in the Scheme.

9.      No action taken by the Foreign Representative, the Debtor or their respective agents, representatives, advisors, or counsel, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the English Proceeding, the documents contemplated thereunder, this Order, the Chapter 15 Case, any further order for additional relief in

the Chapter 15 Case, or any adversary proceedings in connection therewith, will be deemed to constitute a waiver of the immunity afforded such persons under sections 306 or 1510 of the Bankruptcy Code.

10.    No party shall incur any liability for following the terms of this Order (whether by acting or refraining from acting), except in the case of the party's own gross negligence or willful misconduct.

11.    Nothing herein shall enjoin, impair, or otherwise supplement or modify in any manner the rights of any party granted under the Scheme or the documents governing Residual Claims, and nothing herein shall modify the exclusive right of the Courts of England & Wales to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the Explanatory Statement or any provision of the Scheme or Sanction Order, or out of any action to be taken or omitted to be taken under the Scheme or Sanction Order or in connection with the administration of the Scheme or Sanction Order.

12.    Nothing herein shall enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding.

13.    The Foreign Representative, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

14.    Notwithstanding any provision in the Bankruptcy Code or the Bankruptcy Rules to the contrary, including, but not limited to Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014, (a) this Order shall be effective immediately and enforceable upon its entry, (b) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order and (c) this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

15.     This Court shall retain jurisdiction with respect to the implementation,

enforcement, amendment, or modification of this Order.

Dated: September ___, 2020
      New York, New York                _____
                                       THE HONORABLE MICHAEL E. WILES
                                       UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Scheme**

No. CR - 2020 - 003752

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES INSOLVENCY
AND COMPANIES LIST (ChD)

### IN THE MATTER OF NEW LOOK FINANCING PLC

### AND

### IN THE MATTER OF THE COMPANIES ACT 2006

### SCHEME OF ARRANGEMENT

### (*UNDER PART 26 OF THE COMPANIES ACT* 2006)

### BETWEEN

### NEW LOOK FINANCING PLC

### AND

### THE SCHEME CREDITORS

### (AS HEREINAFTER DEFINED)

## TABLE OF CONTENTS

1. DEFINITIONS ...................................................................................................................2

2. INTERPRETATION ........................................................................................................15

3. RESTRUCTURING EFFECTIVE DATE........................................................................16

4. SCHEME CONSIDERATION .........................................................................................17

5. FINANCIAL RESTRUCTURING IMPLEMENTATION ...............................................18

6. RESTRUCTURING STEPS .............................................................................................19

7. GRANTS OF AUTHORITY TO EXECUTE THE FINANCIAL
   RESTRUCTURING DOCUMENTS AND INSTRUCTIONS TO TAKE STEPS
   TO IMPLEMENT THE SCHEME ....................................................................................21

8. RELEASES IN CONNECTION WITH THE FINANCIAL RESTRUCTURING..........22

9. PROVISIONS APPLICABLE TO THE FINANCIAL RESTRUCTURING ..................23

EU-DOCS\29867554.8

**BETWEEN:**

**(1)**    **NEW LOOK FINANCING PLC** (the "**Company**"); and

**(2)**    **THE SCHEME CREDITORS** (as hereinafter defined).

**RECITALS:**

(A)    The Company is a member of the Group and was incorporated and registered in England and Wales as a public limited company on 28 March 2019.  The Company's registered number is 11911640.  The Company's registered office is New Look House, Mercery Road, Weymouth, Dorset DT3 5HJ, United Kingdom.

(B)    The Company is the issuer of the SSNs, and the Scheme Creditors are creditors under, and in respect of, the SSNs.

(C)    On 13 August 2020, the Parent announced that the Group was seeking to implement a comprehensive recapitalisation transaction that will extend the Group's banking and operational facilities, deliver a new money investment and significantly deleverage its balance sheet and that the Parent, the Company and other Group companies entered into the Lock-up Agreement with the Group's financial creditors who agreed to support, implement and consummate the Financial Restructuring.

(D)    Each of (i) the Parent and New MidCo (pursuant to the Companies Undertaking Deed), (ii) Lucid (pursuant to the Lucid Undertaking Deed), and (iii) GLAS Trust Corporation Limited, Global Loan Agency Services Limited and the SSN Trustee (pursuant to the GLAS Undertaking Deed) shall agree to: (a) consent to this Scheme; (b) be bound by this Scheme upon its sanctioning by the Court; and (c) execute or procure to be executed all such documents, and to do or procure to be done all such acts and things, as may be necessary or desirable to be executed or done by them, as described in this Scheme.

(E)    The principal objective and purpose of the Scheme is to effect a compromise and arrangement between the Company and the Scheme Creditors as part of the Financial Restructuring.  To effect these compromises and arrangements, each Scheme Creditor will be bound by the Financial Restructuring Documents, which provide for (among other things), subject to the satisfaction or waiver of certain conditions, the write-down and release of each Scheme Creditor's SSN Holding pursuant to the Supplemental Indenture in exchange for (i) the Shareholder Loan utilised by New MidCo pursuant to the Shareholder Loan Agreement and (i) the issuance of the Scheme Consideration Shares by the Parent.

(F)    The Company intends to seek entry of a Chapter 15 Order from the U.S. Bankruptcy Court which, among other things, recognises the Scheme as a foreign main proceeding under Chapter 15 of the U.S. Bankruptcy Code, gives the Scheme full force and effect within the territorial jurisdiction of the United States and prohibits Scheme Creditors from commencing or continuing any action or proceeding in the United States against the Company or the Group or Group assets located within the territorial jurisdiction of the United States that is inconsistent with the Scheme.

(G)    Unless the compromises and arrangements specified in recital (E) above occur, it is likely that the Obligors (as defined in the Lock-up Agreement) will be unable to implement the Financial Restructuring or satisfy their obligations under the SSN Indenture and other Group financial obligations.

1

1.    **DEFINITIONS**

In this Scheme, the following terms shall, unless the context otherwise requires, have the following meanings:

"**Account Holder**"    means a holder of a Book-Entry Interest;

"**Account Holder Letter**"    means the account holder letter to be signed by an SSN Holder or an Account Holder on behalf of an SSN Holder in substantially the form set out at Appendix 3 to the Explanatory Statement with such minor or technical amendments as the Court may consent to;

"**Act**"    means the Companies Act 2006 (as amended);

"**Advisers**"    means (as applicable):

(a)    Perella Weinberg UK Limited, financial advisers to the Group;

(b)    Latham & Watkins (London) LLP, legal adviser to the Group;

(c)    Linklaters LLP, legal advisers to Brait Capital International Limited;

(d)    Allen & Overy LLP, legal adviser to the RCF Lenders and the Operating Facility Lenders;

(e)    PricewaterhouseCoopers LLP, tax adviser to the Company;

(f)    KPMG LLP, valuation adviser to the Company;

(g)    Morrison & Foerster (UK) LLP, legal adviser to the SSN Trustee, the Security Agent, PIK Security Agent, the RCF Facility Agent, the SSN Paying Agent, the PIK Facility Agent and the Shareholder Loan Facility Agent;

(h)    Carey Olsen, Jersey law legal adviser to the Parent, New MidCo, New Look Investment Limited and New Look Bonds Limited;

(i)    Lucid, as Information Agent; and

(j)    any of the foregoing's partners, employees and affiliated partnerships and the partners and employees of such affiliated partnerships and their respective Subsidiaries and Holding Companies and any local counsel engaged;

"**Affiliate**"    means, in respect of any person or entity:

(a)    a Subsidiary of that person or entity or a Holding Company of that person or entity or any other Subsidiary of such a Holding Company; and

2

(b)        any Affiliated Entities of any of the persons or entities referred to in paragraph (a) above;

**"Affiliated Entities"**        means (a) in relation to an Affiliate that is a fund (the "**first fund**"), (i) a fund which is managed or advised by the same investment manager or investment adviser as the first fund or (ii) if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Associate of the investment manager or investment adviser of the first fund or which is a co-investment vehicle under common control with the first fund; and (b) in relation to any other person that is an Affiliate, a fund which is managed or advised by such person or any of its Associates;

**"Allowed Proceedings"**        means any Proceedings by a Scheme Creditor to enforce its rights under this Scheme, the Lock-up Agreement, a Financial Restructuring Document where the Company or any of its Affiliates or any Scheme Party or another Scheme Creditor (or its Nominated Recipient(s)) fails to perform its obligations under this Scheme, the Lock-up Agreement, or a Financial Restructuring Document or fails to effect the Financial Restructuring;

**"Amended Intercreditor Agreement"**        means the amended and restated Intercreditor Agreement which is to be executed on or about the Restructuring Effective Date in the form agreed by the Majority SSN Holders, the Company, NLR, the Operating Facility Lenders and the RCF Lenders before the date of the Scheme Sanction Hearing (and includes, where the context requires, the amendment and restatement agreement(s) relating thereto);

**"Amended Operating Facility Agreement"**        means the amended and restated Operating Facility Agreement which is to be executed on or about the Restructuring Effective Date in the form agreed by the Majority SSN Holders, NLR and the Operating Facility Lenders before the date of the Scheme Sanction Hearing (and includes, where the context requires, the amendment and restatement agreement(s) relating thereto);

**"Amended Senior Facilities Agreement"**        means the amended and restated Senior Facilities Agreement which is to be executed on or about the Restructuring Effective Date in the form agreed by the Majority SSN Holders, the Company, NLR and the RCF Lenders before the date of the Scheme Sanction Hearing (and includes, where the context requires, the amendment and restatement agreement(s) relating thereto);

**"Amended Super Senior Finance Documents"**        means each of the Amended Senior Facilities Agreement, the Amended Operating Facility Agreement, the Amended Intercreditor Agreement and the Amended Super Senior Supplemental Security;

**"Amended Super Senior Supplemental Security"**        means a supplemental English law debenture and a supplemental Jersey law security interest agreement which are to be executed on or about the Restructuring Effective Date, in each case, in the form agreed by the Company, NLR, the Operating Facility Lenders and the RCF Lenders before the date of the Scheme Sanction Hearing;

3

| | |
|---|---|
| "**Applicable Exchange Rate**" | means the closing mid-rate of exchange for the purchase of sterling with euro as published in The Financial Times in the "Currency Rates" section on the date of such determination; |
| "**Applicable Procedures**" | means, with respect to any transfer, release, waiver, pool factoring and/or cancellation of beneficial interests in any Global Note, the rules and procedures of the relevant Clearing System that apply to such transfer, release, waiver and/or cancellation; |
| "**Associate**" | means, in relation to any person other than the Company, a Subsidiary undertaking of that person or a Holding Company of that person or any other Subsidiary undertaking of that Holding Company, and, in relation to the Company, a Subsidiary undertaking of the Company; |
| "**Board**" | means the board of Directors of the Company; |
| "**Book-Entry Interest**" | means, in relation to the SSNs, a beneficial interest in a Global Note held through and shown on, and transferred only through, records maintained in book-entry form by the Clearing Systems and their respective nominees and successors, acting through themselves or the SSN Common Depositary; |
| "**Business Day**" | means a day on which banks are open for business in London and New York (excluding, for the avoidance of doubt, Saturdays, Sundays and public holidays); |
| "**Calculation Agent**" | means Lucid in its capacity as calculation agent; |
| "**CDD Information**" | means all "client due diligence" information and/or documentation required by Crestbridge from any Scheme Creditor or its Nominated Recipient in connection with the Scheme Consideration Shares Entitlement; |
| "**CDD Information Deadline**" | means 5 p.m. (London time) on 14 October 2020, which is the time by which CDD Information must be received by Crestbridge if the relevant Scheme Creditor (or its Nominated Recipient) wishes to receive its Scheme Consideration Shares Entitlement on the Restructuring Effective Date; |
| "**Chapter 15 Order**" | means an order of the U.S. Bankruptcy Court which, among other things, recognises this Scheme as a "foreign main proceeding" under Chapter 15 of the U.S. Bankruptcy Code, enforces the Court Order within the territorial jurisdiction of the United States and grants related relief; |
| "**Clearing Systems**" | means either or both of Euroclear and Clearstream and each of their respective nominees and successors, acting through itself, the SSN Common Depositary and any other system designed for similar or analogous purposes, as appropriate; |
| "**Clearstream**" | means Clearstream Banking S.A., as currently in effect or any successor securities clearing agency; |

4

| | |
|---|---|
| "**Companies Undertaking Deed**" | means a deed of undertaking from the Parent and New MidCo to the Company in the form agreed by the parties thereto before the date of the Scheme Sanction Hearing pursuant to which each of the parties thereto agrees to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be necessary or desirable to be done by it as described in this Scheme and to be bound by and perform the terms of this Scheme; |
| "**Court**" | means the High Court of Justice of England and Wales; |
| "**Court Order**" | means the order of the Court sanctioning this Scheme under section 899 of the Act; |
| "**Crestbridge**" | means Crestbridge Limited and its Affiliates; |
| "**Director**" or "**Former Director**" | means any person who is, or was, or is deemed to be, at any time a director/manager/officer (or equivalent) of any company in the Group immediately prior to the Restructuring Effective Date, including, for the avoidance of doubt, the Company and each of the Obligors (as defined in the Lock-up Agreement), in their capacity as such; |
| "**Eligible Person**" | means a person who: |

    (a)    is either (x) an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, that is an institution, or (y) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or (z) a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) located and resident outside the United States; and

    (b)    is not a retail investor in the European Economic Area (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a qualified investor as defined in the Prospectus Directive);

| | |
|---|---|
| "**Euro SSN Holding**" | means, in respect of a Scheme Creditor that is an SSN Holder, the Euro SSNs that such Scheme Creditor holds; |
| "**Euro SSNs**" | means the €45,209,687 senior secured notes issued by the Company pursuant to the terms of the SSN Indenture; |
| "**Euroclear**" | means Euroclear Bank SA/NV, or any successor securities clearing agency; |
| "**Excluded Persons**" | has the meaning given to it in Clause 9.11(a); |
| "**Existing Parent Shares**" | means all outstanding A ordinary shares issued by the Parent; |

5

| "**Explanatory Statement**" | means the explanatory statement to this Scheme dated on or around 24 September 2020 required to be provided to the Scheme Creditors pursuant to section 897 of the Act; |
|---|---|
| "**Financial Restructuring Conditions Satisfaction Time**" | means the time at which the Company (acting reasonably and in good faith) confirms to the Scheme Creditors that all of the Financial Restructuring Conditions have been satisfied or waived (as applicable) in accordance with their terms or in accordance with Clause 9.13; |

"**Financial Restructuring Conditions**"    means:

    (a)    the occurrence of the Scheme Effective Date;

    (b)    the satisfaction or waiver of all conditions precedent to each Financial Restructuring Document in accordance with its terms or confirmation that such conditions precedent will be satisfied during the course of the completion of the steps to occur on the date on which the Restructuring Steps are anticipated to occur (other than the occurrence of the Financial Restructuring Conditions Satisfaction Time and/or the Restructuring Effective Date); and

    (c)    this Scheme not having been terminated pursuant to Clause 9.6(a);

"**Financial Restructuring Documents**"    means:

    (a)    the Account Holder Letters;

    (b)    the Restructuring Implementation Deed;

    (c)    the PIK Finance Documents;

    (d)    the Amended Super Senior Finance Documents;

    (e)    the Shareholder Loan Agreement;

    (f)    the Subordination Agreement;

    (g)    the Supplemental Indenture;

    (h)    the New Shareholders' Agreement;

    (i)    the Subscription Agreement;

    (j)    the New Parent Articles;

    (k)    the Companies Undertaking Deed;

    (l)    the GLAS Undertaking Deed;

    (m)    the Lucid Undertaking Deed;

6

| | |
|---|---|
| (n) | the Inter-Company Loan Rationalisation Agreement; |
| (o) | the Payment Direction Letter; and |
| (p) | any other documents that the Company considers necessary to give effect to the Financial Restructuring; |

| | |
|---|---|
| "**Financial Restructuring**" | means the financial, debt and corporate restructuring of the Group contemplated by this Scheme, the Restructuring Steps and the Explanatory Statement and any and all connected compromises, arrangements and/or agreements with persons that are not parties to this Scheme; |
| "**GLAS KYC Information**" | means all "know your customer" information and/or documentation required by the Shareholder Loan Facility Agent from any Scheme Creditor or its Nominated Recipient in connection with the Shareholder Loan Entitlement; |
| "**GLAS KYC Information Deadline**" | means 5 p.m. (London time) on 14 October 2020, which is the time by which GLAS KYC Information must be received by Shareholder Loan Facility Agent if the relevant Scheme Creditor (or its Nominated Recipient) wishes to receive its Shareholder Loan Entitlement on the Restructuring Effective Date; |
| "**GLAS Undertaking Deed**" | means a deed of undertaking in the form agreed by the Majority SSN Holders, the Company, GLAS Trust Corporation Limited, Global Loan Agency Services Limited and the SSN Trustee before the date of the Scheme Sanction Hearing and entered into or to be entered into by GLAS Trust Corporation Limited, Global Loan Agency Services Limited and the SSN Trustee pursuant to which GLAS Trust Corporation Limited, Global Loan Agency Services Limited and the SSN Trustee agree to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be necessary or desirable to be done by it for the purposes of giving effect to this Scheme and to be bound by and perform the terms of this Scheme, in the case of GLAS Trust Corporation Limited, in its respective capacities as the PIK Security Agent and the Security Agent and, in the case of Global Loan Agency Services Limited, in its respective capacities as SSN Paying Agent, PIK Facility Agent and Shareholder Loan Facility Agent; |
| "**Global Note Legend**" | means the legend set forth in section 2.06(f) of the SSN Indenture, which is required to be placed on all Global Notes issued under the SSN Indenture; |
| "**Global Notes**" | means, individually and collectively, the global notes deposited with or on behalf of and registered in the name of the SSN Common Depositary or its nominee, in substantially the form of Exhibit A-1 of the SSN Indenture in respect of the Sterling SSNs and Exhibit A-2 of the SSN Indenture in respect of the Euro SSNs and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the |

7

|  | Global Note" attached thereto, issued in accordance with section 2.01 of the SSN Indenture; |
|---|---|
| **"Group"** | means the Parent and its Subsidiaries; |
| **"Guarantee Liabilities"** | means the "Guarantee Liabilities" as defined in clause 1.1 of the Intercreditor Agreement other than any "Guarantee Liabilities" in so far as they relate to the Senior Facilities Agreement, the Operating Facility Agreement and/or the Hedging Agreement (as defined in the Intercreditor Agreement); |
| **"Holding Company"** | means, in relation to a person or entity, any other person or entity in respect of which it is a Subsidiary; |
| **"Holding Period Trust Agreement"** | means the holding period trust agreement in the form agreed by the Majority SSN Holders, the Holding Period Trustee and the Company before the date of the Scheme Sanction Hearing and to be executed on or before the Restructuring Effective Date; |
| **"Holding Period Trustee"** | means Lucid, or any additional or replacement trustee over the Trust Entitlements at any time that is appointed in accordance with Clause 9.3(d), in its capacity as holding period trustee and in accordance with the Holding Period Trust Agreement; |
| **"Information Agent"** | means Lucid in its capacity as information agent; |
| **"Initial Holding Period"** | means the period of three months following the Restructuring Effective Date; |
| **"Inter-Company Loan Rationalisation Agreement"** | means the inter-company loan rationalisation agreement between NLR and other members of the Group which have balances relevant to this agreement in a form to be agreed between the Company, NLR and the Majority SSN Holders before the date of the Scheme Sanction Hearing; |
| **"Intercreditor Agreement"** | means the intercreditor agreement dated 3 May 2019 between, amongst others, New Look Bonds Limited, the Security Agent, the RCF Lenders and the Operating Facility Lenders (as amended and/or restated from time to time); |
| **"Liability"** | means any debt, liability or obligation whatsoever whether it is present, future, prospective or contingent, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation and whether it arises at common law, in equity or by statute, in England and Wales or in any other jurisdiction, or in any other manner whatsoever, including, but not limited to, "Liabilities" (as defined in the Intercreditor Agreement), and "**Liabilities**" shall be construed accordingly; |
| **"Lock-up Agreement"** | means the lock-up agreement dated 13 August 2020 entered into between, among others, the Parent, New Look Bonds Limited, the Original Consenting RCF Lenders (as defined therein), the Original Consenting Backstop Parties (as defined therein), the Original |

8

|  | Consenting SSN Holders (as defined therein) and the Calculation Agent; |
|---|---|
| "**Longstop Date**" | means 31 December 2020; |
| "**Lucid**" | means Lucid Issuer Services Limited; |
| "**Lucid Undertaking Deed**" | means a deed of undertaking in the form agreed by the Majority SSN Holders, the Company and Lucid before the date of the Scheme Sanction Hearing and entered into or to be entered into by Lucid pursuant to which Lucid agrees to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be necessary or desirable to be done by it for the purposes of giving effect to this Scheme and to be bound by and perform the terms of this Scheme in its respective capacities as Information Agent, Calculation Agent and Holding Period Trustee; |
| "**Majority SSN Holders**" | means Scheme Creditors holding in aggregate more than 50 per cent. of the aggregate principal amount of the SSNs at the relevant time; |
| "**Management Incentive Plan**" | shall have the meaning given to such term in the New Shareholders' Agreement; |
| "**Member State**" | means any member state of the European Union; |
| "**MiFID II**" | means Directive 2014/65/EU (as amended); |
| "**New MidCo**" | means a newly incorporated Group Company which will be a direct Subsidiary of the Parent and the direct Holding Company of New Look Investment Limited; |
| "**New Money Shares**" | means the A ordinary voting shares that will be allotted and issued by the Parent to the lenders under the PIK Facility Agreement (or their nominee) pursuant to the terms of the Restructuring which shall equal in aggregate 80 per cent. (on a fully diluted basis) of the New Parent Shares (subject to the issuance of any C ordinary shares or D ordinary shares pursuant to the Management Incentive Plan); |
| "**New Parent Articles**" | means the new articles of association of the Parent substantially in the form attached at Appendix 9 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| "**New Parent Shares**" | means the entire fully diluted ordinary shares in the capital of the Parent in such number to be determined by the Parent prior to the Voting Record Time, which shall comprise A ordinary shares in such number as represents 76 per cent. of the fully diluted ordinary share capital, B ordinary shares in such number as represents 19 per cent. of the fully diluted ordinary share capital and C ordinary shares in such number as represents 5 per cent. of such fully diluted ordinary share capital; |

9

| | |
|---|---|
| "**New Shareholders' Agreement**" | means the shareholders' agreement substantially in the form attached at Appendix 8 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| "**NLR**" | means New Look Retailers Limited, a limited liability company incorporated in England, whose registered number is 01618428 and whose registered office is New Look House, Mercery Road, Weymouth, Dorset DT3 5HJ, United Kingdom; |
| "**Nominated Recipient**" | means a person (or persons) nominated by a Scheme Creditor pursuant to the Account Holder Letter to receive on its behalf its proportion of the participation in the Scheme Consideration; |
| "**Operating Facility Agreement**" | means the trade finance facilities agreement originally dated 16 March 2018 between, amongst others, NLR and HSBC Bank plc (as facility agent) (as amended by amendment letters dated 16 May 2018, 12 November 2018. 27 May 2020 and 30 June 2020 and as amended and restated on 11 January 2019, 23 January 2019 and 3 May 2019); |
| "**Operating Facility Lenders**" | means HSBC Bank plc in its capacity as the provider of the facilities under the Operating Facility Agreement; |
| "**Parent**" | means New Look Retail Holdings Limited, a company incorporated under the laws of Jersey with registered number 128640 with registered address at 47 Esplanade, St Helier, Jersey JE1 0BD; |
| "**Participating Member State**" | means a Member State that adopts or has adopted, and in each case continues to adopt, the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union; |
| "**Payment Direction Letter**" | means the payment direction letter in the form agreed by the Majority SSN Holders and the Company before the date of the Scheme Sanction Hearing; |
| "**Payment Schedule**" | means the payment schedule in the form agreed by the Majority SSN Holders and the Company before the date of the Scheme Sanction Hearing; |
| "**PIK Facility Agent**" | means Global Loan Agency Services Limited in its capacity as agent under the PIK Facility Agreement; |
| "**PIK Facility Agreement**" | means the PIK loan agreement to be entered into in respect of the PIK Loan in the form agreed by the Participating Consenting SSN Holders (as defined in the Lock-up Agreement), New Midco, the PIK Facility Agent and the PIK Security Agent before the date of the Scheme Sanction Hearing and to be executed on or before the Restructuring Effective Date; |
| "**PIK Finance Documents**" | means the PIK Facility Agreement and the PIK Security; |

10

| | |
|---|---|
| "**PIK Loan**" | means the £40,000,000 cash proceeds loan to be borrowed by New MidCo on the Restructuring Effective Date; |
| "**PIK Security**" | means the "Transaction Security Documents" as defined in the Subordination Agreement; |
| "**PIK Security Agent**" | means GLAS Trust Corporation Limited in its capacity as security agent under the Subordination Agreement; |
| "**Proceedings**" | means any process, action or other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security), whether arising in connection with the Financial Restructuring or otherwise; |
| "**Prohibited Proceedings**" | means any Proceedings which are not Allowed Proceedings; |
| "**Prospectus Directive**" | means Directive 2003/71/EC (as amended or superseded, including by Directive 2010/73/EU) and includes any relevant implementing measure; |
| "**RCF**" | means the revolving credit facility of up to £100,000,000 (which is fully utilised and borrowed by NLR) under to the Senior Facilities Agreement; |
| "**RCF Facility Agent**" | means the Facility Agent as that term is defined in the Senior Facilities Agreement or any successor appointed in accordance with the Senior Facilities Agreement; |
| "**RCF Lenders**" | means each "Lender" under and as defined in the Senior Facilities Agreement; |
| "**Registrar of Companies**" | means the registrar of companies within the meaning of the Act; |
| "**Restructuring Effective Date**" | means the date of completion of the last step set out in Clause 6; |
| "**Restructuring Implementation Deed**" | means the restructuring implementation deed documenting the steps to occur on the Restructuring Effective Date to implement the Financial Restructuring which shall reflect the Restructuring Steps, in the form agreed by the Company, the Majority SSN Holders, the RCF Lenders and the Operating Facility Lenders before the date of the Scheme Sanction Hearing; |
| "**Restructuring Released Parties**" | has the meaning set out in Clause 8.2(a); |
| "**Restructuring Steps**" | means the steps, transactions or actions set out in Clause 6; |

11

| | |
|---|---|
| "**Scheme**" | means this scheme of arrangement in its present form or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate; |
| "**Scheme Claims**" | means any claim or claims in respect of any Liability of the Company to a Scheme Creditor arising directly or indirectly in relation to, or arising out of or in connection with, the SSN Finance Documents, including (without limitation) claim or claims in relation to any Liability of the Company in respect of loss or damage suffered or incurred, whether directly or indirectly, as a result of or in connection with such Liability (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such claims), other than those which arise as a result of a failure to comply with the terms of this Scheme; |
| "**Scheme Consideration**" | means the Shareholder Loan to be utilised by New MidCo on a cashless basis and the Scheme Consideration Shares to be issued by the Parent pursuant to the Scheme; |
| "**Scheme Consideration Shares**" | means the aggregate number of B ordinary non-voting shares that will be allotted and issued by the Parent pursuant to the Scheme which shall equal in aggregate 20 per cent. (on a fully diluted basis) of the New Parent Shares (subject to the issuance of any C ordinary shares or D ordinary shares pursuant to the Management Incentive Plan); |

| | |
|---|---|
| "**Scheme Consideration Shares Entitlement**" | means in respect of each Scheme Creditor: |

(a)     the proportion (expressed as a percentage) of such Scheme Creditor's Sterling Equivalent Aggregate SSN Holding bears to the Sterling Equivalent Total SSNs; multiplied by

(b)     the Scheme Consideration Shares;

| | |
|---|---|
| "**Scheme Creditor Entitlements**" | means, in relation to a Scheme Creditor, if the Restructuring Effective Date occurs, its: |

(a)     Shareholder Loan Entitlement; and

(b)     Scheme Consideration Shares Entitlement;

| | |
|---|---|
| "**Scheme Creditors**" | means the SSN Common Depositary and the SSN Trustee (each solely in its capacity as a beneficiary of the covenants to repay principal and interest on the SSNs pursuant to the SSN Indenture) and the SSN Holders; |
| "**Scheme Effective Date**" | means the date on which an office copy of the Court Order has been delivered to the Registrar of Companies for registration in respect of this Scheme, which delivery shall be made by the Company following receipt of an office copy of the Court Order as soon as possible after the earlier of: |

(a)     the date on which the Chapter 15 Order has been obtained; and

12

EU-DOCS\29867554.8

|  | (b) | 9.00am on the third Business Day after the date of the Court Order; |
|---|---|---|

| "Scheme Meeting" | means the meeting of the Scheme Creditors convened in accordance with the permission of the Court pursuant to section 896 of the Act to consider and, if thought fit, approve this Scheme, including any adjournment thereof; |
|---|---|
| "Scheme Party" | means each of the Company, each Scheme Creditor and any person that has given an Undertaking; |
| "Scheme Sanction Hearing" | means the hearing for the purpose of obtaining the Court Order; |
| "Scheme Voting Submission Deadline" | means 5.00 p.m. (London time) on 14 October 2020; |
| "Scheme Website" | means www.lucid-is.com/newlook; |
| "Securities Act" | means the U.S. Securities Act of 1933 (as amended); |
| "Security Agent" | means the Security Agent as that term is defined in the Intercreditor Agreement or any successor appointed in accordance with the Intercreditor Agreement; |
| "Selling Agent" | means such person as the Holding Period Trustee may (in its sole discretion) appoint for the purposes of selling or otherwise disposing of the remaining Trust Entitlements in accordance with Clause 9.3(c), which person shall be a reputable institution with relevant experience; |
| "Senior Facilities Agreement" | means the senior facility agreement originally dated 25 June 2015 between, amongst others, New Look Bonds Limited and Global Loan Agency Services Limited as the facility agent and GLAS Trust Corporation Limited as security agent (as amended and restated pursuant to amendment and restatement agreements dated 6 March 2018, 11 January 2019, 23 January 2019 and 3 May 2019); |
| "Senior Secured Security Documents" | means the "Security Documents" as defined in the Intercreditor Agreement; |
| "Shareholder Loan" | means a £40,00,000 shareholder loan to be utilised by New MidCo on a cashless basis on the Restructuring Effective Date pursuant to the Shareholder Loan Agreement; |
| "Shareholder Loan Agreement" | means the shareholder loan agreement substantially in the form attached at Appendix 6 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| "Shareholder Loan Entitlement" | means in respect of each Scheme Creditor: |

13

|  |  |
|---|---|
| (a) | the proportion (expressed as a percentage) of such Scheme Creditor's Sterling Equivalent Aggregate SSN Holding bears to the Sterling Equivalent Total SSNs; multiplied by |
| (b) | the Shareholder Loan Total Commitment; |

"**Shareholder Loan Facility Agent**" means Global Loan Agency Services Limited in its capacity as agent under the Shareholder Loan Agreement;

"**Shareholder Loan Total Commitment**" means £40,000,000;

"**SSN Common Depositary**" means a depositary common to Euroclear and Clearstream, being Deutsche Bank AG, London Branch;

"**SSN Finance Documents**" means the SSN Indenture, the Intercreditor Agreement and the Senior Secured Security Documents;

"**SSN Holder**" means a beneficial holder of the SSNs;

"**SSN Holding**" means, in respect of a Scheme Creditor that is an SSN Holder, the SSNs that such Scheme Creditor holds;

"**SSN Indenture**" means the indenture with respect to the SSNs dated 3 May 2019 and made between, among others, the Company and GLAS Trustees Limited as trustee, as amended and supplemented from time to time;

"**SSN Paying Agent**" means Paying Agent as that term is defined in the SSN Indenture or any successor trustee appointed in accordance with the SSN Indenture;

"**SSN Trustee**" means the Trustee as that term is defined in the SSN Indenture (currently GLAS Trustees Limited) or any successor trustee appointed in accordance with the SSN Indenture;

"**SSNs**" means the Sterling SSNs and the Euro SSNs;

"**Sterling Equivalent**" means the equivalent amount in pounds sterling of an amount in euro calculated using the Applicable Exchange Rate determined by the Calculation Agent;

"**Sterling Equivalent Aggregate SSN Holding**" means, in respect of a Scheme Creditor, the aggregate of its Sterling SSN Holding and the Sterling Equivalent of its Euro SSN Holding as at the Voting Record Time;

"**Sterling Equivalent Total SSNs**" means the aggregate of the Sterling SSNs and the Sterling Equivalent of the Euro SSNs as at the Voting Record Time;

"**Sterling SSN Holding**" means, in respect of a Scheme Creditor that is an SSN Holder, the Sterling SSNs that such Scheme Creditor holds;

"**Sterling SSNs**" means the £400,131,636 senior secured notes issued by the Company pursuant to the terms of the SSN Indenture;

14

| | |
|---|---|
| "**Subordination Agreement**" | means the subordination agreement substantially in the form attached at Appendix 7 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| "**Subscription Agreement**" | means the subscription agreement for the Scheme Consideration Shares in the form agreed by the Majority SSN Holders and the Company before the date of the Scheme Sanction Hearing; |
| "**Subsidiary**" | has the same meaning as in section 1159 of the Act; |
| "**Supplemental Indenture**" | means the supplemental indenture to the SSN Indenture substantially in the form attached at Appendix 10 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| "**Trust**" | has the meaning given to it in Clause 9.2(a)(i); |
| "**Trust Entitlement**" | has the meaning given to it in Clause 9.3(b); |
| "**Unadmitted Scheme Creditors**" | has the meaning given to it in Clause 9.3(b); |
| "**Undertakings**" | means the Companies Undertaking Deed, the GLAS Undertaking Deed and the Lucid Undertaking Deed; |
| "**U.S. Bankruptcy Code**" | means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended; |
| "**U.S. Bankruptcy Court**" | means the United States Bankruptcy Court for the Southern District of New York or other court of competent jurisdiction presiding over any case filed under Chapter 15 of the U.S. Bankruptcy Code seeking, among other things, recognition of the Scheme as a foreign main proceeding and enforcement of the Court Order in the United States; |
| "**Voting Record Time**" | means 5.00 p.m. (London time) on 14 October 2020. |

## 2.    INTERPRETATION

2.1    In this Scheme, with effect from the Scheme Effective Date or such other date as may be necessary to construe this Scheme, unless the context otherwise requires or otherwise expressly provides for:

(a)    references to "Clauses", "Appendices" and "Recitals" are references to the Clauses, Appendices and Recitals respectively of this Scheme;

(b)    references to a "person" include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(c)    all references to "£" and "GBP" are references to pounds sterling, the lawful currency of the United Kingdom;

(d)    all references to "€" are references to euro, the single currency of the Participating Member States;

15

(e)     references to a statute or statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

(f)     references to a document include the same as subsequently supplemented, amended and/or restated from time to time;

(g)     references to a time of the day are to London time;

(h)     any references to a Scheme Creditor shall be references to a Scheme Creditor in its capacity as an SSN Holder and a Scheme Creditor shall be required to take all steps and actions required in this Scheme to be taken by a Scheme Creditor in any such capacity (as applicable);

(i)     the singular includes the plural and vice versa and words importing one gender shall include all genders;

(j)     the term "including" means "including, without limitation"; and

(k)     headings are for ease of reference only and shall not affect the interpretation of this Scheme.

2.2     References to any figures or amounts in this Scheme are subject to:

(a)     potential modifications or adjustments under Clause 9.7 or otherwise as a result of any rounding or other calculation or allocation procedures (including the potential cancellation of the Scheme Creditor Entitlements) set out herein;

(b)     such minor or technical amendments or any amendments to correct manifest errors as may be agreed by or on behalf of: (i) the Company and (ii) the Majority SSN Holders; and

(c)     such other amendments, adjustments or changes (including in respect of their levels or the order of funds flow) as may be agreed by the Company and the Majority SSN Holders to the extent such amendments, adjustments or changes do not, taken as a whole, result in any material adverse effect on any Scheme Party without its prior written consent.

## 3.    RESTRUCTURING EFFECTIVE DATE

3.1     This Scheme shall take effect on and from the Scheme Effective Date and by its terms shall approve the Financial Restructuring which shall apply in accordance with Clause 3.2.

3.2     Upon the occurrence of the Financial Restructuring Conditions Satisfaction Time, the arrangement effected by the Scheme shall apply to all Scheme Claims and shall be binding on all Scheme Parties and their respective successors and assigns.

3.3     Each Scheme Creditor acknowledges that, as a result of its Scheme Creditor Entitlements and by operation of the Financial Restructuring, it (or its Nominated Recipient(s) in accordance with Clause 4.3) shall become a shareholder of the Parent in accordance with the Scheme, provided that such Scheme Creditor and/or Nominated Recipient(s) provides the CDD Information in a form satisfactory to Crestbridge.

16

4.      **SCHEME CONSIDERATION**

4.1     Subject to the other provisions of this Scheme, each Scheme Creditor may only receive its participation in the Shareholder Loan and/or Scheme Consideration Shares on the Restructuring Effective Date in accordance with the provisions of this Clause 4.

4.2     A Scheme Creditor (or, if relevant, its Nominated Recipient(s)) may only receive its participation in the Shareholder Loan and/or Scheme Consideration Shares on the Restructuring Effective Date if it has duly elected to do so by:

(a)     validly executing and delivering an Account Holder Letter to the Information Agent before the Scheme Voting Submission Deadline;

(b)     in the case of the Shareholder Loan only, and to the extent required, it has provided the GLAS KYC Information (including, if relevant, the GLAS KYC Information in respect of its Nominated Recipient(s)) to the Shareholder Loan Facility Agent by the GLAS KYC Information Deadline, and the Shareholder Loan Facility Agent has confirmed to the Information Agent that the GLAS KYC Information is in a form satisfactory to it by 5 p.m. (London time) on 26 October 2020.

(c)     in the case of the Scheme Consideration Shares only, and to the extent required, it has provided the CDD Information (including, if relevant, the CDD Information in respect of its Nominated Recipient(s)) to Crestbridge by the CDD Information Deadline, and Crestbridge has confirmed to the Information Agent that the CDD Information is in a form satisfactory to it by 5 p.m. (London time) on 26 October 2020.

4.3     A Scheme Creditor may elect for a Nominated Recipient(s) to receive its participation in the Shareholder Loan and/or Scheme Consideration Shares, provided that:

(a)     to make such election to receive participation in the Shareholder Loan and/or Scheme Consideration Shares on the Restructuring Effective Date, such Scheme Creditor and its Nominated Recipient(s) have each validly executed and delivered an Account Holder Letter to the Information Agent prior to the Scheme Voting Submission Deadline; and

(b)     such Nominated Recipient(s) is an Eligible Person.

4.4     Each Scheme Creditor's entitlement to participate in the Shareholder Loan shall be in an amount equal to its Shareholder Loan Entitlement.  The Shareholder Loan Entitlement of a Scheme Creditor shall be allocated to such Scheme Creditor or its Nominated Recipient(s) in accordance with its applicable Account Holder Letter.

4.5     Each Scheme Creditor's entitlement to receive Scheme Consideration Shares shall be in an amount equal to its Scheme Consideration Shares Entitlement.  The Scheme Consideration Shares Entitlement of a Scheme Creditor shall be allocated to such Scheme Creditor or its Nominated Recipient(s) in accordance with its applicable Account Holder Letter.

4.6     By exercising the election(s) referred to in Clauses 4.2 and 4.3, each Scheme Creditor (and its Nominated Recipient(s)) agrees:

(a)     that returning a completed and validly executed and delivered Account Holder Letter offers no assurance that it (or its Nominated Recipient) will receive its (i) participation in the Shareholder Loan on the Restructuring Effective Date if all relevant GLAS KYC

17

Information is not also provided to the Shareholder Loan Facility Agent by the GLAS KYC Information Deadline and (ii) Scheme Consideration Shares on the Restructuring Effective Date if all relevant CDD Information is not also provided to Crestbridge by the CDD Information Deadline;

(b)     in respect of the Scheme Consideration Shares:

(i)     that its rights and obligations in connection with the Scheme Consideration Shares shall be determined in accordance with the terms of this Scheme, the New Parent Articles, the Subscription Agreement and the New Shareholders' Agreement; and

(ii)     that it shall be bound by and perform its obligations and satisfy its Liabilities as a subscriber for the Scheme Consideration Shares under the New Parent Articles, the Subscription Agreement and as an investor under the New Shareholders' Agreement.

4.7     In the event that the relevant elections and actions are not taken by the relevant deadlines referred to in this Clause 4, such Scheme Creditors' participation in the Shareholder Loan and/or Scheme Consideration Shares will be issued on the Restructuring Effective Date to the Holding Period Trustee until such time as the relevant elections and actions are complied with in accordance with Clause 9.3 (or as otherwise provided in Clause 9.3) in accordance with the Holding Period Trust Agreement.

## 5.     FINANCIAL RESTRUCTURING IMPLEMENTATION

### 5.1     Effectiveness

Pursuant to the Undertakings, the Parent, New Midco, GLAS Trust Corporation Limited, Global Loan Agency Services Limited, the SSN Trustee and Lucid, have severally agreed to be bound by and comply with (i) the obligations expressed to apply to them under this Scheme and the Financial Restructuring Documents to which they are expressed to be a party, and (ii) their respective Undertakings.

### 5.2     Inter-conditionality of Restructuring Steps

Each Scheme Party hereby agrees that:

(a)     the Restructuring Steps shall be completed in the order set out in Clause 6;

(b)     each Restructuring Step shall be completed as soon as reasonably practicable following the completion of the previous Restructuring Step; and

(c)     in the event that any Restructuring Step (a "**Relevant Restructuring Step**") is not completed on the Business Day on which the Restructuring Steps are commenced pursuant to Clause 6, then:

(A)     the process of the closing of the Financial Restructuring shall be halted until the date on which the Relevant Restructuring Step and all remaining Restructuring Steps can be completed (on which date all such Restructuring Steps shall be completed);

18

(B)     to the greatest extent permitted by law, any Restructuring Step completed before the Relevant Restructuring Step shall be deemed to have occurred on the Restructuring Effective Date;

(C)     no Scheme Party shall be permitted to raise any objection for the purposes of this Scheme in connection with the fact that a Restructuring Step has not been completed on the Restructuring Effective Date by reason of the operation of the provisions of this Clause 5.2(c);

(D)     in the event that any Restructuring Step completed before the Relevant Restructuring Step cannot be treated as having occurred on a subsequent date under the provisions of this Clause 5.2(c), then the fact of its occurrence on a date prior to the Restructuring Effective Date shall not prevent it being regarded for the purposes of this Scheme as having occurred on the Restructuring Effective Date; and

(E)     each Scheme Creditor agrees and acknowledges that it shall not transfer any Scheme Creditor Entitlement until the Restructuring Effective Date.

**5.3     Pre-Restructuring Steps: Execution of the Financial Restructuring Documents**

(a)     To the extent not already entered into, as soon as practicable after the Scheme Effective Date, the Company, each Scheme Creditor, Lucid, the Security Agent, the SSN Trustee, the SSN Paying Agent and all other relevant parties shall execute the Restructuring Implementation Deed.

(b)     The Company, each Scheme Creditor, Lucid, the Security Agent, the SSN Trustee and all other relevant parties shall execute each other Financial Restructuring Document to which they are a party, to the extent that any Financial Restructuring Document has not been fully executed before the Scheme Effective Date (which shall be held in escrow by the Company and shall not be released or effective until the relevant Restructuring Step occurs and/or the Restructuring Effective Date occurs, as applicable) unless agreed otherwise by the Majority SSN Holders and the Company and (where applicable) Lucid, the Security Agent, the SSN Paying Agent and the SSN Trustee.

**6.     RESTRUCTURING STEPS**

Each Scheme Party hereby agrees that the following steps shall occur on the Restructuring Effective Date in the order set out below.

**6.1     Restructuring Step 1: Confirmation of Financial Restructuring Conditions**

As soon as practicable following the Financial Restructuring Conditions Satisfaction Time, the Company (through the Information Agent) shall deliver a notice to the Scheme Creditors confirming that all Financial Restructuring Conditions have been satisfied or waived in accordance their terms or in accordance with Clause 9.13.

**6.2     Restructuring Step 2: Exchange of SSNs and Shareholder Loan**

The following documentation shall simultaneously become effective pursuant to and in accordance with their respective terms

19

(a)    the Shareholder Loan Agreement and the Shareholder Loan will be utilised by New MidCo on a cashless basis;

(b)    the Subordination Agreement;

(c)    the Supplemental Indenture and the write down and release in respect of the SSNs; and

(d)    the Inter-Company Loan Rationalisation Agreement.

**6.3**    **Restructuring Step 3: Release of PIK Loan proceeds**

The proceeds of the PIK Loan shall be released by the PIK Facility Agent, who shall be directed by:

(a)    New MidCo and the applicable Company Parties to pay the proceeds of the PIK Loan directly to NLR in settlement of the capital contributions in New Look Investment Limited, New Look Bonds Limited, New Look Limited and NLR; and

(b)    NLR to make the payments in accordance with the Payment Schedule,

in each case, pursuant to and in accordance with the Payment Direction Letter.

**6.4**    **Restructuring Step 4: Effectiveness of New Shareholders' Agreement**

Each of the following documentation shall simultaneously become effective pursuant to and in accordance with their respective terms:

(a)    the New Shareholders' Agreement; and

(b)    the Subscription Agreement in respect of the Scheme Consideration Shares and the New Money Shares.

**6.5**    **Restructuring Step 5: Redemption and issuance of shares and adoption of New Parent Articles**

(a)    The Parent shall redeem all Existing Parent Shares and immediately issue and allot the Scheme Consideration Shares and the New Money Shares pursuant to and in accordance with the Subscription Agreement in such proportions consistent with, in the case of each Scheme Creditor, its Scheme Consideration Shares Entitlement and in the case of each New Money Shareholder, such number of New Money Shares as envisaged pursuant to the terms of the Restructuring.

(b)    The New Parent Articles shall be adopted and come into effect simultaneously with the issuance and allotment of the Scheme Consideration Shares and the New Money Shares.

**6.6**    **Restructuring Step 6: Appointment and resignation of directors**

To the extent required, the appointment and resignation of any directors of the Parent in accordance with the New Shareholders' Agreement shall become effective.

20

**6.7**    **Restructuring Step 7: Effectiveness of Amended Super Senior Finance Documents**

Each of the Amended Super Senior Finance Documents shall simultaneously become effective pursuant to and in accordance with their respective terms.

**7.**    **GRANTS OF AUTHORITY TO EXECUTE THE FINANCIAL RESTRUCTURING DOCUMENTS AND INSTRUCTIONS TO TAKE STEPS TO IMPLEMENT THE SCHEME**

7.1    The Scheme Creditors and, pursuant to an Account Holder Letter and its incorporation into this Scheme, their respective Nominated Recipient(s) hereby irrevocably authorise and direct the Company, the Parent, New Midco, the Shareholder Loan Facility Agent, the Security Agent and the SSN Trustee, as their agent and attorney (acting by their respective directors or other duly appointed representatives):

(a)    on and from the Scheme Effective Date, to enter into, execute and, on and from (i) the Scheme Effective Date in respect of the Restructuring Implementation Deed and (ii) in respect of each other Financial Restructuring Document, the Restructuring Effective Date and in the order contemplated in Clause 6, to release from escrow and deliver as a deed (as applicable), on behalf of each Scheme Creditor, the Financial Restructuring Documents and such other documents as are required to implement the Financial Restructuring;

(b)    on and from the Restructuring Effective Date, to cause each determination of the principal amount of and each principal payment of the SSNs (including, for the avoidance of doubt, any Guarantee Liabilities in respect thereof) outstanding to be reduced to zero and released in full pursuant to the Supplemental Indenture and the Company is authorised to notify the SSN Trustee, the SSN Paying Agent, the SSN Common Depositary and the Clearing Systems (as applicable) in respect of such reduction and release and to take, and instruct the SSN Trustee, the SSN Paying Agent, the SSN Common Depositary and the Clearing Systems (as applicable) to take, all actions and/or steps to implement and consummate the reduction and release of the SSNs in accordance with the Applicable Procedures;

(c)    to agree on their behalf any amendments to the Financial Restructuring Documents which the Company and (if applicable) the other person(s) to be party to the relevant Financial Restructuring Document may deem (acting reasonably and in good faith) necessary or desirable in order to ensure that:

(i)    they reflect the terms of this Scheme and the transactions intended to be entered into in order to effect the Financial Restructuring;

(ii)    the information and categories of information contained, or referred to, in any formula, schedule, annexe or similar, signature blocks, parties provisions, notice details or placeholder in any Financial Restructuring Document reflect the relevant information and categories of information as of the applicable date;

(iii)    the Financial Restructuring Documents may be duly executed and delivered; and/or

(iv)    the Financial Restructuring Documents are legal, valid, binding and enforceable upon the parties to them in accordance with this Scheme; and

21

(d)    to carry out any related or ancillary actions that it considers necessary or desirable for the purposes of implementing this Scheme.

7.2    Each of the Parent, New Midco and the Company undertakes to (and the Company shall procure that each of the relevant entities in the Group shall) take all steps and execute all such documents as are required to give effect to the Financial Restructuring, including the Financial Restructuring Documents and the documentary conditions precedent to them.

7.3    Each Scheme Creditor and, pursuant to an Account Holder Letter and its incorporation into this Scheme, each of their respective Nominated Recipient(s) hereby instructs each of the Shareholder Loan Facility Agent, the Security Agent and the SSN Trustee, to be bound to perform the Restructuring Steps relevant to them with effect from the Scheme Effective Date, and such instruction shall constitute the requisite notice to the Company, the SSN Trustee and/or the Security Agent, as the case may be, and direction (in the case of the SSN Trustee and/or the Security Agent, as the case may be) on behalf of the SSN Holders and/or the SSN Trustee, as the case may be, under the Indenture (and the Scheme Parties agree such notice shall constitute valid notice for the purposes of the Indenture).

7.4    Each Scheme Creditor and, pursuant to an Account Holder Letter and its incorporation into this Scheme, each of their respective Nominated Recipient(s), hereby instructs each of the Shareholder Loan Facility Agent, the Security Agent and the SSN Trustee to individually undertake such steps as it considers necessary or desirable for the purposes of facilitating the implementation of this Scheme, including (without limitation) entering into and executing in its respective capacity the Financial Restructuring Documents to which it is a party and any document that it considers necessary or desirable to implement this Scheme.

7.5    Once a Financial Restructuring Document has been executed and becomes effective, the authority granted by each Scheme Creditor to the Company under this Clause 7 shall expire in respect of that Financial Restructuring Document and it may only be amended in accordance with its terms.

7.6    All grants of authority granted under this Clause 7 shall be treated, for all purposes whatsoever and without limitation, as having been granted by a deed under English law.

## 8.    RELEASES IN CONNECTION WITH THE FINANCIAL RESTRUCTURING

8.1    With effect from the Restructuring Effective Date, all of the rights, title and interest of each Scheme Creditor to its Scheme Claims shall be discharged fully and absolutely by operation of this Scheme as consideration for the Scheme Creditor Entitlements and the right to receive the participation in the Shareholder Loan and the Scheme Consideration Shares under the terms of this Scheme and the Financial Restructuring Documents and without any action on the part of that Scheme Creditor, in each case so as to bind that Scheme Creditor.

8.2    With effect on and from the Restructuring Effective Date:

(a)    each Scheme Creditor (in its capacity as such), subject to Clause 8.2(b), and to the extent not already done so above in respect of its SSNs, irrevocably and unconditionally, fully and finally waives and releases and forever discharges any and all actions, proceedings, claims, damages, counterclaims, complaints, liabilities, liens, rights, demands and set-offs, whether present or future, prospective or contingent, whether in this jurisdiction or any other or under any law, of whatsoever nature and howsoever arising, whether in law or in equity, in contract (including but not limited to breaches or non-performances of contract), statute or in tort (including but not limited

22

to negligence and misrepresentation) or any other manner whatsoever, breaches of statutory duty, for contribution, or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether or not presently known to the parties or to the law, in each case that it ever had, may have or hereafter can, shall or may have arising out of actions, omissions or circumstances on or prior to the Restructuring Effective Date against the Company and each of the following (in each case, in its or their capacity as such): (i) the Advisers, (ii) Lucid, (iii) the SSN Trustee, (iv) the Security Agent, (v) the SSN Paying Agent, (vi) the Shareholder Loan Facility Agent or (vii) any other Scheme Creditor (or Nominated Recipient(s)) or such Scheme Creditor's Affiliates (each person referred to above in this Clause 8.2(a) a "**Restructuring Released Party**", and together the "**Restructuring Released Parties**") in relation to or arising out of or in connection with the SSN Finance Documents, the Scheme Claims and/or the negotiation and the implementation of this Scheme and the Financial Restructuring;

(b)     however, Clause 8.2(a) shall not:

(i)     in any way impair or prejudice any rights of any Scheme Creditor arising under (A) this Scheme, (B) any report or advice provided by any Adviser, on which report or advice such Scheme Creditor is entitled to rely, or (C) any Financial Restructuring Document (including as a consequence of non-compliance with the terms of this Scheme, the Financial Restructuring Documents or in respect of an Allowed Proceeding) or any remedy in respect of any such rights arising under the documents described at (A) to (C) hereof; and

(ii)    apply to any claim or Liability in respect of fraud or wilful misconduct by any Restructuring Released Party.

## 9.     PROVISIONS APPLICABLE TO THE FINANCIAL RESTRUCTURING

### 9.1     Undertakings

Upon the occurrence of the Restructuring Effective Date, each Scheme Creditor hereby irrevocably ratifies and confirms everything which the Company, its their Affiliates and its respective directors/managers/officers (or equivalent), may lawfully do or cause to be done or purport to do pursuant to the authority conferred by, or in connection with, the Financial Restructuring, including Clauses 7 and 8.

### 9.2     Release Trust

(a)     Upon the occurrence of the Restructuring Effective Date, the Company hereby declares that:

(i)     it holds as trustee each of the releases and undertakings given by the Scheme Creditors pursuant to (or in connection with) this Scheme in favour of itself and each of the Affiliates, Lucid, the Security Agent, the SSN Trustee, the Shareholder Loan Facility Agent and the Advisers on trust respectively for itself and each of the Affiliates, Lucid, the Security Agent, the SSN Trustee, the SSN Paying Agent and the Advisers (as applicable) (the "**Trust**"); and

(ii)    it has the power to appoint an additional or replacement trustee over the Trust at any time, subject to any additional or replacement trustee agreeing to be bound by the terms of this Scheme.

23

### 9.3    Holding Period Trustee

(a)    The Scheme Creditor Entitlements may be withheld from being distributed to a Scheme Creditor (or its Nominated Recipient(s)) on the Restructuring Effective Date if, (a) the Information Agent does not receive a validly executed and delivered Account Holder Letter from that Scheme Creditor and all of the information, representations, confirmations and any other documentation required to be provided therein before the Scheme Voting Submission Deadline and/or (b) in the case of the Shareholder Loan Entitlement, the Shareholder Loan Facility Agent does not receive the GLAS KYC Information or to the extent that the Shareholder Loan Facility Agent has not confirmed by 5 p.m. (London time) on 26 October 2020 to the Information Agent that the GLAS KYC Information is in a form satisfactory to the Shareholder Loan Facility Agent and/or (c) in the case of the Scheme Consideration Shares Entitlement, Crestbridge does not receive the CDD Information by the CDD Information Deadline or to the extent Crestbridge has not confirmed to the Information Agent by 5 p.m. (London time) on 26 October 2020 that such CDD Information is in a form satisfactory to Crestbridge.

(b)    Any Scheme Creditor Entitlements withheld pursuant to Clause 9.3(a) will be delivered to the Holding Period Trustee on the Restructuring Effective Date who will hold such Scheme Creditor Entitlements on behalf of the relevant Scheme Creditors (the "**Unadmitted Scheme Creditors**" and each an "**Unadmitted Scheme Creditor**") (the "**Trust Entitlements**") for the Initial Holding Period, subject to the terms of the Financial Restructuring Documents. A Scheme Creditor whose Scheme Creditor Entitlements have been issued to the Holding Period Trustee under this Clause 9.3(b) may request the Holding Period Trustee in writing to transfer the relevant Trust Entitlements to it (or its Nominated Recipient(s)), provided that it (a) provides a validly executed and delivered Account Holder Letter to the Holding Period Trustee, together with any such information, confirmation, representations or undertakings that the Holding Period Trustee may request, (b) in the case of the Shareholder Loan Entitlement, provides the Shareholder Loan Facility Agent the GLAS KYC Information in a form satisfactory to the Shareholder Loan Facility Agent, (c) in the case of the Scheme Consideration Shares Entitlement, provides the CDD Information in a form satisfactory to Crestbridge and/or (d) adheres to the New Shareholders' Agreement.

(c)    Following the expiry of the Initial Holding Period, the Holding Period Trustee will, as soon as reasonably practicable thereafter, use reasonable endeavours, including by the appointment of a Selling Agent or otherwise, to sell or otherwise dispose of the remaining Trust Entitlements for such consideration as it is able to obtain (after any taxes, withholding, deductions, fees, costs or any other expenses in connection therewith) (such consideration being the "**Trust Entitlements Consideration**"). The Holding Period Trustee shall, for a period of three months (the "**Trust Entitlements Consideration Holding Period**"), hold the Trust Entitlements Consideration on trust for each Unadmitted Scheme Creditor *pro rata* to the Trust Entitlements Consideration raised from the sale of the relevant Unadmitted Scheme Creditor's Trust Entitlements. A Scheme Creditor whose Trust Entitlements have been sold or otherwise disposed of by the Holding Period Trustee pursuant to this Clause 9.3(c) may request the Holding Period Trustee in writing to transfer the relevant Trust Entitlements Consideration to it (or its Nominated Recipient(s)) (after deducting any taxes, withholding, deductions, fees, costs, or any other expenses in connection with such Trust Entitlements or Trust Entitlements Consideration), provided that it provides an executed Account Holder Letter, completed as appropriate, together with any relevant information, confirmation, representations or undertakings that the Holding Period Trustee may request. At the

24

end of the Trust Entitlements Consideration Holding Period, the Holding Period Trustee will pay or deliver any remaining Trust Entitlements or Trust Entitlements Consideration to the Company or any person nominated by the Company.

(d)     The Scheme Parties acknowledge and agree that the Holding Period Trustee has the power to appoint an additional or replacement trustee over the Trust Entitlements at any time, subject to any additional or replacement trustee agreeing to be bound by the terms of this Scheme.

**9.4     Stay of Prohibited Proceedings**

(a)     Subject to Clause 9.4(b), no Scheme Creditor may commence, support any person commencing, or instruct any person to commence or take any Prohibited Proceeding in relation to the Financial Restructuring against the Company, any Affiliate and/or an Adviser.

(b)     A Scheme Creditor may commence an Allowed Proceeding against any Scheme Party after giving each Scheme Creditor 21 days' written notice of its intention to do so.

(c)     Each Scheme Creditor will hold on trust for the benefit of the Company any recovery made pursuant to any Prohibited Proceeding in breach of this Clause 9.4 and will turn over any such recovery forthwith upon demand being made by the Company without set-off, counterclaim or deduction.  To the extent that the asset comprising the recovery cannot be held on trust by the Scheme Creditor, the Scheme Creditor shall pay to the Company an amount equal to that recovery immediately upon demand being made by the Company without set-off, counterclaim or deduction, to be held on trust by the Company for the person(s) entitled to it.

**9.5     Failure of all Restructuring Steps to occur before the Longstop Date**

If any of the Restructuring Steps does not occur before the Longstop Date or any termination of this Scheme in accordance with Clause 9.6(a) occurs, Clause 5 shall not apply and, to the extent permitted by applicable law, all Restructuring Steps will not or will be deemed not to have occurred and any actions taken under or pursuant to Clause 5 shall have no valid or binding effect.  To the extent permitted by law, all relevant parties agree to take such steps as are necessary and/or desirable to reverse any such steps that have already occurred in order to put the parties in the position they were in before the steps occurred, provided that no party shall be required to incur any material out-of-pocket costs or expenses.

**9.6     Termination of this Scheme**

(a)     This Scheme shall terminate and shall be construed as if it had never become effective and the rights and obligations of the Scheme Creditors under the SSN Finance Documents shall not be affected and shall remain in full force (and any Defaults and Events of Defaults continuing or occurring in connection with the terms of this Scheme under and as defined in the SSN Finance Documents shall be deemed not to have been waived and any grace period that expired during the duration of this Scheme shall remain expired following the termination of this Scheme) if the Restructuring Effective Date has not occurred by the Longstop Date.

(b)     Clauses 9.5, 9.6(a), 9.11, 9.12 and 9.19 shall survive any termination of this Scheme.

25

9.7     **Fractional entitlements**

Each Scheme Creditors participation in the Shareholder Loan will be rounded to the nearest £0.01, with half a pence being rounded upwards.  Fractions of Scheme Consideration Shares will not be issued and will be rounded down to the nearest whole Scheme Consideration Share. No cash or other consideration will be due in respect of any fraction of the Shareholder Loan less than £0.01 or any fraction of the Scheme Consideration Shares.

9.8     **Assignments or transfers after the Voting Record Time**

(a)     Unless expressly provided otherwise herein, all Scheme Claims shall be determined as at the Voting Record Time.

(b)     The Company shall not be under any obligation to recognise any assignment or transfer of Scheme Claims after the Voting Record Time, provided that, where the Company has received from the relevant parties written notice of such assignment or transfer, the Company may in its absolute discretion, and subject to such evidence as it may reasonably require, agree to recognise such assignment or transfer, subject to the assignee or transferee agreeing to be bound by the terms of this Scheme and to be treated as having been a Scheme Creditor for the purposes of this Scheme.

9.9     **Provision of information by Scheme Creditors**

(a)     An Account Holder Letter submitted by or on behalf of any Scheme Creditor and/or its Nominated Recipient(s) shall be submitted in accordance with the instructions set out in the relevant Account Holder Letter and this Scheme.

(b)     If the Information Agent refuses to accept an Account Holder Letter, it shall promptly prepare a written statement of its reasons for doing so and send that statement by electronic mail to the party that provided such Account Holder Letter.

(c)     The Company may disclose the Account Holder Letter and its contents, any GLAS KYC Information, any CDD Information to such persons and Advisers as are necessary to facilitate the consummation of the Financial Restructuring.

9.10    **Future insolvency**

(a)     To the extent that any administrator, receiver or other insolvency official which is appointed in respect of the Company so agrees, in the event that the Company enters into an insolvency proceeding, administration, reorganisation or liquidation on or before the Restructuring Effective Date, the Company's obligations under this Scheme shall continue to be performed by the Company in an insolvency proceeding, administration reorganisation or liquidation to the fullest extent permitted by law or unless otherwise determined by the Court.

(b)     With effect from the Restructuring Effective Date, this Scheme shall continue according to its terms to the fullest extent permitted by law or unless otherwise determined by the Court, notwithstanding any administration, reorganisation or liquidation of the Company.

EU-DOCS\29867554.8

**9.11    Exclusion of liability**

(a)    To the extent permitted by law, no Scheme Creditor shall be entitled to challenge the validity of any act done or omitted to be done in good faith by any of the Advisers, the Parent, New Midco, the Company, Lucid, the Shareholder Loan Facility Agent, the Holding Period Trustee, the Security Agent, the SSN Trustee, the SSN Paying Agent, the PIK Facility Agent, Crestbridge or the Company (or any of their respective authorised signatories, agents, employees and/or delegates) (the "**Excluded Persons**") in connection with their actions or omissions pursuant to the provisions of this Scheme or the exercise by any of the Excluded Persons in good faith of any power conferred upon them for the purposes of this Scheme if exercised in accordance with the provisions of this Scheme.

(b)    To the extent permitted by law, the Company shall not be entitled to challenge the validity of any act done or omitted to be done in good faith by the Excluded Persons in accordance with the provisions of this Scheme or the exercise by the Excluded Persons in good faith of any power conferred upon it for the purposes of this Scheme if exercised in accordance with the provisions of this Scheme.

(c)    No Excluded Person shall be liable for any cost, loss or liability in connection with this Scheme unless such loss is attributable to its gross negligence, wilful misconduct or fraud.

(d)    With respect to the Scheme Creditors, the Group or any other person affected or bound by this Scheme, the Security Agent, the SSN Trustee, SSN Paying Agent, the Shareholder Loan Facility Agent or the Holding Period Trustee undertakes to perform or to observe only such of its covenants or obligations as are specifically set forth in the Intercreditor Agreement and this Scheme.  The Holding Period Trustee shall have only those duties, obligations and responsibilities expressly specified in this document and no others shall be implied.  Section 1 of the Trustee Act 2000 shall not apply to the duties of the Holding Period Trustee in relation to the trusts constituted by this document.

(e)    Nothing in the Explanatory Statement or this Scheme shall impose any obligation on the Security Agent, the SSN Trustee, the SSN Paying Agent, the Shareholder Loan Facility Agent or the Holding Period Trustee to expend its own funds or pay any amount out of its personal assets with respect to any claims made by a Scheme Creditor as a result of the Security Agent, the SSN Trustee, the SSN Paying Agent, the Shareholder Loan Facility Agent or the Holding Period Trustee taking any of the steps contemplated by this Scheme except to the extent that the same arises from the wilful misconduct or gross negligence of the Security Agent, the SSN Trustee, SSN Paying Agent, the Shareholder Loan Facility Agent or the Holding Period Trustee.

(f)    None of the Security Agent, the SSN Trustee, Lucid, the Holding Period Trustee, the Shareholder Loan Facility Agent and their respective directors, officers, employees, agents and advisers shall be personally responsible or accountable in damages or otherwise to any Scheme Creditor, the Group or any other person affected or bound by this Scheme for any loss, damage or claim incurred by reason of any act or omission performed or omitted by the Security Agent, the SSN Trustee, Lucid, the Shareholder Loan Facility Agent or the Holding Period Trustee in good faith in accordance with this Scheme that it reasonably believes to be within the scope of the authority conferred on it by the Intercreditor Agreement and this Scheme.

27

(g)  None of the Security Agent, the SSN Trustee, Lucid, the Shareholder Loan Facility Agent and the Holding Period Trustee shall be personally liable for or on account of any of the statements, representations, warranties, covenants or obligations stated to be those of any Scheme Creditors, the Group or any other person affected or bound by this Scheme, with all such liability, if any, being expressly waived by any such persons claiming by, through or under any of the foregoing.

(h)  Each of the Security Agent, the SSN Trustee, the Shareholder Loan Facility Agent, Lucid, and the Holding Period Trustee shall at all times be entitled to and may rely on any document notice, consent, order, opinion or certificate given, issued or granted by any person or court that it reasonably believes to be genuine and correct pursuant to the Intercreditor Agreement and this Scheme without being under any obligation to enquire or otherwise determine whether any such notice, consent, order, opinion or certificate is adequate, accurate and/or complete and has been given or granted in accordance with applicable laws or any contractually binding obligation and without being under any responsibility or being under any obligation to validate the legality, effectiveness, completeness, adequacy or enforceability of the Financial Restructuring that is to be implemented as a consequence of this Scheme.

## 9.12    Costs

Subject to and in accordance with the steps set out in Clause 6 and the implementation of the Restructuring Steps, all costs, charges, expenses and disbursements ("**Costs**") incurred by the Company and the Group in connection with the negotiation, preparation and implementation of this Scheme shall be paid in accordance with the Payment Schedule and, to the extent not paid pursuant to the Payment Schedule, such Costs shall be paid by the Company, or the Company shall procure that a member of the Group shall pay such Costs, as and when they arise. Such Costs include, but are not limited to, the costs of holding the Scheme Meeting, the costs of obtaining the sanction of the Court and the costs of placing the notices (if any) required by this Scheme and the fees of the Advisers participating in the negotiation and preparation of the Financial Restructuring Documents, without establishing any obligation to pay any such costs as an expense or in priority to other creditors (to the extent possible under applicable law).

## 9.13    Waiver of the Financial Restructuring Conditions

Any Financial Restructuring Condition may be waived only with the written consent of (i) the Company and (ii) the consent of the Majority SSN Holders.

## 9.14    Modification

The Company may at any hearing to sanction this Scheme consent on behalf of all Scheme Creditors to any modification of, or addition to, this Scheme or to any terms or conditions that the Court may think fit to approve or impose, and which would not directly or indirectly have a material adverse effect on the interests of any Scheme Creditor, the Security Agent, the PIK Security Agent under this Scheme. However, if such modifications could reasonably be expected directly or indirectly to have a material adverse effect on the interests of a Scheme Creditor, then the Company may not give such consent without the prior written consent of that Scheme Creditor.

EU-DOCS\29867554.8

**9.15    Chapter 15 Filing**

To the extent it has not already done so prior to the Scheme Effective Date, the Company shall file a petition for recognition of this Scheme under Chapter 15 of the U.S. Bankruptcy Code and shall use reasonable endeavours to obtain a Chapter 15 Order, unless:

(a)    and until such order is granted or unconditionally denied by the U.S. Bankruptcy Court; or

(b)    otherwise agreed between the Majority SSN Holders and the Company.

**9.16    Exercise of discretion**

Where, under or pursuant to any provision of this Scheme, a matter is to be determined by the Company, it shall be determined by the Board, in their discretion in such manner as they may consider fair and reasonable.  If any difficulty shall arise in determining any such matter either generally or in any particular case or in ensuring the result described above, it shall be resolved by the Company in such manner as it shall consider to be fair and reasonable and its decision shall, insofar as permitted by law, be final and binding on all concerned.

**9.17    Performance of obligations on dates other than a Business Day**

If any obligation is to be performed under the terms of this Scheme on a date other than a Business Day and is not capable of being performed on such date, the relevant obligation shall be performed on the next Business Day.

**9.18    Notices**

(a)    Any notice or other written communication to be given under or in relation to this Scheme shall be given in the English language in writing and shall be deemed to have been duly given if it is delivered by hand, email (or other electronic means in the case of a Clearing System), Applicable Procedures, posted on the Scheme Website, fax, pre-paid recorded delivery or international courier to the address or email address as set out below (or as may be notified by notice to Scheme Creditors from time to time) or, in relation to any notice to be given to the Scheme Creditors that are SSN Holders only, through the Clearing Systems to the relevant Account Holders, and marked for the attention of the relevant person as agreed between the parties or as specified in an Account Holder Letter.

(b)    The addresses for notices are as follows:

(i)    in the case of the Company, to New Look Financing plc, New Look House, Mercery Road, Weymouth, Dorset DT3 5HJ, United Kingdom, marked for the attention of Richard Collyer and email address: projecttone.lwteam@lw.com;

(ii)    in the case of a Scheme Creditor, to the Information Agent at Lucid Issuer Services Limited, Tankerton Works, 12 Argyle Walk, London WC1H 8HA, United Kingdom, marked for the attention of Victor Parzyjagla / Oliver Slyfield, telephone number +44 20 7704 0880 and email address: newlook@lucid-is.com; and

EU-DOCS\29867554.8

    (iii)    in the case of any other person, any address set forth for that person in any agreement entered into in connection with this Scheme.

(c)    Any notice or other written communication to be given under this Scheme shall be deemed to have been served:

    (i)    at the time of delivery if delivered personally;

    (ii)    at the time of transmission if sent by email;

    (iii)    at the time of transmission if sent through the Clearing Systems;

    (iv)    two Business Days after the time and date of posting if sent by pre-paid recorded delivery;

    (v)    three Business Days after the time and date of posting if sent by international courier; or

    (vi)    when the recipient received (or is deemed to receive) the notice or other written communication through access of the Scheme Website.

(d)    The accidental omission to send any notice, written communication or other document in accordance with Clauses 9.18(a) to 9.18(c), or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Scheme.

**9.19**    **Governing law and jurisdiction**

(a)    Subject to Clause 9.19(b), this Scheme and any non-contractual obligations arising out of or in connection with it shall be governed by, and construed in accordance with, the laws of England and Wales and each of the Scheme Creditors hereby agrees that the Court shall have exclusive jurisdiction to hear and determine any suit, action or Proceeding and to settle any dispute which may arise out of the Explanatory Statement or any provision of this Scheme, or out of any action taken or omitted to be taken under this Scheme or in connection with the administration of this Scheme, and, for such purposes, each of the Scheme Creditors irrevocably submits to the jurisdiction of the Court, provided, however, that nothing in this Clause 9.19 shall:

    (i)    affect the validity of other provisions regarding governing law and jurisdiction as between the Company and any of the Scheme Creditors, whether contained in any contract (including any Financial Restructuring Document) or otherwise; or

    (ii)    prevent the Company, an additional or replacement trustee appointed in respect of the Trust or any of the beneficiaries of the Trust from relying upon the provisions of this Scheme in any foreign court or in any foreign Proceedings.

(b)    The U.S. Bankruptcy Court shall have exclusive jurisdiction to hear and determine any dispute, suit, action or Proceeding (including any settlement thereof) which may arise out of or in connection with any Chapter 15 Order relating to the Company or its assets located within the territorial jurisdiction of the United States.

**9.20    Delegation**

(a)    The Company may perform its rights, powers, duties, discretions and/or obligations through such one or more authorised signatories, acting jointly or severally, as it may appoint from time to time.

(b)    The Company may also delegate its rights, powers, duties, discretions and/or obligations (including the execution and delivery of any document or instrument) to any person it deems appropriate, in its sole discretion.

**9.21    Scheme subject to provisions of mandatory law**

This Scheme shall take effect subject to any prohibition or condition imposed by law.

31

**<u>Exhibit C</u>**

**Explanatory Statement**

**THIS DOCUMENT IS AN EXPLANATORY STATEMENT IN COMPLIANCE WITH SECTION 897 OF THE COMPANIES ACT 2006, IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.**

**24 SEPTEMBER 2020**

# EXPLANATORY STATEMENT IN RELATION TO THE SCHEME OF ARRANGEMENT

## UNDER PART 26 OF THE COMPANIES ACT 2006

between

**NEW LOOK FINANCING PLC**
(the "**Scheme Company**")

and

**THE SCHEME CREDITORS**
(as defined in this Explanatory Statement)

**This Explanatory Statement concerns matters which may affect your legal rights and entitlements. If you are in any doubt as to the contents of this document or what action you should take, you are recommended to seek immediately your own independent financial, legal and/or tax advice.**

**This Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Explanatory Statement may be sold, issued or transferred in any jurisdiction in contravention of applicable law.**

**This Explanatory Statement is being sent to persons who are believed to be Scheme Creditors (as defined in this Explanatory Statement) of the Scheme Company as at the date of this document. If you have assigned, sold or otherwise transferred your interests in the SSNs (as defined in this Explanatory Statement) or intend to do so before the Voting Record Time you should forward a copy of this document to the person or persons to whom you have assigned, sold or otherwise transferred those interests or the person or persons to whom you intend to assign, sell or transfer such interests.**

**The Voting Record Time for the Scheme is 5 p.m. London time on 14 October 2020.**

**Only persons that hold interests in the SSNs as at the Voting Record Time will be entitled to vote on the Scheme. Any persons who acquire interests in the SSNs after the Voting Record Time will not be entitled to vote on the Scheme in respect of those interests.**

**This Explanatory Statement is accompanied by a form of Account Holder Letter at Appendix 3 (*Form of Account Holder Letter*) to this Explanatory Statement. Whether or not a Scheme Creditor intends to attend the Scheme Meeting, each Scheme Creditor is requested to instruct its Account Holder to complete and return the Account Holder Letter to the Information Agent in accordance with the instructions set out in Part 6 (*Actions to be Taken by Scheme Creditors*) of this Explanatory Statement, as soon as possible and in any event by 5 p.m. (London time) on 14 October 2020.**

# CONTENTS

| Clause | Page |
| --- | --- |

**IMPORTANT NOTICE TO SCHEME CREDITORS** ...................................................................1

**PART 1**..................................................................................................................................6

**LETTER FROM THE DIRECTORS OF THE SCHEME COMPANY**

**PART 2**................................................................................................................................16

**KEY TRANSACTION DATES**

**PART 3**................................................................................................................................17

**BACKGROUND TO THE GROUP AND THE GROUP'S FINANCING ARRANGEMENTS**

**PART 4**................................................................................................................................19

**THE FINANCIAL RESTRUCTURING**

**PART 5**................................................................................................................................24

**THE SCHEME**

**PART 6**................................................................................................................................30

**ACTIONS TO BE TAKEN BY SCHEME CREDITORS**

**PART 7**................................................................................................................................37

**CONSEQUENCES OF A FAILURE TO IMPLEMENT THE FINANCIAL RESTRUCTURING**

**PART 8**................................................................................................................................41

**DIRECTORS' INTERESTS**

**PART 9**................................................................................................................................42

**RISK FACTORS**

**PART 10**..............................................................................................................................50

**CERTAIN DEFINITIONS AND INTERPRETATION**

**PART 11**..............................................................................................................................58

**ENQUIRIES**

**APPENDIX 1** ......................................................................................................................59

**FORM OF SCHEME**

**APPENDIX 2** ......................................................................................................................60

**FORM OF NOTICE OF SCHEME MEETING**

**APPENDIX 3** ......................................................................................................................61

**FORM OF ACCOUNT HOLDER LETTER**

**APPENDIX 4** ......................................................................................................................62

**EQUITY AND NEW MONEY TERM SHEET**

**APPENDIX 5** ......................................................................................................................63

**DEBT TERM SHEET**

EU-DOCS\29867510.8

**APPENDIX 6** ................................................................................................................**64**

      **FORM OF SHAREHOLDER LOAN AGREEMENT**

**APPENDIX 7** ................................................................................................................**65**

      **FORM OF SUBORDINATION AGREEMENT**

**APPENDIX 8** ................................................................................................................**66**

      **FORM OF SHAREHOLDERS' AGREEMENT**

**APPENDIX 9** ................................................................................................................**67**

      **FORM OF NEW PARENT ARTICLES**

**APPENDIX 10** ..............................................................................................................**68**

      **FORM OF SUPPLEMENTAL INDENTURE**

**APPENDIX 11** ..............................................................................................................**69**

      **FORM OF GLAS UNDERTAKING DEED**

**APPENDIX 12** ..............................................................................................................**70**

      **FORM OF LUCID DEED OF UNDERTAKING**

**APPENDIX 13** ..............................................................................................................**71**

      **FORM OF COMPANIES UNDERTAKING DEED**

**APPENDIX 14** ..............................................................................................................**72**

      **SIMPLIFIED GROUP STRUCTURE CHART**

EU-DOCS\29867510.8

**IMPORTANT NOTICE TO SCHEME CREDITORS**

## 1. THE INFORMATION IN THIS EXPLANATORY STATEMENT

Unless the context otherwise requires, all capitalised terms used in this Explanatory Statement shall have the meanings set out in Part 10 (*Certain Definitions and Interpretation*) of this Explanatory Statement. The appendices to this Explanatory Statement form an integral part of it and, unless expressly stated otherwise, references to this Explanatory Statement shall be construed as references to this Explanatory Statement including the appendices to it.

Copies of this Explanatory Statement are available (free of charge) to Scheme Creditors from the Information Agent, which can be contacted at newlook@lucid-is.com and +44 20 7704 0880 and via the Scheme Website (https://www.lucid-is.com/newlook).

This Explanatory Statement has been prepared in connection with the Scheme under Part 26 of the Companies Act 2006 between the Scheme Company and its Scheme Creditors. This Explanatory Statement has been prepared solely for the purpose of providing information to Scheme Creditors in relation to the Scheme.

This Explanatory Statement, including any other document referred to or relied on, issued with or appended to it should only be used by Scheme Creditors to make decisions regarding the Scheme, and should not be used or relied upon by any other person or for any other purpose. Scheme Creditors may not reproduce or distribute this Explanatory Statement, in whole or in part, and may not disclose any of the contents of this Explanatory Statement or use any information herein for any purpose other than considering and/or making decisions regarding the Scheme except as required by applicable law or regulation. In particular and without limitation, nothing in this Explanatory Statement should be relied on in connection with the purchase or acquisition of any shares or any other financial instruments or assets of the Scheme Company or any other member of the Group.

Nothing contained in this Explanatory Statement shall constitute a warranty, undertaking or guarantee of any kind, express or implied, and nothing contained in this Explanatory Statement shall constitute any admission of any fact or liability on the part of the Scheme Company, or any other member of the Group with respect to any asset to which it may be entitled or any claim against it. Without prejudice to the generality of the foregoing, the distribution of this Explanatory Statement and the information contained within it does not evidence to any person, or constitute any admission by the Scheme Company or any other member of the Group, that a liability is owed by it to any person in respect of any claim or that any person is or may be a Scheme Creditor in respect of the Scheme Company. The failure to distribute this Explanatory Statement to the Scheme Creditor of the Scheme Company shall not constitute an admission by the Scheme Company or any other member of the Group that such person is not a Scheme Creditor of the Scheme Company.

No person has been authorised by the Scheme Company or the Information Agent to give any information or make any representations concerning any of the Scheme (including concerning the Scheme Company or any other member of the Group) which is inconsistent with this Explanatory Statement and, if made, such representations may not be relied upon as having been so authorised.

The information contained in this Explanatory Statement has been prepared based upon information available to the Scheme Company as at the date of this Explanatory Statement. The delivery of this Explanatory Statement does not imply that, unless expressly stated otherwise, the information herein is correct as at any time subsequent to the date hereof. Save as otherwise agreed, or as required by applicable law or regulation, the Scheme Company has no obligation to update or revise any of the information, forward-looking statements or the conclusions contained herein or to reflect new events or circumstances or to correct any inaccuracies which may become apparent to the Scheme Company subsequent to the date hereof. To the best of the knowledge, information and belief of the Scheme Company, the information relating to the Scheme Company contained in this Explanatory Statement is in accordance with the facts known to the Scheme Company as at the date of this Explanatory Statement

and does not omit anything likely to affect the import of such information. The Scheme Company has taken all reasonable steps to ensure that this Explanatory Statement contains the information reasonably necessary to enable the Scheme Creditors to make informed decisions about the effect of the Scheme proposed by the Scheme Company on the Scheme Company and the Scheme Creditors.

The financial and legal advisers to the Group have not verified that the information contained in this Explanatory Statement is true, accurate and complete or that it does not omit anything likely to affect the import of such information. None of the financial or legal advisers of the Group shall have any responsibility or liability for the information contained in this Explanatory Statement.

In making decisions regarding the Scheme, a Scheme Creditor must rely on its own examination, analysis and enquiry of the Scheme Company and the terms and, if approved, the consequences of the Scheme, including the merits and risks involved.

This Explanatory Statement has not been reviewed, verified or approved by any rating agency or any regulatory authority. Without prejudice to any representations and / or warranties expressly given by the Scheme Company, any other member of the Group or their respective directors or officers in any other document, to the fullest extent permitted by law no Scheme Company, other member of the Group or their respective directors, officers, direct or indirect shareholders or controlling parties, affiliates, employees, agents, advisors, experts, or valuation professionals shall have any tortious, contractual or any other liability to any person in connection with the use of this Explanatory Statement. No Scheme Company or other member of the Group accepts any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from any use of this Explanatory Statement, its contents or preparation or otherwise in connection with it, even if the Scheme Company or other member of the Group has been advised of the possibility of such damages.

## 2.  U.S. SECURITIES LAW

Securities may not be offered or sold in the United States unless the offering or sale of such securities is registered under the US Securities Act or such securities are issued in transactions exempt from such registration. The securities proposed to be issued or transferred pursuant to the scheme have not been, and will not be, registered under the U.S. Securities Act or with any securities regulatory authority of any state or any other jurisdiction of the U.S., and may not be offered, sold or resold in the U.S. except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act. The securities that are B ordinary shares of the Parent will be issued in reliance upon the exemption from registration provided by section 3(a)(10) of the US Securities Act. The approval of the High Court of Justice in England and Wales provides the basis for the B ordinary shares of the Parent to be issued without registration under the U.S. Securities Act, in reliance on the exemption from the registration requirements of the U.S. Securities Act provided by section 3(a)(10).

The Scheme Creditors must rely on their own examination of the terms of the Scheme, including the merits and risks involved. The Scheme Creditors resident in the U.S. should consult their own legal, financial and tax advisors with respect to legal, financial and tax consequences of the scheme in their particular circumstances. This Explanatory Statement will not be filed with the SEC, any U.S. state securities authority or the securities authority of any other jurisdiction, and we do not expect that the Scheme will be reviewed by the SEC, any U.S. state securities authority or the securities authority of any other jurisdiction and none of them has or will approve, disapprove, pass judgment upon or endorse the merits or fairness of the Scheme nor the accuracy, adequacy or completeness of this Explanatory Statement or the Scheme. The securities referred to herein have not been recommended by any U.S. federal or state securities commission or regulatory authority. Any representation to the contrary is a criminal offence in the U.S..

## 3.  ELECTRONIC FORM

This Explanatory Statement has been sent to you in electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of transmission and although the Scheme Company and the Information Agent have taken reasonable steps to prevent alteration or corruption of this Explanatory Statement, none of the Scheme Company, the other members of the Group, the Information Agent or their respective directors, officers, direct or indirect shareholders or controlling parties, affiliates, employees or agents, accepts any liability or responsibility whatsoever in respect of any differences between the attached Explanatory Statement distributed to you in electronic format and the Explanatory Statement as it may appear on the Scheme Website.

## 4.  RESTRICTIONS

The distribution of this Explanatory Statement may be restricted by law in certain jurisdictions. No representation is made by the Scheme Company that this Explanatory Statement has been lawfully distributed to any person in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, and the Scheme Company does not assume any responsibility for such distribution to any recipient.

This Explanatory Statement does not constitute an invitation to participate in the transactions contemplated by this Explanatory Statement in or from any jurisdiction in or from which, or to or from any person to or from whom, it is unlawful to make such invitation under applicable securities laws.

The distribution of this Explanatory Statement to or in certain jurisdictions may be restricted by law or regulation in those jurisdictions and persons into whose possession this Explanatory Statement comes are required by the Scheme Company and the Information Agent to inform themselves about, and to observe, any such restrictions.

Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

## 5.  SUMMARY ONLY

The description of the Scheme contained in this Explanatory Statement is qualified in its entirety by reference to the Scheme, the full text of which is set out in Appendix 1 (*Form of Scheme*) (as applicable) to this Explanatory Statement. The Scheme Creditor is advised to read and consider carefully the text of the Scheme.

In the event of a conflict between this Explanatory Statement and the Scheme, the terms of the Scheme shall prevail.

## 6.  NO OFFER

This Explanatory Statement does not constitute an offer to sell, or a solicitation of an offer to buy, securities in any jurisdiction.

## 7.  FORWARD-LOOKING STATEMENTS

Nothing in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of the future financial performance of the Scheme Company and / or any other member of the Group except where otherwise specifically stated.

This Explanatory Statement includes forward-looking statements. All statements, other than statements of historical fact, included in this Explanatory Statement regarding the financial condition of the Scheme Company and / or any other member of the Group or future events or prospects are forward-looking statements. The words "aim," "anticipate," "believe," "continue," "estimate," "expect," "future," "help," "intend," "may," "plan," "shall," "should," "will" or the negative or other variations of them, as well as other statements regarding matters that are not historical fact, are or may constitute forward-looking statements. Such forward-looking statements are based on the current view of the Group's

3

management with respect to future events and financial performance. These views reflect the best judgment of the Group's management but involve a number of risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialise, or should underlying assumptions prove incorrect, actual results may differ materially from those predicted in such forward-looking statements and from past results, performance or achievements. All forward-looking statements contained in this Explanatory Statement are qualified in their entirety by this cautionary statement.

All subsequent written or oral forward-looking statements attributable to the Scheme Company, or any person acting on behalf of a Scheme Company, are expressly qualified in their entirety by the cautionary statements contained throughout this Explanatory Statement. As a result of these risks, uncertainties and assumptions, you should not place undue reliance on such forward-looking statements.

## 8.  LEGAL, TAX AND FINANCIAL ADVICE

Scheme Creditors should not construe the contents of this Explanatory Statement as legal, tax or financial advice.

This Explanatory Statement (together with each document referred to or relied on in this Explanatory Statement) has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it, and, consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it. Any such recipients should conduct their own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to their own objectives, financial situations and needs. Scheme Creditors are recommended to consult their own professional advisers as to legal, tax, financial or other matters relevant to the actions Scheme Creditors should take in relation to the Scheme, or the implications/consequences of those actions.

Reports referred to in this Explanatory Statement have been prepared solely for relevant addressees, on the basis of (variously) specific assumptions and hypothetical scenarios, specific calculation dates, public information and forecast market conditions, and without conducting any public marketing process. Any changes to any of these bases (or any other matter material to a report) could materially impact the views expressed in that report.

This Explanatory Statement is only addressed to Scheme Creditors and no other person should rely on it.

## 9.  OTHER JURISDICTIONS

The implications of the Scheme for Scheme Creditors who are residents or citizens of jurisdictions other than the United Kingdom may be affected by the laws of the relevant jurisdictions. Such overseas Scheme Creditors should inform themselves about and observe any applicable legal requirements. Any person outside the United Kingdom who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction should consult independent professional advisers and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection with the Scheme, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

Scheme Creditors should consult their own professional advisers with respect to the matters described in this Explanatory Statement, including the legal, financial and tax consequences of the Scheme in the particular circumstances of Scheme Creditors.

## 10.  STATEMENT REGARDING INFORMATION CONTAINED IN THIS EXPLANATORY STATEMENT

The Scheme Creditor is responsible for assessing the merits of the Financial Restructuring. In accordance with normal practice, the SSN Trustee, the Security Agent and the Information Agent do

not express any opinion as to the merits of the Financial Restructuring to Scheme Creditors in this Explanatory Statement. Accordingly, the SSN Trustee, the Security Agent and the Information Agent urge Scheme Creditors who are in doubt as to the impact of the implementation of the Financial Restructuring (including any tax consequences) to seek their own independent advice. The SSN Trustee, the Security Agent and the Information Agent have not made and will not make any assessment of the merits of the Financial Restructuring or of the impact of the Financial Restructuring on the interests of Scheme Creditors, either as a class or as individuals. The SSN Trustee, the Security Agent and the Information Agent have not been involved in formulating, preparing or negotiating the Financial Restructuring and they do not make any representation that all relevant information has been disclosed to Scheme Creditors in this Explanatory Statement.

EU-DOCS\29867510.8

# PART 1

## LETTER FROM THE DIRECTORS OF THE SCHEME COMPANY

New Look Financing Plc
New Look House
Mercery Road
Weymouth
Dorset, DT3 5HJ

24 September 2020

Dear Scheme Creditors,

1. **INTRODUCTION**

1.1    As you may be aware from the announcement issued by the Parent on 13 August 2020, and the practice statement letter relating to the Scheme dated 2 September 2020, the Group (as defined below) is seeking to implement a comprehensive recapitalisation transaction that will extend the Group's banking and operational facilities, deliver a new money cash injection of £40,000,000 and significantly de-leverage its balance sheet.

1.2    I am writing to you in your capacity as a Scheme Creditor to summarise the terms of the Financial Restructuring, of which the Scheme forms an integral part.

1.3    This letter forms part of the Explanatory Statement for the Scheme proposed by the Scheme Company. Capitalised terms used in this letter have the meanings given to them in Part 10 (*Certain Definitions and Interpretation*) of this Explanatory Statement. The purpose of this Explanatory Statement is to provide Scheme Creditors with sufficient information to make an informed decision as to whether to vote for or against the Scheme.

1.4    This Explanatory Statement is being sent to Scheme Creditors in electronic format by:

(a)    making it available at https://www.lucid-is.com/newlook (the "**Scheme Website**"). If any Scheme Creditors have difficulty accessing the Scheme Website, please contact the Information Agent and/or the Group's solicitors, via email at newlook@lucid-is.com and projecttone.lwteam@lw.com respectively; and

(b)    the Information Agent who will send it to Scheme Creditors via Euroclear Bank S.A./N.V. and/or Clearstream Banking, société anonyme.

1.5    Each Scheme Creditor is requested to (or instruct its Account Holder to) complete and return the Account Holder Letter to the Information Agent, in accordance with the instructions set out in Part 6 (*Actions to be Taken by Scheme Creditors*) of this Explanatory Statement, as soon as possible and in any event before the deadlines set out in this Explanatory Statement.

2. **OVERVIEW OF THE SCHEME OF ARRANGEMENT**

2.1    A scheme of arrangement of the kind proposed by the Scheme Company is a compromise or arrangement provided for under Part 26 of the Companies Act 2006. A scheme of arrangement will take effect between a company and its creditors (or any class of them), where the compromise or arrangement has been approved by certain majorities of affected creditors and the Court.

EU-DOCS\29867510.8

2.2 These approvals are sought at three key stages:

(a) *firstly,* the Convening Hearing

At this stage the company applies for the Court's permission to convene a meeting or meetings of the relevant class or classes of creditors to vote on its proposals and for permission to circulate explanatory documents to creditors and require voting documents. The Court must be satisfied that, amongst other things, the proposed scheme of arrangement has a prospect of being approved, and that the proposed class or classes of creditors for voting purposes have been correctly constituted.

The Convening Hearing in respect of the Scheme was held on 23 September 2020, and the Court granted the Convening Order, giving permission for the Scheme Company to convene the Scheme Meeting and circulate this Explanatory Statement.

(b) *secondly,* the Scheme Meeting

At this stage the relevant class or classes of creditors are entitled to vote on the scheme. The scheme needs to be approved by a majority in number (more than 50%) representing at least 75% in value of each class of creditor present and voting, in person or by proxy, at the meeting. Ahead of the meeting the company must circulate to its creditors explanatory documentation so that creditors can read and fully consider the terms of the scheme and its implications.

The Scheme Meeting is currently anticipated to be held on 16 October 2020. The Explanatory Statement (of which this letter forms part) constitutes the explanatory documentation required to be circulated to Scheme Creditors ahead of the Scheme Meeting. Further details of the Scheme Meeting are set out at Part 5 (*The Scheme*) of this Explanatory Statement.

(c) *thirdly,* the Scheme Sanction Hearing

At this stage, the company applies for the Court's sanction of the scheme proposed by the company and approved by the requisite majority of its creditors. The Court must be satisfied that, amongst other things, the relevant provisions of Part 26 of the Companies Act and the Convening Order have been complied with and that a reasonable, honest and intelligent member of the class concerned might reasonably approve the scheme of arrangement.

Subject to approval of the Scheme by the requisite majority of Scheme Creditors at the Scheme Meeting, the Scheme Sanction Hearing in respect of the Scheme is currently anticipated to be held on or around 23 October 2020. The Scheme Sanction Hearing may take place remotely, using Skype for Business or a similar format.

2.3 Once a scheme of arrangement has been approved by the requisite majority and sanctioned by the Court, in order to become effective a copy must be delivered to the Registrar of Companies for England and Wales, together with a copy of the order of the Court sanctioning the scheme of arrangement.

2.4 Once a scheme of arrangement becomes effective, it will be binding upon the company and all the members of each relevant class of creditors according to its terms as a matter of English law, including creditors who did not vote on the scheme or who voted against it, irrespective of the jurisdiction in which those creditors reside or have their seat.

EU-DOCS\29867510.8

3.      **KEY TRANSACTION DATES**

3.1     A full list of the key transaction dates is provided at Part 2 (*Key Transaction Dates*) below, but Scheme Creditors should note in particular the following dates on which they may need to take certain actions:

| Key Event | (Expected) Time and Date | Description of Key Event |
|---|---|---|
| **Custody Instructions Deadline** | 5 p.m. (London time) on 13 October 2020 | The time at which a Scheme Creditor that wishes to vote at the Scheme Meeting will be required to ensure that its Account Holder has instructed the relevant Clearing System in which its SSNs are held to irrevocably block those interests in the SSNs. |
| **Voting Record Time** | 5 p.m. London time on 14 October 2020 | The time at which a Scheme Creditor's Voting Value will be determined for the purposes of the Scheme Meeting. |
| **Voting Submission Deadline** | 5 p.m. (London time) on 14 October 2020 | The deadline for Scheme Creditors to submit their validly completed Account Holder Letter in order to vote (either in person or by proxy) at the Scheme Meeting. |
| **Scheme Meeting** | 2 p.m. (London time) on 16 October 2020 | The meeting at which Scheme Creditors will vote (either in person or by proxy) in respect of the Scheme. |
| **Scheme Sanction Hearing** | 23 October 2020 | The Court hearing at which the Court will consider whether to sanction the Scheme. |

4.      **OVERVIEW OF THE FINANCIAL RESTRUCTURING**

The terms of the Financial Restructuring are summarised as follows:

(a)     the write-down and cancellation of the SSNs pursuant to the Supplemental Indenture in exchange for:

        (i)     the incurrence by New MidCo of a £40 million nine-year subordinated shareholder loan on a cashless basis; and

        (ii)    the issuance by the Parent of B ordinary shares (which shall be non-voting shares) representing 20% of the post-Financial Restructuring share capital of the Parent on a fully diluted basis (subject to the allocation of the MIP set out in paragraph (f) below),

        in each case to the holders of the SSNs to be allocated rateably in proportion to the amount of SSNs held by each SSN Holder as at the Voting Record Time;

(b)     a seven-year new money term loan which will be cash-funded in an amount equal to £40 million shall be borrowed by New MidCo and provided by (i) SSN Holders who agreed to participate in the PIK Loan as contemplated by the Lock-Up Agreement on

or prior to the end of a subscription period beginning on the date of the Lock-Up Agreement and ending on 14 September 2020 (as extended pursuant to the terms of the Lock-Up Agreement) and (ii) to the extent that not all SSN Holders participate in the PIK Loan, certain backstop parties that agreed to participate in the PIK Loan pursuant to a backstop letter dated 13 August 2020 (together, the "**New Money Lenders**");

(c)     the Parent shall issue A ordinary shares (which shall be voting shares) representing 80% of the post-Financial Restructuring share capital of the Parent on a fully diluted basis (subject to the allocation of the MIP set out in paragraph (f) below) to the New Money Lenders rateably in proportion to their commitment under the PIK Loan;

(d)     the RCF will be converted into a term loan, the termination date under the RCF shall be extended from 25 June 2021 to 30 June 2024, and certain other amendments to the RCF shall be made (together the "**RCF Amendments**");

(e)     the Operating Facilities shall be extended to 30 June 2023 and the aggregate commitment shall be increased to £70 million (which will be subject to certain step downs from 30 June 2021) and certain other amendments (together with the RCF Amendments, the "**RCF and Operating Facility Amendments**"); and

(f)     the existing management incentive plan will be replaced with a new management incentive plan (the "**MIP**") whereby certain of the management of the Group will be entitled to C ordinary shares of the Parent, which shall represent 5% of the post-Financial Restructuring ordinary share capital of the Parent on a fully diluted basis (and diluting the A ordinary shares of the Parent and the B ordinary shares of the Parent on a pro rata basis) and D ordinary shares of the Parent, which shall entitle holders to 2% of the equity value of the Group upon an exit above a threshold of £300,000,000 (and such entitlement shall dilute the entitlement of the A ordinary shares of the Parent and the B ordinary shares of the Parent on a *pro rata* basis) as more particularly set out in the Shareholders' Agreement.

## 5.    EFFECTIVENESS OF THE SCHEME AND THE FINANCIAL RESTRUCTURING

5.1     The Scheme will become effective in accordance with its terms and legally binding on the Scheme Company and the Scheme Creditors on the Scheme Effective Date, being the date on which an office copy of the Court Order relating to the Scheme is delivered to the Registrar of Companies for England and Wales.

5.2     If the Scheme becomes effective, it will affect all Scheme Creditors. All Scheme Creditors (including those who did not vote in favour of the Scheme or those who did not vote at all) will be bound by the terms of the Scheme as a matter of English law, irrespective of the jurisdiction in which such Scheme Creditors resides or has their corporate seat, along with the Scheme Company and each other member of the Group whose guarantee liabilities in respect of the SSNs will be compromised under the Scheme as third parties.

5.3     The Group intends to seek entry of a Chapter 15 Order from the U.S. Bankruptcy Court which, among other things, recognises the Scheme as a foreign main proceeding under Chapter 15 of the Bankruptcy Code, gives the Scheme full force and effect within the territorial jurisdiction of the United States and prohibits Scheme Creditors from commencing or continuing any action or proceeding in the United States against the Scheme Company or its assets located within the territorial jurisdiction of the United States that is inconsistent with the Scheme.

5.4     Following the Scheme Effective Date, the Financial Restructuring will be implemented and become effective in accordance with the terms of the Financial Restructuring Documents and legally binding on the Scheme Company, the Scheme Creditors and other relevant parties on the Restructuring Effective Date.

5.5     Further details of how the Scheme and the Financial Restructuring will become effective and binding on Scheme Creditors are set out at Part 5 (*The Scheme*) of this Explanatory Statement.

6.      **JURISDICTION OF THE ENGLISH COURT**

6.1     The Scheme Company considers that the Court has jurisdiction to sanction the Scheme for the following reasons:

   (a)     the Scheme Company is a "company" for the purpose of Part 26 of the Companies Act 2006 being a company incorporated and registered in England and Wales, with its assets located in the United Kingdom and its centre of main interests at its registered office, being New Look House, Mercery Road, Weymouth, Dorset, DT3 5HJ; and

   (b)     further, the Court may consider, amongst other issues, whether Part II of the Recast Judgments Regulation applies to the Scheme. Part II of the Recast Judgments Regulation requires that a person domiciled in a member state of the European Union be "sued" in the courts of that member state, subject to certain exceptions including article 8 (which, broadly, allows persons to be sued in the courts of a member state in which a number of defendants are domiciled, if it is expedient to do so). The Scheme Company has concluded, and will submit to the Court that, should the Recast Judgments Regulation apply to the Scheme, article 8 of the Recast Judgments Regulation would be applicable except to the general requirement that a person domiciled in a member state of the European Union be "sued" in the courts of that member state because at least one of the Scheme Creditors is understood to be domiciled in the United Kingdom.

6.2     Accordingly, the Scheme Company understands that there are no jurisdictional issues regarding the Scheme.

7.      **CLASSES OF SCHEME CREDITORS**

   *General*

7.1     In order to become effective, a scheme of arrangement must be approved by a majority in number (more than 50%) representing at least 75% in value of each class of creditors present and voting, in person or by proxy, at each meeting convened at the direction of the Court for the purposes of considering and, if thought fit, approving the scheme of arrangement.

   *Formulation of classes for the Scheme*

7.2     In accordance with the Practice Statement (Practice Statement (Companies: Schemes of Arrangement under Part 26 and Part 26A of the Companies Act 2006)), it is the responsibility of the Scheme Company to formulate the class or classes of creditors for the purposes of convening the Scheme Meeting to consider and, if thought fit, approve the proposed Scheme.

7.3     Where creditors affected by a scheme of arrangement have rights which are so dissimilar, or would be affected so differently by the scheme, as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes, and a separate meeting must be held for each class of creditor.

7.4     The Scheme Company has considered the existing rights of its respective Scheme Creditors against the Scheme Company and the way in which those rights will be affected by the Scheme. Having taken legal advice (privilege for which is not waived), the Scheme Company has concluded that the Scheme Creditors fall into a single class for the purposes of voting on the Scheme.

EU-DOCS\29867510.8

*Rationale for proposed classes*

7.5    The Scheme Company considers that notwithstanding the Sterling SSNs are denominated in sterling and the Euro SSNs are denominated in euro, the rights of the Scheme Creditors are not so dissimilar as to make it impossible for them to consult together with a view to their common interest. On the contrary:

(a)    they each have materially the same rights against the Scheme Company and the Group, in so far as the claims of the Scheme Creditors rank pari passu as between themselves in all scenarios and are secured pursuant to a common security package;

(b)    the alternative to the Scheme is a formal insolvency proceeding in which the sterling and euro denominated SSNs will be converted to a common currency (sterling) at the daily official rate published by the Bank of England, in respect of any distributions;

(c)    if the Scheme becomes effective, those rights will be compromised in materially the same way; and

(d)    in all the circumstances, there is more to unite than divide all of the Scheme Creditors, so as to make any further classes unnecessary.

7.6    In addition, while SSN Holders who will become New Money Lenders will receive a larger proportion of the post-Financial Restructuring equity of the Parent than the other SSN Holders (as described at paragraph 4 above), the Scheme Company considers that this does not require the prospective New Money Lenders to vote in a separate class to the other SSN Holders. This is because all SSN Holders will have had the same right to elect to subscribe for a pro rata share of the PIK Loan pursuant to the terms of the Lock-Up Agreement.

7.7    Likewise, the Scheme Company considers that no class issue arises from the allotment of A ordinary voting shares to SSN Holders who elect to participate in the provision of new money as compared to SSN Holders who have elected not to participate in the PIK Loan. Those SSN Holders will not obtain A ordinary voting shares, but will instead continue to hold only B shares which are non-voting shares. However, all SSN Holders have had four weeks to decide whether to participate or not and all SSN Holders have had an equal opportunity to obtain A ordinary voting shares. Further, all A ordinary voting shares have the same rights and it is irrelevant to the question of class formation that shareholders with the most or second most shares subject to a minimum threshold (as calculated in accordance with the Shareholders' Agreement) have certain board appointment rights.

7.8    On 13 August 2020 the Parent, the Scheme Company and certain other Group companies entered into the Lock-Up Agreement. All Scheme Creditors (including those that were not already party to the Lock-Up Agreement) were thereafter given the opportunity to accede to the Lock-Up Agreement and were provided with instructions for doing so, and contact details for any queries. The Scheme will affect the rights of each Scheme Creditor in the same way, regardless of whether a Scheme Creditor acceded to the Lock-Up Agreement. As of the date of this Explanatory Statement, over 92% of the Scheme Creditors have consented to the Financial Restructuring and entered into or acceded to the Lock-Up Agreement. The Scheme Company therefore does not consider that the Scheme Creditors who have acceded to the Lock-Up Agreement need to be put into a separate class for the purpose of voting on the Scheme.

7.9    Accordingly, it is proposed that a single Scheme Meeting of the Scheme Creditors be convened for the purposes of considering and, if the Scheme Creditors think fit, approving the Scheme.

11

8.    **ALTERNATIVES TO THE FINANCIAL RESTRUCTURING**

8.1    The Group, assisted by its advisors, has considered various alternative options to the Financial Restructuring to address its overleveraged capital structure and deteriorating liquidity position.

8.2    On 13 August 2020, the Group's financial adviser initiated a process to solicit potential interest in the Group by way of a sale transaction or an alternative recapitalisation transaction. The deadline for first round bids was 8 September 2020 and, while some parties expressed an interest in certain assets of the Parent, no bids were received for the share capital of the Parent or an alternative recapitalisation transaction on or before such deadline. One bid for an alternative recapitalisation transaction was received shortly after the deadline, but the terms of such bid included extensive conditionality, which included a successful CVA, the consensual roll-over of the RCF and Operating Facilities and the write-down of the SSNs into subordinated debt without any allocation of equity in the Parent or the Group to SSN Holders. Further, there is no current basis on which the Lock-Up Agreement can be terminated and so, given the obligations under the Lock-Up Agreement to support the Financial Restructuring, the Directors therefore do not view such bid as being implementable in light of the support from the SSN Holders under the Lock-Up Agreement to the terms of the Financial Restructuring.

8.3    The Group's 13-week cash-flow forecast indicates that cash falls below a critical minimum operating level of £30,000,000 during the week commencing 26 October 2020. If the Scheme is not approved by the requisite majority of Scheme Creditors at the Scheme Meeting, the Group will be unable to implement the Financial Restructuring and would need to attempt to negotiate with the Scheme Creditors and lenders under the RCF and Operating Facilities. At this point in time, the Directors do not consider any alternative transaction to address the Group's difficulties to be realistic in the circumstances described above, in particular, given the considerable effort and time which it has taken for the Scheme Company and other members of the Group to agree to the Financial Restructuring and the absence of alternative proposals to date save for one outline proposal materially less advantageous to the potential outcome under the Scheme, as described in paragraph 8.2 above. In the absence of any realistic alternative transaction, the Scheme Company would have no choice but to commence a formal insolvency process on account of (i) the Group's deteriorating liquidity position and (ii) the likely termination of the Lock-Up Agreement in the circumstances in which the Scheme had not been approved and there was no realistic alternative transaction. If the Financial Restructuring is not implemented by the Long-Stop Date (as defined in the Lock-Up Agreement and currently being 30 October 2020), then the Lock-Up Agreement will automatically terminate in any case. The termination of the Lock-Up Agreement would prompt an automatic acceleration of the SSN liabilities against the Scheme Company and certain members of the Group that guarantee the payment obligations of the Scheme Company under the SSN Indenture. Furthermore, the supervisors of the CVA would be entitled to terminate the CVA if the Financial Restructuring is not completed on or before 31 January 2021 and would likely be bound to do so in circumstances in which the Group's financial restructuring had not been implemented, in circumstances in which no realistic alternative was available and the acceleration of the existing financial indebtedness likely. The approval of the CVA and the success of the operational restructuring being implemented thereunder is therefore not in itself sufficient for a successful restructuring of the Group, absent an effective Financial Restructuring. In the view of the Directors, the latter can be achieved only by the implementation of the Scheme.

8.4    The Directors have received analysis from KPMG, which is summarised in Part 7 (*Consequences of a failure to implement the Financial Restructuring*) of this Explanatory Statement, as to the likely outcomes for Scheme Creditors in the event that the Group has to enter into a formal insolvency process. That analysis, which is based upon facts and assumptions that the Directors consider to be reasonable, taking into account their statutory duties to all stakeholders, indicates that the recoveries for Scheme Creditors in such

circumstances is likely to be significantly worse than their potential recoveries pursuant to the Scheme.

9.    **RECOMMENDATION**

10.    The Directors consider the Financial Restructuring and the Scheme to be in the best interests of those with an economic interest in the Group, including the Scheme Creditors. It has arrived at this conclusion on the basis of:

(a)    the benefits to the Scheme Company and to the rest of the Group of the implementation of the Financial Restructuring and the Scheme, which will in turn benefit the Scheme Creditors;

(b)    the extremely high levels of support already received for the Financial Restructuring and the Scheme through the approvals in connection with the Lock-Up Agreement entered into by various Scheme Creditors, as described at paragraph 7 above; and

(c)    the likely negative alternative outcomes for Scheme Creditors if the Scheme is not approved and/or the Financial Restructuring is not completed.

10.2    **Accordingly, the directors of the Scheme Company unanimously recommend the Scheme Creditors vote in favour of the Scheme.**

11.    **ACTION TO BE TAKEN**

11.1    Whether or not they intend to attend the Scheme Meeting, each Scheme Creditor is requested to instruct its Account Holder to complete and return the Account Holder Letter to the Information Agent, in accordance with the instructions set out in (i) Part 6 (*Actions to be Taken by Scheme Creditors*) of this Explanatory Statement; and (ii) Appendix 3 (*Form of Account Holder Letter*), as soon as possible and in any event before the deadlines set out in this Explanatory Statement.

11.2    **If the Scheme is not approved by a majority in number (more than 50%) of Scheme Creditors representing at least 75% in value of each class of Scheme Creditors present and voting at the Scheme Meeting, the Group will be unable to implement the Financial Restructuring.**

12.    **IMPORTANT INFORMATION**

12.1    If you are in any doubt as to what action you should take in connection with the Financial Restructuring, this Explanatory Statement, the proposals contained within it or the documents that accompany it, we recommend you seek immediately your own financial and legal advice from your stockbroker, bank manager, accountant, tax adviser, legal adviser or independent financial adviser.

12.2    The information contained in this Explanatory Statement is not intended to be exhaustive or complete. Scheme Creditors should read this Explanatory Statement, together with the documents that accompany it, in its entirety. All relevant documentation is available on the Scheme Website maintained by the Information Agent at https://www.lucid-is.com/newlook.

13.    **CONTACTS FOR SCHEME CREDITOR QUERIES**

13.1    If you have any difficulty accessing the Scheme Website or any questions in relation to this Explanatory Statement, the Scheme or the Financial Restructuring, please contact either the Information Agent or Latham & Watkins using the contact details below:

EU-DOCS\29867510.8

| **Lucid Issuer Services Limited** | **Latham & Watkins** |
|---|---|
| Information Agent | Legal advisers to the Scheme Company |
| | |
| Contact: Victor Parzyjagla / Oliver Slyfield | Contact: Yen Sum, Tristram Gargent, |
| Tel: +44 20 7704 0880 | Hugo Bowkett and Bhav Parekh |
| | Tel: 020 7710 1000 |
| E-mail: newlook@lucid-is.com | |
| | E-mail: projecttone.lwteam@lw.com |
| Tankerton Works, 12 Argyle Walk, London | |
| WC1H 8HA, United Kingdom | 99 Bishopsgate, London, EC2M 3XF, |
| | United Kingdom |

13.2    The Information Agent has set up the Scheme Website (https://www.lucid-is.com/newlook) to disseminate information and communications about the Scheme.

14.     **CONCLUDING REMARKS**

14.1    The directors of the Scheme Company unanimously support the proposals set out in this Explanatory Statement, believing that entry into the arrangements contemplated by the Scheme are in the best interests of the Scheme Company and the Scheme Creditors. Accordingly, the directors of the Scheme Company seek your support for the Scheme and recommend that you vote in favour of the Scheme at the Scheme Meeting.

EU-DOCS\29867510.8

Yours faithfully,

_____

New Look Financing plc
Richard Collyer
Director

EU-DOCS\29867510.8

## PART 2

### KEY TRANSACTION DATES

Scheme Creditors should take note of the following key dates in connection with the Financial Restructuring. The dates below are indicative only and may be modified in accordance with this Explanatory Statement.

| Key Event | (Expected) Time and Date | Description of Key Event |
|---|---|---|
| **Custody Instructions Deadline** | 5 p.m., London time on 13 October 2020 | The time at which a Scheme Creditor that wishes to vote at the Scheme Meeting will be required to ensure that its Account Holder has instructed the relevant Clearing System in which its SSNs are held to irrevocably block those interests in the SSNs. |
| **Voting Record Time** | 5 p.m., London time on 14 October 2020 | The time at which a Scheme Creditor's Voting Value will be determined for the purposes of the Scheme Meeting. |
| **Voting Submission Deadline** | 5 p.m., London time on 14 October 2020 | The deadline for Scheme Creditors to submit their validly completed Account Holder Letter in order to vote by proxy at the Scheme Meeting. |
| **Scheme Meeting** | 2 p.m. London time on 16 October 2020 | The meeting at which Scheme Creditors will vote (either in person or by proxy) in respect of the Scheme. |
| **Scheme Sanction Hearing** | 23 October 2020 | The Court hearing at which the Court will consider whether to sanction the Scheme. |
| **U.S. Bankruptcy Court Hearing** | On or around 23 October 2020 | The U.S. Bankruptcy Court hearing at which the U.S. Bankruptcy Court will consider whether to recognise the Scheme under Chapter 15 of the U.S. Bankruptcy Code. |
| **Restructuring Effective Date** | On or around 28 October 2020 | The expected date of completion of the Financial Restructuring. |

The date for the Scheme Sanction Hearing is based on current expectations and may be subject to change if so directed by the Court, if the Scheme Meeting is adjourned, or if any person opposes the Scheme.

EU-DOCS\29867510.8

# PART 3

# BACKGROUND TO THE GROUP AND THE GROUP'S FINANCING ARRANGEMENTS

1.      **THE SCHEME COMPANY**

1.1     The Scheme Company is a public limited liability company incorporated in England and Wales with company number 11911640, having its registered office at New Look House, Mercery Road, Weymouth, Dorset, United Kingdom, DT3 5HJ.

2.      **GROUP STRUCTURE**

2.1     The Scheme Company is a wholly-owned (indirect) subsidiary of the Parent, the holding company of the Group, which is a private limited company incorporated under the laws of Jersey with registered number 128640 with its registered address at 47 Esplanade, St Helier, Jersey JE1 0BD.

2.2     A simplified structure chart of the Group, including the Scheme Company, is included at Appendix 14 (*Simplified Group Structure Chart*) to this Explanatory Statement.

3.      **BUSINESS OF THE GROUP**

3.1     The Group is a leading multichannel retailer operating in the value segment of the clothing and footwear market in the United Kingdom and Republic of Ireland. The 'New Look' brand is distinct and trusted in the United Kingdom, and is one of the market leaders in the value-fashion category for women aged 18 to 44 by value.

3.2     The Group principally sells clothing, footwear and accessories in the United Kingdom and Republic of Ireland. The Group operates a multichannel model, which includes:

(a)     496 New Look-branded directly operated stores in the United Kingdom and Republic of Ireland, with a broad geographical coverage;

(b)     the Group's e-commerce platform serving customers in around 68 countries across the globe; and

(c)     the third-party e-commerce arrangements through which the Group sells its products on websites of key third-party e-commerce retailers, including ASOS and Zalando, and which currently serve customers worldwide.

3.3     The Group has 11,261 employees (as at 25 August 2020).

4.      **GROUP FINANCING ARRANGEMENTS**

4.1     The Group's debt structure is as follows:

(a)     the Scheme Company is the issuer of the SSNs pursuant to the SSN Indenture; and

(b)     NLRL is the borrower of:

(i)     a £100 million revolving credit facility pursuant to the Senior Facilities Agreement; and

(ii)    up to £65 million of operating facilities incurred under the TFFA.

4.2    The principal amount outstanding of the Group's financial indebtedness incurred under the SSNs, the RCF and the Operating Facilities was approximately £595,328,087 as of 22 August 2020.

4.3    This breaks down as follows:

| Instrument | Amount Outstanding (22 August 2020) | Amount Outstanding (GBP – 22 August 2020) |
|---|---|---|
| **Senior Facilities Agreement** | **£100,000,000** | **£100,000,000** |
| **TFFA (including overdraft)** | **£54,000,000 (rounded)** | **£54,000,000 (rounded)** |
| **Buyer Agreement[1]** | **£500,000** | **£500,000** |
| **Sterling SSNs** | **£400,131,636** | **£400,131,636** |
| **Euro SSNs** | **€45,209,687** | **£40,696,451** |
| **Total** | **-** | **£595,328,087** |

---

[1] As at the date of this Explanatory Statement, the Buyer Agreement has been terminated.

EU-DOCS\29867510.8

# PART 4

## THE FINANCIAL RESTRUCTURING

1.    **BACKGROUND TO THE FINANCIAL RESTRUCTURING**

*Impact of Covid-19 on the Group's operations*

1.1    The ongoing global COVID-19 Pandemic has caused a rapid and unprecedented impact on the global retail industry and has significantly impacted the Group's business.

1.2    During March 2020, the Group experienced a significant decline in footfall within its stores, with like for like sales declining 32% in UK retail stores compared to the prior year. On 20 March 2020, the Group's management team took the voluntary decision to close all stores in the Republic of Ireland and on 21 March 2020, all stores in the UK were also closed in light of safety concerns for the Group's staff and customers and the reduced footfall in the preceding weeks.

1.3    Following this, and the official lockdown being introduced by the government in the UK on 23 March 2020 and in the Republic of Ireland on 24 March 2020, the Group's revenue from its stores fell to nil. The impact of the COVID-19 Pandemic on the revenue of the Group therefore has been significant. Throughout the closure of the Group's stores, the Group was only able to trade through its e-commerce channels, which historically had accounted for circa 22% of the Group's revenue. Phased store re-openings began on 1 June 2020.

1.4    The Group took proactive actions to preserve cash and safeguard the value of the business as a result of the COVID-19 Pandemic and continues to be proactive in this regard. This included non-payment of rent during the period in which stores were closed and not trading, significantly reducing marketing costs, reviewing and revising production with suppliers, delaying all significant capital expenditure projects, halting all recruitment, reorganising and streamlining the workforce which resulted in the commencement of a redundancy programme, reducing employee salaries, utilising the UK and Republic of Ireland's Job Retention Schemes and requesting a holiday, deferral and discounts on certain payments to strategic suppliers and counterparties. This ensured that the Group could continue to trade online and ensured business continuity once stores re-opened. In addition, although the Group explored available avenues to bolster liquidity, including government loan schemes, none were available to the Group due to specific eligibility criteria required to access them.

1.5    Various actions that the Group had to take are set out below and the Group's stakeholders have been largely supportive of these actions, which has enabled the Group to continue to trade.

(a)    *Suppliers*

(i)    The Group has remained in regular dialogue with key suppliers during this period of uncertainty.

(ii)    Suppliers have continued to be supportive, with support including offering extended payment terms, repayment plans and in some cases discounts to support the business during the COVID-19 Pandemic.

(b)    *Employees*

(i)    In the UK and Republic of Ireland, 85% of the Group's workforce were furloughed as at 1 April 2020, 81% of the workforce were furloughed as at 1 May 2020, 37% of the workforce were furloughed as at 1 June 2020 and 30% of the workforce were furloughed as at 1 July 2020.

19

    (ii)   As part of an ongoing redundancy consultation, as at 26 August 2020 NLRL had removed 203 roles from the structure (including vacancies) and had made 73 compulsory redundancies and 17 voluntary redundancies, resulting in total annualised savings of £5.9 million although there will be an expected £1.3 million redundancy costs.

(c)   *Government and taxation*

    (i)   The Group has agreed a Time to Pay Arrangement with HMRC for deferred taxes.

    (ii)   The Group has secured business rates relief for the period April 2020 to March 2021, which was automatically applied to all stores where permissible.

    (iii)   The Group has received grants from local authorities for low-rated stores up to the €800,000 cap.

(d)   *Rent*

    (i)   In line with many other businesses in the retail sector, the Group took the decision to withhold payment of rent and service charge across its store portfolio from 22 March 2020.

    (ii)   From the re-opening date of a premises (other than the distribution centres where certain bilateral creditor agreements were entered into), NLRL has been paying a contribution to the rent payments due on a turnover basis and service charge payments have been paid in accordance with contractual terms.

1.6   The Group reopened two stores on 1 June 2020 in Isle of Man and Jersey, five of its Republic of Ireland stores and its Guernsey store reopened on 8 June 2020 and since 15 June 2020 has reopened all stores under a phased approach. On a like for like basis, sales performance is down by 33% from the prior year, driven largely by declines in footfall which have been partially offset by an increase in sale conversion rates. Management continue to monitor local lockdown updates as they are announced and maintain focus on the health, safety and wellbeing of customers and employees, as well as ensuring that the Group generates and preserves cash.

1.7   Notwithstanding the measures taken to date by the Group, the COVID-19 Pandemic is expected to have a permanent impact on its business. The Group has forecasted that as a result of a permanent structural shift in customer spend and behaviour from stores to online, in-store footfall and sales will significantly reduce resulting in many stores likely becoming unprofitable to run without securing significant changes to the economics of the Group's liabilities (including financial and lease liabilities). As a result, the Group needs to make permanent adjustments to its operating model, which will be achieved through the CVA for NLRL and a restructuring of its liabilities to its secured creditors, the latter of which is the subject of the Scheme.

## 2.   CREDITOR SUPPORT FOR THE FINANCIAL RESTRUCTURING

### *The Company Voluntary Arrangement*

2.1   The directors of NLRL proposed the CVA with the overall objective to restore the Group's viability through a combination of, among other things:

(a)   compromising rent arrears across certain premises and leases;

(b)   moving to a turnover based rent model for certain premises;

(c)   moving to nil rent and service charge after two months for certain premises; and

(d)   compromising certain non-critical liabilities which are commercially onerous and from which NLRL obtains no benefit.

2.2   The CVA was approved by the relevant creditors of NLRL and its shareholder, New Look Limited, at the relevant meetings held on 15 September 2020 and as such has taken effect, though the CVA remains subject to any challenges made under applicable insolvency legislation prior to the expiry of the applicable challenge period, which is expected to occur on 15 October 2020. Deloitte LLP as supervisors of the CVA is entitled to terminate the CVA after 31 January 2021 if the Financial Restructuring has not been effected on or before that date.

*Financial Restructuring*

2.3   On 13 August 2020, the Parent, the Scheme Company and other Group companies entered into a Lock-Up Agreement with certain of the Group's financial creditors. A copy of the Lock-Up Agreement was made available to all Scheme Creditors on the Scheme Website on 13 August 2020. The parties to the Lock-Up Agreement, which include, among others, 100% of the Group's lenders under the RCF and the Operating Facilities, have agreed to support, implement and consummate the Financial Restructuring on the terms set out in the Lock-Up Agreement and as summarised in paragraph 3.1 below.

2.4   All Scheme Creditors (extending to those that were not already party to the Lock-Up Agreement) were given the opportunity to accede to the Lock-Up Agreement and were provided with instructions for doing so, and contact details for any queries. As at the date of this Explanatory Statement, over 92% of the Scheme Creditors have consented to the Financial Restructuring and entered into or acceded to the Lock-Up Agreement.

*Third-party support for the Scheme*

2.5   In order to successfully implement the Financial Restructuring through the Scheme, participation is required from the Undertaking Parties.

2.6   Each of the Undertaking Parties will execute and deliver prior to the Scheme Sanction Hearing, a Deed of Undertaking in favour of the Court, the Scheme Company and the relevant Scheme Creditors pursuant to which they have agreed to the Scheme and agreed and undertaken to the Court or NLL (as the case may be) and the relevant Scheme Creditors, among other things:

(a)   upon the Scheme being sanctioned by the Court, to be bound by the Scheme;

(b)   on and from the Scheme Effective Date, to promptly do or procure to be done all such acts and things necessary or desirable for the purpose of giving effect to the Scheme; and

(c)   on and from the Scheme Effective Date, to promptly execute and be bound by the Financial Restructuring Documents (and related documents) to which they are party.

3.   **KEY TERMS OF THE FINANCIAL RESTRUCTURING**

3.1   The terms of the Financial Restructuring are summarised as follows:

(a)   the write-down and cancellation of the SSNs pursuant to the Supplemental Indenture in exchange for:

(i)   the incurrence by New MidCo of a £40 million nine-year subordinated shareholder loan on a cashless basis; and

(ii)   the issuance by the Parent of B ordinary shares (which shall be non-voting shares) representing 20% of the post-Financial Restructuring share capital of

the Parent on a fully diluted basis (subject to the allocation of the MIP set out in paragraph (f) below),

in each case to the holders of the SSNs, rateably in proportion to the amount of SSNs held by each SSN Holder as at the Voting Record Time;

(b)     a seven-year new money term loan which will be cash-funded in an amount equal to £40 million shall be borrowed by New MidCo and provided by (i) SSN Holders who agreed to participate in the PIK Loan as contemplated by the Lock-Up Agreement on or prior to the end of a subscription period beginning on the date of the Lock-Up Agreement and ending on 14 September 2020 (as extended pursuant to the terms of the Lock-Up Agreement) and (ii) to the extent that not all SSN Holders participate in the PIK Loan, certain backstop parties that agreed to participate in the PIK Loan pursuant to a backstop letter dated 13 August 2020;

(c)     the Parent shall issue A ordinary shares (which shall be voting shares) representing 80% of the post-Financial Restructuring share capital of the Parent on a fully diluted basis (subject to the allocation of the MIP set out in paragraph (f) below) to the New Money Lenders rateably in proportion to their commitment under the PIK Loan;

(d)     the RCF will be converted into a term loan, the termination date under the RCF shall be extended from 25 June 2021 to 30 June 2024, and certain other amendments to the RCF shall be made;

(e)     the Operating Facilities shall be extended to 30 June 2023 and the aggregate commitment shall be increased to £70 million (which will be subject to certain step downs from 30 June 2021) and certain other amendments; and

(f)     the existing management incentive plan will be replaced with the MIP whereby certain of the management of the Group will be entitled to C ordinary shares of the Parent, which shall represent 5% of the post-Financial Restructuring ordinary share capital of the Parent on a fully diluted basis (and diluting the A ordinary shares of the Parent and the B ordinary shares of the Parent on a pro rata basis) and D ordinary shares of the Parent, which shall entitle holders to 2% of the equity value of the Group upon an exit above a threshold of £300,000,000 (and such entitlement shall dilute the entitlement of the A ordinary shares of the Parent and the B ordinary shares of the Parent on a pro rata basis) as more particularly set out in the Shareholders' Agreement.

3.2     A summary of the terms of:

(a)     the Shareholders' Agreement and New Parent Articles is set out at Part 1 of Appendix 4 (*Equity and New Money Term Sheet*) to this Explanatory Statement;

(b)     the Shareholder Loan and PIK Loan is set out at Part 2 of Appendix 4 (*Equity and New Money Term Sheet*) to this Explanatory Statement; and

(c)     the RCF and Operating Facility Amendments is set out at Appendix 5 (*Debt Term Sheet*) to this Explanatory Statement.

3.3     The following agreed long-form documents are appended to this Explanatory Statement:

(a)     the Shareholder Loan Agreement is set out at Appendix 6 (*Shareholder Loan Agreement*) to this Explanatory Statement;

(b)     the Subordination Agreement is set out at Appendix 7 (*Subordination Agreement*) to this Explanatory Statement;

22

(c)    the Shareholders' Agreement is set out at Appendix 8 (*Shareholders' Agreement*) to this Explanatory Statement;

(d)    the New Parent Articles are set out at Appendix 9 (*New Parent Articles*) to this Explanatory Statement; and

(e)    the Supplemental Indenture is set out at Appendix 10 (*Supplemental Indenture*) to this Explanatory Statement.

3.4    The following agreed long-form documentation is not appended to this Explanatory Statement but is available on request by a Scheme Creditor to the Scheme Company:

(a)    the PIK Facility Agreement;

(b)    the RCF and Operating Facility Amendments; and

(c)    the Restructuring Implementation Deed.

EU-DOCS\29867510.8

## PART 5

## THE SCHEME

**This section contains a brief description of the principal terms of the Scheme. The summary information contained in this section does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by reference to, the Scheme and the information contained elsewhere in this Explanatory Statement.**

1.    **OVERVIEW**

1.1    The arrangements in respect of the Scheme are proposed to be effected by way of a scheme of arrangement under the laws of England and Wales.

1.2    A scheme of arrangement is a formal procedure under Part 26 of the Act which enables a company to agree a compromise or arrangement with its creditors or any class of its creditors in respect of its debts or other obligations owed to those creditors. A scheme of arrangement requires the following to occur in order to become legally binding:

(a)    the approval of a majority in number (more than 50%) representing at least 75%. in value of the creditors or class of creditors present in person or by proxy and voting at the meeting convened to approve the scheme of arrangement;

(b)    the approval of the Court by the making of an order sanctioning the scheme of arrangement; and

(c)    the delivery of the order sanctioning the scheme of arrangement to the Registrar of Companies for England and Wales.

1.3    If a scheme of arrangement is approved by the requisite majority and sanctioned by the Court and the order sanctioning the scheme of arrangement is delivered to the Registrar of Companies, the scheme of arrangement will become effective in accordance with its terms and bind all the creditors subject to it, both those creditors who voted in favour of it and those creditors who voted against it or did not vote at all and their successors and assigns.

1.4    A scheme of arrangement cannot be sanctioned by the Court unless the Court is satisfied, among other things, that the relevant provisions of Part 26 of the Act have been complied with and that an intelligent and honest person being a member of the class concerned and acting in respect of his/her own interest, might reasonably approve the scheme of arrangement.

1.5    The actions required of the Scheme Creditors in connection with the Scheme are set out in detail in Part 6 (*Actions to be Taken by Scheme Creditors*) of this Explanatory Statement.

2.    **THE SCHEME CREDITORS**

2.1    The creditors who are bound by the terms of a scheme, if it becomes effective, are referred to in the Scheme as Scheme Creditors.

2.2    The Scheme Company considers its Scheme Creditors to be:

(a)    the direct creditors in respect of the SSNs, being the SSN Common Depositary as holder of the SSNs and the SSN Trustee solely as the beneficiaries of the covenants to repay principal and pay interest on the SSNs pursuant to the SSN Indenture; and

(b)    the contingent creditors in respect of the SSNs, being the SSN Holders as the beneficial owners of and/or the persons with the ultimate economic interest in the SSNs.

24

2.3    The Scheme Company considers that the SSN Holders, as the beneficial owners of and/or the persons with the ultimate economic interest in the SSNs, are the persons with the "real" interest in the Scheme.

2.4    The SSN Holders are those persons with a beneficial interest as principal in the SSNs held through and shown on, and transferred only through, records maintained in book entry form by the Clearing Systems at the Voting Record Time.

2.5    To avoid double counting, each of the SSN Trustee and the SSN Common Depositary have confirmed in signed writing that it will not exercise any voting rights to which it may be entitled as a Scheme Creditor. This is to ensure an orderly voting procedure and is considered by the legal advisers to the Scheme Company to represent current market practice in this type of situation.

3.    **TERMS OF THE SCHEME**

3.1    The Scheme provides for the implementation of the Financial Restructuring in respect of the SSNs.

3.2    The form of the Scheme is included as Appendix 1 (*Form of Scheme*) to this Explanatory Statement.

3.3    The Scheme sets out the detailed Restructuring Steps that will occur on the Restructuring Effective Date and also provides for:

(a)    the grant of authority to the Scheme Company, the Parent, New Midco, the Shareholder Loan Facility Agent, the Security Agent and the SSN Trustee to, from the relevant time as set out in the Scheme, act as agent and attorney for Scheme Creditors and, pursuant to the Account Holder Letter and its incorporation into the Scheme, their Nominated Recipients (if applicable) in order to, *inter alia*:

(i)    execute, release and deliver the Financial Restructuring Documents and such other documents as are required to implement the Financial Restructuring on behalf of each Scheme Creditor;

(ii)    cause each determination of the principal amount of and each principal payment of the SSNs (including, for the avoidance of doubt, any Guarantee Liabilities in respect thereof) outstanding to be reduced to zero and released in full pursuant to a supplemental indenture substantially in the form attached at Appendix 10 (*Supplemental Indenture*) of this Explanatory Statement;

(iii)    agree on behalf of each Scheme Creditor any amendments to the Financial Restructuring Documents which the Scheme Company and (if applicable) the other person(s) to be party to the relevant Financial Restructuring Document may deem necessary or desirable in order to, amongst other things, ensure that they reflect the terms of the Scheme and the transactions intended to be entered into in order to effect the Financial Restructuring; and

(iv)    carry out any related or ancillary actions that it considers necessary or desirable for the purposes of implementing this Scheme;

(b)    a Scheme Creditors' participation in the Shareholder Loan and/or Scheme Consideration Shares to be issued on the Restructuring Effective Date to a Holding Period Trustee, in the event that a Scheme Creditor does not make the relevant actions by the relevant deadlines referred to in clause 4 (*Scheme Consideration*) of the Scheme;

(c)    releases by the Scheme Creditors for the benefit of the Scheme Company and each of the following (in each case, in its or their capacity as such): (i) the Advisers (as defined in the Scheme), (ii) Lucid, (iii) the SSN Trustee, (iv) the Security Agent, (v) the SSN Paying Agent, (vi) the Shareholder Loan Facility Agent or (vii) any other Scheme Creditor (or Nominated Recipient(s)) or such Scheme Creditor's Affiliates; and

(d)    the Scheme Company to be authorised to consent on behalf of all Scheme Creditors to any modification of, or addition to, the Scheme or to any terms or conditions that the Court may think fit to approve or impose, and which would not directly or indirectly have a material adverse effect on the interests of any Scheme Creditor, the Security Agent, or the PIK Security Agent under the Scheme, provided that if such modifications could reasonably be expected directly or indirectly to have a material adverse effect on the interests of a Scheme Creditor, then the Scheme Company may not give such consent without the prior written consent of that Scheme Creditor.

3.4    Participation in the PIK Loan will not be effected pursuant to the Scheme, as Scheme Creditors were instead given the opportunity pursuant to the Lock-Up Agreement and for a period of over four weeks to elect to participate. This was required from a timing perspective, because the Scheme Company needed certainty as to potential holdings in order to ensure that the participants in the PIK Loan, who are also to receive A ordinary shares in the Parent, were able to make the appropriate regulatory and anti-trust filings before the Restructuring Effective Date. No additional fees were made available for agreeing to accede to the Lock-Up Agreement or to participate in the PIK Loan or to backstop any participations in the PIK Loan.

3.5    If the Scheme Creditors do not approve the Scheme at the Scheme Meeting, then the Scheme Company will not be able to implement the Financial Restructuring.

## 4.    APPROVAL OF THE SCHEME AND THE VOTING PROCESS

4.1    In order for the Scheme to be approved by the Scheme Creditors, the Scheme must be approved by a majority in number (more than 50%) representing at least 75% in value of each class of Scheme Creditors present and voting, either in person or by proxy, at the Scheme Meeting convened for the purpose of considering and, if thought fit, approving the Scheme.

4.2    The procedure for Scheme Creditors to vote on the Scheme is set out at Part 6 (*Actions to be taken by Scheme Creditors*) of this Explanatory Statement.

## 5.    THE SCHEME MEETING

5.1    In accordance with the Convening Order, on or about the date of this Explanatory Statement, the Scheme Company will notify Scheme Creditors of the time and date of and means of attending the Scheme Meeting by sending the Notice of Scheme Meeting to the Scheme Creditors via the Scheme Website.

5.2    The Scheme Meeting will take place by webinar (rather than as a physical meeting) on 16 October 2020, commencing at 2 p.m. (London time). The form of the Notice of the Scheme Meeting is included as Appendix 2 (*Form of Notice of Scheme Meeting*) to this Explanatory Statement. Scheme Creditors and their appointed proxies may attend and vote at the Scheme Meeting "in person" by attending the Scheme Meeting webinar. Scheme Creditors who wish to attend the Scheme Meeting webinar should contact the Information Agent.

5.3    Once the Scheme Meeting has been opened, and the Chairperson has addressed all of the Scheme Creditors generally in relation to the conduct of the Scheme Meeting and taken any questions from Scheme Creditors, voting will be conducted for the Scheme Meeting.

5.4    The form of Notice of Scheme Meeting is included as Appendix 2 (*Form of Notice of Scheme Meeting*) to this Explanatory Statement.

6.    **VOTING VALUE**

6.1    The Voting Value of each Scheme Creditor which submits a valid Account Holder Letter will be calculated as at the Voting Record Time based on information confidentially provided to the Scheme Company by the Information Agent in conjunction with the Clearing Systems. This information will be used by the Chairperson to determine whether the Scheme is approved at the Scheme Meeting. Accordingly, Scheme Creditors do not need to take any action in respect of confirming the amount of their Scheme Claims other than providing the details requested in the Account Holder Letter.

6.2    The Chairperson may, for voting purposes only, reject a Scheme Claim in whole or in part if she or he considers that the relevant Scheme Creditor has not complied with the voting procedures set out in Part 6 (*Actions to be Taken by Scheme Creditors*) of this Explanatory Statement. If a Scheme Claim is unascertained, contingent or disputed (in part) but the Chairperson is able to place a minimum value on that Scheme Claim, she or he may admit the Scheme Claim for voting purposes at that value. If a Scheme Claim is disputed in its entirety, or the Chairperson is otherwise unable to place a minimum value on it, that Scheme Claim may be valued at £1 for voting purposes.

6.3    The Chairperson will report to the Court, at the Scheme Sanction Hearing, his or her decision to reject Scheme Claims (if any), with details of those Scheme Claims and the reasons for rejection.

6.4    The Chairperson's determination of a Scheme Creditor's Voting Value shall, subject to manifest error, be binding on each Scheme Creditor.

6.5    The Voting Value attributed to a Scheme Creditor at the Scheme Meeting does not (in itself) constitute an admission of the existence or quantum of any liability of any member of the Group to the Scheme Creditor and will not bind the Scheme Company or Scheme Creditors for any other purpose.

7.    **NEXT STEPS AFTER THE SCHEME MEETING**

7.1    Following the Scheme Meeting, provided that the requisite majority of Scheme Creditors vote in favour of the Scheme, the Scheme Company intends to apply at the Scheme Sanction Hearing for a Court Order sanctioning the Scheme.

7.2    The Scheme Sanction Hearing is currently anticipated to be held on or around 23 October 2020. The Scheme Company will notify Scheme Creditors of the precise time of the Scheme Sanction Hearing via the Scheme Website and will communicate any change to the date of the Scheme Sanction Hearing in the same manner.

7.3    Scheme Creditors are entitled to attend the Scheme Sanction Hearing in person or through counsel and to make representations at the Scheme Sanction Hearing, although they are not obliged to do so. Scheme Creditors who wish to attend the Scheme Sanction Hearing in person or through counsel should contact Latham & Watkins to obtain instructions for attending the Scheme Sanction Hearing.

8.    **EFFECTIVENESS OF THE SCHEME AND THE FINANCIAL RESTRUCTURING**

8.1    The Scheme will become effective in accordance with its terms and legally binding on the Scheme Company and the Scheme Creditors on the Scheme Effective Date.

27

8.2 In order for the Scheme Effective Date to occur:

(a) the Scheme must be approved by a majority in number (more than 50%) representing at least 75% in value of each class of Scheme Creditors present and voting, in person or by proxy, at the Scheme Meeting convened for the purpose of considering and, if thought fit, approving the Scheme;

(b) the Scheme must be sanctioned by the Court; and

(c) an office copy of the Court Order relating to the Scheme must be delivered to the Registrar of Companies for England and Wales.

8.3 If the Scheme Effective Date occurs, the Scheme will affect all Scheme Creditors. All Scheme Creditors (including those who did not vote in favour of the Scheme or those who did not vote at all) will be bound by the terms of the Scheme as a matter of English law, irrespective of the jurisdiction in which such Scheme Creditors resides or has their seat, along with the Scheme Company.

8.4 It is intended that the Scheme Effective Date will occur as soon as reasonably practicable following the date of the Scheme Sanction Hearing and the receipt of the relevant Court Order. The Scheme Company will notify Scheme Creditors of the occurrence of the Scheme Effective Date via the Scheme Website.

8.5 Upon satisfaction or waiver of the Financial Restructuring Conditions (of which the Scheme Company is required to notify the Scheme Creditors), the arrangement effected by the Scheme will apply to all Scheme Claims and will be binding on all Scheme Creditors and their respective successors and assigns. The transactions comprising the Restructuring Steps will then be completed as soon as reasonably practicable and in the order set out in the Scheme.

8.6 The Financial Restructuring Conditions include amongst other things:

(a) the occurrence of the Scheme Effective Date; and

(b) the satisfaction or waiver of all conditions precedent to each Financial Restructuring Document.

8.7 Each of the parties to a Deed of Undertaking will execute and deliver prior to the Scheme Sanction Hearing, a Deed of Undertaking in favour of the Court, the Scheme Company and the Scheme Creditors pursuant to which they have agreed to the Scheme and agreed and undertaken to the Court, the Scheme Company and the Scheme Creditors, among other things:

(a) upon the Scheme being sanctioned by the Court, to be bound by the Scheme;

(b) on and from the Scheme Effective Date, to promptly do or procure to be done all such acts and things necessary or desirable for the purpose of giving effect to the Scheme; and

(c) on and from the Scheme Effective Date, to promptly execute and be bound by the Financial Restructuring Documents (and related documents) to which they are party.

8.8 Scheme Creditor Entitlements may be withheld from being distributed to a Scheme Creditor (or its Nominated Recipient) on the Restructuring Effective Date if (a) the Information Agent does not receive a validly executed and delivered Account Holder Letter from that Scheme Creditor and all of the information, representations, confirmations and any other documentation required to be provided therein before the Voting Submission Deadline and/or (b) in the case of Scheme Creditor Entitlements to the Shareholder Loan, the Shareholder Loan Facility Agent does not receive the GLAS KYC Information or to the extent that the Shareholder Loan Facility Agent

has not confirmed by 5 p.m. (London time) on 26 October 2020 to the Information Agent that the GLAS KYC Information is in a form satisfactory to the Shareholder Loan Facility Agent and/or (c) in the case of Scheme Creditor Entitlements to the Scheme Consideration Shares, Crestbridge does not receive the CDD Information by the CDD Information Deadline or to the extent Crestbridge has not confirmed to the Information Agent by 5 p.m. (London time) on 26 October 2020 that such CDD Information is in a form satisfactory to Crestbridge.

8.9    Any such withheld Scheme Creditor Entitlements will be delivered to the Holding Period Trustee who will hold such Scheme Creditor Entitlements on behalf of the relevant Scheme Creditor as more particularly set out in clause 9.3 (*Holding Period Trustee*) of the Scheme.

9.    **CHAPTER 15 RECOGNITION**

The Group intends to deliver the Court Order to the Registrar of Companies once the hearing to recognise the Scheme under Chapter 15 has occurred. It is intended that the hearing to recognise the Scheme under Chapter 15 will occur on the same day as the Scheme Sanction Hearing or shortly thereafter.

EU-DOCS\29867510.8

# PART 6

## ACTIONS TO BE TAKEN BY SCHEME CREDITORS

**Please take the action requested of you in paragraphs 2 to 5 of these instructions as soon as possible. There is a limited time period within which the Account Holder Letter can be returned, duly executed and completed, as directed in these instructions, in order to vote at the Scheme Meeting.**

1.    **GENERAL**

1.1    Each Scheme Creditor should immediately contact its Account Holder (through any Intermediaries, if appropriate) to ensure that a valid Account Holder Letter in respect of its Scheme Claim is delivered to and received by the Information Agent.

1.2    It will be the responsibility of Account Holders to obtain from the SSN Holders (through any Intermediaries, if applicable) on whose behalf they are acting in accordance with the procedures established between them whatever information or instructions they may require to identify in an Account Holder Letter the relevant SSN Holder and to provide the information, instructions, confirmations and representations required to be given by the Account Holder Letter for and on behalf of the relevant SSN Holder.

1.3    To assist this process, each SSN Holder is strongly encouraged to contact its Account Holder (through any Intermediaries, if appropriate) to enable that Account Holder to complete an Account Holder Letter, or to deliver a populated Account Holder Letter to the Account Holder (as preferred) and procure that the Account Holder shall deliver such duly signed Account Holder Letter to the Information Agent before the Voting Submission Deadline.

1.4    Before the Custody Instructions Deadline, being 5 p.m. (London time) on 13 October 2020, each SSN Holder that wishes to vote at the Scheme Meeting will be required to ensure that its Account Holder has instructed the relevant Clearing System in which the SSNs which are the subject of the Account Holder Letter are held to irrevocably block those interests in the SSNs, by giving Custody Instructions to that effect to the relevant Clearing System. The procedure for doing this is described further below.

1.5    If a person is in any doubt as to whether or not it is an SSN Holder, such person should contact the Information Agent using the contact details in the Account Holder Letter set out in Part 11 (*Enquiries*) to this Explanatory Statement.

1.6    SSN Holders may also wish to refer to the diagram set out below to see the relationship between SSN Holders, Intermediaries and Account Holders.

1.7    The following diagram illustrates the relationship between certain persons with interests in the SSNs held in global form through the Clearing Systems:



1.8     The Information Agent has been appointed to facilitate communications with SSN Holders. The Information Agent is the agent of the Scheme Company and owes no duty to any Scheme Creditor.

## 2.      COMPLETION OF ACCOUNT HOLDER LETTERS

In order to vote at the Scheme Meeting, each SSN Holder (or its Account Holder) (through any Intermediaries, if applicable) should instruct its Account Holder to complete, sign and submit to the Information Agent an Account Holder Letter in accordance with paragraphs 4 and 5 below.

## 3.      PROCEDURE FOR BLOCKING NOTES HELD IN A CLEARING SYSTEM

3.1     Each Account Holder should ensure that Euroclear and/or Clearstream (as the case may be) has received irrevocable instructions, as per the standard procedures of the relevant Clearing System (with which it has complied), to block the SSNs which are the subject of an Account Holder Letter.

3.2     Each SSN Holder procuring the submission of an Account Holder Letter by its Account Holder should instruct its Account Holder to confirm that (and the Account Holder should ensure that) the Account Holder Letter cross references the relevant Custody Instructions Reference Number.

3.3     Failure to include a valid Custody Instructions Reference Number in an Account Holder Letter delivered on behalf of an SSN Holder to the Information Agent will invalidate that Account Holder Letter, and the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting, and the relevant SSN Holder will not be entitled to vote at the Scheme Meeting.

EU-DOCS\29867510.8

3.4     SSNs held in Euroclear and/or Clearstream should be blocked in accordance with the procedures of the relevant Clearing System and the deadlines required by that Clearing System. It is the responsibility of Account Holders to ensure that they comply with any particular deadlines imposed by the Information Agent and the relevant Clearing System for blocking the SSNs.

3.5     Custody Instructions in respect of any SSNs held in Euroclear and/or Clearstream which are the subject of an Account Holder Letter should be given to Euroclear and/or Clearstream in accordance with the deadlines specified by Euroclear and/or Clearstream and their standard practices.

3.6     Euroclear and/or Clearstream will assign a Custody Instructions Reference Number in respect of each Custody Instruction and, as noted above, the Custody Instructions Reference Number must be cross-referenced in the Account Holder Letter relating to the SSNs in respect of which the Custody Instructions Reference Number has been obtained.

3.7     An Account Holder Letter will not be valid if it does not contain the relevant Custody Instructions Reference Number(s). This will enable the Information Agent to verify the blocking of the SSNs in accordance with the procedure described below.

3.8     Each Custody Instruction should clearly state: (i) the aggregate principal amount of the SSNs; (ii) the name, telephone number and email address of the SSN Holder; (iii) the securities account number at the relevant Clearing System in which the relevant SSNs are held and (iv) the name of the Account Holder.

3.9     The Information Agent will request the Clearing Systems to confirm to its satisfaction that the relevant SSNs have been blocked with effect from or before the date of receipt by the Information Agent of an Account Holder Letter. In the event that a Clearing System fails to do so, the Information Agent may reject that Account Holder Letter.

3.10    In order to give the requested confirmation for voting purposes, the Clearing Systems will need to have received the Custody Instructions no later than 5 p.m. (London time) on 13 October 2020, being the Custody Instructions Deadline.

3.11    The Information Agent will use all reasonable endeavours to assist SSN Holders to complete their Account Holder Letters validly, should it receive any Account Holder Letters which are not valid. However, failure to deliver a valid Account Holder Letter on behalf of an SSN Holder to the Information Agent in the manner and within the deadlines referred to above will mean that the voting instructions contained in such Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting, and the relevant SSN Holder will not be entitled to vote at the Scheme Meeting.

3.12    None of the Scheme Company, the Information Agent or any other person will be responsible for any loss or Liability incurred by an SSN Holder as a result of any determination by the Information Agent that an Account Holder Letter contains an error or is incomplete, even if this is subsequently shown not to have been the case.

4.      **COMPLETING THE ACCOUNT HOLDER LETTER**

4.1     Each SSN Holder will need to give its Account Holder information and instructions as to voting and certain other matters.

4.2     SSN Holders may attend and vote at the Scheme Meeting by:

        (a)     appointing a person as its proxy to attend and vote at the Scheme Meeting on the SSN Holder's behalf; or

EU-DOCS\29867510.8

(b)    attending and voting at the Scheme Meeting in person,

in each case, by ensuring that such election is recorded in the Account Holder Letter delivered on its behalf and that the voting intention section of the Account Holder Letter is completed.

4.3    Each SSN Holder is recommended to appoint a proxy (either the Chairperson or someone else of its choice who would be willing to attend the Scheme Meeting) in any event, even if that SSN Holder intends to attend and vote in person or by a duly authorised representative, if a corporation, in case such SSN Holder is unable to do so for any reason.

4.4    Each SSN Holder which submits, delivers or procures the delivery of an Account Holder Letter will be required to make (or authorise its Account Holder to make on its behalf) the representations, warranties and undertakings to the Scheme Company set out in the Account Holder Letter.

4.5    Any SSN Holder that is unable to give any of the representations, warranties and undertakings referred to above should contact the Information Agent directly as soon as possible, as there may be additional procedures involved in respect of that SSN Holder's participation in the Scheme.

4.6    If an SSN Holder appoints a proxy and then decides to attend and vote at the Scheme Meeting in person or by a duly authorised representative, if a corporation, that SSN Holder will be entitled to do so.

4.7    Each SSN Holder should also ensure that the following is included in the Account Holder Letter delivered on its behalf:

(a)    its identity;

(b)    details of the SSNs which are the subject of the Account Holder Letter, including the ISIN number(s), the principal amount of the SSNs blocked at the relevant Clearing System(s), the identity of the relevant Clearing System(s), the account number of the Account Holder in the relevant Clearing System(s) and the Custody Instructions Reference Number(s);

(c)    the appropriate confirmations to be given by the Account Holder;

(d)    its voting instructions as well as any other information, confirmation, elections or representations requested in the Account Holder Letter;

(e)    certain securities law confirmations; and

(f)    details in respect of any Nominated Recipients it wishes to appoint.

## 5.    SUBMITTING THE ACCOUNT HOLDER LETTER

5.1    Each SSN Holder should complete and submit an Account Holder Letter online at the Scheme Website (https://www.lucid-is.com/newlook) so as to be received by no later than the Voting Submission Deadline.

5.2    Account Holder Letters received after the Voting Submission Deadline will not constitute valid voting instructions for the purposes of the Scheme, subject to the discretion of the Chairperson and **provided that** any such Account Holder Letter is received before the Scheme Meeting is closed.

5.3    The Chairperson will be entitled to rely on the signatures to the Account Holder Letter as a warranty that the confirmations given therein are correct in respect of the SSN Holders.

EU-DOCS\29867510.8

5.4    By delivering an Account Holder Letter to the Information Agent, the Account Holder:

(a)    confirms to the Scheme Company and the Information Agent that Custody Instructions in respect of the SSNs which are the subject of that Account Holder Letter have been issued to the relevant Clearing System with effect from or before the date of submission of the Account Holder Letter in accordance with the normal procedures of such Clearing System and after taking into account the deadlines imposed by such Clearing System;

(b)    instructs the relevant Clearing System to transmit to the Information Agent (for onward transmission to the Scheme Company) the information contained within the Custody Instructions; and

(c)    gives the other confirmations required by the Account Holder Letter in favour of the Scheme Company and the Information Agent.

5.5    If an Account Holder submits more than one valid Account Holder Letter, but the instructions in the Account Holder Letters are not compatible with each other, the Chairperson shall have regard only to the Account Holder Letter which was received last before the Voting Submission Deadline.

## 6.    ATTENDANCE AND VOTING AT THE SCHEME MEETING

6.1    Scheme Creditors may attend and vote at the Scheme Meeting by:

(a)    appointing a person as its proxy to attend and vote at the Scheme Meeting on the Scheme Creditor's behalf; or

(b)    attending and voting at the Scheme Meeting in person.

## 7.    THE SCHEME MEETING

7.1    In accordance with the Convening Order, the Scheme Meeting will take place by webinar (rather than as a physical meeting) on 16 October 2020, commencing at 2 p.m. (London time). The form of the Notice of the Scheme Meeting is included as Appendix 2 (*Form of Notice of Scheme Meeting*) to this Explanatory Statement. Scheme Creditors and their appointed proxies may attend and vote at the Scheme Meeting "in person" by attending the Scheme Meeting webinar. Scheme Creditors who wish to attend the Scheme Meeting webinar should contact the Information Agent. Scheme Creditors are advised that admittance to the Scheme Meeting will be subject to a time-consuming verification process. Registration for the Scheme Meeting will commence at 1 p.m. (London time) on 16 October 2020.

7.2    If an SSN Holder wishes to attend the Scheme Meeting, it should produce:

(a)    a duplicate copy of the Account Holder Letter delivered on its behalf;

(b)    evidence of corporate authority (in the case of a corporation) (for example, a valid power of attorney and/or board minutes); and

(c)    a passport as proof of personal identity (and the passport number must match that on the SSN Holder's Account Holder Letter),

at the registration for the Scheme Meeting which will commence at 1 p.m. (London time) on 16 October 2020.

7.3    Any proxy attending the Scheme Meeting on behalf of a SSN Holder should produce a duplicate copy of the Account Holder Letter in which he or she is named as proxy. Where this copy can

be matched against one of the copies provided by the relevant Account Holder to the Information Agent on behalf of the Scheme Company, that SSN Holder's proxy will be admitted to the Scheme Meeting upon providing a passport as proof of personal identity (and the passport number must match that on the SSN Holder's Account Holder Letter under which the SSN Holder appoints such person as its proxy).

7.4    Where the Account Holder Letter cannot be produced by the person purporting to have been appointed by a SSN Holder as its proxy, that person will need to provide a passport as proof of personal identity and, **provided that** the evidenced identity conforms with the details in the relevant copy of the Account Holder Letter provided by the relevant Account Holder to the Information Agent on behalf of the Scheme Company, that person will be admitted to the Scheme Meeting.

7.5    If a SSN Holder appoints the Chairperson as its proxy, there is no need for the Chairperson to take the Account Holder Letter to the Scheme Meeting.

7.6    Scheme Creditors will be given the opportunity to consult with each other (including through the use of online break-out rooms) and raise any questions or issues they may have in relation to the Scheme. Scheme Creditors are however encouraged to raise any such questions or issues with Latham & Watkins, using the contact details set out in Part 1 (*Letter*) of this Explanatory Statement, as soon as possible, in advance of the Scheme Meeting.

## 8.    VOTING PROCEDURES AT THE SCHEME MEETING

8.1    Once the Scheme Meeting has been opened, and the Chairperson has addressed all of the Scheme Creditors generally in relation to the conduct of the Scheme Meeting and taken any questions from Scheme Creditors, voting will be conducted for the Scheme Meeting.

8.2    The Chairperson will determine whether the Scheme has been approved by the requisite majority of Scheme Creditors at the Scheme Meeting. The Scheme must be approved by a majority in number (more than 50%) representing at least 75% in value of each class of Scheme Creditors present and voting, either in person or by proxy, at the Scheme Meeting.

8.3    An explanation as to how the Voting Value of Scheme Creditors will be determined for voting purposes is set out at paragraph 6 of Part 5 (*The Scheme*) of this Explanatory Statement.

## 9.    SCHEME SANCTION HEARING

9.1    Following the Scheme Meeting, **provided that** the requisite majority of Scheme Creditors (as set out at paragraph 8 above) vote in favour of the Scheme, the Scheme Company intends to apply at the Scheme Sanction Hearing for a Court Order sanctioning the Scheme.

9.2    The Scheme Sanction Hearing is currently anticipated to be held on or around 23 October 2020. The Scheme Company will notify Scheme Creditors of the precise time of the Scheme Sanction Hearing via the Scheme Website and will communicate any change to the date of the Scheme Sanction Hearing in the same manner.

9.3    Scheme Creditors are entitled, but not obliged, to attend in person or through counsel and to make representations at the Scheme Sanction Hearing. Scheme Creditors who wish to attend the Scheme Sanction Hearing in person or through counsel should contact Latham & Watkins set out in Part 1 (*Letter*) of this Explanatory Statement to obtain instructions for attending the Scheme Sanction Hearing.

9.4    Scheme Creditors should be aware that the Scheme Company notified the Scheme Creditors in the practice statement letter sent to Scheme Creditors on 2 September 2020 of the proposed constitution of classes for the purpose of the Scheme Meeting. The Scheme Company also

requested Scheme Creditors raise any Creditor Concerns at the Convening Hearing. The Scheme Company understand that the Court will expect the Scheme Creditor raising Creditor Concerns at the Scheme Sanction Hearing to show good reason why such Creditor Concerns were not raised earlier when the opportunity to do so was given.

EU-DOCS\29867510.8

PART 7

CONSEQUENCES OF A FAILURE TO IMPLEMENT THE FINANCIAL
RESTRUCTURING

1.    **CONSEQUENCES OF A FAILURE TO IMPLEMENT THE FINANCIAL
RESTRUCTURING**

1.1    The Group's 13-week cash flow forecast indicates that available cash falls below a critical
operating level of £30,000,000 during the week commencing 26 October 2020. In the event that
it becomes apparent that the Financial Restructuring is not capable of being implemented (for
example, if the requisite majority of Scheme Creditors does not vote in favour of the Scheme
or if the Court decides not to exercise its discretion to sanction the Scheme), the Group would
need to attempt to negotiate with the Scheme Creditors and lenders under the RCF and
Operating Facilities to reach an alternative transaction before liquidity falls below such
operating level or the Lock-Up Agreement is terminated as a result (with the consequences set
out in paragraph 1.2 below).

1.2    The Directors believe that, in light of the considerable effort and time which it has taken for the
Scheme Company and other members of the Group to agree to the Financial Restructuring with
its the Group's key stakeholders, it is unlikely that the Scheme Creditors, lenders under the RCF
and lenders under the Operating Facility would agree to an alternative transaction, which would
leave the Group with a viable capital structure, before the Scheme Company would need to
commence a formal insolvency process on account of the Group's deteriorating liquidity
position. Further, if the Financial Restructuring is not implemented by the Long-Stop Date (as
defined in the Lock-Up Agreement and currently being 30 October 2020) then the Lock-Up
Agreement will automatically terminate, which would prompt an automatic acceleration of the
SSN liabilities against the Scheme Company and certain members of the Group that guarantee
the payment obligations of the Scheme Company under the SSN Indenture and the Operating
Facility liabilities would become due and payable.

1.3    Furthermore, the supervisors of the CVA would be entitled to terminate the CVA if the
Financial Restructuring is not completed on or before 31 January 2021 and would likely be
bound to do so in circumstances in which the Financial Restructuring had not been implemented
and if no realistic alternative was available and the acceleration of the Group's existing financial
indebtedness looked likely. The approval of the CVA and the success of the operational
restructuring in that respect is not therefore sufficient for a successful restructuring of the Group
absent an effective Financial Restructuring.

1.4    The Directors note that the Group, assisted by its advisors, has already initiated a process to
solicit potential interest in the Group by way of a sale transaction or an alternative
recapitalisation transaction. No bids were received for the share capital of the Parent or an
alternative recapitalisation transaction by the specified deadline. One bid for an alternative
recapitalisation transaction was received shortly after the deadline, but the terms of such bid
included extensive conditionality, which included a successful CVA, the consensual roll-over
of the RCF and Operating Facilities and the write-down of the SSNs into subordinated debt
without any allocation of equity to SSN Holders in the Parent or the Group. There is no current
basis on which the Lock-Up Agreement can be terminated and so, given the obligations under
the Lock-Up Agreement to support the Financial Restructuring, the Directors view such bid as
not being implementable in light of the support from the SSN Holders under the Lock-Up
Agreement to the terms of the Financial Restructuring. Therefore, the Directors consider that it
will be extremely challenging to sell the Group as a going concern.

1.5    In the absence of such alternative transaction, the Directors consider that it is likely that the Scheme Company and such other members of the Group would be or would become insolvent and the Directors would consider themselves obliged to commence a formal insolvency process with respect to the Scheme Company and (in their capacities as directors of such other members of the Group) certain other members of the Group. Given the lack of interest elicited by the Group for a sale of the entire business, it is anticipated that an insolvency would result in a piecemeal liquidation of the Group's business, with probably significant job losses for its employees and a significant lower return to the Group's creditors than that is likely to be obtained following the implementation of the Financial Restructuring.

## 2.    ESTIMATED ALTERNATIVE OUTCOME FOR SCHEME CREDITORS

2.1    The Group instructed KPMG to undertake an independent valuation of the Group's business as at 30 June 2020 and then to undertake a consequential indicative analysis as to how this might translate into recoveries for Scheme Creditors if the Financial Restructuring is not successful and to opine accordingly as of 17 September 2020 on whether the Scheme is fair to Scheme Creditors from a financial perspective (on the basis that management of the Group have confirmed that there have been no material changes to the performance expectations for the business of the Group based on actual financial performance between 30 June 2020 and 17 September 2020 and that they are not aware of any changes, or any new information, which would indicate a material change in the value of the business since 30 June 2020). Scheme Creditors should note that, in carrying out their work, KPMG only owe a duty of care to the Scheme Company and not to the Scheme Creditors.

2.2    KPMG prepared their valuation work on the basis of 'market value' as defined by standards of the International Valuation Standards Council, being "the estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer and a willing seller in an arm's length transaction, after proper marketing and where the parties each acted knowledgeably, prudently and without compulsion".

2.3    In terms of the financial information provided by management of the Group to KPMG, this included: unaudited financial results for FY20, as well as the Q320 full year reforecast, a reconciliation of pre- and post- Covid-19 financial results (i.e. excluding the impact of Covid-19 on sales, costs and certain one-off items as indicative pre-Covid 19 performance for the period), unaudited financial results for Q121 and management's latest three-year business plan that sets out expectations for the Group's performance over the period of FY21-FY23 as at May 2020, which has been prepared using FY20 actual results as a starting point, together with a report from management consultants OC&C with respect to the Group's forecasts.

2.4    KPMG applied several different valuation methodologies including:

    (a)    a discounted cashflow analysis, using the quarterly cashflow forecasts prepared by management of the Group for the periods from July 2020 to March 2023 and discounted by a weighted average cost of capital of 12.3% to 15.4%;

    (b)    a capitalised earnings analysis on near-term earnings and the multiples observed in the market for comparable companies that primarily focus on high-street fashion retail, which consist of high street apparel specialists such as Primark, as well as up-market fashion retailers (Ted Baker) and multichannel stores (M&S) and consideration was also given to the distribution model and geography the Group operates in relation to such comparable companies. KPMG concluded that it was appropriate to consider multiples for comparable companies at a discount to the mean comparable company multiples and more closely aligned to the likes of M&S and Frasers and therefore concluded on multiples of between 0.25x and 0.45x enterprise value/revenue (depending on the forecast year in question) and between 2.0x and 3.5x enterprise value/EBITDA(R) (depending on the forecast year in question). In terms of comparable

transactions, KPMG considered those in the fashion retail sector, including department stores for whom clothes constitute a significant proportion of revenue and primarily considered transactions involving the acquisition of a majority stake, with an implied enterprise value of above £20m and which have occurred within two years of 30 June 2020; transactions for companies that have EBITDA margins above 20% were excluded on the basis that they were not considered to be comparable given the Group's actual and forecast margins. However, KPMG concluded that it was not appropriate to place any reliance on multiples for comparable transactions as they were not able to identify any such transactions that occurred following the outbreak of Covid-19 on the basis of the preceding assumptions; and

(c)     a listed debt analysis, which considered a market value range based on the broker-quoted price as at its highest and lowest values over the three months preceding 30 June 2020 as well as at 30 June 2020,

and estimated that the market value of the Group's business ranged from £117 million to £378 million on a going concern basis and assuming the Group had no issues in regards to its liquidity.

2.5     KPMG also considered a high-level liquidation valuation based on an orderly wind down scenario, for which KPMG relied on the balance sheet provided by management of the Group as of 30 June 2020 with adjustments based on the potential recoverability of each of the assets (including, for example, an assumed recovery of between 10% and 50% on stock, an assumed recovery of between 0.9% and 14.6% on the New Look brand, an assumed recovery of between 0% and 10% on software licences and relying on management's assessment of unrestricted cash as at 17 September 2020) and certain updating adjustments as of 17 September 2020. The analysis does not include the associated costs of realising the assets in a wind-down scenario (e.g. agents, rent, legal costs and staffing). On this basis, KPMG estimated that the market value of the Group's business ranged from £93.4 million to £175.9 million.

2.6     An illustrative application of estimated values in an orderly liquidation scenario under the security proceeds waterfall set out in the Intercreditor Agreement (where the RCF and the Operating Facilities rank super senior to, and so would recover ahead of, the SSNs) results in the following prospective estimated recoveries for Scheme Creditors:

(i) Low case - 0p in the £

(ii) High case – 2.59p in the £

The Directors would note that such estimates in the KPMG valuation are based on an orderly liquidation and there is no guarantee that such liquidation will be orderly and therefore the returns may well be lower in practice. The Directors also consider that the high-end of the brand recovery analysis used in the KPMG valuation is high compared to brand valuations on comparable transactions such as Karen Millen and Coast and so view the low-end of the brand recovery analysis as more appropriate. Similarly, the Directors view that the recoveries with respect to software licences will be very minimal and therefore view the low-end of the relevant recovery analysis as more likely here.

2.7     Finally, KPMG also considered a valuation based on a hypothetical accelerated M&A transaction, where value would be reduced given the adverse circumstances that would apply to such a transaction when set against those pertaining to the "market value" test. KPMG notes that the question of value reduction can vary depending upon individual circumstances but could be as great as 25-50 per cent. On this basis, KPMG estimated that the market value of the Group's business ranged from £118.1 million to £341.1 million. However, as noted above, a process to solicit potential interest in the Group by way of an accelerated M&A process was in

fact initiated and ultimately failed to produce any implementable bids and therefore this valuation is not considered realistic.

2.8    KPMG have concluded that, when set against these potential recoveries, the value to be received by Scheme Creditors pursuant to the Scheme is fair from a financial point of view taking into account all the circumstances, and appears likely to be greater than the value to be realised through an administration or liquidation.

2.9    The Group considers the Scheme to be in the interest of the Scheme Creditors because if the Scheme is not approved and the wider Financial Restructuring is not implemented then their recoveries seem likely to be inferior to their potential recoveries from the Financial Restructuring given the potential for a return on the Shareholder Loan and the potential for equity upside in the restructured Group.

EU-DOCS\29867510.8

# PART 8

## DIRECTORS' INTERESTS

1.      The current directors of the Scheme Company and their functions are:

| Scheme Company | Name | Position |
|---|---|---|
| New Look Financing plc | Richard John Collyer | Director / Chief Financial Officer |
| | Nigel Graham Oddy | Director / Chief Executive Officer |

2.      Each director will, following implementation of the Scheme, hold an indirect interest in the Scheme Company through a MIP. These are C ordinary shares of the Parent, which shall represent 5% of the post-Financial Restructuring ordinary share capital of the Parent on a fully diluted basis and D ordinary shares of the Parent, which shall entitle holders to 2% of the equity value of the Group upon an exit above a threshold of £300,000,000 (and such entitlement shall dilute the entitlement of the A ordinary shares of the Parent and the B ordinary shares of the Parent on a pro rata basis) as more particularly set out in the Shareholders Agreement. As such, directors who are members of the management incentive programme will receive a direct benefit from the Financial Restructuring.

3.      Each director is also paid a salary by a member of the Group, which is payable in any event and not dependent on or linked to the Financial Restructuring.

4.      As at the date of this Explanatory Statement, none of the directors are entitled to a transaction bonus in connection with the Financial Restructuring.

5.      Save as disclosed in this Part 8 (*Directors' Interests*) of this Explanatory Statement, the effect of the Scheme on interests of the Scheme Company's directors is not expected to be different from its effect on similar interests of other persons.

# PART 9

## RISK FACTORS

*All statements in this Explanatory Statement are to be read subject to, and are qualified in their entirety by, the matters referred to in this Part 9 (Risk Factors).*

*The risk factors described below are those that the Group believes are potentially significant, but this should not be regarded as a comprehensive statement of all potential risks and uncertainties relating to the Financial Restructuring or the Scheme. Additional risks and uncertainties not presently known to the Group, or that the Group currently considers to be immaterial, may also have an adverse effect on the Financial Restructuring or the Scheme, the Scheme Company and/or the Group, and no assurance can be given that all material risks relating to the Group are set out below. Scheme Creditors should carefully consider these risk factors and the other information set out in this Explanatory Statement.*

*This Explanatory Statement also contains forward-looking statements that include risks and uncertainties. Actual results may differ from those anticipated in these forward-looking statements as a result of various factors, including the risks described below and elsewhere in this Explanatory Statement.*

*If a Scheme Creditor is in any doubt about the action it should take, such Scheme Creditor is advised to consult appropriately authorised independent professional advisers.*

1.      **RISKS RELATING TO THE SCHEME**

*Effectiveness of the Scheme requires the approval of Scheme Creditors*

1.1     Pursuant to Part 26 of the Act, in order for the Scheme to become legally binding on the Scheme Company and the Scheme Creditors, a majority in number representing at least 75%. in value of the relevant single class of Scheme Creditors present and voting either in person or by proxy at the meeting ordered to be summoned by the Court must vote in favour of the Scheme. In order for the Scheme to become effective, the Scheme must then be sanctioned by Court orders, and an official copy of the orders must be delivered to the Registrar of Companies for registration.

1.2     If approved by the relevant majorities, the Scheme is expected to be made effective by the delivery of copies of the Court Order to the Registrar of Companies. If the Scheme becomes effective, the Scheme Creditors will be bound by its terms from the date on which it becomes effective.

1.3     Pursuant to the Lock-Up Agreement, any Scheme Creditor that has acceded to the Lock-Up Agreement has agreed (among other things) to support, implement and consummate the proposed transaction on the terms set out in the Steps Plan and the Term Sheets by voting in favour of the Scheme.

1.4     Although Scheme Creditors which are party to the Lock-Up Agreement are expected to vote in favour of the Scheme, in the event that the Lock-Up Agreement was terminated in accordance with its terms, any Scheme Creditor that had acceded to the Lock-Up Agreement would cease to be bound by its obligation to support the Scheme.

*Even if the Scheme Creditors approve the Scheme, the Scheme may be objected to and may not be completed*

1.5     If the Scheme is approved at the Scheme Meeting, it is possible for a person with an interest in the Scheme (whether a Scheme Creditor or otherwise) to lodge objections with the Court, and,

if such objections have been lodged, to attend or be represented at the Scheme Sanction Hearing in order to make representations that the Scheme should not be approved and to appeal against the granting of the Court Order. Therefore, there can be no assurance that objections will not be made at or before the Scheme Sanction Hearing, or that an appeal will not be made against the grant of the Court Order and that any such objections or appeal will not delay or possibly prevent the Financial Restructuring.

### *Effectiveness of the Scheme requires the sanction of the Court*

1.6     In order for the Scheme to become effective, it must receive the sanction of the Court. The Court will not sanction the Scheme unless it is satisfied that the correct procedures have been followed, the proposed arrangements are reasonable and that there are no other reasons why the Scheme should not be approved. There can be no assurance that the Court will determine that the Scheme is reasonable or that the Court will not conclude that there are other reasons why the Scheme should not be sanctioned. If the Court does not sanction the Scheme, or sanctions it subject to conditions or amendments which: (i) the Group deems unacceptable; or (ii) would have (directly or indirectly) a material adverse effect on the interests of any Scheme Creditor and such conditions or amendments are not approved by the Scheme Creditors, the Scheme will not become effective and the Financial Restructuring will not be implemented.

### *Recognition of Scheme in the United States*

1.7     There is a possibility that the U.S. Bankruptcy Court will not recognise the Scheme under Chapter 15. If the U.S. Bankruptcy Court declines to recognise the Scheme under Chapter 15, the Scheme may not be recognised or enforced in the United States.

### *Scheme Creditors are responsible for assessing the merits of the Financial Restructuring and the Scheme*

1.8     Each Scheme Creditor is responsible for independently assessing the merits of the Financial Restructuring and the Scheme. This Explanatory Statement has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it and, consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it. Any such recipients should conduct their own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to their own objectives, financial situations and needs, and making an assessment of how this Explanatory Statement and the Scheme will affect them.

### *The Scheme may not be implemented in accordance with the timeline envisaged in this Explanatory Statement*

1.9     Factors unknown to the Scheme Company at the date of this Explanatory Statement may result in delays to the implementation of the Scheme.

### *The Financial Restructuring is subject to a number of conditions*

1.10    The Financial Restructuring will not become effective unless all the conditions precedent (including, among others, obtaining the Chapter 15 Order described further in Part 5 (*The Scheme*) of the Explanatory Statement) to the transactions contemplated by the Financial Restructuring are satisfied or waived.

### *Implementation of the Financial Restructuring may breach certain of the Group's contractual obligations*

1.11    There is a risk that the proposal or the implementation of the Financial Restructuring, or the taking of any steps required to implement the Financial Restructuring, may constitute a breach

of the Group's contractual obligations under one or more agreements. The consequences of such a breach may include the termination of such agreements, which may adversely affect the results of operations and financial condition of the Group.

2. **RISKS RELATING TO THE GROUP**

*The Scheme does not guarantee viability of the business*

2.1     While it is anticipated that the Scheme and the Financial Restructuring will ensure the continued viability of the Group's business (which is conducted primarily through NLRL), there may be other factors which have an impact on its financial performance, business, affairs and continued progress (including, but not limited to, risks of future further store closures associated with the ongoing global COVID-19 Pandemic).

2.2     The successful implementation of the Scheme and the Financial Restructuring cannot be taken as an indication or guarantee of the continued viability of the Group's business.

*The Group contains entities organised under the laws of several jurisdictions*

2.3     The Group contains entities organised under the laws of several jurisdictions. In the event that a member of the Group faces financial difficulty, it is not possible to predict with certainty in which jurisdictions insolvency or similar proceedings would be commenced or how these proceedings would be resolved. Any insolvency proceedings commenced in respect of a member of the Group would most likely be based on and governed by the insolvency laws of the jurisdiction under which it is organised. As a result, creditors will most likely be subject to the insolvency laws of that member of the Group's jurisdiction of incorporation. There can be no assurance as to how the insolvency laws of these jurisdictions will be applied in insolvency proceedings relating to several jurisdictions.

2.4     Further, one or more member of the Group may in the future take actions which result in the insolvency laws of a different or additional jurisdiction being applicable to them. In certain circumstances, those laws may conflict, or one or more persons may dispute the applicability of, any such insolvency laws.

2.5     The insolvency and other laws of the jurisdiction in which each member of the Group is organised or operates may be materially different from, or conflict with, both each other and the laws under any creditor's country of incorporation. Some jurisdictions may be less favourable to the interests of certain creditors than others, which may affect, among other things: the ability to obtain post-petition interest; the duration of proceedings; preference periods; and the priority of governmental and other creditors in any insolvency proceeding.

2.6     Prospective creditors should seek independent legal advice in each relevant jurisdiction when entering into financing arrangements with any member of the Group, in particular with regard to the impact of local law on their rights as creditors in the event of insolvency.

*The Group is materially affected by economic conditions in the United Kingdom and other market risks*

2.7     The Group is materially affected by economic conditions in the United Kingdom. Factors such as declining business and consumer confidence, increasing energy prices, downturns in the property market and other challenges can have a significant negative impact on the buying behaviour of commercial and individual customers.

2.8     Any of the foregoing factors could have an adverse impact on the Group's financial condition, results of operations and cash flows after the Financial Restructuring.

2.9     Furthermore, the Group was significantly impacted by the lockdown introduced by the Governments in the UK and the Republic of Ireland in response to the COVID-19 Pandemic, which resulted in store closures. The Group is likely to be similarly impacted in the future if such lockdown measures are reintroduced.

***Legal, political and economic uncertainty in the Eurozone, including the exit of the United Kingdom from the European Union may adversely impact current trading arrangements***

2.10    As of 31 January 2020, the United Kingdom is no longer an EU member state and is currently in a transition period until at least 31 December 2020 (the "**Transition Period**"). Following this date, there are likely to be changes in the legal rights and obligations of commercial parties across all industries. During the Transition Period, EU laws and regulations will continue to apply.

2.11    Due to the size and importance of the UK economy, the uncertainty and unpredictability concerning the UK's legal, political and economic relationship with Europe after the Transition Period may continue to be a source of instability in the international markets, create significant currency fluctuations, and/or otherwise adversely affect trading agreements or similar cross border co-operation arrangements (whether economic, tax, fiscal, legal, regulatory or otherwise) for the foreseeable future.

***Adverse publicity relating to the Financial Restructuring or the financial condition of the Group may adversely affect the Group's supplier relationships and market perception of the Group's business***

2.12    Adverse publicity relating to the Financial Restructuring may have a material adverse effect on the Group's supplier and creditor relationships and/or the market perception of its business. Existing suppliers or creditors may choose not to do business with the Group, may demand quicker payment terms and/or may not extend normal trade credit, and the Group may find it difficult to obtain new or alternative suppliers. Any of the foregoing could have a material effect on the Group's business, financial condition, results of operations and/or its authorised economic operator status with HMRC.

***The Group faces a number of additional operational risks, some of which are outside its control, which could have a material adverse effect on its business, results of operations and financial condition***

2.13    The operating performance of the Group's business may be affected by a number of additional factors, some of which are outside its control, including:

(a)     changes in laws, regulations and government policies, including in relation to taxation, which increase the cost of compliance with such laws, regulations or policies;

(b)     industry competition and disruption, which has been and continues to be intense across all of the Group's business lines and which, if the Group is unable to compete effectively, could result in loss of revenue and market share;

(c)     interruption to or loss of information processing systems, which could result in disruption to the infrastructure that supports the Group's business and therefore its ability to operate effectively; and

(d)     database privacy, identity theft and related computer and internet issues, which are subject to frequently changing rules and regulations, and any failure to comply with which could result in legal liability or reputational harm.

EU-DOCS\29867510.8

2.14    These factors, and/or the failure by the Group to monitor and manage the same effectively, could have a material adverse effect on the Group's business, results of operations and financial condition.

### *The Group may not have enough cash available to service its debt*

2.15    The Group's ability to make scheduled payments on its indebtedness, or to refinance its debt, depends on its future operating and financial performance, which will be affected by its ability to implement successfully, following the Financial Restructuring, the Group's business strategy as well as general economic, financial, competitive, regulatory, technical and other factors beyond its control.

2.16    If, in the future, the Group cannot generate sufficient cash to meet its debt service requirements, the Group may, among other things, need to refinance all or a portion of its debt, obtain additional financing, delay planned capital expenditures or sell material assets. If the Group is not able to refinance its debt as necessary, obtain additional financing or sell assets on commercially reasonable terms or at all, the Group may not be able to satisfy its obligations with respect to its debt. In that event, borrowings under other debt agreements or instruments that contain cross default or cross acceleration provisions may become payable on demand, and the Group may not have sufficient funds to repay all of the Group's debts.

### *Persons in the United States may have difficulty enforcing rights against the Company and its directors and executive officers*

2.17    The U.S. and England currently do not have a treaty providing for the reciprocal recognition and enforcement of judgements (as opposed to arbitration awards) in civil and commercial matters. Consequently, a final judgement for payment rendered by any federal or state court in the U.S. based on civil liability, whether or not predicated solely upon U.S. federal securities laws, would not automatically be recognised or enforceable in England. In order to enforce any such U.S. judgement in England, proceedings must first be initiated before a court of competent jurisdiction in England. In such an action, the English court would not generally reinvestigate the merits of the original matter decided by the U.S. court (subject to what is described below) and it would usually be possible to obtain summary judgement on such a claim (assuming that there is no good defence to it).

2.18    Recognition and enforcement of a U.S. judgement by an English court in such an action is conditional upon (among other things) the following:

(a)    the U.S. court having had, at the time when proceedings were served, jurisdiction over the original proceedings according to English rules of international law;

(b)    the U.S. judgement being final and conclusive on the merits in the sense of being final and unalterable in the court which pronounced it and being for a definite sum of money; and

(c)    the U.S. judgement not being for a sum payable in respect of taxes, or other charges of a like nature or in respect of a penalty or fine or otherwise based on a U.S. law that an English court considers to relate to penal, revenue or other public law.

2.19    An English court may refuse to enforce such a judgement if the judgement debtor satisfies the court that:

(a)    the U.S. judgement contravenes English public policy;

(b)    the U.S. judgement has been arrived at by doubling, trebling or otherwise multiplying a sum assessed as compensation for the loss or damages sustained, is otherwise

EU-DOCS\29867510.8

specified in section 5 of the Protection of Trading Interests Act 1980 or is based on measures designated by the Secretary of State under Section 1 of the Protection of Trading Interests Act 1980;

(c)      the U.S. judgement has been obtained by fraud or in breach of English principles of natural or substantial justice;

(d)      the U.S. judgement is a judgement on a matter previously determined by an English court or another court whose judgement is entitled to recognition in England or conflicts with an earlier judgement of such court;

(e)      the English enforcement proceedings were not commenced within the relevant limitation period; or

(f)      the U.S. judgement was obtained contrary to an agreement for the settlement of disputes under which the dispute in question was to be settled otherwise than by proceedings in a U.S. court (to whose jurisdiction the judgement debtor did not submit).

2.20    Only subject to the foregoing may investors be able to enforce in England judgements that have been obtained from U.S. federal or state courts. Notwithstanding the preceding, it cannot be assured that those judgements will be recognised or enforceable in England. In addition, it is uncertain as to whether an English court would accept jurisdiction and impose civil liability if the original action was commenced in England, instead of the U.S., and predicated solely upon U.S. federal securities laws.

*KYC and money laundering requirements are required to be satisfied*

2.21    Each Scheme Creditor will be required to provide relevant KYC information in order to comply with certain international rules and regulations and internal policies, including certain "know your customer" requirements and other anti-money-laundering measures, which are mandatory and time-consuming and may involve ongoing discussions and exchange of information between certain entities involved in the settlement of certain Scheme Creditor Entitlements and the relevant Scheme Creditor. The satisfaction of such requirements and measures may not be possible prior to the Scheme Effective Date and, as a result, a Scheme Creditor may not be entitled to subscribe for, or receive, certain Scheme Creditor Entitlements on the Scheme Effective Date.

3.      **RISK FACTORS RELATING TO THE SCHEME CONSIDERATION**

*The Shareholder Loan is unsecured, bears no interest and has no restrictive covenants*

3.1     The Shareholder Loan is unsecured and is structurally subordinated to the RCF and the Operating Facilities and contractually subordinated to the PIK Loan, therefore the lenders under the Shareholder Loan Agreement will effectively rank after lenders under the RCF, the Operating Facilities and the PIK Loan. The Shareholder Loan Agreement does not bear interest or contain any restrictive or financial covenants.

*There will be no active trading market for participations in the Shareholder Loan*

3.2     The Shareholder Loan will not be listed or admitted to trading on any regulated market. The Group does not expect any active trading market for the Shareholder Loan to develop. If a market for the Shareholder Loan were to develop, the Shareholder Loan could trade at prices that may be volatile and lower than the initial face values depending on a number of factors, including the liquidity of the Shareholder Loan, prevailing interest rates, transfer restrictions, the markets for similar securities, the future performance of the Group and technological, market, economic, legislative, political, regulatory and other factors. Furthermore,

47

participations in the Shareholder Loan are stapled to ownership of the Scheme Consideration Shares, which are also not expected to be a liquid investment.

***There will be no active trading market for New Parent Shares and holders may be unable to sell their New Parent Shares***

3.3   The New Parent Shares issued and delivered pursuant to the Scheme will be in uncertificated form unless shareholders request otherwise and will not be listed on any stock exchange. A written instrument of transfer form is required to transfer their legal ownership (although share certificates will not be issued). The Group does not expect any active trading market for the New Parent Shares to develop. If a market for the New Parent Shares were to develop, the New Parent Shares could trade at prices that may be volatile and lower than the initial values at which such shares have been valued for purposes of the Scheme depending on a number of factors, including the liquidity of the New Parent Shares, prevailing interest rates, transfer restrictions, the markets for similar securities, the future performance of the Group and technological, market, economic, legislative, political, regulatory and other factors. Furthermore, the Scheme Consideration Shares are stapled to participations in the Shareholder Loan, which are also not expected to be a liquid investment.

***Issuance of additional New Parent Shares may dilute ownership and voting interest of holders of New Parent Shares and have an adverse effect on their price***

3.4   An additional issue of ordinary shares by the Parent could dilute the proportionate ownership and voting interest of shareholders and could have an adverse effect on the price of New Parent Shares. This will particularly be the case if and to the extent that such an issue of New Parent Shares is not effected on a pre-emptive or a "catch-up" basis or shareholders do not take up their rights to subscribe for further New Parent Shares structured as a pre-emptive offer or as an emergency securities issuance.

***There can be no assurance as to the level of future dividends with respect to New Parent Shares, if any***

3.5   The declaration, payment and amount of any future dividends of the Parent are subject to the discretion of its board of directors and will depend on, among other things, the Group's earnings, financial position, cash requirements and availability of profits, as well as provisions of relevant laws or generally accepted accounting principles from time to time.

3.6   The Parent is a holding company with no business operations other than the direct and indirect equity interests it holds in its Subsidiaries and will be dependent upon the cash flow from its operating Subsidiaries in the form of dividends or other distributions for payments to the holders of New Parent Shares. The amounts of dividends and distributions available to the Parent will depend on the profitability and cash flows of its Subsidiaries and the ability of those Subsidiaries to pay dividends or make upstream loans under applicable law. The Subsidiaries of the Parent, however, may not be able to, or may not be permitted under applicable law to, make distributions or advance upstream loans to the Parent to make dividend distributions on the New Parent Shares.

***Drag-along provisions of the Articles of Association applicable to the Parent may mandate a holder to sell its New Parent Shares and the price that such holder will be able to recover for its New Parent Shares may be lower than the initial value at which such New Parent Shares have been valued for purposes of the Scheme or that could be recovered otherwise***

3.7   Pursuant to the Articles of Association, if one or more holders of the New Parent Shares (the "**Vendor Shareholders**") propose to transfer two thirds or more in aggregate of the total number of A ordinary Shares of the Parent, to a purchaser (other than to an Affiliate or new holding company of the Parent), the Vendor Shareholders or the relevant purchaser will have

48

the option to require all of the other holders of New Parent Shares to sell and transfer all of their New Parent Shares to the purchaser for the consideration determined in accordance with the relevant provision of the Articles of Association.

***On an insolvent liquidation of the Parent under the laws of Jersey, holders of New Parent Shares may be required to pay up their shares as contributories of the Parent***

3.8    The Parent is a no-par-value company incorporated under the laws of Jersey and as such the New Parent Shares will have no nominal or par value. However, it is still necessary for the directors of the Parent to set an amount to be paid up by subscribers to the New Parent Shares and, to the extent the shares have been paid up, to transfer the paid up amount to the Parent's "stated capital account" for the applicable class of shares.

3.9    In determining the amount to be paid up by subscribers to the New Parent Shares and transferred to the Parent's stated capital account, the directors of the Parent may consider the value of any cash and/or non-cash consideration received by the company in relation to the subscription. In the present circumstances it is anticipated that the amount the directors will transfer to the stated capital account will primarily constitute their assessment of the aggregate non-cash value to the Parent of the various subscribers' support for the Financial Restructuring. The directors are not required to obtain an independent valuation of any such non-cash consideration but must act in accordance with their statutory and fiduciary duties when assessing such value. In the event of an insolvent liquidation of the Parent under the laws of Jersey, the directors' assessment of the value transferred to the stated capital account may be challenged by the liquidator, and the holders of New Parent Shares may be required to contribute to the assets of the company to the extent the shares are not considered to have been paid up in full.

EU-DOCS\29867510.8

**PART 10**

**CERTAIN DEFINITIONS AND INTERPRETATION**

In this Explanatory Statement and the Notice of the Scheme Meeting, the following words and expressions shall have the following meanings, except in the Scheme included as Appendix 1 (*Form of Scheme*) to this Explanatory Statement or where the context otherwise requires. Terms used but not otherwise defined in this Explanatory Statement will have the meanings given to them in the Scheme. The principles of interpretation in clause 2.1 (*Interpretation*) of the Scheme will also apply to this Explanatory Statement, save that references to "Clauses" or "Appendices" in the Scheme shall mean the clauses or appendices of this Explanatory Statement.

"**Account Holder**" means a holder of a Book Entry Interest.

"**Account Holder Letter**" means the Account Holder Letter for voting at the Scheme Meeting, substantially in the form of Appendix 3 (*Form of Account Holder Letter*) to this Explanatory Statement with such minor or technical amendments as the Court may consent to.

"**Act**" means the Companies Act 2006 (as amended).

"**Affiliate**" means, in respect of any person or entity:

  (i)  a Subsidiary of that person or entity or a Holding Company of that person or entity or any other Subsidiary of such a Holding Company; and

  (ii)  any Affiliated Entities of any of the persons or entities referred to in paragraph (a) above.

"**Affiliated Entities**" means (a) in relation to an Affiliate that is a fund (the "**first fund**"), (i) a fund which is managed or advised by the same investment manager or investment adviser as the first fund or (ii) if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Associate of the investment manager or investment adviser of the first fund or which is a co-investment vehicle under common control with the first fund; and (b) in relation to any other person that is an Affiliate, a fund which is managed or advised by such person or any of its Associates.

"**Applicable Exchange Rate**" means the closing mid-rate of exchange for the purchase of sterling with euro as published in The Financial Times in the "Currency Rates" section on the date of such determination.

"**Associates**" means, in relation to any person other than the Scheme Company, a Subsidiary undertaking of that person or a Holding Company of that person or any other Subsidiary undertaking of that Holding Company, and, in relation to the Scheme Company, a Subsidiary undertaking of the Scheme Company.

"**Book Entry Interest**" means, in relation to the SSNs, a beneficial interest in a Global Note held through and shown on, and transferred only through, records maintained in book entry form by the Clearing Systems and their respective nominees and their respective nominees and successors, acting through themselves or the SSN Common Depositary.

"**Business Day**" means a day on which banks are open for business in London and New York (excluding, for the avoidance of doubt, Saturdays, Sundays and public holidays).

"**Buyer Agreement**" means the buyer agreement dated 10 February 2010 (as amended and/or restated from time to time) between, amongst others, New Look and HSBC Invoice Finance (UK) Limited.

"**Calculation Agent**" means Lucid in its capacity as calculation agent.

"**CDD Information**" means all "client due diligence" information and/or documentation required by Crestbridge from any Scheme Creditor or its Nominated Recipient in connection with the Scheme Consideration Shares.

"**CDD Information Deadline**" means 5 p.m. (London time) on 14 October 2020, which is the time by which CDD Information must be received by Crestbridge if the relevant Scheme Creditor (or its Nominated Recipient) wishes to receive its Scheme Consideration Shares Entitlement on the Restructuring Effective Date.

"**Chairperson**" means Richard Collyer of the Scheme Company or, failing him, Yen Sum of Latham & Watkins or, failing her, Jessica Walker of Latham & Watkins, or any other person acting as chairperson of the Scheme Meeting.

"**Chapter 15**" means chapter 15 of the U.S. Bankruptcy Code.

"**Chapter 15 Order**" means an order of the U.S. Bankruptcy Court which, among other things, recognises this Scheme as a "foreign main proceeding" under Chapter 15 and enforces the Court Order within the territorial jurisdiction of the United States.

"**Clearing Systems**" means either or both of Euroclear and Clearstream and each of their respective nominees and successors, acting through itself, the SSN Common Depositary and any other system designed for similar or analogous purposes, as appropriate.

"**Clearstream**" means Clearstream Banking S.A., as currently in effect or any successor securities clearing agency.

"**Companies Undertaking Deed**" means the deed of undertaking from the Parent and New MidCo to the Scheme Company, substantially in the form of Appendix 13 (*Form of Companies Undertaking Deed*) to this Explanatory Statement.

"**Convening Hearing**" means the hearing of the Court at which the Scheme Company will apply for permission to convene the Scheme Meeting and to circulate this Explanatory Statement to the Scheme Creditors.

"**Convening Order**" means the order of the Court dated 24 September 2020 granting the Scheme Company permission to convene the Scheme Meeting and circulate this Explanatory Statement to Scheme Creditors.

"**Court**" means the High Court of Justice of England and Wales

"**Court Order**" means the order of the Court sanctioning the Scheme under section 899 of the Act.

"**COVID-19 Pandemic**" means the pandemic of COVID-19 recognised by the World Health Organisation on 11 March 2020.

"**Creditor Concerns**" means any issues which arise as to the constitution of meetings of creditors, the convening of meetings of creditors, or which otherwise affect the conduct of those meetings, or which affect the jurisdiction of the Court to sanction a scheme of arrangement.

"**Crestbridge**" means Crestbridge Limited and its Affiliates.

"**Custody Instructions**" means instructions given by any relevant Account Holder to the Clearing System in which any relevant SSNs are held, instructing that Clearing System to block those SSNs in accordance with the instructions contained in this Explanatory Statement.

"**Custody Instructions Deadline**" means 5 p.m. (London time) on 13 October 2020.

51

"**Custody Instructions Reference Number**" means a reference number provided by a Clearing System to an Account Holder which has delivered Custody Instructions to that Clearing System, confirming that the blocking instructions contained in those Custody Instructions have been complied with by that Clearing System.

"**CVA**" means the company voluntary arrangement pursuant to section 1 of the Insolvency Act 1986 proposed by the directors of NLRL on 26 August 2020 and approved by its creditors and members on 15 September 2020.

"**Debt Term Sheet**" means the debt term sheet set out at Appendix 5 (*Debt Term Sheet*) to this Explanatory Statement.

"**Deed of Undertaking**" means the Companies Undertaking Deed, the GLAS Undertaking Deed and the Lucid Undertaking Deed.

"**Directors**" means the directors of the Scheme Company, which at the date of this Explanatory Statement are Richard Collyer and Nigel Oddy.

"**Equity and New Money Term Sheet**" means the equity term sheet set out at Appendix 4 (*Equity and New Money Term Sheet*) to this Explanatory Statement.

"**Euroclear**" means Euroclear Bank SA/NV, or any successor securities clearing agency.

"**Euro SSN Holding**" means, in respect of a Scheme Creditor that is an SSN Holder, the principal amount of Euro SSNs that such Scheme Creditor holds.

"**Euro SSNs**" the €45,209,687 senior secured notes issued by the Scheme Company pursuant to the terms of the SSN Indenture.

"**Explanatory Statement**" means this explanatory statement relating to the Scheme, to be provided to Scheme Creditors following the Convening Hearing in accordance with Part 26 of the Act.

"**Financial Restructuring**" means the financial, debt and corporate restructuring of the Group as contemplated by and further detailed in this Explanatory Statement.

"**Financial Restructuring Conditions**" means the "Financial Restructuring Conditions" as set out in the Scheme.

"**Financial Restructuring Documents**" means the "Financial Restructuring Documents" as set out in the Scheme.

"**GLAS KYC Information**" means all "know your customer" information and/or documentation required by the Shareholder Loan Facility Agent from any Scheme Creditor or its Nominated Recipient in connection with the Shareholder Loan Entitlement.

"**GLAS Undertaking Deed**" means the deed of undertaking to be executed by, amongst others, GLAS Trust Corporation Limited, Global Loan Agency Services Limited and the SSN Trustee substantially in the form of Appendix 11 (*Form of GLAS Undertaking Deed*) to this Explanatory Statement.

"**Global Notes**" means, individually and collectively, the global notes deposited with or on behalf of and registered in the name of the SSN Common Depositary or its nominee, in substantially the form of Exhibit A-1 of the SSN Indenture in respect of the Sterling SSNs and Exhibit A-2 of the SSN Indenture in respect of the Euro SSNs and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with section 2.01 of the SSN Indenture.

"**Group**" means the Parent and its Subsidiaries.

EU-DOCS\29867510.8

"**Guarantee Liabilities**" means the "Guarantee Liabilities" as defined in clause 1.1 of the Intercreditor Agreement other than any "Guarantee Liabilities" in so far as they relate to the Senior Facilities Agreement, the Operating Facility Agreement and/or the Hedging Agreement (as defined in the Intercreditor Agreement).

"**Holding Company**" means, in relation to a person or entity, any other person or entity in respect of which it is a Subsidiary.

"**Holding Period Trust Agreement**" means the holding period trust agreement in the form agreed by the Majority SSN Holders, the Holding Period Trustee and the Scheme Company before the date of the Scheme Sanction Hearing and to be executed on or before the Restructuring Effective Date;

"**Holding Period Trustee**" means Lucid, or any additional or replacement trustee at any time that is appointed in accordance with clause 9.3(d) (*Holding Period Trustee*) of the Scheme, in its capacity as holding period trustee and in accordance with the Holding Period Trust Agreement.

"**Information Agent**" means Lucid in its capacity as information agent.

"**Intercreditor Agreement**" means the intercreditor agreement dated 3 May 2019 (as amended and/or restated from time to time) between, amongst others, New Look Bonds Limited, GLAS Trust Corporation Limited as Security Agent, the Senior Lenders, Operating Facility Lenders, Hedge Counterparties, and other Debtors as specified therein.

"**Intermediaries**" means any bank or brokerage house which does not have an account with Euroclear or Clearstream, and which holds SSNs either for its own account or for its client.

"**KPMG**" means KPMG LLP.

"**Latham & Watkins**" means Latham & Watkins (London) LLP.

"**Liability**" means any debt, liability or obligation whatsoever whether it is present, future, prospective or contingent, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation and whether it arises at common law, in equity or by statute, in England and Wales or in any other jurisdiction, or in any other manner whatsoever, including, but not limited to, "Liabilities" (as defined in the Intercreditor Agreement), and "Liabilities" shall be construed accordingly.

"**Lock-Up Agreement**" means the lock-up agreement dated 13 August 2020 entered into between, among others, the Parent, New Look Bonds Limited, the Original Consenting RCF Lenders (as defined therein), the Original Consenting Backstop Parties (as defined therein), the Original Consenting SSN Holders (as defined therein) and the Calculation Agent. "**Lucid**" means Lucid Issuer Services Limited.

"**Lucid Undertaking Deed**" means the deed of undertaking entered into by, amongst others, Lucid in its capacity as Information Agent, Calculation Agent and Holding Period Trustee substantially in the form of Appendix 12 (*Form of Lucid Undertaking Deed*) to this Explanatory Statement.

"**Majority SSN Holders**" means Scheme Creditors holding in aggregate more than 50%. of the aggregate principal amount of the SSNs at the relevant time.

"**MIP**" has the meaning given to it in 44(f) of Part 1 (*Letter from the Directors of the Scheme Company*) of this Explanatory Statement.

"**New MidCo**" means a newly incorporated member of the Group which will be a direct Subsidiary of the Parent and the direct holding company of New Look Investment Limited.

"**New Money Lenders**" has the meaning given to it in paragraph 44(b) of Part 1 (*Letter from the Directors of the Scheme Company*) of this Explanatory Statement.

EU-DOCS\29867510.8

"**New Parent Articles**" means the new articles of association of the Parent substantially in the form attached at Appendix 9 (*New Parent Articles*) to this Explanatory Statement with such minor or technical amendments as the Court may consent to.

"**New Parent Shares**" means the entire fully diluted ordinary shares in the capital of the Parent in such number to be determined by the Parent prior to the Voting Record Time, which shall comprise A ordinary shares in such number as represents 76%. of the fully diluted ordinary share capital, B ordinary shares in such number as represents 19%. of the fully diluted ordinary share capital and C ordinary shares in such number as represents 5%. of such fully diluted ordinary share capital.

"**NLRL**" means New Look Retailers Limited, a private limited company incorporated and registered in England and Wales with company number 01618428.

"**Nominated Recipient**" means a person (or persons) nominated by a Scheme Creditor pursuant to the Account Holder Letter to receive on its behalf its proportion of the participation in the Scheme Consideration.

"**Notice of Scheme Meeting**"   means the notice of the Scheme Meeting, substantially in the form of Appendix 2 (*Form of Notice of Scheme Meeting*) to this Explanatory Statement.

"**Operating Facilities**" means the facilities made available under the Operating Facility Agreement.

"**Parent**" means New Look Retail Holdings Limited, a private limited company incorporated under the laws of Jersey with registered number 128640 with registered address at 47 Esplanade, St Helier, Jersey JE1 0BD.

"**PIK Facility Agreement**" means the PIK loan agreement to be entered into in respect of the PIK Loan in the form agreed by the Participating Consenting SSN Holders (as defined in the Lock-Up Agreement), New Midco, the PIK Facility Agent and the PIK Security Agent before the date of the Scheme Sanction Hearing and to be executed on or before the Restructuring Effective Date.

"**PIK Loan**" means the £40,000,000 cash proceeds loan to be borrowed by New MidCo on the Restructuring Effective Date.

"**PIK Facility Agent**" means Global Loan Agency Services Limited in its capacity as agent under the PIK Facility Agreement.

"**PIK Security Agent**" means GLAS Trust Corporation Limited in its capacity as security agent under the Subordination Agreement.

"**RCF**" means the revolving credit facility of up to £100,000,000 (which is fully utilised and borrowed by NLRL) under to the Senior Facilities Agreement.

"**RCF Amendments**" has the meaning given to it in paragraph 44(d) of Part 1 (*Letter from the Directors of the Scheme Company*) of this Explanatory Statement.

"**RCF and Operating Facility Amendments**" has the meaning given to it in 44(e) of Part 1 (*Letter from the Directors of the Scheme Company*) of this Explanatory Statement.

"**Recast Judgments Regulation**" means Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012.

"**Restructuring Effective Date**" means the "Restructuring Effective Date" under and as defined in the Scheme.

"**Restructuring Implementation Deed**" means the "Restructuring Implementation Deed" under and as defined in the Scheme.

EU-DOCS\29867510.8

"**Restructuring Steps**" means the steps detailed in clause 6 (*Restructuring Steps*) of the Scheme.

"**Scheme**" means the scheme of arrangement between the Scheme Company and its respective Scheme Creditors, substantially in the form of Appendix 1 (*Form of Scheme*) to this Explanatory Statement or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate.

"**Scheme Claim**" means any claim or claims in respect of any Liability of the Scheme Company to a Scheme Creditor arising directly or indirectly in relation to, or arising out of or in connection with, the SSN Finance Documents, including (without limitation) claim or claims in relation to any Liability of the Scheme Company in respect of loss or damage suffered or incurred, whether directly or indirectly, as a result of or in connection with such Liability (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such claims), other than those which arise as a result of a failure to comply with the terms of the Scheme.

"**Scheme Company**" means New Look Financing plc, a public limited liability company incorporated in England and Wales with company number 11911640.

"**Scheme Consideration**" means the Shareholder Loan to be utilised by New MidCo on a cashless basis and the Scheme Consideration Shares to be issued by the Parent pursuant to the Scheme and the Restructuring Implementation Deed.

"**Scheme Consideration Share Entitlement**" means in respect of each Scheme Creditor:

(i)     the proportion (expressed as a percentage) of such Scheme Creditor's Sterling Equivalent Aggregate SSN Holding bears to the Sterling Equivalent Total SSNs; multiplied by

(ii)    the Scheme Consideration Shares.

"**Scheme Consideration Shares**" means the aggregate number of B ordinary non-voting shares that will be allotted and issued by the Parent pursuant to the Scheme which shall equal in aggregate 20%. (on a fully diluted basis) of the New Parent Shares (subject to the issuance of any shares pursuant to the MIP).

"**Scheme Creditor**" means the SSN Common Depositary and the SSN Trustee (each solely in its capacity as a beneficiary of the covenants to repay principal and interest on the SSNs pursuant to the SSN Indenture) and the SSN Holders.

"**Scheme Creditor Entitlements**" means, in relation to a Scheme Creditor, if the Restructuring Effective Date occurs, its:

(i)     Shareholder Loan Entitlement; and

(ii)    Scheme Consideration Shares Entitlement.

"**Scheme Effective Date**" means the date on which an office copy of the Court Order has been delivered to the Registrar of Companies for registration in respect of this Scheme, which delivery shall be made by the Scheme Company following receipt of an office copy of the Court Order as soon as possible after the earlier of:

(i)     the date on which the Chapter 15 Order has been obtained; and

(ii)    9.00 am on the third Business Day after the date of the Court Order.

"**Scheme Meeting**" means the meeting of the Scheme Creditors convened in accordance with the permission of the Court pursuant to section 896 of the Act to consider and, if thought fit, approve this Scheme, including any adjournment thereof.

"**Scheme Sanction Hearing**" means the hearing for the purpose of obtaining the Court Order.

"**Scheme Website**" means www.lucid-is.com/newlook.

"**SEC**" means U.S. Securities and Exchange Commission.

"**Security Agent**" means the Security Agent as that term is defined in the Intercreditor Agreement or any successor appointed in accordance with the Intercreditor Agreement.

"**Senior Facilities Agreement**" means the senior facility agreement originally dated 25 June 2015 between, amongst others, New Look Bonds Limited and Global Loan Agency Services Limited as the facility agent and GLAS Trust Corporation Limited as security agent (as amended and restated pursuant to amendment and restatement agreements dated 6 March 2018, 11 January 2019, 23 January 2019 and 3 May 2019).

"**Shareholder Loan Agreement**" means the shareholder loan agreement substantially in the form attached at Appendix 6 (*Shareholder Loan Agreement*) to this Explanatory Statement with such minor or technical amendments as the Court may consent to.

"**Shareholder Loan Entitlement**" means in respect of each Scheme Creditor:

(i)     the proportion (expressed as a percentage) of such Scheme Creditor's Sterling Equivalent Aggregate SSN Holding bears to the Sterling Equivalent Total SSNs; multiplied by

(ii)    £40,000,000.

"**Shareholder Loan Facility Agent**" means Global Loan Agency Services Limited in its capacity as agent under the Shareholder Loan Agreement.

"**Shareholder Loan**" means a £40,000,000 shareholder loan to be utilised by New MidCo on a cashless basis on the Restructuring Effective Date pursuant to the Shareholder Loan Agreement.

"**Shareholders' Agreement**" means the shareholders' agreement substantially in the form attached at Appendix 8 (*Shareholders' Agreement*) to this Explanatory Statement with such minor or technical amendments as the Court may consent to.

"**SSNs**" means the Sterling SSNs and the Euro SSNs.

"**SSN Common Depositary**" means a depositary common to Euroclear and Clearstream, being Deutsche Bank AG, London Branch as at the date of this Explanatory Statement.

"**SSN Finance Documents**" means the SSN Indenture, the Intercreditor Agreement and the Senior Secured Security Documents.

"**SSN Holder**" means a subscriber or beneficial owner, from time to time, of SSNs.

"**SSN Indenture**" means the indenture with respect to the SSNs dated 3 May 2019 and made between, among others, the Scheme Company and GLAS Trustees Limited as trustee, as amended and supplemented from time to time.

"**SSN Trustee**" means the Trustee as that term is defined in the SSN Indenture or any successor trustee appointed in accordance with the SSN Indenture.

EU-DOCS\29867510.8

"**SSN Paying Agent**" means Paying Agent as that term is defined in the SSN Indenture or any successor trustee appointed in accordance with the SSN Indenture.

"**Steps Plan**" means the implementation steps plan or steps paper in the form set out in Schedule 10 (*Steps Plan*) of the Lock-Up Agreement.

"**Sterling Equivalent**" means the equivalent amount in pounds sterling of an amount in euro calculated using the Applicable Exchange Rate determined by the Calculation Agent.

"**Sterling Equivalent Aggregate SSN Holding**" means, in respect of a Scheme Creditor, the aggregate principal amount of its Sterling SSN Holding and the Sterling Equivalent of its Euro SSN Holding as at the Voting Record Time;

"**Sterling Equivalent Total SSNs**" means the aggregate principal amount of the Sterling SSNs and the Sterling Equivalent of the Euro SSNs as at the Voting Record Time.

"**Sterling SSN Holding**" means, in respect of a Scheme Creditor that is an SSN Holder, the Sterling SSNs that such Scheme Creditor holds.

"**Sterling SSNs**" means the £400,131,636 senior secured notes issued by the Scheme Company pursuant to the terms of the SSN Indenture.

"**Subordination Agreement**" means the subordination agreement substantially in the form attached at Appendix 7 (*Subordination Agreement*) to this Explanatory Statement with such minor or technical amendments as the Court may consent to.

"**Subsidiary**" has the same meaning as in section 1159 of the Act.

"**Term Sheets**" means the Debt Term Sheet and the Equity and New Money Term Sheet.

"**TFFA**" means the trade finance facilities agreement dated 16 March 2018 (as amended and/or restated from time to time) between, amongst others, NLRL and HSBC Bank plc (as facility agent).

"**Undertaking Parties**" means each of the parties to the Deeds of Undertakings.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended.

"**U.S. Bankruptcy Court**" means the U.S. Bankruptcy Court for the Southern District of New York or other court of competent jurisdiction presiding over any case filed under Chapter 15 of the U.S. Bankruptcy Code seeking, among other things, recognition of the Scheme as a foreign main proceeding and enforcement of the Court Order in the United States.

"**U.S. Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Voting Record Time**" means 5 p.m. (London time) on 14 October 2020.

"**Voting Submission Deadline**" means 5 p.m. (London time) on 14 October 2020.

"**Voting Value**" means the amount owing to a Scheme Creditor for the purposes of voting in favour or against the Scheme.

EU-DOCS\29867510.8

## PART 11

## ENQUIRIES

Requests for information in relation to the Scheme should be directed to:

**THE INFORMATION AGENT**

Lucid Issuer Services Limited
Tankerton Works, 12 Argyle Walk, London WC1H 8HA, United Kingdom
Contact: Victor Parzyjagla / Oliver Slyfield
E-mail: newlook@lucid-is.com
Tel: +44 20 7704 0880

or

**LEGAL ADVISERS TO THE GROUP**

Latham & Watkins
99 Bishopsgate, London, EC2M 3XF, United Kingdom
Contact: Yen Sum, Tristram Gargent, Hugo Bowkett and Bhav Parekh
E-mail: projecttone.lwteam@lw.com
Tel: +44 20 7710 1000

EU-DOCS\29867510.8

**APPENDIX 1**

**FORM OF SCHEME**

EU-DOCS\29867510.8

**No. CR - 2020 - 003752**

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES INSOLVENCY
AND COMPANIES LIST (ChD)

**IN THE MATTER OF NEW LOOK FINANCING PLC**

**AND**

**IN THE MATTER OF THE COMPANIES ACT 2006**

**SCHEME OF ARRANGEMENT**

(*UNDER PART 26 OF THE COMPANIES ACT* **2006**)

**BETWEEN**

**NEW LOOK FINANCING PLC**

**AND**

**THE SCHEME CREDITORS**

(**AS HEREINAFTER DEFINED**)

## TABLE OF CONTENTS

1.    DEFINITIONS ......................................................................................................2

2.    INTERPRETATION ..........................................................................................15

3.    RESTRUCTURING EFFECTIVE DATE...........................................................16

4.    SCHEME CONSIDERATION ...........................................................................17

5.    FINANCIAL RESTRUCTURING IMPLEMENTATION ..................................18

6.    RESTRUCTURING STEPS ...............................................................................19

7.    GRANTS OF AUTHORITY TO EXECUTE THE FINANCIAL
      RESTRUCTURING DOCUMENTS AND INSTRUCTIONS TO TAKE STEPS
      TO IMPLEMENT THE SCHEME .....................................................................21

8.    RELEASES IN CONNECTION WITH THE FINANCIAL RESTRUCTURING..........22

9.    PROVISIONS APPLICABLE TO THE FINANCIAL RESTRUCTURING ..................23

EU-DOCS\29867554.8

**BETWEEN:**

**(1)**      **NEW LOOK FINANCING PLC** (the "**Company**"); and

**(2)**      **THE SCHEME CREDITORS** (as hereinafter defined).

**RECITALS:**

(A)      The Company is a member of the Group and was incorporated and registered in England and Wales as a public limited company on 28 March 2019. The Company's registered number is 11911640. The Company's registered office is New Look House, Mercery Road, Weymouth, Dorset DT3 5HJ, United Kingdom.

(B)      The Company is the issuer of the SSNs, and the Scheme Creditors are creditors under, and in respect of, the SSNs.

(C)      On 13 August 2020, the Parent announced that the Group was seeking to implement a comprehensive recapitalisation transaction that will extend the Group's banking and operational facilities, deliver a new money investment and significantly deleverage its balance sheet and that the Parent, the Company and other Group companies entered into the Lock-up Agreement with the Group's financial creditors who agreed to support, implement and consummate the Financial Restructuring.

(D)      Each of (i) the Parent and New MidCo (pursuant to the Companies Undertaking Deed), (ii) Lucid (pursuant to the Lucid Undertaking Deed), and (iii) GLAS Trust Corporation Limited, Global Loan Agency Services Limited and the SSN Trustee (pursuant to the GLAS Undertaking Deed) shall agree to: (a) consent to this Scheme; (b) be bound by this Scheme upon its sanctioning by the Court; and (c) execute or procure to be executed all such documents, and to do or procure to be done all such acts and things, as may be necessary or desirable to be executed or done by them, as described in this Scheme.

(E)      The principal objective and purpose of the Scheme is to effect a compromise and arrangement between the Company and the Scheme Creditors as part of the Financial Restructuring. To effect these compromises and arrangements, each Scheme Creditor will be bound by the Financial Restructuring Documents, which provide for (among other things), subject to the satisfaction or waiver of certain conditions, the write-down and release of each Scheme Creditor's SSN Holding pursuant to the Supplemental Indenture in exchange for (i) the Shareholder Loan utilised by New MidCo pursuant to the Shareholder Loan Agreement and (i) the issuance of the Scheme Consideration Shares by the Parent.

(F)      The Company intends to seek entry of a Chapter 15 Order from the U.S. Bankruptcy Court which, among other things, recognises the Scheme as a foreign main proceeding under Chapter 15 of the U.S. Bankruptcy Code, gives the Scheme full force and effect within the territorial jurisdiction of the United States and prohibits Scheme Creditors from commencing or continuing any action or proceeding in the United States against the Company or the Group or Group assets located within the territorial jurisdiction of the United States that is inconsistent with the Scheme.

(G)      Unless the compromises and arrangements specified in recital (E) above occur, it is likely that the Obligors (as defined in the Lock-up Agreement) will be unable to implement the Financial Restructuring or satisfy their obligations under the SSN Indenture and other Group financial obligations.

1

1.    **DEFINITIONS**

In this Scheme, the following terms shall, unless the context otherwise requires, have the following meanings:

| | |
|---|---|
| "**Account Holder**" | means a holder of a Book-Entry Interest; |
| "**Account Holder Letter**" | means the account holder letter to be signed by an SSN Holder or an Account Holder on behalf of an SSN Holder in substantially the form set out at Appendix 3 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| "**Act**" | means the Companies Act 2006 (as amended); |
| "**Advisers**" | means (as applicable): |

    (a)    Perella Weinberg UK Limited, financial advisers to the Group;

    (b)    Latham & Watkins (London) LLP, legal adviser to the Group;

    (c)    Linklaters LLP, legal advisers to Brait Capital International Limited;

    (d)    Allen & Overy LLP, legal adviser to the RCF Lenders and the Operating Facility Lenders;

    (e)    PricewaterhouseCoopers LLP, tax adviser to the Company;

    (f)    KPMG LLP, valuation adviser to the Company;

    (g)    Morrison & Foerster (UK) LLP, legal adviser to the SSN Trustee, the Security Agent, PIK Security Agent, the RCF Facility Agent, the SSN Paying Agent, the PIK Facility Agent and the Shareholder Loan Facility Agent;

    (h)    Carey Olsen, Jersey law legal adviser to the Parent, New MidCo, New Look Investment Limited and New Look Bonds Limited;

    (i)    Lucid, as Information Agent; and

    (j)    any of the foregoing's partners, employees and affiliated partnerships and the partners and employees of such affiliated partnerships and their respective Subsidiaries and Holding Companies and any local counsel engaged;

| | |
|---|---|
| "**Affiliate**" | means, in respect of any person or entity: |

    (a)    a Subsidiary of that person or entity or a Holding Company of that person or entity or any other Subsidiary of such a Holding Company; and

2

| | |
|---|---|
| | (b)    any Affiliated Entities of any of the persons or entities referred to in paragraph (a) above; |
| "**Affiliated Entities**" | means (a) in relation to an Affiliate that is a fund (the "**first fund**"), (i) a fund which is managed or advised by the same investment manager or investment adviser as the first fund or (ii) if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Associate of the investment manager or investment adviser of the first fund or which is a co-investment vehicle under common control with the first fund; and (b) in relation to any other person that is an Affiliate, a fund which is managed or advised by such person or any of its Associates; |
| "**Allowed Proceedings**" | means any Proceedings by a Scheme Creditor to enforce its rights under this Scheme, the Lock-up Agreement, a Financial Restructuring Document where the Company or any of its Affiliates or any Scheme Party or another Scheme Creditor (or its Nominated Recipient(s)) fails to perform its obligations under this Scheme, the Lock-up Agreement, or a Financial Restructuring Document or fails to effect the Financial Restructuring; |
| "**Amended Intercreditor Agreement**" | means the amended and restated Intercreditor Agreement which is to be executed on or about the Restructuring Effective Date in the form agreed by the Majority SSN Holders, the Company, NLR, the Operating Facility Lenders and the RCF Lenders before the date of the Scheme Sanction Hearing (and includes, where the context requires, the amendment and restatement agreement(s) relating thereto); |
| "**Amended Operating Facility Agreement**" | means the amended and restated Operating Facility Agreement which is to be executed on or about the Restructuring Effective Date in the form agreed by the Majority SSN Holders, NLR and the Operating Facility Lenders before the date of the Scheme Sanction Hearing (and includes, where the context requires, the amendment and restatement agreement(s) relating thereto); |
| "**Amended Senior Facilities Agreement**" | means the amended and restated Senior Facilities Agreement which is to be executed on or about the Restructuring Effective Date in the form agreed by the Majority SSN Holders, the Company, NLR and the RCF Lenders before the date of the Scheme Sanction Hearing (and includes, where the context requires, the amendment and restatement agreement(s) relating thereto); |
| "**Amended Super Senior Finance Documents**" | means each of the Amended Senior Facilities Agreement, the Amended Operating Facility Agreement, the Amended Intercreditor Agreement and the Amended Super Senior Supplemental Security; |
| "**Amended Super Senior Supplemental Security**" | means a supplemental English law debenture and a supplemental Jersey law security interest agreement which are to be executed on or about the Restructuring Effective Date, in each case, in the form agreed by the Company, NLR, the Operating Facility Lenders and the RCF Lenders before the date of the Scheme Sanction Hearing; |

3

| | |
|---|---|
| "**Applicable Exchange Rate**" | means the closing mid-rate of exchange for the purchase of sterling with euro as published in The Financial Times in the "Currency Rates" section on the date of such determination; |
| "**Applicable Procedures**" | means, with respect to any transfer, release, waiver, pool factoring and/or cancellation of beneficial interests in any Global Note, the rules and procedures of the relevant Clearing System that apply to such transfer, release, waiver and/or cancellation; |
| "**Associate**" | means, in relation to any person other than the Company, a Subsidiary undertaking of that person or a Holding Company of that person or any other Subsidiary undertaking of that Holding Company, and, in relation to the Company, a Subsidiary undertaking of the Company; |
| "**Board**" | means the board of Directors of the Company; |
| "**Book-Entry Interest**" | means, in relation to the SSNs, a beneficial interest in a Global Note held through and shown on, and transferred only through, records maintained in book-entry form by the Clearing Systems and their respective nominees and successors, acting through themselves or the SSN Common Depositary; |
| "**Business Day**" | means a day on which banks are open for business in London and New York (excluding, for the avoidance of doubt, Saturdays, Sundays and public holidays); |
| "**Calculation Agent**" | means Lucid in its capacity as calculation agent; |
| "**CDD Information**" | means all "client due diligence" information and/or documentation required by Crestbridge from any Scheme Creditor or its Nominated Recipient in connection with the Scheme Consideration Shares Entitlement; |
| "**CDD Information Deadline**" | means 5 p.m. (London time) on 14 October 2020, which is the time by which CDD Information must be received by Crestbridge if the relevant Scheme Creditor (or its Nominated Recipient) wishes to receive its Scheme Consideration Shares Entitlement on the Restructuring Effective Date; |
| "**Chapter 15 Order**" | means an order of the U.S. Bankruptcy Court which, among other things, recognises this Scheme as a "foreign main proceeding" under Chapter 15 of the U.S. Bankruptcy Code, enforces the Court Order within the territorial jurisdiction of the United States and grants related relief; |
| "**Clearing Systems**" | means either or both of Euroclear and Clearstream and each of their respective nominees and successors, acting through itself, the SSN Common Depositary and any other system designed for similar or analogous purposes, as appropriate; |
| "**Clearstream**" | means Clearstream Banking S.A., as currently in effect or any successor securities clearing agency; |

4

| | |
|---|---|
| "**Companies Undertaking Deed**" | means a deed of undertaking from the Parent and New MidCo to the Company in the form agreed by the parties thereto before the date of the Scheme Sanction Hearing pursuant to which each of the parties thereto agrees to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be necessary or desirable to be done by it as described in this Scheme and to be bound by and perform the terms of this Scheme; |
| "**Court**" | means the High Court of Justice of England and Wales; |
| "**Court Order**" | means the order of the Court sanctioning this Scheme under section 899 of the Act; |
| "**Crestbridge**" | means Crestbridge Limited and its Affiliates; |
| "**Director**" or "**Former Director**" | means any person who is, or was, or is deemed to be, at any time a director/manager/officer (or equivalent) of any company in the Group immediately prior to the Restructuring Effective Date, including, for the avoidance of doubt, the Company and each of the Obligors (as defined in the Lock-up Agreement), in their capacity as such; |
| "**Eligible Person**" | means a person who: |

(a)     is either (x) an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, that is an institution, or (y) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or (z) a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) located and resident outside the United States; and

(b)     is not a retail investor in the European Economic Area (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a qualified investor as defined in the Prospectus Directive);

| | |
|---|---|
| "**Euro SSN Holding**" | means, in respect of a Scheme Creditor that is an SSN Holder, the Euro SSNs that such Scheme Creditor holds; |
| "**Euro SSNs**" | means the €45,209,687 senior secured notes issued by the Company pursuant to the terms of the SSN Indenture; |
| "**Euroclear**" | means Euroclear Bank SA/NV, or any successor securities clearing agency; |
| "**Excluded Persons**" | has the meaning given to it in Clause 9.11(a); |
| "**Existing Parent Shares**" | means all outstanding A ordinary shares issued by the Parent; |

5

| | |
|---|---|
| "**Explanatory Statement**" | means the explanatory statement to this Scheme dated on or around 24 September 2020 required to be provided to the Scheme Creditors pursuant to section 897 of the Act; |
| "**Financial Restructuring Conditions Satisfaction Time**" | means the time at which the Company (acting reasonably and in good faith) confirms to the Scheme Creditors that all of the Financial Restructuring Conditions have been satisfied or waived (as applicable) in accordance with their terms or in accordance with Clause 9.13; |

"**Financial Restructuring Conditions**"    means:

(a)    the occurrence of the Scheme Effective Date;

(b)    the satisfaction or waiver of all conditions precedent to each Financial Restructuring Document in accordance with its terms or confirmation that such conditions precedent will be satisfied during the course of the completion of the steps to occur on the date on which the Restructuring Steps are anticipated to occur (other than the occurrence of the Financial Restructuring Conditions Satisfaction Time and/or the Restructuring Effective Date); and

(c)    this Scheme not having been terminated pursuant to Clause 9.6(a);

"**Financial Restructuring Documents**"    means:

(a)    the Account Holder Letters;

(b)    the Restructuring Implementation Deed;

(c)    the PIK Finance Documents;

(d)    the Amended Super Senior Finance Documents;

(e)    the Shareholder Loan Agreement;

(f)    the Subordination Agreement;

(g)    the Supplemental Indenture;

(h)    the New Shareholders' Agreement;

(i)    the Subscription Agreement;

(j)    the New Parent Articles;

(k)    the Companies Undertaking Deed;

(l)    the GLAS Undertaking Deed;

(m)    the Lucid Undertaking Deed;

6

| | |
|---|---|
| (n) | the Inter-Company Loan Rationalisation Agreement; |
| (o) | the Payment Direction Letter; and |
| (p) | any other documents that the Company considers necessary to give effect to the Financial Restructuring; |

| | |
|---|---|
| "**Financial Restructuring**" | means the financial, debt and corporate restructuring of the Group contemplated by this Scheme, the Restructuring Steps and the Explanatory Statement and any and all connected compromises, arrangements and/or agreements with persons that are not parties to this Scheme; |
| "**GLAS KYC Information**" | means all "know your customer" information and/or documentation required by the Shareholder Loan Facility Agent from any Scheme Creditor or its Nominated Recipient in connection with the Shareholder Loan Entitlement; |
| "**GLAS KYC Information Deadline**" | means 5 p.m. (London time) on 14 October 2020, which is the time by which GLAS KYC Information must be received by Shareholder Loan Facility Agent if the relevant Scheme Creditor (or its Nominated Recipient) wishes to receive its Shareholder Loan Entitlement on the Restructuring Effective Date; |
| "**GLAS Undertaking Deed**" | means a deed of undertaking in the form agreed by the Majority SSN Holders, the Company, GLAS Trust Corporation Limited, Global Loan Agency Services Limited and the SSN Trustee before the date of the Scheme Sanction Hearing and entered into or to be entered into by GLAS Trust Corporation Limited, Global Loan Agency Services Limited and the SSN Trustee pursuant to which GLAS Trust Corporation Limited, Global Loan Agency Services Limited and the SSN Trustee agree to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be necessary or desirable to be done by it for the purposes of giving effect to this Scheme and to be bound by and perform the terms of this Scheme, in the case of GLAS Trust Corporation Limited, in its respective capacities as the PIK Security Agent and the Security Agent and, in the case of Global Loan Agency Services Limited, in its respective capacities as SSN Paying Agent, PIK Facility Agent and Shareholder Loan Facility Agent; |
| "**Global Note Legend**" | means the legend set forth in section 2.06(f) of the SSN Indenture, which is required to be placed on all Global Notes issued under the SSN Indenture; |
| "**Global Notes**" | means, individually and collectively, the global notes deposited with or on behalf of and registered in the name of the SSN Common Depositary or its nominee, in substantially the form of Exhibit A-1 of the SSN Indenture in respect of the Sterling SSNs and Exhibit A-2 of the SSN Indenture in respect of the Euro SSNs and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the |

7

|  | Global Note" attached thereto, issued in accordance with section 2.01 of the SSN Indenture; |
|---|---|
| **"Group"** | means the Parent and its Subsidiaries; |
| **"Guarantee Liabilities"** | means the "Guarantee Liabilities" as defined in clause 1.1 of the Intercreditor Agreement other than any "Guarantee Liabilities" in so far as they relate to the Senior Facilities Agreement, the Operating Facility Agreement and/or the Hedging Agreement (as defined in the Intercreditor Agreement); |
| **"Holding Company"** | means, in relation to a person or entity, any other person or entity in respect of which it is a Subsidiary; |
| **"Holding Period Trust Agreement"** | means the holding period trust agreement in the form agreed by the Majority SSN Holders, the Holding Period Trustee and the Company before the date of the Scheme Sanction Hearing and to be executed on or before the Restructuring Effective Date; |
| **"Holding Period Trustee"** | means Lucid, or any additional or replacement trustee over the Trust Entitlements at any time that is appointed in accordance with Clause 9.3(d), in its capacity as holding period trustee and in accordance with the Holding Period Trust Agreement; |
| **"Information Agent"** | means Lucid in its capacity as information agent; |
| **"Initial Holding Period"** | means the period of three months following the Restructuring Effective Date; |
| **"Inter-Company Loan Rationalisation Agreement"** | means the inter-company loan rationalisation agreement between NLR and other members of the Group which have balances relevant to this agreement in a form to be agreed between the Company, NLR and the Majority SSN Holders before the date of the Scheme Sanction Hearing; |
| **"Intercreditor Agreement"** | means the intercreditor agreement dated 3 May 2019 between, amongst others, New Look Bonds Limited, the Security Agent, the RCF Lenders and the Operating Facility Lenders (as amended and/or restated from time to time); |
| **"Liability"** | means any debt, liability or obligation whatsoever whether it is present, future, prospective or contingent, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation and whether it arises at common law, in equity or by statute, in England and Wales or in any other jurisdiction, or in any other manner whatsoever, including, but not limited to, "Liabilities" (as defined in the Intercreditor Agreement), and "**Liabilities**" shall be construed accordingly; |
| **"Lock-up Agreement"** | means the lock-up agreement dated 13 August 2020 entered into between, among others, the Parent, New Look Bonds Limited, the Original Consenting RCF Lenders (as defined therein), the Original Consenting Backstop Parties (as defined therein), the Original |

8

|                          | Consenting SSN Holders (as defined therein) and the Calculation Agent; |
|--------------------------|------------------------------------------------------------------------|
| "**Longstop Date**" | means 31 December 2020; |
| "**Lucid**" | means Lucid Issuer Services Limited; |
| "**Lucid Undertaking Deed**" | means a deed of undertaking in the form agreed by the Majority SSN Holders, the Company and Lucid before the date of the Scheme Sanction Hearing and entered into or to be entered into by Lucid pursuant to which Lucid agrees to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be necessary or desirable to be done by it for the purposes of giving effect to this Scheme and to be bound by and perform the terms of this Scheme in its respective capacities as Information Agent, Calculation Agent and Holding Period Trustee; |
| "**Majority SSN Holders**" | means Scheme Creditors holding in aggregate more than 50 per cent. of the aggregate principal amount of the SSNs at the relevant time; |
| "**Management Incentive Plan**" | shall have the meaning given to such term in the New Shareholders' Agreement; |
| "**Member State**" | means any member state of the European Union; |
| "**MiFID II**" | means Directive 2014/65/EU (as amended); |
| "**New MidCo**" | means a newly incorporated Group Company which will be a direct Subsidiary of the Parent and the direct Holding Company of New Look Investment Limited; |
| "**New Money Shares**" | means the A ordinary voting shares that will be allotted and issued by the Parent to the lenders under the PIK Facility Agreement (or their nominee) pursuant to the terms of the Restructuring which shall equal in aggregate 80 per cent. (on a fully diluted basis) of the New Parent Shares (subject to the issuance of any C ordinary shares or D ordinary shares pursuant to the Management Incentive Plan); |
| "**New Parent Articles**" | means the new articles of association of the Parent substantially in the form attached at Appendix 9 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| "**New Parent Shares**" | means the entire fully diluted ordinary shares in the capital of the Parent in such number to be determined by the Parent prior to the Voting Record Time, which shall comprise A ordinary shares in such number as represents 76 per cent. of the fully diluted ordinary share capital, B ordinary shares in such number as represents 19 per cent. of the fully diluted ordinary share capital and C ordinary shares in such number as represents 5 per cent. of such fully diluted ordinary share capital; |

9

| | |
|---|---|
| **"New Shareholders' Agreement"** | means the shareholders' agreement substantially in the form attached at Appendix 8 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| **"NLR"** | means New Look Retailers Limited, a limited liability company incorporated in England, whose registered number is 01618428 and whose registered office is New Look House, Mercery Road, Weymouth, Dorset DT3 5HJ, United Kingdom; |
| **"Nominated Recipient"** | means a person (or persons) nominated by a Scheme Creditor pursuant to the Account Holder Letter to receive on its behalf its proportion of the participation in the Scheme Consideration; |
| **"Operating Facility Agreement"** | means the trade finance facilities agreement originally dated 16 March 2018 between, amongst others, NLR and HSBC Bank plc (as facility agent) (as amended by amendment letters dated 16 May 2018, 12 November 2018. 27 May 2020 and 30 June 2020 and as amended and restated on 11 January 2019, 23 January 2019 and 3 May 2019); |
| **"Operating Facility Lenders"** | means HSBC Bank plc in its capacity as the provider of the facilities under the Operating Facility Agreement; |
| **"Parent"** | means New Look Retail Holdings Limited, a company incorporated under the laws of Jersey with registered number 128640 with registered address at 47 Esplanade, St Helier, Jersey JE1 0BD; |
| **"Participating Member State"** | means a Member State that adopts or has adopted, and in each case continues to adopt, the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union; |
| **"Payment Direction Letter"** | means the payment direction letter in the form agreed by the Majority SSN Holders and the Company before the date of the Scheme Sanction Hearing; |
| **"Payment Schedule"** | means the payment schedule in the form agreed by the Majority SSN Holders and the Company before the date of the Scheme Sanction Hearing; |
| **"PIK Facility Agent"** | means Global Loan Agency Services Limited in its capacity as agent under the PIK Facility Agreement; |
| **"PIK Facility Agreement"** | means the PIK loan agreement to be entered into in respect of the PIK Loan in the form agreed by the Participating Consenting SSN Holders (as defined in the Lock-up Agreement), New Midco, the PIK Facility Agent and the PIK Security Agent before the date of the Scheme Sanction Hearing and to be executed on or before the Restructuring Effective Date; |
| **"PIK Finance Documents"** | means the PIK Facility Agreement and the PIK Security; |

10

| | |
|---|---|
| "**PIK Loan**" | means the £40,000,000 cash proceeds loan to be borrowed by New MidCo on the Restructuring Effective Date; |
| "**PIK Security**" | means the "Transaction Security Documents" as defined in the Subordination Agreement; |
| "**PIK Security Agent**" | means GLAS Trust Corporation Limited in its capacity as security agent under the Subordination Agreement; |
| "**Proceedings**" | means any process, action or other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security), whether arising in connection with the Financial Restructuring or otherwise; |
| "**Prohibited Proceedings**" | means any Proceedings which are not Allowed Proceedings; |
| "**Prospectus Directive**" | means Directive 2003/71/EC (as amended or superseded, including by Directive 2010/73/EU) and includes any relevant implementing measure; |
| "**RCF**" | means the revolving credit facility of up to £100,000,000 (which is fully utilised and borrowed by NLR) under to the Senior Facilities Agreement; |
| "**RCF Facility Agent**" | means the Facility Agent as that term is defined in the Senior Facilities Agreement or any successor appointed in accordance with the Senior Facilities Agreement; |
| "**RCF Lenders**" | means each "Lender" under and as defined in the Senior Facilities Agreement; |
| "**Registrar of Companies**" | means the registrar of companies within the meaning of the Act; |
| "**Restructuring Effective Date**" | means the date of completion of the last step set out in Clause 6; |
| "**Restructuring Implementation Deed**" | means the restructuring implementation deed documenting the steps to occur on the Restructuring Effective Date to implement the Financial Restructuring which shall reflect the Restructuring Steps, in the form agreed by the Company, the Majority SSN Holders, the RCF Lenders and the Operating Facility Lenders before the date of the Scheme Sanction Hearing; |
| "**Restructuring Released Parties**" | has the meaning set out in Clause 8.2(a); |
| "**Restructuring Steps**" | means the steps, transactions or actions set out in Clause 6; |

11

| | |
|---|---|
| "**Scheme**" | means this scheme of arrangement in its present form or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate; |
| "**Scheme Claims**" | means any claim or claims in respect of any Liability of the Company to a Scheme Creditor arising directly or indirectly in relation to, or arising out of or in connection with, the SSN Finance Documents, including (without limitation) claim or claims in relation to any Liability of the Company in respect of loss or damage suffered or incurred, whether directly or indirectly, as a result of or in connection with such Liability (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such claims), other than those which arise as a result of a failure to comply with the terms of this Scheme; |
| "**Scheme Consideration**" | means the Shareholder Loan to be utilised by New MidCo on a cashless basis and the Scheme Consideration Shares to be issued by the Parent pursuant to the Scheme; |
| "**Scheme Consideration Shares**" | means the aggregate number of B ordinary non-voting shares that will be allotted and issued by the Parent pursuant to the Scheme which shall equal in aggregate 20 per cent. (on a fully diluted basis) of the New Parent Shares (subject to the issuance of any C ordinary shares or D ordinary shares pursuant to the Management Incentive Plan); |

"**Scheme Consideration Shares Entitlement**"  means in respect of each Scheme Creditor:

(a)  the proportion (expressed as a percentage) of such Scheme Creditor's Sterling Equivalent Aggregate SSN Holding bears to the Sterling Equivalent Total SSNs; multiplied by

(b)  the Scheme Consideration Shares;

"**Scheme Creditor Entitlements**"  means, in relation to a Scheme Creditor, if the Restructuring Effective Date occurs, its:

(a)  Shareholder Loan Entitlement; and

(b)  Scheme Consideration Shares Entitlement;

| | |
|---|---|
| "**Scheme Creditors**" | means the SSN Common Depositary and the SSN Trustee (each solely in its capacity as a beneficiary of the covenants to repay principal and interest on the SSNs pursuant to the SSN Indenture) and the SSN Holders; |
| "**Scheme Effective Date**" | means the date on which an office copy of the Court Order has been delivered to the Registrar of Companies for registration in respect of this Scheme, which delivery shall be made by the Company following receipt of an office copy of the Court Order as soon as possible after the earlier of: |

(a)  the date on which the Chapter 15 Order has been obtained; and

12

|  | (b) | 9.00am on the third Business Day after the date of the Court Order; |
|---|---|---|

| "**Scheme Meeting**" | means the meeting of the Scheme Creditors convened in accordance with the permission of the Court pursuant to section 896 of the Act to consider and, if thought fit, approve this Scheme, including any adjournment thereof; |
|---|---|
| "**Scheme Party**" | means each of the Company, each Scheme Creditor and any person that has given an Undertaking; |
| "**Scheme Sanction Hearing**" | means the hearing for the purpose of obtaining the Court Order; |
| "**Scheme Voting Submission Deadline**" | means 5.00 p.m. (London time) on 14 October 2020; |
| "**Scheme Website**" | means www.lucid-is.com/newlook; |
| "**Securities Act**" | means the U.S. Securities Act of 1933 (as amended); |
| "**Security Agent**" | means the Security Agent as that term is defined in the Intercreditor Agreement or any successor appointed in accordance with the Intercreditor Agreement; |
| "**Selling Agent**" | means such person as the Holding Period Trustee may (in its sole discretion) appoint for the purposes of selling or otherwise disposing of the remaining Trust Entitlements in accordance with Clause 9.3(c), which person shall be a reputable institution with relevant experience; |
| "**Senior Facilities Agreement**" | means the senior facility agreement originally dated 25 June 2015 between, amongst others, New Look Bonds Limited and Global Loan Agency Services Limited as the facility agent and GLAS Trust Corporation Limited as security agent (as amended and restated pursuant to amendment and restatement agreements dated 6 March 2018, 11 January 2019, 23 January 2019 and 3 May 2019); |
| "**Senior Secured Security Documents**" | means the "Security Documents" as defined in the Intercreditor Agreement; |
| "**Shareholder Loan**" | means a £40,00,000 shareholder loan to be utilised by New MidCo on a cashless basis on the Restructuring Effective Date pursuant to the Shareholder Loan Agreement; |
| "**Shareholder Loan Agreement**" | means the shareholder loan agreement substantially in the form attached at Appendix 6 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| "**Shareholder Loan Entitlement**" | means in respect of each Scheme Creditor: |

13

|     |     |     |
| --- | --- | --- |
| (a) | the proportion (expressed as a percentage) of such Scheme Creditor's Sterling Equivalent Aggregate SSN Holding bears to the Sterling Equivalent Total SSNs; multiplied by |

|     |     |
| --- | --- |
| (b) | the Shareholder Loan Total Commitment; |

| | |
|---|---|
| "**Shareholder Loan Facility Agent**" | means Global Loan Agency Services Limited in its capacity as agent under the Shareholder Loan Agreement; |
| "**Shareholder Loan Total Commitment**" | means £40,000,000; |
| "**SSN Common Depositary**" | means a depositary common to Euroclear and Clearstream, being Deutsche Bank AG, London Branch; |
| "**SSN Finance Documents**" | means the SSN Indenture, the Intercreditor Agreement and the Senior Secured Security Documents; |
| "**SSN Holder**" | means a beneficial holder of the SSNs; |
| "**SSN Holding**" | means, in respect of a Scheme Creditor that is an SSN Holder, the SSNs that such Scheme Creditor holds; |
| "**SSN Indenture**" | means the indenture with respect to the SSNs dated 3 May 2019 and made between, among others, the Company and GLAS Trustees Limited as trustee, as amended and supplemented from time to time; |
| "**SSN Paying Agent**" | means Paying Agent as that term is defined in the SSN Indenture or any successor trustee appointed in accordance with the SSN Indenture; |
| "**SSN Trustee**" | means the Trustee as that term is defined in the SSN Indenture (currently GLAS Trustees Limited) or any successor trustee appointed in accordance with the SSN Indenture; |
| "**SSNs**" | means the Sterling SSNs and the Euro SSNs; |
| "**Sterling Equivalent**" | means the equivalent amount in pounds sterling of an amount in euro calculated using the Applicable Exchange Rate determined by the Calculation Agent; |
| "**Sterling Equivalent Aggregate SSN Holding**" | means, in respect of a Scheme Creditor, the aggregate of its Sterling SSN Holding and the Sterling Equivalent of its Euro SSN Holding as at the Voting Record Time; |
| "**Sterling Equivalent Total SSNs**" | means the aggregate of the Sterling SSNs and the Sterling Equivalent of the Euro SSNs as at the Voting Record Time; |
| "**Sterling SSN Holding**" | means, in respect of a Scheme Creditor that is an SSN Holder, the Sterling SSNs that such Scheme Creditor holds; |
| "**Sterling SSNs**" | means the £400,131,636 senior secured notes issued by the Company pursuant to the terms of the SSN Indenture; |

14

| | |
|---|---|
| "**Subordination Agreement**" | means the subordination agreement substantially in the form attached at Appendix 7 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| "**Subscription Agreement**" | means the subscription agreement for the Scheme Consideration Shares in the form agreed by the Majority SSN Holders and the Company before the date of the Scheme Sanction Hearing; |
| "**Subsidiary**" | has the same meaning as in section 1159 of the Act; |
| "**Supplemental Indenture**" | means the supplemental indenture to the SSN Indenture substantially in the form attached at Appendix 10 to the Explanatory Statement with such minor or technical amendments as the Court may consent to; |
| "**Trust**" | has the meaning given to it in Clause 9.2(a)(i); |
| "**Trust Entitlement**" | has the meaning given to it in Clause 9.3(b); |
| "**Unadmitted Scheme Creditors**" | has the meaning given to it in Clause 9.3(b); |
| "**Undertakings**" | means the Companies Undertaking Deed, the GLAS Undertaking Deed and the Lucid Undertaking Deed; |
| "**U.S. Bankruptcy Code**" | means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended; |
| "**U.S. Bankruptcy Court**" | means the United States Bankruptcy Court for the Southern District of New York or other court of competent jurisdiction presiding over any case filed under Chapter 15 of the U.S. Bankruptcy Code seeking, among other things, recognition of the Scheme as a foreign main proceeding and enforcement of the Court Order in the United States; |
| "**Voting Record Time**" | means 5.00 p.m. (London time) on 14 October 2020. |

## 2.      INTERPRETATION

2.1     In this Scheme, with effect from the Scheme Effective Date or such other date as may be necessary to construe this Scheme, unless the context otherwise requires or otherwise expressly provides for:

(a)      references to "Clauses", "Appendices" and "Recitals" are references to the Clauses, Appendices and Recitals respectively of this Scheme;

(b)      references to a "person" include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(c)      all references to "£" and "GBP" are references to pounds sterling, the lawful currency of the United Kingdom;

(d)      all references to "€" are references to euro, the single currency of the Participating Member States;

15

(e)     references to a statute or statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

(f)     references to a document include the same as subsequently supplemented, amended and/or restated from time to time;

(g)     references to a time of the day are to London time;

(h)     any references to a Scheme Creditor shall be references to a Scheme Creditor in its capacity as an SSN Holder and a Scheme Creditor shall be required to take all steps and actions required in this Scheme to be taken by a Scheme Creditor in any such capacity (as applicable);

(i)     the singular includes the plural and vice versa and words importing one gender shall include all genders;

(j)     the term "including" means "including, without limitation"; and

(k)     headings are for ease of reference only and shall not affect the interpretation of this Scheme.

2.2     References to any figures or amounts in this Scheme are subject to:

(a)     potential modifications or adjustments under Clause 9.7 or otherwise as a result of any rounding or other calculation or allocation procedures (including the potential cancellation of the Scheme Creditor Entitlements) set out herein;

(b)     such minor or technical amendments or any amendments to correct manifest errors as may be agreed by or on behalf of: (i) the Company and (ii) the Majority SSN Holders; and

(c)     such other amendments, adjustments or changes (including in respect of their levels or the order of funds flow) as may be agreed by the Company and the Majority SSN Holders to the extent such amendments, adjustments or changes do not, taken as a whole, result in any material adverse effect on any Scheme Party without its prior written consent.

## 3.     RESTRUCTURING EFFECTIVE DATE

3.1     This Scheme shall take effect on and from the Scheme Effective Date and by its terms shall approve the Financial Restructuring which shall apply in accordance with Clause 3.2.

3.2     Upon the occurrence of the Financial Restructuring Conditions Satisfaction Time, the arrangement effected by the Scheme shall apply to all Scheme Claims and shall be binding on all Scheme Parties and their respective successors and assigns.

3.3     Each Scheme Creditor acknowledges that, as a result of its Scheme Creditor Entitlements and by operation of the Financial Restructuring, it (or its Nominated Recipient(s) in accordance with Clause 4.3) shall become a shareholder of the Parent in accordance with the Scheme, provided that such Scheme Creditor and/or Nominated Recipient(s) provides the CDD Information in a form satisfactory to Crestbridge.

16

4.  **SCHEME CONSIDERATION**

4.1   Subject to the other provisions of this Scheme, each Scheme Creditor may only receive its participation in the Shareholder Loan and/or Scheme Consideration Shares on the Restructuring Effective Date in accordance with the provisions of this Clause 4.

4.2   A Scheme Creditor (or, if relevant, its Nominated Recipient(s)) may only receive its participation in the Shareholder Loan and/or Scheme Consideration Shares on the Restructuring Effective Date if it has duly elected to do so by:

(a)   validly executing and delivering an Account Holder Letter to the Information Agent before the Scheme Voting Submission Deadline;

(b)   in the case of the Shareholder Loan only, and to the extent required, it has provided the GLAS KYC Information (including, if relevant, the GLAS KYC Information in respect of its Nominated Recipient(s)) to the Shareholder Loan Facility Agent by the GLAS KYC Information Deadline, and the Shareholder Loan Facility Agent has confirmed to the Information Agent that the GLAS KYC Information is in a form satisfactory to it by 5 p.m. (London time) on 26 October 2020.

(c)   in the case of the Scheme Consideration Shares only, and to the extent required, it has provided the CDD Information (including, if relevant, the CDD Information in respect of its Nominated Recipient(s)) to Crestbridge by the CDD Information Deadline, and Crestbridge has confirmed to the Information Agent that the CDD Information is in a form satisfactory to it by 5 p.m. (London time) on 26 October 2020.

4.3   A Scheme Creditor may elect for a Nominated Recipient(s) to receive its participation in the Shareholder Loan and/or Scheme Consideration Shares, provided that:

(a)   to make such election to receive participation in the Shareholder Loan and/or Scheme Consideration Shares on the Restructuring Effective Date, such Scheme Creditor and its Nominated Recipient(s) have each validly executed and delivered an Account Holder Letter to the Information Agent prior to the Scheme Voting Submission Deadline; and

(b)   such Nominated Recipient(s) is an Eligible Person.

4.4   Each Scheme Creditor's entitlement to participate in the Shareholder Loan shall be in an amount equal to its Shareholder Loan Entitlement.  The Shareholder Loan Entitlement of a Scheme Creditor shall be allocated to such Scheme Creditor or its Nominated Recipient(s) in accordance with its applicable Account Holder Letter.

4.5   Each Scheme Creditor's entitlement to receive Scheme Consideration Shares shall be in an amount equal to its Scheme Consideration Shares Entitlement.  The Scheme Consideration Shares Entitlement of a Scheme Creditor shall be allocated to such Scheme Creditor or its Nominated Recipient(s) in accordance with its applicable Account Holder Letter.

4.6   By exercising the election(s) referred to in Clauses 4.2 and 4.3, each Scheme Creditor (and its Nominated Recipient(s)) agrees:

(a)   that returning a completed and validly executed and delivered Account Holder Letter offers no assurance that it (or its Nominated Recipient) will receive its (i) participation in the Shareholder Loan on the Restructuring Effective Date if all relevant GLAS KYC

17

Information is not also provided to the Shareholder Loan Facility Agent by the GLAS KYC Information Deadline and (ii) Scheme Consideration Shares on the Restructuring Effective Date if all relevant CDD Information is not also provided to Crestbridge by the CDD Information Deadline;

(b)     in respect of the Scheme Consideration Shares:

(i)     that its rights and obligations in connection with the Scheme Consideration Shares shall be determined in accordance with the terms of this Scheme, the New Parent Articles, the Subscription Agreement and the New Shareholders' Agreement; and

(ii)    that it shall be bound by and perform its obligations and satisfy its Liabilities as a subscriber for the Scheme Consideration Shares under the New Parent Articles, the Subscription Agreement and as an investor under the New Shareholders' Agreement.

4.7     In the event that the relevant elections and actions are not taken by the relevant deadlines referred to in this Clause 4, such Scheme Creditors' participation in the Shareholder Loan and/or Scheme Consideration Shares will be issued on the Restructuring Effective Date to the Holding Period Trustee until such time as the relevant elections and actions are complied with in accordance with Clause 9.3 (or as otherwise provided in Clause 9.3) in accordance with the Holding Period Trust Agreement.

## 5.     FINANCIAL RESTRUCTURING IMPLEMENTATION

### 5.1     Effectiveness

Pursuant to the Undertakings, the Parent, New Midco, GLAS Trust Corporation Limited, Global Loan Agency Services Limited, the SSN Trustee and Lucid, have severally agreed to be bound by and comply with (i) the obligations expressed to apply to them under this Scheme and the Financial Restructuring Documents to which they are expressed to be a party, and (ii) their respective Undertakings.

### 5.2     Inter-conditionality of Restructuring Steps

Each Scheme Party hereby agrees that:

(a)     the Restructuring Steps shall be completed in the order set out in Clause 6;

(b)     each Restructuring Step shall be completed as soon as reasonably practicable following the completion of the previous Restructuring Step; and

(c)     in the event that any Restructuring Step (a "**Relevant Restructuring Step**") is not completed on the Business Day on which the Restructuring Steps are commenced pursuant to Clause 6, then:

(A)     the process of the closing of the Financial Restructuring shall be halted until the date on which the Relevant Restructuring Step and all remaining Restructuring Steps can be completed (on which date all such Restructuring Steps shall be completed);

18

(B)    to the greatest extent permitted by law, any Restructuring Step completed before the Relevant Restructuring Step shall be deemed to have occurred on the Restructuring Effective Date;

(C)    no Scheme Party shall be permitted to raise any objection for the purposes of this Scheme in connection with the fact that a Restructuring Step has not been completed on the Restructuring Effective Date by reason of the operation of the provisions of this Clause 5.2(c);

(D)    in the event that any Restructuring Step completed before the Relevant Restructuring Step cannot be treated as having occurred on a subsequent date under the provisions of this Clause 5.2(c), then the fact of its occurrence on a date prior to the Restructuring Effective Date shall not prevent it being regarded for the purposes of this Scheme as having occurred on the Restructuring Effective Date; and

(E)    each Scheme Creditor agrees and acknowledges that it shall not transfer any Scheme Creditor Entitlement until the Restructuring Effective Date.

**5.3    Pre-Restructuring Steps: Execution of the Financial Restructuring Documents**

(a)    To the extent not already entered into, as soon as practicable after the Scheme Effective Date, the Company, each Scheme Creditor, Lucid, the Security Agent, the SSN Trustee, the SSN Paying Agent and all other relevant parties shall execute the Restructuring Implementation Deed.

(b)    The Company, each Scheme Creditor, Lucid, the Security Agent, the SSN Trustee and all other relevant parties shall execute each other Financial Restructuring Document to which they are a party, to the extent that any Financial Restructuring Document has not been fully executed before the Scheme Effective Date (which shall be held in escrow by the Company and shall not be released or effective until the relevant Restructuring Step occurs and/or the Restructuring Effective Date occurs, as applicable) unless agreed otherwise by the Majority SSN Holders and the Company and (where applicable) Lucid, the Security Agent, the SSN Paying Agent and the SSN Trustee.

**6.    RESTRUCTURING STEPS**

Each Scheme Party hereby agrees that the following steps shall occur on the Restructuring Effective Date in the order set out below.

**6.1    Restructuring Step 1: Confirmation of Financial Restructuring Conditions**

As soon as practicable following the Financial Restructuring Conditions Satisfaction Time, the Company (through the Information Agent) shall deliver a notice to the Scheme Creditors confirming that all Financial Restructuring Conditions have been satisfied or waived in accordance their terms or in accordance with Clause 9.13.

**6.2    Restructuring Step 2: Exchange of SSNs and Shareholder Loan**

The following documentation shall simultaneously become effective pursuant to and in accordance with their respective terms

19

(a)    the Shareholder Loan Agreement and the Shareholder Loan will be utilised by New MidCo on a cashless basis;

(b)    the Subordination Agreement;

(c)    the Supplemental Indenture and the write down and release in respect of the SSNs; and

(d)    the Inter-Company Loan Rationalisation Agreement.

**6.3    Restructuring Step 3: Release of PIK Loan proceeds**

The proceeds of the PIK Loan shall be released by the PIK Facility Agent, who shall be directed by:

(a)    New MidCo and the applicable Company Parties to pay the proceeds of the PIK Loan directly to NLR in settlement of the capital contributions in New Look Investment Limited, New Look Bonds Limited, New Look Limited and NLR; and

(b)    NLR to make the payments in accordance with the Payment Schedule,

in each case, pursuant to and in accordance with the Payment Direction Letter.

**6.4    Restructuring Step 4: Effectiveness of New Shareholders' Agreement**

Each of the following documentation shall simultaneously become effective pursuant to and in accordance with their respective terms:

(a)    the New Shareholders' Agreement; and

(b)    the Subscription Agreement in respect of the Scheme Consideration Shares and the New Money Shares.

**6.5    Restructuring Step 5: Redemption and issuance of shares and adoption of New Parent Articles**

(a)    The Parent shall redeem all Existing Parent Shares and immediately issue and allot the Scheme Consideration Shares and the New Money Shares pursuant to and in accordance with the Subscription Agreement in such proportions consistent with, in the case of each Scheme Creditor, its Scheme Consideration Shares Entitlement and in the case of each New Money Shareholder, such number of New Money Shares as envisaged pursuant to the terms of the Restructuring.

(b)    The New Parent Articles shall be adopted and come into effect simultaneously with the issuance and allotment of the Scheme Consideration Shares and the New Money Shares.

**6.6    Restructuring Step 6: Appointment and resignation of directors**

To the extent required, the appointment and resignation of any directors of the Parent in accordance with the New Shareholders' Agreement shall become effective.

20

**6.7**     **Restructuring Step 7: Effectiveness of Amended Super Senior Finance Documents**

Each of the Amended Super Senior Finance Documents shall simultaneously become effective pursuant to and in accordance with their respective terms.

**7.**     **GRANTS OF AUTHORITY TO EXECUTE THE FINANCIAL RESTRUCTURING DOCUMENTS AND INSTRUCTIONS TO TAKE STEPS TO IMPLEMENT THE SCHEME**

7.1     The Scheme Creditors and, pursuant to an Account Holder Letter and its incorporation into this Scheme, their respective Nominated Recipient(s) hereby irrevocably authorise and direct the Company, the Parent, New Midco, the Shareholder Loan Facility Agent, the Security Agent and the SSN Trustee, as their agent and attorney (acting by their respective directors or other duly appointed representatives):

(a)     on and from the Scheme Effective Date, to enter into, execute and, on and from (i) the Scheme Effective Date in respect of the Restructuring Implementation Deed and (ii) in respect of each other Financial Restructuring Document, the Restructuring Effective Date and in the order contemplated in Clause 6, to release from escrow and deliver as a deed (as applicable), on behalf of each Scheme Creditor, the Financial Restructuring Documents and such other documents as are required to implement the Financial Restructuring;

(b)     on and from the Restructuring Effective Date, to cause each determination of the principal amount of and each principal payment of the SSNs (including, for the avoidance of doubt, any Guarantee Liabilities in respect thereof) outstanding to be reduced to zero and released in full pursuant to the Supplemental Indenture and the Company is authorised to notify the SSN Trustee, the SSN Paying Agent, the SSN Common Depositary and the Clearing Systems (as applicable) in respect of such reduction and release and to take, and instruct the SSN Trustee, the SSN Paying Agent, the SSN Common Depositary and the Clearing Systems (as applicable) to take, all actions and/or steps to implement and consummate the reduction and release of the SSNs in accordance with the Applicable Procedures;

(c)     to agree on their behalf any amendments to the Financial Restructuring Documents which the Company and (if applicable) the other person(s) to be party to the relevant Financial Restructuring Document may deem (acting reasonably and in good faith) necessary or desirable in order to ensure that:

(i)     they reflect the terms of this Scheme and the transactions intended to be entered into in order to effect the Financial Restructuring;

(ii)     the information and categories of information contained, or referred to, in any formula, schedule, annexe or similar, signature blocks, parties provisions, notice details or placeholder in any Financial Restructuring Document reflect the relevant information and categories of information as of the applicable date;

(iii)     the Financial Restructuring Documents may be duly executed and delivered; and/or

(iv)     the Financial Restructuring Documents are legal, valid, binding and enforceable upon the parties to them in accordance with this Scheme; and

21

(d)     to carry out any related or ancillary actions that it considers necessary or desirable for the purposes of implementing this Scheme.

7.2     Each of the Parent, New Midco and the Company undertakes to (and the Company shall procure that each of the relevant entities in the Group shall) take all steps and execute all such documents as are required to give effect to the Financial Restructuring, including the Financial Restructuring Documents and the documentary conditions precedent to them.

7.3     Each Scheme Creditor and, pursuant to an Account Holder Letter and its incorporation into this Scheme, each of their respective Nominated Recipient(s) hereby instructs each of the Shareholder Loan Facility Agent, the Security Agent and the SSN Trustee, to be bound to perform the Restructuring Steps relevant to them with effect from the Scheme Effective Date, and such instruction shall constitute the requisite notice to the Company, the SSN Trustee and/or the Security Agent, as the case may be, and direction (in the case of the SSN Trustee and/or the Security Agent, as the case may be) on behalf of the SSN Holders and/or the SSN Trustee, as the case may be, under the Indenture (and the Scheme Parties agree such notice shall constitute valid notice for the purposes of the Indenture).

7.4     Each Scheme Creditor and, pursuant to an Account Holder Letter and its incorporation into this Scheme, each of their respective Nominated Recipient(s), hereby instructs each of the Shareholder Loan Facility Agent, the Security Agent and the SSN Trustee to individually undertake such steps as it considers necessary or desirable for the purposes of facilitating the implementation of this Scheme, including (without limitation) entering into and executing in its respective capacity the Financial Restructuring Documents to which it is a party and any document that it considers necessary or desirable to implement this Scheme.

7.5     Once a Financial Restructuring Document has been executed and becomes effective, the authority granted by each Scheme Creditor to the Company under this Clause 7 shall expire in respect of that Financial Restructuring Document and it may only be amended in accordance with its terms.

7.6     All grants of authority granted under this Clause 7 shall be treated, for all purposes whatsoever and without limitation, as having been granted by a deed under English law.

## 8.      RELEASES IN CONNECTION WITH THE FINANCIAL RESTRUCTURING

8.1     With effect from the Restructuring Effective Date, all of the rights, title and interest of each Scheme Creditor to its Scheme Claims shall be discharged fully and absolutely by operation of this Scheme as consideration for the Scheme Creditor Entitlements and the right to receive the participation in the Shareholder Loan and the Scheme Consideration Shares under the terms of this Scheme and the Financial Restructuring Documents and without any action on the part of that Scheme Creditor, in each case so as to bind that Scheme Creditor.

8.2     With effect on and from the Restructuring Effective Date:

(a)     each Scheme Creditor (in its capacity as such), subject to Clause 8.2(b), and to the extent not already done so above in respect of its SSNs, irrevocably and unconditionally, fully and finally waives and releases and forever discharges any and all actions, proceedings, claims, damages, counterclaims, complaints, liabilities, liens, rights, demands and set-offs, whether present or future, prospective or contingent, whether in this jurisdiction or any other or under any law, of whatsoever nature and howsoever arising, whether in law or in equity, in contract (including but not limited to breaches or non-performances of contract), statute or in tort (including but not limited

22

to negligence and misrepresentation) or any other manner whatsoever, breaches of statutory duty, for contribution, or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether or not presently known to the parties or to the law, in each case that it ever had, may have or hereafter can, shall or may have arising out of actions, omissions or circumstances on or prior to the Restructuring Effective Date against the Company and each of the following (in each case, in its or their capacity as such): (i) the Advisers, (ii) Lucid, (iii) the SSN Trustee, (iv) the Security Agent, (v) the SSN Paying Agent, (vi) the Shareholder Loan Facility Agent or (vii) any other Scheme Creditor (or Nominated Recipient(s)) or such Scheme Creditor's Affiliates (each person referred to above in this Clause 8.2(a) a "**Restructuring Released Party**", and together the "**Restructuring Released Parties**") in relation to or arising out of or in connection with the SSN Finance Documents, the Scheme Claims and/or the negotiation and the implementation of this Scheme and the Financial Restructuring;

(b) however, Clause 8.2(a) shall not:

(i) in any way impair or prejudice any rights of any Scheme Creditor arising under (A) this Scheme, (B) any report or advice provided by any Adviser, on which report or advice such Scheme Creditor is entitled to rely, or (C) any Financial Restructuring Document (including as a consequence of non-compliance with the terms of this Scheme, the Financial Restructuring Documents or in respect of an Allowed Proceeding) or any remedy in respect of any such rights arising under the documents described at (A) to (C) hereof; and

(ii) apply to any claim or Liability in respect of fraud or wilful misconduct by any Restructuring Released Party.

## 9. PROVISIONS APPLICABLE TO THE FINANCIAL RESTRUCTURING

### 9.1 Undertakings

Upon the occurrence of the Restructuring Effective Date, each Scheme Creditor hereby irrevocably ratifies and confirms everything which the Company, its their Affiliates and its respective directors/managers/officers (or equivalent), may lawfully do or cause to be done or purport to do pursuant to the authority conferred by, or in connection with, the Financial Restructuring, including Clauses 7 and 8.

### 9.2 Release Trust

(a) Upon the occurrence of the Restructuring Effective Date, the Company hereby declares that:

(i) it holds as trustee each of the releases and undertakings given by the Scheme Creditors pursuant to (or in connection with) this Scheme in favour of itself and each of the Affiliates, Lucid, the Security Agent, the SSN Trustee, the Shareholder Loan Facility Agent and the Advisers on trust respectively for itself and each of the Affiliates, Lucid, the Security Agent, the SSN Trustee, the SSN Paying Agent and the Advisers (as applicable) (the "**Trust**"); and

(ii) it has the power to appoint an additional or replacement trustee over the Trust at any time, subject to any additional or replacement trustee agreeing to be bound by the terms of this Scheme.

23

9.3 **Holding Period Trustee**

(a)     The Scheme Creditor Entitlements may be withheld from being distributed to a Scheme Creditor (or its Nominated Recipient(s)) on the Restructuring Effective Date if, (a) the Information Agent does not receive a validly executed and delivered Account Holder Letter from that Scheme Creditor and all of the information, representations, confirmations and any other documentation required to be provided therein before the Scheme Voting Submission Deadline and/or (b) in the case of the Shareholder Loan Entitlement, the Shareholder Loan Facility Agent does not receive the GLAS KYC Information or to the extent that the Shareholder Loan Facility Agent has not confirmed by 5 p.m. (London time) on 26 October 2020 to the Information Agent that the GLAS KYC Information is in a form satisfactory to the Shareholder Loan Facility Agent and/or (c) in the case of the Scheme Consideration Shares Entitlement, Crestbridge does not receive the CDD Information by the CDD Information Deadline or to the extent Crestbridge has not confirmed to the Information Agent by 5 p.m. (London time) on 26 October 2020 that such CDD Information is in a form satisfactory to Crestbridge.

(b)     Any Scheme Creditor Entitlements withheld pursuant to Clause 9.3(a) will be delivered to the Holding Period Trustee on the Restructuring Effective Date who will hold such Scheme Creditor Entitlements on behalf of the relevant Scheme Creditors (the "**Unadmitted Scheme Creditors**" and each an "**Unadmitted Scheme Creditor**") (the "**Trust Entitlements**") for the Initial Holding Period, subject to the terms of the Financial Restructuring Documents.    A Scheme Creditor whose Scheme Creditor Entitlements have been issued to the Holding Period Trustee under this Clause 9.3(b) may request the Holding Period Trustee in writing to transfer the relevant Trust Entitlements to it (or its Nominated Recipient(s)), provided that it (a) provides a validly executed and delivered Account Holder Letter to the Holding Period Trustee, together with any such information, confirmation, representations or undertakings that the Holding Period Trustee may request, (b) in the case of the Shareholder Loan Entitlement, provides the Shareholder Loan Facility Agent the GLAS KYC Information in a form satisfactory to the Shareholder Loan Facility Agent, (c) in the case of the Scheme Consideration Shares Entitlement, provides the CDD Information in a form satisfactory to Crestbridge and/or (d) adheres to the New Shareholders' Agreement.

(c)     Following the expiry of the Initial Holding Period, the Holding Period Trustee will, as soon as reasonably practicable thereafter, use reasonable endeavours, including by the appointment of a Selling Agent or otherwise, to sell or otherwise dispose of the remaining Trust Entitlements for such consideration as it is able to obtain (after any taxes, withholding, deductions, fees, costs or any other expenses in connection therewith) (such consideration being the "**Trust Entitlements Consideration**"). The Holding Period Trustee shall, for a period of three months (the "**Trust Entitlements Consideration Holding Period**"), hold the Trust Entitlements Consideration on trust for each Unadmitted Scheme Creditor *pro rata* to the Trust Entitlements Consideration raised from the sale of the relevant Unadmitted Scheme Creditor's Trust Entitlements. A Scheme Creditor whose Trust Entitlements have been sold or otherwise disposed of by the Holding Period Trustee pursuant to this Clause 9.3(c) may request the Holding Period Trustee in writing to transfer the relevant Trust Entitlements Consideration to it (or its Nominated Recipient(s)) (after deducting any taxes, withholding, deductions, fees, costs, or any other expenses in connection with such Trust Entitlements or Trust Entitlements Consideration), provided that it provides an executed Account Holder Letter, completed as appropriate, together with any relevant information, confirmation, representations or undertakings that the Holding Period Trustee may request.    At the

24

end of the Trust Entitlements Consideration Holding Period, the Holding Period Trustee will pay or deliver any remaining Trust Entitlements or Trust Entitlements Consideration to the Company or any person nominated by the Company.

(d)    The Scheme Parties acknowledge and agree that the Holding Period Trustee has the power to appoint an additional or replacement trustee over the Trust Entitlements at any time, subject to any additional or replacement trustee agreeing to be bound by the terms of this Scheme.

**9.4    Stay of Prohibited Proceedings**

(a)    Subject to Clause 9.4(b), no Scheme Creditor may commence, support any person commencing, or instruct any person to commence or take any Prohibited Proceeding in relation to the Financial Restructuring against the Company, any Affiliate and/or an Adviser.

(b)    A Scheme Creditor may commence an Allowed Proceeding against any Scheme Party after giving each Scheme Creditor 21 days' written notice of its intention to do so.

(c)    Each Scheme Creditor will hold on trust for the benefit of the Company any recovery made pursuant to any Prohibited Proceeding in breach of this Clause 9.4 and will turn over any such recovery forthwith upon demand being made by the Company without set-off, counterclaim or deduction.  To the extent that the asset comprising the recovery cannot be held on trust by the Scheme Creditor, the Scheme Creditor shall pay to the Company an amount equal to that recovery immediately upon demand being made by the Company without set-off, counterclaim or deduction, to be held on trust by the Company for the person(s) entitled to it.

**9.5    Failure of all Restructuring Steps to occur before the Longstop Date**

If any of the Restructuring Steps does not occur before the Longstop Date or any termination of this Scheme in accordance with Clause 9.6(a) occurs, Clause 5 shall not apply and, to the extent permitted by applicable law, all Restructuring Steps will not or will be deemed not to have occurred and any actions taken under or pursuant to Clause 5 shall have no valid or binding effect.  To the extent permitted by law, all relevant parties agree to take such steps as are necessary and/or desirable to reverse any such steps that have already occurred in order to put the parties in the position they were in before the steps occurred, provided that no party shall be required to incur any material out-of-pocket costs or expenses.

**9.6    Termination of this Scheme**

(a)    This Scheme shall terminate and shall be construed as if it had never become effective and the rights and obligations of the Scheme Creditors under the SSN Finance Documents shall not be affected and shall remain in full force (and any Defaults and Events of Defaults continuing or occurring in connection with the terms of this Scheme under and as defined in the SSN Finance Documents shall be deemed not to have been waived and any grace period that expired during the duration of this Scheme shall remain expired following the termination of this Scheme) if the Restructuring Effective Date has not occurred by the Longstop Date.

(b)    Clauses 9.5, 9.6(a), 9.11, 9.12 and 9.19 shall survive any termination of this Scheme.

25

**9.7    Fractional entitlements**

Each Scheme Creditors participation in the Shareholder Loan will be rounded to the nearest £0.01, with half a pence being rounded upwards.  Fractions of Scheme Consideration Shares will not be issued and will be rounded down to the nearest whole Scheme Consideration Share. No cash or other consideration will be due in respect of any fraction of the Shareholder Loan less than £0.01 or any fraction of the Scheme Consideration Shares.

**9.8    Assignments or transfers after the Voting Record Time**

(a)    Unless expressly provided otherwise herein, all Scheme Claims shall be determined as at the Voting Record Time.

(b)    The Company shall not be under any obligation to recognise any assignment or transfer of Scheme Claims after the Voting Record Time, provided that, where the Company has received from the relevant parties written notice of such assignment or transfer, the Company may in its absolute discretion, and subject to such evidence as it may reasonably require, agree to recognise such assignment or transfer, subject to the assignee or transferee agreeing to be bound by the terms of this Scheme and to be treated as having been a Scheme Creditor for the purposes of this Scheme.

**9.9    Provision of information by Scheme Creditors**

(a)    An Account Holder Letter submitted by or on behalf of any Scheme Creditor and/or its Nominated Recipient(s) shall be submitted in accordance with the instructions set out in the relevant Account Holder Letter and this Scheme.

(b)    If the Information Agent refuses to accept an Account Holder Letter, it shall promptly prepare a written statement of its reasons for doing so and send that statement by electronic mail to the party that provided such Account Holder Letter.

(c)    The Company may disclose the Account Holder Letter and its contents, any GLAS KYC Information, any CDD Information to such persons and Advisers as are necessary to facilitate the consummation of the Financial Restructuring.

**9.10    Future insolvency**

(a)    To the extent that any administrator, receiver or other insolvency official which is appointed in respect of the Company so agrees, in the event that the Company enters into an insolvency proceeding, administration, reorganisation or liquidation on or before the Restructuring Effective Date, the Company's obligations under this Scheme shall continue to be performed by the Company in an insolvency proceeding, administration reorganisation or liquidation to the fullest extent permitted by law or unless otherwise determined by the Court.

(b)    With effect from the Restructuring Effective Date, this Scheme shall continue according to its terms to the fullest extent permitted by law or unless otherwise determined by the Court, notwithstanding any administration, reorganisation or liquidation of the Company.

26

**9.11    Exclusion of liability**

(a)    To the extent permitted by law, no Scheme Creditor shall be entitled to challenge the validity of any act done or omitted to be done in good faith by any of the Advisers, the Parent, New Midco, the Company, Lucid, the Shareholder Loan Facility Agent, the Holding Period Trustee, the Security Agent, the SSN Trustee, the SSN Paying Agent, the PIK Facility Agent, Crestbridge or the Company (or any of their respective authorised signatories, agents, employees and/or delegates) (the "**Excluded Persons**") in connection with their actions or omissions pursuant to the provisions of this Scheme or the exercise by any of the Excluded Persons in good faith of any power conferred upon them for the purposes of this Scheme if exercised in accordance with the provisions of this Scheme.

(b)    To the extent permitted by law, the Company shall not be entitled to challenge the validity of any act done or omitted to be done in good faith by the Excluded Persons in accordance with the provisions of this Scheme or the exercise by the Excluded Persons in good faith of any power conferred upon it for the purposes of this Scheme if exercised in accordance with the provisions of this Scheme.

(c)    No Excluded Person shall be liable for any cost, loss or liability in connection with this Scheme unless such loss is attributable to its gross negligence, wilful misconduct or fraud.

(d)    With respect to the Scheme Creditors, the Group or any other person affected or bound by this Scheme, the Security Agent, the SSN Trustee, SSN Paying Agent, the Shareholder Loan Facility Agent or the Holding Period Trustee undertakes to perform or to observe only such of its covenants or obligations as are specifically set forth in the Intercreditor Agreement and this Scheme.  The Holding Period Trustee shall have only those duties, obligations and responsibilities expressly specified in this document and no others shall be implied.  Section 1 of the Trustee Act 2000 shall not apply to the duties of the Holding Period Trustee in relation to the trusts constituted by this document.

(e)    Nothing in the Explanatory Statement or this Scheme shall impose any obligation on the Security Agent, the SSN Trustee, the SSN Paying Agent, the Shareholder Loan Facility Agent or the Holding Period Trustee to expend its own funds or pay any amount out of its personal assets with respect to any claims made by a Scheme Creditor as a result of the Security Agent, the SSN Trustee, the SSN Paying Agent, the Shareholder Loan Facility Agent or the Holding Period Trustee taking any of the steps contemplated by this Scheme except to the extent that the same arises from the wilful misconduct or gross negligence of the Security Agent, the SSN Trustee, SSN Paying Agent, the Shareholder Loan Facility Agent or the Holding Period Trustee.

(f)    None of the Security Agent, the SSN Trustee, Lucid, the Holding Period Trustee, the Shareholder Loan Facility Agent and their respective directors, officers, employees, agents and advisers shall be personally responsible or accountable in damages or otherwise to any Scheme Creditor, the Group or any other person affected or bound by this Scheme for any loss, damage or claim incurred by reason of any act or omission performed or omitted by the Security Agent, the SSN Trustee, Lucid, the Shareholder Loan Facility Agent or the Holding Period Trustee in good faith in accordance with this Scheme that it reasonably believes to be within the scope of the authority conferred on it by the Intercreditor Agreement and this Scheme.

27

(g)     None of the Security Agent, the SSN Trustee, Lucid, the Shareholder Loan Facility Agent and the Holding Period Trustee shall be personally liable for or on account of any of the statements, representations, warranties, covenants or obligations stated to be those of any Scheme Creditors, the Group or any other person affected or bound by this Scheme, with all such liability, if any, being expressly waived by any such persons claiming by, through or under any of the foregoing.

(h)     Each of the Security Agent, the SSN Trustee, the Shareholder Loan Facility Agent, Lucid, and the Holding Period Trustee shall at all times be entitled to and may rely on any document notice, consent, order, opinion or certificate given, issued or granted by any person or court that it reasonably believes to be genuine and correct pursuant to the Intercreditor Agreement and this Scheme without being under any obligation to enquire or otherwise determine whether any such notice, consent, order, opinion or certificate is adequate, accurate and/or complete and has been given or granted in accordance with applicable laws or any contractually binding obligation and without being under any responsibility or being under any obligation to validate the legality, effectiveness, completeness, adequacy or enforceability of the Financial Restructuring that is to be implemented as a consequence of this Scheme.

**9.12    Costs**

Subject to and in accordance with the steps set out in Clause 6 and the implementation of the Restructuring Steps, all costs, charges, expenses and disbursements ("**Costs**") incurred by the Company and the Group in connection with the negotiation, preparation and implementation of this Scheme shall be paid in accordance with the Payment Schedule and, to the extent not paid pursuant to the Payment Schedule, such Costs shall be paid by the Company, or the Company shall procure that a member of the Group shall pay such Costs, as and when they arise.  Such Costs include, but are not limited to, the costs of holding the Scheme Meeting, the costs of obtaining the sanction of the Court and the costs of placing the notices (if any) required by this Scheme and the fees of the Advisers participating in the negotiation and preparation of the Financial Restructuring Documents, without establishing any obligation to pay any such costs as an expense or in priority to other creditors (to the extent possible under applicable law).

**9.13    Waiver of the Financial Restructuring Conditions**

Any Financial Restructuring Condition may be waived only with the written consent of (i) the Company and (ii) the consent of the Majority SSN Holders.

**9.14    Modification**

The Company may at any hearing to sanction this Scheme consent on behalf of all Scheme Creditors to any modification of, or addition to, this Scheme or to any terms or conditions that the Court may think fit to approve or impose, and which would not directly or indirectly have a material adverse effect on the interests of any Scheme Creditor, the Security Agent, the PIK Security Agent under this Scheme. However, if such modifications could reasonably be expected directly or indirectly to have a material adverse effect on the interests of a Scheme Creditor, then the Company may not give such consent without the prior written consent of that Scheme Creditor.

28

**9.15    Chapter 15 Filing**

To the extent it has not already done so prior to the Scheme Effective Date, the Company shall file a petition for recognition of this Scheme under Chapter 15 of the U.S. Bankruptcy Code and shall use reasonable endeavours to obtain a Chapter 15 Order, unless:

(a)    and until such order is granted or unconditionally denied by the U.S. Bankruptcy Court; or

(b)    otherwise agreed between the Majority SSN Holders and the Company.

**9.16    Exercise of discretion**

Where, under or pursuant to any provision of this Scheme, a matter is to be determined by the Company, it shall be determined by the Board, in their discretion in such manner as they may consider fair and reasonable.  If any difficulty shall arise in determining any such matter either generally or in any particular case or in ensuring the result described above, it shall be resolved by the Company in such manner as it shall consider to be fair and reasonable and its decision shall, insofar as permitted by law, be final and binding on all concerned.

**9.17    Performance of obligations on dates other than a Business Day**

If any obligation is to be performed under the terms of this Scheme on a date other than a Business Day and is not capable of being performed on such date, the relevant obligation shall be performed on the next Business Day.

**9.18    Notices**

(a)    Any notice or other written communication to be given under or in relation to this Scheme shall be given in the English language in writing and shall be deemed to have been duly given if it is delivered by hand, email (or other electronic means in the case of a Clearing System), Applicable Procedures, posted on the Scheme Website, fax, pre-paid recorded delivery or international courier to the address or email address as set out below (or as may be notified by notice to Scheme Creditors from time to time) or, in relation to any notice to be given to the Scheme Creditors that are SSN Holders only, through the Clearing Systems to the relevant Account Holders, and marked for the attention of the relevant person as agreed between the parties or as specified in an Account Holder Letter.

(b)    The addresses for notices are as follows:

(i)    in the case of the Company, to New Look Financing plc, New Look House, Mercery Road, Weymouth, Dorset DT3 5HJ, United Kingdom, marked for the attention of Richard Collyer and email address: projecttone.lwteam@lw.com;

(ii)    in the case of a Scheme Creditor, to the Information Agent at Lucid Issuer Services Limited, Tankerton Works, 12 Argyle Walk, London WC1H 8HA, United Kingdom, marked for the attention of Victor Parzyjagla / Oliver Slyfield, telephone number +44 20 7704 0880 and email address: newlook@lucid-is.com; and

29

(iii)     in the case of any other person, any address set forth for that person in any agreement entered into in connection with this Scheme.

(c)     Any notice or other written communication to be given under this Scheme shall be deemed to have been served:

(i)     at the time of delivery if delivered personally;

(ii)     at the time of transmission if sent by email;

(iii)     at the time of transmission if sent through the Clearing Systems;

(iv)     two Business Days after the time and date of posting if sent by pre-paid recorded delivery;

(v)     three Business Days after the time and date of posting if sent by international courier; or

(vi)     when the recipient received (or is deemed to receive) the notice or other written communication through access of the Scheme Website.

(d)     The accidental omission to send any notice, written communication or other document in accordance with Clauses 9.18(a) to 9.18(c), or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Scheme.

**9.19     Governing law and jurisdiction**

(a)     Subject to Clause 9.19(b), this Scheme and any non-contractual obligations arising out of or in connection with it shall be governed by, and construed in accordance with, the laws of England and Wales and each of the Scheme Creditors hereby agrees that the Court shall have exclusive jurisdiction to hear and determine any suit, action or Proceeding and to settle any dispute which may arise out of the Explanatory Statement or any provision of this Scheme, or out of any action taken or omitted to be taken under this Scheme or in connection with the administration of this Scheme, and, for such purposes, each of the Scheme Creditors irrevocably submits to the jurisdiction of the Court, provided, however, that nothing in this Clause 9.19 shall:

(i)     affect the validity of other provisions regarding governing law and jurisdiction as between the Company and any of the Scheme Creditors, whether contained in any contract (including any Financial Restructuring Document) or otherwise; or

(ii)     prevent the Company, an additional or replacement trustee appointed in respect of the Trust or any of the beneficiaries of the Trust from relying upon the provisions of this Scheme in any foreign court or in any foreign Proceedings.

(b)     The U.S. Bankruptcy Court shall have exclusive jurisdiction to hear and determine any dispute, suit, action or Proceeding (including any settlement thereof) which may arise out of or in connection with any Chapter 15 Order relating to the Company or its assets located within the territorial jurisdiction of the United States.

**9.20    Delegation**

    (a)    The Company may perform its rights, powers, duties, discretions and/or obligations through such one or more authorised signatories, acting jointly or severally, as it may appoint from time to time.

    (b)    The Company may also delegate its rights, powers, duties, discretions and/or obligations (including the execution and delivery of any document or instrument) to any person it deems appropriate, in its sole discretion.

**9.21    Scheme subject to provisions of mandatory law**

This Scheme shall take effect subject to any prohibition or condition imposed by law.

31

**APPENDIX 2**

**FORM OF NOTICE OF SCHEME MEETING**

EU-DOCS\29867510.8

**24 September 2020**

<div align="center">

**NOTICE OF SCHEME MEETING**

</div>

<div align="right">

**Claim No: 003752 of 2020**

</div>

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMPANIES COURT (ChD)**

<div align="center">

**IN THE MATTER OF NEW LOOK FINANCING PLC**

**(the "Company")**

**- and -**

**IN THE MATTER OF THE COMPANIES ACT 2006**

</div>

NOTICE IS HEREBY GIVEN that, pursuant to an order dated 24 September 2020 made in the above matter (the "**Convening Order**"), the High Court of Justice of England and Wales (the "**Court**") has directed that a meeting of the Company and the creditors specified therein (the "**Scheme Creditors**") shall be convened on or about 16 October 2020 for the purpose of considering and, if thought fit, approving (with or without modification, addition or condition approved or imposed by the Court) the scheme of arrangement proposed in respect of the Company pursuant to Part 26 of the Companies Act 2006 (the "**Scheme**") as set out in Appendix 1 (*The Scheme*) to the statement required to be furnished to Scheme Creditors pursuant to section 897 of the Companies Act 2006 (the "**Explanatory Statement**").

**NOTICE IS HEREBY GIVEN** that such meeting will take place by webinar on 16 October 2020 commencing at 2 p.m. (London time) (the "**Scheme Meeting**"). A capitalised term used in this notice which is not otherwise defined herein shall have the meaning given to it in the Scheme.

1.      The purpose of the Scheme Meeting will be to consider and vote upon the following resolution:

"THAT the Scheme (in its present form or with, or subject to, any modification, addition or condition approved or imposed by the Court) a print out of which has been produced to the Scheme Meeting and, for the purpose of identification only, signed by the Chairperson thereof, be and is hereby approved".

2.      All Scheme Creditors as at 5 p.m., London time on 14 October 2020 (the "**Voting Record Time**") are requested to attend the Scheme Meeting at the time and place above indicated either in person or by proxy.

3.      Scheme Creditors may vote in person at the Scheme Meeting or they may appoint another person, whether a Scheme Creditor or not, as their proxy to attend and vote in their place. Each Scheme Creditor or its proxy will be required to register his/her attendance at the Scheme Meeting prior to its commencement.

4.      A copy of the Scheme and the Explanatory Statement have been circulated to you along with this notice. The form to enable Scheme Creditors to vote in person or by proxy at the Scheme Meeting is enclosed as an appendix to this notice (an "**Account Holder Letter**").

5.      In order to vote on the Scheme and attend at the Scheme Meeting (in person, or by proxy), each Scheme Creditor should immediately contact its Account Holder (through any Intermediaries, if appropriate) to ensure that a valid Account Holder Letter is completed, signed and submitted

in accordance with the procedures described in the Explanatory Statement, to Lucid Issuer Services Limited (as Information Agent) online via the Scheme Website at www.lucid-is.com/newlook or by email in pdf form to newlook@lucid-is.com by 5 p.m. (London time) on 14 October 2020 (the "**Voting Submission Deadline**").

6.  Account Holder Letters received after the Voting Submission Deadline will not constitute valid voting instructions for the purposes of the Scheme Meeting, subject to the discretion of the Chairperson and provided that any such Account Holder Letter is received before the Scheme Meeting is closed.

7.  Scheme Creditors who wish to attend the Scheme Meeting webinar should contact the Information Agent using the contact details set out below. Registration for the Scheme Meeting webinar will commence from 1 p.m. (London time) on 16 October 2020 and will require the following to be produced:

    (a)  a duplicate copy of the Account Holder Letter;

    (b)  evidence of corporate authority (in the case of a corporation) (for example, a valid power of attorney and/or board minutes); and

    (c)  a passport as proof of personal identity (and the passport number must match that on the Account Holder Letter).

8.  Any proxy attending the Scheme Meeting on behalf of an SSN Holder should produce a duplicate copy of the Account Holder Letter in which he or she is named as proxy. Where this copy can be matched against one of the copies provided by the relevant Account Holder to the Information Agent on behalf of the Scheme Company, that SSN Holder's proxy will be admitted to the Scheme Meeting upon providing a passport as proof of personal identity (and the passport number must match that on the SSN Holder's Account Holder Letter under which the SSN Holder appoints such person as its proxy).

9.  Where the Account Holder Letter cannot be produced by the person purporting to have been appointed by an SSN Holder as its proxy, that person will need to provide a passport as proof of personal identity and, provided that the evidenced identity conforms with the details in the relevant copy of the Account Holder Letter provided by the relevant Account Holder to the Information Agent on behalf of the Scheme Company, that person will be admitted to the Scheme Meeting.

10. If an SSN Holder appoints the Chairperson as its proxy, there is no need for the Chairperson to take the Account Holder Letter to the Scheme Meeting.

11. Scheme Creditors will be given the opportunity to consult with each other (including through the use of online break-out rooms) and raise any questions or issues they may have in relation to the Scheme. Scheme Creditors are however encouraged to raise any such questions or issues with Latham & Watkins, using the contact details set out in this notice, as soon as possible, in advance of the Scheme Meeting.

12. The Scheme will be binding on all Scheme Creditors if:

    (a)  at least 75% in value (agreed by the Chairperson in accordance with the value of Scheme Claims) and more than 50% in number of claims of the Scheme Creditors present and voting either in person or by proxy at the Scheme Meeting approve the Scheme;

    (b)  the Court sanctions the Scheme; and

(c)     an office copy of the Court Order sanctioning the Scheme is delivered to the Registrar of Companies.

13.     By the Convening Order, the Court has appointed Richard Collyer of the Company or, failing him, Yen Sum of Latham & Watkins or, failing her, Jessica Walker of Latham & Watkins to act as Chairperson of the meeting referred to above and has directed the Chairperson to report the result of such meeting to the Court.

14.     Following the Scheme Meeting, provided that the requisite majorities of Scheme Creditors vote in favour of the Scheme, the Company intends to apply at the Scheme Sanction Hearing for a Court Order sanctioning the Scheme.

15.     Further details of and documents relating to the Scheme are available to Scheme Creditors on the Scheme Website. Paper copies of the Explanatory Statement and / or the Scheme are also available (free of charge) to Scheme Creditors from the Information Agent, which can be contacted using the contact details set out below.

**Enquiries**

| **THE INFORMATION AGENT** | **LEGAL ADVISERS TO THE GROUP** |
|---|---|
| Lucid Issuer Services Limited | Latham & Watkins |
| Tankerton Works, 12 Argyle Walk, London WC1H 8HA, United Kingdom | 99 Bishopsgate, London, EC2M 3XF, United Kingdom |
| Contact: Victor Parzyjagla / Oliver Slyfield | Contact: Yen Sum, Tristram Gargent, Hugo Bowkett and Bhav Parekh |
| E-mail: newlook@lucid-is.com | E-mail: projecttone.lwteam@lw.com |
| Tel: +44 20 7704 0880 | Tel: +44 20 7710 1000 |

**APPENDIX**

**FORM OF ACCOUNT HOLDER LETTER**

## APPENDIX 3

### FORM OF ACCOUNT HOLDER LETTER

EU-DOCS\29867510.8

# FORM OF ACCOUNT HOLDER LETTER

**IN THE BUSINESS AND PROPERTY**
**COURTS OF ENGLAND AND WALES**
**COMPANIES COURT (ChD)**

**Claim No. 003752**

## ACCOUNT HOLDER LETTER FOR USE BY SSN HOLDERS

## IN THE MATTER OF NEW LOOK FINANCING PLC

- and -

## IN THE MATTER OF THE COMPANIES ACT 2006

SCHEME OF ARRANGEMENT

(*under Part 26 of the Companies Act 2006*)

Between

NEW LOOK FINANCING PLC

and

THE SCHEME CREDITORS

Sterling-denominated 12% Senior Secured PIK Notes due 2024

ISIN XS1984318854 and XS1984318342

Euro-denominated 12% Senior Secured PIK Notes due 2024

ISIN XS1984319159 and XS1984318938

**Custody Instruction Deadline: 5 p.m. (London time) on 13 October 2020**

**Voting Record Time and Voting Submission Deadline: 5 p.m. London time on 14 October 2020**

**Scheme Meeting: 2 p.m. (London time) on 16 October 2020 (to be held by webinar)**

You are advised to act well in advance of the above deadlines in order to make sure all the necessary procedures are completed in advance of the relevant deadline.

A separate Account Holder Letter must be completed by an Account Holder for each SSN Holder.

EU-DOCS\29884165.5

## INSTRUCTIONS FOR THE COMPLETION AND SUBMISSION OF THIS ACCOUNT HOLDER LETTER

This Account Holder Letter is divided into six (6) parts as summarised below. Terms used but not otherwise defined in this Account Holder Letter will have the meanings given to them in the Explanatory Statement.

Before any part of this Account Holder Letter is completed, SSN Holders should read the Scheme and the Explanatory Statement. The Scheme and the Explanatory Statement and all relevant associated documentation can be found at the Scheme Website at www.lucid-is.com/newlook.

**In order for an SSN Holder to vote at the Scheme Meeting and receive Scheme Creditor Entitlements, the validly completed Account Holder Letter together with any accompanying documents or evidence must be submitted to the Information Agent by the Voting Submission Deadline online via www.lucid-is.com/newlook or by email in pdf form to newlook@lucid-is.com.**

"**validly completed**" means, in relation to an Account Holder Letter, an Account Holder Letter which, to the satisfaction of the Information Agent (acting reasonably):

(a)     has had each relevant part and section thereof completed in full;

(b)     gives all required authorisations, confirmations and undertakings in the form requested therein; and

(c)     is executed in Part 2 thereof by the Account Holder.

It is highly recommended that the completed Account Holder Letter is printed or saved as a PDF document after submission. You will receive acknowledgment of the online transmission of your submission together with the final PDF. Original paper copies of the Account Holder Letter are not required and should not be sent to the Information Agent.

**All elections made in this Account Holder Letter shall, subject to verification by the Company and/or the Information Agent, be final and binding on and from the date of submission of the Account Holder Letter to the Information Agent, provided that the Account Holder Letter is received by the Information Agent no later than the Voting Submission Deadline and provided that the Account Holder does not submit another valid Account Holder Letter (with the same or different elections) before the Voting Submission Deadline.**

Notwithstanding any other provision of this Account Holder Letter, any representation, undertaking or confirmation required to be given by an SSN Holder or its Account Holder or Nominated Recipient(s) in this Account Holder Letter may be waived in writing by the Scheme Company and the Information Agent.

The SSN Holder confirms, by submission of this Account Holder Letter, that the Company may at any hearing to sanction the Scheme consent on behalf of all Scheme Creditors to any modification of, or addition to, the Scheme or to any terms or conditions that the Court may think fit to approve or impose, and which would not directly or indirectly have a material adverse effect on the interests of any Scheme Creditor, the Security Agent or the PIK Security Agent under this Scheme. However, if such modifications could reasonably be expected directly or indirectly to have a material adverse effect on the interests of a Scheme Creditor, then the Company may not give such consent without the prior written consent of that Scheme Creditor.

EU-DOCS\29884165.5

You may not need to complete and submit all parts of this Account Holder Letter. However, where any part of this Account Holder Letter is completed, please ensure that all sections comprised within that part are submitted to the Information Agent.

1.      **PART 1: Account Holder and SSN Holder Administrative Information**

This part must be completed in all cases by the Account Holder. If the Account Holder is different to the SSN Holder, the Account Holder shall also specify the name of the SSN Holder on whose behalf this Account Holder Letter is being submitted. If there are multiple SSN Holders, represented by a single Account Holder, a separate Account Holder Letter must be completed by an Account Holder in respect of each SSN Holder.

If the Account Holder and the SSN Holder are the same person or legal entity, any references in this Account Holder Letter to an "Account Holder" and "SSN Holder" shall be treated as interchangeable.

2.      **PART 2: SSN Holder's Scheme Claims**

This part <u>must be completed and signed</u> in all cases by the Account Holder. Where an Account Holder is acting on behalf of an SSN Holder who is its client, then the Account Holder must complete and sign this part on behalf of that SSN Holder. Please sign where indicated.

It should be noted that a Custody Instruction Reference Number in respect of any SSNs that are identified in Part 2 of this Account Holder Letter must be provided by the Account Holder by submitting its Custody Instructions to the relevant Clearing System to block the trading of the SSNs by the Custody Instruction Deadline. Such Custody Instruction Reference Number must be specified in the space provided in Part 2 of this Account Holder Letter.

Failure to include a valid Custody Instruction Reference Number will invalidate this Account Holder Letter and the Voting Submissions contained in this Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting and the relevant SSN Holder will not be entitled to vote at the Scheme Meeting.

3.      **PART 3: Voting Submissions**

This part must be completed by the Account Holder if it (or if different, the SSN Holder who is its client) wishes to vote on the Scheme. In order for the Account Holder (or the SSN Holder, as applicable) to vote on the Scheme, this Account Holder Letter must be validly completed and submitted to the Information Agent by the Voting Submission Deadline.

SSN Holders are reminded that, pursuant to the Lock-Up Agreement, any Scheme Creditor that has acceded to the Lock-Up Agreement has agreed (among other things) to support, implement and consummate the proposed transaction on the terms set out in the Steps Plan and the Term Sheets by voting in favour of the Scheme.

Where an Account Holder (or if different, an SSN Holder, as applicable) or its proxy intends to attend the Scheme Meeting in person, a valid original passport or other original government issued photographic identification will be required as proof of personal identity and the passport or identification details contained therein must match Part 3 of this Account Holder Letter. In addition, where the Account Holder (or the SSN Holder, as applicable) is a corporate person, evidence of the individual proxy's authority to attend the Scheme Meeting on behalf of the Account Holder/the SSN Holder (for example, a valid power of attorney and/or board resolutions) will be required. If appropriate personal identification or evidence of authority is not produced, that person shall only be permitted to attend and vote at the Scheme Meeting at the discretion of the Chairperson of the Scheme Meeting.

Scheme Creditors who wish to attend the Scheme Meeting webinar should contact the Information Agent.

Any proxy attending the Scheme Meeting on behalf of an Account Holder (or if different, an SSN Holder) should produce a duplicate copy of the Account Holder Letter in which he/she is named as proxy.

4. **PART 4: Appointment of a Nominated Recipient**

This part must be completed by an SSN Holder or its Account Holder on its behalf if it intends to appoint a Nominated Recipient(s) to receive any of its Scheme Creditor Entitlements.

5. **PART 5: Instructions for the completion of identification procedures ("CDD Information") in respect of Scheme Consideration Shares**

This part sets out the initial CDD Information required in respect of each SSN Holder or its Nominated Recipient(s) (if appointed) as well as the process for submitting such CDD Information.

If an SSN Holder would like to receive its Scheme Consideration Shares on the Restructuring Effective Date, it must ensure that all relevant CDD Information is provided to Crestbridge in respect of the legal person which will receive the Scheme Consideration Shares (either the SSN Holder or its Nominated Recipient(s) (if appointed)) by the Voting Submission Deadline.

Please note that the relevant CDD Information to be provided to Crestbridge will depend on whether the legal person receiving the Scheme Consideration Shares is a company, an individual, a limited partnership or a trust and accordingly, the relevant forms for each type of legal person are included in Part 5 of this Account Holder Letter.

To the extent that an SSN Holder or its Nominated Recipient is an existing shareholder of the Parent, only section 1 of Part 5 of this Account Holder Letter needs to be completed.

Once the relevant sections are completed, all of Part 5 of this Account Holder Letter must be sent to Crestbridge at the following email address: hawkeye.jsy@crestbridge.com.

For any queries related to the CDD Information that must be provided in Part 5 of this Account Holder Letter the SSN Holders shall contact Crestbridge at hawkeye.jsy@crestbridge.com or +44 1534 835 099

6. **PART 6: Instructions for the completion of identification procedures in respect of the Shareholder Loan:**

This part requires each SSN Holder to confirm that they have submitted the initial GLAS KYC Information required in respect of each SSN Holder or its Nominated Recipient (if appointed) to Global Loan Agency Services Limited in its capacity as agent under the Shareholder Loan Agreement.

For any queries related to the GLAS KYC Information that must be provided pursuant to Part 6 of this Account Holder Letter, the SSN Holders should contact Global Loan Agency Services Limited at lee.morrell@glas.agency (copy: tmg@glas.agency) or +44 203 764 9321. Please entitle any email correspondence "Project Tone (TRN00001324) – KYC Request".

EU-DOCS\29884165.5

**FOR ASSISTANCE, CONTACT THE INFORMATION AGENT:**

Lucid Issuer Services Limited
Tankerton Works
12 Argyle Walk
London WC1H 8HA

United Kingdom

Attention: Victor Parzyjagla / Oliver Slyfield

Phone: +44 20 7704 0880

E-mail: newlook@lucid-is.com

EU-DOCS\29884165.5

# PART 1

## ACCOUNT HOLDER ADMINISTRATIVE DETAILS

Full name of Account Holder:

……………………………………………………………………………………………………

Is the Account Holder a member of Euroclear or Clearstream:

……………………………………………………………………………………………………

Account Number of Account Holder or Participant at Clearing System:

……………………………………………………………………………………………………

Telephone number (with country code):

……………………………………………………………………………………………………

Email address:

……………………………………………………………………………………………………

Principal contact person:

……………………………………………………………………………………………………

## SSN HOLDER ADMINISTRATIVE DETAILS (IF DIFFERENT TO THE ABOVE)

*These are the details of the beneficial owner of the SSN*

Name of SSN Holder:

……………………………………………………………………………………………………

Registered or principal address:

……………………………………………………………………………………………………

Place of incorporation / residence:

……………………………………………………………………………………………………

Company number or equivalent (if any):

……………………………………………………………………………………………………

Telephone number (with country code):

……………………………………………………………………………………………………

Email address:

……………………………………………………………………………………………………

Principal contact person:

……………………………………………………………………………………………………

EU-DOCS\29884165.5

**PART 2**

**SSN HOLDER'S SCHEME CLAIMS**

The Account Holder, for itself or on behalf of the relevant SSN Holder named in Part 1 of this Account Holder Letter (as applicable), holds the following SSNs, which have been "blocked" by delivery of a Custody Instruction to the relevant Clearing System, the Custody Instruction Reference Number of which is identified below.

| ISIN | Amount blocked at Clearing System | Clearing System | Clearing System Account number | Custody Instruction Reference Number |
|------|-----------------------------------|-----------------|--------------------------------|--------------------------------------|
| XS1984318342 | | | | |
| XS1984318854 | | | | |
| XS1984318938 | | | | |
| XS1984319159 | | | | |

| | |
|---|---|
| Account Holder's authorised employee / representative name | _____ |
| Executed by authorised employee / representative for and on behalf of Account Holder | _____ |
| Date | _____ |

EU-DOCS\29884165.5

## PART 3

## VOTING SUBMISSIONS

A.      Attendance at the Scheme Meeting (*tick only ONE of the boxes below*)

The Account Holder (or if different, the SSN Holder identified in Part 1 of this Account Holder Letter) wishes to:

☐      appoint the Chairperson of the Scheme Meeting as its proxy to attend and vote on its behalf at the Scheme Meeting

☐      appoint the following individual (being a person other than the Chairperson of the Scheme Meeting) as its proxy to attend and vote on its behalf at the Scheme Meeting

Name: _____

Passport Country and number / identification number:

_____

☐      attend and vote at the Scheme Meeting in person

Name: _____

Passport Country and number / identification number:

_____

B.      Indication of overall voting intention (*tick only ONE of the boxes below*)

The Account Holder (or if different, the SSN Holder identified in Part 1 of this Account Holder Letter) wishes to vote (or to instruct its proxy to vote) at the Scheme Meeting as follows:

☐      **FOR the Scheme**

☐      **AGAINST the Scheme**

EU-DOCS\29884165.5

## PART 4

## APPOINTMENT OF NOMINATED RECIPIENT(S)

If you would like to appoint a Nominated Recipient to receive the Shareholder Loan and/or the Scheme Consideration Shares, please complete the following details in respect of the Nominated Recipient(s).

**Note: a maximum of two Nominated Recipients can be appointed – one in respect of the Shareholder Loan and one in respect of the Scheme Consideration Shares.**

1.      **Shareholder Loan**

Name of Nominated Recipient

_____

Email address of Nominated Recipient

_____

Registered address of Nominated Recipient

_____

Contact telephone number (with country code) of Nominated Recipient

_____

2.      **Scheme Consideration Shares**

Name of Nominated Recipient

_____

Email address of Nominated Recipient

_____

Registered address of Nominated Recipient

_____

Contact telephone number (with country code) of Nominated Recipient

EU-DOCS\29884165.5

## PART 5

### CDD INFORMATION

### N.B. LUCID CANNOT ASSIST WITH ANY QUERIES ON CDD INFORMATION

1.      This Part 5 is split into five sections, to be completed depending on the type of entity through which the SSN Holder or Nominated Recipient will hold the Scheme Consideration Shares.

- Section 1 – to be completed where the SSN Holder or Nominated Recipient **is an existing shareholder of the Parent**;

- Section 2 – to be completed where the SSN Holder or Nominated Recipient is a company (and is not an existing shareholder of the Parent);

- Section 3 – to be completed where the SSN Holder or Nominated Recipient is an individual (and is not an existing shareholder of the Parent);

- Section 4 – to be completed where the SSN Holder or Nominated Recipient is a limited partnership (and is not an existing shareholder of the Parent); and

- Section 5 – to be completed where the SSN Holder or Nominated Recipient is a trust (and is not an existing shareholder of the Parent).

2.      Each SSN Holder or its Nominated Recipient (if appointed) that would like to receive its Scheme Consideration Shares on the Restructuring Effective Date must ensure that the relevant application form set out in Section 1 – Section 5 of this Part 5 has been filled in and returned to Crestbridge by the Voting Submission Deadline.

3.      **Please note that if the SSN Holder's or its Nominated Recipient's interest in the Parent will equate to 10% or more of the entire issued share capital of the Parent, additional CDD Information will be required from that SSN Holder or Nominated Recipient, its directors and UBOs/Controllers.**

4.      If the SSN Holder or its Nominated Recipient is concerned that its shareholding in the Parent may equate to 10% or more of the Parent's entire issued share capital, it should contact Crestbridge as soon as possible for further guidance.

5.      **If you have any questions, please contact Crestbridge on the following contact details:**

Email: hawkeye.jsy@crestbridge.com

Telephone: +44 1534 835 099

EU-DOCS\29884165.5

### New Look Retail Holdings Limited
### Section 1
### To be completed where the SSN Holder or its Nominated Recipient (if appointed) is an existing shareholder of the Parent

## 1. Existing shareholder information

The SSN Holder or Nominated Recipient (if appointed) that will receive shares in New Look Retail Holdings Limited (the "**Parent**") is required to complete the following application form. This form is designed to collect the information required under anti-money laundering ("**AML**") legislation in Jersey. As well as collecting information on the subscribing entity itself, the Parent will also need information on the direct owners, directors or other controllers and potentially the ultimate beneficial owners of the subscribing entity (the "**Investor**").

The Parent is required to comply with Jersey AML regulations. This requires the Parent to identify its Investors and certain parties/individuals associated with the Investor.

## 1.1 Shareholder details

**Name of existing shareholder:**

**Former names (if applicable):**

## 1.2 Confirmation of address

**Are the address details previously provided to Crestbridge still accurate?**

Yes     ☐

No      ☐     Complete section 1.3 of the form.

## 1.3 New address

**Registered office / permanent address:**

**Principal place of business/operations or mailing address (if different to the above):**

EU-
DOCS\29884165.5

**New Look Retail Holdings Limited**
**Section 1**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is an existing shareholder of the Parent**

| Declaration and signature |
|---|

I declare that the information provided on this form is, to the best of my knowledge and belief, accurate and complete.

I further certify that:

- I am officially authorised to sign for the company to which this form relates.

- Where legally required to do so, I hereby consent to New Look Retail Holdings Limited sharing this information with Crestbridge[(2)] and the relevant authorities.

- The company, its beneficial owners, directors, controllers and third parties for whom the company is acting have no direct/indirect connection to Iran and/or North Korea.

Print name _____         Signature _____

Date _____

Capacity _____

**Notes**

(1)    **Contact Details**
If you have any questions on the application form or documents to be provided, please do not hesitate to contact Crestbridge:

**Email:**              hawkeye.jsy@crestbridge.com
**Telephone:**     +44 1534 835099

(2)    **Crestbridge**

EU-DOCS\29884165.5

**New Look Retail Holdings Limited**

**Section 1**

**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is an existing shareholder of the Parent**

The term Crestbridge includes the Jersey Crestbridge Limited affiliation, Crestbridge Management ICC and any incorporated cells from time to time, Crestbridge Management Company S.A., Crestbridge S.A., Crestbridge Cayman Limited, Crestbridge Bahrain B.S.C.(c), Crestbridge UK Limited, Crestbridge Property Partnerships Limited and Crestbridge Operator Services Limited.

EU-DOCS\29884165.5

**New Look Retail Holdings Limited**
**Section 2**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a company (and is not an existing shareholder of the Parent)**

## 1. Company information

The SSN Holder or Nominated Recipient (if appointed) that will receive shares in New Look Retail Holdings Limited (the "**Parent**") is required to complete the following application form. This form is designed to collect the information required under anti-money laundering ("**AML**") legislation in Jersey. As well as collecting information on the subscribing entity itself, the Parent will also need information on the direct owners, directors or other controllers and potentially the ultimate beneficial owners of the subscribing entity (the "**Investor**").

The Parent is required to comply with Jersey AML regulations. This requires the Parent to identify its Investors and certain parties/individuals associated with the Investor.

## 1.1 Company details

**Name of company:**

**Trading names (if applicable):**

**Former names (if applicable):**

**Registered office address:**

**Principal place of business/operations or mailing address (if different):**

**Email address:**

**Country of incorporation:**

**Date of incorporation:**

**Official identification numbers:**

**Name of regulator (if applicable):**

**Name of stock exchange (if applicable):**

14

**New Look Retail Holdings Limited**
**Section 2**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a company (and is not an existing shareholder of the Parent)**

**1.2 Source of wealth and Investor background**

Please provide details of the activities that have generated the company's total net worth including the period over which the wealth was generated and the geographical sphere of such activities, including the net worth of the UBOs.

EU-
DOCS\29884165.5

### New Look Retail Holdings Limited
### Section 2
### To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a company (and is not an existing shareholder of the Parent)

| 2. Directors |
|---|

The Parent is required to identify the directors of the Investor. If all of the below required information is included on the company's register of directors, please provide a copy of the current register.

Alternatively, please complete the following for **ALL** of the Directors of the Investor:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EU-DOCS\29884165.5

**New Look Retail Holdings Limited**
**Section 2**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a company (and is not an existing shareholder of the Parent)**

## 3. Ownership and control

Please provide a structure chart showing the relationship from the investor through to the UBOs (if any).

The Parent is required to identify the ultimate beneficial owner(s) ("**UBO(s)**") of the SSN Holder or its Nominated Recipient.

**Are any of the direct owners or UBO(s) of the Investor regulated or listed?**

Yes          ☐          Please complete section 3.1 or 3.2 and contact Crestbridge[2] at hawkeye.jsy@crestbridge.com for guidance on the requirements for that direct owner or UBO.

No           ☐          Complete section 3.3 of the form.

## 3.1 Listed companies

**Name of listed company:**

**Stock Exchange:**

**Ticker no:**

## 3.2 Regulated companies

**Name of regulated company:**

**Name of regulator:**

**Regulated entity no:**

**Regulated activities:**

## 3.3 UBOs and controllers

A person is considered a UBO if they hold 25% or more of the shares in the Investor. The UBO must be an **individual person.** If the Investor company is widely held and there are no individual persons identified as UBOs, The Parent must identify any "controllers" of the SSN Holder or its Nominated Recipient.

"Controllers" are those **individual persons**, other than directors, who can control the company (i.e. through shareholders' agreements, the power to appoint senior management, or through holding convertible stock or any outstanding debt that is convertible into voting rights or through personal connections, by participating in financing, because of close and intimate family relationships, historical or contractual associations or as a result of default on certain payments).

17

**New Look Retail Holdings Limited**
**Section 2**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a company (and is not an existing shareholder of the Parent)**

The UBOs or Controllers of the Investor have been identified and their details included in the table below ☐

I/we confirm that there are no UBOs or other controllers of the Investor other than the directors detailed in section 2 ☐

Please complete the following for **ALL** UBOs or Controllers of the SSN Holder or its Nominated Recipient:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EU-DOCS\29884165.5

**New Look Retail Holdings Limited**
**Section 2**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a company (and is not an existing shareholder of the Parent)**

<div style="background-color: orange">**Declaration and signature**</div>

I declare that the information provided on this form is, to the best of my knowledge and belief, accurate and complete.

I further certify that:

-    I am officially authorised to sign for the company to which this form relates.

-    Where legally required to do so, I hereby consent to New Look Retail Holdings Limited sharing this information with Crestbridge[2] and the relevant authorities

-    The company, its beneficial owners, directors, controllers and third parties for whom the company is acting have no direct/indirect connection to Iran and/or North Korea.

_____          _____
Print name                                                    Signature

_____
Date

_____
Capacity

_____

**Notes**

**(3)    Contact Details**
If you have any questions on the application form or documents to be provided, please do not hesitate to contact Crestbridge:

**Email:**              hawkeye.jsy@crestbridge.com
**Telephone:**    +44 1534 835099

**(4)    Crestbridge**
The term Crestbridge includes the Jersey Crestbridge Limited affiliation, Crestbridge Management ICC and any incorporated cells from time to time, Crestbridge Management Company S.A., Crestbridge S.A., Crestbridge Cayman Limited, Crestbridge Bahrain B.S.C.(c), Crestbridge UK Limited, Crestbridge Property Partnerships Limited and Crestbridge Operator Services Limited.

EU-
DOCS\29884165.5

**New Look Retail Holdings Limited**
**Section 3**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is an individual (and is not an existing shareholder of the Parent)**

## 1. Individual information

The SSN Holder or Nominated Recipient (if appointed) that will receive shares in New Look Retail Holdings Limited (the "**Parent**") is required to complete this application form. This form is designed to collect the information required under AML legislation in Jersey.

The Parent is required to comply with Jersey anti-money laundering ("**AML**") regulations. This requires the Parent to identify its investors/subscribers (the "**Investor**") and certain parties/individuals associated with the investor.

### 1.1 Individual details

**Name (include any former or maiden names):**

**Permanent resident address:**

**Email address:**

**Mailing address (if different):**

**Place of birth (city and country):**

**Nationality:**

**Date of birth (DD/MM/YYYY):**

### 1.2 Source of wealth and Investor background

Please provide details of the activities that have generated your total net worth including the period over which the wealth was generated and the geographical sphere of such activities. Please provide details regarding your background, including an overview of your employment history.

**New Look Retail Holdings Limited**
**Section 3**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is an individual (and is not an existing shareholder of the Parent)**

| Declaration and signature |
|---|

I declare that the information provided on this form is, to the best of my knowledge and belief, accurate and complete.

I further certify that:

- Where legally required to do so, I hereby consent to New Look Retail Holdings Limited sharing this information with Crestbridge[(2)] and  the relevant authorities

- I am the individual / I am officially authorised to sign for that individual *(delete as appropriate)* to which this form relates

- I have / the individual to which this form relates has *(delete as appropriate)* no direct/indirect connection(s) to Iran or North Korea.


_____                    _____
Print name                                          Signature


_____
Date


_____
Capacity


**Notes**

**(1)   Contact Details**
If you have any questions on the application form or documents to be provided, please do not hesitate to contact Crestbridge:

**Email:**            hawkeye.jsy@crestbridge.com
**Telephone:**     +44 1534 835099


**(2)   Crestbridge**
The term Crestbridge includes the Jersey Crestbridge Limited affiliation, Crestbridge Management ICC and any incorporated cells from time to time, Crestbridge Management Company S.A., Crestbridge S.A., Crestbridge Cayman Limited, Crestbridge Bahrain B.S.C.(c), Crestbridge UK Limited, Crestbridge Property Partnerships Limited and Crestbridge Operator Services Limited.

**New Look Retail Holdings Limited**
**Section 4**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a
Limited Partnership (and is not an existing shareholder of the Parent)**

## 1. Company information

The SSN Holder or Nominated Recipient (if appointed) that will receive shares in New Look Retail Holdings Limited (the "**Parent**") is required to complete an application form. This form is designed to collect the information required under anti-money laundering ("**AML**") legislation in Jersey. As well as collecting information on the subscribing entity itself, the Parent will also need information on the direct owners, directors or other controllers and potentially the ultimate beneficial owners of the subscribing entity (the "**Investor**").

The Parent is required to comply with Jersey AML regulations. This requires the Parent to identify its Investors and certain parties/individuals associated with the Investor.

## 1.1 Limited Partnership details

**Name of Limited Partnership:**

**Trading names (if applicable):**

**Former names (if applicable):**

**Registered office address:**

**Principal place of business/operations or mailing address (if different):**

**Email address:**

**Country of establishment:**

**Date of establishment:**

**Official identification numbers:**

**Name of regulator (if applicable):**

**Name of stock exchange (if applicable):**

**New Look Retail Holdings Limited**
**Section 4**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a Limited Partnership (and is not an existing shareholder of the Parent)**

| 1.2 General Partner details |
|---|

**Name of Limited Partnership's General Partner:**

**Trading names (if applicable):**

**Former names (if applicable):**

**Registered office address:**

**Principal place of business/operations or mailing address (if different):**

**Country of establishment:**

**Date of establishment:**

**Official identification numbers:**

**Name of regulator (if applicable):**

**Name of stock exchange (if applicable):**

**New Look Retail Holdings Limited**
**Section 4**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a Limited Partnership (and is not an existing shareholder of the Parent)**

**1.2 Source of wealth and Investor background**

Please provide details of the activities that have generated the Limited Partnership's total net worth including the period over which the wealth was generated and the geographical sphere of such activities, including the net worth of the UBOs.

**New Look Retail Holdings Limited**
**Section 4**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a Limited Partnership (and is not an existing shareholder of the Parent)**

| 2. Directors |
| --- |

The Parent is required to identify the directors of the General Partner ("**GP**") (if it is a company). Please complete the following for **ALL** of the Directors of the GP or if all of the below required information is included on the GP's register of directors, please provide a copy of the current register:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**New Look Retail Holdings Limited**
**Section 4**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a Limited Partnership (and is not an existing shareholder of the Parent)**

| 3. Ownership and Control |
| --- |

The Parent is required to identify the ultimate beneficial owner(s) ("**UBO(s)**") of the SSN Holder or its Nominated Recipient.

A person is considered a UBO if they hold 25% or more of the shares in the Investor. The UBO must be an **individual person.** If the Investor is widely held and there are no individual persons identified as UBOs, the Parent must identify any "controllers" of the SSN Holder or its Nominated Recipient.

"Controllers" are those **individual persons**, other than directors, who can control the company (i.e. through shareholders' agreements, the power to appoint senior management, or through holding convertible stock or any outstanding debt that is convertible into voting rights or through personal connections, by participating in financing, because of close and intimate family relationships, historical or contractual associations or as a result of default on certain payments).

The UBOs or Controllers of the Investor have been identified and their details included in the table below    ☐

I/we confirm that there are no UBOs or other controllers of the Investor other than the directors detailed in section 2    ☐

If any of the UBO(s) or Controller(s) you identify is a company, please complete the AML Form for Companies in Section 1. However, if such corporate entity is also **regulated** or **listed** - please contact Crestbridge[2] at hawkeye.jsy@crestbridge.com for guidance on the requirements.

If any of the UBO(s) or Controller(s) is an **individual person** please complete the following for **ALL** such parties:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
| --- | --- | --- | --- | --- |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**New Look Retail Holdings Limited**
**Section 4**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a Limited Partnership (and is not an existing shareholder of the Parent)**

| Declaration and signature |
|---|

I declare that the information provided on this form is, to the best of my knowledge and belief, accurate and complete.

I further certify that:

- I am officially authorised to sign for the Limited Partnership to which this form relates.

- Where legally required to do so, I hereby consent to New Look Retail Holdings Limited sharing this information with Crestbridge[2] and the relevant authorities.

- The Limited Partnership, its beneficial owners, controllers and third parties for whom the Limited Partnership is acting have no direct/indirect connection to Iran and/or North Korea.


_____          _____
Print name                                                        Signature


_____
Date


_____
Capacity

---

**Notes**

**(1)    Contact Details**
If you have any questions on the application form or documents to be provided, please do not hesitate to contact Crestbridge:

**Email:**          hawkeye.jsy@crestbridge.com
**Telephone:**    +44 1534 835099


**(2)    Crestbridge**
The term Crestbridge includes the Jersey Crestbridge Limited affiliation, Crestbridge Management ICC and any incorporated cells from time to time, Crestbridge Management Company S.A., Crestbridge S.A., Crestbridge Cayman Limited, Crestbridge Bahrain B.S.C.(c), Crestbridge UK Limited, Crestbridge Property Partnerships Limited and Crestbridge Operator Services Limited.

**New Look Retail Holdings Limited**
**Section 5**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a Trust (and is not an existing shareholder of the Parent)**

| 1. Trust information |
| --- |

The SSN Holder or Nominated Recipient (if appointed) that will receive shares in New Look Retail Holdings Limited (the "**Parent**") is required to complete an application form. This form is designed to collect the information required under anti-money laundering ("**AML**") legislation in Jersey. As well as collecting information on the subscribing entity itself, the Parent will also need information on the direct owners, directors or other controllers and potentially the ultimate beneficial owners of the subscribing entity (the "**Investor**").

The Parent is required to comply with Jersey AML regulations. This requires the Parent to identify its Investors and certain parties/individuals associated with the Investor.

| 1.1 Trust details |
| --- |

**Name of trust:**

**Date of establishment:**

**Official identification number (if applicable):**

**Name of trustee:**

**Address of trustee:**

**Mailing address (if different):**

**Email address of trustee:**

**Regulator of trustee (if applicable):**

**Jurisdiction of trust:**

**Type of trust:**
- ☐ Discretionary
- ☐ Life interest
- ☐ Charitable
- ☐ Other

If other, please provide further details below

_____

_____

**New Look Retail Holdings Limited**
**Section 5**
**To be completed where the SSN Holder or its Nominated Recipient (if appointed) is a Trust (and is not an existing shareholder of the Parent)**

## 1.2 Source of wealth and Investor background

Please provide details of the activities that have generated the trust's total net assets (including the source of wealth of the settlor) including the period over which the wealth was generated and the geographical sphere of such activities.

## 2. Key Parties associated with the trust

**Name of initial settlor:**

**Address of settlor:**

**Mailing address (if different):**

**If there have been any additional settlors, please provide the name(s) of any subsequent settlors**

**Address of subsequent settlor:**

**Name of protector (if applicable):**

**Address of protector:**

**Name(s) and addresses of any beneficiaries with a vested right:**

## 3. Ownership and Control

The Parent is required to identify the ultimate beneficial owner(s) ("**UBO(s)**") and controllers of the Investor.

If any of the **Trustee**, **Settlor(s)**, **Protector(s)** of the Trust or **Beneficiaries** with a vested interest in the Trust (the "**Key Parties**") is a company, please complete the AML Form for Companies in Section 1. However, if such corporate entity is also **regulated** or **listed** - please contact Crestbridge[(2)] at hawkeye.jsy@crestbridge.com for guidance on the requirements.

If any of the **Key Parties** (as defined above) is an **individual person** please complete the following for all such Key Parties:

| Name (include any former names) and relationship to Investor | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

EU-DOCS\29884165.5

## Declaration and signature

I declare that the information provided on this form is, to the best of my knowledge and belief, accurate and complete.

I further certify that:

- I am officially authorised to sign for the trust to which this form relates.

- Where legally required to do so, I hereby consent to New Look Retail Holdings Limited sharing this information with Crestbridge[2] and the relevant authorities.

- The trust, its trustee(s), settlor(s), beneficiary/(ies) or protector(s) have no direct/indirect connection to Iran and/or North Korea.


_____        _____

Print name                              Signature


_____

Date


_____

Capacity


## Notes

**(1)  Contact Details**

If you have any questions on the application form or documents to be provided, please do not hesitate to contact Crestbridge:

**Email:** hawkeye.jsy@crestbridge.com
**Telephone:** +44 1534 835099

**(2)  Crestbridge**

The term Crestbridge includes the Jersey Crestbridge Limited affiliation, Crestbridge Management ICC and any incorporated cells from time to time, Crestbridge Management Company S.A., Crestbridge S.A., Crestbridge Cayman Limited, Crestbridge Bahrain B.S.C.(c), Crestbridge UK Limited, Crestbridge Property Partnerships Limited and Crestbridge Operator Services Limited.

31

## PART 6

## GLAS KYC INFORMATION

### N.B. LUCID CANNOT ASSIST WITH ANY GLAS KYC INFORMATION QUERIES

**KYC information provided should be in respect of the SSN Holder or, if it appoints a Nominated Recipient, such Nominated Recipient only.**

1.1    **Evidence of Company Registration and Registered Address** – one of the following:

a. Certificate of Incorporation (or equivalent) including any subsequent name change documents.

b. Extract from Registrar of Companies / Local Chamber of Commerce.

1.2    **For Funds only –** please provide their:

Proof of sponsorship e.g. Investment / Collateral / Portfolio Management Agreement or a letter from the fund Manager. If the sponsor is not a regulated entity, then the items below are also required.

1.3    **List of Directors** – one of the following:

a. Certified list of Directors.

b. Extract from Registrar of Companies / Local Chamber of Commerce (or equivalent).

1.4    **List of Shareholders** – one of the following:

Provided documentation should include the full names and countries of registration of all entities and individuals present in the upward Group structure, identifying 100% ownership at every level.

a. Certified Structure chart dated within last 3 months.

b. Shareholders register appropriately certified within 3 months.

1.5    **For all individuals who are direct / indirect UBOs of 25% or more** - please provide their:

a. Photo identification - e.g. full valid passport, national identity card or current photocard driving license certified within the last 3 months, and

b. Address identification - e.g. utility bill (excluding mobile phone bills) or bank statements.

If the top company is not owned by a 25% controller, please provide a letter from a director or authorised person confirming this.

**Please note that, subject to Global Loan Agency Services Limited's review of the above documentation, additional information may be required to satisfy Global Loan Agency Services Limited's  internal AML policy.**

For any queries related to this GLAS KYC Information, SSN Holders should contact Global Loan Agency Services Limited at lee.morrell@glas.agency (copy: tmg@glas.agency) or +44 203 764 9321.

Please entitle any email correspondence "Project Tone (TRN00001324) – KYC Request".

EU-DOCS\29884165.5

**APPENDIX 4**

**EQUITY AND NEW MONEY TERM SHEET**

EU-DOCS\29867510.8

**STRICTLY PRIVATE & CONFIDENTIAL**

# EQUITY AND NEW MONEY TERM SHEET

## LATHAM&WATKINS

99 Bishopsgate
London EC2M 3XF
United Kingdom
Tel: +44.20.7710.1000
www.lw.com

EU-DOCS\28960059.30

# PART 1

# EQUITY TERM SHEET

| 1. | **INTRODUCTION** | |
|---|---|---|
| 1.1 | **Equity Issuance:** | This term sheet sets out a summary of the key terms on which: |
| | | (a) the holders of the €45,209,687 12% Senior Secured PIK Notes due 2024 and the £400,131,636 12% Senior Secured PIK Notes due 2024 (together the "**SSNs**") issued by New Look Financing plc (the "**SSN Holders**"); and |
| | | (b) the lenders under the New Money Loan (as defined in the Lock-up Agreement) (the "**New Money Lenders**"), |
| | | shall be issued with shares in the Company (the "**Equity Issuance**"). |
| | | The SSN Holders shall be referred to herein as the "**Equitized Holders**". |
| | | The SSN Holders and the New Money Lenders shall be referred to herein as the "**Investors**". |
| | | The "**Closing Date**" means the date on which the Equity Issuance completes. |
| 1.2 | **Company:** | A no par value share Jersey company or where appropriate, the holding company of the group as at the relevant date (the "**Company**")[1]. |
| 1.3 | **Group:** | The Company and its subsidiaries and "**Group Company**" shall be interpreted accordingly. |
| 1.4 | **Governing Documents:** | The terms of the Investors' investment in the Company will be governed by: |
| | | (a) a shareholders' agreement in relation to the Group to be executed by the New Money Lenders[2], and the Company (the "**Shareholders' Agreement**") which shall governed by the laws of England and Wales; and |

---

[1] **Note**: In the event that the Financial Restructuring is implemented in accordance with Plan A (as defined in the Steps Plan), the Company for the purposes of this Term Sheet shall be New Look Retail Holdings Limited and the existing ordinary class A shares of the Company shall be redeemed in accordance with the Steps Plan and the terms set out in this Term Sheet shall be replicated within the existing Group.

[2] **Note**: In the event that the Financial Restructuring is implemented in accordance with Plan A (as defined in the Steps Plan), the Equitised Holders will also enter into the Shareholders' Agreement.

| | | | |
|---|---|---|---|
| | | (b) | articles of association of the Company (the "**Articles of Association**") which shall be governed by the laws of Jersey. |
| **2.** | **CAPITAL STRUCTURE** | | |
| **2.1** | **Share Classes and Share Rights:** | The Company's share capital structure shall be comprised of: |
| | | (a) | A ordinary shares (the "**A Ordinary Shares**"); |
| | | (b) | B ordinary shares (the "**B Ordinary Shares**"); |
| | | (c) | C ordinary shares (the "**C Ordinary Shares**"); and |
| | | (d) | D ordinary shares ("**D Ordinary Shares**"), |
| | | in the case of (b), (c), (d) and (e) (the "**Ordinary Shares**"), in the case of (d) and (e) (the "**MIP Shares**") and in each case of (a), (b), (c), (d) and (e) subject to confirmation from a tax and structuring perspective. |
| | | **A Ordinary Shares** |
| | | The A Ordinary Shares will be issued to New Money Lenders. On a return of capital or an Exit the A Ordinary Shares shall rank *pari passu* with the B Ordinary Shares and the MIP Shares, subject in respect of the D Ordinary Shares to the Threshold being achieved. The A Ordinary Shares shall represent 80% of the total issued ordinary share capital of the Company as at the Closing Date. The proportion of A Ordinary Shares to be issued to each applicable New Money Lender shall be calculated pro rata to their commitment under the New Money Loan at a time calculated immediately prior to the Closing Date (or at any other time set as per the relevant implementation plan in the Lock-up Agreement). |
| | | The A Ordinary Shares shall have a right (i) to dividends, distributions and profits on a winding up of the Company provided that no dividend or distribution shall be paid or made until such time as (a) the Shareholder Loan (as defined in the Lock-up Agreement) has been repaid; and (b) the New Money Loan (including Incremental Facilities) has been repaid; and (ii) to one vote per A Ordinary Share. The A Ordinary Shares shall be non-redeemable. |
| | | **B Ordinary Shares** |
| | | The B Ordinary Shares will be issued to the Equitized Holders. On a return of capital or an Exit the B Ordinary Shares shall rank *pari passu* with the A Ordinary Shares and the MIP Shares, subject in respect of the D Ordinary Shares to the Threshold being achieved. The B Ordinary Shares shall represent 20% of the total issued ordinary share capital of the Company as at the Closing Date. The proportion of B Ordinary Shares to be held by an Equitized Holder shall be calculated pro rata to their existing proportion of the aggregate principal amount of the SSNs immediately prior to the Closing Date (or at a time set as per the relevant implementation plan in the Lock-up Agreement). |
| | | The B Ordinary shares have a right to dividends, distributions and profits on a winding up of the Company provided that no dividend |

EU-DOCS\28960059.30

| | | |
|---|---|---|
| | | or distribution shall be paid or made until such time as (a) the Shareholder Loan has been repaid; and (b) the New Money Loan (including Incremental Facilities) has been repaid. The B Ordinary Shares shall not be entitled to vote or receive notice of a resolution that requires the approval of the shareholders. The B Ordinary Shares shall be non-redeemable. |
| | | **MIP Shares** |
| | | The MIP Shares are described in further detail in section 2.2 below. |
| | | Each Investor shall have the right to nominate any of its affiliates and/or related funds, branches or controlled co-investment vehicles ("**Investor Group**") to receive any A Ordinary Shares or B Ordinary Shares on its behalf. Those persons who hold more than 50% of the A Ordinary Shares for the time being in issue are referred to as (the "**Investor Majority**"). |
| 2.2 | **Management Incentive Plan ("MIP") and MIP Shares:** | The Remuneration Committee in consultation with the Board shall approve the formation of a MIP constituted by the MIP Shares (to be available to both executive directors, non-executive directors and employees of the Group). |
| | | **C Ordinary Shares** |
| | | On a return or capital or an Exit the C Ordinary shares shall rank *pari passu* with the A Ordinary Shares, B Ordinary Shares and, subject to the Threshold being achieved, the D Ordinary Shares. The C Ordinary Shares shall represent 5% of the total issued ordinary share capital of the Company on a fully diluted basis following the issue of shares on the Closing Date and on any Incremental Facility being entered into. The issue of the C Ordinary Shares shall dilute the A Ordinary Shares and B Ordinary Shares pro rata to their respective shareholdings. |
| | | The C Ordinary Shares shall have a right to dividends, distributions and profits on a winding up of the Company provided that no dividend or distribution shall be paid or made until such time as (a) the Shareholder Loan has been repaid; and (b) the New Money Loan (including Incremental Facilities) has been repaid. The C Ordinary Shares shall not be entitled to vote or receive notice of a resolution that requires the approval of the shareholders. The C Ordinary Shares shall be non-redeemable. |
| | | **D Ordinary Shares** |
| | | Provided the holders of the A Ordinary Shares, B Ordinary Shares and C Ordinary Shares have realized an aggregate amount equal to £300,000,000 ("**Threshold**") of cash proceeds (including any proceeds from an Exit) in respect of their A Ordinary Shares, B Ordinary Shares and C Ordinary Shares on or before the date of an Exit, on a return of capital or an Exit the D Ordinary Shares shall rank *pari passu* with the A Ordinary Shares, B Ordinary Shares and C Ordinary Shares. Subject to the Threshold being achieved, on an Exit, return of capital or distribution of profits on a winding up the D Ordinary Shares shall be entitled to 2% of the equity value in excess of the Threshold, and such entitlement of the D Ordinary Shares shall dilute the entitlement of the A Ordinary |

EU-DOCS\28960059.30

Shares and B Ordinary Shares pro rata to their respective shareholdings.

Except as provided for in the preceding paragraph, the D Ordinary Shares shall have no right to dividends. The D Ordinary Shares shall not be entitled to vote or receive notice of a resolution that requires the approval of the shareholders. The D Ordinary Shares shall be non-redeemable.

The Threshold shall increase as a result of any issuances (including an Incremental Issue) of equity securities to the Investors. The Threshold shall reduce as a result of any dividends, distributions, buybacks or redemptions to the Investors occurring prior to the date of an Exit.

Allocations of the MIP Shares are to be agreed following the Closing Date.

| 2.3 | Incremental Share Issue: | If the holders of the A Ordinary Shares participate ("**Incremental Participants**") in the funding of new debt commitments pursuant to the Incremental Facilities for the Group following the Closing Date, the Incremental Participants shall be issued with A Ordinary Shares ("**Incremental Issue**") in the same proportions of the Incremental Issue as represents the proportion of A Ordinary Shares issued to them in relation to the Equity Issuance undertaken as at the Closing Date. |
|---|---|---|
| 2.4 | Pre-emptive Rights on Issue of Further Shares: | If following the Closing Date there is a proposal to issue any equity or debt securities or any debt in any Group Company (other than to another Group Company), each holder of A Ordinary Shares, B Ordinary Shares and C Ordinary Shares shall be given an opportunity to subscribe, at the same time and on the same terms, for such percentage of the securities or debt to be issued as equates to its pro rata share of the total number of ordinary shares of the Company (excluding the D Ordinary Shares) that are in issue, save where an issue of securities is: |

      (a)    required in accordance with an emergency fundraising and such other Investors are given the opportunity to "catch-up" within a reasonable period of time and the Company shall, so far as is reasonably practicable (taking into account the urgency of the Group's financing requirements) and permitted under applicable laws, give reasonable notice (being not less than 15 business days) of any such emergency fundraising to the Investors that consent to receive such information;

      (b)    to an independent third party for non-cash consideration for the purposes of funding of a corporate acquisition, merger or joint venture entered into on arms' length terms;

      (c)    to executive directors, non-executive directors or employees pursuant to the MIP;

      (d)    approved pursuant to paragraph (f) or (g) of Part B of Schedule 1; and

| | | |
|---|---|---|
| | (e) | in connection with the Incremental Facilities, such issuance(s) being in accordance with this term sheet, the Lock-up Agreement and/or terms set out therein. |
| | The D Ordinary Shares shall not receive rights of pre-emption in connection with the issuance of any debt or equity securities or any debt by any Group Company. | |

| 3. | **CORPORATE GOVERNANCE** | |
|---|---|---|
| 3.1 | **Board Composition and Appointment:** | The board of directors of the Company (the "**Board**") will be comprised of up to a maximum of ten directors ("**Director Quota**"). |
| | | There shall always be available for appointment to the Board: |
| | | (a) two positions within the Director Quota for the chief executive officer ("**CEO**") and the chief financial officer ("**CFO**") to be appointed to the Board ("**Executive Directors**"); |
| | | (b) one position within the Director Quota for a non-executive chairperson ("**Chairperson**"); |
| | | (c) up to five positions within the Director Quota for non-executive directors ("**NEDs**"); and |
| | | (d) two positions within the Director Quota for investor directors ("**Investor Directors**"). |
| | | The Executive Directors, Chairperson, NEDs and Investor Directors may be appointed to, and removed from, the Board in the following manner: |
| | | (e) subject to section 3.8, an Executive Director may be appointed to and removed from the Board by a resolution of the Board to approve such appointment or removal; |
| | | (f) a Chairperson may be appointed to and removed from the Board by an Investor Majority (in its sole discretion) giving written notice to the Company of such appointment or removal; |
| | | (g) a NED may be appointed to and removed from the Board by an Investor Majority (in its sole discretion, and in the case of the appointment of one NED by an Investor Majority ("**Minority NED**"), such appointment or removal to the Board of the Minority NED shall not require the positive affirmative vote of any of the Investor Directors and for the purposes of this paragraph only, the Investor Majority shall be calculated by reference to a majority of the A Ordinary Shares excluding each and all of the A Ordinary Shares beneficially owned or held by the A Investor Group and the B Investor Group) giving written notice to the Company of such appointment or removal; and |

|  |  | (h) | Investor Directors may be appointed and removed from the Board in accordance with section 3.2.

The Minority NED may be nominated or proposed by an Investor Group or Investor Groups (other than any of the A Investor Group or the B Investor Group) who individually or together represent no less than 5% of the A Ordinary Shares.  Further mechanisms to restrict frivolous nominations to the Board by a shareholder as well as the logistics and (as the case may be) the timing of such nominations, appointments, removals and/or retirements, shall be included in the Shareholders' Agreement and/or Articles (as applicable). |
| 3.2 | **Investor Director Appointments:** | At the Closing Date one Investor Director ("**A Investor Director**") shall be appointed by the Investor Group who would be entitled to the most Ordinary Shares by reference to the Company's pro forma share capital structure as derived from the number of SSNs held by each Investor as per the Bondholder Identification Exercise[3] ("**A Investor Group**") and one Investor Director ("**B Investor Director**") shall be appointed by the Investor Group who would be entitled to the second most Ordinary Shares by reference to the Company's pro forma share capital structure as derived from the number of SSNs held by each Investor as per the Bondholder Identification Exercise ("**B Investor Group**").

The A Investor Group may (in its sole discretion) appoint or remove from the Board the A Investor Director by giving written notice to the Company of such appointment or removal.

The B Investor Group may (in its sole discretion) appoint or remove from the Board the B Investor Director by giving written notice to the Company of such appointment or removal.

If at any time the A Investor Group or B Investor Group holds less than 15% of the total number of A Ordinary Shares in issue, each such A Investor Group or B Investor Group shall no longer be entitled to appoint or remove their respective A Investor Director or the B Investor Director (as the case may be), and any such A Investor Director or B Investor Director appointee shall immediately resign from their position. As a result of the A Investor Director or B Investor Director appointee resigning, until such time as two Investor Directors are appointed to the Board in accordance with the following paragraph, any matter that requires the positive affirmative vote of two Investor Directors shall only require the positive affirmative vote of one Investor Director.

If at any time the A Investor Group and B Investor Group each hold less than 15% of the total number of A Ordinary Shares in issue,  such A Investor Group and B Investor Group shall no longer be entitled to appoint or remove from the Board the A Investor Director and the B Investor Director (as the case may be), and any |

---

[3]     "**Bondholder Identification Exercise**" means the bondholder identification exercise as of 25 August 2020 conducted by Lucid Issuer Services Limited on or prior to 27 August 2020 on the instructions of the Group with the purpose to determine the identity and holdings of the SSN Holders as of 25 August 2020. As at 25 August 2020, SSN Holders representing over 91 per cent. by value of the aggregate SSN Debt  are party or have acceded to the Lock-up Agreement.

EU-DOCS\28960059.30

such A Investor Director or B Investor Director appointee shall immediately resign from their position.

If the A Investor Group and B Investor Group are both no longer entitled to appoint the A Investor Director or the B Investor Director, the right to appoint the Investor Directors shall be available to the two Investors or Investor Groups that hold the highest number of A Ordinary Shares (which may include the A Investor Group or B Investor Group), provided that if at any time an Investor or Investor Group subsequently holds more than 15% of the total number of A Ordinary Shares in issue ("**Relevant Investor**"), in circumstances where the A Ordinary Shareholder(s) with existing Investor Director representatives on the Board hold less than 15%, such Relevant Investor shall be entitled to appoint and remove from the Board the Investor Director appointed by the shareholder with the fewest number of A Ordinary Shares (and this process shall be repeated if a second holder of A Ordinary Shares comes to own more than 15% of the A Ordinary Shares), and any Investor Director previously appointed by the two Investors or Investor Groups holding the highest number of A Ordinary Shares in issue (but less than 15% thereof) shall resign from their position if so directed by the Relevant Investor.

Failure to appoint an Investor Director shall not be deemed to constitute a waiver of the right to make an appointment, nor will it prohibit the Company from otherwise adhering to the terms of the Shareholders' Agreement and the Articles.

Each Investor having the right to appoint a director to the Board shall have the right to appoint a director to the board of directors of each other Group Company and the provisions set out above shall apply to the board of directors of each Group Company *mutatis mutandis* (to the extent permitted by law in the relevant jurisdiction of each Group Company).

| | | |
|---|---|---|
| **3.3** | **Board at Closing:** | At the Closing Date the Board shall be comprised of up to nine directors constituted by: |

| | | |
|---|---|---|
| | (a) | Nigel Oddy and Richard Collyer as the two Executive Directors; |
| | (b) | Alistair McGeorge as the Chairperson; |
| | (c) | certain persons appointed as the NEDs; |
| | (d) | a certain person appointed as the A Investor Director; and |
| | (e) | Stuart MacKenzie or Bruce Baisley as the B Investor Director. |

| | | |
|---|---|---|
| **3.4** | **Board Observer:** | For so long as the A Investor Group holds at least 15% of the total number of A Ordinary Shares in issue, the A Investor Group shall be entitled (but have no obligation) to appoint an observer to attend meetings of the Board. If at any time the A Investor Group holds less than 15% of the total number of A Ordinary Shares in issue, any such observer appointed shall be removed and no longer be permitted to attend meetings of the Board. |

EU-DOCS\28960059.30

|  |  | For so long as the B Investor Group holds at least 15% of the total number of A Ordinary Shares in issue, the B Investor Group shall be entitled (but have no obligation) to appoint an observer to attend meetings of the Board. If at any time the B Investor Group holds less than 15% of the total number of A Ordinary Shares in issue, any such observer appointed shall be removed and no longer be permitted to attend meetings of the Board.<br><br>Any such person attending as an observer shall not be entitled to vote and shall not count towards the quorum.<br><br>Each observer will receive reimbursement of reasonable out-of-pocket expenses (including for the avoidance of doubt flight / travel arrangements for board meetings) in line with the Group's expenses policy. |
| 3.5 | **Fees and Expenses of Investor Directors and NEDs:** | Each director (including an Investor Director) that is not an employee of the Group will receive a reasonable and customary director's fee in line with market practice and subject to an aggregate maximum amount to be determined by the Remuneration Committee. Each Director will receive reimbursement of reasonable out-of-pocket expenses (including for the avoidance of doubt flight / travel arrangements for Board meetings) in line with the Group's expenses policy or as approved by the Remuneration Committee. |
| 3.6 | **Board Meetings:** | The frequency of Board meetings shall be determined by the Board but shall be at least eight times per year. In addition, any director may call a directors' meeting by giving notice of the meeting to the directors or by authorising the company secretary (if any) to give such notice. Unless otherwise agreed by all directors, Board meetings shall be convened on a minimum of 5 days' notice and shall be adjourned by 7 days (or such other period as may be agreed by all directors) if requested by any Investor Director.<br><br>Board information pack, agenda and copies of the latest management accounts will be circulated with notice of the meeting and agenda at least five days before each meeting, and such notice period can be shortened or waived by a simple majority of the directors together with the consent of two Investor Directors (or one Investor Director, if there is only one Investor Director appointed) from time to time.<br><br>The quorum for the transaction of business of the Board shall be any five eligible directors (including each Investor Director provided that if an Investor Director expressly waives their right to be part of the quorum of the Board then such Investor Director shall not be required in order for a meeting of the Board to form a quorum).<br><br>Each member of the Board has one vote provided that any proposed resolution of the Board shall require the affirmative vote of one Investor Director in order for such resolution to be passed. The Chairperson shall have the casting vote.<br><br>A mechanism shall be included in the Shareholders' Agreement to avoid a frustration event that may occur as a result of the |

EU-DOCS\28960059.30

| | | |
|---|---|---|
| | | requirement for the attendance at, and the vote of, Investor Directors at meetings of the Board. |
| | | The Board may also pass resolutions with the unanimous written consent of all the directors (which shall include responding by e-mail). |
| 3.7 | **Audit and Remuneration Committee:** | Standing committees of the Board will be established called the remuneration committee ("**Remuneration Committee**") and the audit committee ("**Audit Committee**"). |
| | | The Remuneration Committee and Audit Committee shall be constituted by at least one NED, one Executive Director and up to two Investor Directors. One of the relevant NEDs shall chair meetings of the Remuneration Committee and the Audit Committee. Each member of the Remuneration Committee and Audit Committee shall have one vote provided that any proposed resolution shall require the affirmative vote of one Investor Director in order for such resolution to be passed. |
| | | The CFO will be invited to attend and speak at any meeting of the Audit Committee but shall not be counted for the purposes of quorum, and shall not be entitled to vote on any resolution of the Audit Committee. |
| | | Each of the Remuneration Committee and Audit Committee shall adopt terms of reference that have been approved by the Board. |
| 3.8 | **Matters Requiring Consent:** | All decisions of the Group will be resolved by the Board, subject to any delegation of day to day management of the business to senior management in the ordinary course of business.  For the avoidance of doubt, subject to the provisions of law in the relevant jurisdiction of each Group Company, the Board shall be consulted on and shall take all major decisions affecting the Group and, in any event, the matters listed in Schedule 2 must be brought to the attention of the Board. Subject to section 4.5, a proposal by the Board in relation to: |
| | | (i)      the matters listed in Part A of Schedule 2 shall require a simple majority approval of the Board (such approval to include the positive affirmative vote of at least one Investor Director); and |
| | | (ii)     the matters listed in Part B of Schedule 2 shall require a simple majority approval of the Board (such approval shall include the positive affirmative vote of at least two Investor Directors provided that an Exit process and/or Exit after the fourth anniversary of the Closing Date shall only require the positive affirmative vote of only one Investor Director). |
| | | In addition to the matters referred to in (i) and (ii) of this section 3.8, the matters in (iii) and (iv) of this section 3.8 shall also require a simple majority approval of the Board (such approval to include the positive affirmative vote of at least one Investor Director) and: |

10

|  |  |  |  |
|---|---|---|---|
|  |  | (iii) | in the case of the matters set out in Part A of Schedule 1, such matters shall also require the prior written consent of the Investor Majority; |
|  |  | (iv) | in the case of the matters set out in Part B of Schedule 1, such matters shall also require the prior written consent of the Investors holding at least 66.67% of the A Ordinary Shares in issue provided that if one Investor or Investor Group holds at least 40% of the A Ordinary Shares in issue, such matters set out in Part B of Schedule 1 shall also require the prior written consent of any other Investor holding at least 15% of the A Ordinary Shares in issue. |
|  |  |  | The Board shall be consulted on and shall be required to approve the matters set out in Part A and Part B of Schedule 1 (but, for these purposes, ignoring any monetary thresholds or materiality thresholds set out therein). |
|  |  |  | A vote by the Board in relation to any matter referred to in (i), (ii), (iii) and (iv) of this section 3.8 shall exclude the vote of any director who is directly or indirectly interested in such matter. If at any time, no Investor Directors have been appointed, the quorum and other requirements for Board meetings shall not require an Investor Director and the approval of an Investor Director of any matters in this term sheet shall not be required. |
| 3.9 | **Provision of Information:** |  | The Company shall be required to supply the Investor Directors with the financial statements as set forth in the definitive documentation for the Reinstated Facilities (or the documentation for any refinancing of the Reinstated Facilities). Any Investor or Investor Group will receive a copy of the quarterly information pack (which shall include quarterly accounts of the Group). |
|  |  |  | In addition, the A Investor Group and B Investor Group shall be entitled to receive such information concerning the Group as it reasonably requires in order to comply with any reporting requirements as a public company and in order to disclose information to the extent that it has done historically and to disclose information publicly to such extent. |
|  |  |  | The Company shall notify the other Investors in the event that any of the A Investor Group or B Investor Group holds less than 15% of the total number of A Ordinary Shares in issue. |
| 3.10 | **Ability to Communicate Information:** |  | Subject to compliance with applicable laws, the Investor Directors shall be entitled to pass any information received by them that relates to the Company to the Investors they are appointed by and to any of their professional advisers. |
|  |  |  | Subject to compliance with applicable laws, the Investors shall be entitled to pass any information received by them that relates to the Company to various persons on a confidential basis, including to any affiliate of that Investor, to any bona fide investor in, or purchaser of shares in or assets of, the Group and any of their professional advisers and actual or potential lenders who have |

11

|   |   |   |
|---|---|---|
|   |   | provided financing or are to provide financing in connection with the purchase of any shares held by an Investor (subject to any such lender having executed a customary confidentiality agreement with the Investor (which shall allow the Company to enforce the provisions of the confidentiality agreement against the counterparty thereto) prior to the disclosure of such information), provided that the sharing of any Group confidential information with any third party material direct competitor (European and Asian affordable fashion retailers) or material supplier of the Group shall require the prior consent of the Company (not to be unreasonably withheld, delayed or conditioned). In addition, subject to each Investor's rights as a shareholder under law, the Company may decide to withhold information from an Investor that is a Competitor or Supplier (as defined below), including information such person(s). might otherwise receive in relation to the matters in Schedule 1. In addition, the A Investor Group and B Investor Group shall be entitled to disclose information as set out in section 3.9 to extent applicable. |
| **4.** | **TRANSFERS** |   |
| **4.1** | **Transfers of Shares and Stapling:** | Any transfers shall be subject to the Tag Offer, Delayed Tag Offer, Drag Right and RoFO (as set out below) unless it is a Permitted Transfer (as defined below).<br><br>Legal and/or beneficial title to an Ordinary Share shall be freely transferable:<br><br>(a)    in the case of an Investor, to an affiliate of that Investor (for as long as it remains the relevant Investor's affiliate);<br><br>(b)    in the case of Ordinary Shares acquired in connection with the backstop, to an affiliate of an Investor, provided that, for the purposes of this paragraph 4.1(b) only, "affiliate" shall mean a person holding 25% or more, directly or indirectly, of the equity share capital in an Investor and companies controlled by such person;<br><br>(c)    to a new holding company of the Company of which the shareholders are the same as those of the Company and hold shares in the same proportions; or<br><br>(d)    in the case of a holder of a MIP Share, (i) with the prior written consent of the Remuneration Committee to a spouse or trust for bona fide tax planning purposes; or (ii) with the prior written consent of the Board,<br><br>each a ("**Permitted Transfer**").<br><br>Transfers to competitors (European and Asian affordable fashion retailers) or any material supplier of the Group, in each case together with any persons whose primary business is that of being a competitor or material supplier of the Group (together, any such persons being referred to herein as a "**Competitor or Supplier**") shall not be permitted, except where disposing of sufficient shares |

EU-DOCS\28960059.30

|  |  | to trigger a Tag Offer or Drag Right. Transfers of Ordinary Shares to an affiliate that is, or directly or indirectly controls, a Competitor or Supplier shall also be prohibited. |
|  |  | The A Ordinary Shares shall be stapled to the New Money Loan such that any transfer of A Ordinary Shares to any person shall require the holder of such A Ordinary Shares to simultaneously transfer a pro rata proportion of its holding of New Money Loan to such person and vice versa. |
|  |  | The B Ordinary Shares shall be stapled to the Shareholder Loan such that any transfer of B Ordinary Shares to any person shall require the holder of such B Ordinary Shares to simultaneously transfer a pro rata proportion of its holding of Shareholder Loan to such person and vice versa. |
| 4.2 | **Right of First Offer ("RoFO"):** | If a holder ("**Seller**") of A Ordinary Shares wishes to transfer an amount equal to 0.5% or more of the total number of A Ordinary Shares ("**Sale Shares**") to a third party (provided that such third party is not a Competitor or Supplier, in which case such transfer shall not be permitted), the Seller shall, in priority to entering into a legally binding agreement for transfer with any third party, appoint an agent or broker who shall list the Sale Shares for sale (through the Company's designated online portal if practicable) ("**Listing Notice**"). The Listing Notice shall specify the number of Sale Shares being sold and the price per Sale Share. The other holders of A Ordinary Shares ("**Non-Sellers**") shall have 10 business days ("**Response Period**") from the date of the Listing Notice to respond in writing ("**Response Notice**") (through the Company's designated online portal if practicable) to the Listing Notice as to whether a Non-Seller would like to purchase the Sale Shares. Each Non-Seller that gives a Response Notice shall be entitled to its pro rata proportion of the Sale Shares and to the extent there are any excess Sale Shares remaining following the allocation of such entitlement to the Non-Sellers who give a Response Notice, such excess Sale Shares shall be allocated pro rata as between the relevant Non-Sellers who state that they wish to purchase excess Sale Shares, and if Non-Sellers elect to purchase less than all of the Sale Shares, the Seller shall be entitled to sell the excess Sale Shares to a third party in accordance with this paragraph or at its discretion to reject the Response Notices and sell all of the Sale Shares to a third party in accordance with this paragraph. |
|  |  | If a Seller does not receive a response to the Listing Notice, or does not receive Response Notices for all of the Sale Shares and wishes to reject them, or following a Response Notice the relevant Non-Seller fails to complete the transfer of Sale Shares within 20 business days of the last day of the Response Period, the Seller shall have 50 business days thereafter (extended, if required, due to any mandatory anti-trust or regulatory period) ("**Completion Period**") to complete the transfer of the Sale Shares provided that the price paid for the Sale Shares by a third party is equal to or more than the price specified for the Sale Shares in the Listing Notice. If the transfer of Sale Shares is not completed during the Completion Period, the Seller shall retain the Sale Shares and the Seller (including its affiliates) shall not be entitled to propose a transfer of their A Ordinary Shares (except for Permitted |

| | | |
|---|---|---|
| | | Transfers) for a period of 6 months following the last day of the Completion Period. |
| | | A Seller shall be responsible for all of its own costs related to the transfer of any A Ordinary Shares. |
| | | Any A Ordinary Shares transferred pursuant to this section shall also be subject to the stapling provisions in section 4.1. |
| 4.3 | Tag Offer: | Save for Permitted Transfers and subject to the stapling requirements set out in section 4.1, if an independent third party purchaser and/or its affiliates ("**Purchaser**"), which is not and whose affiliates are not an existing shareholder of the Company on the date of the Lock-up Agreement, would hold more than 66.67% of A Ordinary Shares following a bona fide sale (whether in one or a series of transactions) by one or more shareholders of the Company, the Purchaser is obligated to submit a one-time offer in writing to buy all of the Ordinary Shares (a "**Tag Offer**"). A holder of Ordinary Shares shall have the option to accept or reject the Tag Offer. |
| | | The consideration payable under the Tag Offer shall be equal to the highest consideration paid as part of the proposed sale (or if higher, received from a buyer for shares in the 12 months prior to the date of the Tag Offer): |
| | | (a)    in the same form or, at the election of each tagging shareholder, for the cash equivalent of the fair value of any non-cash consideration; and |
| | | (b)    subject to the same payment terms, |
| | | as offered for each Ordinary Share which is the subject of the sale of Ordinary Shares triggering the Tag Offer. The consideration payable for any shares shall be specified in the Tag Offer. |
| | | If after 54 months of the Closing Date (the "**Tag Longstop Date**") an A Ordinary Shareholder and/or its affiliates hold 66.67% of the A Ordinary Shares, and such A Ordinary Shareholder and/or its affiliates are an existing shareholder of the Company on the date of the Lock-up Agreement (an "**Original Shareholder**"), then the Original Shareholder shall be obligated to submit a Tag Offer  (a "**Delayed Tag Offer**") upon the Tag Longstop Date. A holder of Ordinary Shares shall have the option to accept or reject the Delayed Tag Offer. |
| | | A Delayed Tag Offer shall not be required if on or before the Tag Longstop Date a legally binding agreement has been executed to consummate an Exit provided that it closes within 60 months after the Closing Date (failing which the Delayed Tag Offer shall be made immediately thereafter). |
| | | The consideration payable under the Delayed Tag Offer shall be in cash and shall be a price per Ordinary Share equal to the highest consideration paid by the Original Shareholder and/or its affiliates for an A Ordinary Share (either in cash or if any consideration paid was non-cash, an amount equal to the fair value of such non-cash consideration). |
| | | Each tagging shareholder shall pay its pro rata share of the costs incurred in connection with the proposed sale but shall not be |

14

|  | |
|---|---|
| | required to give any warranties, indemnities, covenants or undertakings in connection therewith to any person, save for warranties as to its title to, and capacity to sell, such shares and leakage.<br><br>Fair value for any non-cash consideration shall be the amount as determined between the Purchaser or, as the case may be, Original Shareholder and a majority of the tagging shareholders that have elected to receive cash consideration or if there is no agreement, an amount determined by an independent expert. A mechanism will be included to apportion the costs of the independent expert to encourage agreement between the parties. |
| **4.4** **Drag Right:** | Save for Permitted Transfers, and subject to the stapling requirements set out in section 4.1, if one or more holders of A Ordinary Shares propose to sell (whether in one or a series of transactions) to a Purchaser which is not an existing shareholder or an affiliate of an existing shareholder in a bona fide transaction, between them, more than 66.67% of the A Ordinary Shares in the Company (which shall constitute an Exit and be subject to (ii) of section 3.8 and section 4.5)), the proposed buyer or the proposed seller may, following execution of a binding agreement (whether conditional or unconditional) for the sale of Ordinary Shares (the "**Sale Agreement**"), require each other holder of Ordinary Shares to transfer all their Ordinary Shares (the "**Drag Shares**").<br><br>The consideration payable for each Drag Share shall be:<br><br>(a)    equal to the higher of (i) the highest consideration paid as part of this proposed sale; or (ii) the amount received by the relevant sellers in the 12 months prior to the date of the Sale Agreement;<br><br>(b)    in the same form or, at the election of each dragged shareholder, for the cash equivalent of the fair value of any non-cash consideration; and<br><br>(c)    subject to the same payment terms,<br><br>as offered for each A Ordinary Share in the Sale Agreement.<br><br>Each dragged shareholder shall pay its pro rata share of the costs incurred in connection with the proposed sale and shall give warranties with respect to its title to, and ownership of, the relevant Drag Shares but shall not be required to give any other warranties, indemnities, covenants or undertakings.<br><br>Fair value for any non-cash consideration shall be the amount as determined between the Purchaser and a majority of the dragged shareholders that have elected to receive cash consideration or if there is no agreement, an amount determined by an independent expert. A mechanism will be included to apportion the costs of the independent expert to encourage agreement between the parties. |
| **4.5** **Exit:** | The Investors shall co-operate in good faith to determine an appropriate plan to achieve a sale or other disposal (whether through an IPO, an asset sale, a share sale, a winding-up or otherwise) of the Company (an "**Exit**"). |

15

Within 6 months of the Closing Date the Board intends to appoint financial advisors to undertake a strategic review of the operations of the Group, and in particular whether any value accretive corporate activities are available for the Company and/or its shareholders. Following Closing, the Board shall discuss the foregoing in good faith, including the choice of financial adviser. The Board shall be under no obligation to pursue any accretive or other activities identified in the review but shall discuss and consider the outcome of the review in good faith.

Notwithstanding anything to the contrary in this term sheet, no approval of an Investor Director (whether pursuant to Schedules 1 or 2 or otherwise) shall be required in respect of the above strategic review or any matters connected with it (including the appointment of financial advisors), but without prejudice to the consent of Investor Directors required in respect of executing agreements in respect of the actual Exit.

The Board intends to commence the Exit process no later than 3 years after the Closing Date by appointing an independent investment bank and/or M&A advisor. The Board intends to complete the Exit no later than 4 years after the Closing Date.

In the event that an Exit has not occurred by the fourth anniversary of the Closing Date, and the requirement to do so has not been waived by at least two Investor Directors, the Investors holding 66.67% of the A Ordinary Shares in issue can serve notice on the Board requiring it to complete an Exit by a new date.

In the event that the Board fails to comply with its obligations in relation to an Exit process or an Exit is not completed by the fourth anniversary of the Closing date:

(a)     provided that they are doing so in order to implement an Exit, the Investors holding 66.67% shall be entitled to appoint such minimum number of additional directors to the Board that will allow such Investors to control the Board for as long as they are continuing to seek to implement an Exit; and

(b)     notwithstanding anything to the contrary in this term sheet, the approval of only one Investor Director (whether pursuant to Schedules 1 or 2 or otherwise) shall be required in respect of any matters connected with an Exit after the fourth anniversary of the Closing Date, including for the avoidance of doubt the appointment of financial advisors and approval of the actual Exit itself.

In the event that an existing Investor is involved in the Exit process directly or indirectly as an acquirer of any shares, loan notes, securities or debentures (or any rights to acquire shares, loan notes, securities or debentures) in the Company or in any other Group Company, it shall be required to declare the nature and extent of any such interest and any Investor Director (or Board observer) appointed by such Investor shall be required to recuse him/herself

16

| | |
|---|---|
| | from any such Board discussions on the sell-side Exit process where a conflict may arise. |

EU-DOCS\28960059.30

## SCHEDULE 1

## SHAREHOLDER RESERVED MATTERS

**Part A**

(a)    incurs any new borrowings (or modifies the key terms thereof) or enters into foreign exchange contracts, interest rate swaps or other derivative instruments or factors any of its debts (or enters into similar arrangements), in each case in excess of £50,000,000 in aggregate (but excluding refinancing on arm's length terms or trade credit incurred in the usual course of business);

(b)    acquires (whether by one transaction or by a series of transactions) the whole, or a substantial or material part of the business, undertaking or assets of any other person with a transaction value or purchase price in excess of £25,000,000 or disposes (whether by one transaction or by a series of transactions) of the whole or any substantial or material part of the business, undertaking or any other substantial or material part of its assets of any Group Company) with a transaction value or purchase price in excess of £25,000,000 other than, in each case, in the course of usual trading;

(c)    except in relation to intra-group transfers, declares, makes or pays a dividend or other distribution (whether in cash, stock or in kind) or makes any reduction of, or other change to, its paid-up share capital;

(d)    save in respect of retention of title provisions in the ordinary course of trading, creates, grants, issues or varies any Encumbrance over its shares, assets or undertakings (otherwise than in accordance with the Finance Documents or any document to be entered into pursuant to the Finance Documents);

(e)    makes any material changes to the accounting procedures, practices, policies or principles by reference to which its accounts are prepared or the basis of their application or its accounting reference date or Financial Year end (save as may be necessary to comply with changes in statements of standard accounting practice);

(f)    enters into any joint venture, partnership or agreement or arrangement for the sharing of profits or assets or other similar arrangement which represents 10% or more of Group consolidated EBITDA as at the date of entering into such arrangements based on the Group's most recently available audited consolidated financial accounts, apart from where already permitted;

(g)    institutes, engages in, settle or takes any material decision in relation to any threatened or actual legal proceedings, the value or cost of which might reasonably be expected to exceed £3,000,000 in relation to the same matter or thing and in excess of £15,000,000 in aggregate or which might involve criminal liability for any party thereto other than in respect of (i) debt collection in the ordinary course of business; (ii) where any such liability would be covered by an existing Group insurance policy; and (iii) claims brought against the Group in the United Kingdom by employees in the ordinary course of employment relations (other than class/collective actions or where any such employee claim is expected to have a material impact on the business of the Group) or consumers in the ordinary course of business;

(h)    enters into, terminates or varies any contracts or arrangements between any Group Company and a Shareholder (or a party related to a Shareholder) of value in excess of £3,000,000 in aggregate; and

(i)    appoints or removes any NED (excluding the Minority NED) of any Group Company.

**Part B**

(a)    acquires (whether by one transaction or by a series of transactions) the whole, or a substantial or material part of the business, undertaking or assets of any other person which materially change the business proposition of the Group;

EU-DOCS\28960059.30

(b)     disposes of all or substantially all of the assets of the Group (or other disposals of businesses of the Group generating in excess of 25% of Group consolidated EBITDA (based on the Group's most recently available audited consolidated financial accounts)), either pursuant to one transaction or a series of related transactions;

(c)     enters into any transaction for an amalgamation, reconstruction or merger with a third party or related party;

(d)     makes any material change to the nature of the business of the Group (including the material expansion or development of the Group or any of its businesses);

(e)     takes any steps (other than a bona fide solvent winding up of any Group Company or part of a bona fide Group-wide entity clean up previously approved by the board or where required pursuant to law) to:

    (i)     wind-up, liquidate, or dissolve any Group Company;

    (ii)    obtain an administration order in respect of itself;

    (iii)   invite any person to appoint a receiver or manager of the whole or any part of its business;

    (iv)    make a proposal for a voluntary arrangement under section 1 of the Insolvency Act 1986;

    (v)     obtain a compromise or arrangement under Part 18A of the Jersey Companies Law or Part 26 of the Companies Act 2006;

    (vi)    do anything similar or analogous to those things in paragraphs (i) to (v) above, in any other jurisdiction.

(f)     makes any change of any kind to its share capital, including creating, allotting, issuing, redeeming or repurchasing any share, loan capital or other security or grant any options over, or any other right in respect of, any share, loan capital or other security other than matters approved pursuant to sub-paragraph (g) below or where already permitted as an intra-Group activity or which otherwise is technical or administrative in nature and is determined by the Board acting in good faith to cause no detriment to any shareholder;

(g)     makes any increase in the aggregate percentage amount of 5% of the Ordinary Shares for Management and 2% of the Ordinary Shares that the holders of Growth Shares (as defined in the Equity Term Sheet) shall be entitled to upon an Exit pursuant to the Management Incentive Plan;

(h)     alters the Shareholders' Agreement or Articles of Association or other constitutional documents or equivalent documents of a Group Company;

(i)     makes any change to the domicile of the Company or change the head office of the Group to a location outside the UK; and

(j)     appoints or removes the Chief Executive Officer or the Chief Financial Officer.

19

## SCHEDULE 2

## BOARD RESERVED MATTERS

**Part A**

(a)     appoints or removes any operational director of the Group, any officer or any member of the executive management committee of the Group or any Employee whose base annual salary is in excess of £200,000;

(b)     institutes, engages in, settles or takes any material decision in relation to any legal proceedings, where the amount claimed is in excess of £100,000 in relation to the same matter or thing;

(c)     appoints any external advisor where the fees of such external adviser are anticipated to exceed £1,000,000 in any one Financial Year, unless such fees are specifically approved in the Annual Budget;

(d)     makes any public announcement other than in the ordinary course of trading;

(e)     incorporates any new company within the Group;

(f)     appoints any committee of the Board, establishes its terms of reference and regulation of proceedings, or appoints any member to such committee;

(g)     approves the annual consolidated financial accounts of the Group;

(h)     except as provided for the in Forex Policy[4], incur any new borrowings (or modifies the key terms thereof) or enters into foreign exchange contracts, interest rate swaps or other derivative instruments or factors any of its debts (or enters into similar arrangements), in each case in excess of £5,000,000 in aggregate; and

(i)     utilisation of the Incremental Facility in an aggregate amount exceeding £10,000,000.

**Part B**

(j)     makes any material changes to the nature or long-term strategy of the business or enters into a new business line (which shall exclude any new product line that is approved by the Board and any business line that is included in the Business Plan);

(k)     approves or amends the Annual Budget, Business Plan or strategic plan of the Group;

(l)     save to the extent set out in paragraph 4.5, commences an Exit process (including selection of advisers);

(m)     any material amendment to the capital structure of any Group Company and or the constitutional documents of any Group Company;

(n)     except as provided for the in Forex Policy, including incurring any new borrowings (or modifies the key terms thereof) or refinancing existing borrowings or enters into foreign exchange contracts, interest rate swaps or other derivative instruments or factors any of its debts (or enters into similar arrangements), in each case in excess of £25,000,000 in aggregate; and

(o)     redeems, exchanges or buybacks any of the Shares of any Group Company (except in relation to the MIP Shares).

---

[4] **LW Note**: Forex Policy to be agreed form document in the long form documents.

**PART 2**

**NEW MONEY TERM SHEET**

### A. Overview

| Newco Structure | - New holding companies incorporated in Jersey ("**Newco 1**", its immediate subsidiary "**Newco 2**" and Newco 2's immediate subsidiary "**Newco 3**")[1] |
| --- | --- |
| | - Newco 2 funded with £40m proceeds of New Money Term Loan |
| | - 80% of the A Ordinary Shares in Newco 1 held by New Money Providers (as defined below) pro rata to participation; the remaining 20% to be issued to existing SSN holders pro rata to holdings at the restructuring effective date in the form of B Ordinary Shares |
| | - £40m of SSNs to be reinstated in the form of a loan at Newco 2 (the "**Shareholder Loan**"), which is contractually subordinated in all respects to the New Money Term Loan |
| | - MIP at Newco 1 |

### B. New Money Term Loan

| Key Economic Terms | Initial amount: £40m of net cash proceeds to be fully drawn at closing |
| --- | --- |
| | Interest: 16.5% PIK |
| | OID: 5% (to be capitalised and added to the principal amount of the New Money Term Loan on the restructuring effective date) |
| | Currency: GBP |
| Allocation | To be allocated to participating SSN holders pro rata to their SSN holdings (the "**New Money Providers**"). Backstop parties to backstop any entitlements not taken up by SSN holders. |
| Instrument | Term loan |
| Borrower | Newco 2 |
| Guarantors | None |
| Facility Agent / Security Agent | GLAS (subject to fee quote approval) |
| Use of Proceeds | To be used for: |
| | - general corporate purposes of the New Look group; and |
| | - payment of agreed transaction and adviser costs |
| Final Redemption Date | 7 years from closing |
| Repayment | Bullet |
| Conditions | - An officer's certificate (signed by an authorised signatory) confirming that the CVA has been approved (and the relevant challenge period has expired) to achieve a rent reduction not materially more adverse than the estimated rental value as set out in the business plan |
| | - Applicable regulatory consents, licences and registrations |
| | - Anti-trust clearance |
| | - Other customary documentary conditions precedent for a financing of this nature |
| Incremental Facilities | Up to £50m in new commitments to be offered pro rata to existing lenders of the New Money Term Loan at time of borrowing. |

---

[1]  NTD: in the event of a "Plan A" implementation where the existing capital structure is retained, Newco 1 will be replaced by New Look Retail Holdings Limited, Newco 2 will be a newly-incorporated Jersey company and Newco 3 will be New Look Investment Limited

|  | |
|---|---|
|  | Maturity, availability period, pricing to be agreed between Newco 2 and the lenders of the Incremental Facilities (though in any case maturity shall be no earlier than the New Money Term Loan).<br><br>Incremental Facilities to rank pari passu with the New Money Term Loan.<br><br>£1m minimum incremental amount. Drawdown notice period of three business days.<br><br>Participating lenders to receive newly issued A Ordinary Shares in the same proportion to the applicable Incremental Facility as represents the proportion of A Ordinary Shares issued in respect of the New Money Term Loan |
| **Interest Payment Dates** | Semi-annual, to be capitalised |
| **Default Interest** | 1% |
| **Financial covenants** | None |
| **Information Undertakings** | Financial Statements (as such term is defined in the Senior Facilities Agreement) as set forth in the Senior Facilities Agreement and the Operating Facility Agreement, in each case as amended by and in accordance with the Debt Term Sheet (the facilities under such amended Senior Facilities Agreement and the Operating Facility Agreement being the "**Reinstated Facilities**") (or the documentation for any refinancing of the Reinstated Facilities) |
| **Restrictive Covenants** | Customary restrictive covenants which are in any case no more restrictive than those set forth in the definitive documentation for the Reinstated Facilities (or the documentation for any refinancing of the Reinstated Facilities), modified to reflect customary holding company permissions and *de minimis* baskets and to include:<br><br>-    baskets to permit the transactions contemplated by this term sheet;<br><br>-    a restriction on the insertion of any further intermediate holding companies between Newco 2 and New Look Limited; and<br><br>-    customary anti-layering protection |
| **Representations and Warranties** | Customary representations and warranties |
| **Events of Default** | Non-payment, including cross acceleration of the Reinstated Facilities |
| **Security** | Share pledge over Newco 2's shares in Newco 3<br><br>Assignment of intercompany receivables owed to Newco 2 by Newco 3<br><br>Floating charge (or equivalent) over Newco 2 bank accounts |
| **Ranking** | New Money Term Loan to be senior to the Shareholder Loan in all respects. New Money Term Loan to rank structurally junior to the Reinstated Facilities. The New Money Term Loan would not benefit from any guarantees or security from Newco 3 or its subsidiaries. |
| **Stapling** | Stapled to A Ordinary Shares |
| **Transfer Restrictions** | As applicable to A Ordinary Shares in Part 1 of the Equity and New Money Term Sheet. |
| **Amendments and waivers** | Changes to key economic terms require at least 66⅔% lender (and Newco 2) consent<br><br>Acceleration / enforcement 66⅔% lender consent<br><br>Other terms require simple majority lender (and Newco 2) consent |
| **Documentation** | Loan Agreement, security agreement, in each case as customary for a financing of this nature |
| **Governing law** | English law except for any share security agreement which shall be governed by the laws of the jurisdiction of incorporation of Newco 2 or bank account security agreement which shall be governed by the laws of the jurisdiction where the relevant bank account is held. |
| **Listing** | None |

C.  **Shareholder Loan**

| | |
|---|---|
| **Principal** | £40m (on a cashless basis as reinstatement of SSNs) |
| **Interest** | None |
| **Allocation** | To be allocated to each SSN holder *pro rata* to their SSN holdings |
| **Instrument** | Term loan |
| **Borrower** | Newco 2 |
| **Guarantors** | None |
| **Facility Agent** | GLAS (subject to fee quote approval) |
| **Redemption Date** | 9 years from closing (however the Borrower may voluntarily prepay the Shareholder Loan at any time following the repayment in full of the New Money Term Loan for cash without any fee or prepayment premia) |
| **Repayment** | Bullet |
| **Conditions** | None |
| **Interest Payment Dates** | N/A |
| **Default Interest** | None |
| **Financial covenants** | None |
| **Information Undertakings** | Financial statements as set forth in the New Money Term Loan |
| **Restrictive Covenants** | None |
| **Representations and Warranties** | Customary representations and warranties |
| **Events of Default** | Non-payment and cross acceleration of the New Money Term Loan only |
| **Security** | None |
| **Ranking** | Shareholder Loan to be contractually subordinated in all respects to the New Money Term Loan |
| **Stapling** | Stapled to B Ordinary Shares |
| **Transfer Restrictions** | As applicable to B Ordinary Shares in Part 1 of the Equity and New Money Term Sheet. |
| **Amendments and waivers** | Changes to key economic terms require at least 66⅔% lender (and Newco 2) consent<br><br>Acceleration requires 66⅔% lender consent<br><br>Other terms require simple majority lender (and Newco 2) consent |
| **Documentation** | Loan Agreement as customary for a financing of this nature |
| **Governing law** | English law |
| **Listing** | None |

## APPENDIX 5

### DEBT TERM SHEET

EU-DOCS\29867510.8

**STRICTLY PRIVATE & CONFIDENTIAL**



# DEBT TERM SHEET

# LATHAM&WATKINS

99 Bishopsgate
London EC2M 3XF
United Kingdom
Tel: +44.20.7710.1000
www.lw.com



This term sheet is the "Debt Term Sheet" referred to in, and is subject to the terms of, the lock up agreement dated 12 August 2020 (the "**Lock-up Agreement**") among New Look Bonds Limited, certain consenting RCF lenders, certain consenting operating facility lenders and others.

## PART 1

## GENERAL

| | |
|---|---|
| **Documentation:** | The Senior Facilities Agreement, Trade Finance Facilities Agreement and Buyer Agreement (each a "**Relevant Facilities Agreement**") shall be amended to reflect the changes set out in this Term Sheet (and otherwise shall continue on their current terms except as modified by this Term Sheet(and "Financial Restructuring" as it appears in the Relevant Facilities Agreement shall include the Financial Restructuring), provided that if the Company and HSBC agree, each reference to Buyer Agreement in this Term Sheet shall be to any replacement of the existing Buyer Agreement with a new buyer agreement which is otherwise consistent with the terms set out in this Term Sheet as applicable to the Buyer Agreement). |
| **Definitions:** | Definitions used but not defined in this Term Sheet shall have the meanings given to them in the Lock-up Agreement, the Senior Facilities Agreement or Operating Facility Agreement (as applicable). |

## PART 2

## PARTIES

| | |
|---|---|
| **Parent:** | New Look Bonds Limited or, if the Financial Restructuring is implemented in accordance with "Plan B" of the Steps Plan, New Look Limited (in which case, the definition of "Legacy Group" shall be expanded to include any Group member prior to the Financial Restructuring implemented in accordance with "Plan B" of the Steps Plan that is not a subsidiary of New Look Limited after such implementation). |
| **Guarantors:** | As per the existing Senior Facilities Agreement and Operating Facility Agreement, but set at 85 per cent. of Consolidated EBITDA and 85 per cent. of the total assets of the Group.  The Parent shall add New Look Retailers (Ireland) Ltd as a Guarantor within 45 days of the end of its examinership or, if no examinership has been commenced in |

2

NEW
LOOK

respect of New Look Retailers (Ireland) Ltd as at the Restructuring Effective Date, within 45 days of the Restructuring Effective Date, in each case provided it is a Material Company at such time (by reference to the most recent consolidated management accounts or interim financial statements) and otherwise on the terms of the existing Senior Facilities Agreement.

**Springing Guarantee Covenant:** If a member of the Group that is not a Guarantor provides a guarantee for any Indebtedness incurred by a Guarantor, such non-Guarantor shall, subject to the Agreed Security Principles, accede as a Guarantor under the Senior Facilities Agreement as soon as reasonably practicable and no later than forty-five days of such guarantee.

**Group:** The Parent and its Subsidiaries. The concept of Unrestricted Subsidiaries will be removed.

## PART 3

## KEY TERMS

**Total Commitment:**

*Senior Facilities Agreement:* £100,000,000 fully drawn term loan facility, plus the applicable arrangement fee set out below.

*Trade Finance Facilities Agreement:* £70,000,000, stepping down to £60,000,000 on 30 June 2021 (the "**First Step Down Date**") and stepping down to £50,000,000 on 31 December 2021 (the "**Second Step Down Date**").

The Total Commitments shall initially be made up of Total RCF Commitments of £10,500,000 and Total Import Facility Commitments of £59,500,000, provided that the Original Borrower may, on not less than three Business Days' written notice to the Facility Agent, re-allocate any Available Commitments in respect of the Import Facility to the Revolving Credit Facility (and vice versa) from time to time in its sole discretion, provided always that any re-allocation which would have the effect that the Total RCF Commitments exceed £15,000,000 (as reduced pro rata on each step down date) shall require the prior written consent of the Facility Agent).

*Buyer Agreement:* BA Exposure Limit: £10,000,000.

**Aggregate Trade Exposure:** The aggregate principal amount of outstanding Utilisations and Ancillary Outstandings under the Trade Finance

Facilities Agreement shall not, when aggregated with the aggregate principal amounts outstanding under the Buyer Agreement exceed:

(a)    prior to the First Step Down Date, £70,000,000 (the "**First Step-Down**");

(b)    on and from the First Step Down Date to the Second Step Down Date, £60,000,000 (the "**Second Step-Down**"); and

(c)    on and from the Second Step Down Date, £50,000,000.

(the "**Aggregate Trade Exposure**").

The Original Borrower shall confirm to the Facility Agent under the Trade Finance Facilities Agreement in writing by no later than (i) in relation to the First Step-Down, 10 Business Days prior to the First Step Down Date or (ii) in relation to the Second Step-Down, 10 Business Days the Second Step Down Date, the allocation of the step down amount between the Trade Finance Facilities Agreement and the Buyer Agreement, provided that the Buyer (under and as defined in the Buyers Agreement) has entered into consultation with HSBC (under and as defined in the Buyer Agreement) by no later than the date falling 20 Business Days prior to the First Step Down Date (in the case of the First Step-Down) or 20 Business Days prior to the Second Step Down Date (in the case of the Second Step-Down) regarding the proposed allocation, provided further that if the Facility Agent under the Trade Finance Facilities Agreement does not agree to such allocation prior to the date falling 5 Business Days prior to the First Step Down Date (in the case of the First Step-Down) or 5 Business Days prior to the Second Step Down Date (in the case of the Second Step-Down) then the Facility Agent under the Trade Finance Facilities Agreement shall determine each such allocation.

**Transaction Security:**    In accordance with the Agreed Security Principles:

(a)    the same Transaction Security as provided for in the existing Senior Facilities Agreement and Operating Facility Agreement; and

(b)    if the Financial Restructuring is implemented in accordance with "Plan B" of the Steps Plan, Transaction Security over the shares owned by [Newco 3] in New Look Limited, together with any intercompany receivables owed by New Look Limited to [Newco 3].



**Ranking:**

| | |
|---|---|
| *Senior Facilities Agreement:* | Senior secured and *pari passu* with the Operating Facility Agreement, except to the extent set out in the Intercreditor Principles. |
| *Operating Facility Agreement:* | Senior secured and *pari passu* with the Senior Facilities Agreement, except to the extent set out in the Intercreditor Principles. |

**Termination Date:**

| | |
|---|---|
| *Senior Facilities Agreement:* | 30 June 2024. |
| *Trade Finance Facilities Agreement:* | 30 June 2023.  Existing Buyer Agreement to terminate on 28 August 2020. |
| *Operating Facility Refinancing:* | Unless the Parent determines (in the reasonable opinion of the Board of Directors of the Group) that the Operating Facility is not required for the business of the Group (any such determination to be evidenced to the Facility Agent under the Senior Facilities Agreement by delivery to the Facility Agent under the Senior Facilities Agreement of an Officer's Certificate certifying that determination together with a pro forma forecast demonstrating that the Group will be in compliance with the financial covenants referred to in this Term Sheet for the next 12 months): |

(a)    the Parent shall provide a commercial heads of terms for the refinancing of the Operating Facility to the Facility Agent under the Senior Facilities Agreement for its information purposes only not less than three months prior to the Termination Date applicable to the Operating Facility. The terms of such refinancing may be on a committed or non-committed basis and may be provided by the existing lender under the Operating Facility or any other finance provider acceptable to the Parent; and

(b)    if the Parent fails to provide such heads of terms to the Facility Agent under the Senior Facilities Agreement in the prescribed time, no Event of Default shall occur, however, the Facility Agent under the Senior Facilities Agreement shall be entitled to appoint a single Financial Advisor at the reasonable cost of the Group, which Financial Advisor shall be permitted access at reasonable times during normal business hours and on reasonable notice to meet and discuss matters with

NEW
LOOK

senior management of the Group with regards to refinancing the Operating Facility and, to the extent necessary for such purposes, reasonable access to the books and records of the Group, and if the Parent so requires in the presence of a representative of the Group, provided that such access is not exercised in a manner which is materially adverse to the running of the business and all information obtained as a result of such access shall be subject to confidentiality restrictions, and provided that, failure to provide the Financial Advisor with such access shall constitute an Event of Default under the Senior Facilities Agreement and the Operating Facility Agreement.

**Covenants, representations, undertakings, events of default and other terms:**

Subject to the below, on the same terms as applicable to the Senior Facilities Agreement and the Trade Finance Facilities Agreement as at the date of this Agreement (and to include market-standard sanctions and anti-corruption representations and warranty and undertakings in the form attached in Appendix C (*Sanctions and Anti-corruption rider*).

*Covenants:*

*Baskets:*

Unless otherwise stated in Appendix A (*Baskets table*), all baskets are as provided for in the existing Senior Facilities Agreement and/or Operating Facility Agreement.

*Information Undertakings*

From the Restructuring Effective Date, on the terms of the Senior Facilities Agreement and the Operating Facility Agreement subject to the following changes:

Within 14 days of delivering the consolidated management accounts or interim financial statements for each Financial Quarter or financial half-year (as may be applicable), the Parent shall hold a conference call with Lenders about the financial performance of the Group.

Paragraph (b) of clause 26.8 (*Information: miscellaneous*) of the LMA Senior Multicurrency Term and Revolving Facilities Agreement for Leveraged Acquisition Finance Transactions (Senior/Mezzanine) (the "**LMA SFA**") shall be included as an additional information undertaking in clause 23 of the Senior Facilities Agreement and clause 22 of the Trade Finance Facilities Agreement, but only with respect to any such proceedings that are reasonably likely to be adversely determined and which, if adversely determined,

NEW
LOOK

would be reasonably likely to have a Material Adverse Effect.

"**Business Plan**" shall be defined as the financial model for the business of the Group in the form agreed between the Parent and the Lenders under the Senior Facilities Agreement and Trade Finance Facilities Agreement on or prior to the date of this Term Sheet and as may be adjusted for any final terms of the CVA and as may be further adjusted to the extent not materially adverse to the Finance Parties.

An additional information undertaking shall be included in the Senior Facilities Agreement only requiring the Parent to confirm to the Facility Agent (email confirmation being sufficient from any Officer of the Parent) the aggregate principal amount of outstanding Utilisations and Ancillary Outstandings under the Operating Facility (broken down between each type of facility):

(a)     on the Restructuring Effective Date;

(b)      on each monthly reporting date pursuant to paragraph (c) of clause 23.1 (*Financial Statements*) of the Senior Facilities Agreement.

*Minimum liquidity:*

The minimum liquidity covenant set out at (i) Section 1.12 (*Minimum Liquidity*) of Schedule 19 (*Covenants*) to the Senior Facilities Agreement and (ii) Section 1.12 (*Minimum Liquidity*) of Schedule 15 (*Covenants*) to the Trade Finance Facilities Agreement shall be amended to reflect the following:

(a)     tested monthly on the basis of the 13-week cash flow forecast provided under the existing Senior Facilities Agreement and Trade Finance Facilities Agreement;

(b)     if Available Liquidity is forecast to be below £30,000,000 for at least two consecutive weeks of the relevant 13-week cash flow forecast, (i) the Facility Agent under the Senior Facilities Agreement and the Facility Agent under the Trade Finance Facilities Agreement shall be entitled to jointly appoint a single joint Financial Advisor at the reasonable cost of the Group, which Financial Advisor shall be permitted access at reasonable times during normal business hours and on reasonable notice to meet and discuss matters with senior management of the Group with regards to Available Liquidity and, to the extent necessary for such purposes, reasonable access to the books and

NEW
LOOK

records of the Group and, if the Parent so requires in the presence of a representative of the Group, provided that such access is not exercised in a manner which is materially adverse to the running of the business and all information obtained as a result of such access such be subject to confidentiality restrictions, and (ii) the Parent will be obliged to provide the 13-week cash flow forecast on a weekly basis to the relevant Facility Agent and the minimum liquidity covenant shall be tested on a weekly basis, with the weekly 13-week cash flow forecast being delivered to the each Facility agent as soon as practicable and no later than 5 Business Days after the end of the applicable week provided that if the Available Liquidity is subsequently forecast to be equal to or more than £30,000,000 for the duration of the most recently delivered 13-week cash flow forecast, the rights in favour of the Facility Agent detailed at subparagraphs (i) and (ii) above shall automatically and immediately, without further action from any party, cease to apply (until, for the avoidance of doubt, the Available Liquidity is again forecast to be below £30,000,000 for at least two consecutive weeks of the relevant 13-week cash flow forecast); and

(c) if Available Liquidity is forecast to be below £20,000,000 for a period of two consecutive weeks in the first 6 weeks of the relevant 13-week cash flow forecast (the "**Relevant Weekly Forecast**"), an Event of Default shall occur, provided that no Event of Default will occur if, within 10 Business Days after delivery to the Facility Agent of the Relevant Weekly Forecast, the Parent has received the proceeds of any New Equity or Permitted Subordinated Debt in an amount sufficient to ensure that the Available Liquidity for the relevant period would be £20,000,000 or more.

"**Available Liquidity**" means the aggregate of cash and Cash Equivalent Investments of the Group, excluding cash in tills and in transit.

"**Financial Advisor**" shall be an independent third party financial advisor as agreed between the Parent and the Facility Agent in writing (each acting reasonably), and which has delivered to the Parent a confidentiality undertaking in favour of the Parent and any other relevant member of the

8

NEW
LOOK

Group prior to receiving access. For the avoidance of doubt, if a Financial Advisor has been appointed pursuant to the terms of this Term Sheet, the Finance Parties shall be obliged to rely on the existing appointment and may not appoint a separate Financial Advisor pursuant to a separate term of this Term Sheet without express written consent from the Parent.

*Minimum capex:*

The following minimum capex covenants will be added to the Senior Facilities Agreement and Trade Finance Facilities Agreement:

If, in any financial year after the financial year ended [27] March 2021 (a "**Relevant Financial Year**"):

(a)     the Group fails to spend (i) for the financial year ending [26] March 2022, at least £27,500,000 (or its equivalent)[1] and (i) for the financial year ending [26] March 2023, at least £22,500,000 (or its equivalent),[2] in each case as determined within 120 days after the end of such financial year by reference to the annual financial statements of the Group (the difference between the actual capex spend for that financial year and the applicable minimum capex amount specified in sub-paragraphs (a)(i) and (a)(ii) above (as applicable), the "**Unused Capex Amount**"); and

(b)     a period of two months after such determination has elapsed during which time the Group has not spent the Unused Capex Amount on capex,

the Facility Agent under the Senior Facilities Agreement and the Facility Agent under the Trade Finance Facilities Agreement shall be entitled to jointly appoint a single joint Financial Advisor at the reasonable cost of the Group, which Financial Advisor shall be permitted access at reasonable times during normal business hours and on reasonable notice to meet and discuss matters with senior management of the Group with regards to capex spend and, to the extent necessary for such purposes, reasonable access to the books and records of the Group, and if the Parent so requires in the presence of a representative of the Group, provided that such access is not exercised in a manner which is materially adverse to the running of the business and all information obtained as a result of such access shall be subject to confidentiality restrictions.

---

[1]     Set at 50% of the forecast capex spend for that financial year pursuant to the Business Plan

[2]     Set at 50% of the forecast capex spend for that financial year pursuant to the Business Plan

NEW
LOOK

Notwithstanding the above, a failure by the Group to spend at least £20,000,000 on capex (the "**Capex Floor**") in any Relevant Financial Year (as determined within 120 days after the end of such financial year by reference to the annual financial statements of the Group) (the difference between the actual capex spend for that financial year and the Capex Floor being, the "**Shortfall Amount**"), will, if a period of two months after such determination has elapsed and the Group has not spent the Shortfall Amount on capex within such period, constitute an Event of Default under the Senior Facilities Agreement and the Trade Finance Facilities Agreement.

No such access rights shall apply or Event of Default shall occur or be continuing if, within two months of the determination of the Unused Capex Amount or Shortfall Amount (as applicable), 50% of the Unused Capex Amount or Shortfall Amounts (as applicable) is applied in reduction of the Senior Facilities Agreement and the Operating Facility Agreement on a pro rata basis.

| | |
|---|---|
| *Minimum EBITDA:* | The following minimum EBITDA covenant will be added to the Senior Facilities Agreement and Trade Finance Facilities Agreement: |

Minimum EBITDA to be set with 30% headroom to the Business Plan (adjusted for the effect of the CVA) and tested quarterly on an LTM basis, with the first test to commence in respect of the Financial Quarter ending [25] December 2021.

Any failure to comply with such covenant shall not result in an Event of Default but shall entitle the lenders under the Senior Facilities Agreement and Trade Finance Facilities Agreement to appoint a single joint Financial Advisor at the reasonable cost of the Group, which Financial Advisor shall be permitted access at reasonable times during normal business hours and on reasonable notice to meet and discuss matters with senior management of the Group with regards to the profitability of the Group and, to the extent necessary for such purposes, reasonable access to the books and records of the Group, and if the Parent so requires in the presence of a representative of the Group, provided that such access is not exercised in a manner which is materially adverse to the running of the business and all information obtained as a result of such access shall be subject to confidentiality restrictions.

NEW
LOOK

| | |
|---|---|
| *Notes-related covenants:* | Clause 25.5 (*Notes Debt*) and clause 25.8 (*Consultation with Lenders regarding prepayment of Senior Notes*) of the Senior Facilities Agreement and clause 25.12 (*Consultation with Lenders regarding prepayment of Senior Notes*) of the Trade Finance Facilities Agreement to be deleted. |
| *Most Favoured Nation:* | The Senior Facilities Agreement shall be amended to include a 'most favoured nation' covenant in relation to the Operating Facility Documents (as defined in the Intercreditor Agreement) on the following terms: |

If:

(a)    any financial covenant (as set out in this Term Sheet) or information undertaking, in each case, under the Trade Finance Facilities Agreement which is replicated in substantially identical form (subject to necessary changes) in the Senior Facilities Agreement is amended; or

(b)    any additional Security or assurance against loss is granted by any member of the Group in favour of an Operating Facility Lender (as defined in the Intercreditor Agreement), in each case, to the extent such amendment is not in relation to any cash cover permitted under the Senior Facilities Agreement, the relevant Permitted Senior Financing Agreement or the relevant Operating Facility Document (as the case may be) relating to any Ancillary Facility or for any Letter of Credit issued by an Issuing Bank (each capitalised term in the foregoing as defined in the Intercreditor Agreement),

(each such provision in paragraphs (a) or (b), an "**MFN Provision**") in each case, after the Restructuring Effective Date,

(c)    the Parent:

(i)    shall, on or before the date such amendment to an MFN Provision is entered into, deliver a notice to the Facility Agent under the Senior Facilities Agreement together with a signed copy of the document evidencing such amendment, and

(ii)    may request that the relevant provision in the Senior Facilities Agreement be amended to reflect the equivalent MFN Provision(s) in

NEW
LOOK

the relevant Operating Facility Document, in which case, the consent of the Finance Parties to such amendments shall not be unreasonably delayed or withheld, and, provided that no Default is continuing, upon receipt of such consent, the Senior Facilities Agreement shall be deemed to be so amended; and

(d)     the Facility Agent (on the instructions of the Majority Lenders) under the Senior Facilities Agreement may notify the Parent that it requires that (as applicable) the relevant provision in the Senior Facilities Agreement be amended to reflect the equivalent MFN Provision(s) in the relevant Operating Facility Document, in which case, upon such notification, the Senior Facilities Agreement shall be deemed to be so amended,

and, in each case, the Parties shall promptly enter into any amendment documentation to evidence such amendments or, as applicable, the Parent shall procure that the relevant members of the Group promptly enter into any additional documentation to reflect such additional Security or assurance against loss as required by the Facility Agent (acting reasonably).

|  |  |
|---|---|
| ***Representations:*** | The following additional representations shall be included in clause 22 (*Representations*) of the Senior Facilities Agreement and clause 21 (*Representations*) of the Trade Finance Facilities Agreement: |

1.     paragraph (a)(ii) of clause 25.6 (*Validity and admissibility in evidence*) of the LMA SFA shall be included within clause 22.5(a) of the Senior Facilities Agreement and clause 21.5(A) of the Trade Finance Facilities Agreement;*

2.     subject to Legal Reservations and Perfection Requirements, clause 25.7 (*Governing law and enforcement*) of the LMA SFA shall be included as a new representation and warranty in clause 22 (*Representations*) of the Senior Facilities Agreement and clause 21 (*Representations*) of the Trade Finance Facilities Agreement;*

NEW
LOOK

3.  paragraph (f) of clause 25.13 (*Financial statements*) of the LMA SFA shall be included as a new representation and warranty in clause 22 (*Representations*) of the Senior Facilities Agreement and clause 21 (*Representations*) of the Trade Finance Facilities Agreement;*

4.  paragraphs (a) to (e) (inclusive, but by reference to the Business Plan only) and paragraph (g) of 25.12 (*No misleading information*) of the LMA SFA (including appropriate knowledge qualifiers (based on the best of its knowledge and belief, after having made due enquiries)) shall be included as a new representation and warranty in clause 22 (*Representations*) of the Senior Facilities Agreement and clause 21 (*Representations*) of the Trade Finance Facilities Agreement; and

5.  clause 25.24 of the LMA SFA (*Intellectual Property*) (including materiality and MAE qualifiers) shall be included as a new representation and warranty in clause 22 (*Representations*) of the Senior Facilities Agreement and clause 21 (*Representations*) of the Trade Finance Facilities Agreement.

The representations and warranties above shall be made on the Restructuring Effective Date and those marked with an * above shall repeat on the date of each Utilisation Request and the first day of each Interest Period.

**Events of Default:**

The following Events of Default to be included and/or amended in Clause 26 (*Events of Default*) and Schedule 20 (*Defaults*) of the Senior Facilities Agreement and Clause 26 (*Events of Default*) and Schedule 16 (*Defaults*) of the Trade Finance Facilities Agreement:

1.  paragraph (a) of Schedule 20 (*Defaults*) of the Senior Facilities Agreement and Schedule 16 (*Defaults*) of the Trade Finance Facilities Agreement shall be amended to apply with respect to any amounts due and payable under the Senior Finance Documents (and not paid for 10 Business Days);

2.  paragraph (e) of Schedule 20 (*Defaults*) of the Senior Facilities Agreement and paragraph (d) of Schedule 16 (*Defaults*) of the Trade Finance Facilities Agreement (as applicable) shall be amended so that the "60 days" reference therein is shortened to "20 Business Days" for any failure by the Parent to

NEW
LOOK

comply with the additional information or access undertakings set out in this Term Sheet to the extent such undertaking expressly applies to that Relevant Facilities Agreement;

3.    clause 29.8 (*Creditors' process*) of the LMA SFA will be included, but only to the extent applicable to the Parent or a Significant Subsidiary or group of Subsidiaries that, taken together (as of the latest audited consolidated financial statements for the Parent and its Subsidiaries), would constitute a Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law and subject to a £20,000,000 *de minimis* threshold and a 30 day grace period;

4.    clause 29.10 (*Intercreditor Agreement*) of the LMA SFA, but applicable only to a Debtor or Investor (each as defined in the Intercreditor Agreement) and subject to customary materiality thresholds and a 30 Business Day grace period; and

5.    Clause 26.2 (*Unlawfulness, invalidity, rescission and repudiation*) of the Senior Facilities Agreement and Trade Finance Facilities Agreement to be updated to include, subject to the Legal Reservations and Perfection Requirements and the existing proviso of such clause, the invalidity of Transaction Security and subordination created under the Intercreditor Agreement or either of the same ceasing to be legal, valid, binding, enforceable or effective or being alleged to be ineffective by any member of the Group.

6.    an Event of Default shall occur under the Senior Facilities Agreement if the Operating Facility is not refinanced by the date falling 14 days prior to the Termination Date (as defined in the Operating Facility Agreement), unless the Parent determines (in the reasonable opinion of the Board of Directors of the Group) that the Operating Facility is not required for the business of the Group (any such determination to be evidenced to the Facility Agent under the Senior Facilities Agreement by delivery to the Facility Agent under the Senior Facilities Agreement of an Officer's Certificate certifying that determination together with a pro forma forecast demonstrating that the Group will be in compliance with the financial covenants referred to in this Term

NEW
LOOK

|  |  |
|---|---|
|  | Sheet for the next 12 months). Such Event of Default will be subject to a 14 day grace period. |
| **Voluntary Prepayment – call protection:** |  |
| *Senior Facilities Agreement:* | 1. Prior to 1 October 2021, no prepayment fee shall be payable; |
|  | 2. on or after 1 October 2021 but prior to 30 September 2022, an amount equal to 2.00% of the principal amount of such prepayment; |
|  | 3. on or after 30 September 2022 but prior to 30 September 2023, an amount equal to 1.00% of the principal amount of such prepayment; and |
|  | 4. on or after 1 October 2023, , no prepayment fee shall be payable. |
| *Operating Facility Agreement:* | None. |
| **Mandatory Prepayment:** |  |
| *Change of Control:* | As per the existing Senior Facilities Agreement and Operating Facility Agreement, except that there shall be no mandatory prepayment or entitlement to require a mandatory prepayment as a result of any Change of Control due to the Financial Restructuring. |
| **Assignment and Transfers by Lenders:** |  |
| *Senior Facilities Agreement:* | As per the existing Senior Facilities Agreement, except that clause 27.2(b)(i) and (ii)(A) shall be deleted. |
| *Trade Finance Facilities Agreement:* | As per the existing Trade Finance Facilities Agreement, except that clause 27.2(a)(i) shall be deleted. |
| **Replacement of screen rate:** | Clause 14 (*Changes to Calculation of Interest*) of the Senior Facilities Agreement and the Trade Finance Facilities Agreement to be retained, save for the removal of Clause 14.3 (*Alternative Reference Bank Rate*) of each of the Senior Facilities Agreement and Trade Finance Facilities Agreement. Replacement of Screen Rate language in accordance with Clause 42.5 (*Replacement of Screen Rate*) of the LMA SFA (with Majority Lender thresholds) to be included. |

NEW
LOOK

| | |
|---|---|
| **Intercreditor Principles:** | The Intercreditor Agreement will be amended to reflect the principles set out in Appendix B (*Intercreditor Principles*). |
| **Miscellaneous Provisions:** | Qualified financial contract (QFC) and contractual recognition of bail in language to be included. |
| **Tax:** | Clause 16 (*Tax gross-up and indemnities*) of the Senior Facilities Agreement and the Trade Finance Facilities Agreement to be amended as follows: |

1. Qualifying Lender provisions should only relate to the Original Borrower jurisdictions.

2. Treaty Lender wording to be updated given the Original Obligors are all in the UK (other than the Jersey). Obligation on Lenders to produce a certificate of residence to the Borrower on request to be removed.

3. Bank Levies should be limited to known bank levies only, in each case, in force or publicly announced as at Restructuring Effective Date.

| | |
|---|---|
| **Conditions precedent** | As per clause 4.1 and paragraphs 1, 2(a) (being the Relevant Facilities Agreement, Intercreditor Agreement and applicable fee letters) and 3 of Part 1 of Schedule 2 (Closing Date Conditions Precedent) of the existing Senior Facilities Agreement and: |

1. An Officer's Certificate from the Parent (signed by an authorised signatory) confirming that: (a) the CVA has been approved; (b) no creditor entitled to vote on the CVA has applied to court to challenge the CVA within the period of 28 days of the date on which the CVA Approval has been reported to the court (or if any such application has been made, that it has been withdrawn); and (c) the CVA provides for the achievement of a rent reduction which is not materially more adverse than the estimated rental value as set out in the initial financial model (being the financial forecast dated 12 June 2020 delivered by or on behalf of the Parent to the Lenders and reviewed by A&M), on the basis confirmed in writing by the Parent to the Lenders on or before the date of the Lock-

N E W
L O O K

up Agreement (for this purpose "**CVA**" means the company voluntary arrangement as referred to in the Steps Plan and "**CVA Approval**" means that the CVA has been approved by the requisite creditors in accordance with Part I of the Insolvency Act 1986);

2.    re-confirmation of existing security;

3.    a structure chart describing the borrowers and guarantors of all outstanding debt in the Group to be subject to the Intercreditor Agreement;

4.    a funds flow statement for information purposes only setting out use of proceeds and showing the liquidity position of the Group post funding.



## PART 4

## PRICING

**Margin:**

*Senior Facilities Agreement:*

| Leverage Ratio | Facility Margin p.a. |
|---|---|
| > 2.00:1 | 6.00% |
| ≤ 2.00:1 | 5.00% |

provided that in respect of any Interest Period for a Loan ending prior to 31 December 2021**:**

(a)  the highest rate specified in the table above shall be applicable to that Loan; and

(b)  an additional 50 bps Margin ("**PIK Margin**") shall accrue in respect of each Loan and shall not be paid in cash but shall instead be capitalised and added to the outstanding principal amount of the relevant Loan on the last day of the relevant interest period applicable to that Loan and subsequently treated for all purposes as part of the principal amount of that Loan.

"**Leverage Ratio**" for the purposes of the Margin shall have the meaning given to it in the Senior Facilities Agreement and the Trade Finance Facilities Agreement where the reference to "Consolidated Net Leverage Ratio" shall be as defined in the Senior Notes Indenture provided that only Indebtedness under the Senior Facilities Agreement and cash loans under the Operating Facility Agreement shall be included for the purposes of "Consolidated Leverage" under paragraph (i)(x) of the definition "Consolidated Net Leverage" (as defined in the Senior Notes Indenture) and the aggregate of cash and Cash Equivalents of the Group in excess of £30,000,000 may be deducted from "Consolidated Leverage" for the purposes of paragraph (i)(y) of the definition of "Consolidated Net Leverage" (as defined in the Senior Notes Indenture) and there shall be no adjustments for lost revenue directly resulting from the COVID-19 pandemic and any adjustments for one-off expenses occurred as a result of the COVID-19 pandemic shall be capped at £10,000,000 in aggregate.



| | |
|---|---|
| *Trade Finance Facility Agreement:* | On the same terms as applicable to the Trade Finance Facility Agreement as at the date of this Agreement, subject to a 0.50 per cent increase on the Margin applicable to any Loan. |
| **Applicable fees in connection with transaction:** | |
| *Senior Facilities Agreement:* | 1.00 per cent arrangement fee (not paid in cash but capitalised on the Restructuring Effective Date). |
| *Operating Facility Agreement:* | 1.00 per cent exit fee (paid in cash on the Termination Date). |



# APPENDIX A

## BASKETS TABLE

Except as amended below, all baskets are as provided for in the existing Senior Facilities Agreement and/or Trade Finance Facilities Agreement.

|  | Amended baskets to Senior Facilities Agreement and Operating Facility Agreement |
|---|---|
| **DEBT COVENANT** |  |
| *Existing Notes* | Existing basket to be removed. |
| *Credit Facilities* | £100 million.<br><br>To the extent funds are raised from Credit Facilities outside the Senior Facilities Agreement, the net cash proceeds of such funds will be used to pay down Senior Facilities Agreement on a pound for pound basis, subject to the Refinancing Consent Rights. |
| *Cap Leases / Purchase money debt* | £10 million. |
| *Permitted Trade L/C Facilities* | £100 million, incurrence limited to operational and working capital purposes, provided that, if the Group's LTM EBITDA is less than £50 million at that time, the prior consent of the Facility Agent under the Trade Finance Facilities Agreement is required for any incurrence of a secured Trade L/C Facility where the Trade L/C Facility Amounts then outstanding exceeds (or would following incurrence of such new Trade L/C Facility exceed) £70 million, subject to the Refinancing Consent Rights. For the avoidance of doubt, no pound for pound reduction. |
| *Permitted Qualified Receivables Financing* | £30 million, incurrence limited to operational and working capital purposes, provided that the Facility Agent under the Trade Finance Facilities Agreement has given it's prior consent to such incurrence.<br>The net cash proceeds of such financing will be used to pay down the Senior Facilities Agreement on a pound for pound basis. |
| *Permitted Inventory Financing* | £50 million for inventory financing to be incurred on customary terms which has sole recourse to the assets financed by such financing (and to which the Parent has shared the substantially agreed term sheet in respect of such financing with the Facility Agent under the Senior Facilities Agreement), provided that the Facility Agent under the Trade Finance Facilities Agreement has given it's prior consent to such incurrence.<br>The net cash proceeds of such financing will be used to pay down the Senior Facilities Agreement on a pound for pound basis. |
| *General basket* | £60 million (to rank junior on the Transaction Security or unsecured (together "**Junior Debt**")) and subject to non-Guarantor cap of £10 million, provided that any Junior Debt does not mature prior to the date which is 3 months after the latest maturity date under the Senior Facilities Agreement and the Security Agent receives copies of the Junior Debt documentation as soon as reasonably practicable after the relevant Junior Debt is incurred. |

NEW
LOOK

| | Amended baskets to Senior Facilities Agreement and Operating Facility Agreement |
|---|---|
| | An additional undertaking shall be included in the Senior Facilities Agreement and Operating Facility Agreement requiring the Parent to provide copies of any amendments entered into in respect of the Junior Debt documentation, promptly after entering into such documentation. |
| *Refinancing Indebtedness* | No Refinancing Indebtedness may have a maturity that is earlier than the maturity of the debt under the Senior Facilities Agreement or Trade Finance Facilities Agreement. |
| *Refinancing Consent Rights* | To the extent the proceeds of any Additional Debt used to refinance all or any part of any Refinanced Facility (and not, for the avoidance of doubt, both Refinanced Facilities) in an amount greater than £20 million in aggregate at any time prior to the first anniversary of the Restructuring Effective Date or at any time the Parent is in breach of the financial covenants set out in this Term Sheet, such Additional Debt may not be incurred without the prior written consent of the Facility Agent under the Non-Refinanced Facility.

For the avoidance of doubt, the net cash proceeds of any Additional Debt which is less than £20 million in aggregate will not be used to pay down Trade Finance Facilities Agreement during any of the periods referred to in the preceding paragraph.

For this purpose:

"**Additional Debt**" means any additional Financial Indebtedness incurred under the Credit Facilities basket or the Permitted Trade L/C Facilities basket which either ranks "super senior" under the Intercreditor Agreement, is Pari Passu Indebtedness or is secured by a Lien on the Collateral.

"**Refinanced Facility**" means any facility made available under (a) the Senior Facilities Agreement or (b) the Trade Finance Facilities Agreement, in each case, which is refinanced with the proceeds of any Additional Debt.

"**Non-Refinanced Facility**" means any facility made available under the Senior Facilities Agreement or the Trade Finance Facilities Agreement which is not a Refinanced Facility.

The lender under the Operating Facility shall be notified and consulted in advance on any Additional Debt which is to be applied in prepayment of the Operating Facility. |
| **RESTRICTED PAYMENTS COVENANT** | |
| *General* | Limitation on paying down any Subordinated Indebtedness to cover any second lien debt (not just debt subordinated in right of payment). |

NEW
LOOK

|  | **Amended baskets to Senior Facilities Agreement and Operating Facility Agreement** |
|---|---|
| *General RP basket* | £7.5 million provided that such basket cannot be used for any direct or indirect dividends, share buybacks, payments or distributions to any direct or indirect shareholders or Permitted Holders. |
| *Holding company payments* | Ordinary course, including holding company overheads, fees, costs and expenses capped at £1 million p.a. + related taxes<br><br>Note, a new basket will be added to cover fees, costs and expenses related to the Financial Restructuring. |
| *General Permitted Investment basket* | £12.5 million provided that such basket cannot be used for any direct or indirect dividends, share buybacks, payments or distributions to any direct or indirect shareholders or Permitted Holders. |
| **ASSET SALES** | |
| *De minimis exception* | £5 million. |
| *Cash consideration requirement - Permitted Asset Swap carve out* | Carve out for cash consideration requirements for Permitted Asset Swap to be limited to a Permitted Asset Swap in respect of non-current assets only. |
| *Designated non-cash consideration* | £10 million. |
| *Threshold for tender offer* | £20 million. |
| **LIENS** | |
| *Permitted Collateral Liens* | The words "*or which are secured on assets that are subject to a floating charge in favour of the Finance Parties*" will be deleted in (A)(i) of the definition of "Permitted Collateral Liens" and the following proviso shall be added to the definition of "Collateral": "*provided that any property or asset subject only to a floating charge (and not any other Lien) under any Transaction Security Document to the extent such charge has not crystallized into a fixed charge shall not be deemed "Collateral" for the purposes of determining whether a Permitted Lien is permitted over such asset or property*" |
| **FINANCIAL DEFINITIONS** | |
| *Pro forma adjustments* | For Consolidated  EBITDA, as calculated in "Consolidated Leverage Ratio" (as defined in the Senior Notes Indenture) subject to a 10% cap. |



## APPENDIX B

### INTERCREDITOR PRINCIPLES

**Documentation:**  The Intercreditor Agreement will be amended to reflect the capital structure contemplated by this Term Sheet, including such amendments as are set out in this Appendix.

**Instructing Group:**  On or prior to the Senior Discharge Date, the "Instructing Group" shall be constituted by the Majority Senior Creditors provided that:

(a)    for the purposes of the definition of the "Instructing Group", the definitions of "Senior Creditors", "Senior Credit Participations" and "Senior Creditor Discharge Date" shall include the Operating Facility Lenders, their Aggregate Trade Exposure and the Operating Facility Liabilities, respectively; and

(b)    if at any time any one Senior Creditor (as adjusted in accordance with paragraph (a) above) holds 33 1/3 per. cent or more of the total aggregate amount of all Exposure (being, in relation to a Senior Creditor at any time, the aggregate amount of its participation in all utilisations outstanding under the Senior Facilities Agreement and the Operating Facility Agreement (whether by loan, letter of credit or otherwise but only to the extent that SFA Cash Cover has not been provided by a Debtor in respect of those amounts) (excluding the Super Priority Liabilities)) at that time (the "**Predominant Creditor**"):

(i)    any instruction to the Security Agent to enforce the Transaction Security, take any other Enforcement Action or exercise any other right, power, authority or discretion (each, a "**Positive Instruction**") by the Predominant Creditor shall be taken into account for the purposes of determining the Instructing Group only if either (1) at least two Senior Creditors (who are not the same entity as, or an Affiliate of, the Predominant Creditor) or (2) those Senior Creditors (who are not the same entity as, or an Affiliate of, the Predominant Creditor) whose Exposure at that time aggregate 15 per cent or more of the total Exposure, at that time, are also providing same Positive Instruction to the Security Agent as the Predominant Creditor; and

(ii)    any instruction to the Security Agent to refrain or cease from enforcing the Transaction Security, taking any other Enforcement Action or exercising any other right, power, authority or discretion (including, failing to give instruction in relation to any such matter) (each, a "**Negative Instruction**") by the Predominant Creditor shall be taken into account for the purposes of determining the Instructing Group only if either (1) at least two Senior Creditors (who are not the same entity as, or an Affiliate of, the Predominant Creditor) or (2) those Senior Creditors (who are not the same entity as, or an Affiliate of, the Predominant Creditor) whose Exposure at that time aggregate 10 per cent or more of the total Exposure, at that



time, are also providing the same Negative Instruction to the Security Agent as the Predominant Creditor.

After the Senior Discharge Date, the "Instructing Group" shall be constituted by the Majority Second Lien Creditors.

**Application of Proceeds:** As per the Intercreditor Agreement, provided that:

(a) until 30 June 2021, while the Total Commitments under the Operating Facilities exceed £60,000,000 Recoveries up to the lesser of (i) the amount of the outstanding Utilisations under the Operating Facilities in excess of £60,000,000 and (ii) of £10,000,000; and

(b) on and from 30 June 2021 until 31 December 2021, while the Total Commitments under the Operating Facilities exceed £50,000,000, Recoveries up to the lesser of (i) the amount of the outstanding Utilisations under the Operating Facilities in excess of £50,000,000 and (ii) £10,000,000,

shall be applied by the Security Agent in payment to the Operating Facility Lenders for application towards the discharge of the Operating Facility Liabilities (such amount of the Operating Facility Liabilities being the "**Super Priority Liabilities**"), to the extent permitted by applicable law (and, in all other respects, subject to the provisions of clause 13 of the Intercreditor Agreement), in priority to the Senior Lender Liabilities, the Hedging Liabilities and the remaining Operating Facility Liabilities.

**Senior Notes Liabilities:** The category of Senior Notes Liabilities (and associated references) shall be deleted.

**Senior Parent Liabilities:** The category of Senior Parent Liabilities (and associated references) will be replaced by the category of Second Lien Liabilities (and associated references), with the following principles reflected:

(a) Second Lien Liabilities may be constituted by loan or note liabilities;

(b) the Senior Secured Liabilities and Operating Facility Liabilities shall rank in right and priority of payment to the Second Lien Liabilities and the Transaction Security shall secure the Senior Secured Liabilities and Operating Facility Liabilities in priority to the Second Lien Liabilities; and

(c) any Payment of the Second Lien Liabilities shall be as provided for in "Second Lien – Permitted Payments" below and any Enforcement Action in respect of Second Lien Liabilities shall be as provided for in "*Second Lien – Enforcement*" below.

**Second Lien - Permitted Payments:** As per clause 5.2 of the Intercreditor Agreement, subject to the following changes:

(a) Payments shall be permitted in respect of principal amounts in accordance with clauses under the Second Lien Finance Documents relating to repayment or prepayment of Second Lien Creditors on: (1) illegality (provided that the relevant illegality does not arise as a result of action taken by a Second Lien Creditor

24

NEW
LOOK

which is taken with the intention of triggering a prepayment under such provision); (2) to the extent required to cancel and repay or prepay a single lender in relation to a tax gross-up, tax indemnity or increased costs; or (3) to the extent an equivalent payment has been made or will be made simultaneously under a Senior Financing Agreement or Operating Facility Document (in relation to any creditor thereunder exercising its right to be prepaid), change of control / sale of all or substantially all of the assets of the Group, provided that in each case (other than in respect of illegality) no Event of Default is continuing and no Second Lien Payment Stop Notice has been issued or Senior Payment Default has occurred;

(b)     Payments of non-cash interest made by means of capitalisation of interest or the issue of an instrument subordinated to the Senior Secured Liabilities on the same terms as the Second Lien Liabilities shall not be subject to any Second Lien Payment Stop Notice or Senior Payment Default block;

(c)     if an Event of Default is continuing under the Second Lien Finance Documents, Payments shall be permitted in respect of commercially reasonable work fees and professional fees, costs and expenses for restructuring advice and valuations (including legal advice and the advice of other appropriate financial/restructuring advisors), provided that such fees paid in cash do not exceed 1.00 per cent of the total commitment under the Second Lien Finance Documents but excluding any fees or costs incurred in connection with any current, threatened or pending litigation against any Senior Secured Creditor or Operating Facility Lender);

(d)     Payments shall be permitted in respect of amounts due under the original form of any fee/OID letter or any compensation relating to the Second Lien Finance Documents in relation to an increase in the principal amount of the Second Lien Liabilities that is not prohibited by the terms of the Senior Financing Agreements, provided that such fee paid in cash does not exceed 1.00 per cent of the total commitments under such Second Lien Finance Document and in each case no Second Lien Payment Stop Notice has been issued or Senior Payment Default has occurred;

(e)     Payments shall be permitted in respect of consent and/or waiver fees in respect of any consent granted under, or waiver or amendment of any provisions of, a Second Lien Finance Document (provided those fees do not exceed, on a percentage basis, any corresponding fees paid to the Senior Secured Creditors or Operating Facility Lenders);

(f)     Payments shall be permitted in respect of an amount that is outstanding as a result of the accrual of cash interest payable in respect of the Second Lien Liabilities during a period when a Second Lien Payment Stop Notice was outstanding (provided that such Second Lien Payment Stop Notice is no longer outstanding); or

(g)     Payments shall be permitted if an Event of Default is continuing under the Second Lien Finance Documents and provided that the Payment is of all or part of the Second Lien Liabilities as a result of those Second Lien Liabilities being released or otherwise



discharged solely in consideration of the issue of shares in any holding company of the Company (each a "**Debt for Equity Swap**") provided that (i) no cash or cash equivalent payment is made in respect of the Second Lien Liabilities, (ii) any Liabilities owed by a member of the Group to another member of the Group, the Investors or any other holding company of the Company that arise as a result of any Debt for Equity Swap are subordinated to the Senior Secured Liabilities pursuant to the Intercreditor Agreement and (iii) any Liabilities owed by a member of the Group to another member of the Group arising as a result of such Debt for Equity Swap are subject to Transaction Security.

On or after the Senior Discharge Date payments may be made to the Second Lien Creditors in accordance with the relevant Second Lien Finance Documents.

**Second Lien Payment Stop Notice:**      As per clause 5.3 of the Intercreditor Agreement, subject to the following changes:

(a)      a Second Lien Payment Stop Notice may only be served from the date which is one Business Day after:

(i)      the date of any of the following Events of Default referred to in paragraphs (A) and (B) below under the Senior Facilities Agreement (or any equivalent in any other Senior Financing Agreement) is continuing or an event under paragraph (C) below is continuing :

(A)      an Event of Default relating to the breach of the minimum liquidity covenant or breach of the minimum capex covenant in the section entitled "*Covenants*" in this Term Sheet, an Event of Default under clause 26.2 (*Unlawfulness, invalidity, rescission and repudiation*) (as amended in accordance with this Term Sheet and only to the extent that the unlawfulness or invalidity relates to a Transaction Security Document or the Intercreditor Agreement), an Event of Default referred to in paragraphs 2 or 3 of the section entitled "*Events of Default*" in this Term Sheet, an Event of Default under paragraph (d) of Schedule 20 (*Defaults*) relating to the non-provision of any annual or quarterly financial statements or any accompanying Compliance Certificates or an Event of Default under paragraphs (e) or (f) of Schedule 20 (*Defaults*); or

(B)      any other Event of Default (other than under paragraph (a) of Schedule 20 (Defaults)) which has or is reasonably likely to have a Material Adverse Effect;

(C)      an acceleration of the Senior Facilities Agreement or Operating Facility; or



|  | (ii) | breach of the minimum EBITDA covenant set out in the section entitled "*Covenants*" in this Term Sheet; |
|---|---|---|

(b)    the reference to "179 days" shall be replaced by a reference to "120 days"; and

(c)    the reference to "45 days" shall be replaced by a reference to "90 days"

**Second Lien –**
**Enforcement:**    As per clauses 5.9 and 5.10 of the Intercreditor Agreement, subject to clause 5.10(a) of the Intercreditor Agreement being deleted and replaced with the following and clause 5.10(f) of the Intercreditor Agreement being deleted:

"*(a)*

(i)    *120 days after the Second Lien Standstill Start Date, in the case of non-payment of any amount of principal, interest or fees in respect of the relevant Second Lien Liabilities or in the case of any financial covenant breach under the relevant Second Lien Financing Agreement; and*

(i)    *150 days after the Second Lien Standstill Start Date, in the case of any other event of default under the relevant Second Lien Financing Agreement;*"

**Consultation:**    As per Clause 11.7 (*Consultation Period*) of the Intercreditor Agreement, subject to the following changes (and the disenfranchisement provisions in the Intercreditor Agreement):

(a)    the obligation to consult in paragraph (a) of clause 11.7 of the Intercreditor Agreement shall extend to consulting with each Agent of the Second Lien Creditors provided that the 30-day time period specified therein shall be reduced to 15 days; and

(b)    paragraphs (b) and (c) of clause 11.7 shall be deleted.

**Distressed Disposals:**    Clause 12.2 (*Distressed Disposals*) of the Intercreditor Agreement shall be modified by the addition of the following value protection provisions for the Second Lien Liabilities:

If a Distressed Disposal is being effected such that the guarantees/Security benefitting the Second Lien Creditors would be released, it is a condition to such release that:

(a)    each Agent of the Second Lien Creditors has approved the release; or

(b)    where the shares/assets of a guarantor or borrower of Second Lien Liabilities are sold:

(i)    the proceeds of such sale or disposal are:

(A)    in cash (or substantially in cash); or

(B)    (only if the consideration in respect of each other cash offer received for those shares or assets is less than the aggregate par value of the outstanding Senior Secured Liabilities and Operating Facility

27



Liabilities) not in cash (or substantially in cash), provided that the requirements of paragraph (C)(II) below are satisfied;

(ii)     all claims of the Senior Secured Creditors and the Operating Facility Lenders (other than in relation to performance bonds or guarantees or similar instruments) against a member of the Group (if any) all of whose shares (other than any minority interest not owned by members of the Group) are sold or disposed of pursuant to such Enforcement Action, are unconditionally released and discharged or sold or disposed of concurrently with such sale (and are not assumed by the purchaser or one of its Affiliates) and all Security under the Security Documents in respect of the assets that are sold or disposed of is simultaneously and unconditionally released and discharged concurrently with such sale, provided that if each Senior Agent (acting reasonably and in good faith):

(A)     determines that the Senior Secured Creditors will recover a greater amount if any such claim is sold or otherwise transferred to the purchaser or one of its Affiliates and not released and discharged; and

(B)     serves a written notice on the Security Agent confirming the same,

the Security Agent shall be entitled to sell or otherwise transfer such claim to the purchaser or one of its Affiliates; and

(iii)     such sale or disposal is made:

(A)     pursuant to a Public Auction in respect of which the Primary Creditors are entitled to participate; or

(B)     where a Financial Advisor selected by the Security Agent has delivered an opinion in respect of such sale or disposal that the amount received in connection therewith is fair from a financial point of view, taking into account all relevant circumstances, including the method of enforcement, provided that the liability of such Financial Advisor may be limited to the amount of its fees in respect of such engagement (it being acknowledged that the Security Agent shall have no obligation to select or engage any Financial Advisor unless it shall have been indemnified and/or secured and/or prefunded to its satisfaction).

**Amendments and waivers: Senior Secured Liabilities and Operating Facility Liabilities:**     The Senior Secured Creditors and Operating Facility Lenders shall be entitled to amend their applicable Debt Documents in accordance with their terms provided that any amendment which results in any increase to the principal amount of such Liabilities may only be made with the prior consent of the Majority Second Lien Creditors but excluding any increase



which is permitted under the original form of such applicable Debt Documents.

The Senior Secured Creditors, the Operating Facility Lenders Creditors and the Parent will not designate a document as a Debt Document without the prior consent of the Majority Second Lien Creditors if the terms of that document effect a change which would otherwise require the consent of the Majority Second Lien Creditors.

**Amendments and waivers: Second Lien Liabilities**

The Second Lien Creditors shall be entitled to amend the Second Lien Finance Documents in accordance with their terms provided that any amendment to the Second Lien Finance Documents which results in any increase to the principal amount of the Second Lien Liabilities (as set out in the original form of the applicable Second Lien Financing Agreement) may only be made with the prior consent of the Majority Senior Creditors but excluding any increase which is permitted under the original form of the applicable Second Lien Financing Agreement.

The Second Lien Creditors and the Parent will not designate a document as a Second Lien Finance Document without the prior consent of the Majority Senior Creditors (which for the purposes of this provision, shall include the Operating Facility Lenders, their Aggregate Trade Exposure and the Operating Facility Liabilities, respectively) if the terms of that document effect a change which would otherwise require the consent of the Majority Senior Creditors.



# APPENDIX C

### SANCTIONS AND ANTI-CORRUPTION

*Definitions:*

**Anti-Corruption Laws** means all laws, rules and regulations of any jurisdiction concerning or relating to bribery or corruption, including, but not limited to, the US Foreign Corrupt Practices Act of 1977 or the UK Bribery Act 2010.

**Anti-Money Laundering Laws** means all applicable financial record keeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency.

**Blocking Law** means:

(a)     any provision of Council Regulation (EC) No 2271/1996 of 22 November 1996 (or any law or regulation implementing such Regulation in any member state of the European Union or the United Kingdom);

(b)     section 7 of the German Foreign Trade Regulation (*Außenwirtschaftsverordnung*); or

(c)     any other applicable blocking or anti-boycott law in any country having jurisdiction over any Lender or Obligor.

**Prohibited Payment** means any bribe, rebate, payoff, influence payment, kickback or other payment or gift of money or anything of value (including meals or entertainment) to any officer, employee or ceremonial office holder of any government or instrumentality thereof, any political party or supra-national organization (such as the United Nations), any political candidate, any royal family member or any other person who is connected or associated personally with any of the foregoing or any other person that is prohibited under any applicable law or regulation.

**Restricted Country** means: a country or territory that is, or whose government is, the subject of general export, import, financial, investment or trade embargos by any Sanctioning Authority, which as at the date of the Agreement, includes Cuba, Iran, the Region of Crimea, North Korea, Sudan and Syria.

**Restricted Entity** means any person, entity or other party that is:

(a)     a government of a Restricted Country,

(b)     located, domiciled, resident, incorporated in a Restricted Country;

(c)     named on any Sanctions List administered by a Sanctioning Authority; or

(d)     controlled or owned by a person, entity or other party referred to in paragraphs (a) to (c) above.

**Sanctioning Authority** means:

(a)     the United Nations;

(b)     the US government or any US government agency (including the Office of Foreign Asset Control);

(c)     the European Union or any present or future member state thereof; or



(d)    the UK government or any UK government agency (including the Foreign and Commonwealth Office of the United Kingdom and Her Majesty's Treasury);

in each case, as amended, supplemented or substituted from time to time.

**Sanctions** means any economic or financial sanctions or trade embargoes administered, enacted or enforced by any Sanctioning Authority.

**Sanctions Lists** means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, the Consolidated List of Asset Freeze Targets maintained by Her Majesty's Treasury or any equivalent list of designated persons and/or entitles maintained by or public announcement of a Sanctions designation made by a Sanctioning Authority, each as amended, supplemented or substituted from time to time.

***Representations:***

**1.1**    **Anti-Corruption Laws and Anti-Money Laundering Laws**

(a)    It and each of its Subsidiaries:

    (i)    has conducted its businesses and is in compliance with all Anti-Corruption Laws and Anti-Money Laundering Laws and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving it or any of its Subsidiaries with respect to the Anti-Corruption Laws or Anti-Money Laundering Laws is pending or, to the best of its knowledge and belief, threatened or contemplated;

    (ii)    has instituted and maintains policies and procedures reasonably designed to promote and achieve compliance with such laws applicable to it in the jurisdictions in which it operates;

    (iii)    has not made, offered to make, promised to make or authorised any Prohibited Payment; and

    (iv)    has not been subject to any investigation by any governmental entity with regard to any actual or alleged Prohibited Payment.

(b)    No funds or other consideration it contributes in connection with any transaction under the Finance Documents will have been derived from or related to any activity that violates or is deemed criminal under the Anti-Corruption Laws or Anti-Money Laundering Laws.

**1.2**    **Sanctions**

(a)    Neither it nor any of its Subsidiaries, directors or officers or, to the best of its knowledge and belief, any of its or their employees:

    (i)    is a Restricted Entity;

    (ii)    is or has ever been subject to any claim, proceeding, formal notice or investigation with respect to Sanctions;

    (iii)    is engaging or has engaged (since the date of this Agreement) in any transaction that evades or avoids or has the purpose of evading or avoiding or breaches or attempts to breach any Sanctions; or



(iv)  has engaged (since the date of this Agreement) or is engaging, directly or indirectly, in any trade, business or other activity with it for the benefit of any Restricted Country or Restricted Entity in breach of applicable Sanctions.

(b)  Paragraph (a) above will not apply if and to the extent that it results in a violation of or conflict with, or exposes any party to this Agreement or any directors, officers or employees of the foregoing to liability under any Blocking Law applicable to that person.

*Undertakings:*

### 1.3   Anti-Corruption Laws and Anti-Money Laundering Laws

(a)  Each Obligor must maintain in effect and enforce policies and procedures designed to ensure compliance by it and its respective directors, officers, employees and agents with Anti-Corruption Laws and Anti-Money Laundering Laws.

(b)  Each Obligor must not (and must ensure that none of its respective directors, officers, employees will) use the proceeds of any Loan in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of any Anti-Corruption Laws and Anti-Money Laundering Laws.

### 1.4   Sanctions

(a)  Each Obligor shall not and shall ensure that none of its Subsidiaries will:

(i)  use, lend, contribute or otherwise make available any part of the proceeds of the Facility or other transaction contemplated by the Finance Documents directly or knowingly indirectly:

(A)  for the purpose of any trade, business or other activities involving or for the benefit of any Restricted Entity or Restricted Country in breach of any Sanctions; or

(B)  in any other manner that would result in any person being in breach of Sanctions;

(ii)  engage in any transaction that evades or avoids or has the purpose of evading or avoiding or breaches or attempts to breach, directly or indirectly, any Sanctions; or

(iii)  fund all or part of any payment in connection with a Finance Document out of proceeds derived from business or transactions with a Restricted Entity or involving business with a Restricted Country that is in breach of applicable Sanctions, or from any action which is in breach of Sanctions.

(b)  Each Obligor shall, and shall use its best efforts to procure that its Subsidiaries will, comply with all Sanctions.

(c)  Each Obligor shall promptly upon written notice of the same, supply to the Facility Agent details of any claim, action, suit, proceedings or investigations against it by a Sanctioning Authority with respect to Sanctions.

(d)  Paragraphs (a) to (c) above shall not apply if and to the extent that they result in a violation of or conflict with, or expose any party to this Agreement or any directors, officers or employees of the foregoing to liability under any Blocking Law applicable to that person.

## APPENDIX 6

**FORM OF SHAREHOLDER LOAN AGREEMENT**

**SUBSTANTIALLY AGREED FORM**

**_____ 2020**

**[NEWCO]**

as Borrower

**THE INSTITUTIONS LISTED**

as Original Lenders

and

**GLOBAL LOAN AGENCY SERVICES LIMITED**

as Facility Agent

---

# SHAREHOLDER LOAN AGREEMENT

---

# CONTENTS

**Clause**                                                                  **Page**

| | | |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | THE SHAREHOLDER LOAN | 11 |
| 3. | REPAYMENT | 12 |
| 4. | VOLUNTARY PREPAYMENT | 12 |
| 5. | RESTRICTIONS: GENERAL | 12 |
| 6. | REPRESENTATIONS | 12 |
| 7. | FINANCIAL STATEMENTS | 14 |
| 8. | EVENTS OF DEFAULT | 15 |
| 9. | CHANGES TO THE LENDERS | 16 |
| 10. | ROLE OF THE FACILITY AGENT AND OTHERS | 21 |
| 11. | NOTICES | 27 |
| 12. | FATCA INFORMATION | 29 |
| 13. | PARTIAL INVALIDITY | 29 |
| 14. | REMEDIES AND WAIVERS | 30 |
| 15. | AMENDMENTS AND WAIVERS | 30 |
| 16. | CONFIDENTIALITY | 33 |
| 17. | COUNTERPARTS | 35 |
| 18. | GOVERNING LAW | 35 |
| 19. | ENFORCEMENT | 35 |
| SCHEDULE 1 | | 37 |
| | THE ORIGINAL LENDERS | |
| SCHEDULE 2 | | 38 |
| | FORM OF TRANSFER CERTIFICATE | |

EU-DOCS\29780222.8

**THIS AGREEMENT** is dated _____ 2020 and made between:

(1)  **[NEWCO],** a company incorporated under the laws of Jersey with registered number [ ● ] (the "**Borrower**"); and

(2)  **THE INSTITUTIONS** listed in Schedule 1 (*The Original Lenders*) as Lenders (the "**Original Lenders**");

(3)  **GLOBAL LOAN AGENCY SERVICES LIMITED** as Facility Agent of the Lenders (the "**Facility Agent**").

**WHEREAS**

(A)  The Lenders wish to make an unsecured subordinated term loan facility available to the Borrower on the terms set out in this Agreement.

(B)  Each of the Lender and the Borrower agree and acknowledge that entry into this Agreement is to its commercial benefit.

**IT IS AGREED** as follows:

1.      **DEFINITIONS AND INTERPRETATION**

1.1    **Definitions**

In this Agreement:

"**Acceleration Date**" means the date (if any) on which the Facility Agent:

(a)    gives a notice under and in accordance with paragraph (b) of Clause 8.1 (*Acceleration*); or

(b)    having placed the Shareholder Loan on demand pursuant to paragraph (c) of Clause 8.1 (*Acceleration*), makes a demand under and in accordance with paragraph (c) as aforesaid.

"**Affiliate**" of any specified person means any other person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control" when used with respect to any person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agent's Spot Rate of Exchange**" means the Facility Agent's spot rate of exchange, for the purchase of the relevant currency in the London foreign exchange market with the Base Currency as of 11.00 a.m. (London time) on a particular day (or such other rate as may be agreed by the Facility Agent and the Borrower).

 "**Anti-Corruption Laws**" means all laws, rules and regulations of any jurisdiction concerning or relating to bribery or corruption, including, but not limited to, the US Foreign Corrupt Practices Act of 1977 or the UK Bribery Act 2010.

"**Anti-Money Laundering Laws**" means all applicable financial record keeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency.

1

"**Article 55 BRRD**" means Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms.

"**Articles**" has the meaning given to that term in the Shareholders' Agreement.

"**Assignment Date**" means the date on which an assignment of rights or benefits under this Agreement by an Existing Lender to a New Lender in accordance with terms and conditions of Clause 9 (*Changes to the Lenders*) becomes effective.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration, in each case, required by law or regulation.

"**Base Currency**" means Sterling.

"**Blocking Law**" means:

(a)     any provision of Council Regulation (EC) No 2271/1996 of 22 November 1996 (or any law or regulation implementing such Regulation in any member state of the European Union or the United Kingdom);

(b)     section 7 of the German Foreign Trade Regulation (*Außenwirtschaftsverordnung*); or

(c)     any other applicable blocking or anti-boycott law in any country having jurisdiction over any Lender.

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in London and Jersey.

"**Capital Stock**" of any person means any and all shares of, rights to purchase, warrants or options for, or other equivalents of or partnership or other interests in (however designated), equity of such Person, including any preferred equity, but excluding any debt securities convertible into such equity.

"**Closing Date**" means the date on which the first utilisation of the PIK Facility occurs.

"**Code**" means the US Internal Revenue Code of 1986.

"**Commitment**" means:

(a)     in relation to an Original Lender, the amount as notified by the Borrower to the Facility Agent on or before the Closing Date and the amount of any other Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount of any Commitment transferred to it or assumed by it under and in accordance with this Agreement,

to the extent not cancelled, reduced, increased or transferred by it under this Agreement.

"**Confidential Information**" means all information relating to the Borrower, the Group, the Finance Documents or the Shareholder Loan of which a Finance Party is or becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or the Facility (including from any financial advisor appointed under the Finance Document) from either:

(a)     any member of the Group or any of its advisers; or

(b)      another Finance Party, if the information was obtained by that Finance Party from any member of the Group or any of their respective advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(i)      is or becomes public information other than as a result of any breach by that Finance Party or any of its Affiliates of Clause 16 (*Confidentiality*); or

(ii)     is identified in writing at the time of delivery as non-confidential by any member of the Group or any of its advisers; or

(iii)    is known by that Finance Party before the date the information is disclosed to it in accordance with paragraph (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is unconnected with the Group and which, in either case, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 8 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under this Agreement or any combination of any of the foregoing) be an Event of Default, provided that any such event or circumstance which requires the satisfaction of a condition as to materiality before it becomes an Event of Default shall not be a Default unless that condition is satisfied.

"**Defaulting Lender**" means any Lender:

(a)      which has failed to make its participation in the Shareholder Loan available or has notified the Facility Agent that it will not make its participation in the Shareholder Loan available;

(b)      which has otherwise rescinded or repudiated this Agreement; or

(c)      with respect to which an Insolvency Event has occurred and is continuing,

unless, in the case of paragraph (a) above:

(i)      its failure to pay is caused by:

(A)      administrative or technical error; or

(B)      a Disruption Event; and

payment is made within three Business Days of its due date; or

(ii)     the Lender is disputing in good faith whether it is contractually obliged to make the payment in question.

"**Disruption Event**" means either or both of:

(a)      a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Shareholder Loan (or otherwise in order for the transactions contemplated by this Agreement to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

3

(b)     the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

(i)     from performing its payment obligations under this Agreement; or

(ii)     from communicating with other Parties in accordance with the terms of this Agreement,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

"**Equityholders**" means the holders of Capital Stock or equity interests in the Borrower or any direct or indirect Parent Holding Company of the Borrower from time to time and any Person to whom such Persons assign or sub-participate or have assigned or sub-participated such Capital Stock or equity interests.

"**FATCA**" means:

(a)     sections 1471 to 1474 of the Code or any associated regulations;

(b)     any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)     any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"**FATCA Deduction**" means a deduction or withholding from a payment under a Finance Document required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**Finance Document**" means this Agreement and the Subordination Agreement and any other document or agreement designated as such by the Facility Agent and the Borrower.

"**Finance Party**" means the Facility Agent and the Lenders.

"**Group**" means the Borrower and its Subsidiaries for the time being.

"**HoldCo**" means New Look Retail Holdings Limited (a company incorporated under the laws of Jersey with company number 128640).

"**HoldCo Shares**" has the meaning given to the term "Ordinary B Shares" in the Shareholders' Agreement.

"**Holding Company**" means any person of which the Borrower at any time is or becomes a Subsidiary after the Closing Date and any holding companies established by any Equityholder for purposes of holding its investment in any Holding Company.

"**Insolvency Event**" means, in relation to a Finance Party, that the Finance Party:

(a)     is dissolved (other than pursuant to a consolidation, amalgamation or merger);

4

(b)    becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(c)    makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(d)    institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official;

(e)    has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition is instituted or presented by a person or entity not described in paragraph (d) above and:

(i)    results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation; or

(ii)    is not dismissed, discharged, stayed or restrained in each case within thirty days of the institution or presentation thereof;

(f)    has exercised in respect of it one or more of the stabilisation powers pursuant to Part 1 of the Banking Act 2009 and/or has instituted against it a bank insolvency proceeding pursuant to Part 2 of the Banking Act 2009 or a bank administration proceeding pursuant to Part 3 of the Banking Act 2009;

(g)    has a resolution passed for its winding-up, official management, examinership or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(h)    seeks or becomes subject to the appointment of an administrator, examiner, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets;

(i)    has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty days thereafter;

(j)    causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in paragraphs (a) to (i) above; or

(k)    takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

"**Legal Reservations**" means:

(a)    the principle that equitable remedies may be granted or refused at the discretion of a court, the limitation of enforcement by laws relating to insolvency, bankruptcy,

EU-DOCS\29780222.8

liquidation, reorganisation, court schemes, moratoria, administration and other laws generally affecting the rights of creditors and similar principles or limitations under the laws of any applicable jurisdiction;

(b)     the time barring of claims under applicable limitation laws (including the Limitation Acts), the possibility that an undertaking to assume liability for or indemnify a person against non-payment of stamp duty may be void and defences of set-off or counterclaim and similar principles or limitations under the laws of any applicable jurisdiction;

(c)     the principle that any additional interest imposed under any relevant agreement may be held to be unenforceable on the grounds that it is a penalty and thus void;

(d)     the principle that in certain circumstances security granted by way of fixed charge may be characterised as a floating charge or that security purported to be constituted by way of an assignment may be recharacterised as a charge;

(e)     the principle that an English court may not give effect to an indemnity for legal costs incurred by an unsuccessful litigant;

(f)     the principle that the creation or purported creation of security over any contract or agreement which is subject to a prohibition against transfer, assignment or charging may be void, ineffective or invalid and may give rise to a breach entitling the contracting party to terminate or take any other action in relation to such contract or agreement; and

(g)     similar principles, rights and defences under the laws of any Relevant Jurisdiction to the extent that they are relevant and applicable.

"**Lender**" means:

(a)     any Original Lender; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Lender in accordance with Clause 9 (*Changes to the Lenders*),

which in each case has not ceased to be a Lender in accordance with this Agreement.

"**Limitation Acts**" mean the Limitation Act 1980 and the Foreign Limitation Periods Act 1984.

"**Majority Lenders**" means, at any time, subject to Clause 15 (*Amendments and Waivers*), a Lender or Lenders whose Commitments aggregate more than 50 per cent. of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated more than 50 per cent. of the Total Commitments immediately prior to that reduction).

"**Material Adverse Effect**" means any event or circumstance which, taking into account all relevant circumstances, has a material adverse effect on:

(a)     the business, assets or financial condition of the Group taken as a whole; or

(b)     the ability of the Group taken as a whole to perform its payment obligations under this Agreement.

"**Month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

6

(a)     if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day; and

(b)     if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month.

The above rules will only apply to the last month of any period. Monthly shall be construed accordingly.

"**New Lender**" has the meaning given to that term in Clause 9.1 (*Assignments and transfers by the Lenders*).

"**New Lender Certificate**" means a Transfer Certificate and/or any other assignment or transfer document entered into in accordance with the terms and conditions of this Agreement pursuant to which a person becomes party to this Agreement as a Lender, in each case as the context requires.

"**Participating Member State**" means any member state of the European Union that has the Euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"**Party**" means a party to this Agreement.

"**Perfection Requirements**" means the making or the procuring of the necessary or appropriate registrations, filings, endorsements, notarisations, stampings and/or notifications of Agreement (if any).

"**PIK Facility**" has the meaning given to the term "Facility" and "Additional Facility" in the PIK Facility Agreement.

"**PIK Facility Agreement**" means the facility agreement entered into on or around the date hereof between the Borrower and Global Loan Agency Services Limited as facility agent.

"**Prohibited Payment**" means any bribe, rebate, payoff, influence payment, kickback or other payment or gift of money or anything of value (including meals or entertainment) to any officer, employee or ceremonial office holder of any government or instrumentality thereof, any political party or supra-national organization (such as the United Nations), any political candidate, any royal family member or any other person who is connected or associated personally with any of the foregoing or any other person that is prohibited under any applicable law or regulation.

"**Register**" has the meaning given to that term in Clause 9.6 (*Maintenance of Register and provision of New Lender Certificates and Increase Confirmations*).

"**Related Fund**" means, in relation to a trust, fund or other entity, another trust, fund or other entity which:

(a)     is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets; and

(b)     has the same fund manager or asset manager or, if managed by different fund managers or asset managers, the fund managers or asset managers are Affiliates, or is owned by the same person as the first trust, fund or other entity.

7

"**Relevant Amount**" means the number of HoldCo Shares (rounded to the nearest whole number) equal to the total number of HoldCo Shares held by the relevant Existing Lender (or its Relevant Affiliate(s)) multiplied by the Relevant Percentage.

"**Relevant Affiliate**" means:

(a)    in relation to an Existing Lender, its Affiliate(s) (as defined in the Shareholders' Agreement) which such Existing Lender has nominated to hold the HoldCo Shares in accordance with the Shareholders' Agreement; and

(b)    in relation to a New Lender, its Affiliate(s) (as defined in the Shareholders' Agreement) which such New Lender has nominated to hold the HoldCo Shares.

"**Relevant Percentage**" means, in respect of an Existing Lender and Facility Transfer, the sterling equivalent of the Facility Transfer divided by the sterling equivalent of the aggregate Shareholder Loan held by the Existing Lender, expressed as a percentage (rounded to two decimal places).

"**Restricted Country**" means: a country or territory that is, or whose government is, the subject of general export, import, financial, investment or trade embargos by any Sanctioning Authority, which as at the date of the Agreement, includes Cuba, Iran, the Region of Crimea, North Korea, Sudan and Syria.

"**Restricted Entity**" means any person, entity or other party that is:

(a)    a government of a Restricted Country,

(b)    located, domiciled, resident, incorporated in a Restricted Country;

(c)    named on any Sanctions List administered by a Sanctioning Authority; or

(d)    controlled or owned by a person, entity or other party referred to in paragraphs (a) to (c) above.

"**Restructuring Implementation Deed**" means the restructuring implementation deed dated on or about [●] 2020 between, among others, the Borrower and the Facility Agent.

"**Sanctioning Authority**" means:

(a)    the United Nations;

(b)    the US government or any US government agency (including the Office of Foreign Asset Control);

(c)    the European Union or any present or future member state thereof; or

(d)    the UK government or any UK government agency (including the Foreign and Commonwealth Office of the United Kingdom and Her Majesty's Treasury);

in each case, as amended, supplemented or substituted from time to time.

"**Sanctions**" means any economic or financial sanctions or trade embargoes administered, enacted or enforced by any Sanctioning Authority.

"**Sanctions Lists**" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, the Consolidated List of Asset Freeze Targets maintained by Her Majesty's Treasury or any equivalent list of designated persons

EU-DOCS\29780222.8

and/or entitles maintained by or public announcement of a Sanctions designation made by a Sanctioning Authority, each as amended, supplemented or substituted from time to time.

"**Senior Parent**" means New Look Bonds Limited, a company incorporated under the laws of Jersey with registered number 128638.

"**Shareholders' Agreement**" means the shareholder agreement entered into on or about the date hereof and as amended from time to time between, amongst others, HoldCo as the Company, Lucid Issuer Services Limited as the Holding Period Trustee and the various Investors named therein from time to time (each term as defined therein).

"**Shareholder Loan**" means the term loan facility made available under this Agreement as described in Clause 2 (*The Shareholder Loan*).

"**Stapled Period**" means the period commencing on the Closing Date and ending on the earlier of the Junior Discharge Date (as defined in the Subordination Agreement) and the date on which a resolution is passed by the requisite majority of the Shareholders (as defined in the Shareholders' Agreement) in accordance with the terms of the Shareholders' Agreement to de-staple the HoldCo Shares from the Shareholder Loan.

"**Subordination Agreement**" means the subordination agreement dated on or about the date hereof between, among others, the Borrower and the Facility Agent.

"**Super Majority Lenders**" means, at any time, subject to Clause 15 (*Amendments and Waivers*), a Lender or Lenders whose Commitments aggregate at least 66 2/3rd per cent. of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated at least 66 2/3rd per cent. of the Total Commitments immediately prior to that reduction).

"**Termination Date**" means the date falling 108 Months after the Closing Date.

"**Transfer Certificate**" means a certificate substantially in the form set out in Schedule 2 (*Form of Transfer Certificate*) or in any other form agreed between the Facility Agent and the Borrower.

"**Total Commitments**" means the aggregate of the Commitments, being £40,000,000 as at the date of this Agreement.

"**Transfer Date**" means, in relation to a transfer, the later of:

(a)     the proposed Transfer Date specified in the Transfer Certificate; and

(b)     the date on which the Facility Agent executes the Transfer Certificate.

1.2     **Construction**

(a)     Unless a contrary indication appears, a reference in this Agreement to:

(i)     the "**Facility Agent**", the "**Borrower**", any "**Finance Party**", any "**Lender**", any "**Party**" or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees (including the surviving entity of any merger involving that person);

(ii)     an "**agency**" of a state includes any local or other authority, self-regulating or other recognised body or agency, central or federal bank, department, government, legislature, minister, ministry, self-regulating organisation, official or public or statutory person (whether autonomous or not) of, or of the government of, that state or any political sub-division in or of that state;

9

(iii)    an "**agreement**" includes any legally binding arrangement, contract, deed or instrument (in each case whether oral, written or entered into by way of a written offer and implicit acceptance);

(iv)    an "**amendment**" includes any amendment, supplement, variation, novation, modification, replacement or restatement (however fundamental) and "**amend**" and "**amended**" shall be construed accordingly;

(v)    "**assets**" includes businesses, undertakings, securities, properties, revenues or rights of every description and whether present or future, actual or contingent;

(vi)    a "**company**" includes a company, a corporation or a limited partnership;

(vii)    a "**consent**" includes an authorisation, permit, approval, consent, exemption, licence, order, filing, registration, recording, notarisation, permission or waiver;

(viii)    "**including**" means including without limitation and "**includes**" and "**included**" shall be construed accordingly;

(ix)    "**participation**" of a Lender in the Shareholder Loan means the amount of such Shareholder Loan which such Lender has made or is to make available and thereafter that part of the Shareholder Loan which is owed to such Lender;

(x)    a "**person**" includes any person, firm, company, corporation, government, state or agency of a state or any association, trust or partnership (whether or not having separate legal personality) of two or more of the foregoing;

(xi)    a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law, but if not having the force of law being one with which it is the practice of the relevant person to comply) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(xii)    a provision of law is a reference to that provision as amended or re-enacted;

(xiii)    a time of day is a reference to London time; and

(xiv)    the singular includes the plural (and vice versa).

(b)    Section, Clause and Schedule headings are for ease of reference only.

(c)    A Default or an Event of Default is continuing if it has not been remedied or waived.

(d)    No personal liability shall attach to any director, officer or employee of any member of the Group for any representation or statement made by that member of the Group in a certificate signed by a director, officer or employee save in the case of fraud in which case liability (if any) will be determined in accordance with applicable law.

(e)    Any reference to the Lenders, the Majority Lenders or any other class of Lenders or the Finance Parties being required to act reasonably (or similar language) shall mean that each relevant Lender or the Finance Party is required to act reasonably.

(f)    A reference to "**the date of this Agreement**" is a reference to the original date of this Agreement.

10

(g)    Notwithstanding anything to the contrary contained in this Agreement, the parties agree to treat CQS ACS Fund ("**IACS**") for all purposes as if it were a separate legal entity to CQS Global Funds ICAV (the "**Umbrella**") and the Umbrella's other sub-funds and any amounts owed to or liabilities incurred by IACS in connection with this Agreement may be satisfied solely from the assets of IACS (the "**Designated Assets**"). If the Designated Assets of IACS are insufficient to meet its payment obligations or liabilities under this Agreement, then, notwithstanding any other provision contained in this Agreement, to the extent any outstanding payment obligation cannot be met from the Designated Assets (such outstanding amount, the "**Shortfall Amount**"), the parties acknowledge and agree that no party shall have a right to bring any claim, action or proceedings against any other sub-fund of the Umbrella or against the Umbrella itself in relation to such Shortfall Amount.

1.3    **Currency Symbols and Definitions**

(a)    "**€**" and "**Euro**" mean the single currency unit of the Participating Member States.

(b)    "**£**", "**GBP**" and "**Sterling**" means the lawful currency for the time being of the United Kingdom.

1.4    **Third party rights**

(a)    Unless expressly provided to the contrary in a Finance Document, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "**Third Parties Act**") to enforce or enjoy the benefit of any term of this Agreement.

(b)    Notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to amend, rescind or vary any Finance Document at any time.

1.5    **Subordination Agreement**

(a)    Notwithstanding anything to the contrary in this Agreement:

(i)    this Agreement is entered into subject to, and with the benefit of, the terms of the Subordination Agreement; and

(ii)    the terms of the Subordination Agreement will prevail if there is a conflict between the terms of this Agreement and the terms of the Subordination Agreement.

(b)    The Parties acknowledge and agree that the Shareholder Loan shall be treated as "Junior Debt" for the purposes of (and as defined in) the Subordination Agreement and the Finance Documents shall be treated as "Junior Finance Documents" for the purposes of (and as defined in) the Subordination Agreement.

2.    **THE SHAREHOLDER LOAN**

2.1    **The Shareholder Loan**

(a)    Subject to the terms of this Agreement, the Lender makes available to the Borrower a term loan facility in an aggregate amount equal to the Total Commitments.

(b)    Subject to the terms of this Agreement, on the Closing Date in accordance with clause [●] of the Restructuring Implementation Deed, the Borrower shall be deemed to have utilised the Shareholder Loan in full in an aggregate amount equal to the Total Commitments.

11

2.2    **Finance Parties' rights and obligations**

(a)    The obligations of each Finance Party under this Agreement are several. Failure by a Finance Party to perform its obligations under this Agreement does not affect the obligations of any other Finance Party under this Agreement. No Finance Party is responsible for the obligations of any other Finance Party under this Agreement.

(b)    The rights of each Finance Party under or in connection with this Agreement are separate and independent rights and any debt arising under this Agreement to a Finance Party from the Borrower shall be a separate and independent debt.

(c)    A Finance Party may, except as otherwise stated in this Agreement, separately enforce its rights under this Agreement.

**3.    REPAYMENT**

(a)    The Borrower shall repay the aggregate outstanding principal amount of the Shareholder Loan in full on the Termination Date.

(b)    The Borrower may not reborrow any part of the Shareholder Loan which is repaid.

**4.    VOLUNTARY PREPAYMENT**

Following the Senior Discharge Date (as defined in the Subordination Agreement), the Borrower may, if it gives the Facility Agent not less than three Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of the Shareholder Loan without premium or penalty.

**5.    RESTRICTIONS: GENERAL**

(a)    In the event a payment to be made by the Borrower pursuant to Clause 3 (*Repayment*) above cannot be made pursuant to the terms and conditions of the Subordination Agreement or a "Senior Finance Document" (under and as defined in the Subordination Agreement) restricting the Borrower from making such payments to the Lender, the payment obligation of the Borrower shall be postponed until such day as the restriction no longer applies.  Such postponements shall not be considered as a Default and no penalty shall accrue relating to such non-payments.

(b)    The Borrower shall not repay or prepay all or any part of the Shareholder Loan or cancel all or any part of the commitments for the Shareholder Loan following the Closing Date unless, at the same time, there is a pro rata reduction of in the total number of HoldCo Shares (rounded to the nearest whole number) held by that Lender (or its Relevant Affiliates(s)) in accordance with the Shareholders' Agreement.

(c)    Prior to the full and final repayment of the Shareholder Loan, the Borrower shall not pay any dividends to, or make any share buyback from, its direct shareholder or make any payments on any Shareholder Debt (as defined in the Subordination Agreement) to a Shareholder Creditor (as defined in the Subordination Agreement), in each case, without the prior written consent of the Facility Agent.  For the avoidance of doubt, this paragraph (c) shall not restrict the Borrower from making any payments under the PIK Facility from time to time.

**6.    REPRESENTATIONS**

The Borrower makes the following representations and warranties to each Finance Party on the Closing Date.

EU-DOCS\29780222.8

6.1  **Status**

    (a)    It is duly incorporated, organised or established and validly existing under the law of its jurisdiction of incorporation, organisation or establishment.

    (b)    It has the power to own its assets and carry on its business in all material respects as it is being conducted.

6.2  **Binding obligations**

Subject to the Legal Reservations and the Perfection Requirements, the obligations expressed to be assumed by it in this Agreement are legal, valid, binding and enforceable obligations.

6.3  **Non-conflict with other obligations**

The entry into and delivery by it of, and the performance by it of its obligations under, this Agreement do not:

    (a)    conflict with any law or regulation applicable to it to an extent which has, or would reasonably be expected to have, a Material Adverse Effect;

    (b)    conflict in any material respect with its constitutional documents; or

    (c)    breach any agreement or instrument binding upon it or any of its assets, in each case to an extent which has, or would reasonably be expected to have, a Material Adverse Effect.

6.4  **Power and authority**

It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, this Agreement.

6.5  **Authorisations**

    (a)    Subject to the Legal Reservations and Perfection Requirements, all material Authorisations required to enable it lawfully to enter into and comply with its material obligations under this Agreement,

        have been (or will by the required date be) obtained or effected and are (or will by the required date be) in full force and effect.

    (b)    All Authorisations necessary for the conduct of the business of the Group in the ordinary course have been obtained or effected and are in full force and effect, in each case to the extent that failure to do so has, or would reasonably be expected to have, a Material Adverse Effect.

6.6  **No default**

No Event of Default has occurred and is continuing or would reasonably be to result from the making of the Shareholder Loan or the entry into or performance of this Agreement.

6.7  **Anti-Corruption Laws and Anti-Money Laundering Laws**

    (a)    It:

        (i)    has conducted its businesses and is in compliance with all Anti-Corruption Laws and Anti-Money Laundering Laws and no action, suit or proceeding by

13

or before any court or governmental agency, authority or body or any arbitrator involving it with respect to the Anti-Corruption Laws or Anti-Money Laundering Laws is pending or, to the best of its knowledge and belief, threatened or contemplated;

(ii)    has instituted and maintains policies and procedures reasonably designed to promote and achieve compliance with such laws applicable to it in the jurisdictions in which it operates;

(iii)    has not made, offered to make, promised to make or authorised any Prohibited Payment; and

(iv)    has not been subject to any investigation by any governmental entity with regard to any actual or alleged Prohibited Payment.

(b)    No funds or other consideration it contributes in connection with any transaction under this Agreement will have been derived from or related to any activity that violates or is deemed criminal under the Anti-Corruption Laws or Anti-Money Laundering Laws.

6.8    **Sanctions**

(a)    Neither it nor any of its directors or officers or, to the best of its knowledge and belief, any of its or their employees:

(i)    is a Restricted Entity;

(ii)    is or has ever been subject to any claim, proceeding, formal notice or investigation with respect to Sanctions;

(iii)    is engaging or has engaged (since the date of this Agreement) in any transaction that evades or avoids or has the purpose of evading or avoiding or breaches or attempts to breach any Sanctions; or

(iv)    has engaged (since the date of this Agreement) or is engaging, directly or indirectly, in any trade, business or other activity with it for the benefit of any Restricted Country or Restricted Entity in breach of applicable Sanctions.

(b)    Paragraph (a) above will not apply if and to the extent that it results in a violation of or conflict with, or exposes any party to this Agreement or any directors, officers or employees of the foregoing to liability under any Blocking Law applicable to that person.

7.    **FINANCIAL STATEMENTS**

The Borrower shall supply to the Facility Agent (if requested by the Facility Agent, in sufficient copies for all the Lenders):

(a)    within 140 days after the end of each of its financial years commencing with the first financial year after the Closing Date, the audited annual consolidated financial statements of the Senior Parent for that financial year (or, at the option of the Borrower, the audited consolidated financial statements of a Holding Company of the Senior Parent for that financial year); and

(b)    within 70 days (or 85 days in the case of the first such Financial Quarter ending after the Closing Date) after the end of each Financial Quarter (excluding the final Financial Quarter in each financial year), the consolidated management accounts or interim financial statements of the Senior Parent for that Financial Year (or, at the option of the

Borrower, the consolidated management accounts or interim financial statements of a Holding Company of the Senior Parent for that Financial Year),

in each case, in the form such financial statements are delivered to the lenders under the PIK Facility Agreement, subject, in each case, to any confidentiality or regulatory restrictions relating to the supply of information concerning the Group or otherwise binding on members of the Group (provided that such restrictions have not been entered into with a view to circumventing the reporting requirements specified in this Agreement), provided that the Borrower shall be deemed to have complied with the requirements to provide such financial statements if a Lender has received such document or information in its capacity as a Senior Lender or in its capacity as an Equityholder.  For this purpose, "**Financial Quarter**" shall mean the period of three months ending on 31 March, 30 June, 30 September and 31 December in each year, in each case save as adjusted by the Borrower to avoid a date which is not a Business Day and to reflect any changes in the financial year end of the Borrower.

## 8.    EVENTS OF DEFAULT

### 8.1    Events of Default

Each of the following is an Event of Default:

(a)    The Borrower does not pay any principal amount of the Shareholder Loan when due and payable, in each case unless failure to pay is caused by:

   (i)    administrative error or delay or technical error;

   (ii)    delay in the transmission of funds; or

   (iii)    a Disruption Event,

and payment is made within three Business Days of its due date.

(b)    A default under the PIK Facility, which default:

   (i)    is caused by a failure to pay principal at stated maturity on the PIK Facility, immediately upon the expiration of the grace period provided in the PIK Facility Agreement; or

   (ii)    results in the acceleration of the PIK Facility prior to its stated maturity,

and, in each case, where such payment default or acceleration of the PIK Facility continues unremedied for 40 days.

### 8.2    Acceleration

On and at any time after the occurrence of an Event of Default which is continuing, the Facility Agent may, and shall if so directed by the Super Majority Lenders, by notice to the Borrower:

(a)    cancel the Total Commitments whereupon they shall immediately be cancelled;

(b)    declare that all or part of the Shareholder Loan and all other amounts accrued under the this Agreement be immediately due and payable, whereupon they shall become immediately due and payable; and/or

(c)    declare that all or part of the Shareholder Loan and any other amounts accrued under this Agreement be payable on demand, whereupon they shall immediately become

15

payable on demand by the Facility Agent acting on the instructions of the Super Majority Lenders.

## 9. CHANGES TO THE LENDERS

### 9.1 Assignments and transfers by the Lenders

(a) Subject to this Clause 9, a Lender (the "**Existing Lender**") may assign any of its rights and benefits or transfer by novation any of its rights, benefits and obligations, under this Agreement to:

    (i) another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets; or

    (ii) any other person approved in writing by the Borrower,

    (the "**New Lender**").

(b) The prior written consent of the Borrower shall not be required for any assignment or transfer by an Existing Lender of any of its rights and/or obligations under the Finance Documents to a New Lender.

(c) Notwithstanding paragraph (b), no transfer or assignment shall be made:

    (i) to, with, involving or in favour of any person that is a competitor, supplier or sub-contractor of the Group in any of the material activities of the Group (or any person that is an Affiliate of or is acting, in relation to the Shareholder Loan, on behalf of such a person) (provided that, in relation to any specific assignment or transfer and unless an Existing Lender has knowledge or is advised to the contrary, an Existing Lender shall be entitled to request and rely on a written statement from the Borrower provided in relation to that assignment or transfer that the relevant New Lender is not a competitor, supplier or sub-contractor of the Group); or

    (ii) to, with, involving or in favour of any person that is (or would, upon becoming a Lender, be) a Defaulting Lender at the time of such assignment or transfer (provided that, unless an Existing Lender has knowledge or is advised to the contrary, it shall be entitled to rely on a written statement from a New Lender in a Transfer Certificate that it is not, and will not become, a Defaulting Lender).

(d) In the event that any assignment or transfer is carried out in breach of this Clause 9, such assignment or transfer be void and deemed not to have occurred and any right, obligation and economic interest in the Shareholder Loan purported to be the subject of such assignment or transfer shall remain with the Existing Lender.

(e) Unless the Borrower and the Facility Agent otherwise agree and except as provided below, if an Existing Lender assigns or transfers all or any part of its share of the Shareholder Loan or of its rights and obligations under this Agreement to a person (other than one of its Affiliates, another Lender or a Related Fund), such transfer or assignment must be:

    (i) in a minimum amount of no less than 1 per cent. of the outstanding principal amount of the Loans at the time such transfer or assignment is made (net of any re-assignment or re-transfer) or if it is a transfer or assignment of all of the

Existing Lender's existing share in the Shareholder Loan, in an amount equal to such existing share; and

(ii)     in an amount such that each of the Existing Lender and the New Lender has, after the transfer or assignment (and net of any re-transfer or re-assignment), a share in the Shareholder Loan in a minimum amount of no less than 1 per cent. of the outstanding principal amount of the Loans at the time such transfer or assignment is made, or, if it is a transfer or assignment of all of the Existing Lender's existing share in the Shareholder Loan, in an amount equal to such existing share.

(f)     If on the same date two or more Existing Lenders are transferring part of their share in the Shareholder Loan to the same transferee or assignee, the minimum amount so transferred by any Existing Lender to the transferee or assignee may be less than 1 per cent. of the outstanding principal amount of the Loans at the time such transfer or assignment is made, if the aggregate amount transferred or assigned to that transferee or assignee on that date is at least 1 per cent. of the outstanding principal amount of the Loans at the time such transfer or assignment is made (net of any re-assignment or re-transfer) and provided that each of the Existing Lenders and the New Lender has, after the transfer or assignment (and net of any re-transfer or re-assignment), a share in the Shareholder Loan in a minimum amount of no less than 1 per cent. of the outstanding principal amount of the Loans at the time the relevant transfers or assignments are made, or, if it is a transfer or assignment of all of the Existing Lender's existing share in the Shareholder Loan, in an amount equal to such existing share.

(g)     In determining compliance with paragraph (e) or (f) above, any amount transferred or assigned by or to a Related Fund shall be aggregated with any amounts transferred or assigned by or to a Related Fund, and any amount held by any New Lender or Related Funds in different currencies shall be aggregated as at the time of the relevant transfer or assignment by reference to the Agent's Spot Rate of Exchange for such currencies at the time of such transfer or assignment.

(h)     An assignment will only be effective on:

(i)     receipt by the Facility Agent of a written confirmation from the New Lender (in form and substance satisfactory to the Facility Agent and the Borrower, each acting reasonably) that the New Lender will assume the same obligations to the other Finance Parties as it would have been under if it was an Original Lender;

(ii)     unless the New Lender is already a party to the Subordination Agreement in its capacity as a Lender, the New Lender acceding to the Subordination Agreement in its capacity as a Lender in accordance with the terms of Subordination Agreement;

(iii)     unless the New Lender or its Relevant Affiliate is already a party to the Shareholders' Agreement in its capacity as an Investor (as defined in the Shareholders' Agreement), the New Lender acceding to, or procuring its Relevant Affiliate to accede to, the Shareholders' Agreement in its capacity as an Investor (as defined in the Shareholders' Agreement) in accordance with the terms of Shareholders' Agreement; and

(iv)     the performance by the Facility Agent of all "know your customer" or other similar checks relating to any person that it is required to carry out under all applicable laws and regulations in relation to such assignment to a New Lender, the completion of which the Facility Agent shall promptly notify to the Existing Lender and the New Lender.

17

As soon as reasonably practical following any Assignment Date, the Facility Agent shall notify the Borrower of the details of the relevant New Lender. A transfer may not be effected if it would cause a breach of this Clause 9.

(i)     A copy of each Confidentiality Undertaking required pursuant to any term of this Agreement shall, unless otherwise agreed by the Borrower (or unless no information is disclosed to any person under or in reliance on that Confidentiality Undertaking), be provided to the Borrower within ten Business Days of it being agreed (and in any event before any information is disclosed under or in reliance on that Confidentiality Undertaking and before any agreement or documentation is entered into in relation to any assignment, transfer or other Debt Purchase Transaction).

(j)     The Borrower shall be entitled to require the Finance Parties to provide information in reasonable detail regarding the identities and participations of each of the Lenders and the relevant Finance Parties shall provide such information as soon as reasonably practical after receipt of such a request.

(k)     Any condition or restriction in this Clause 9 may be waived with the prior written consent of the Borrower and the Facility Agent and subject to compliance with the terms of the Shareholders' Agreement.

## 9.2    Stapling

(a)     Without prejudice to any other provision set out under this Clause 9, during the Stapled Period, an Existing Lender may not assign any of its rights in and/or transfer any of its rights and obligations under and/or assign or transfer an economic interest in the Shareholder Loan (each a "**Facility Transfer**") to any New Lender unless at the same time it (or it procures that its Relevant Affiliate(s)) (i) assigns its rights in and/or transfers its rights and obligations under and/or assigns or transfers its economic interest in the number of HoldCo Shares equal to the Relevant Amount to such New Lender (or its Relevant Affiliate(s)) in accordance with the terms of the Shareholders' Agreement and/or the Articles and (ii) delivers satisfactory evidence of such assignment and/or transfer of the HoldCo Shares to the Facility Agent.

(b)     Any assignment, transfer or any other transaction transferring an economic interest (i) in breach of paragraph (a) above or (ii) to a New Lender that is not a Permitted Transferee (under and as defined in the Articles), in either case, shall be void and deemed not to have occurred and any right, obligation and economic interest in the Shareholder Loan purported to be the subject of such Facility Transfer shall remain with the Existing Lender.

## 9.3    Assignment or transfer fee

The New Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Facility Agent (for its own account) a fee of £[ ● ].

## 9.4    Limitation of responsibility of Existing Lenders

(a)     Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

(i)     the legality, validity, effectiveness, adequacy or enforceability of this Agreement or any other documents;

(ii)     the financial condition of the Borrower;

18

(iii)      the performance and observance by the Borrower or any other member of the Group of its obligations under this Agreement or any other documents; or

(iv)      the accuracy of any statements (whether written or oral) made in, or in connection with, this Agreement or any other document,

and any representations or warranties implied by law are excluded.

(b)      Each New Lender confirms to the Existing Lender and the other Parties that it:

(i)      has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of the Borrower and its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Lender or any other Party in connection with this Agreement; and

(ii)      will continue to make its own independent appraisal of the creditworthiness of the Borrower and its related entities whilst any amount is or may be outstanding under this Agreement or any Commitment is in force.

(c)      Nothing in this Agreement obliges an Existing Lender to:

(i)      accept a re-transfer from a New Lender of any of the rights and obligations assigned or transferred under this Clause 9; or

(ii)      support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by the Borrower of its obligations under this Agreement or otherwise.

**9.5**      **Procedure for transfer**

(a)      A transfer is effected in accordance with paragraph (c) below if:

(i)      the Existing Lender and the New Lender deliver to the Facility Agent a duly completed Transfer Certificate; and

(ii)      the Facility Agent executes the Transfer Certificate.

The Facility Agent must execute as soon as reasonably practicable a Transfer Certificate delivered to it and which appears on its face to be in order. The Facility Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the transfer to such New Lender and that the provisions set out in Clause 9.2 (*Stapling*) have been complied with by the Existing Lender and the New Lender.

(b)      Each Party (other than the Existing Lender and the New Lender) irrevocably authorises the Facility Agent to execute any duly completed Transfer Certificate on its behalf.

(c)      On the Transfer Date:

(i)      the Existing Lender will assign absolutely to the New Lender the Existing Lender's rights expressed to be the subject of the assignment in the Transfer Certificate;

EU-DOCS\29780222.8

(ii)     the Existing Lender will be released from the obligations expressed to be the subject of the release in the Transfer Certificate; and

(iii)    the New Lender will become party to this Agreement as a Lender and the Subordination Agreement as a Junior Creditor (as defined in the Subordination Agreement) and will be bound by obligations equivalent to those from which the Existing Lender is released under paragraph (ii) above.

(d)    As soon as reasonably practical following the Transfer Date, the Facility Agent shall notify the Borrower of the details of the New Lender.

(e)    A transfer may not be effected if it would cause a breach of this Clause 9.

### 9.6    Maintenance of Register and provision of New Lender Certificates

(a)    The Facility Agent shall, as soon as reasonably practicable after it has executed a New Lender Certificate, deliver to the Borrower a copy of that New Lender Certificate.

(b)    The Borrower designates the Facility Agent to act as the Borrower's non-fiduciary agent to maintain (solely for the purposes of this Clause 9.6) a register (the "**Register**") on which it will record the names and addresses of each Lender and the Commitments of and the outstanding amount of the Loans owing to each Lender. The entries in the Register shall, in the absence of manifest error, be conclusive and the Borrower and the Finance Parties shall treat each person whose name is recorded in the Register as a Lender pursuant to and in accordance with the terms of this Agreement as a Lender for all purposes under this Agreement.

(c)    Any failure to make or update the Register, or any error in the Register, will not affect the Borrower's obligations in respect of the Loans.

(d)    The Facility Agent will promptly update the Register on the relevant Transfer Date or, as the case may be, Assignment Date.

(e)    The Facility Agent will provide a copy of the Register to the Borrower on request and in any event at 6 monthly intervals from the date of this Agreement.

### 9.7    Assignment by way of security

In addition to the other rights provided in this Clause 9, each Lender may, without the consent of the Borrower, at any time charge, assign or otherwise creates security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure the obligations of that Lender, including:

(a)    any charge, assignment or other security to secure obligations to a federal reserve or central bank or any other authorised government body; and

(b)    in the case of any Lender which is a fund, any charge, assignment or other security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

except that no such charge, assignment or security shall:

(i)     release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or security for the Lender as a party to any of the Finance Documents; or

20

(ii)    require any payments to be made by the Borrower or grant to any person any more extensive rights than those required to be made or granted to the relevant Lender under the Finance Documents.

## 10.    ROLE OF THE FACILITY AGENT AND OTHERS

### 10.1    Appointment of the Facility Agent

(a)    Each of the other Finance Parties appoints the Facility Agent to act as its agent under and in connection with the Finance Documents.

(b)    Each other Finance Party authorises the Facility Agent to exercise the rights, powers, authorities and discretions specifically given to the Facility Agent under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

### 10.2    Duties of the Facility Agent

(a)    Subject to paragraph (b) below, the Facility Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Facility Agent for that Party by any other Party.

(b)    Without prejudice to Clause 9.6 (*Maintenance of Register and provision of New Lender Certificates and Increase Confirmations*) above, paragraph (a) above shall not apply to any New Lender Certificate.

(c)    Except where a Finance Document specifically provides otherwise, the Facility Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(d)    If the Facility Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

(e)    If the Facility Agent is aware of the non-payment of any principal, commitment fee or other fee payable to a Finance Party (other than the Facility Agent) under this Agreement it shall promptly notify the other Finance Parties.

(f)    The Facility Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

### 10.3    No fiduciary duties

(a)    Nothing in this Agreement constitutes the Facility Agent as a trustee or fiduciary of any other person.

(b)    The Facility Agent shall not be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

### 10.4    Business with the Group

The Facility Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

### 10.5    Rights and discretions

(a)    The Facility Agent may rely on:

21

(i)      any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

(ii)     any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify.

(b)      The Facility Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Lenders) that:

(i)      no Default has occurred (unless it has actual knowledge of a Default); and

(ii)     any right, power, authority or discretion vested in any Party or any group of the Lenders has not been exercised.

(c)      The Facility Agent and each Lender may engage, pay for and rely on the advice or services of any lawyers, accountants, surveyors or other experts.

(d)      The Facility Agent and each Lender may act in relation to the Finance Documents through its personnel and agents and shall not be liable for the negligence or misconduct of such agents.

(e)      The Facility Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

(f)      Without prejudice to the generality of paragraph (e) above, the Facility Agent may disclose the identity of a Non-Consenting Lender to the other Finance Parties and/or the Borrower and shall disclose the same upon the written request of the Parent or the Majority Lenders.

(g)      Notwithstanding any other provision of any Finance Document to the contrary, the Facility Agent is not obliged to do or omit to do anything if it would or is reasonably likely in its reasonable opinion constitute a breach of any applicable law or regulation or a breach of a fiduciary duty or duty of confidentiality.

## 10.6   Majority Lenders' instructions

(a)      Unless a contrary indication appears in a Finance Document, the Facility Agent shall (i) exercise any right, power, authority or discretion vested in it as Facility Agent in accordance with any instructions given to it by the Majority Lenders (or, if so instructed by the Majority Lenders, refrain from acting or exercising any right, power, authority or discretion vested in it as Facility Agent) and (ii) not be liable for any act (or omission) if it acts (or refrains from taking any action) in accordance with such an instruction of the Majority Lenders.

(b)      Unless a contrary indication appears in a Finance Document, any instructions given by the Majority Lenders will be binding on all the Finance Parties.

(c)      The Facility Agent may refrain from acting in accordance with the instructions of the Majority Lenders (or, if appropriate, the Lenders or relevant class or number of Lenders) until it has received such security as it may require for any cost, loss or liability (together with any associated VAT) which it may incur in complying with the instructions.

(d)      In the absence of instructions from the Majority Lenders, (or, if appropriate, the Lenders or relevant class or number of Lenders) the Facility Agent may act (or refrain from taking action) as it considers to be in the best interest of the Lenders.

EU-DOCS\29780222.8

(e)     The Facility Agent is not authorised to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings relating to any Finance Document.

(f)     Each New Lender irrevocably and unconditionally agrees and confirms that:

(i)      it has approved each request for a consent, amendment, release or waiver made by any member of the Group (or the Facility Agent on behalf of any member of the Group) and approved by the requisite Lenders in accordance with Clause 15 (*Amendments and Waivers*) on or prior to the date which any assignment or transfer to which it is a party becomes effective pursuant to Clause 9 (*Changes to the Lenders*) (each an "**Approved Amendment**"); and

(ii)     the Facility Agent has authority to execute on its behalf any agreement or other document relating to an Approved Amendment.

## 10.7    Responsibility for documentation

The Facility Agent is not responsible for:

(a)     the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Facility Agent, the Borrower or any other person given in or in connection with any Finance Document or the transactions contemplated in the Finance Documents; or

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with any Finance Document.

## 10.8    Exclusion of liability

(a)     Without limiting paragraph (b) below, the Facility Agent will not be liable for any action taken by it under or in connection with any Finance Document, unless directly caused by its negligence, wilful misconduct or breach of the Finance Documents.

(b)     No Party (other than the Facility Agent) may take any proceedings against any officer, employee or agent of the Facility Agent in respect of any claim it might have against the Facility Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document or any Transaction Document and each officer, employee or agent of the Facility Agent may rely on this Clause 10.8 subject to Clause 1.3 (*Third party rights*) and the provisions of the Contracts (Rights of Third Parties) Act 1999.

(c)     The Facility Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by the Facility Agent if the Facility Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Facility Agent for that purpose.

(d)     Nothing in this Agreement shall oblige the Facility Agent to carry out any "know your customer" or other checks in relation to any person on behalf of any Lender and each Lender confirms to the Facility Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Facility Agent.

23

(e)     Each Lender acknowledges that in the event that the Facility Agent is required by law or any contractual arrangement with a tax authority to make a deduction or withholding for or on account of tax from a payment made by the Facility Agent under a Senior Finance Document, the Facility Agent shall be authorised and entitled to make such deduction or withholding (and no Lender will have any claim or recourse to the Facility Agent on account of any such deduction or withholding).

## 10.9    Lenders' indemnity to the Facility Agent

(a)     Subject to paragraph (b) below, each Lender shall (in the proportion that its Commitment bears to the Total Commitments) indemnify the Facility Agent, within three Business Days of demand, against any cost, loss or liability including without limitation for negligence or any other category of liability whatsoever incurred by the Facility Agent (otherwise than by reason of its gross negligence or wilful misconduct) notwithstanding the Facility Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent in acting as Facility Agent under the Finance Documents (unless it has been reimbursed by the Borrower pursuant to a Finance Document).

(b)     If the Commitments are then zero, each Lender's indemnity under paragraph (a) above shall be in proportion to its Commitments to the Total Commitments immediately prior to their reduction to zero.

## 10.10    Resignation of the Facility Agent

(a)     The Facility Agent may resign and appoint one of its Affiliates acting through an office in the United Kingdom as successor by giving notice not less than ten Business Days to the other Finance Parties and the Borrower.

(b)     Alternatively the Facility Agent may resign by giving not less than thirty days' notice to the other Finance Parties and the Borrower, in which case the Majority Lenders (after consultation with the Borrower) may appoint a successor Facility Agent (acting through an office in the United Kingdom).

(c)     If the Majority Lenders have not appointed a successor Facility Agent in accordance with paragraph (a) above within thirty days after notice of resignation was given, the Facility Agent (after consultation with the Borrower) may appoint a successor Facility Agent (acting through an office in the United Kingdom).

(d)     The retiring Facility Agent shall, at its own cost, make available to the successor Facility Agent such documents and records and provide such assistance as the successor Facility Agent may reasonably request for the purposes of performing its functions as Facility Agent under the Finance Documents.

(e)     The Facility Agent's resignation notice shall only take effect upon the appointment of a successor.

(f)     Upon the appointment of a successor, the retiring Facility Agent shall be discharged from any further obligation in respect of the Finance Documents but shall remain entitled to the benefit of this Clause 10 and Clause 10.16 (*Borrower's Indemnity to the Facility Agent*) (and any agency fees for the account of the retiring Facility Agent shall cease to accrue from (and shall be payable on) that date). Its successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

24

(g)    After consultation with the Borrower, the Majority Lenders may, by notice to the Facility Agent, require it to resign in accordance with paragraph (a) above. In this event, the Facility Agent shall resign in accordance with paragraph (a) above but the cost referred to in paragraph (d) above shall be for the account of the Borrower.

(h)    If at any time, the Borrower reasonably believes that the Facility Agent may not be entitled to receive payments free from any withholding or deduction  for or on account of FATCA, it may, by notice to the Facility Agent, require it to resign in accordance with paragraph (b) above. In this event, the Facility Agent shall resign in accordance with paragraph (b) above (with a successor Facility Agent to be appointed by the Majority Lenders in accordance with paragraph (b) above within 30 days of notice by the Borrower requiring the Facility Agent to resign).

## 10.11    Replacement of the Facility Agent

(a)    After consultation with the Borrower, the Majority Lenders may, by giving thirty days' notice to the Facility Agent (or, at any time the Facility Agent is an Impaired Agent, by giving any shorter notice determined by the Majority Lenders) replace the Facility Agent by appointing a successor Agent (acting through an office in the United Kingdom).

(b)    The retiring Facility Agent shall (at its own cost if it is an Impaired Agent and otherwise at the expense of the Lenders) make available to the successor Facility Agent such documents and records and provide such assistance as the successor Facility Agent may reasonably request for the purposes of performing its functions as Facility Agent under the Finance Documents.

(c)    The appointment of the successor Facility Agent shall take effect on the date specified in the notice from the Majority Lenders (or, as the case may be, the Borrower) to the retiring Facility Agent. As from this date, the retiring Facility Agent shall be discharged from any further obligation in respect of the Finance Documents but shall remain entitled to the benefit of this Clause 10 (and any agency fees for the account of the retiring Facility Agent shall cease to accrue from (and shall be payable on) that date).

(d)    Any successor Facility Agent and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

## 10.12    Confidentiality

(a)    In acting as agent for the Finance Parties, the Facility Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b)    If information is received by another division or department of the Facility Agent, it may be treated as confidential to that division or department and the Facility Agent shall not be deemed to have notice of it.

(c)    Notwithstanding any other provision of any Finance Document to the contrary, none of the Facility Agent and the Arrangers are obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would or is reasonably likely to in its reasonable opinion constitute a breach of any law or a breach of a fiduciary duty.

(d)    The Facility Agent may forward any document that it is required to forward to a Lender to a professional advisor of that Lender where such professional advisor has been

EU-DOCS\29780222.8

appointed by such Lender (and notified to the Facility Agent as such) in order to ensure that such Lender does not receive any information relating to the Group that in accordance with any law or regulation it should not be in receipt of and in doing so the Facility Agent will be deemed to have fulfilled its obligation to forward such document to such Lender.

## 10.13   Relationship with the Lenders

The Facility Agent may treat each Lender as a Lender, entitled to payments under this Agreement unless it has received not less than five Business Days' prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

## 10.14   Credit appraisal by the Finance Parties

Without affecting the responsibility of the Borrower for information supplied by it or on its behalf in connection with any Finance Document, each Finance Party confirms to the Facility Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)   the financial condition, status and nature of each member of the Group;

(b)   the legality, validity, effectiveness, adequacy or enforceability of any Finance Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(c)   whether that Finance Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(d)   the adequacy, accuracy and/or completeness of any information provided by the Facility Agent, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document.

## 10.15   Deduction from amounts payable by the Facility Agent

If any Party owes an amount to the Facility Agent under the Finance Documents, the Facility Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Facility Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed. For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

## 10.16   Borrower's Indemnity to the Facility Agent

The Borrower shall promptly indemnify the Facility Agent against any cost, loss or liability incurred by the Facility Agent (acting reasonably) as a result of:

(a)   investigating any event which it reasonably believes is a Default (provided that if after the Facility Agent so investigating it is established that the relevant event is not a Default, such cost, loss or liability of investigation shall be for the account of the Lenders);

(b)     acting or relying on any notice, request or instruction from the Borrower which it reasonably believes to be genuine, correct and appropriately authorised; or

(c)     occurrence of any Event of Default.

10.17   **Facility Agent's transaction expenses**

The Borrower shall promptly on demand pay the Facility Agent the amount of all third party costs and expenses (including legal fees and notarial costs) incurred by any of them in connection with the negotiation, preparation, printing, execution and perfection of:

(a)     the Facility, this Agreement and any other Finance Document executed on or prior to the date of this Agreement; and

(b)     any other Finance Documents executed after the date of this Agreement,

subject in each case to the Closing Date having occurred and on a basis and up to an amount as agreed between the Facility Agent and the Borrower from time to time.

10.18   **Amendment costs**

If the Borrower requests an amendment, waiver or consent; or the Borrower shall, within ten Business Days of demand, reimburse (or procure reimbursement of) the Facility Agent for the amount of all third party costs and expenses (including legal fees and notarial costs) incurred by the Facility Agent in responding to, evaluating, negotiating or complying with that request or requirement.

10.19   **Enforcement and preservation costs**

The Borrower shall, within five Business Days of demand, pay (or procure payment) to each Finance Party the amount of all costs and expenses (including legal fees and notarial costs) incurred by the Facility Agent on behalf of that Finance Party in connection with the enforcement of or the preservation of any rights, powers and remedies under any Finance Document.

11.     **NOTICES**

11.1    **Communications in writing**

Any communication to be made under or in connection with this Agreement shall be made in writing and, unless otherwise stated, may be made by fax or letter.

11.2    **Addresses**

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with this Agreement is as set out below its signature to this Agreement and, in the case of the fax number and department or officer of the Facility Agent (to the extent not included with its signature to this Agreement), as notified to the other Parties within five Business Days of the date of this Agreement, or any substitute address, fax number or department or officer as the Party may notify to the Facility Agent (or the Facility Agent may notify to the other Parties, if a change is made by the Facility Agent) by not less than five Business Days' notice.

27

11.3    **Delivery**

(a)    Any communication or document made or delivered by one person to another under or in connection with this Agreement will only be effective:

(i)    if by way of fax, when received in legible form; or

(ii)    if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post, postage prepaid, in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 11.2 (*Addresses*), if addressed to that department or officer.

(b)    Any communication or document to be made or delivered to the Facility Agent will be effective only when actually received by the Facility Agent and then only if it is expressly marked for the attention of the department or officer identified with the Facility Agent's signature below (or any substitute department or officer as the Facility Agent shall specify for this purpose).

(c)    All notices from or to the Borrower shall be sent through the Facility Agent.

11.4    **Notification of address and fax number**

Promptly upon receipt of notification of an address and fax number or change of address or fax number pursuant to Clause 11.2 (*Addresses*) or changing its own address or fax number, the Facility Agent shall notify the other Parties.

11.5    **Electronic communication**

(a)    Any communication to be made between the Facility Agent and a Lender or the Borrower under or in connection with this Agreement may be made by electronic mail or other electronic means, if the Facility Agent, the Lender and the Borrower (as applicable):

(i)    agree that, unless and until notified to the contrary, this is to be an accepted form of communication (with such agreement to be deemed given by each person which is a Party at the date of this Agreement);

(ii)    notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

(iii)    notify each other of any change to their address or any other such information supplied by them.

(b)    Any electronic communication made between the Parties will be effective only when actually received in readable form and in the case of any electronic communication made by a Party to the Facility Agent only if it is addressed in such a manner as the Facility Agent shall specify for this purpose.

11.6    **English language**

(a)    Any notice given under or in connection with this Agreement must be in English.

(b)    All other documents provided under or in connection with this Agreement must be:

28

        (i)       in English; or

        (ii)      if not in English, and if so reasonably requested by the Facility Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 12.    FATCA INFORMATION

(a)    Subject to paragraph (c) below, each Party shall, within ten Business Days of a reasonable request by another Party:

        (i)       confirm to that other Party whether it is:

              (A)     a FATCA Exempt Party; or

              (B)     not a FATCA Exempt Party;

        (ii)      supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

        (iii)     supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

(b)    If a Party confirms to another Party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c)    Paragraph (a) above shall not oblige any Finance Party to do anything, and paragraph (a)(iii) above shall not oblige any other Party to do anything, which would or might in its reasonable opinion constitute a breach of:

        (i)       any law or regulation;

        (ii)      any fiduciary duty; or

        (iii)     any duty of confidentiality.

(d)    If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with paragraph (a)(i) or (a)(ii) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

## 13.    PARTIAL INVALIDITY

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability

of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 14.    REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of any Finance Party, any right or remedy under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

## 15.    AMENDMENTS AND WAIVERS

### 15.1    Required consents

(a)    Subject to Clause 15.2 (*Exceptions*) any term of this Agreement may be amended or waived with the consent of the Majority Lenders and the Borrower and any such amendment or waiver will be binding on all Parties.

(b)    The Facility Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 15.

### 15.2    Exceptions

(a)    Other than as provided in the following paragraphs of this Clause 15.2:

(i)    an amendment or waiver to:

(A)    the definitions of "Majority Lenders" or "Super Majority Lenders" in Clause 1.1 (*Definitions*);

(B)    this paragraph (a); or

(C)    any provision which expressly requires the consent of all the Lenders,

shall require the consent of all Lenders;

(ii)    an amendment or waiver to Clause 9 (*Changes to the Lenders*) (other than Clause 9.2 (*Stapling*)) making the provisions of that Clause more restrictive for any of the Lenders shall require only the consent of each Lender who will be subject to any such additional restrictions; and

(iii)    an amendment or waiver to the clause(s) of the Subordination Agreement setting out the ranking of the Shareholder Loan in the case of any distribution of enforcement recoveries, in each case to the extent relating to the ranking of the Shareholder Loan and the rights and/or obligations of the Lenders (in such capacity) under that clause, shall require only the consent of each Lender whose rights and/or obligations under that clause are adversely effected by that amendment or waiver.

(b)    An amendment or waiver which relates to the recovery and application of proceeds under, or any waiver of prepayments required under, Clause 4 (*Voluntary Prepayment*) shall only require the consent of the Majority Lenders.

(c)    An amendment or waiver to Clause 9.2 (*Stapling*) (and any material definitions relating thereto) may only be made if a resolution is passed by the requisite majority of the Shareholders (as defined in the Shareholders' Agreement) in accordance with the terms

of the Shareholders' Agreement and/or Articles to de-staple the HoldCo Shares from the Shareholder Loan.

(d)     An amendment or waiver which relates to the rights or obligations of the Facility Agent or the Lenders (in each case in such capacity) may not be effected without the consent of the Facility Agent or the Lenders (as the case may be) at such time.

(e)     An Event of Default or Default may be waived with the consent of the Majority Lenders, provided that no payment Event of Default may be waived without the consent of each Lender to which the relevant overdue payment is still owing. Any notice, demand, declaration or other step or action taken under or pursuant to Clause 8.1 (*Acceleration*) (including any event constituting the Acceleration Date) may be revoked with the consent of the Majority Lenders.

(f)     Notwithstanding anything to the contrary in in this Agreement, a Finance Party may unilaterally waive, relinquish or otherwise irrevocably give up all or any of its rights under this Agreement with the consent of the Borrower.

(g)     Any term of this Agreement may be amended or waived by the Borrower and the Facility Agent without the consent of any other Party if that amendment or waiver is:

    (i)      to cure defects or omissions, resolve ambiguities or inconsistencies or reflect changes of a minor, technical or administrative nature; or

    (ii)     otherwise for the benefit of all or any of the Lenders.

(h)     For the avoidance of doubt, each paragraph (a) to (g) above is without prejudice to the ability to effect, make or grant any amendment, waiver or consent pursuant to or in accordance with any other of the paragraphs (a) to (g) above, paragraph (a) of Clause 15.1 (*Required Consents*) or any other provision of this Clause 15.

(i)     Any amendment or waiver made or effected in accordance with any of paragraphs (a) to (g) above, or in accordance with any other term of this Agreement, shall be binding on all Parties. Each Secured Party irrevocably and unconditionally authorises and instructs the Facility Agent (for the benefit of the Facility Agent and the Borrower) to execute any documentation relating to a proposed amendment or waiver as soon as the requisite Lender consent is received (or on such later date as may be agreed by the Facility Agent and Borrower).

## 15.3    Replacement of Lenders

(a)     If at any time any Lender becomes a Non-Consenting Lender, then the Borrower may, on not less than five Business Days' prior notice to the Facility Agent and that Lender:

    (A)     Subject to compliance with the provisions of this Agreement (including Clause 9.2 (*Stapling*)) replace that Lender by causing it to (and that Lender shall) transfer all or any part of its rights and obligations under this Agreement to one or more Lenders or other persons selected by the Borrower (in each case which confirms its willingness to assume the relevant rights and obligations) for a purchase price equal to the outstanding principal amount of such Lender's participation in the outstanding Loans to be transferred and all accrued fees and other amounts payable to it under this Agreement in respect of such participation (the "**Replacement Amount**"); and/or

EU-DOCS\29780222.8

(B)     prepay (or procure that another member of the Group prepays) all or any part of that Lender's participation in the outstanding Shareholder Loan and all other amounts payable to it under this Agreement in respect of such participation; and/or

(C)     cancel all or any Commitments of that Lender.

Any notice delivered under this paragraph (a) exercising any rights under (A) above shall be accompanied by a Transfer Certificate complying with Clause 9.5 (*Procedure for transfer*), which Transfer Certificate shall be immediately executed by the relevant Non-Consenting Lender and returned to the Borrower. Notwithstanding the requirements of Clause 9 (*Changes to the Lenders*) or any other provisions of this Agreement, if a Lender does not execute and/or return a Transfer Certificate as required by this paragraph (a) within two Business Days of delivery by the Borrower, the relevant transfer or transfers shall automatically and immediately be effected for all purposes under this Agreement on payment of the Replacement Amount to the Facility Agent (for the account of the relevant Lender).

(b)     Unless otherwise agreed by the Majority Lenders, the replacement or prepayment of a Lender pursuant to this Clause 15.3 shall be subject to the following:

(i)     the Borrower shall have no right to replace the Facility Agent (in such capacity) pursuant to paragraph (a) above; and

(ii)    the Borrower may only exercise its replacement or prepayment rights pursuant to paragraph (a)(A) or (a)(B) above in respect of any relevant Lender within 180 days of becoming entitled to do so (or, if later, on or prior to the date 180 days after the date on which the Borrower receives notice in writing that such Lender has become a Non-Consenting Lender) on each occasion such Lender is a Non-Consenting Lender.

(c)     No Lender shall have any obligation to the Borrower to find a replacement Lender for the purposes of paragraph (a)(A) above.

(d)     In no event shall a Lender being replaced pursuant to paragraph (a)(A) above be required to pay or surrender to the relevant replacement Lender (or any other person) any of the fees received by it pursuant to this Agreement.

(e)     For the purposes of this Clause 15.3, "**Non-Consenting Lender**" means:

(i)     any Lender which does not agree to consent to a departure from, or waiver or amendment of, any provision of this Agreement which has been requested by the Borrower (or the Facility Agent on its behalf) where the requested consent, waiver or amendment is one which requires greater than Majority Lender consent pursuant to this Agreement and has been agreed to by the Majority Lenders; and/or

(ii)    any Lender whose Commitment has been excluded in relation to any request pursuant to Clause 15.4 (*Excluded Commitments*) on more than one occasion.

15.4    **Excluded Commitments**

The Commitments of any Lender which has been requested by any member of the Group (or the Facility Agent on behalf of any member of the Group) to agree to a consent to a departure from, or waiver or amendment of, any provision of this Agreement but has not accepted or rejected such request before 5.00 p.m. London time on the date falling fifteen Business Days'

from the date of that request being made (or such other time and date as the Borrower may specify, with the consent of the Facility Agent if less than fifteen Business Days from the date of such request being made) shall be disregarded when calculating whether the level of consent required under this Agreement has been obtained (with a corresponding reduction in all relevant Commitments for the purposes of calculating the required level of Lenders).

15.5    **Disenfranchisement of Defaulting Lenders**

(a)    For so long as a Lender is a Defaulting Lender, unless otherwise agreed by the Borrower (and the Facility Agent where the Defaulting Lender is a member of the Group), that Lender's participations and Commitments shall not be included when considering whether the approval of the Majority Lenders, the Super-Majority Lenders, all Lenders or any other class of Lenders (as applicable) has been obtained in respect of any request from any member of the Group (or the Facility Agent on behalf of any member of the Group) for any consent, amendment, release or waiver under this Agreement.

(b)    For the purposes of this Clause 15.5, the Facility Agent may assume that the following Lenders are Defaulting Lenders:

(i)    any Lender which has notified the Facility Agent that it has become a Defaulting Lender; or

(ii)    any Lender in relation to which it is aware that any of the events or circumstances referred to in the definition of "Defaulting Lender" has occurred,

unless it has received notice to the contrary from the Lender concerned (together with any supporting evidence reasonably requested by the Facility Agent) or the Facility Agent is otherwise aware that the Lender has ceased to be a Defaulting Lender.

16.    **CONFIDENTIALITY**

(a)    Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

(b)    Any Finance Party may disclose:

(i)    to any of its Affiliates and Related Funds and any of its or their officers, directors, employees, professional advisers and auditors such Confidential Information as is required on a need to know basis if any such person to whom the Confidential Information is to be given pursuant to this paragraph (i) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information and agrees to keep that information confidential on the same terms as set out herein (except that there shall be no such requirement to obtain such agreement if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information on which the Borrower can rely);

(ii)    to any person:

(A)    to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Senior Finance Documents and to any of that person's Affiliates, Related Funds and professional advisers;

33

(B)    with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or the Borrower and to any of that person's Affiliates, Related Funds and professional advisers;

(C)    who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in paragraph (i)(A) or (i)(B) above;

(D)    to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(E)    to whom or for whose benefit that Finance Party charges, assigns or otherwise creates security (or may do so) pursuant to Clause 9.7 (*Assignment by way of security*);

(F)    to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(G)    who is a Party; or

(H)    with the consent of the Borrower;

in each case, such Confidential Information as is required on a need to know basis if:

(I)    in relation to paragraphs (i)(A), (i)(B) and (i)(C) above, the person to whom the Confidential Information is to be given has first entered into a confidentiality undertaking substantially in the form agreed with the Borrower on which the Parent can rely (a "**Confidentiality Undertaking**") except that there shall be no requirement for a Confidentiality Undertaking if:

(1)    the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information; or

(2)    in relation to paragraph (i)(D) above:

a)    the recipient is a federal reserve, central bank or other authorised governmental body;

b)    the disclosure is made on a confidential basis (and the relevant Finance Party informs the recipient of the confidential nature of the Confidential Information and that some or all of such Confidential Information may be price-sensitive information); and

c)    the relevant Finance Party notifies the Parent of the disclosure prior to making such disclosure;

34

(II)    in relation to paragraphs (i)(D), (i)(E), (i)(F) and (i)(G) above, the person to whom the Confidential Information is to be given has first entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive on which the Borrower can rely and is informed that some or all of such Confidential Information may be price-sensitive information (except that there shall be no requirement to so inform if it is not practicable so to do in the circumstances, in which case the relevant Finance Party shall notify the Borrower accordingly prior to making any disclosure); and

(III)   in relation to paragraphs (i)(A), (i)(B), (i)(C) and (i)(E) above, the relevant assignment, transfer, sub-participation or other transaction or step is (or, in the case of a potential assignment, transfer, sub-participation or other transaction or step, would be) permitted by the terms of this Agreement;

(iii)   to any person appointed by that Finance Party or by a person to whom paragraph (i)(A) or (i)(B) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this paragraph (iii) if the service provider to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking; and

(iv)    to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Borrower if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

Nothing in this Clause 16 shall permit a Finance Party to disclose any Confidential Information to an entity that is not an Permitted Transferee (under and as defined in the Articles) in connection with any actual or potential Debt Purchase Transaction with such entity unless, at the time of any such disclosure, the Finance Party (acting reasonably) considered that such person was a Permitted Transferee (under and as defined in the Articles).

## 17.    COUNTERPARTS

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

## 18.    GOVERNING LAW

This Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by English law.

## 19.    ENFORCEMENT

### 19.1    Jurisdiction of English Courts

(a)    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity

EU-DOCS\29780222.8

or termination of this Agreement and any dispute relating to non-contractual obligations and any preliminary injunctions within the meaning of article 31 of Council Regulation (EC) No. 44/2001 of 22 December 2000 on jurisdiction and the recognition of judgments in civil and commercial matters) (a "**Dispute**").

(b)     The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)     This Clause 19.1 is for the benefit of the Finance Parties only. As a result, no Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Finance Parties may take concurrent proceedings in any number of jurisdictions.

## 19.2    Service of process

Without prejudice to any other mode of service allowed under any relevant law the Borrower:

(a)     irrevocably appoints New Look Limited as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement; and

(b)     agrees that failure by a process agent to notify the Borrower of the process will not invalidate the proceedings concerned.

The Borrower may irrevocably appoint another person as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement, subject to notifying the Facility Agent accordingly. In the case of any replacement of an existing agent for service of process, following the new process agent's appointment and notification to the Facility Agent of such new appointment, the existing process agent may resign.

## 19.3    Waiver of immunity

The Borrower irrevocably and unconditionally:

(a)     agrees not to claim any immunity from proceedings brought by a Finance Party against it in relation to this Agreement and to ensure that no such claim is made on its behalf;

(b)     consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)     waives all rights of immunity in respect of it or its assets.

**THIS AGREEMENT** has been entered into on the date stated at the beginning of this Agreement.

**SCHEDULE 1**

**THE ORIGINAL LENDERS**

| Name of Original Lender |
|---|
| |
| |
| |
| |
| |
| |

EU-DOCS\29780222.8

## SCHEDULE 2

## FORM OF TRANSFER CERTIFICATE

To:      [_____] as Facility

From:   [The Existing Lender] (the "**Existing Lender**") and [The New Lender] (the "**New Lender**")

Dated:

Dear Sirs

### [Newco] – Shareholder Loan Agreement
### dated [_] 2020 (the "Shareholder Loan Agreement")

1.      We refer to the Shareholder Loan Agreement. This agreement shall take effect as a Transfer Certificate for the purpose of the Shareholder Loan Agreement and as a Creditor/Agent Accession Undertaking for the purposes of the Subordination Agreement (and as defined in the Subordination Agreement).

2.

      (a)      The Existing Lender assigns absolutely to the New Lender all the rights of the Existing Lender under the Shareholder Loan Agreement and the Subordination Agreement which correspond to that portion of the Existing Lender's Commitments and participations in the Shareholder Loan under the Shareholder Loan Agreement specified in the schedule to this Transfer Certificate (the "**Schedule**").

      (b)      The Existing Lender is released from all the obligations of the Existing Lender which correspond to that portion of the Existing Lender's Commitments and participations in in the Shareholder Loan under the Shareholder Loan Agreement specified in the Schedule.

      (c)      The New Lender becomes a Lender under the Shareholder Loan Agreement and a [Junior Creditor] under (and as defined in) the Subordination Agreement and assumes and is bound by obligations equivalent to those from which the Existing Lender is released under paragraph (b) above.

3.      The proposed Transfer Date is [_____].

4.      The New Lender confirms:* it [is]/[is not] a Defaulting Lender; and

5.      On the Transfer Date the New Lender:

      (a)      becomes party to the Shareholder Loan Agreement as a Lender; and

      (b)      becomes party to the Subordination Agreement as a Junior Creditor (as defined in the Subordination Agreement).

In consideration of the New Lender being accepted as a Junior Creditor for the purposes of the Shareholder Loan Agreement (and as defined therein), the New Lender confirms that, as from the Transfer Date, it intends to be party to the Subordination Agreement as a Junior Creditor, and undertakes to perform all the obligations expressed in the Subordination Agreement to be assumed by a Junior Creditor and agrees that it shall be bound by all the provisions of the Subordination Agreement, as if it had been an original party to the Subordination Agreement.

EU-DOCS\29780222.8

6.      The New Lender confirms that its entry into this Transfer Certificate is permitted by the terms of Clause 11.1 (*Assignments and transfer by Lenders*) of the Shareholder Loan Agreement.

7.      The administrative details of the New Lender for the purposes of the Shareholder Loan Agreement are set out in the Schedule.

8.      The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of Clause 9.4 (*Limitation of responsibility of Existing Lenders*) of the Facility Agreement.

9.      The Existing Lender and the New Lender expressly confirm that they have entered into legally binding arrangements to effect, on the Transfer Date in compliance with the terms of Clause 9.2 (*Stapling*) of the Facility Agreement.

10.     This Transfer Certificate takes effect as a deed notwithstanding that a party may execute it under hand.

11.     This Transfer Certificate has been executed and delivered as a deed on the date stated at the beginning of this Transfer Certificate. This Transfer Certificate and any non-contractual obligations arising out of or in connection with it are governed by English law.

12.     Terms which are used in this Transfer Certificate which are not defined in this Transfer Certificate but are defined in the Shareholder Loan Agreement shall have the meaning given to those terms in the Shareholder Loan Agreement. Clauses 17 (*Counterparts*) and 19 (*Enforcement*) of the Shareholder Loan Agreement are incorporated in this Transfer Certificate mutatis mutandis.

13.     This Transfer Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Transfer Certificate.

**Note:**    **The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Lender's interest in security in all jurisdictions. It is the responsibility of each individual New Lender to ascertain whether any other documents or other formalities are required to perfect transfer of such share in the Existing Lender's security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

---

.

## THE SCHEDULE

## COMMITMENT/RIGHTS AND OBLIGATIONS TO BE TRANSFERRED

[*Insert relevant details*]

[*Facility Office address, fax number and attention details for notices and account details for payments*]

[Existing Lender]                              [New Lender]

By:                                             By:

This Transfer Certificate is accepted by the Facility Agent and the Transfer Date is confirmed as [_____].

[Facility Agent]

By:

## SIGNATORIES

[*Signature pages to be inserted*]

**APPENDIX 7**

**FORM OF SUBORDINATION AGREEMENT**

EU-DOCS\29867510.8

**SUBSTANTIALLY AGREED FORM**

**Dated _____ 2020**

**[NEWCO]**
as the Company

with

**GLOBAL LOAN AGENCY SERVICES LIMITED**
acting as Original Senior Agent

**GLAS TRUST CORPORATION LIMITED**
acting as Security Agent

and others

_____

# SUBORDINATION AGREEMENT

_____

## CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | RANKING AND PRIORITY | 16 |
| 3. | SENIOR CREDITORS AND SENIOR LIABILITIES | 16 |
| 4. | SUBORDINATED LIABILITIES | 17 |
| 5. | EFFECT OF INSOLVENCY EVENT | 21 |
| 6. | TURNOVER OF RECEIPTS | 23 |
| 7. | REDISTRIBUTION | 25 |
| 8. | ENFORCEMENT OF TRANSACTION SECURITY | 26 |
| 9. | NON-DISTRESSED DISPOSALS, DISTRESSED DISPOSALS AND DISPOSAL PROCEEDS | 27 |
| 10. | APPLICATION OF PROCEEDS | 30 |
| 11. | THE SECURITY AGENT | 32 |
| 12. | CHANGE OF SECURITY AGENT | 43 |
| 13. | CHANGES TO THE PARTIES | 44 |
| 14. | COSTS AND EXPENSES | 46 |
| 15. | INDEMNITIES | 47 |
| 16. | INFORMATION | 48 |
| 17. | NOTICES | 49 |
| 18. | PRESERVATION | 51 |
| 19. | CONSENTS, AMENDMENTS AND OVERRIDE | 53 |
| 20. | COUNTERPARTS | 56 |
| 21. | GOVERNING LAW | 56 |
| 22. | ENFORCEMENT | 56 |
| SCHEDULE 1 | | 57 |
| | FORM OF CREDITOR/CREDITOR REPRESENTATIVE ACCESSION UNDERTAKING | |

**THIS AGREEMENT** is dated _____ 2020 and made between:

(1)     **[NEWCO],** a company incorporated under the laws of Jersey with registered number [ ● ] (the "**Company**");

(2)     **THE FINANCIAL INSTITUTIONS** named on the signing pages as Original Senior Creditors (the "**Original Senior Creditor**");

(3)     **THE FINANCIAL INSTITUTIONS** named on the signing pages as Original Senior Creditors (the "**Original Junior Creditor**");

(4)     **NEW LOOK RETAIL HOLDINGS LIMITED,** a company incorporated under the laws of Jersey with registered number 128640 (the "**Original Shareholder Creditor**");

(5)     **GLOBAL LOAN AGENCY SERVICES LIMITED** as agent under the Junior Debt Agreement (the "**Original Junior Agent**");

(6)     **GLOBAL LOAN AGENCY SERVICES LIMITED** as agent under the PIK Facility Agreement (the "**Original Senior Agent**") and

(7)     **GLAS TRUST CORPORATION LIMITED** as security agent for the Secured Parties (the "**Security Agent**").

**IT IS AGREED** as follows:

**1.      DEFINITIONS AND INTERPRETATION**

1.1     **Definitions**

In this Agreement:

"**Acceleration Event**" means the Senior Agent exercising any of its rights under paragraphs (a)(ii) and (a)(iii) of Clause 20.3 (*Acceleration*) of the PIK Facility Agreement or any equivalent provision of a Senior Finance Document.

"**Additional Facility**" has the meaning given to that term in the PIK Facility Agreement.

"**Affiliate**" has the meaning given to that term in the PIK Facility Agreement.

"**Agent Liabilities**" means all present and future liabilities and obligations, whether actual or contingent and whether incurred solely or jointly, of the Company to the relevant Creditor Representatives under or in connection with the Senior Finance Documents and the Junior Finance Documents.

"**Agreed Security Principles**" has the meaning given to that term in the PIK Facility Agreement.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London and Jersey.

"**Charged Property**" means all of the assets of the Company which from time to time are, or are expressed to be, the subject of the Transaction Security.

"**Base Currency**" means British pounds sterling.

1

"**Base Currency Amount**" means, in relation to an amount, that amount converted (to the extent not already denominated in the Base Currency) into the Base Currency at the Security Agent's Spot Rate of Exchange on the Business Day prior to the relevant calculation.

"**Consent**" means any consent, approval, release or waiver or agreement to any amendment.

"**Creditor/Creditor Representative Accession Undertaking**" means:

(a)     an undertaking substantially in the form set out in Schedule 1 (*Form of Creditor/Creditor Representative Accession Undertaking*);

(b)     a Transfer Certificate as defined in the PIK Facility Agreement;

(c)     an Increase Confirmation as defined in the PIK Facility Agreement; or

(d)     an Additional Facility Notice or Additional Facility Lender Accession Notice as defined in the PIK Facility Agreement (in each case).

as the context may require (and provided that in the case of paragraphs (b), (c) and (d) above, such document includes accession wording to this Agreement substantially in the form set out in the undertaking referred to in paragraph (a) above).

"**Creditor Representative**" means:

(a)     in relation to the Senior Creditors, the Senior Agent; and

(b)     in relation to the Junior Creditors, the Junior Agent.

"**Creditors**" means the Senior Creditors, the Senior Agent, the Security Agent, the Subordinated Creditors and the Junior Agent, as the context so determines.

"**Debt Document**" means each of this Agreement, the Senior Finance Documents, the Junior Finance Documents, the Shareholder Debt Documents and any other document designated as such by the Security Agent and the Company, as the context so determines.

"**Debt Purchase Transaction**" has the meaning given to the term "Debt Purchase Transaction" in the PIK Facility Agreement.

"**Default**" means an Event of Default or any event which would (with the expiry of a grace period or the giving of notice provided for in the relevant definition of event of default under the relevant Debt Document or any combination of the foregoing) be an Event of Default provided that any such event or circumstance which requires the satisfaction of a condition as to materiality before it becomes an Event of Default shall not be a Default or an Event of Default until such condition is satisfied.

"**Defaulting Lender**" means a Senior Creditor which is a Defaulting Lender under, and as defined in, the PIK Facility Agreement.

"**Delegate**" means any delegate, agent, attorney, co-trustee or co-security agent appointed by the Security Agent.

"**Distress Event**" means any of:

(a)     an Acceleration Event which has occurred and is continuing; or

(b)     the enforcement of any Transaction Security as a result of an Acceleration Event which has occurred and is continuing.

2

"**Distressed Disposal**" means a disposal of an asset or shares of, or other financial securities issued by, a member of the Group, which is:

(a)     being effected at the request of the Majority Senior Creditors in circumstances where the Transaction Security has become enforceable as a result of an Acceleration Event which was continuing at the time the request for enforcement was made;

(b)     being effected by enforcement of the Transaction Security as a result of an Acceleration Event which was continuing at the time the request for enforcement was made; or

(c)     being effected after the occurrence of a Distress Event, by the Company to another person or persons.

"**Enforcement Action**" means:

(a)     in relation to any Liabilities:

(i)     the acceleration of any Liabilities or the making of any declaration that any Liabilities are prematurely due and payable (other than as a result of it becoming unlawful for a Senior Creditor to perform its obligations under, or of any voluntary or mandatory prepayment arising under, the Debt Documents);

(ii)     the making of any declaration that any Liabilities are payable on demand;

(iii)     the making of a demand for payment in relation to a Liability that is payable on demand;

(iv)     the making of any demand against the Company in relation to any guarantee, indemnity, surety, parallel debt, contribution or subrogation of the Company;

(v)     the exercise of any right to require the Company to acquire any Liability (including exercising any put or call option against the Company for the redemption or purchase of any Liability but excluding any such right which arises as a result of clause [22] (*Debt Purchase Transactions*) of the PIK Facility Agreement and excluding any mandatory offer arising as a result of a change of control or asset sale or escrow special mandatory redemption (howsoever described) as set out in the Senior Finance Documents);

(vi)     the exercise of any right of set-off, account combination or payment netting against the Company in respect of any Liabilities other than the exercise of any such right which is otherwise expressly permitted under the Senior Finance Documents to the extent that the exercise of that right gives effect to a Permitted Payment; and

(vii)     the suing for, commencing or joining of any legal or arbitration proceedings against the Company to recover any Liabilities;

(b)     the taking of any steps to enforce or require the enforcement of any Transaction Security (including the crystallisation of any floating charge forming part of the Transaction Security) as a result of an Acceleration Event which was continuing at the time the request for enforcement was made;

(c)     the entering into of any composition, compromise, assignment or similar arrangement with the Company (other than any action permitted under Clause 13 (*Changes to the Parties*) or any debt buy-backs pursuant to open market debt repurchases, tender offers or exchange offers entered into in accordance with the Senior Finance Documents, and

3

not undertaken as part of an announced restructuring or turnaround plan or while a Default was outstanding under the relevant Senior Finance Document); or

(d)     the petitioning, applying or voting for, or the taking of any steps (including the appointment of any liquidator, receiver, administrator or similar officer) in relation to, the winding up, dissolution, administration or reorganisation of the Company, or any of the Company's assets or any suspension of payments or moratorium of any indebtedness of the Company or any analogous procedure or step in any jurisdiction,

except that the following shall not constitute Enforcement Action:

(i)      the taking of any action falling within paragraph (a)(vii) or (d) above which is necessary (but only to the extent necessary) to preserve the validity, existence or priority of claims in respect of Liabilities, including the registration of such claims before any court or governmental authority and the bringing, supporting or joining of proceedings to prevent any loss of the right to bring, support or join proceedings by reason of applicable limitation periods;

(ii)     any discussions or consultations between, or proposals made by, any of the Secured Parties with respect to instructions to enforce any Transaction Security pursuant to Clause 8 (*Enforcement of Transaction Security*);

(iii)    bringing legal proceedings against any person in connection with any securities violation, securities or listing regulations or common law fraud or to restrain any actual or putative breach of the Debt Documents or for specific performance with no claims for damages;

(iv)    a Secured Party bringing legal proceedings against any person solely for the purpose of:

(A)     obtaining injunctive relief (or any analogous remedy outside England and Wales) to restrain any actual or putative breach of any Debt Document to which it is a party;

(B)     obtaining specific performance (other than specific performance of an obligation to make a payment) with no claim for damages; or

(C)     requesting judicial interpretation of any provision of any Debt Document to which it is a party with no claim for damages; and

(v)     a demand made by a Subordinated Creditor in relation to the Subordinated Liabilities to the extent:

(A)     any resulting Payment would constitute a Permitted Subordinated Payment; or

(B)     any Subordinated Liability of the Company being released or discharged in consideration for the issue of shares in the Company provided that the ownership interest of the Company prior to such issue is not diluted as a result and provided further that (in any such case) in the event that the shares of the Company are subject to Transaction Security prior to such issue, then the percentage of shares in the Company subject to Transaction Security is not diluted.

"**Event of Default**" means any event or circumstance specified as such in the relevant Debt Document.

"**Group**" has the meaning given to that term in the PIK Facility Agreement.

"**Holding Company**" has the meaning given to that term in the PIK Facility Agreement.

"**Insolvency Event**" means, in relation to the Company:

(a)     any resolution is passed or order made for its insolvency, bankruptcy, winding up, dissolution, administration, examination or reorganisation (excluding solvent reorganisations);

(b)     a composition, compromise, assignment, or arrangement with any class of creditors generally (other than any Secured Party) in connection with or as a result of any financial difficulty on the part of the Company;

(c)     a moratorium is declared in relation to any of its indebtedness;

(d)     the appointment of any liquidator, receiver, examiner, administrator, administrative receiver, compulsory manager or other similar officer in respect of it or any of its assets; or

(e)     any analogous procedure or step is taken in any jurisdiction,

other than (in each case):

(i)     any proceedings which are frivolous or vexatious and which, if capable of remedy, are discharged, stayed or dismissed within 20 Business Days of commencement or, if earlier, the date on which it is advertised (or such other period as agreed between the Company and the Majority Senior Creditors);

(ii)     (in the case of an application to appoint an administrator or commence proceedings) any proceedings which the Security Agent is satisfied (acting on the instructions of the Majority Senior Creditors) will be withdrawn before it is heard or will be unsuccessful; and

(iii)     as permitted in the PIK Facility Agreement or otherwise not constituting a Default.

"**Junior Agent**" means the Original Junior Agent and any successor facility agent under the Junior Debt Agreement or any other agent or representative of the Junior Creditors, in each case, appointed by the Junior Creditors which has acceded to this Agreement as the Junior Agent.

"**Junior Creditor**" means each lender or other creditor in respect of the Junior Debt (including the Original Junior Creditors) which accedes to this Agreement by executing a Creditor/Creditor Representative Accession Undertaking in accordance with this Agreement, which, in each case, has not ceased to be a Junior Creditors in accordance with this Agreement or the relevant Junior Finance Document.

"**Junior Debt**" means any indebtedness incurred by the Company (including, for the avoidance of doubt, under the Junior Debt Agreement) which is notified to the Security Agent by the Company in writing as indebtedness to be treated as "Junior Debt" for the purposes of this Agreement, provided that incurrence of such indebtedness is not prohibited by the terms of the Senior Finance Documents and any then existing Junior Finance Document and either the providers of such indebtedness have agreed to become party to this Agreement as Junior Creditors by executing and delivering a Creditor/Creditor Representative Accession Undertaking or the agent, trustee or other representative in respect of such Junior Debt has agreed to become party to this Agreement as Junior Agent on behalf of the providers of such

indebtedness by executing and delivering a Creditor/Creditor Representative Accession Undertaking, in each case to the extent not already party to this Agreement in that capacity.

"**Junior Debt Agreement**" means the facility agreement or other equivalent document entered into by the Company, the Junior Agent and the Original Junior Creditors in respect of the Junior Debt which is made available or issued on or about the date of this Agreement.

"**Junior Discharge Date**" means the first date on which all Junior Liabilities have been fully and finally discharged to the satisfaction of the Junior Agent (whether or not as a result of an enforcement) and the Junior Creditors (in that capacity) are under no further obligation to provide financial accommodation to the Company under the Junior Finance Documents.

"**Junior Finance Documents**" means all documents, agreements and instruments between the Company and a Junior Creditor evidencing any Junior Debt (including, for the avoidance of doubt, the Junior Debt Agreement), excluding, for the avoidance of doubt, any documentations, agreements and instruments with respect to the Shareholder Liabilities or Senior Liabilities.

"**Junior Liabilities**" means the Liabilities owed by the Company to the Junior Creditors under or in connection with the Junior Finance Documents.

"**Junior Participation**" means, in relation to a Junior Creditor, the aggregate of its principal amounts (including capitalised interest) outstandings under the Junior Finance Documents.

"**Legal Reservations**" has the meaning given to that term in the PIK Facility Agreement.

"**Liabilities**" means all present and future liabilities and obligations at any time of the Company to any Creditor under the Debt Documents (including by way of the grant of Security under such documents), both actual and contingent and whether incurred solely or jointly or in any other capacity together with any of the following matters relating to or arising in respect of those liabilities and obligations:

(f)      any refinancing, novation, deferral or extension;

(g)      any claim for breach of representation, warranty or undertaking or on an event of default or under any indemnity given under or in connection with any document or agreement evidencing or constituting any other liability or obligation falling within this definition;

(h)      any claim for damages or restitution; and

(i)      any claim as a result of any recovery by the Company of a Payment on the grounds of preference or otherwise,

and any amounts which would be included in any of the above but for any discharge, stay, non-provability, unenforceability or non-allowance of those amounts in any insolvency or other proceedings.

"**Majority Senior Creditors**" means, at any time, those Senior Creditors whose Senior Participations at that time aggregate more than 66 2/3% of the total Senior Participations at that time.

"**Majority Junior Creditors**" means, at any time, those Junior Creditors whose Junior Participations at that time aggregate more than 66 2/3% of the total Junior Participations at that time.

"**Material Adverse Effect**" has the meaning given to that term in the PIK Facility Agreement.

6

"**Non-Distressed Disposal**" has the meaning given to that term in Clause 9.1 (*Non-Distressed Disposals*).

"**Party**" means a party to this Agreement.

"**Payment**" means, in respect of any Liabilities (or any other liabilities or obligations), a payment, prepayment, repayment, redemption, repurchase, defeasance or discharge of those Liabilities (or other liabilities or obligations).

"**Perfection Requirements**" has the meaning given to that term in the PIK Facility Agreement.

"**Permitted Payment**" means any Payments to any person not prohibited to be made by this Agreement, as the context requires.

"**Permitted Subordinated Payments**" means the Payments permitted by Clause 4.2 (*Permitted Payments: Subordinated Liabilities*).

"**PIK Facility**" means each of the "Facility" under and as defined in the PIK Facility Agreement and each Additional Facility from time to time.

"**PIK Facility Agreement**" means the payment-in-kind facility agreement dated on or about the date hereof among the Company as borrower, the Original Senior Creditors, the Original Senior Agent and others.

"**Receiver**" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property, as the context may require.

"**Recoveries**" has the meaning given to that term in Clause 10.1 (*Order of Application - Transaction Security*).

"**Relevant Liabilities**" means:

(a)     in the case of a Creditor:

(i)     the Liabilities owed to Creditors ranking (in accordance with the terms of this Agreement) pari passu with or in priority to that Creditor together with all Agent Liabilities owed to the relevant Creditor Representative of those Creditors; and

(ii)     all Security Agent Liabilities; and

(b)     in the case of the Company, the Liabilities owed to the Creditors together with the Agent Liabilities owed to the relevant Creditor Representative of those Creditors and the Security Agent Liabilities.

"**Required Creditor Consent**" means, in relation to any proposed matter, step or action taken prior to the Senior Discharge Date (the "**Senior Secured Proposed Action**"), the prior consent of, if the Senior Secured Proposed Action is prohibited by the terms of the PIK Facility Agreement, the Majority Senior Creditors.

"**Retiring Security Agent**" has the meaning given to that term in paragraph (d) of Clause 12.1 (*Resignation of the Security Agent*).

"**Secured Obligations**" means all Liabilities and all other present and future obligations at any time due, owing or incurred by the Company to any Secured Party under the Senior Finance Documents, both actual and contingent and whether incurred solely or jointly and as principal or surety or in any other capacity.

"**Secured Parties**" means the Security Agent, the Senior Agent, any Receiver or Delegate and the Senior Creditors from time to time but, in the case of the Senior Agent or any Senior Creditor, only if, it is a party to this Agreement or has acceded to this Agreement, in the appropriate capacity, pursuant to Clause 13.2 (*Change of Senior Creditors*).

"**Security**" means a mortgage, charge, pledge, lien, security assignment, security transfer of title or other security interest having a similar effect.

"**Security Agent Liabilities**" means all the Liabilities owed by the Company to the Security Agent under or in connection with the relevant Debt Documents (but does not include any amount in respect of principal, interest, redemption or prepayment).

"**Security Agent's Spot Rate of Exchange**" means, in respect of the conversion of one currency (the "**First Currency**") into another currency (the "**Second Currency**"), (a) the Security Agent's spot rate of exchange; or (b) (if the Security Agent does not have an available spot rate of exchange) any other publicly available spot rate of exchange selected by the Security Agent (acting reasonably), for which the Security Agent is able to purchase the Second Currency with the First Currency in the London foreign exchange market at or about 11:00 a.m. (London time) on a particular day, which shall be notified by the Security Agent in accordance with Clause 11.26 (*Security Agent's Spot Rate of Exchange*).

"**Security Documents**" means each of the Transaction Security Documents and any other document entered into at any time by the Company creating any Security in favour of any of the Secured Parties as security for any of the Secured Obligations.

"**Security Property**" means:

(a)     the Transaction Security expressed to be granted in favour of the Security Agent as agent or trustee for the Secured Parties for the benefit of the Secured Parties and all proceeds of that Transaction Security;

(b)     the Security Agent's interest in any trust fund created pursuant to Clause 6 (*Turnover of Receipts*); and

(c)     any other amounts or property, whether rights, entitlements, choses in action or otherwise, actual or contingent, which the Security Agent is required by the terms of the Debt Documents to hold as trustee on trust for (or otherwise for the benefit of) the Secured Parties.

"**Senior Agent**" means

(a)     in relation to the PIK Facility, the Original Senior Agent or any replacement or successor facility agent appointed in accordance with the terms and conditions of the PIK Facility Agreement and which has acceded to this Agreement as a Creditor Representative of such Senior Creditors under the PIK Facility Agreement; and

(b)     in relation to any other Senior Facility, if applicable, the person acting as agent or creditor representative of the relevant Senior Creditors providing such Senior Facility in the relevant Senior Finance Documents and which has acceded to this Agreement as a Senior Agent of such Senior Creditors.

"**Senior Creditor**" means:

(a)     in relation to the PIK Facility, each "Lender" referred to in the PIK Facility Agreement (including, for the avoidance of doubt, the Original Senior Creditors); and

(b)      in relation to any other Senior Facility, each "Lender" (under and as defined in the Senior Finance Documents),

in each case, which accedes to this Agreement by executing a Creditor/Creditor Representative Accession Undertaking in accordance with this Agreement, which, in each case, has not ceased to be a Senior Creditor in accordance with this Agreement or the relevant Senior Finance Document.

"**Senior Default**" means a Default under the relevant Senior Finance Document.

"**Senior Discharge Date**" means the first date on which all Senior Liabilities have been fully and finally discharged to the satisfaction of the Senior Agent (whether or not as a result of an enforcement) and the Senior Creditors (in that capacity) are under no further obligation to provide financial accommodation to the Company under the Senior Finance Documents.

"**Senior Facility**" means

(a)      each PIK Facility; and

(b)      any debt facilities, indentures or other arrangements providing for revolving credit loans, term loans, letters of credit or other indebtedness which is provided to the Company and Refinances (as defined in the PIK Facility Agreement) the facility referred to in paragraph (a) above.

"**Senior Finance Documents**" means:

(a)      in relation to the PIK Facility, any documents referred to in the definition of "Finance Document" in the PIK Facility Agreement; and

(b)      in relation to any other Senior Facility, if applicable, any document or instrument entered into between the Company and a Senior Creditor setting out the terms of any loan, credit or guarantee facility or securities which creates or evidences a Senior Facility.

"**Senior Liabilities**" means the Liabilities owed by the Company to the Senior Creditors under or in connection with the Senior Finance Documents, including, for the avoidance of doubt, any such Liabilities in connection with any Additional Facility excluding, for the avoidance of doubt, any Junior Liabilities or Shareholder Liabilities.

"**Senior Participation**" means, in relation to a Senior Creditor, the aggregate of its principal amounts (including capitalised interest) outstandings under the Senior Finance Documents.

"**Shareholder Creditor**" means the Original Shareholder Creditor and each direct or indirect Holding Company of the Company or Affiliate of the Company who is not a member of the Group (and their respective transferees and successors) which is a lender or creditor in respect of the Shareholder Debt and which accedes to this Agreement by executing a Creditor/Creditor Representative Accession Undertaking in accordance with this Agreement, which, in each case, has not ceased to be a Shareholder Creditor in accordance with this Agreement or the relevant Shareholder Debt Documents.

"**Shareholder Debt**" means any indebtedness incurred by the Company which is notified to the Security Agent by the Company in writing as indebtedness to be treated as "Shareholder Debt" for the purposes of this Agreement, provided that incurrence of such indebtedness is not prohibited by the terms of the Senior Finance Documents and the Junior Finance Document and either the providers of such indebtedness have agreed to become party to this Agreement as Shareholder Creditors by executing and delivering a Creditor/Creditor Representative

Accession Undertaking, in each case to the extent not already party to this Agreement in that capacity.

"**Shareholder Debt Documents**" means all documents, agreements and instruments between the Company and a Shareholder Creditor evidencing any Shareholder Debt and excluding, for the avoidance of doubt, any documentations, agreements and instruments with respect to any Senior Facility or Junior Debt.

"**Shareholder Liabilities**" means the Liabilities owed by the Company to any Shareholder Creditor (including but not limited to any indebtedness, declared dividends or other declared distribution in respect of share capital), excluding, for the avoidance of doubt, any Junior Liabilities or Senior Liabilities.

"**Subordinated Creditors**" means the Junior Creditors, the Junior Agent and the Shareholder Creditors.

"**Subordinated Documents**" means the Junior Finance Documents and the Shareholder Debt Documents.

"**Subordinated Liabilities**" means the Junior Liabilities, the Agent Liabilities of a Junior Agent and the Shareholder Liabilities.

"**Subordination Amendment**" means any amendment or waiver which is subject to Clause 19 (*Consents, Amendments and Override*).

"**Subsidiary**" has the meaning given to that term in the PIK Facility Agreement.

"**Tax**" has the meaning given to that term in the PIK Facility Agreement and "**Taxes**" shall be construed accordingly.

"**Third Parties Rights Act**" has the meaning given to that term in Clause 1.3 (*Third Party Rights*).

"**Transaction Security**" means any Security from the Company which, to the extent legally possible and subject to any Agreed Security Principles and the provisions of this Agreement is created, or expressed to be created, in favour of the Security Agent as agent or trustee for the other Secured Parties (or a class of Secured Parties) in respect of the Secured Obligations.

"**Transaction Security Documents**" means any document entered into by the Company creating or expressed to create Transaction Security.

"**VAT**" means value added tax as provided for in the Value Added Tax Act 1994 or any tax imposed in compliance with the council directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112) and/or any other tax of a similar nature in any applicable jurisdiction.

1.2    **Construction**

(a)    Unless a contrary indication appears, a reference in this Agreement to:

(i)    the Company, any Creditor, Senior Creditor, Secured Party, Security Agent, Senior Agent, Junior Agent, Junior Creditor, Shareholder Creditor, Subordinated Creditor or (in relation to paragraph (B) below) any other person, shall be construed:

(A)    to be a reference to it in its capacity as such and not in any other capacity; and

10

(B)     so as to include its successors in title, permitted assigns and permitted transferees and, in the case of the Security Agent, any person for the time being appointed as the Security Agent in accordance with this Agreement;

(ii)     "**assets**" includes present and future properties, revenues and rights of every description;

(iii)    a "**Debt Document**" or any other agreement or instrument is (other than a reference to a Debt Document or any other agreement or instrument in original form) a reference to that Debt Document, or other agreement or instrument, as amended, novated, supplemented, extended or restated (however fundamentally) and includes any increase in, addition to or extension of or other change to any facility made available under any such agreement or instrument (in each case to the extent not prohibited by this Agreement);

(iv)     "**enforcing**" (or any derivation) the Transaction Security shall include the appointment of an administrator of the Company by the Security Agent;

(v)      "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(vi)     the "**original form**" of a Debt Document or any other agreement or instrument is a reference to that Debt Document, agreement or instrument as originally entered into;

(vii)    a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality) or two or more of the foregoing;

(viii)   a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but if not having the force of law, with which persons customarily comply) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(ix)     "**shares**" or "**share capital**" includes equivalent ownership interests (and "**shareholder**" and similar expressions shall be construed accordingly);

(x)      a provision of law is a reference to that provision as amended or re-enacted;

(xi)     the words "**notwithstanding anything to the contrary in this Agreement or any other Debt Document**" shall include any provisions in this Agreement or any other Debt Document which are expressed or purport to override any other provisions of this Agreement or any other Debt Document as a condition or otherwise to the taking of any action, step or any transaction; and

(xii)    any corporation into which the Security Agent may be merged or converted, or any corporation with which the Security Agent may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Security Agent shall be a party, or any corporation, including affiliated corporations, to which the Security Agent shall sell or otherwise transfer:

(A)     all or substantially all of its assets; or

(B)      all or substantially all of its corporate trust business,

shall, on the date when the merger, conversion, consolidation or transfer becomes effective and to the extent permitted by any applicable laws become the successor Security Agent under this Agreement without the execution or filing of any paper or any further act on the part of the parties to this Agreement, unless otherwise required by the Company, and after the said effective date all references in this Agreement to the Security Agent shall be deemed to be references to such successor corporation. Written notice of any such merger, conversion, consolidation or transfer shall immediately be given by the Security Agent to each other Party.

(b)      Section, Clause and Schedule headings are for ease of reference only.

(c)      A Default or an Event of Default is "**continuing**" if it has not been remedied or waived and an Acceleration Event is "continuing" unless the underlying Event of Default has ceased to be continuing or the relevant demand or notice has been revoked, rescinded or otherwise made ineffective by the Senior Agent. If any Acceleration Event, Default or Event of Default has occurred but is no longer continuing (a "**Cured Default**"), any other Default or Event of Default which would not have arisen had the Cured Default not occurred, shall be deemed not to be continuing automatically upon, and simultaneous with, the remedy or waiver of the Cured Default. For the avoidance of doubt, any Default or Event of Default in respect of a failure to deliver any certificate, notice, document, report, financial statement or other information within a time period prescribed in the PIK Facility Agreement shall be deemed to be cured upon performance of such obligation even though such performance is not within the prescribed period specified in the PIK Facility Agreement.

(d)      "**disposal**" means any sale, lease, licence, transfer (including any transfer of any property interest in any asset) and any grant of Security or quasi Security or conveyance of or with respect to any asset, undertaking or business.

(e)      The right or requirement of any Party to take or not take any action on or following the occurrence of an Insolvency Event shall cease to apply if the relevant Insolvency Event is no longer continuing (unless an Acceleration Event has occurred and is continuing and without prejudice to any action taken or not taken in accordance with the terms of this Agreement while that Insolvency Event is continuing).

(f)      In determining whether or not any Liabilities have been fully and finally discharged, contingent liabilities (such as the risk of clawback flowing from a preference) shall be disregarded by the Senior Agent, Security Agent or otherwise except to the extent that there is a reasonable likelihood that those liabilities will become actual liabilities.

(g)      Any reference in this Agreement to the Company being permitted to make any Payment or take any other action shall include a reference to the Company being permitted to make any arrangement in respect of that Payment or action or take any step, make any payment or enter into any transaction to facilitate or fund the making of that Payment or the taking of that action.

(h)      Notwithstanding anything to the contrary, where any provision of this Agreement refers to or otherwise contemplates any consent, approval, release, waiver, agreement, notification or other step or action (each an "**Action**") which may be required from or by any person:

(i)      which is not a Party at such time;

(ii)  in respect of any agreement which is not in existence at such time;

(iii)  in respect of any indebtedness which has not been committed or incurred (or an agreement in relation thereto) at such time; or

(iv)  in respect of Liabilities or Creditors (or other persons) for which the Senior Discharge Date has occurred at or prior to such time or concurrently with any Action coming into effect,

unless otherwise agreed or specified by the Company, that Action shall not be required (or be required from any person that is a party thereto) and no such provision shall, or shall be construed so as to, in any way prohibit or restrict the rights or actions of the Company. Further, for the avoidance of doubt, no references to any agreement which is not in existence (or under which debt obligations have not been actually incurred by a member of the Group) shall, or shall be construed so as to, in any way prohibit or restrict the rights or actions of the Company (and no consent, approval, release, waiver, agreement, notification or other step or action shall be required from any party thereto).

(i)  Where any consent is required under this Agreement from a Senior Creditor where such consent is required after the Senior Discharge Date such consent requirement will cease to apply.

(j)  Notwithstanding anything to the contrary in this Agreement or any other Debt Document, nothing in this Agreement or any Debt Document shall prohibit a non-cash contribution of any asset (including, without limitation, any participation, claim, commitment, rights, benefits and/or obligations in respect of any Liabilities and/or any other indebtedness borrowed or issued by the Company from time to time) by a person that is not a member of the Group to the Company, provided that to the extent such transaction results in any indebtedness or claim being outstanding from the Company to any of its direct or indirect shareholders, such indebtedness or claim constitutes Subordinated Liabilities or is otherwise subordinated in accordance with the Debt Documents.

(k)  If the terms of any Debt Document:

(i)  require the relevant Creditors to provide approval (or deemed approval to have been provided) for a particular matter, step or action (for the avoidance of doubt, excluding any such terms which expressly entitle the relevant Creditors to withhold their approval for that matter, step or action) and such approval has been given (or is deemed to have been given) pursuant to the terms of that Debt Document; or

(ii)  do not seek to regulate a particular matter, step or action (which shall be deemed to be the case if the relevant matter, step or action is not the subject of an express requirement or restriction in that Debt Document),

for the purposes of this Agreement that matter, step or action shall not be prohibited by the terms of that Debt Document.

(l)  In determining whether any indebtedness or other amount (including, without limitation, under the PIK Facility Agreement) is prohibited by the terms of any Debt Document or to the extent any amendment or waiver is sought for or to permit any step or other action, the terms of any Debt Document which:

(i)  relate to any Liabilities which are to be refinanced or otherwise replaced with such indebtedness or other amount or that will be refinanced or otherwise

13

replaced following such step or action for which such amendment or waiver is sought; or

(ii)     will not exist or will cease to be in effect on the date on which such indebtedness or other amount is incurred by a member of the Group or following the taking effect of such amendment or waiver,

shall not be taken into account (including for the purposes of any vote or consent of any class (including the Majority Senior Creditors) for the purposes of any Debt Document in respect of any such amendment or waiver).

(m)     References to any matter being "**permitted**" under one or more of the Debt Documents shall include references to such matters not being prohibited or otherwise approved under those Debt Documents.

(n)     Any requirement that consent be given under this Agreement shall mean such consent is to be given in writing, which, for the purposes of this Agreement, will be deemed to include any instructions, waivers or consents provided through any applicable clearance system in accordance with the terms of the relevant Debt Documents.

(o)     Until the relevant proceeds are released from such escrow (or similar or equivalent arrangements), the provisions of this Agreement shall not apply to or create any restriction in respect of any escrow or similar arrangement pursuant to which the proceeds of any Debt Document are subject and this Agreement shall not govern the rights and obligations of the Creditors concerned until such proceeds are released from such escrow or similar arrangement in accordance with its terms.

(p)     Any references to terms in this Agreement that are defined in any Debt Document, (the "**Defined Term**") shall include not only the definition but also terms or mechanics which are equivalent or similar to the manner in which such Defined Term is interpreted under this Agreement and, if such Debt Document no longer exists, any equivalent term to the Defined Term in any other Debt Document or if no such equivalent exists, the Defined Term as in existence prior to the relevant Debt Document ceasing to exist.

(q)     For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement or any other Debt Document, nothing in this Agreement shall prohibit any debt exchange, non-cash rollover or other similar or equivalent transaction in relation to any Liabilities.

(r)     To the extent any step or action is permitted under this Agreement (or permitted subject to the consent of specified Parties under this Agreement), the Parties hereto agree that such step or action will be permitted under the other Debt Documents (or permitted thereunder subject to the consent of such specified Parties) and if there is any conflict between the terms of, or the requirement for any conditions in, this Agreement and any other Debt Document, the terms of, or the requirement for any conditions in, this Agreement will prevail (save to the extent that to do so would result in or have the effect of the Company contravening any applicable law or regulation, or present a material risk of liability for the Company and/or its directors or officers, or give rise to a material risk of breach of fiduciary or statutory duties), in each case notwithstanding any restriction or prohibition to the contrary, any provision expressed or purported to override any provision of this Agreement or the requirement to fulfil any additional conditions, in each case, in any other Debt Document.

(s)     No Indemnity or payment obligation of the Company in any Debt Document shall include an indemnity or payment obligation in relation to or for any action or step where

there has been (or that arises in connection with) a breach by a Creditor under a Debt Document.

(t)     To the extent that in this Agreement the consent of a Creditor Representative under any Debt Document or the relevant Creditors under any Debt Document is required, then such consent is hereby expressly given to the extent that the matter, step or action requiring approval is not prohibited by the terms of that Debt Document, including for the avoidance of doubt, for the purposes of determining the Majority Senior Creditors or any other class, group or percentage of any Creditors (including, for the avoidance of doubt, unanimity).

(u)     Any agreement given by a Senior Creditor or a Junior Creditor shall, unless expressly provided otherwise, extend to and include the relevant Creditor Representative of such Senior Creditor or Junior Creditor (as the case may be).

(v)     References to any Creditors (or any class, group or percentage of any Creditors (including, for the avoidance of doubt, unanimity)) giving any Consent under this Agreement means (in each case) acting through the applicable Creditor Representative, if any, or, as applicable, the Security Agent.

(w)     Any reference to any requirement for any person to accede to this Agreement shall be construed as a reference to such person executing and delivering to the Security Agent a Creditor/Creditor Representative Accession Undertaking.

(x)     Any reference to a term, provision, action or step being agreed by the Company shall be construed as any agreement given at any time by the Company in its discretion which refers to the applicable term, provision, action or step and the applicable provision of this Agreement for which such agreement applies.

(y)     Nothing in this Agreement or any other Debt Document shall restrict the Company, any Party, any member of the Group (or Holding Company or Affiliate thereof) or the Creditors (or any of them) agreeing the ranking of their respective claims and any other intercreditor arrangements among themselves in documentation separate to this Agreement and entered into solely between such parties (or on their behalf by a Creditor Representative).

(z)     To the extent that the Company or Affiliate thereof is a party to this Agreement in more than one capacity, and a payment is permitted to be made or received or a right is granted in respect of one of those capacities (or with respect to specific Liabilities associated with that capacity), then such payment or right shall not be restricted or limited by the terms of this Agreement relating to any other capacity that such member of the Group or Affiliate has assumed (or as a result of the treatment of specific Liabilities associated with that capacity).

(aa)    The Parties intend that this Agreement shall take effect as a deed, notwithstanding that a party may only execute it under hand.

(bb)    Notwithstanding anything to the contrary contained in this Agreement, the parties agree to treat CQS ACS Fund ("**IACS**") for all purposes as if it were a separate legal entity to CQS Global Funds ICAV (the "**Umbrella**") and the Umbrella's other sub-funds and any amounts owed to or liabilities incurred by IACS in connection with this Agreement may be satisfied solely from the assets of IACS (the "**Designated Assets**"). If the Designated Assets of IACS are insufficient to meet its payment obligations or liabilities under this Agreement, then, notwithstanding any other provision contained in this Agreement, to the extent any outstanding payment obligation cannot be met from the Designated Assets (such outstanding amount, the "**Shortfall Amount**"), the parties

acknowledge and agree that no party shall have a right to bring any claim, action or proceedings against any other sub-fund of the Umbrella or against the Umbrella itself in relation to such Shortfall Amount.

1.3    **Third Party Rights**

(a)    Unless expressly provided to the contrary in this Agreement, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "**Third Parties Rights Act**") to enforce or to enjoy the benefit of any term of this Agreement.

(b)    Notwithstanding any term of this Agreement, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

(c)    Any Receiver, Delegate or any other person described in Clause 11.10 (*No Proceedings*) may, subject to this Clause 1.3 and the Third Parties Rights Act, rely on any Clause of this Agreement which expressly confers rights on it.

2.    **RANKING AND PRIORITY**

2.1    **Creditor Liabilities**

Each of the Parties agrees that the Liabilities owed by the Company to the Creditors shall rank in right and priority of payment in the following order and are postponed and subordinated to any prior ranking Liabilities as follows:

(a)    *first*, the Senior Liabilities and the Agent Liabilities of the Senior Agent *pari passu* and without any preference between them;

(b)    *second*, the Junior Liabilities and the Agent Liabilities of the Junior Agent *pari passu* and without any preference between them; and

(c)    *third*, the Shareholder Liabilities *pari passu* and without any preference between them.

2.2    **Transaction Security**

Each of the Parties agrees that the Transaction Security shall, subject to the terms of this Agreement, rank and secure the Secured Obligations (but only to the extent that such Transaction Security is expressed to secure those Liabilities) *pari passu* and without any preference between them.

2.3    **Shareholder Liabilities**

This Agreement does not purport to rank any of the Shareholder Liabilities as between themselves.

3.    **SENIOR CREDITORS AND SENIOR LIABILITIES**

3.1    **Payments of Senior Creditor Liabilities**

(a)    The Company may make Payments in respect of the Senior Creditor Liabilities at any time.

(b)    Any failure to make a Payment due under the Senior Finance Documents as a result of this Clause 3.1 shall not prevent the occurrence of an Event of Default as a consequence of that failure to make a Payment in relation to the relevant Senior Finance Document.

3.2     **Amendments and Waivers**

The Senior Creditors and the Company may amend or waive the terms of the Senior Finance Documents in accordance with their terms (and subject only to any consent required under them) at any time.

3.3     **Restriction on Enforcement: Senior Creditors**

No Senior Creditor may take any Enforcement Action under paragraph (b), (c) or (d) of that definition without the prior written consent of the Majority Senior Creditors.

4.      **SUBORDINATED LIABILITIES**

4.1     **Restriction on Payment: Subordinated Liabilities**

Prior to the Senior Discharge Date, the Company will not make any Payment of the Subordinated Liabilities at any time unless:

(a)      that Payment is permitted under Clause 4.2 (*Permitted Payments: Subordinated Liabilities*); or

(b)      the taking or receipt of that Payment is permitted under Clause 4.7 (*Permitted Enforcement: Subordinated Creditors*); or

(c)      the Required Creditor Consent and the consent of the Majority Junior Creditors for such Payment has been obtained.

4.2     **Permitted Payments: Subordinated Liabilities**

(a)      The Company may make any Payments in respect of the Subordinated Liabilities (whether of principal, interest or otherwise) if such Payment is not prohibited by the Senior Finance Documents and the Junior Finance Documents or, to the extent prohibited, the Required Creditor Consent and the consent of the Majority Junior Creditor has been obtained.

(b)      Payments in respect of the Subordinated Liabilities may not be made pursuant to paragraph (a) above if, at the time of the Payment, an Acceleration Event has occurred, unless the Required Creditor Consent and the Majority Junior Creditors (if required) has been obtained.

(c)      Nothing in this Agreement or any of the Debt Documents shall prohibit or restrict any roll-up or capitalisation of any amount under any Subordinated Document or the issue of any payment in kind instruments in satisfaction of any amount under any Subordinated Document or any forgiveness, write-off or capitalisation of any Subordinated Liabilities or the release or other discharge of any such Subordinated Liabilities.

4.3     **Payment obligations continue**

The Company shall not be released from the liability to make any Payment (including of default interest, which shall continue to accrue) under any Subordinated Document by the operation of Clause 4.1 (*Restriction on Payment: Subordinated Liabilities*) and Clause 4.2 (*Permitted Payments: Subordinated Liabilities*) even if its obligation to make that Payment is restricted at any time by the terms of any of those Clauses.

17

4.4     **Amendments and Waivers: Subordinated Creditors**

(a)     Prior to the Senior Discharge Date, subject to paragraph (b) below, the Subordinated Creditors and the Company shall not amend, waive or vary the terms of any of the documents or instruments pursuant to which the Subordinated Liabilities are constituted which would result in the interests of any Senior Creditor being adversely affected in any material respect or the ranking and/or subordination contemplated by this Agreement being impaired.

(b)     Paragraph (a) above does not apply to any amendment, waiver or consent:

(i)     which has been made with the prior Required Creditor Consent and the Majority Junior Creditors; or

(ii)     which is minor, technical or administrative or corrects a manifest error.

4.5     **Security: Subordinated Creditors**

The Subordinated Creditors may not take, accept or receive the benefit of any Security, guarantee, indemnity or other assurance against loss from the Company in respect of any of the Subordinated Liabilities prior to the Senior Discharge Date, unless the requisite Senior Creditors under the PIK Facility Agreement consent to that Security, guarantee, indemnity or other assurance against loss, provided that the Shareholder Creditors may not take, accept or receive the benefit of any Security, guarantee, indemnity or other assurance against loss from the Company in respect of the Shareholder Liabilities without the prior consent of the Majority Junior Creditors.

4.6     **Restriction on Enforcement: Subordinated Creditors**

Subject to Clause 4.7 (*Permitted Enforcement: Subordinated Creditors*), no Subordinated Creditor shall be entitled to take any Enforcement Action in respect of any of the Subordinated Liabilities at any time prior to the Senior Discharge Date, unless:

(a)     such Enforcement Action is solely a demand for payment, set-off, account combination or payment netting which is permitted by Clause 4.2 (*Permitted Payments: Subordinated Liabilities*);

(b)     otherwise consented to by the Security Agent or the Majority Senior Creditors; or

(c)     the Required Creditor Consent for such Enforcement Action has been obtained.

4.7     **Permitted Enforcement: Subordinated Creditors**

After the occurrence of an Insolvency Event in relation to the Company, each Subordinated Creditor may only (unless otherwise directed by the Security Agent or unless the Security Agent has taken, or has given notice that it intends to take, action on behalf of that Subordinated Creditor in accordance with Clause 5.4 (*Filing of Claims*)) exercise any right it may otherwise have in respect of the Company to:

(a)     accelerate any of the Subordinated Liabilities or declare them prematurely due and payable or payable on demand;

(b)     make a demand under any guarantee, indemnity or other assurance against loss given by the Company in respect of any Subordinated Liabilities;

(c)     exercise any right of set off or take or receive any Payment in respect of any Subordinated Liabilities of the Company; or

(d)      claim and prove in the liquidation, administration or other insolvency proceedings of the Company for the Subordinated Liabilities owing to it,

but shall not take any other Enforcement Action.  After the Senior Discharge Date, this Clause 4.7 is subject to Clause 4.10 (*Shareholder Liabilities*).

4.8      **Representations: Subordinated Creditor**

Each Subordinated Creditor represents and warrants to each Secured Party on the date of this Agreement (or, if it becomes a Party after such date, the date of the Creditor/Creditor Representative Accession Undertaking) that:

(a)      it is duly incorporated (or, as the case may be, organised) and validly established under the laws of its jurisdiction of incorporation (or, as the case may be, organisation);

(b)      subject to the Legal Reservations and Perfection Requirements, the obligations expressed to be assumed by it in this Agreement are valid, legally binding and enforceable obligations; and

(c)      subject to the Legal Reservations and Perfection Requirements, the entry into and performance by it of, and the transactions contemplated by, this Agreement do not contravene:

(i)      any law or regulation applicable to it;

(ii)     its constitutional documents; or

(iii)    any agreement or instrument binding upon it or any of its assets,

in each case, to an extent which would have a Material Adverse Effect.

4.9      **Subordinated Liabilities: Exceptions**

Notwithstanding anything to the contrary, nothing in this Agreement or any of the Debt Documents shall prohibit or restrict:

(a)      any Payment made to a Subordinated Creditor under and in accordance with the terms of any Debt Document other than with respect to Subordinated Liabilities;

(b)      any Payment or other return made by way of a roll-up or capitalisation of any amount, an issue of shares, an incurrence of indebtedness constituting Subordinated Liabilities (including the issue of payment-in-kind instruments) or any other similar or equivalent step, action or arrangement;

(c)      any payment made (whether cash or in kind) or other step or action taken to facilitate any Payment (or other matter) in respect of any Subordinated Liabilities (in each case to the extent that such Payment or other matter is not prohibited by this Clause 4); and

(d)      any Subordinated Creditor from granting any Security over or in relation to the Subordinated Liabilities or any related rights in respect thereof provided that the rights of the holder of such Security upon any enforcement are subject to this Agreement.

4.10     **Shareholder Liabilities**

(a)      Without prejudice to any other provision of this Agreement, subject to Clauses 6 (*Turnover of Receipts*), 5 (*Effect of Insolvency Event*) and 10 (*Application of Proceeds*),

with respect to the Subordinated Liabilities only after the Senior Discharge Date, each of the Subordinated Creditors and the Company agree as follows:

(i)     all Shareholder Liabilities shall be subordinated and postponed to all Junior Liabilities;

(ii)    in relation to any amounts received or recovered in respect of the Shareholder Liabilities by a Shareholder Creditor (whether by way of Payment or distribution of, or on account of or in relation to, the Shareholder Liabilities, including by way of set-off which is not expressly permitted to be paid to any Shareholder Creditor under the Senior Finance Documents or the Junior Finance Documents or as a result of any other litigation or proceedings against the Company) the Company and each Shareholder Creditor shall, to the extent such payment or distribution is not permitted under paragraph (a)(iii) below:

> (A)     in relation to receipts or recoveries not received or recovered by way of set-off, hold an amount of that receipt or recovery on trust for the Junior Creditors and promptly pay or distribute that amount to the Junior Creditors for application in accordance with Clause 2.1 (*Creditor Liabilities*);

> (B)     in relation to receipts and recoveries received or recovered by way of set-off, promptly pay an amount equal to that recovery to the Junior Creditors for application in in accordance with Clause 2.1 (*Creditor Liabilities*);

(iii)   no Shareholder Creditor shall:

> (A)     accept or receive the benefit of any security, guarantee, indemnity or other assurance against loss from the Company in respect of the Shareholder Liabilities at any time prior to the later to occur of the Senior Discharge Date and the Junior Discharge Date; and

> (B)     with respect to the Shareholder Documents, exercise any right to terminate, prepay or repay any of the Shareholder Debt Documents or agree to a maturity for repayment of any of the Shareholder Debt Documents which is earlier than the maturity date of the Junior Debt

in each case unless the prior written consent of the Majority Junior Creditors is obtained.

(iv)    no Shareholder Creditor shall be entitled to take any Enforcement Action in respect of any of the Shareholder Liabilities owed to it at any time prior to the Junior Discharge Date;

(v)     if paragraph (a)(i) above applies, the Company and each Shareholder Creditor will:

> (A)     pay all payments under or in respect of the Shareholder Debt Documents in cash or in kind received by or on behalf of it from the Company (or any liquidator, administrator, receiver or similar official of such debtor or its assets) over to the Junior Creditors for application in the order set out in Clause 2.1 (*Creditor Liabilities*); and

> (B)     direct the trustee in bankruptcy, liquidator, administrator, receiver or other person distributing the assets of the Company or their proceeds

to make payments in respect of the Shareholder Debt Documents direct to the Junior Creditors until all Junior Liabilities have been paid in full;

(vi)   to the fullest extent permitted under mandatory provisions of applicable law, until the Junior Discharge Date, the Junior Creditors may, and are hereby irrevocably authorised on behalf of the Company and the Shareholder Creditors, as applicable, to:

(A)   claim, enforce and prove for liabilities in respect of the Shareholder Liabilities owed by the Company to that Shareholder Creditor;

(B)   exercise all powers of convening meetings, voting and representation in respect of liabilities in respect of the Shareholder Liabilities and the Shareholder Creditors under the Shareholder Debt Documents will provide all forms of proxy and of representation requested by the Shareholder Creditors for that purpose;

(C)   exercise all powers of convening meetings, voting and representation in respect of liabilities in respect of the Shareholder Liabilities under the Shareholder Debt Documents will provide all forms of proxy and of representation requested by the Junior Creditor for that purpose;

(D)   file claims and proofs, give receipts and take all such proceedings and do all such things as the Junior Creditor considers reasonably necessary to recover any liabilities in respect of the Shareholder Liabilities;

(E)   receive all distributions in respect of the Shareholder Debt Documents for application in accordance with Clause 2.1 (*Creditor Liabilities*); and

(F)   release any claims in respect to Shareholder Liabilities owed to the relevant Shareholder Creditor under the Shareholder Debt Documents and/or accept the transfer of all or part of the obligations in respect of those Shareholder Liabilities.

(b)   If, for any reason, any of the trusts expressed to be created in paragraph (a) above should fail or be unenforceable, the Company and Shareholder Creditors:

(i)   shall hold the relevant receipt or recovery as agent for the Junior Creditors; and

(ii)   shall promptly pay or assign the relevant receipt or recovery to the Junior Creditors for application in the order set out in Clause 2.1 (*Creditor Liabilities*).

## 5.    EFFECT OF INSOLVENCY EVENT

### 5.1    Payment of Distributions

(a)   After the occurrence of an Insolvency Event in relation to the Company, any Party entitled to receive a distribution out of the assets of the Company in respect of Liabilities owed to that Party shall, to the extent it is able to do so, direct the person responsible for the distribution of the assets of the Company to pay that distribution to the Security Agent until the Liabilities owing to the Secured Parties have been paid in full.

(b)   The Security Agent shall apply distributions paid to it under paragraph (a) above in accordance with Clause 10 (*Application of Proceeds*).

5.2     **Set-Off**

(a)     Subject to paragraph (b) below, to the extent that the Company's Liabilities are discharged by way of set-off (mandatory or otherwise) after the occurrence of an Insolvency Event in relation to the Company, any Creditor which benefited from that set-off shall pay an amount equal to the amount of the Liabilities owed to it which are discharged by that set-off to the Security Agent for application in accordance with Clause 10 (*Application of Proceeds*).

(b)     Paragraph (a) above shall not apply to any set-off which gives effect to a Permitted Payment (or another payment or distribution not prohibited by the terms of this Agreement) which is otherwise permitted to be made under this Agreement notwithstanding the occurrence of the relevant Insolvency Event.

5.3     **Non-Cash Distributions**

Subject to Clause 10.1 (*Order of Application - Transaction Security*), if the Security Agent or any other Secured Party receives a distribution in a form other than in cash in respect of any of the Liabilities, the Liabilities will not be reduced by that distribution until and except to the extent that the realisation proceeds are actually applied towards the Liabilities.

5.4     **Filing of Claims**

After the occurrence of an Insolvency Event in relation to the Company, each Creditor irrevocably authorises the Security Agent (acting in accordance with Clause 5.6 (*Security Agent Instructions*) and with express faculty of self-contracting, sub-empowering or multiple representation), on its behalf, to:

(a)     take any Enforcement Action (in accordance with the terms of this Agreement) against the Company;

(b)     demand, sue, prove and give receipt for any or all of the Company's Liabilities;

(c)     collect and receive all distributions on, or on account of, any or all of the Company's Liabilities; and

(d)     file claims, take proceedings and do all other things the Security Agent considers reasonably necessary to recover the Company's Liabilities.

5.5     **Creditors' Actions**

Each Creditor will:

(a)     do all things that the Security Agent (acting in accordance with Clause 5.6 (*Security Agent Instructions*)) reasonably requests in order to give effect to this Clause 5; and

(b)     if the Security Agent is not entitled to take any of the actions contemplated by this Clause 5 or if the Security Agent (acting in accordance with Clause 5.6 (*Security Agent Instructions*)) requests that a Creditor take that action, undertake that action itself in accordance with the instructions of the Security Agent (acting in accordance with Clause 5.6 (*Security Agent Instructions*)) or grant a power of attorney to the Security Agent (on such terms as the Security Agent (acting in accordance with Clause 5.6 (*Security Agent Instructions*)) may reasonably require) to enable the Security Agent to take such action.

22

5.6     **Security Agent Instructions**

For the purposes of Clause 5.4 (*Filing of Claims*) and Clause 5.5 (*Creditors' Actions*), the Security Agent shall act:

(a)     on the instructions of the applicable group of Senior Creditors entitled, at that time, to give instructions under:

(i)     Clause 8.1 (*Enforcement Instructions – Transaction Security*) or Clause 8.2 (*Manner of Enforcement - Transaction Security*); or

(ii)     otherwise provided by this Agreement;

(b)     in the absence of any such instructions, as the Security Agent sees fit (which may include taking no action).

5.7     **Limitation by Applicable Laws**

Each of the provisions of this Clause 5 shall apply only to the extent permitted by applicable laws.

6.     **TURNOVER OF RECEIPTS**

6.1     **Turnover by the Creditors**

Subject to Clause 3.1 (*Payments of Senior Creditor Liabilities*), Clause 6.2 (*Exclusions*) and Clause 6.3 (*Permitted Assurance and Receipts*), if at any time prior to the Senior Discharge Date any Creditor receives or recovers from the Company:

(a)     any Payment or distribution of, or on account of or in relation to, any of the Liabilities other than any Payment or distribution which is either:

(i)     not prohibited by the terms of this Agreement; or

(ii)     made in accordance with Clause 10 (*Application of Proceeds*);

(b)     other than where Clause 5.2 (*Set-Off*) applies, any amount by way of set-off in respect of any of the Liabilities owed to it which does not give effect to a Permitted Payment;

(c)     notwithstanding paragraphs (a) and (b) above, and other than where Clause 5.2 (*Set-Off*) applies, any amount:

(i)     on account of, or in relation to, any of the Liabilities:

(A)     after the occurrence of a Distress Event; or

(B)     as a result of any other litigation or proceedings against the Company (other than after the occurrence of an Insolvency Event in respect of the Company); or

(ii)     by way of set-off in respect of any of the Liabilities owed to it after the occurrence of a Distress Event,

other than, in each case, any amount received or recovered in accordance with Clause 10 (*Application of Proceeds*);

(d)    the proceeds of any enforcement of any Transaction Security except in accordance with Clause 10 (*Application of Proceeds*); or

(e)    other than where Clause 5.2 (*Set-Off*) applies, any distribution in cash or in kind or Payment of, or on account of or in relation to, any of the Liabilities owed by the Company which is not in accordance with Clause 10 (*Application of Proceeds*) and which is made as a result of, or after, the occurrence of an Insolvency Event in respect of the Company; or

that Creditor will:

(i)    in relation to receipts and recoveries not received or recovered by way of set-off:

(A)    hold an amount of that receipt or recovery equal to the Relevant Liabilities (or if less, the amount received or recovered) on trust for (or otherwise on behalf and for the account of) the Security Agent and promptly pay or distribute that amount to the Security Agent for application in accordance with the terms of this Agreement; and

(B)    promptly pay or distribute an amount equal to the amount (if any) by which the receipt or recovery exceeds the Relevant Liabilities to the Security Agent for application in accordance with the terms of this Agreement; and

(ii)    in relation to receipts and recoveries received or recovered by way of set-off, promptly pay an amount equal to that recovery to the Security Agent for application in accordance with the terms of this Agreement.

6.2    **Exclusions**

Clause 6.1 (*Turnover by the Creditors*) shall not apply to any receipt or recovery in respect of funds received by the Security Agent for its own account.

6.3    **Permitted Assurance and Receipts**

Nothing in this Agreement shall restrict the ability of any Senior Creditor or Subordinated Creditor to:

(a)    arrange with any person which is not the Company or a Holding Company of the Company any assurance against loss in respect of, or reduction of its credit exposure to, the Company (including assurance by way of credit-based derivative or sub-participation) or restrict the terms or application of proceeds or recoveries of such assurance; or

(b)    make any assignment or transfer permitted by Clause 13 (*Changes to the Parties*), which:

(i)    is permitted by the Senior Finance Documents under which the relevant Liabilities were incurred; and

(ii)    is not in breach of any provision of the PIK Facility Agreement,

and that Senior Creditor or Subordinated Creditor shall not be obliged to account to any other Party for any sum received by it as a result of that action.

6.4     **Sums received by the Company**

If the Company receives or recovers any sum which, under the terms of any of the Debt Documents, should have been paid to the Security Agent, the Company will:

(a)     hold an amount of that receipt or recovery equal to the Relevant Liabilities (or, if less, the amount received or recovered) on trust for (or otherwise on behalf and for the account of) the Security Agent and promptly pay that amount to the Security Agent for application in accordance with the terms of this Agreement; and

(b)     promptly pay an amount equal to the amount (if any) by which the receipt or recovery exceeds the Relevant Liabilities to the Security Agent for application in accordance with the terms of this Agreement.

6.5     **Saving Provision**

If, for any reason, any of the trusts expressed to be created in this Clause 6 should fail or be unenforceable, the affected Creditor or the Company will promptly pay an amount equal to that receipt or recovery to the Security Agent to be held on trust by the Security Agent for application in accordance with the terms of this Agreement.

**7.     REDISTRIBUTION**

7.1     **Recovering Creditor's Rights**

(a)     Any amount paid by a Creditor (a "**Recovering Creditor**") to the Security Agent under Clause 5 (*Effect of Insolvency Event*) or Clause 6 (*Turnover of Receipts*) shall be treated as having been paid by the Company and distributed to the Security Agent, the Senior Agent, and the Senior Creditors (each, a "**Sharing Creditor**") in accordance with the terms of this Agreement.

(b)     On a distribution by the Security Agent under paragraph (a) above of a Payment received by a Recovering Creditor from the Company, as between the Company and the Recovering Creditor, an amount equal to the amount received or recovered by the Recovering Creditor and paid to the Security Agent (the "**Shared Amount**") will be treated as not having been paid by the Company.

7.2     **Reversal of Redistribution**

(a)     If any part of the Shared Amount received or recovered by a Recovering Creditor becomes repayable to the Company and is repaid by that Recovering Creditor to the Company, then:

(i)     each Sharing Creditor shall, upon request of the Security Agent, pay to the Security Agent for the account of that Recovering Creditor an amount equal to the appropriate part of its share of the Shared Amount (together with an amount as is necessary to reimburse that Recovering Creditor for its proportion of any interest on the Shared Amount which that Recovering Creditor is required to pay) (the "**Redistributed Amount**"); and

(ii)     as between the Company and each relevant Sharing Creditor, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by the Company.

(b)     The Security Agent shall not be obliged to pay any Redistributed Amount to a Recovering Creditor under paragraph (a) above until it has been able to establish to its

25

satisfaction that it has actually received that Redistributed Amount from the relevant Sharing Creditor.

7.3    **Deferral of Subrogation**

No Creditor nor the Company will exercise any rights which it may have by reason of the performance by it of its obligations under the Debt Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights under the Debt Documents of any Creditor which ranks ahead of it in accordance with the priorities set out in Clause 2 (*Ranking and Priority*) until such time as all of the Liabilities owing to each prior ranking Creditor (or, in the case of the Company, owing to each Creditor) have been irrevocably paid in full.

8.    **ENFORCEMENT OF TRANSACTION SECURITY**

8.1    **Enforcement Instructions – Transaction Security**

(a)    The Security Agent may refrain from enforcing the Transaction Security unless instructed otherwise by the Majority Senior Creditors.

(b)    Subject to the Transaction Security having become enforceable in accordance with its terms, the Majority Senior Creditors may give or refrain from giving instructions to the Security Agent to enforce or refrain from enforcing the Transaction Security as they see fit.

(c)    The Security Agent is entitled to rely on and comply with instructions given, or deemed to be given, in accordance with this Clause 8.1.

(d)    No Secured Party shall have any independent power to enforce, or to have recourse to, any Transaction Security or to exercise any rights or powers arising under the Security Documents except through the Security Agent.

8.2    **Manner of Enforcement - Transaction Security**

If the Transaction Security is being enforced pursuant to Clause 8.1 (*Enforcement Instructions – Transaction Security*), the Security Agent shall enforce the applicable Transaction Security in such manner (including, without limitation, the selection of any administrator of the Company to be appointed by the Security Agent):

(a)    as the Majority Senior Creditors shall instruct; or

(b)    in the absence of any such instructions, as the Security Agent sees fit (which may include taking no action).

8.3    **Exercise of Voting Rights**

(a)    Each Creditor, the Company and each Subordinated Creditor agrees (to the fullest extent permitted by law at the relevant time) with the Security Agent that it will cast its vote in any proposal put to the vote by or under the supervision of any judicial or supervisory authority in respect of any insolvency, pre-insolvency or rehabilitation or similar proceedings relating to the Company, as instructed by the Security Agent.

(b)    Subject to paragraph (c) below, the Security Agent shall give instructions for the purposes of paragraph (a) of this Clause 8.3 as directed by the Majority Senior Creditors provided such instructions have been given in accordance with Clause 8.1 (*Enforcement Instructions – Transaction Security*).

(c)     Nothing in this Clause 8.3 entitles any Party to exercise or require any other Secured Party to exercise such power of voting or representation to waive, reduce, discharge or extend the due date for (or change the basis for accrual of any) payment of or reschedule any of the Liabilities owed to that Secured Party.

8.4     **Waiver of Rights**

To the extent permitted under applicable law and subject to Clause 8.1 (*Enforcement Instructions – Transaction Security*), Clause 8.2 (*Manner of Enforcement - Transaction Security*), Clause 10 (*Application of Proceeds*) and paragraph (c) of Clause 9.2 (*Distressed Disposals*), each Secured Party and the Company waives all rights it may otherwise have to require that the Transaction Security be enforced in any particular order or manner or at any particular time or that any sum received or recovered from any person, or by virtue of the enforcement of any of the Transaction Security or of any other security interest, which is capable of being applied in or towards discharge of any of the Secured Obligations is so applied.

8.5     **Security held by other Creditors**

If any Transaction Security is held by a Creditor other than the Security Agent, then creditors may only enforce that Transaction Security in accordance with instructions given by the Majority Senior Creditors in accordance with this Clause 8 (and for this purpose references to the Security Agent shall be construed as references to that Creditor).

8.6     **Enforcement through Security Agent Only**

The Secured Parties shall not have any independent power to enforce, or have recourse to, any of the Transaction Security or to exercise any right, power, authority or discretion arising under the Security Documents except through the Security Agent.

9.     **NON-DISTRESSED DISPOSALS, DISTRESSED DISPOSALS AND DISPOSAL PROCEEDS**

9.1     **Non-Distressed Disposals**

(a)     Notwithstanding anything to the contrary in this Agreement or any other Debt Document, the Security Agent (on behalf of itself and the Secured Parties) and each other party to any Security Document hereby agrees (and is irrevocably authorised, instructed and obliged to do so by, and without any further consent, agreement, instruction, direction, confirmation, payment, certification or other document, request or information from, any Creditor, other Secured Party or the Company) that it shall promptly, following receipt of a written request from the Company to the Security Agent, release (or procure that any other relevant person releases) from the Transaction Security and the Senior Finance Documents:

(i)     any Security (and/or any other claim relating to a Debt Document) over any asset which the Company has confirmed pursuant to paragraph (c) below is the subject of:

(A)     a disposal not prohibited by the terms of the Senior Finance Documents (or, to the extent any Senior Finance Document prohibits such disposal, the applicable Senior Agent authorises the release in accordance with the terms of the  Senior Finance Document or the Required Creditor Consent for such disposal has been obtained) (including a disposal to a member of the Group, but without prejudice to any obligation of the Company in the  Senior Finance Document to provide replacement security); or

(B)    any other transaction not prohibited by the terms of the Senior Finance Documents pursuant to which that asset will cease to be held or owned by a member of the Group (or, to the extent any Senior Finance Document prohibits such transaction, the applicable Senior Agent authorises the release in accordance with the terms of the Senior Finance Document or the Required Creditor Consent for such transaction has been obtained);

and in each case where such disposal or other transaction is not a Distressed Disposal (in each case, a "**Non-Distressed Disposal**");

(ii)    any Security (and/or any other claim relating to a Debt Document) over any document or other agreement requested in order for the Company to effect any amendment or waiver in respect of that document or agreement or otherwise exercise any rights, comply with any obligations or take any action in relation to that document or agreement (in each case to the extent the Company has confirmed pursuant to paragraph (c) below it is not prohibited by the terms of the Senior Finance Documents); and

(iii)    any Security (and/or any other claim relating to a Debt Document) over any other asset to the extent that the Company has confirmed pursuant to paragraph (c) below that such Security is not required to be given, or such release is otherwise, in accordance with the terms of the  Senior Finance Documents and/or return any physical collateral or take such other action in order to facilitate any transaction not prohibited by the Senior Finance Documents.

(b)    Any release or other step contemplated by this Clause 9.1 shall not be conditional upon the performance of any obligation of any counterparty to any disposal, Permitted Transaction (as defined in paragraph (f) below) or other agreement or arrangement, or upon the receipt of any consideration or asset by the Company, provided that if any Non-Distressed Disposal is not made:

(i)    each release of Transaction Security or any claim described in paragraph (a) above shall have no effect and the Transaction Security or claim subject to that release shall continue in such force and effect as if that release had not been effected (to the extent possible under applicable law); and

(ii)    the Parties agree that, to the extent required under applicable law, any Transaction Security released or purported to be released shall promptly be retaken on substantially the same terms.

(c)    When making any request for a release pursuant to sub-paragraph (a)(i), (a)(ii) or (a)(iii) of this Clause 9.1, the Company shall confirm in writing to the Security Agent that:

(i)    in the case of any release requested pursuant to sub-paragraph (a)(i) or (a)(ii) above, the relevant disposal or other action is not prohibited by the terms of any Senior Finance Document, in each case, as the case may be, as at the date of completion of such release, or at the option of the Company, on the date that the definitive agreement for such disposal or similar transaction is entered into; or

(ii)    in the case of any release requested pursuant to paragraph (a)(iii) above, such Security is not required to be given, or the relevant release or cessation is otherwise, in accordance with terms of the Senior Finance Document,

28

and the Security Agent shall be entitled to rely on that confirmation for all purposes under the Senior Finance Documents.

(d)    The Security Agent (on behalf of itself and the Secured Parties) and each other party to any Security Document shall and hereby agrees to (and is irrevocably authorised, instructed and obliged to do so by, and without any further consent, agreement, sanction, authority, instruction, direction, confirmation, payment, certification or other document, request or information from any Creditor, other Secured Party or the Company) promptly enter into (or procure that any relevant person enters into) and deliver such documentation and/or take such other action as the Company shall require to give effect to, or to evidence, any release (including in any official register) or other matter contemplated by or in connection with this Clause 9.1 (including the issuance of any certificates of non-crystallisation of floating charges, any consent to dealing, any return of physical collateral or the issuance and/or delivery of any other similar or equivalent document that may be required or desirable).

(e)    Without prejudice to the foregoing and for the avoidance of doubt, if requested by the Company in accordance with the terms of the Senior Finance Documents, the Security Agent, the Creditors and the other Secured Parties shall promptly execute any guarantee, security or other release and/or any amendment, supplement or other documentation relating to any Transaction Security or Security Documents as contemplated by the terms of the Senior Finance Documents and the Security Agent (on behalf of itself and the Secured Parties) hereby agrees to execute, and will promptly execute if requested by the Company, (and is irrevocably authorised, instructed and obliged to do so by, and without any further consent, agreement, sanction, authority, instruction, direction, confirmation, payment, certification or other document, request or information from, any Creditor, other Secured Party or the Company) any such release or document on behalf of the Creditors and the other Secured Parties. When making any request pursuant to this paragraph (e) the Company shall confirm in writing to the Security Agent that such request is in accordance with the terms of the Senior Finance Documents and the Security Agent shall be entitled to rely on that confirmation for all purposes under the Senior Finance Documents.

(f)    Notwithstanding anything to the contrary in any Debt Document, nothing in any Security Document shall operate or be construed so as to prevent any transaction, matter or other step not prohibited by the terms of this Agreement or the Senior Finance Documents (a "**Permitted Transaction**"). The Security Agent (on behalf of itself and the Secured Parties) hereby agrees (and is irrevocably authorised, instructed and obliged to do so by, and without any further consent, agreement, sanction, authority, instruction, direction, confirmation, payment, certification or other document, request or information from, any Creditor, other Secured Party or the Company) that it shall promptly execute any release or other document and/or take such other action or step under or in relation to any Debt Document (or any asset subject or expressed to be subject to any Transaction Security or any Security Document) as is requested by the Company in order to complete, implement or facilitate a Permitted Transaction. In the event that the Company makes any request pursuant to and in reliance on the preceding sentence, the Security Agent shall be permitted to request a confirmation from the Company that the relevant transaction, matter or other step is a Permitted Transaction and the Security Agent shall be entitled to rely on that confirmation for all purposes under the Senior Finance Documents.

9.2    **Distressed Disposals**

(a)    If a Distressed Disposal of any asset is being effected, the Security Agent is irrevocably authorised (at the cost of the Company and without any consent, sanction, authority or

further confirmation from any Creditor or the Company) to release the Transaction Security or any other claim over that asset and execute and deliver or enter into any release of that Transaction Security or claim and issue any letters of non-crystallisation of any floating charge or any consent to dealing or transfer any of the Liabilities that may, in the discretion of the Security Agent, be considered necessary or desirable, to the extent that a release or disposal is not likely to cause any personal criminal or civil liability.

(b)   The net proceeds of each Distressed Disposal shall be paid to the Security Agent for application in accordance with Clause 10 (*Application of Proceeds*) as if those proceeds were the proceeds of an enforcement of the Transaction Security and as if that disposal of Liabilities had not occurred.

(c)   In the case of a Distressed Disposal effected by or at the request of the Security Agent, the Security Agent acting on the instructions of the Majority Senior Creditors shall take reasonable care to obtain a fair market price in the prevailing market conditions (although the Security Agent shall not have any obligation to postpone any such Distressed Disposal or disposal of Liabilities in order to achieve a higher price).

9.3   **Creditors' and Company's Actions**

(a)   Each Creditor and, in relation to clause 9.2 (*Distressed Disposals*), the Company will:

(i)    do all things that the Security Agent reasonably requests in order to give effect to this Clause 9 (which shall include, without limitation, the execution of any assignments, transfers, releases, delegation of faculties, powers of attorney or other documents that the Security Agent may reasonably consider to be necessary to give effect to the releases or disposals contemplated by this Clause 9); and

(ii)   if the Security Agent is not entitled to take any of the actions contemplated by this Clause 9 or if the Security Agent requests that any Creditor or the Company take any such action, take that action itself in accordance with the reasonable instructions of the Security Agent,

provided that the proceeds of those disposals are applied in accordance with Clause 9.1 (*Non-Distressed Disposals*) or Clause 9.2 (*Distressed Disposals*) (as the case may be).

(b)   Each Secured Party irrevocably authorises and instructs the Security Agent (at the cost of the relevant Secured Party to the extent such Secured Party is required to do such action and has failed to do so and without any further consent, agreement, sanction, authority, instruction, direction, confirmation, payment, certification or other document, request or information from any Secured Party) to be its agent to do anything which that Secured Party has authorised the Security Agent or any other Party to do under this Agreement or is itself required to do under this Agreement, but has failed to do (which shall include, without limitation, the execution of any assignments, transfers, releases or other documents that may be necessary) to give effect to the release and disposals contemplated by this Clause 9.

## 10.   APPLICATION OF PROCEEDS

10.1   **Order of Application - Transaction Security**

Subject to Clause 10.2 (*Prospective Liabilities*), all amounts from time to time received or recovered by the Security Agent pursuant to the terms of any Debt Document (subject to the proviso to this Clause 10.1) or in connection with the realisation or enforcement of all or any

part of the Transaction Security (the "**Recoveries**") shall be applied at any time as the Security Agent (in its discretion) sees fit, to the extent permitted by applicable law (and subject to the provisions of this Clause 10), in the following order of priority:

(a)     in discharging any sums owing to the Senior Agent (in respect of its Agent Liabilities), the Security Agent Liabilities, any Liabilities of any Receiver or any Delegate on a pari passu basis;

(b)     in payment of all costs and expenses incurred by the Senior Agent or Senior Creditors in connection with any realisation or enforcement of the Transaction Security taken in accordance with the terms of this Agreement or any action taken at the request of the Security Agent under Clause 5.5 (*Creditors' Actions*);

(c)     in payment to the Senior Agent on its own behalf and on behalf of the relevant Senior Creditors for application towards the discharge of the Senior Liabilities (in accordance with the terms of the Senior Finance Documents) on a pari passu basis;

(d)     if the Company is not under any further actual or contingent liability under any Senior Finance Document, in payment to any other person to whom the Security Agent is obliged to pay in priority to the Company including in the order set out in Clause 2.1 (*Creditor Liabilities*); and

(e)     the balance, if any, in payment to the Company.

## 10.2     Prospective Liabilities

Following a Distress Event, the Security Agent may, in its discretion, hold any amount of the Recoveries not in excess of the Expected Amount (as defined below) in an interest bearing suspense or impersonal account(s) in the name of the Security Agent with such financial institution (including itself) and for so long as the Security Agent shall think fit until otherwise directed by the Majority Senior Creditors (the interest being credited to the relevant account) for later application under Clause 10.1 (*Order of Application - Transaction Security*) in respect of:

(a)     any sum to the Security Agent, any Receiver or any Delegate; and

(b)     any part of the Liabilities or the Senior Agent Liabilities (in each case only to the extent entitled to share in such Recoveries),

that the Security Agent reasonably considers, in each case, might become due or owing at any time in the future (the "**Expected Amount**").

## 10.3     Investment of Proceeds

Prior to the application of the proceeds of the Security Property in accordance with Clause 10.1 (*Order of Application - Transaction Security*), the Security Agent may, in its discretion, hold all or part of those proceeds (but not in excess of the amounts due or to become due and while so held the excess of the interest charged on the Liabilities shall not exceed the interest earned on such suspense or impersonal account(s)) in an interest bearing suspense or impersonal account(s) in the name of the Security Agent with such financial institution (including itself) and for so long as the Security Agent shall think fit until otherwise directed by the Majority Senior Creditors (the interest being credited to the relevant account) pending the application from time to time of those moneys in the Security Agent's discretion in accordance with the provisions of this Clause 10.

10.4    **Currency Conversion**

(a)    For the purpose of, or pending the discharge of, any of the Secured Obligations, the Security Agent may convert any moneys received or recovered by it from one currency to another, at the Security Agent's Spot Rate of Exchange.

(b)    The obligations of the Company to pay in the due currency shall only be satisfied to the extent of the amount of the due currency purchased after deducting the costs of conversion.

10.5    **Permitted Deductions**

The Security Agent shall be entitled, in its discretion, (a) to set aside by way of reserve amounts required to meet and (b) to make and pay, any deductions and withholdings (on account of taxes or otherwise) which it is or may be required by any applicable law to make from any distribution or payment made by it under this Agreement, and to pay all Taxes, fees and expenses which may be assessed against it in respect of any of the Charged Property, or as a consequence of performing its duties, or by virtue of its capacity as the Security Agent under any of the Debt Documents or otherwise (other than in connection with its remuneration for performing its duties under this Agreement).

10.6    **Good Discharge**

(a)    Any payment to be made in respect of the Secured Obligations by the Security Agent may be made to the Senior Agent on behalf of its Creditors and any payment made in that way shall be a good discharge, to the extent of that payment, by the Security Agent.

(b)    The Security Agent is not under any obligation to make the payments to the Senior Agent under paragraph (a) above in the same currency as that in which the Liabilities owing to the relevant Creditor are denominated.

10.7    **Calculation of Amounts**

For the purpose of calculating any person's share of any sum payable to or by it, the Security Agent shall be entitled to:

(a)    notionally convert the Liabilities owed to any person into a common base currency (decided in its discretion by the Security Agent), that notional conversion to be made at the spot rate at which the Security Agent is able to purchase the notional base currency with the actual currency of the Liabilities owed to that person at the time at which that calculation is to be made; and

(b)    assume that all moneys received or recovered as a result of the enforcement or realisation of the Security Property are applied in discharge of the Liabilities in accordance with the terms of the relevant Debt Documents under which those Liabilities have arisen.

**11.    THE SECURITY AGENT**

11.1    **Appointment by Secured Parties**

(a)    Each Secured Party (other than the Security Agent) irrevocably appoints the Security Agent in accordance with the following provisions of this Clause 11 to act as its agent, trustee, joint and several creditor and/or beneficiary of a parallel debt (as the case may be) under this Agreement and with respect to the applicable Senior Finance Documents, and irrevocably authorises the Security Agent (whether acting as security trustee or

security agent) on its behalf and grants power of attorney to the Security Agent (with express faculty of self-contracting, sub-empowering or multiple representation) to:

(i)    execute each applicable Senior Finance Document expressed to be executed by the Security Agent on its behalf and execute any releases and any other documents, instruments or notices to be executed by the Security Agent as contemplated by the terms of this Agreement or any applicable Senior Finance Document, receive any notices in respect of this Agreement or any applicable Senior Finance Document, specify to third parties the names of the Secured Parties at any given date and take any other action in relation to the creation, perfection, confirmation, amendment, extension, maintenance, enforcement and/or release of any security created under any Security Document in the name and on behalf of the Secured Parties;

(ii)    perform such duties and exercise such rights and powers under this Agreement and the applicable Senior Finance Documents as are specifically delegated to the Security Agent by the terms of this Agreement and the other Debt Documents, together with such rights, powers and discretions as are reasonably incidental thereto;

(iii)    confirms that in the event that any security created under the Security Documents remains registered in the name of a Secured Party after such person has ceased to be a Secured Party then the Security Agent shall remain empowered to execute a release of such Security in its name and on its behalf; and

(iv)    undertakes to ratify and approve any such action taken in the name and on behalf of the Secured Parties by the Security Agent acting in its appointed capacity.

(b)    Each Secured Party (other than the Security Agent) confirms that:

(i)    the Security Agent has authority to accept on its behalf the terms of any reliance letter or engagement letter relating to any reports or letters provided in connection with the Senior Finance Documents or the transactions contemplated by the Senior Finance Documents, to bind it in respect of those reports or letters and to sign that reliance letter or engagement letter on its behalf and, to the extent that reliance letter or engagement letter has already been entered into, ratifies those actions; and

(ii)    it accepts the terms and qualifications set out in that reliance letter or engagement letter.

(c)    The Security Agent's duties under this Agreement and/or the applicable Senior Finance Documents to which the Security Agent is a party are solely of a mechanical and administrative nature.

(d)    The Security Agent shall be entitled to grant sub-power of attorney, including the release of any sub-attorney from the restrictions referred to in paragraph (c) above.

## 11.2    Trust

(a)    Subject to paragraph (b) below, the Security Agent declares that it shall (to the extent possible under applicable law) hold the Transaction Security on trust for the relevant Secured Parties on the terms contained in this Agreement.

(b)    Each other Secured Party authorises the Security Agent (whether or not by or through employees or agents):

(i)    to perform the duties, obligations and responsibilities and to exercise such rights, remedies, powers and discretions as are specifically delegated to or conferred upon the Security Agent under this Agreement and/or the applicable Senior Finance Documents together with such powers and discretions as are reasonably incidental to the exercise of such rights, remedies and powers; and

(ii)    to take such action on its behalf as may from time to time be authorised under or in accordance with the applicable Senior Finance Documents.

(c)    Each of the other parties to this Agreement agrees that the Security Agent (whether acting as security trustee or security agent) shall have only those duties, obligations and responsibilities expressly specified in this Agreement or in the applicable Senior Finance Documents to which the Security Agent is expressed to be a party (and no others shall be implied).

## 11.3    No Independent Power

The Secured Parties shall not have any independent power to enforce, or have recourse to, any of the Transaction Security or to exercise any rights or powers arising under the Security Documents (for the avoidance of doubt, other than any Senior Finance Documents which are not Transaction Security Documents) except through the Security Agent.

## 11.4    Instructions to Security Agent and Exercise of Discretion

(a)    Subject to paragraphs (d) and (e) below, the Security Agent shall act in accordance with any instructions given to it by the Majority Senior Creditors or, if so instructed by the Majority Senior Creditors, refrain from exercising any right, power, authority or discretion vested in it as Security Agent and shall be entitled to assume that: any instructions received by it from a Creditor Representative, the Creditors or a group of Creditors are duly given in accordance with the terms of the Debt Documents and unless it has received actual notice of revocation, those instructions or directions have not been revoked.

(b)    Subject to paragraphs (d) and (e) below, the Security Agent shall be entitled to request instructions, or clarification of any direction, from the Majority Senior Creditors as to whether, and in what manner, it should exercise or refrain from exercising any rights, powers, authorities and discretions and the Security Agent may refrain from acting unless and until those instructions or clarification are received by it.

(c)    The Security Agent shall not be liable for any act (or omission) if it acts or refrains from acting in accordance with paragraphs (a) and (b) above and (g) below.

(d)    Paragraph (a) and (b) above and (e) to (g) below shall not apply:

(i)    where a contrary indication appears in this Agreement (including under Clause 19 (*Consents, Amendments and Override*));

(ii)    where this Agreement or applicable law or regulation requires a Security Agent to act in a specified manner or to take a specified action;

(iii)    in respect of any provision which protects the Security Agent's own position in its personal capacity as opposed to its role of Security Agent for the Secured

34

Parties including, without limitation, the provisions set out in Clause 11.6 (*Security Agent's Discretions*) to Clause 11.24 (*Disapplication*); and

(iv)    in respect of the exercise of the Security Agent's discretion to exercise a right, power or authority under any of:

(A)    Clause 9.1 (*Non-Distressed Disposals*);

(B)    Clause 10.1 (*Order of Application - Transaction Security*);

(C)    Clause 10.2 (*Prospective Liabilities*); and

(D)    Clause 10.5 (*Permitted Deductions*),

which instruction and authority shall have been given under the terms of such Clauses and not the instructions of the Majority Senior Creditors pursuant to paragraphs (a) and (b) above.

(e)    Unless paragraph (d) above applies, if giving effect to instructions given by the Majority Senior Creditors would have an effect equivalent to Subordination Amendment, the Security Agent shall not act in accordance with those instructions unless consent to it so acting is obtained from each Party (other than the Security Agent), whose consent would have been required in respect of that Subordination Amendment.

(f)    Unless paragraph (d) above applies, in exercising any discretion to exercise a right, power or authority under this Agreement where it has not received any instructions from the Majority Senior Creditors, as to the exercise of that discretion, the Security Agent shall do so having regard to the interests of all the Secured Parties.

(g)    The Security Agent may refrain from acting in accordance with any instructions of the Majority Senior Creditors as requested pursuant to paragraphs (a) and (b) above until it has received indemnification and/or security (including by way of pre-funding) from the Majority Senior Creditors that it may in its discretion require (which may be greater than that contained in the Senior Finance Documents) for any cost, loss or liability (together with applicable VAT) which it may incur in complying with those instructions.

(h)    The Security Agent shall have all rights and privileges and immunities which gratuitous trustees have or may have in England, even though it is entitled to remuneration.

## 11.5    Security Agent's Actions

Without prejudice to the provisions of Clause 8 (*Enforcement of Transaction Security*) and Clause 11.4 (*Instructions to Security Agent and Exercise of Discretion*), the Security Agent may (but shall not be obliged to), in the absence of any instructions to the contrary, take such action (or refrain from taking such action) in the exercise of any of its powers and duties under the Debt Documents as it considers in its "good faith" discretion to be appropriate. In determining whether to act or refrain from acting the Security Agent shall be entitled to request instructions from any Creditor or class of Creditors.

## 11.6    Security Agent's Discretions

The Security Agent may:

(a)    assume (unless it has received actual notice to the contrary from a Creditor) that no Default has occurred and the Company is not in breach of or default under its

obligations under any of the Debt Documents and any right, power, authority or discretion vested by any Debt Document in any person has not been exercised;

(b)    if it receives any instructions or directions under Clause 8 (*Enforcement of Transaction Security*) to take any action in relation to the Transaction Security, assume that all applicable conditions under the Debt Documents for taking that action have been satisfied;

(c)    engage, pay for and rely on the advice or services of any legal advisers, accountants, tax advisers, surveyors or other experts (whether obtained by the Security Agent or by any other Secured Party) whose advice or services may (in its reasonable opinion) at any time seem necessary, expedient or desirable, and the Security Agent shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of such reliance;

(d)    act under the Debt Documents through its personnel and agents;

(e)    rely upon any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised and, as to any matters of fact which might reasonably be expected to be within the knowledge of a Secured Party, any Creditor or the Company, upon a certificate signed by or on behalf of that person; and

(f)    refrain from acting in accordance with the instructions of any Party (including bringing any legal action or proceeding arising out of or in connection with the Debt Documents) until it has received any indemnification and/or security that it may in its discretion require (whether by way of payment in advance or otherwise) for all costs, losses and liabilities which it may incur in so acting.

## 11.7   Security Agent's Obligations

The Security Agent shall promptly:

(a)    subject to Clause 16.2 (*Disclosure*), copy to the relevant Creditor Representative the contents of any notice or document received by it from the Company under any Debt Document;

(b)    forward to a Party the original or a copy of any document which is delivered to the Security Agent for that Party by any other Party provided that, except where a Debt Document expressly provides otherwise, the Security Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party;

(c)    inform each Creditor Representative of the occurrence of any Default or any default by the Company in the due performance of or compliance with its obligations under any Debt Document of which the Security Agent has received notice from any other party to this Agreement; and

(d)    to the extent a Party (other than the Security Agent) is required to calculate a base Currency Amount, and upon a request by that Party, notify that Party of the Secured Agent's Spot Rate of Exchange.

## 11.8   Excluded Obligations

Notwithstanding anything to the contrary expressed or implied in the Debt Documents, the Security Agent shall not:

36

(a)     be bound to enquire as to: whether or not any Default has occurred or the performance, default or any breach by the Company of its obligations under any of the Debt Documents;

(b)     be bound to account to any other Party for any sum or the profit element of any sum received by it for its own account;

(c)     be bound to disclose to any other person (including, but not limited, to any Secured Party): (i) any confidential information or (ii) any other information if disclosure would, or might in its reasonable opinion, constitute a breach of any law or be a breach of fiduciary duty;

(d)     have or be deemed to have any relationship of trust or agency with the Company; or

(e)     have any fiduciary duties to the Company and nothing in this Agreement constitutes the Security Agent as an agent, trustee or fiduciary of the Company.

## 11.9    Exclusion of Liability

(a)     None of the Security Agent, any Receiver nor any Delegate shall be responsible or be liable for:

   (i)     the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Security Agent or any other person in or in connection with any Debt Document or the transactions contemplated in the Debt Documents, or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document;

   (ii)    the legality, validity, effectiveness, adequacy or enforceability of any Debt Document, the Security Property, or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document or the Security Property;

   (iii)   any losses, damages or costs to any person or diminution in value or any liability arising as a result of taking or refraining from taking any action in relation to any of the Debt Documents, the Security Property, or otherwise, whether in accordance with an instruction from a Creditor Representative or otherwise unless directly caused by its gross negligence or wilful misconduct;

   (iv)    the exercise of, or the failure to exercise, any judgment, discretion or power given to it by or in connection with any of the Debt Documents, the Security Property, or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, the Debt Documents or the Security Property;

   (v)     any shortfall which arises on the enforcement or realisation of the Security Property;

   (vi)    any determination as to whether any information provided or to be provided to any Secured Party is non-public information, the use of which may be regulated or prohibited by applicable law or regulation relating to insider trading or otherwise;

37

(vii)   without prejudice to the generality of paragraphs (ii) and (iii) above, any damages, costs, losses, any diminution in value or any liability whatsoever arising as a result of:

   (A)    any act, event or circumstance not reasonably within its control; or

   (B)    the general risks of investment in, or the holding of assets in, any jurisdiction,

   including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets; breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b)   No Party (other than the Security Agent, that Receiver or that Delegate (as applicable)) may take any proceedings against any officer, employee or agent of the Security Agent, a Receiver or a Delegate in respect of any claim it might have against the Security Agent, a Receiver or a Delegate or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Debt Document or any Security Property and any officer, employee or agent of the Security Agent, a Receiver or a Delegate may rely on this Clause 11.9 subject to Clause 1.3 (*Third Party Rights*) and the provisions of the Third Parties Rights Act.

(c)   Nothing in this Agreement shall oblige the Security Agent to carry out:

   (i)    any "know your customer" or other checks in relation to any person; or

   (ii)   any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Senior Creditor,

   on behalf of any Senior Creditor and each Senior Creditor confirms to the Security Agent, that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Security Agent.

(d)   Without prejudice to any provision of any Debt Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate, any liability of the Security Agent, any Receiver or Delegate arising under or in connection with any Debt Document or the Security Property shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Security Agent, Receiver or Delegate (as the case may be) or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Security Agent, Receiver or Delegate (as the case may be) at any time which increase the amount of that loss. In no event shall the Security Agent, any Receiver or Delegate be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Security Agent, Receiver or Delegate (as the case may be) has been advised of the possibility of such loss or damages.

11.10   **No Proceedings**

No Party (other than the Security Agent, that Receiver or that Delegate) may take any proceedings against any officer, employee or agent of the Security Agent, a Receiver or a Delegate in respect of any claim it might have against the Security Agent, a Receiver or a Delegate or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Debt Document or any Security Property and any officer, employee or agent of the Security Agent, a Receiver or a Delegate may rely on this Clause 11.10 subject to Clause 1.3 (*Third Party Rights*) and the provisions of the Third Parties Rights Act.

11.11   **Rights**

(a)   The Security Agent may assume that:

(i)   any instructions received by it from the Majority Senior Creditors are duly given in accordance with the terms of the Debt Documents; and

(ii)   unless it has received notice of revocation, that those instructions have not been revoked and no revocation of any such instructions shall affect any actions taken by the Security Agent in reliance on such instructions prior to actual receipt of a written notice of revocation.

(b)   The Security Agent may assume (unless it has received notice to the contrary in its capacity as security trustee or security agent for the Secured Parties) that any right, power, authority or discretion vested in any Party or any group of Creditors has not been exercised.

(c)   The Security Agent, any Receiver and any Delegate may act in relation to the Debt Documents and the Security Property through its officers, employees and agents and shall not:

(i)   be liable for any error of judgment made by any such person; or

(ii)   be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part of any such person,

unless such error or such loss was directly caused by the Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct.

(d)   Unless this Agreement or another Debt Document expressly specifies otherwise, the Security Agent may disclose to any other Party any information it reasonably believes it has received as security trustee or security agent under this Agreement.

(e)   Notwithstanding any provision of any Debt Document to the contrary, the Security Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it by a member of the Group.

11.12   **Responsibility for Documentation**

None of the Security Agent, any Receiver nor any Delegate is responsible or liable for:

(a)   the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Security Agent, the Company or any other person in or in connection with any Debt Document or the transactions contemplated in the Debt Documents, or

any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document;

(b)    the legality, validity, effectiveness, adequacy or enforceability of any Debt Document, the Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document or the Security Property; or

(c)    any determination as to whether any information provided or to be provided to any Secured Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

## 11.13    No Duty to Monitor

The Security Agent shall not be bound to enquire:

(a)    whether or not any Default or Acceleration Event has occurred;

(b)    as to the performance, default or any breach by any Party of its obligations under any Debt Document; or

(c)    whether any other event specified in any Debt Document has occurred.

## 11.14    Own Responsibility

Without affecting the responsibility of the Company for information supplied by it or on its behalf in connection with any Debt Document, each other Secured Party confirms to the Security Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Debt Document, including, but not limited to:

(a)    the financial condition, status and nature of each member of the Group;

(b)    the legality, validity, effectiveness, adequacy and enforceability of any Debt Document, the Security Property and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document or the Security Property;

(c)    whether that Secured Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Debt Document, the Security Property, the transactions contemplated by the Debt Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document or the Security Property;

(d)    the adequacy, accuracy and/or completeness of any information provided by the Security Agent or by any other person under or in connection with any Debt Document, the transactions contemplated by any Debt Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document; and

(e)    the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property,

and each other Secured Party warrants to the Security Agent that it has not relied on and will not at any time rely on that Security Agent in respect of any of these matters.

11.15   **No Responsibility to Perfect Transaction Security**

The Security Agent shall have no responsibility for perfecting the Transaction Security and shall not be liable for any failure to:

(a)    require the deposit with it of any deed or document certifying, representing or constituting the title of the Company to any of the Charged Property;

(b)    obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any of the Debt Documents or the Transaction Security;

(c)    register, file or record or otherwise protect any of the Transaction Security (or the priority of any of the Transaction Security) under any applicable laws in any jurisdiction or to give notice to any person of the execution of any of the Debt Documents or of the Transaction Security;

(d)    take, or to require the Company to take, any steps to perfect its title to any of the Charged Property or to render the Transaction Security effective or to secure the creation of any ancillary Security under the laws of any jurisdiction; or

(e)    require any further assurances in relation to any of the Security Documents.

11.16   **Insurance by Security Agent**

(a)    The Security Agent shall be under no obligation to insure any of the Charged Property, to require any other person to maintain any insurance or to verify any obligation to arrange or maintain insurance contained in the Debt Documents. The Security Agent shall not be responsible for any loss which may be suffered by any person as a result of the lack of or inadequacy of any such insurance.

(b)    Where the Security Agent is named on any insurance policy as an insured party and/or loss payee, the Security Agent shall not be responsible for any loss which may be suffered by reason of, directly or indirectly, its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Majority Senior Creditors has requested it to do so in writing and the Security Agent shall have failed to do so within 14 days after receipt of that request.

11.17   **Custodians and Nominees**

The Security Agent may (to the extent legally permitted) appoint and pay any person to act as a custodian or nominee on any terms in relation to any assets held by the Security Agent as trustee or agent of the Secured Parties (as applicable) or any assets over which Security is created pursuant to the Security Documents as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to any such assets and the Security Agent shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Agreement or be bound to supervise the proceedings or acts of any person.

11.18   **Acceptance of Title**

The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that the Company may have to any of the Charged Property and shall not be liable for or bound to require the Company to remedy any defect in its right or title.

11.19   **Refrain from Illegality**

Notwithstanding anything to the contrary expressed or implied in the Debt Documents, the Security Agent may refrain from doing anything which in its opinion will or may be contrary to any relevant law, directive or regulation of any jurisdiction and the Security Agent may do anything which is, in its opinion, necessary to comply with any such law, directive or regulation.

11.20   **Business with the Company**

The Security Agent may accept deposits from, lend money to, and generally engage in any kind of banking or other business with the Company.

11.21   **Winding Up of Trust and release of Transaction Security**

If the Security Agent, with the approval of the Senior Agent, determines that (x) all of the Secured Obligations and all other obligations secured by the Transaction Security Documents have been fully and finally discharged and (y) none of the Secured Parties is under any commitment, obligation or liability (actual or contingent) to make advances or provide other financial accommodation to the Company pursuant to the Debt Documents:

(a)   the trusts set out in this Agreement relating to the Secured Obligations shall in relation to the Transaction Security be wound up and the Security Agent shall release, without recourse, representation or warranty of any kind (either express or implied), all of the Transaction Security and the rights of the Security Agent under each of the Transaction Security Documents; and

(b)   any Retiring Security Agent shall release, without recourse, representation or warranty of any kind (either express or implied), all of its rights under each of the Transaction Security Documents.

11.22   **Powers Supplemental**

The rights, powers, authorities and discretions conferred upon the Security Agent by this Agreement and the Debt Documents shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Security Agent by general law or otherwise.

11.23   **Trustee Division Separate**

(a)   In acting as trustee or agent for the Secured Parties (as applicable), the Security Agent shall be regarded as acting through its trustee division which shall be treated as a separate entity from any of its other divisions or departments.

(b)   If information is received by another division or department of the Security Agent, it may be treated as confidential to that division or department and the Security Agent shall not be deemed to have notice of it.

11.24   **Disapplication**

Section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Agent in relation to the trusts constituted by this Agreement. Where there are any inconsistencies between the Trustee Act 1925 or the Trustee Act 2000 and the provisions of this Agreement, the provisions of this Agreement shall, to the extent allowed by law, prevail and, in the case of any inconsistency with the Trustee Act 2000, the provisions of this Agreement shall constitute a restriction or exclusion for the purposes of that Act.

11.25   **Subordinated Creditors and Company: Power of Attorney**

Each Subordinated Creditor and the Company by way of security for its obligations under this Agreement irrevocably appoints the Security Agent to be its attorney following an Acceleration Event to do anything which that Subordinated Creditor or the Company has authorised the Security Agent or any other Party to do under this Agreement or is itself required to do under this Agreement (with express faculty of self-contracting, sub-empowering or multiple representation) but has failed to do so within 10 Business Days of receipt of written request by the Security Agent (and the Security Agent may delegate that power on such terms in accordance with Clause 12.2 (*Delegation*)).

11.26   **Security Agent's Spot Rate of Exchange**

The Security Agent shall promptly to the extent that another Party is required to calculate a Base Currency Amount, and upon a reasonable request by that Party, notify that Party of the relevant Security Agent's Spot Rate of Exchange.

11.27   **Provisions Survive Termination**

The provisions of this Clause 11 shall survive any termination or discharge of this Agreement and the resignation or termination of the appointment of the Security Agent.

**12.**   **CHANGE OF SECURITY AGENT**

12.1   **Resignation of the Security Agent**

(a)   The Security Agent may resign and appoint one of its Affiliates as successor by giving notice to the Company and the Secured Parties.

(b)   Alternatively, the Security Agent may resign by giving 30 days' notice to the other Parties in which case the Majority Senior Creditors may appoint a successor Security Agent.

(c)   If the Majority Senior Creditors have not appointed a successor Security Agent in accordance with paragraph (b) above within 30 days after the notice of resignation was given, the Security Agent (after consultation with the Company and the Agent) may appoint a successor Security Agent.

(d)   A retiring Security Agent (the "**Retiring Security Agent**") shall:

(i)   make available to the successor Security Agent such documents and records and provide such assistance as the successor Security Agent may reasonably request for the purposes of performing its functions as Security Agent under the Debt Documents; and

(ii)   enter into and deliver to the successor Security Agent those documents and effect any registrations as may be required for the transfer or assignment of all of its rights and benefits under the Debt Documents to the successor Security Agent.

(e)   The Company must, at its own reasonable cost, take any action and enter into and deliver any document which is reasonably required by the Retiring Security Agent to ensure that a Security Document provides for effective and perfected Security in favour of any successor Security Agent.

(f)   The Security Agent's resignation notice shall only take effect upon: (i) the appointment of a successor; and (ii) the transfer of all of the Security Property to that successor.

(g)     Upon the appointment of a successor, the Retiring Security Agent shall be discharged from any further obligation in respect of the Debt Documents (other than its obligations under paragraph (d) above) but shall, in respect of any act or omission by it whilst it was the Security Agent, remain entitled to the benefit of Clause 11 (*The Security Agent*), Clause 15.1 (*Company's Indemnity*) and Clause 15.3 (*Senior Creditors' Indemnity*). Its successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if that successor had been an original Party.

(h)     After consultation with the Company, the Majority Senior Creditors may by written notice to the Security Agent, require it to resign in accordance with paragraph (b) above. In this event, the Security Agent shall resign in accordance with paragraph (b) above but the cost referred to in paragraph (d) above shall be for the account of the Company.

## 12.2    Delegation

(a)     Each of the Security Agent, any Receiver and any Delegate may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any of the rights, powers and discretions vested in it by any of the Debt Documents.

(b)     That delegation may be made upon any terms and conditions (including the power to sub-delegate) and subject to any restrictions that the Security Agent, that Receiver or that Delegate (as the case may be) may, in its discretion, think fit in the interests of the Secured Parties and it shall not be bound to supervise, or be in any way responsible for any loss incurred by reason of any misconduct or default on the part of any such delegate or sub-delegate.

## 12.3    Additional Security Agents

(a)     The Security Agent may at any time appoint (and subsequently remove), to the extent legally permitted, any person to act as a separate trustee or agent or as a co-trustee or co-agent jointly with it if (i) it in good faith considers that appointment to be in the interests of the Secured Parties or (ii) for the purposes of conforming to any legal requirements, restrictions or conditions which the Security Agent deems to be relevant (acting reasonably) or (iii) for obtaining or enforcing any judgment in any jurisdiction, and the Security Agent shall give prior notice to the Company and the Senior Agent of that appointment.

(b)     Any person so appointed shall have the rights, powers and discretions (not exceeding those conferred on the Security Agent by this Agreement) and the duties and obligations that are conferred or imposed by the instrument of appointment.

(c)     The remuneration that the Security Agent may pay to that person, and any costs and expenses (together with any applicable VAT) incurred by that person in performing its functions pursuant to that appointment shall, for the purposes of this Agreement, be treated as costs and expenses reasonably incurred by the Security Agent.

(d)     Each Creditor hereby expressly gives its prior consent to any assignment and/or transfer to a successor Security Agent appointed in accordance with the provisions of this Agreement.

## 13.    CHANGES TO THE PARTIES

## 13.1    Assignments and Transfers

No Party may assign any of its rights and benefits or transfer any of its rights, benefits and obligations in respect of any Debt Documents or the Liabilities except as permitted by this

Clause 13, provided that the Company may assign any of its rights and benefits or transfer any of its rights, benefits and obligations:

(a)     pursuant to any reorganisation or other transaction not prohibited by the terms of the PIK Facility Agreement (and, for the avoidance of doubt and ignoring any prohibition set out in this Clause 13, provided that such assignment or, as the case may be, transfer is not expressly prohibited by the terms of the PIK Facility Agreement); and/or

(b)     as otherwise contemplated or permitted by any Debt Document.

## 13.2    Change of Senior Creditors

(a)     A Senior Creditor may transfer by novation any of its rights, benefits and obligations in respect of any Debt Documents or the Liabilities if:

     (i)     that transfer is in accordance with the terms of the PIK Facility Agreement; and

     (ii)     subject to paragraph (b) below, any transferee has (if not already party to this Agreement as a Senior Creditor) acceded to this Agreement as a Senior Creditor pursuant to Clause 13.4 (*Creditor/Creditor Representative Accession Undertaking*).

(b)     Paragraph (a)(ii) above shall not apply in respect of any Debt Purchase Transaction permitted by clause 22 (*Debt Purchase Transactions*) of the PIK Facility Agreement entered into by the Company and effected in accordance with the terms of the Debt Documents.

(c)     In order for indebtedness to be treated as a Senior Facility for the purposes of this Agreement, each creditor and/or creditor representative in respect of that indebtedness shall accede to this Agreement as Senior Creditor and/or Senior Agent (as applicable) if such person has executed and delivered to the Security Agent and the Company a Creditor/Creditor Representative Accession Undertaking agreeing to be bound by all the terms of this Agreement as if it had originally been party to this Agreement as a Senior Creditor.

## 13.3    Change of Creditor Representative

No person shall become a Creditor Representative unless at the same time, it accedes to this Agreement in such capacity pursuant to Clause 13.4 (*Creditor/Creditor Representative Accession Undertaking*).

## 13.4    Creditor/Creditor Representative Accession Undertaking

With effect from the date of acceptance by the Security Agent of a Creditor/Creditor Representative Accession Undertaking duly executed and delivered to the Security Agent by the relevant acceding party or, if later, the date specified in that Creditor/Creditor Representative Accession Undertaking:

(a)     any Party ceasing entirely to be a Creditor or Creditor Representative (as applicable) shall be discharged from further obligations towards the Security Agent and other Parties under this Agreement and their respective rights against one another shall be cancelled (except in each case for those rights which arose prior to that date); and

(b)     as from that date, the replacement or new Creditor or Creditor Representative shall assume the same obligations and become entitled to the same rights, as if it had been an original Party to this Agreement in that capacity,

and each other Party irrevocably authorises and instructs the Security Agent (and as the case may be the Agent) to execute on its behalf any Creditor/Creditor Representative Accession Undertaking which has been duly completed and signed on behalf of that person.

13.5    **Subordinated Creditors/Accession of New Subordinated Creditors**

Any person in its discretion may accede to this Agreement in the capacity of a Subordinated Creditor and any Subordinated Creditor may assign any of its rights and benefits or transfer any of its rights, benefits and obligations in respect of the Subordinated Liabilities owed to it subject to the terms of the applicable Subordinated Documents if such person, assignee or transferee has executed and delivered to the Security Agent and the Company a Creditor/Creditor Representative Accession Undertaking agreeing to be bound by all the terms of this Agreement as if it had originally been party to this Agreement as a Subordinated Creditor.

13.6    **Additional Parties**

Each of the other Parties instructs and appoints the Security Agent to receive on its behalf each Creditor/Creditor Representative Accession Undertaking delivered to the Security Agent and the Security Agent shall, as soon as reasonably practicable after receipt by it, sign and accept the same if it appears on its face to have been completed, executed and, where applicable, delivered in the form contemplated by this Agreement or, where applicable, by the PIK Facility Agreement. After the Senior Discharge Date, the Creditor/Creditor Representative Accession Undertaking shall be delivered to the Junior Agent and the Company for the purposes of this Clause 13 and any resignation as contemplated by Clause 13.7 (*Resignation of Subordinated Creditors*).

13.7    **Resignation of Subordinated Creditors**

In the event that a person which is a Party to this Agreement as a Subordinated Creditor is no longer a creditor in respect of any Subordinated Liabilities, that person may resign (and will resign if required by the Company) as a Subordinated Creditor by giving notice to the Security Agent and the Company. From the date of receipt by the Security Agent and the Company of any such notice of resignation that person shall cease to be a Party to this Agreement as a Subordinated Creditor and shall have no further rights or obligations under this Agreement as a Subordinated Creditor.

14.    **COSTS AND EXPENSES**

14.1    **Transaction Expenses**

The Company shall, promptly within ten Business Days of demand, pay to the Security Agent the amount of all reasonable third party out-of-pocket costs and expenses (including legal fees, subject to agreed caps, if any) properly incurred by the Security Agent and any Receiver or Delegate (evidence of which shall be provided to the Company) in connection with the negotiation, preparation, printing, execution, syndication and perfection of this Agreement and any other documents referred to in this Agreement and the Transaction Security, in each case up to the maximum amount agreed to by the Company and the Security Agent (if any).

14.2    **Amendment Costs**

If the Company requests an amendment, waiver or consent under this Agreement, the Company shall within ten Business Days of demand, reimburse (or procure the reimbursement of) the Security Agent for the amount of all reasonable third party costs and expenses (including legal fees, subject to agreed caps (if any)) reasonably incurred by the Security Agent, by any Receiver or Delegate in responding to, evaluating, negotiating or complying with that request or requirement.

14.3    **Stamp Taxes**

The Company shall pay and, within ten Business Days of demand, indemnify the Security Agent against any cost, loss or liability the Security Agent incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Debt Document except to the extent that such stamp duty, registration or other similar Taxes become(s) payable upon a voluntary registration made by the Security Agent if such registration is not necessary to evidence, prove, maintain, enforce, compel or otherwise assert the rights or obligation of the Security Agent under a Debt Document.

14.4    **Interest on Demand**

Without duplication of any default interest payable under any Debt Document, if any Creditor or the Company fails to pay any amount payable by it under this Agreement on its due date, interest shall (to the extent such accrual does not result in any double counting under the provisions of this Agreement and the provisions of the other Senior Finance Documents) accrue on the overdue amount (and be compounded with it) from the due date up to the date of actual payment (both before and after judgment and to the extent interest at a default rate is not otherwise being paid on that sum) at the rate which is 1 per cent. per annum over the rate at which the Security Agent was being offered, by leading banks in the London interbank market, deposits in an amount comparable to the unpaid amounts in the currencies of those amounts for any period(s) that the Security Agent may from time to time select.

14.5    **Enforcement and Preservation Costs**

The Company shall, within ten Business Days of demand, pay to the Security Agent the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of or the preservation of any rights under any Debt Document, the Transaction Security and any proceedings instituted by or against the Security Agent as a consequence of taking or holding the Transaction Security or enforcing these rights.

**15.    INDEMNITIES**

15.1    **Company's Indemnity**

(a)    The Company shall promptly indemnify the Security Agent and every Receiver and Delegate against any cost, loss or liability (together with any applicable VAT) incurred (but excluding any costs and expenses arising as a result of the Security Agent's gross negligence or wilful default) by any of them:

(i)    in relation to or as a result of:

(A)    any failure by the Company to comply with obligations under Clause 14 (*Costs and Expenses*); or

(B)    the taking, holding, protection or enforcement of the Transaction Security; or

(C)    the exercise of any of the rights, powers, discretions and remedies vested in the Security Agent (or, if applicable, the relevant Secured Party), each Receiver and each Delegate by the Debt Documents or by law (including any costs, losses and liabilities which the Security Agent may incur in connection with acting following the request of the Company as contemplated by the terms of any Debt Document); or

47

<div style="margin-left:2em">

(D)      any default by the Company in the performance of any of the obligations expressed to be assumed by it in the Debt Documents; or

(E)      acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised; or

(F)      instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; or

(G)      acting as the Security Agent, Secured Party, Receiver or Delegate under the Debt Documents or which otherwise relates to any of the Security Property; or

(ii)      which otherwise relates to any of the Security Property or the performance of the terms of this Agreement.

</div>

(b)      The Company expressly acknowledges and agrees that the continuation of its indemnity obligations under this Clause 15.1 will not be prejudiced by any release or disposal under Clause 9.2 (*Distressed Disposals*) taking into account the operation of that Clause.

## 15.2 Priority of Indemnity

The Security Agent and every Receiver and Delegate may, in priority to any payment to the Secured Parties, indemnify itself out of the Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in Clause 15.1 (*Company's Indemnity*) and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all moneys payable to it, in each case in accordance with Clause 10.1 (*Order of Application - Transaction Security*).

## 15.3 Senior Creditors' Indemnity

Each Senior Creditor shall (in the proportion that the Liabilities due to it bears to the aggregate of the Liabilities due to all the Senior Creditors for the time being (or, if the Liabilities due to each of those Senior Creditors is zero, immediately prior to their being reduced to zero)), indemnify the Security Agent and every Receiver and every Delegate, within three Business Days of demand, against any cost, loss or liability incurred by any of them (otherwise than by reason of the Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct) in acting as Security Agent, Receiver or Delegate under the Debt Documents (unless the Security Agent, Receiver or Delegate has been reimbursed by the Company pursuant to a Debt Document) and the Company shall jointly and severally indemnify each Senior Creditor against any payment made by it under this Clause 15.

## 15.4 The Company's Indemnity to Senior Creditors

The Company shall promptly and as principal obligor indemnify each Senior Creditor against any cost, loss or liability (together with any applicable VAT), whether or not reasonably foreseeable, reasonably incurred by any of them in relation to or arising out of the operation of Clause 9.2 (*Distressed Disposals*).

## 16. INFORMATION

## 16.1 Information and Dealing

(a)      The Creditors shall provide to the Security Agent from time to time (through the relevant Creditor Representative in the case of a Senior Creditor or a Junior Creditor)

any information that the Security Agent may reasonably specify as being necessary or desirable to enable the Security Agent to perform its functions as trustee or agent.

(b)     Subject to clause 27.7 (*Communication when Agent is Impaired Agent*) of the PIK Facility Agreement, each Senior Creditor shall deal with the Security Agent exclusively through the Senior Agent.

16.2    **Disclosure**

(a)     Notwithstanding any agreement to the contrary but subject to paragraph (b) below, the Company consents, until the Senior Discharge Date, to the disclosure by any of the Senior Creditors, the Agent and the Security Agent to each other (whether or not through the Agent and/or the Security Agent) of such information concerning the Company as any Senior Creditor, the Senior Agent or the Security Agent shall see fit to the extent that the disclosure of such information does not breach any applicable law.

(b)     Prior to the occurrence of an Acceleration Event, the Company shall have the right under or in connection with any Debt Document to provide any notice, request or information to the Security Agent or any Senior Creditor, any Junior Creditor or a Creditor Representative on a confidential basis and if marked as such, the Security Agent, such Senior Creditor, Junior Creditor or a Creditor Representative shall keep such information confidential and shall not have the right to disclose such information to any other Senior Creditor, Junior Creditor or person.

16.3    **Notification of Prescribed Events**

(a)     If a Senior Default either occurs or ceases to be continuing, the Senior Agent shall, upon becoming aware of that occurrence or cessation, notify the Security Agent.

(b)     If an Acceleration Event occurs, the Senior Agent shall notify the Security Agent and the Security Agent shall, upon receiving that notification, notify each other Party.

(c)     If the Security Agent enforces, or takes formal steps to enforce, any of the Transaction Security it shall notify each other Secured Party of that action.

(d)     If any Senior Creditor or the Agent exercises any right it may have to enforce, or to take formal steps to enforce, any of the Transaction Security it shall notify the Security Agent and the Security Agent shall, upon receiving that notification, notify each other Party of that action.

## 17.    NOTICES

17.1    **Communications in Writing**

Any communication to be made under or in connection with this Agreement shall be made in writing and, unless otherwise stated, may be made by electronic mail or letter.

17.2    **Security Agent's Communications with Senior Creditors**

The Security Agent shall be entitled to carry out all dealings with the Senior Creditors through the Senior Agent and may give to the Senior Agent any notice or other communication required to be given by the Security Agent to a Senior Creditor.

17.3     **Security Agent's Communications with Junior Creditors**

The Security Agent shall be entitled to carry out all dealings with the Junior Creditors through the Senior Agent and may give to the Junior Agent any notice or other communication required to be given by the Security Agent to a Junior Creditor.

17.4     **Addresses**

The address and electronic mail address (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with this Agreement is:

(a)      in the case of any person which is a Party on the date of this Agreement, that identified with its signature below; and

(b)      in the case of each other Party, that notified in writing to the Security Agent on or prior to the date on which it becomes a Party,

or any substitute address, electronic mail address or department or officer which that Party may notify to the Security Agent (or the Security Agent may notify to the other Parties, if a change is made by the Security Agent) by not less than five Business Days' notice.

17.5     **Delivery**

(a)      Any communication or document made or delivered by one person to another under or in connection with this Agreement will only be effective:

    (i)      if by way of electronic mail, when received in legible form; or

    (ii)     if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post, postage prepaid, in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 17.4 (*Addresses*), if addressed to that department or officer.

(b)      Any communication or document to be made or delivered to the Security Agent will be effective only when actually received by it and then only if it is expressly marked for the attention of the department or officer identified in Clause 17.4 (*Addresses*) (or any substitute department or officer as the Security Agent shall specify for this purpose).

(c)      Any communication or document made or delivered to the Company in accordance with this Clause 17.5 will be deemed to have been made or delivered to each of the Company and each of the Creditors (other than a Senior Creditor, Junior Creditor or Creditor Representative).

17.6     **Notification of Address and Electronic Mail Address**

Promptly upon receipt of notification of an address and electronic mail address or change of address or electronic mail address pursuant to Clause 17.4 (*Addresses*) or changing its own address or electronic mail address, the Security Agent shall notify the other Parties.

17.7     **Electronic Communication**

(a)      Any communication to be made under or in connection with this Agreement may be made by electronic mail or other electronic means, if the Parties:

(i) agree that, unless and until notified to the contrary, this is to be an accepted form of communication (with such agreement to be deemed to be given by each person which is a Party unless otherwise notified to the contrary by the Security Agent and the Company);

(ii) notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

(iii) notify each other of any change to their address or any other such information supplied by them.

(b) Any electronic communication made between the Parties will be effective only when actually received in readable form and in the case of any electronic communication made by a Party to the Security Agent only if it is addressed in such a manner as the Security Agent shall specify for this purpose.

17.8 **English Language**

(a) Any notice given under or in connection with this Agreement must be in English.

(b) All other documents provided under or in connection with this Agreement must be:

(i) in English; or

(ii) if not in English, and if so required by the Security Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

17.9 **Notices to all Creditors**

(a) Where any request for a consent, amendment or waiver which requires the consent of all the Parties to this Agreement or any class of creditors (or percentage of such class) (as the case may be) is received by a Creditor Representative from the Company the Creditor Representative shall provide notice of such request to such Parties or the relevant class of Creditors at the same time.

(b) Where an instruction is required by a Creditor Representative from a class of Creditors (or a percentage of such class), notice of such instruction shall be provided to each Creditor in the relevant class at the same time.

18. **PRESERVATION**

18.1 **Waiver of Defences**

The provisions of this Agreement or any Transaction Security will not be affected by an act, omission, matter or thing which, but for this Clause 18.1, would reduce, release or prejudice the subordination and priorities expressed to be created by this Agreement including (without limitation and whether or not known to any Party):

(a) any time, waiver or consent granted to, or composition with, the Company or other person;

(b) the release of the Company or any other person under the terms of any composition or arrangement with any creditor of the Company;

(c)     the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, the Company or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any Security;

(d)     any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of the Company or other person;

(e)     any amendment, novation, supplement, extension (whether of maturity or otherwise) or restatement (in each case, however fundamental and of whatsoever nature, and whether or not more onerous) or replacement of a Debt Document or any other document or security;

(f)     any unenforceability, illegality or invalidity of any obligation of any person under any Debt Document or any other document or security;

(g)     any intermediate Payment of any of the Liabilities owing to the Senior Creditors in whole or in part; or

(h)     any insolvency or similar proceedings.

## 18.2    Partial Invalidity

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of that provision under the law of any other jurisdiction will in any way be affected or impaired.

## 18.3    No Impairment

(a)     If, at any time after its date, any provision of a Debt Document (including this Agreement) is not binding on or enforceable in accordance with its terms against a person expressed to be a party to that Debt Document, neither the binding nature nor the enforceability of that provision nor any other provision of that Debt Document will be impaired as against the other party(ies) to that Debt Document.

(b)     Each Party expressly acknowledges and agrees that any right to any payment, indemnity or otherwise under any Debt Document shall not (by reason only of such right) delay, condition or restrict any obligation in this Agreement to act promptly as otherwise required in relation to any step, action or document required to be taken or entered into hereunder.

## 18.4    Remedies and Waivers

No failure to exercise, nor any delay in exercising, on the part of any Party, any right or remedy under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

## 18.5    Priorities Not Affected

Except as otherwise provided in this Agreement the priorities referred to in Clause 2 (*Ranking and Priority*) will:

(a)     not be affected by any reduction or increase in the principal amount secured by the Transaction Security in respect of the Liabilities owing to the Secured Parties or by any intermediate reduction or increase in, amendment or variation to any of the Debt Documents, or by any variation or satisfaction of, any of the Liabilities or any other circumstances;

(b)     apply regardless of the order in which or dates upon which this Agreement and the other Debt Documents are executed or registered or notice of them is given to any person; and

(c)     secure the Liabilities owing to the Secured Parties in the order specified, regardless of the date upon which any of the Liabilities arise or of any fluctuations in the amount of any of the Liabilities outstanding.

## 19.    CONSENTS, AMENDMENTS AND OVERRIDE

### 19.1    Required Consents

(a)     Subject to paragraphs (b) to (f) below, Clause 9 (*Non-Distressed Disposals, Distressed Disposals And Disposal Proceeds*) and Clause 19.4 (*Exceptions*), this Agreement may be amended or waived only with the consent of the Company, the Senior Agent and the Security Agent provided that, to the extent that an amendment, waiver or consent only affects one class of Creditors, and such amendment, waiver or consent could not reasonably be expected materially or adversely to affect the interests of the other classes of Creditors, only written agreement from the Creditor Representative acting on behalf of the affected class and the Company shall be required.

(b)     Subject to paragraphs (c) to (f) below, Clause 9 (*Non-Distressed Disposals, Distressed Disposals And Disposal Proceeds*) and Clause 19.4 (*Exceptions*), an amendment or waiver of this Agreement that has the effect of changing or which relates to:

(i)      Clause 7 (*Redistribution*), Clause 10 (*Application of Proceeds*) or this Clause 19;

(ii)     the order of priority or subordination under this Agreement;

(iii)    paragraphs (d)(iii), (e) and (f) of Clause 11.4 (*Instructions to Security Agent and Exercise of Discretion*); or

(iv)    Clause 6 (*Turnover of Receipts*),

other than an amendment or waiver which, without prejudice to the other terms of this Agreement, is consequential to or required to implement a Facility Change (as defined in the PIK Facility Agreement or in the equivalent term in any Debt Document) shall not be made without the consent of:

(A)     the Senior Agent acting in accordance with the provisions of the PIK Facility Agreement; and

(B)     the Company.

(c)     The Senior Agent shall, to the extent it is consented to by the requisite percentage of the Creditors it represents or it is otherwise authorised by the Debt Documents to which it is party, act on such instructions or authorisations in accordance therewith save to the extent that any amendments so consented to or authorised relate to any provision affecting the personal rights and obligations of the Senior Agent in its capacity as such.

(d)     Subject to paragraph (a) of Clause 19.2 (*Amendments and Waivers: Transaction Security Documents*) and Clause 19.4 (*Exceptions*), where the Security Agent consent is required for any amendment or waiver in this Clause 19, the Security Agent shall act on the instructions of the Majority Senior Creditors; provided that in all cases such consent of the Security Agent shall be deemed to have been given without such instruction or consent where either (i) the Majority Senior Creditors are not expressly required to instruct the Security Agent in relation to such amendment or waiver in accordance with the terms of this Agreement; or (ii) the Senior Agent has given its consent on behalf of Creditors which in aggregate comprise the Majority Senior Creditors.

(e)     This Agreement may be amended by the Senior Agent, the Security Agent and the Company without the consent of any other Party to:

    (i)     cure defects, omissions or manifest errors or resolve ambiguities or inconsistencies; or

    (ii)     to effect any amendment that imposes additional obligations or restrictions (whether conditional or otherwise) upon the Company or member of the Group and which does not impose any additional obligations or restrictions on any other Party but which (for the avoidance of doubt) may grant such other Parties additional rights.

(f)     Notwithstanding anything to the contrary in the Debt Documents, a Creditor may unilaterally waive, relinquish or otherwise irrevocably give up all or any of its rights under any Debt Document with the consent of the Company.

(g)     Following the Senior Discharge Date, any amendments shall only be made by the Company and the Junior Agent.

## 19.2    Amendments and Waivers: Transaction Security Documents

Save as otherwise required or permitted by Clause 9 (*Non-Distressed Disposals, Distressed Disposals And Disposal Proceeds*), Clause 19.1 (*Required Consents*) and subject to paragraphs (a) and (b) below, and to paragraph (b) of Clause 19.4 (*Exceptions*) or as permitted by the Debt Documents:

(a)     the Security Agent may, if the Company consents, amend the terms of, release or waive any of the requirements of or grant consents under, any of the Transaction Security Documents which shall be binding on each Party; and

(b)     the prior consent of the Senior Creditors and the Company is required to authorise any amendment, release or waiver of, or consent under, any Transaction Security Document which would adversely affect the nature or scope of the assets subject to Transaction Security or the manner in which the proceeds of enforcement of the Transaction Security are distributed.

## 19.3    Effectiveness

Any amendment, waiver or consent given in accordance with this Clause 19 will be binding on all Parties and the Security Agent may effect (with the consent of the Company), on behalf of the Creditor Representative or Creditor, any amendment, waiver or consent permitted by this Clause 19.

19.4    **Exceptions**

(a)    Subject to paragraphs (b) below, an amendment, waiver or consent which relates to the rights or obligations which are personal to a Creditor Representative or the Security Agent in its capacity as such (including, without limitation, any ability of the Security Agent to act in its discretion under this Agreement) may not be effected without the consent of the relevant Creditor Representative or the Security Agent.

(b)    Neither paragraph (a) above, nor paragraphs (a) to (d) of Clause 19.1 (*Required Consents*) nor Clause 19.2 (*Amendments and Waivers: Transaction Security Documents*) shall apply:

(i)    to any release of Transaction Security claim or Liabilities; or

(ii)    to any amendment, waiver or consent,

which, in each case, the Security Agent gives in accordance with Clause 9 (*Non-Distressed Disposals, Distressed Disposals And Disposal Proceeds*), or as contemplated by the terms of any Debt Document or is consequential to or required to implement a Facility Change (as defined in the PIK Facility Agreement or in the equivalent term in any Debt Document) and each Party agrees that any such release, amendment, waiver or consent can be effected solely by the Company and the Security Agent acting in accordance with the provisions of such clauses or the applicable Security Document to give effect to the same.

19.5    **Deemed consent**

If the Senior Agent gives a Consent in respect of the Senior Finance Documents then, if that action was permitted by the terms of this Agreement, the Subordinated Creditors and the Company will (or will be deemed to):

(a)    give a corresponding Consent in equivalent terms in relation to each of the Debt Documents to which they are a party; and

(b)    do anything (including executing any document) that the Senior Agent may reasonably require to give effect to paragraph (a) above.

19.6    **Excluded consents**

Clause 19.5 (*Deemed consent*) does not apply to any Consent which has the effect of:

(a)    increasing or decreasing the Liabilities;

(b)    changing the basis upon which any Permitted Payments are calculated (including the timing, currency or amount of such Payments); or

(c)    changing the terms of this Agreement or of any Security Document.

19.7    **No Liability**

Neither the Senior Agent nor the Senior Creditors will be liable to any other Creditor or the Company for any Consent given or deemed to be given under this Clause 19.

19.8    **Agreement to Override**

Unless expressly stated otherwise in this Agreement, this Agreement overrides anything in any other Debt Document.

20.     **COUNTERPARTS**

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

21.     **GOVERNING LAW**

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

22.     **ENFORCEMENT**

22.1    **Jurisdiction**

(a)     The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or the consequences of its nullity or any non-contractual obligation arising out of or in connection with this Agreement) (a "**Dispute**").

(b)     The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)     This Clause 22.1 is for the benefit of the Secured Parties only. As a result, no Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Secured Parties may take concurrent proceedings in any number of jurisdictions.

22.2    **Service of process**

(a)     Without prejudice to any other mode of service allowed under any relevant law the Company:

(i)     irrevocably appoints the New Look Limited, New Look House, Mercery Road, Weymouth, Dorset DT3 5HJ (Attn: The Directors), as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement; and

(ii)    agrees that failure by a process agent to notify the Company of the process will not invalidate the proceedings concerned.

(b)     The Company may irrevocably appoint another person as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement, subject to notifying the Security Agent accordingly. In the case of any replacement of an existing agent for service of process, following the new process agent's appointment and notification to the Security Agent of such new appointment, the existing process agent may resign.

**THIS AGREEMENT** has been entered into on the date stated at the beginning of this Agreement and executed as a deed by the Parties and is intended to be and is delivered by them as a deed on the date specified above and shall take effect as a deed.

## SCHEDULE 1

## FORM OF CREDITOR/CREDITOR REPRESENTATIVE ACCESSION UNDERTAKING

To:      [Insert full name of current Security Agent] for itself and each of the other parties to the Subordination Agreement referred to below / [*addressee as per Subordination Agreement*].

From:   [Insert full name of Acceding Party]

**This Undertaking** is made on [date] by [insert full name of applicable party] (the "**Acceding Party**") in relation to the Subordination Agreement (the "**Subordination Agreement**") dated [ ● ] between, amongst others, [ ● ] as Company, [ ● ] as security agent, [ ● ] as agent and the other Creditors (as defined in the Subordination Agreement). Terms defined in the Subordination Agreement shall, unless otherwise defined in this Undertaking, bear the same meanings when used in this Undertaking.

In consideration of the Acceding Party being accepted as a [*insert applicable defined terms and capacity*] for the purposes of the Subordination Agreement, the Acceding Party confirms that, as from [*date*], it intends to be party to the Subordination Agreement as a [*insert applicable defined terms and capacity*] and undertakes to perform all the obligations expressed in the Subordination Agreement to be assumed by a [*insert applicable defined terms and capacity*] and agrees that it shall be bound by all the provisions of the Subordination Agreement, as if it had been an original party to the Subordination Agreement.

The Acceding Party expressly ratifies and approves any and all acts done by the Security Agent on its behalf prior to execution by the Acceding Party of this Undertaking.

This Undertaking and any non-contractual obligations arising out of or in connection with it are governed by English law.

**THIS UNDERTAKING** has been entered into on the date stated above [and is executed and delivered as a deed by the Acceding Party on the date stated above].

**Acceding Party**

[**Executed** as a **Deed**]

[insert full name of Acceding                              )

Creditor/Agent]                                            )          By:


Address:
Contact:
Telephone Number:
Email:

[Accepted by the Security Agent                           )

for and on behalf of                                      )          Signed:

[Insert full name of current Security Agent ]    )          Date: ]

57

# Signatures[1]

---

[1] **NTD:** To be updated.

**APPENDIX 8**

**FORM OF SHAREHOLDERS' AGREEMENT**

EU-DOCS\29867510.8

**_____ 2020**

**THE INVESTORS**

and

**LUCID ISSUER SERVICES LIMITED**

and

**NEW LOOK RETAIL HOLDINGS LIMITED**

---

**SHAREHOLDERS' AGREEMENT**

related to

**NEW LOOK RETAIL HOLDINGS LIMITED**

---

## LATHAM&WATKINS

99 Bishopsgate
London EC2M 3XF
United Kingdom
Tel: +44.20.7710.1000

Contact: Yen Sum / Jennifer Brennan / Kem Ihenacho

## TABLE OF CONTENTS

**Clause**                                                                                                 **Page**

1.      DEFINITIONS AND INTERPRETATION ........................................................................ 1

2.      BOARD OF DIRECTORS ........................................................................................ 14

3.      BOARD AND BOARD MEETINGS ............................................................................ 20

4.      CONDUCT OF BUSINESS AND RESERVED MATTERS ............................................ 22

5.      SHAREHOLDER MATTERS ..................................................................................... 23

6.      PROVISION OF INFORMATION ............................................................................... 24

7.      PRE-EMPTION ON NEW ISSUE ............................................................................... 26

8.      MANAGEMENT INCENTIVE PLAN AND POWER OF ATTORNEY .......................... 29

9.      ROLE OF THE HOLDING PERIOD TRUSTEE ........................................................... 29

10.     FEES, COSTS AND EXPENSES ................................................................................ 31

11.     EXIT .................................................................................................................... 31

12.     CONFIDENTIALITY AND ANNOUNCEMENTS .......................................................... 34

13.     STAPLE ................................................................................................................ 36

14.     RIGHT OF FIRST OFFER ....................................................................................... 36

15.     INCREMENTAL ISSUE .......................................................................................... 38

16.     GROUP WATERFALL ............................................................................................ 38

17.     ASSIGNMENT ....................................................................................................... 39

18.     DURATION .......................................................................................................... 40

19.     ENTIRE AGREEMENT AND REMEDIES .................................................................. 40

20.     WAIVER AND VARIATION ..................................................................................... 41

21.     INVALIDITY ......................................................................................................... 41

22.     NO PARTNERSHIP OR AGENCY ............................................................................ 41

23.     NOTICES .............................................................................................................. 42

24.     RIGHTS OF THIRD PARTIES ................................................................................. 43

25.     COUNTERPARTS AND EFFECTIVENESS ................................................................. 43

26.     GOVERNING LAW AND JURISDICTION .................................................................. 43

27.     PROCESS AGENT .................................................................................................. 44

SCHEDULE 1 .................................................................................................................... 45

        PARTICULARS OF THE INVESTORS

SCHEDULE 2 .................................................................................................................... 46

        CONDUCT OF BUSINESS AND RESERVED MATTERS

SCHEDULE 3 .................................................................................................................... 54

        INFORMATION OBLIGATIONS

SCHEDULE 4 .................................................................................................................... 55

        DEED OF ADHERENCE

**AGREED FORM DOCUMENTS:**
Articles
Forex Policy

**THIS AGREEMENT** is entered into as a deed on _____ 2020

**BETWEEN**

(1)    **THE INVESTORS** details of which are set out in Schedule 1;

(2)    **LUCID ISSUER SERVICES LIMITED**, a company incorporated in England and Wales with number 05098454 whose registered office is at Tankerton Works, 12 Argyle Walk, London, WC1H 8HA (the "**Holding Period Trustee**"); and

(3)    **NEW LOOK RETAIL HOLDINGS LIMITED**, a company incorporated in Jersey with registered number 128640 and having its registered office at 47 Esplanade, St Helier, JE1 0BD (the "**Company**").

**WHEREAS**

(A)    The Company is a public company limited by shares and was incorporated in Jersey on 27 March 2019.

(B)    The Company is proposing to restructure its share capital whereby certain shares of the Company are redeemed and cancelled for nil value (the "**Redemption**").

(C)    Simultaneously with or shortly after the Redemption, the Investors have agreed to subscribe for new Shares pursuant to the terms of a financial restructuring of the Group (i) in the case of the Scheme Creditors and/or certain persons connected with them, as part of their Scheme Creditor Entitlements (as defined in the Scheme); and (ii) in the case of certain Investors and/or certain persons connected with them, in part consideration for their commitment to provide the PIK Facility, in each case, pursuant to a subscription agreement (the "**Subscription Agreement**").

(D)    As a result of the Redemption the existing shareholders' agreement dated 3 May 2019 governing the rights of the Company will be terminated in accordance with its terms.

(E)    The parties wish to enter into this Agreement to record the terms on which they will regulate the affairs of the Company and its subsidiaries.

**IT IS AGREED THAT**

1.    **DEFINITIONS AND INTERPRETATION**

1.1    In this Agreement, unless expressly stated otherwise:

"**15% Scenario**" occurs when the Y Investor Group 15% Scenario and the Z Investor Group 15% Scenario occurs;

"**40% Scenario**" occurs when an Investor or Investor Group holds a number of A Ordinary Shares representing 40% or more of the total issued A Ordinary Shares and another Investor or Investor Group holds equal to or more than the Qualifying Shareholding;

"**A Ordinary Shareholder**" means a holder of A Ordinary Shares;

"**A Ordinary Shares**" means the A ordinary shares in the capital of the Company, the rights and restrictions attached to which are set out in the Articles;

1

"**Accelerated Securities Issue**" means any issue of Relevant Securities to any Allottee (other than to another Group Company):

(a)     where there has occurred and is continuing an event of default under any Finance Document where such event of default has not been waived by the relevant providers of finance and in the opinion of the Board (with the approval of an Investor Special Majority or an Investor Super Majority (as the case may be) pursuant to Clause 4.3 and paragraph 2(f) of Part 2 of Schedule 2), the issue of Relevant Securities is necessary to cure the event of default;

(b)     where in the opinion of the Board, there is a likelihood of an event of default under any Finance Document or any agreement with any debt finance provider occurring and the issue of Relevant Securities is, in the opinion of the Board (with the approval of an Investor Special Majority or an Investor Super Majority (as the case may be) pursuant to Clause 4.3 and paragraph 2(f) of Part 2 of Schedule 2), necessary to avoid the event of default occurring; or

(c)     in connection with any corporate acquisition, merger or joint venture by any Group Company that has been approved by the Board (and approved pursuant to paragraph 1(b) or 2(a) of Part 2 of Schedule 2 (if applicable)) where the issue of the Relevant Securities is in the opinion of the Board (with the approval of an Investor Special Majority or an Investor Super Majority (as the case may be) pursuant to Clause 4.3 and paragraph 2(f) of Part 2 of Schedule 2), necessary to effect such acquisition, merger or joint venture (provided such acquisition, merger or joint venture is on arm's length terms);

"**Accelerated Securities Issue Notice**" has the meaning given in Clause 7.5;

"**Acceptance Notice**" has the meaning given in Clause 7.1;

"**Additional Facility Lender**" has the meaning given to that term in the Additional PIK Facility;

"**Additional Facility Notice**" has the meaning given to that term in the Additional PIK Facility;

"**Additional PIK Facility**" means the additional £50,000,000 incremental facilities which may be made available pursuant to the terms of the PIK Facility Agreement;

"**Adjourned Meeting**" has the meaning given in Clause 3.6;

"**Affiliate**" has the meaning given in the Articles;

"**Agreed Form**" means, in relation to a document, the form of that document initialled by or on behalf of the Y Investor and the Z Investor for identification;

"**Allocation Notice**" has the meaning given in Clause 14.6;

"**Allottees**" means any person (whether or not an existing holder of Shares) nominated by the Board (and approved by an Investor Special Majority or an Investor Super Majority (as the case may be) pursuant to Clause 4.3 and paragraph 2(f) of Part 2 of Schedule 2);

"**Alternative Eligible Investors**" has the meaning given in Clause 2.16;

"**Alternative Investor**" has the meaning given in Clause 2.16(a);

EU-DOCS\29742045.10

"**Alternative Investor Majority**" means the holders of a majority in number of the A Ordinary Shares for the time being in issue (excluding any A Ordinary Shares held by the Y Investor Group and Z Investor Group) acting by way of written consent or direction;

"**Annual Budget**" means the annual budget relating to the Group as agreed by the Board and as amended pursuant to paragraph 1.1(b) of Part 2 of Schedule 2;

"**Anti-Corruption Laws**" means any Law relating to anti-bribery or anti-corruption (governmental or commercial) that applies to the business and dealings of the Group or the Investors from time to time, including the US Foreign and Corrupt Practices Act 1977, the UK Bribery Act 2010 and all national and international Laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions;

"**Antitrust Laws**" means any Law relating to restrictive or anti-competitive agreements or practices, abuse of dominant or monopoly market positions (whether held individually or collectively), or the control of acquisitions or mergers, that applies to the business and dealings of the Group or the Investors from time to time, including in relation to cartels, pricing, resale pricing, market sharing, bid rigging, terms of trading, purchase or supply and joint ventures;

"**Applicant**" has the meaning given in Clause 14.6;

"**Appointment**" has the meaning given in Clause 2.15;

"**Approved Matter**" has the meaning given in Clause 3.9;

"**Articles**" means the new articles of association of the Company in the Agreed Form to be adopted on or around the date of this Agreement and, once adopted, those articles of association from time to time and any reference in this Agreement to any Article shall be to that article as set out in the Articles;

"**Asset Sale**" means a sale by the Company (or other Group Companies) of all, or substantially all, of the Group's business, assets and undertakings (other than pursuant to an intra-group reorganisation);

"**Audit Committee**" has the meaning given in Clause 2.22;

"**B Incremental Proportion**" means a number of B Ordinary Shares so that following the issue of A Ordinary Shares in connection with an Incremental Issue, the Junior Debt Holder receives the same proportion of Surplus Assets as they would have received as at [*Closing Date*] 2020 but for the issue of such A Ordinary Shares provided that if there has been an issuance of Relevant Securities that includes B Ordinary Shares pursuant to Clause 15 which a Junior Debt Holder has not subscribed for, such proportion of the Surplus Assets the relevant Junior Debt Holder would have received as at [*Closing Date*] 2020 shall be reduced proportionately by the number of B Ordinary Shares that are issued as Relevant Securities and not subscribed for;

"**B Ordinary Shares**" means the B ordinary shares in the capital of the Company, the rights and restrictions attached to which are set out in the Articles;

"**Board**" means the board of directors of the Company from time to time;

"**Board Observer**" means the Y Investor Group Board Observer or the Z Investor Group Board Observer as appointed from time to time;

3

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks in the City of London and Jersey are open for ordinary banking business;

"**Business Plan**" means the business plan relating to the Group as agreed by the Board and as amended pursuant to paragraph 1.1(b) of Part 2 of Schedule 2;

"**C Ordinary Shares**" means the C ordinary shares in the capital of the Company, the rights and restrictions attached to which are set out in the Articles;

"**Catch-Up Subscription**" has the meaning given in Clause 7.5;

"**CEO**" means the chief executive officer of the Group from time to time;

"**CFO**" means the chief financial officer of the Group from time to time;

"**Competitor/Supplier Entity**" means:

(a)     any person whose business is or seeks to be in competition with the Group's business (being an affordable fashion retailer) as carried on at the relevant time in Europe and Asia; and/or

(b)     any person who is or seeks to be a material supplier of the Group's business as carried on at the relevant time which includes,

together with their agents or proxies, or any person who, either alone or acting together with any other person, including any Affiliate of such person, holds greater than 25% of the direct or indirect ownership, or controls more than 25% of the direct or indirect voting rights, of any such person in (a) or (b) (but excluding, in each case, (i) any Investor or any of its Affiliates that is, or whose interests are managed by, a bona fide Fund Manager regularly engaged in or established for the purposes of making, purchasing or investing in loans, debt securities or other financial assets and has not been established for the primary or main purpose of investing in the share capital of companies or to obtain a control position in any company, who, either alone or acting together with any other person, including any Affiliate of such person, holds greater than 25% of the direct or indirect ownership, or controls more than 25% of the direct or indirect voting rights, in any operating or portfolio company (being a subsidiary undertaking or group of subsidiary undertakings trading as a separate and distinct going concern) that would otherwise be a person falling within (a) or (b) above, and/or (ii) any Affiliate of any Investor where bona fide customary information barriers are in place between such Affiliate and any such Investor which restrict the sharing of information between such Affiliate and such Investor with regards to the Group and such operating or portfolio company);

"**Completion Period**" has the meaning given in Clause 14.8;

"**Confidential Information**" has the meaning given in Clause 12.1;

"**Continuing Shareholders**" has the meaning given in Clause 14.4;

"**D Ordinary Shares**" means the D ordinary shares in the capital of the Company, the rights and restrictions attached to which are set out in the Articles;

"**Deed of Adherence**" means a deed in the form set out in Schedule 4, subject to any amendments as the Board considers appropriate in the circumstances, completed and executed in accordance with Clause 17.4;

4

"**Designated Assets**" has the meaning given in Clause 19.5;

"**Designated Website**" has the meaning given in Clause 6.8;

"**Director Notice**" has the meaning given in Clause 2.15;

"**Dispute**" has the meaning given in Clause 26.3;

"**Director Quota**" has the meaning given in Clause 2.1;

"**Eligible Investors**" has the meaning given in Clause 2.15;

"**Employee**" means an employee of the Group from time to time;

"**Encumbrance**" means any interest or equity of any person (including any right to acquire, option or right of pre-emption), any mortgage, charge, pledge, lien, assignment, hypothecation, security interest (including any created by Law), title retention or other security agreement or arrangement;

"**End Date**" has the meaning given in Clause 7.1;

"**equity securities**" shall be construed in accordance with section 540 of the Companies Act, as it is in force on the date of this Agreement;

"**Equity Term Sheet**" means the equity term sheet (as amended) contained in the Lock-up Agreement;

"**Excess Securities**" has the meaning given in Clause 7.1;

"**Exchange Rate**" means, with respect to a particular currency for a particular day, the closing mid-point spot rate of exchange for that currency into pounds sterling on such date as published in the London edition of the Financial Times first published thereafter or, where no such rate is published in respect of that currency for such date, at the rate quoted by HSBC Bank plc as at the close of business in London as at such date;

"**Executive Director**" means any person appointed as the CEO or CFO of the Group by the Board from time to time;

"**Exit**" means an IPO, a Winding-Up or completion of a Sale or completion of an Asset Sale;

"**Exit Date**" has the meaning given in Clause 11.3;

"**Finance Documents**" means:

(a)     any Debt Financing Agreements as such term is defined in the Intercreditor Deed;

(b)     any Senior Debt Agreements and the Junior Debt Agreement as each such term is defined in the Subordination Agreement;

"**Financial Advisors**" has the meaning given in Clause 11.2;

"**Financial Year**" means an accounting period in respect of which the Company prepares its annual accounts in accordance with the relevant provisions of the Jersey Companies Law;

"**First Relevant Investor**" has the meaning given in Clause 2.12;

"**First Substitute Investor Group**" has the meaning given in Clause 2.11;

"**Forex Policy**" means the foreign exchange policy of the Company in the Agreed Form to be adopted on or around the date of this Agreement;

"**Fund Manager**" means any appropriately licensed and/or regulated person who acts for and on behalf of third party investors (and related investment arrangements) on a discretionary or non-discretionary basis pursuant to a management or advisory agreement in consideration for receipt of a management fee, advisory fee, carried interest and/or other similar form of remuneration;

"**Government Entity**" means:

(a)     any national, federal, state, county, municipal, local, or foreign government or any entity exercising executive, legislative, judicial, regulatory, taxing, or administrative functions of or pertaining to government;

(b)     any public international organisation;

(c)     any agency, division, bureau, department, or other political subdivision of any government, entity, or organisation described in the foregoing subparagraphs (a) or (b);

(d)     any company, business, enterprise, or other entity owned, in whole or in part, or controlled by any government, entity, organisation, or other person described in the foregoing subparagraphs (a), (b) or (c); or

(e)     any political party;

"**Government Official**" means:

(a)     any official, officer, employee, or representative of, or any person acting in an official capacity for or on behalf of, any Government Entity;

(b)     any political party or party official or candidate for political office;

(c)     a Politically Exposed Person (PEP) as defined by the Financial Action Task Force (FATF) or Groupe d'action Financière sur le Blanchiment de Capitaux (GAFI); or

(d)     any company, business, enterprise, or other entity owned, in whole or in part, or controlled by any person described in the foregoing subparagraphs (a), (b) or (c);

"**Group**" means the Company and each of its subsidiary undertakings from time to time including any New Holding Company and "**member of the Group**" and "**Group Company**" shall be construed accordingly;

"**Holding Period Trust Agreement**" means the holding period trust agreement entered into between the Holding Period Trustee and the Company on or around the date of this Agreement;

"**IACS**" has the meaning given in Clause 19.5;

6

"**Intercreditor Deed**" means the intercreditor agreement dated 3 May 2020 (as amended and/or restated from time to time) between, amongst others, New Look Bonds Limited, New Look Limited, Global Loan Agency Services Limited as Senior Facility Agent, GLAS Trust Corporation Limited as Security Agent and the other parties named therein in relation to the Finance Documents;

"**Internal Transfer**" has the meaning given in the Articles;

"**Investor**" means each of those persons listed in Schedule 1 and any person who enters into a Deed of Adherence as an Investor;

"**Investor Director**" means the Y Investor Director, the Z Investor Director or such other director appointed in accordance with Clause 2.11 from time to time and includes any alternate director appointed to act in his place from time to time;

"**Investor Group**" means an Investor together with any of its Affiliates that hold A Ordinary Shares;

"**Investor Majority**" means the holders of a majority in number of the issued A Ordinary Shares (from time to time) acting by way of written consent or direction;

"**Investor Special Majority**" means the Investors holding at least two thirds in number of the issued A Ordinary Shares acting by way of written consent or direction;

"**Investor Super Majority**" means any Investor or Investor Group holding a number of A Ordinary Shares representing 40% or more of the total issued A Ordinary Shares and any Investor or Investor Group holding equal to or more than the Qualifying Shareholding together acting by way of written consent or direction;

"**IPO**" has the meaning given in the Articles;

"**Jersey Companies Law**" means the Companies (Jersey) Law 1991, in so far as it applies to the Company;

"**Junior Debt**" has the meaning given to such term in the Subordination Agreement;

"**Junior Debt Holder**" means a holder of Junior Debt;

"**Laws**" means all applicable legislation, statutes, directives, regulations, judgments, decisions, decrees, orders, instruments, by-laws, and other legislative measures or decisions having the force of law, treaties, conventions and other agreements between states, or between states and the European Union or other supranational bodies, rules of common law, customary law and equity and all civil or other codes and all other laws of, or having effect in, any jurisdiction from time to time;

"**Listing Notice**" has the meaning given in Clause 14.2;

"**Lock-up Agreement**" means the lock-up agreement, dated 13 August 2020, between, New Look Retail Holdings Limited, New Look Bonds Limited, New Look Investment Limited, New Look Financing Plc, Lucid Issuer Services Limited and the other parties named therein;

"**Management Incentive Plan**" has the meaning given in Clause 8.1;

7

"**Minority Appointment**" has the meaning given in Clause 2.16;

"**Minority Director Notice**" has the meaning given in Clause 2.16;

"**Minority Non-Executive Director**" has the meaning given in Clause 2.6;

"**New Issue Notice**" has the meaning given in Clause 7.1;

"**New Shareholder**" has the meaning given in Clause 17.4;

"**Non-Executive Chairperson**" means any person appointed as the non-executive chairperson of the Group by the Board in accordance with Clause 2.5 from time to time;

"**Non-Executive Director**" means any person that is not a director, officer, employee or Representative of, or otherwise engaged to provide services to, any Investor or any Affiliate of an Investor (but excluding any operating or portfolio company of any Investor or any Affiliate of an Investor or any entity in which an Investor or any Affiliate of an Investor holds an interest) appointed as the non-executive director of the Group in accordance with Clause 2.5(b) from time to time;

"**Non-Website Investor**" has the meaning given in Clause 6.9;

"**Ordinary Shares**" means the A Ordinary Shares, B Ordinary Shares, C Shares and D Shares or any of them;

"**Participating Shareholder**" has the meaning given in Clause 7.1;

"**PIK Facility**" has the meaning given to such term in the Subordination Agreement;

"**PIK Facility Agreement**" has the meaning given to such term in the Subordination Agreement;

"**Pre-Exit Reorganisation**" has the meaning given in Clause 11.9;

"**Process Agent**" has the meaning given in Clause 27.1;

"**Prospective Buyer**" has the meaning given in Clause 11.13;

"**Qualifying Ordinary Shareholder**" means a holder of A Ordinary Shares, B Ordinary Shares or C Ordinary Shares;

"**Qualifying Ordinary Shares**" means the A Ordinary Shares, B Ordinary Shares and C Ordinary Shares;

"**Qualifying Shareholding**" means the number of A Ordinary Shares representing 15% or more of the total issued A Ordinary Shares;

"**Redemption**" has the meaning given in recital (B);

 "**Relevant Affiliate**" means:

(a)      in relation to an existing Investor:

EU-DOCS\29742045.10

         (i)      in respect of a transfer of A Ordinary Shares, its Affiliate(s) which is the lender in respect of its PIK Facility and/or Additional PIK Facility that nominated such Investor to hold the A Ordinary Shares; and

         (ii)     in respect of a transfer of B Ordinary Shares, its Affiliate(s) which is the lender in respect of its Junior Debt that nominated such Investor to hold the B Ordinary Shares; and

(b)     in relation to a proposed transferee:

         (i)      in respect of a transfer of A Ordinary Shares, its Affiliate(s) which shall be the lender in respect of its PIK Facility and/or Additional PIK Facility that nominated such Investor to hold the A Ordinary Shares; and

         (ii)     in respect of a transfer of B Ordinary Shares, its Affiliate(s) which shall be the lender in respect of its Junior Debt that nominates such proposed transferee to hold the B Ordinary Shares;

"**Relevant Amount**" has the meaning given to that term in the Additional PIK Facility;

"**Relevant Entitlement**" means, in the case of each Qualifying Ordinary Shareholder such percentage of the Relevant Securities as equates to his or its pro rata share of the Qualifying Ordinary Shares in issue immediately prior to the allotment and issue of the Relevant Securities (save that an Investor's Relevant Entitlement may instead be subscribed for by an Affiliate of that Investor);

"**Relevant Party**" has the meaning given in Clause 27.1;

"**Relevant Securities**" has the meaning given in Clause 7.1;

"**Relevant Substitute Investor Group**" has the meaning given in Clause 2.12;

"**Remuneration Committee**" has the meaning given in Clause 2.22;

"**Representatives**" has the meaning given in Clause 12.2;

"**Response Notice**" has the meaning given in Clause 14.4;

"**Response Period**" has the meaning given in Clause 14.4;

"**Sale Shares**" has the meaning given in Clause 14.1;

"**Sanctions List**" any applicable lists pursuant to applicable laws relating to economic or trade sanctions, including the laws or regulations implemented by the Office of Foreign Assets Control of the United States, the United Nations, the European Union, Her Majesty's Treasury and any similar laws or regulations in other jurisdictions;

"**Scheme**" means the scheme of arrangement made under Part 26 of the Companies Act 2006 between New Look Financing plc, a company incorporated in England and Wales with registered number 11911640, and the Scheme Creditors (as defined therein), as sanctioned by the High Court of Justice of England and Wales on [●] 2020;

"**Scheme Creditors**" has the meaning given to it in the Scheme;

9

"**Second End Date**" has the meaning given in Clause 7.1;

"**Second Relevant Investor**" has the meaning given in Clause 2.12;

"**Second Request**" has the meaning given in Clause 5.2;

"**Second Substitute Investor Group**" has the meaning given in Clause 2.11;

"**Seller**" has the meaning given in Clause 14.1;

"**Senior Facility Agreement**" has the meaning given to it in the Intercreditor Deed;

"**Share**" means any share in the capital of the Company from time to time;

"**Shareholder**" means a holder of Shares from time to time;

"**Shareholder Reserved Matters**" means those matters set out in paragraphs 1 and 2 of Part 2 of Schedule 2;

"**Shortfall Amount**" has the meaning given in Clause 19.5;

"**Staple Amount**" means:

(a)    in respect of a transfer of A Ordinary Shares, the amount of the commitment under the PIK Facility and/or Additional PIK Facility (rounded to the nearest whole number) equal to the aggregate commitment under the PIK Facility and/or Additional PIK Facility held by the transferor (or its Relevant Affiliate(s)) multiplied by the Staple Percentage; and

(b)    in respect of a transfer of B Ordinary Shares, the amount of the commitment under the Junior Debt (rounded to the nearest whole number) equal to the aggregate commitment under the Junior Debt held by the transferor (or its Relevant Affiliate(s)) multiplied by the Staple Percentage;

"**Staple Percentage**" means:

(a)    in respect of a transfer of A Ordinary Shares, the total amount of the A Ordinary Shares to be transferred divided by the aggregate A Ordinary Shares held by the Investor, expressed as a percentage (rounded to two decimal places); and

(b)    in respect of a transfer of B Ordinary Shares, the total amount of the B Ordinary Shares to be transferred divided by the aggregate B Ordinary Shares held by the Investor, expressed as a percentage (rounded to two decimal places);

"**Stapled Period**" means the period commencing on the date of this Agreement and ending on the earlier of:

(a)    in respect of a transfer of:

(i)    A Ordinary Shares, the Senior Discharge Date (as defined in the Subordination Agreement)

(ii)    B Ordinary Shares, the Junior Discharge Date (as defined in the Subordination Agreement); and

10

(b)        the date on which Investors representing an Investor Special Majority resolve in accordance with this Agreement to end the Stapled Period in respect of the A Ordinary Shares and/or the B Ordinary Shares;

"**Steps Plan**" has the meaning given in the Lock-up Agreement;

"**Strategic Review**" has the meaning given in Clause 11.2;

"**Subordination Agreement**" means the subordination agreement dated on or about the date of this Agreement (as amended and/or restated from time to time) between, amongst others, [●], Global Loan Agency Services Limited as Original Senior Agent and GLAS Trust Corporation Limited as Security Agent;

"**Subscription Agreement**" has the meaning given in recital (C);

"**Substitute Investor Groups**" has the meaning given in Clause 2.11;

"**Tax**" means all forms of taxation, levy, impost, contribution, duty, liability and charge in the nature of taxation imposed anywhere in the world and all related withholdings or deductions of any nature (including, for the avoidance of doubt, PAYE and National Insurance contribution liabilities in the United Kingdom and corresponding obligations elsewhere) imposed or collected by a Tax Authority whether directly or primarily chargeable against, recoverable from or attributable to any of the Group Companies or another person and all fines, penalties, charges and interest related to any of the foregoing (and "**Taxes**" and "**Taxation**" shall be construed accordingly);

"**Tax Authority**" means a taxing or other governmental (local or central), state or municipal authority (whether within or outside the United Kingdom) competent to impose a liability for or to collect Tax;

"**Transaction Documents**" means this Agreement, the Articles, the Subscription Agreement and any documents entered into in connection therewith;

"**Transfer Price**" has the meaning given in Clause 14.2;

"**Umbrella**" has the meaning given in Clause 19.5;

"**Unsuitable Director**" means a person who:

(a)        has been determined by a court of competent jurisdiction to have acted in material breach of the Law or to have committed any serious criminal offence, or material breach of any fiduciary duty; or

(b)        who is not qualified to be a director pursuant to the Articles; or

(c)        who is prohibited from occupying the position of a director pursuant to Law;

"**Website Investors**" has the meaning given in Clause 6.8;

"**Winding-Up**" has the meaning given in the Articles;

"**Working Hours**" has the meaning given in Clause 23.1;

EU-DOCS\29742045.10

"**Y Investor**" means [●][1];

"**Y Investor Director**" means the director of the Board as appointed from time to time in accordance with Clause 2.7 and includes any alternate director appointed to act in his place from time to time;

"**Y Investor Group**" means the Y Investor and its Affiliates;

"**Y Investor Group 15% Scenario**" occurs where the Y Investor Group holds less than the Qualifying Shareholding;

"**Y Investor Group Board Observer**" has the meaning given in Clause 2.19;

"**Z Investor**" means [●][2];

"**Z Investor Director**" means the director of the Board as appointed from time to time in accordance with Clause 2.8 and includes any alternate director appointed to act in his place from time to time;

"**Z Investor Group**" means the Z Investor and its Affiliates;

"**Z Investor Group 15% Scenario**" occurs where the Z Investor Group holds less than the Qualifying Shareholding; and

"**Z Investor Group Board Observer**" has the meaning given in Clause 2.20.

1.2    In this Agreement:

(a)    "holding company" and "subsidiary" mean "holding company" and "subsidiary" respectively as defined in section 1159 of the Companies Act 2006, "group undertaking" means "group undertaking" as defined in section 1161 of the Companies Act 2006 and "subsidiary undertaking" means "subsidiary undertaking" as defined in section 1162 of the Companies Act 2006 and in interpreting those sections for the purposes of this Agreement, a company is to be treated as (i) a member of a subsidiary or a subsidiary undertaking (as the case may be) even if its shares are registered in the name of a nominee or any party holding a security over those shares (or that secured party's nominee) or (ii) the holding company or parent undertaking (as the case may be) of another company even if its shares in the other company are registered in the name of a nominee or any party holding security over those shares (or that secured party's nominee);

(b)    every reference to a particular Law shall be construed also as a reference to all other Laws made under the Law referred to and to all such Laws as amended, re-enacted, consolidated or replaced or as their application or interpretation is affected by other Laws from time to time provided that, as between the parties, no such amendment or modification shall apply for the purposes of this Agreement to the extent that it would

---

[1] **Note**: The person (together with its Affiliates) identified as entitled to the most Ordinary Shares by reference to the Company's pro forma capital structure as derived from the number of SSNs (as defined in the Equity Term Sheet) held by each Investor Group as per footnote 3 of the Equity Term Sheet.

[2] **Note**: The person (together with its Affiliates) identified as entitled to the second most Ordinary Shares by reference to the Company's pro forma capital structure as derived from the number of SSNs (as defined in the Equity Term Sheet) held by each Investor Group as per footnote 3 of the Equity Term Sheet.

EU-DOCS\29742045.10

impose any new or extended obligation, liability or restriction on, or otherwise adversely affect the rights of, any party;

(c)     references to Clauses, Sub-clauses and Schedules are references to clauses and sub-clauses of and schedules to this Agreement, references to paragraphs are references to paragraphs of the specified Schedule (or, if no Schedule is specified, paragraphs of the Schedule in which the reference appears) and references to this Agreement include the Schedules;

(d)     references to the singular include the plural and vice versa and references that are gender neutral or gender specific include each and every gender and no gender;

(e)     references to a "party" mean a party to this Agreement and include his and its successors in title, personal representatives and permitted assigns;

(f)     references to a "person" include any individual, partnership, company, body corporate, corporation sole or aggregate, firm, joint venture, association, trust, government, state or agency of a state, unincorporated association or organisation, in each case whether or not having separate legal personality and irrespective of the jurisdiction in or under the Law of which it was incorporated or exists, and a reference to any of them shall include a reference to the others;

(g)     references to a "company" include any company, corporation or other body corporate wherever and however incorporated or established;

(h)     references to "sterling", "pounds sterling" or "£" are references to the lawful currency from time to time of the United Kingdom, references to "euros", "EUR" or "€" are references to the lawful currency from time to time of the member states of the European Union that have adopted the single currency;

(i)     for the purposes of applying a reference to a monetary sum expressed in pounds sterling in Clause 4 and Schedule 2, an amount in a different currency shall be deemed to be an amount in pounds sterling converted at the Exchange Rate on the Business Day immediately preceding the date of the relevant action being or proposed to be taken;

(j)     references to times of the day are to London time unless otherwise stated;

(k)     references to writing include any modes of reproducing words in a legible and non-transitory form;

(l)     references to any English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court official or any other legal concept or thing shall in respect of any jurisdiction other than England be deemed to include what most nearly approximates in that jurisdiction to the English legal term;

(m)     words introduced by the word "other" shall not be given a restrictive meaning because they are preceded by words referring to a particular class of acts, matters or things;

(n)     general words shall not be given a restrictive meaning because they are followed by words which are particular examples of the acts, matters or things covered by the general words and the words "includes" and "including" shall be construed without limitation;

13

(o)    words and expressions defined in the Articles and not otherwise defined in this Agreement shall have the same meaning in this Agreement as are given to them in the Articles;

(p)    any matter requiring the written consent of the Board may be achieved by the Board resolving to approve such matter by (save as otherwise indicated in this Agreement) simple majority at any meeting of the Board;

(q)    any reference to written consent shall include by e-mail.

1.3    The headings and sub-headings in this Agreement are inserted for convenience only and shall not affect the construction of this Agreement.

1.4    Each of the schedules to this Agreement shall form part of this Agreement.

1.5    References to this Agreement include this Agreement as validly amended or varied in accordance with its terms.

1.6    All warranties, representations, indemnities, covenants, agreements and obligations given or entered into by more than one party under this Agreement are, unless otherwise stated, given or entered into severally and not jointly and severally and accordingly the liability of each party in respect of any breach of any such obligation, undertaking or liability shall extend only to any loss or damage arising from his or its own breach or his or its proportionate share of any joint breach.

1.7    Any obligation of the Company to "procure" a certain outcome shall mean an obligation for the Company to exercise its voting rights and use any and all powers vested in it from time to time as a shareholder in or of the Company or any other Group Company or other entity (as relevant), to ensure compliance with that obligation so far as it is reasonably able to do so, whether acting alone or (to the extent that it is lawfully able to contribute to ensuring such compliance collectively) acting with others.

1.8    Every obligation contained in this Agreement shall be deemed to be a legally binding and absolute obligation, and where the fulfilment of such obligation is not within the power or control of the relevant party, the obligation of such party shall be to use all of his or its rights and powers to procure compliance with that obligation in accordance with the foregoing sentence.

1.9    Any obligation of the Company in this Agreement shall be binding insofar as it does not constitute an unlawful fetter on such party's statutory powers.

1.10    Where it is expressed in this Agreement that the consent, determination or direction of an Investor Majority is required, such consent, determination or direction shall be deemed to have been given if the relevant matter or transaction has been consented to in writing by an Investor Majority.

2.    **BOARD OF DIRECTORS**

2.1    Subject to Clause 11.5, immediately following execution of this Agreement, the Board shall be comprised of up to a maximum of ten (10) directors (the "**Director Quota**").

**Board Positions**

2.2    The Board shall always have the following maximum positions available within the Director Quota:

14

(a)    two (2) positions available for Executive Directors;

(b)    one (1) position available for a Non-Executive Chairperson;

(c)    up to five (5) positions available for Non-Executive Directors; and

(d)    subject to Clause 11.5, two (2) positions available for Investor Directors.

**Board Constitution**

2.3    Immediately following execution of this Agreement, the Board shall be comprised of:

(a)    the CEO, being Nigel Oddy;

(b)    the CFO, being Richard Collyer;

(c)    the Non-Executive Chairperson, being Alistair McGeorge;

(d)    the Y Investor Director, being [●];[3]

(e)    the Z Investor Director, being [●];[4] and

(f)    up to five (5) Non-Executive Directors, being [●], [●], [●], [●] and [●] of which [ ] shall be designated as the Minority Non-Executive Director.[5]

**Executive Board Appointment**

2.4    Subject to Clause 4.3 and paragraph 2(j) of Part 2 of Schedule 2, each Executive Director shall be appointed and removed by the Board.

**Chairperson and NED Appointment**

2.5    An Investor Majority shall be entitled at any time to appoint:

(a)    a Non-Executive Chairperson in accordance with Clause 2.15, and shall be entitled to remove any such person as Non-Executive Chairperson for any reason and to appoint another person in his/her place to be the Non-Executive Chairperson.

(b)    four (4) Non-Executive Directors in accordance with Clause 2.15, and shall be entitled to remove any such persons for any reason and to appoint another person in his/her place to be a Non-Executive Director.

**Minority Non-Executive Director Appointment**

2.6    An Alternative Investor Majority shall be entitled at any time to appoint one (1) person as a Non-Executive Director (the "**Minority Non-Executive Director**") in accordance with Clause 2.16, and shall be entitled to remove any such person for any reason and to appoint another person in

---

[3] **Note:** To be confirmed when known.

[4] **Note:** To be confirmed when known.

[5] **Note:** To be confirmed when known.

15

his/her place to be the Minority Non-Executive Director and any such appointment or removal shall not require the consent of any of the Investor Directors.

**Y Investor Director**

2.7    Subject to Clauses 2.8 and 2.11, the Y Investor Director shall be appointed by the Y Investor Group and the Y Investor Group shall be entitled to remove any such person as the Y Investor Director for any reason and to appoint another Y Investor Director in his/her place.

2.8    In a Y Investor Group 15% Scenario, provided the Y Investor or Y Investor Group does not qualify as a Substitute Investor Group pursuant to Clause 2.11, the Y Investor shall cease to be entitled to appoint and remove a Y Investor Director and the Y Investor shall immediately procure that any Y Investor Director appointed to the Board from time to time shall immediately resign from the Board.

**Z Investor Director**

2.9    Subject to Clauses 2.10 and 2.11, the Z Investor Director shall be appointed by the Z Investor Group and the Z Investor Group shall be entitled to remove any such person as the Z Investor Director for any reason and to appoint another Z Investor Director in his/her place.

2.10   In a Z Investor Group 15% Scenario, provided the Z Investor or Z Investor Group does not qualify as a Substitute Investor Group pursuant to Clause 2.11, the Z Investor shall cease to be entitled to appoint and remove a Z Investor Director and the Z Investor shall immediately procure that any Z Investor Director appointed to the Board from time to time shall immediately resign from the Board.

**Other Investor Directors**

2.11   Subject to Clause 2.12, in a 15% Scenario:

(a)    the Investor who together with any of its Affiliates holds the highest number of A Ordinary Shares, which shall be calculated by reference to the total number of A Ordinary Shares each Investor and its Affiliates hold (a "**First Substitute Investor Group**"); and

(b)    the Investor who together with any of its Affiliates holds the second highest number of A Ordinary Shares, which shall be calculated by reference to the total number of A Ordinary Shares each Investor and its Affiliates hold (a "**Second Substitute Investor Group**" together with the First Substitute Investor Group each the "**Substitute Investor Groups**"),

shall be entitled to appoint and remove one (1) Investor Director each. For the avoidance of doubt, the Substitute Investor Groups may include the Y Investor Group or the Z Investor Group.

2.12   If at any time:

(a)    an Investor Director is appointed by the Substitute Investor Groups;

(b)    a Substitute Investor Group holds less than the Qualifying Shareholding; and

(c)    an Investor or an Investor Group increases their holding to be equal to or more than the Qualifying Shareholding (the "**First Relevant Investor**"),

EU-DOCS\29742045.10

the First Relevant Investor shall be entitled to: (i) provide a written notice to the Company and the Company shall provide a written notice to the Substitute Investor Group holding the lowest percentage of issued A Ordinary Shares (the "**Relevant Substitute Investor Group**") that the Investor Director appointed by such Relevant Substitute Investor Group (if any) shall be required to resign (if appointed) or that the Relevant Substitute Investor Group shall cease to be entitled to appoint an Investor Director; and (ii) appoint a replacement Investor Director. This Clause 2.12 shall apply *mutatis mutandis* to the next Investor or Investor Group that increases their holding to be equal to or more than the Qualifying Shareholding (the "**Second Relevant Investor**" and together with the First Relevant Investor, the "**Relevant Investors**" and each a "**Relevant Investor**").

2.13    A Relevant Substitute Investor Group that receives a written notice from the Company in accordance with Clause 2.12 shall immediately procure that the Investor Director appointed by it shall resign.

2.14    Failure by an Investor to exercise their right to appoint an Investor Director shall not be deemed to constitute a waiver of the right to make such an appointment and the Company.

2.15    The process for appointing and/or removing the Non-Executive Chairperson and the Non-Executive Directors (other than the Minority Non-Executive Director) by an Investor Majority for the purposes of Clauses 2.5 and 2.5(b) shall be as follows:

(a)    any holder of A Ordinary Shares who holds a number of A Ordinary Shares representing 2% or more of the total issued A Ordinary Shares (an "**Eligible Investor**") shall be entitled to nominate a person for appointment (an "**Appointment**") or removal upon written notice to the Company and the Company shall inform each other Investor in the form of a written notice provided that, in the case of an Appointment, (i) such Eligible Investor may only nominate a person who it reasonably believes in good faith will be appointed pursuant to this Agreement; (ii) such person nominated for appointment is not an Unsuitable Director; and (iii) such notice shall also contain that person's credentials and any other information deemed appropriate by the relevant Eligible Investor proposing the Appointment (the "**Director Notice**");

(b)    each Investor shall give notice in writing to the Company of its consent or lack of consent to the appointment or removal of such person or persons within five (5) Business Days following receipt by the Investors of the Director Notice;

(c)    in circumstances where an Investor Majority has not been achieved within five (5) Business Days following receipt by the Investors of the Director Notice, no new Director Notice may be given by an Eligible Investor until the date falling three (3) months following the date of the Director Notice that failed to achieve an Investor Majority, at which point the process set out in Clause 2.15 shall apply.

2.16    The process for appointing and/or removing the Minority Non-Executive Director by an Alternative Investor Majority for the purposes of Clause 2.6 shall be as follows:

(a)    any holder(s) of A Ordinary Shares whose holding of A Ordinary Shares is included in the calculation of an Alternative Investor Majority ("**Alternative Investor**"), provided such Alternative Investor(s) hold in aggregate a number of A Ordinary Shares that represents no less than 5% of the total issued A Ordinary Shares (the "**Alternative Eligible Investors**"), shall be entitled to nominate a person for appointment (a "**Minority Appointment**") or removal upon written notice to the Company and the Company shall

17

inform each other Alternative Investor in the form of a written notice provided that, in the case of a Minority Appointment, (i) such Investor Group may only nominate a person who it reasonably believes in good faith will be appointed pursuant to this Agreement; (ii) such person nominated for appointment is not an Unsuitable Director; and (iii) such notice shall also contain that person's credentials and other information deemed appropriate by the relevant Alternative Eligible Investors (the "**Minority Director Notice**");

(b)     each Alterative Investor shall give notice in writing to the Company of its consent or lack of consent to the appointment or removal of such person or persons within five (5) Business Days following receipt by the Alternative Eligible Investors of the Minority Director Notice;

(c)     in circumstances where an Alternative Investor Majority has not been achieved within five (5) Business Days following receipt by the Alternative Investors of the Minority Director Notice, no new Minority Director Notice may be given by an Alternative Eligible Investor until the date falling three (3) months following the date of the Minority Director Notice that failed to achieve an Alternative Investor Majority, at which point the process set out in the process set out in Clause 2.16 shall apply.

2.17    Subject to this Clause 2, each appointment to, and removal from, the Board shall be made by notice in writing served on the Company and shall take effect immediately, save for the first appointments to the Board whose appointments shall, if not previously effected, be made and take effect on the date of this Agreement. The Investor Directors shall not be removed except pursuant to this Clause 2 or in accordance with [Article 55 (*Termination Of Director's Appointment*)].[6] Each Investor Director shall be entitled to appoint any person to be his alternate director.

**Executive Observer**

2.18    The CEO may nominate two Representatives of the Company to attend and observe Board meetings from time to time (and, for the avoidance of doubt, such person shall not be a director, shall not count for the purposes of a quorum and shall have no voting rights). The first such persons shall be Clare Dobbie and Helen Connelly.

**Y Investor Observer**

2.19    Without prejudice to Clause 2.1, for so long as the Y Investor Group holds equal to or more than the Qualifying Shareholding, the Y Investor Group may nominate from time to time one person (the "**Y Investor Group Board Observer**") to attend and speak at meetings of the Board or any committee of the Board. The Y Investor Group Board Observer shall attend such meetings solely in the role of observer and shall not be a director, shall not count for the purposes of a quorum and shall have no voting rights. If the Y Investor Group is no longer entitled to appoint and remove the Y Investor Group Board Observer pursuant to this Clause 2.14, the Y Investor Group shall procure that any Y Investor Group Board Observer so appointed shall immediately be removed and shall no longer be permitted to attend meetings of the Board or any committee of the Board.

**Z Investor Observer**

---

[6] **Note:** To be aligned with the Articles.

EU-DOCS\29742045.10

2.20    Without prejudice to Clause 2.1, for so long as the Z Investor Group holds equal to or more than the Qualifying Shareholding, the Z Investor Group may nominate from time to time one person (the "**Z Investor Group Board Observer**") to attend and speak at meetings of the Board or any committee of the Board. The Z Investor Group Board Observer shall attend such meetings solely in the role of observer and shall not be a director, shall not count for the purposes of a quorum and shall have no voting rights. If the Z Investor Group is no longer entitled to appoint and remove the Z Investor Group Board Observer pursuant to this Clause 2.14, the Z Investor shall procure that any Z Investor Group Board Observer so appointed shall immediately be removed and shall no longer be permitted to attend meetings of the Board or any committee of the Board.

### Observer Rights

2.21    Any Representative or Board Observer appointed to attend a Board meeting under Clauses 2.18, 2.19 or 2.20 respectively may be required by the Board to enter into customary confidentiality undertakings with the Company prior to and as a condition of receiving any Board materials or attending any Board meetings.

### Committees

2.22    Standing committees of the directors of the Company have previously been established by the Board called the remuneration committee (the "**Remuneration Committee**") and audit committee (the "**Audit Committee**").

### Remuneration Committee

2.23    Notwithstanding any prior arrangement, following the date of this Agreement the Remuneration Committee shall be comprised of:

(a)    at least one (1) Non-Executive Director who shall act as the chair of the Remuneration Committee;

(b)    one (1) Executive Director; and

(c)    each of the then appointed Investor Directors (unless they waive such right).

2.24    Each member of the Remuneration Committee shall have one vote on the matters to be decided by the Remuneration Committee. The Remuneration Committee shall act by majority, such majority to include the positive affirmative vote of an Investor Director. The Remuneration Committee shall adopt terms of reference that have been approved by the Board. The Remuneration Committee may approve matters unanimously by providing written consent to such matter.

2.25    The Remuneration Committee shall meet at least twice per year and shall make determinations on all matters concerning general remuneration policy of the Group and the emoluments and fees of any Employee, director, officer or consultant of the Group with a basic salary, fees or remuneration of more than £135,000 per annum (including salary reviews, the setting of bonus levels and performance targets and the granting and review of pensions and other benefits) or such other amount as may be determined by the Board. The Remuneration Committee shall make determinations as regards the adoption of any employee share scheme or any changes or variation to any employee share scheme and shall be empowered, on behalf of the Company, and shall be the vehicle through which any grant of options, warrants or other convertible security or any issue of any equity security under any employee share scheme is made.

EU-DOCS\29742045.10

**Audit Committee**

2.26    Notwithstanding any prior arrangement, following the date of this Agreement, the Audit Committee shall be comprised of:

(a)    at least one (1) Non-Executive Director who shall act as the chair of the Audit Committee;

(b)    one (1) Executive Director; and

(c)    each of the then appointed Investor Directors (unless they waive such right).

2.27    Each member of the Audit Committee shall have one vote on the matters to be decided by the Audit Committee. The Audit Committee shall act by majority, such majority to include the positive affirmative vote of an Investor Director. The Audit Committee shall adopt terms of reference that have been approved by the Board. The Audit Committee may approve matters unanimously by providing written consent to such matter.

2.28    The parties acknowledge and agree that the CFO may be invited by any member of the Audit Committee to attend and speak at the Audit Committee. The CFO shall not be counted for the purposes of the quorum and shall not be entitled to vote on the matters to be decided by the Audit Committee.

2.29    The Audit Committee shall meet at least three times per year and shall review the financial statements of the Group before approval and, as necessary, take advice to be assured that the principles and policies adopted comply with statutory requirements and with the best practices in accounting standards, consult with the external auditors regarding the extent of their work and review with them all major points arising from the auditor's management letters and the responses thereto, seek to satisfy itself that the internal control and compliance environment within the Group is adequate and effective and recommend to the Board the appointment and level of remuneration of the auditors.

**Group Company**

2.30    Each Investor (including those acting as the Investor Majority, where applicable) having the right to appoint or remove directors of the Board and the Board Observers shall, to the fullest extent permitted under Law, be entitled to apply at any time the provisions in this Clause 2 in respect of the appointment and removal of directors of the Board and the Board Observers to the board of directors of each other Group Company *mutatis mutandis* as if set out herein, except that references to the "Board" shall be construed as references to "the board of directors of each Group Company".

3.    **BOARD AND BOARD MEETINGS**

**Board Meeting Frequency**

3.1    The frequency of Board meetings shall be determined by the Board, provided that the Company undertakes to the Investors that it shall procure that at least eight (8) Board meetings shall be held in each calendar year (at not more than seven (7) week intervals).

**Board Meeting Location**

20

3.2     Board meetings shall occur at the Company's principal office in London, United Kingdom (or such other venue specified (with the consent of the Y Investor Director and the Z Investor Director) in the notice of the meeting or by way of telephone or video conference).

**Board Meeting Notice**

3.3     Any director of the Company may call a Board meeting by giving notice of the meeting to the other directors of the Company or by authorising the company secretary or nominated secretary (if any) to give such notice.

3.4     Board meetings shall be convened by giving to the directors not less than five (5) Business Days' notice such notice shall be required to enclose an agenda, the last set of management accounts provided to the directors or the latest management accounts for the Company (if available) and copies of any appropriate supporting papers provided that the directors may unanimously resolve to shorten the time period specified in this Clause 3.4.

**Quorum**

3.5     The quorum for the transaction of business at a meeting of the Board shall be any five (5) eligible directors which shall include each Investor Director appointed from time to time provided that where:

(a)     an Investor Director who has expressly waived their right in writing (including by e-mail) to be part of the quorum of the Board (for either a single meeting of the Board or for any other specified number of meetings of the Board); or

(b)     Investor Directors who are not present at an Adjourned Meeting within one hour from the time appointed for the meeting or cease to be present  (other than for an immaterial period) during any such meeting,

in each case, the relevant Investor Director(s) shall not be required in order for a meeting of the Board to form a quorum and, in circumstances where no Investor Directors are on the Board at the relevant time, no Investor Directors shall be required in order for a meeting of the Board to form a quorum.

3.6     If:

(a)     requested in writing by an Investor Director to the Non-Executive Chairperson;

(b)     within one hour from the time appointed for a meeting of the Board a quorum is not present; or

(c)     during any such meeting a quorum ceases to be present,

the meeting shall stand adjourned to the same day in the next week, at the same time and place or to such later date and at such other time (being not less than 7 days' later) and, subject to Clause 3.2, such place as determined by the Chairman (an "**Adjourned Meeting**").

3.7     If at the Adjourned Meeting a quorum is not present within one hour from the time appointed for the meeting, or during any such meeting a quorum ceases to be present, the directors who are present shall constitute a quorum.

**Voting**

EU-DOCS\29742045.10

3.8      Each director present at a meeting of the Board shall have one vote. If the numbers of votes for and against a proposal at a meeting of directors of the Board are equal, the Chairman or other director chairing the meeting (or part of a meeting) shall have a casting vote.

**Requisite Consent**

3.9      The requisite level of consent for matters to be resolved by the Board shall be a majority approval of the Board:

(a)      which shall require the positive affirmative vote of at least one (1) Investor Director and an Investor Majority in respect of those matters set out in paragraph 1 of Part 2 of Schedule 2 each an "**Approved Matter**";

(b)      which shall require the positive affirmative vote of at least one (1) Investor Director and either an Investor Special Majority or an Investor Super Majority, as applicable, in respect of those matters set out in paragraph 2 of Part 2 of Schedule 2;

(c)      which shall require the positive affirmative vote of at least one (1) Investor Director in respect of those matters set out in paragraph 3 of Part 2 of Schedule 2; and

(d)      which shall require the positive affirmative vote of both (2) Investor Directors in respect of those matters set out in paragraph 4 of Part 2 of Schedule 2 provided that in circumstances where two Investor Directors are on the Board who have been appointed pursuant to Clause 2.11, the positive affirmative vote of only one (1) Investor Director will be required;

(e)      notwithstanding anything to the contrary contained in sub-clauses 3.9(a) to 3.9(b) of this Clause 3.9, if only one (1) Investor Director is on the Board the positive affirmative vote of only one (1) Investor Director will be required; or

(f)      where the matter relates to any other decision of the Board not specified in this Clause 3.1, such matter shall require a vote in favour from one (1) Investor Director,

subject in each case to Clause 11.5(b) and provided that in circumstances where there are no Investor Directors on the Board, for the avoidance of doubt, no Investor Director's affirmative vote shall be required.

3.10      Subject to any delegation of day to day management of the Group to senior management, the directors on the Board are responsible for the management of the Group's business, for which purpose they may exercise all the powers of the Company (or any Group Company). Notwithstanding the provisions of Clause 4.1 and paragraph 2 of Part 2 of Schedule 2, the Board shall:

(a)      be consulted on and, to the fullest extent permitted by Law, shall take all major decisions affecting the Group; and

(b)      be made aware of the details relating to any action that is proposed to be taken in connection with those matters set out in Schedule 2.

4.      **CONDUCT OF BUSINESS AND RESERVED MATTERS**

4.1      The parties acknowledge that it is their intention for the Group to be run in accordance with the principles set out in Part 1 of Schedule 2 (*Conduct of Business*).

EU-DOCS\29742045.10

4.2     Without prejudice to the generality of Clause 3.10 and subject to Clause 3.9, the Board shall be consulted on each of the matters listed in paragraphs 1 and 2 of Part 2 of Schedule 2 and if any such matter is proposed at a meeting of the Board, the majority approval of the Board shall be required before the Company (or any Group Company) carries out any of the Shareholder Reserved Matters.  For the purposes of this Clause 4.2, any monetary thresholds or materiality thresholds included in the Shareholder Reserved Matters shall be deemed not to apply.

4.3     The Company undertakes to each of the Investors that it shall, and shall procure that each other Group Company shall, perform its obligations as set out in Part 1 and Part 2 of Schedule 2 (except to the extent that this would constitute an unlawful fetter on its statutory powers) and each sub-paragraph of Part 1 and Part 2 of Schedule 2 shall be a separate and severable undertaking.

4.4     Where an Approved Matter requires the approval of a greater number of the holders of the A Ordinary Shares to approve such matter under Jersey Companies Law, each holder of A Ordinary Shares undertakes to vote in favour of such matter within fourteen days of being notified to do so by the Company.

4.5     Each holder of A Ordinary Shares hereby appoints the Company (acting by any director on the Board of the Company) to act as its true and lawful attorney in the event that it does not vote in accordance with Clause 4.4, and in such holder's name or otherwise and on its behalf with full power to exercise all rights of such holder and do such acts on behalf of such holder which, in the absolute discretion of the Company acting reasonably, are required in order to approve the Approved Matter under Jersey Companies Law, including but not limited to:

        (a)     receiving notice of, attending and voting at any meeting of the Shareholders or written resolution of the Shareholders, including any meeting or written resolution of the members of any particular class of Shareholder of the Company (as the case may be), and all or any adjournment of such meetings;

        (b)     signing any resolution which is required to be signed by such holder; and

        (c)     otherwise executing, delivering and doing all deeds, instruments and acts in such holder's name as is required in order to approve the Approved Matter.

## 5.     SHAREHOLDER MATTERS

5.1     Where any matter under this Agreement or the Articles requires the consent of the Investors, the Company shall prior to and as a condition to consummating any of the matters requiring such consent, send a written notice to each Investor (subject to Clause 6.9) via the Designated Website that the Company intends to seek the consent of the Investors in relation to this Agreement, the Articles or for any other reason (including in relation to a Shareholder Reserved Matter) and such notice shall identify the applicable matter for which consent is being sought.

5.2     Where an Investor Majority, an Investor Special Majority or an Investor Super Majority (as applicable) has not been achieved within ten (10) Business Days of receipt by the Investors of such a request by the Company for the written consent of the Investors pursuant to the Shareholder Reserved Matters and where this is as a result of Investors holding in aggregate at least the number of outstanding A Ordinary Shares equal to the percentage in number of A Ordinary Shares required in order to obtain an Investor Majority, an Investor Special Majority or an Investor Super Majority (as applicable) not participating in such vote (by casting a vote either in favour or against the relevant Shareholder Reserved Matter(s)), then, the Company shall make a second request for the written consent of the Investors pursuant to the same Shareholder

23

Reserved Matter (the "**Second Request**") and, where an Investor Majority, an Investor Special Majority or an Investor Super Majority (as applicable) has still not been achieved (for any reason) within ten (10) Business Days of receipt by the Investors of the Second Request, then, for the purpose of determining whether an Investor Majority, Investor Special Majority or an Investor Super Majority (as applicable), has been obtained in relation to the Second Request:

(a)     the prior written consent of an Investor Majority shall be deemed obtained where the Investors who, in aggregate hold a majority in number of the issued A Ordinary Shares held by those Investors who have cast a vote within ten (10) Business Days of the Second Request, vote in favour;

(b)     the prior written consent of an Investor Special Majority shall be deemed obtained where the Investors who, in aggregate hold more than two thirds in number of the issued A Ordinary Shares held by those Investors who have cast a vote within ten (10) Business Days of the Second Request, vote in favour; and

(c)     the prior written consent of an Investor Super Majority shall be deemed obtained where the Investors who, in aggregate hold a number of A Ordinary Shares that represents two thirds or more of the total issued A Ordinary Shares held by those Investors who have cast a vote within 10 Business Days of the Second Request, vote in favour.

5.3     The Company shall call a general meeting of the Shareholders or hold a vote of the Shareholders in accordance with the terms of this Agreement (including in connection with any matter that requires the consent of the Investor Majority pursuant to the terms of this Agreement) once the Company has received requests to do so from Investors (together with any of their Affiliates) holding a number of A Ordinary Shares representing 10% or more of the total issued A Ordinary Shares.

5.4     Pursuant to Article 87(4) of the Jersey Companies Law, the Shareholders agree to dispense with the requirement of the Company to hold annual general meetings.

6.     **PROVISION OF INFORMATION**

6.1     The Company will perform its obligations as set out in Schedule 3.

6.2     The Company shall deliver to each Investor or Investor Group the information specified in Schedule 3.

6.3     The Company shall deliver to the Y Investor Group and the Z Investor Group such information as reasonably requested by such Investor Groups in order to comply with any reporting requirements connected to their or their Affiliates' status as a public company. The Y Investor Group and the Z Investor Group shall be entitled to publicly disclose any such information provided by the Company pursuant to this Clause 6.3 provided that such disclosures are in line with the relevant Investor Group's historical practice for such public disclosures or to the extent that it is required to be disclosed by Law, the rules of any relevant stock exchange or by any competent regulatory authority.

6.4     Except as required by Law, the Company shall be entitled to withhold any information from an Investor that is a Competitor/Supplier Entity.

6.5     An Investor shall promptly notify the Company if it or any member of its Investor Group becomes a Competitor/Supplier Entity.

EU-DOCS\29742045.10

6.6     The Company shall promptly notify the Investors of an Y Investor Group 15% Scenario and/or a Z Investor Group 15% Scenario.

6.7     If the Company fails to provide any of the information referred to in this Clause 6 within the applicable period specified therein, an Investor Majority shall, without prejudice to any other rights the Investors may have, be entitled to appoint a firm of accountants to produce such information at the Company's expense and the Company agrees to provide, and shall procure that all Group Companies provide, all information and assistance required by such accountants for that purpose.

6.8     To the extent permitted by Law, the Company may satisfy its obligations under this Agreement to deliver any information, notices and/or communication under this Agreement or in connection with the matters contemplated herein in relation to those Investors (the "**Website Investors**") who accept this method of communication (and for the avoidance of doubt each Investor shall be deemed to accept this method of communication unless it has expressly notified the Company to the contrary) by posting (either directly or by way of another Group Company posting) this information, notice and/or other communication onto an electronic website designated by the Company (the "**Designated Website**") if each Website Investor is aware of the address of and any relevant password specifications for the Designated Website.

6.9     If any Investor (a "**Non-Website Investor**") does not agree to the delivery of information through the Designated Website then it shall notify the Company accordingly and the Company shall supply the information to such Non-Website Investor in accordance with Clause 23.1(a) to 23.1(e).

6.10    The Company shall (or shall procure that one of its Representatives shall) supply each Website Investor with the address of and any relevant password specifications for the Designated Website following designation of that website by the Company.

6.11    The Company shall promptly upon becoming aware of its occurrence notify (or shall procure notification of) the Website Investors if:

(a)     the Designated Website cannot be accessed due to technical failure;

(b)     the password specifications for the Designated Website change;

(c)     any new information which is required to be provided under this Agreement is posted onto the Designated Website;

(d)     any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

(e)     the Company becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

6.12    If the Company notifies (or procures the notification of) the Website Investors under Clause 6.11(a) or Clause 6.11(e) above, all information to be provided by the Company under this Agreement after the date of that notice shall be supplied in accordance with Clause 23.1(a) to 23.1(e) until the Company is satisfied that the circumstances giving rise to the notification are no longer continuing.

25

7.    **PRE-EMPTION ON NEW ISSUE**

7.1    Subject to Clause 7.2, if from time to time a Group Company proposes to issue any Shares, equity securities, other shares, debt securities or debt in the capital of the Company (or other Group Company) or other securities or instruments convertible into any Shares, equity securities, other shares, debt securities or debt in the capital of the Company (or other Group Company) (excluding any debt, loan, facility, asset based lending arrangement, operating facility, capital expenditure facility, forex, hedging or derivative contract that a Group Company requires for the operation of the business in the ordinary course of trading) ("**Relevant Securities**") that has, in each case, been approved by an Investor Special Majority or an Investor Super Majority (as the case may be) pursuant to Clause 4.3 and paragraph 2(f) of Part 2 of Schedule 2, the Company shall procure that:

(a)    no such Relevant Securities will be so issued unless such issuance has been made pursuant to this Clause 7.1(a) and each Qualifying Ordinary Shareholder has first been given an opportunity which shall remain open for not less than ten (10) Business Days (such date as chosen being the "**End Date**") to subscribe, at the same time and on the same terms (including the same price per Relevant Security), for his or its Relevant Entitlement. Such opportunity shall be offered to each Qualifying Ordinary Shareholder in the form of a notice in writing from the Company (the "**New Issue Notice**");

(b)    the New Issue Notice shall indicate the total number of Relevant Securities to be issued and their respective proportions, the Relevant Entitlement of each Qualifying Ordinary Shareholder and the subscription price of each Relevant Security and each Other Security. If and to the extent that a Qualifying Ordinary Shareholder wishes to accept the offer set out in the New Issue Notice and subscribe for any or all of his or its Relevant Entitlement either through itself or an Affiliate, he or it shall give notice of such acceptance in writing to the Company on or before the End Date (each such notice, an "**Acceptance Notice**" and each Qualifying Ordinary Shareholder giving such Acceptance Notice, a "**Participating Shareholder**"), failing which the Qualifying Ordinary Shareholder (as applicable) shall be deemed to have declined to subscribe for any of his or its Relevant Entitlement in connection with the New Issue Notice.  Any Acceptance Notice given by a Participating Shareholder pursuant to this Clause 7.1(b) shall be irrevocable;

(c)    if by 5.00 p.m. on the End Date, the Company has not received Acceptance Notices in an amount equal to the Relevant Securities the subject of the New Issue Notice (the Relevant Securities in respect of which no Acceptance Notice has been received being the "**Excess Securities**"), the Board shall offer such Excess Securities to the Participating Shareholders. Such Participating Shareholders shall be given a further reasonable period of time (being not less than five (5) Business Days, such date chosen being the "**Second End Date**") to apply to subscribe for such number of Excess Securities as they wish (save that the Excess Securities may be subscribed for by an Affiliate of such Participating Shareholder in place of that Participating Shareholder) and on the same terms (including the same price per Relevant Security and the same price per Other Security) on which that Participating Shareholder agreed to subscribe for the Relevant Securities pursuant to the New Issue Notice. If there are applications by Participating Shareholders for, in aggregate, a greater number than the number of Excess Securities, they shall be satisfied pro rata to the numbers applied for by each relevant Participating Shareholder;

(d)    within five (5) Business Days of the End Date (or the Second End Date, as applicable), the Company shall give notice in writing to each Participating Shareholder of:

26

(i) the number and price of the Relevant Securities (and Excess Securities, as applicable) for which that Participating Shareholder has committed to subscribe; and

(ii) the place and time on which the subscription is to be completed and the account details for the telegraphic transfer of the required subscription price; and

(e) if, following the procedure set out in this Clause 7.1, there still remain any Relevant Securities for which Qualifying Ordinary Shareholders have either (i) not committed to subscribe; or (ii) failed to make a payment at the required time in connection with their commitment to subscribe for, then such Relevant Securities may be allotted to such persons (who may or may not be existing shareholders in the Company) (but excluding any Competitor/Supplier Entity) as the Board may nominate, provided that the terms of such allotment are the same as those previously offered to the Qualifying Ordinary Shareholders.

7.2 Each party agrees that Clause 7.1 shall not apply to:

(a) an issue of Relevant Securities in connection with an Accelerated Securities Issue that has been approved by an Investor Special Majority or an Investor Super Majority (as the case may be) pursuant to Clause 4.3 and paragraph 2(f) of Part 2 of Schedule 2) and that, for the purposes of implementing an Accelerated Securities Issue, the Board (with the approval of an Investor Special Majority or an Investor Super Majority (as the case may be) pursuant to Clause 4.3 and paragraph 2(f) of Part 2 of Schedule 2) may, subject to Clause 7.5, determine the number of Relevant Securities to be issued and the timing and other terms of that issue;

(b) an issue of Relevant Securities to any wholly owned Group Company;

(c) an issue of C Ordinary Shares and D Ordinary Shares as part of the Management Incentive Plan as approved by the Remuneration Committee;

(d) an issue of Relevant Securities approved by an Investor Special Majority or an Investor Super Majority (as the case may be) pursuant to Clause 4.3 and paragraph 2(f) of Part 2 of Schedule 2 as non-cash consideration to an independent third party for the purposes of a corporate acquisition, merger or joint venture proposed by the Board on arm's length terms that has been approved pursuant to paragraph 1(b) or paragraph 2(a) of Part 2 of Schedule 2 (if applicable);

(e) an issue of Relevant Securities that has been approved pursuant to paragraph 2(g) of Part 2 of Schedule 2; or

(f) an issue of Relevant Securities issued:

(i) pursuant to the Subscription Agreement; or

(ii) in connection with the Additional PIK Facility (on or around the same time as an advance under the Additional PIK Facility), such issuance being in the same proportion to the Additional PIK Facility as represents the proportion of A Ordinary Shares issued in respect of the PIK Facility.

27

7.3     If the Board (with the approval of an Investor Special Majority or an Investor Super Majority (as the case may be) pursuant to Clause 4.3 and paragraph 2(f) of Part 2 of Schedule 2) proposes an Accelerated Securities Issue it shall, so far as is reasonably practicable (taking into account the urgency of the Group's financing requirements) and permitted under Law, give prior written notice of a reasonable period of time (being not less than fifteen (15) Business Days) to each Investor of any such Accelerated Securities Issue and, notwithstanding any other provision in this Agreement or in the Articles, each party shall:

(a)     consent to any board or shareholders' meeting of a Group Company being held on short notice to implement the Accelerated Securities Issue and procure that any director appointed by it or him will so consent (subject always to his fiduciary duties);

(b)     vote in favour of all resolutions as a shareholder of the relevant Group Company, which are proposed by the Board to implement the Accelerated Securities Issue; and

(c)     procure the circulation to the board of directors or shareholders of the relevant Group Company of such board or shareholder written resolutions (respectively) proposed by the Board to implement the Accelerated Securities Issue and (subject to their fiduciary duties as a director of the relevant Group Company) to sign (or to the extent permitted by Law in the case of a written resolution, to indicate their agreement to) such resolutions and return them (or the relevant indication) to the Company as soon as reasonably practicable.

7.4     If an Investor fails to comply with its obligations under Clause 7.3, the Board may (and shall, if requested by an Investor Special Majority) authorise any director to execute, complete and deliver as agent for and on behalf of that Investor:

(a)     a written consent to any board or shareholders' meeting of any Group Company being held on short notice to implement the Accelerated Securities Issue;

(b)     any shareholder written resolutions of the relevant Group Company which are proposed by the Investor Majority to implement the Accelerated Securities Issue;

(c)     a proxy form appointing any director as that Investor's proxy to vote in his name and on his behalf in favour of all resolutions proposed at a shareholders' meeting of the relevant Group Company which are proposed by the Investor Majority to implement the Accelerated Securities Issue; and

(d)     any other documents required to be signed by or on behalf of that Investor in connection with the Accelerated Securities Issue.

7.5     Within ten (10) Business Days of an Accelerated Securities Issue each Qualifying Ordinary Shareholder shall be given notice (the "**Accelerated Securities Issue Notice**") (such Accelerated Securities Issue Notice shall contain the same information as is required for a New Issue Notice pursuant to Clause 7.1(b)) of the opportunity, which shall remain open for not less than twenty (20) Business Days to subscribe for (or otherwise acquire, from those Investors that opt to participate in such a sale, provided each Investor has been given a reasonable opportunity to participate in such a sale) such number of Relevant Securities (the "**Catch-Up Subscription**") which, if subscribed for or acquired in full, would result in such Qualifying Ordinary Shareholder's proportionate holding of such Relevant Securities following the Catch-Up Subscription and the Accelerated Securities Issue equalling such Qualifying Ordinary Shareholder's proportionate holding of the Qualifying Ordinary Shares immediately prior to the

28

Accelerated Securities Issue (and assuming for these purposes that any other Qualifying Ordinary Shareholders exercised their subscription rights in full).

7.6    The parties agree and acknowledge that the Holding Period Trustee shall not (and shall not be required by any Investor to) exercise any pre-emption or catch-up rights under this Clause 7.

8.    **MANAGEMENT INCENTIVE PLAN AND POWER OF ATTORNEY**

8.1    Each party agrees to approve any resolution and sign any documentation in connection with implementing a new management incentive plan following the date of this Agreement which shall be available for the Executive Directors, the Non-Executive Directors and Employees that has been approved by the Remuneration Committee in consultation with the Board and in accordance with the Equity Term Sheet (the "**Management Incentive Plan**"), including but not limited to passing resolutions authorising the new issuance of shares pursuant to the Management Incentive Plan, the allocation of which shall be determined following the date of this Agreement, and procuring that any amendments to this Agreement and/or the Articles required to implement the Management Incentive Plan are given effect.

8.2    Nothing in this Clause 8 shall prejudice the Investors' rights pursuant to Clause 4.3 and Part 2 of Schedule 2.

8.3    Each party hereby appoints the Company (acting by any director on the Board of the Company) to act as its true and lawful attorney and in its name or otherwise and on its behalf with full power to exercise all its rights and do such acts on its behalf which, in the absolute discretion of the Company acting reasonably and at the direction of the Remuneration Committee in consultation with the Board, are required in order to implement the Management Incentive Plan, including but not limited to:

(a)    receiving notice of, attending and voting at any general meeting of the shareholders of the Company, including any meeting of the members of any particular class of shareholder of the Company, and all or any adjournment of such meetings, including for the purposes of Part 2 of Schedule 2;

(b)    signing any resolution as a registered holder of Ordinary Shares;

(c)    completing and returning proxy cards, consents to short notice and any other documents required to be signed by the registered holder of Ordinary Shares; and

(d)    otherwise executing, delivering and doing all deeds, instruments and acts in its name insofar as may be done in its capacity as registered holder of Ordinary Shares.

8.4    The power of attorney in Clause 8.3 shall be irrevocable save to the extent agreed in writing by an Investor Majority.

9.    **ROLE OF THE HOLDING PERIOD TRUSTEE**

9.1    It is expressly understood and agreed by the parties that this Agreement is executed and delivered by the Holding Period Trustee not individually or personally but solely in its capacity as Holding Period Trustee in the exercise of the powers and authority conferred and vested in it under the Holding Period Trust Agreement. It is further understood by the parties that in no case shall the Holding Period Trustee be:

29

(a)     responsible or accountable in damages or otherwise to any other party for any loss, damage or claim incurred by reason of any act or omission performed or omitted by it without fraud, gross negligence or wilful misconduct in accordance with this Agreement and in a manner that the Holding Period Trustee believed to be within the scope of the authority conferred on the Holding Period Notes Trustee by this Agreement and the Holding Period Trust Agreement or by Law; or

(b)     personally liable for or on account of any of the statements, representations, warranties, covenants or obligations stated to be those of any other party, all such liability, if any, being expressly waived by the parties and any person claiming by, through or under such party, provided however, that a Holding Period Trustee shall be liable under this Agreement for its own fraud, gross negligence or wilful misconduct.

9.2     It is also acknowledged that the Holding Period Trustee shall not have any responsibility for the actions of any individual Shareholder.

9.3     The Holding Period Trustee shall, at all times, act in accordance with the terms set forth in the Holding Period Trust Agreement.

9.4     In acting or otherwise exercising its rights or performing its duties under this Agreement or the Holding Period Trust Agreement, the Holding Period Trustee shall act in accordance with the provisions of this Agreement and the Holding Period Trust Agreement and shall seek any necessary instruction or direction in accordance with the Holding Period Trust Agreement and where it so acts on such instructions or directions, the Holding Period Trustee shall not incur any liability to any person for so acting.  In so acting, the Holding Period Trustee shall have all the rights, benefits, protections, indemnities and immunities set out in this Agreement and the Holding Period Trust Agreement.

9.5     In the event there is an inconsistency or conflict between the rights, duties, benefits, obligations, protections, immunities or indemnities of the Holding Period Trustee as contained in this Agreement, on the one hand, and the Holding Period Trust Agreement, on the other hand, the provisions in the Holding Period Trust Agreement shall prevail and apply.

9.6     The Holding Period Trustee shall not have any obligation to take any action under this Agreement unless it is indemnified and/or secured to its satisfaction (whether by way of payment in advance or otherwise) by the Company or the Shareholders. The Holding Period Trustee is not required to indemnify any other person, whether or not a party in respect of the transactions contemplated by this Agreement.

9.7     The Holding Period Trustee shall be under no obligation to instruct or direct any Investor to take any action unless it shall have been instructed to do so in accordance with the Holding Period Trust Agreement and indemnified and/or secured to its satisfaction.

9.8     The Holding Period Trustee shall not be required to give any bond or surety with respect to the performance of its duties or the exercise of its powers under this Agreement.

9.9     The provisions relating to the Holding Period Trustee contained in the Holding Period Trust Agreement are for the benefit of the Holding Period Trustee and shall survive the discharge or termination of the Holding Period Trust Agreement and the replacement or resignation of the Holding Period Trustee.

EU-DOCS\29742045.10

10.     **FEES, COSTS AND EXPENSES**

10.1    Subject to any amounts as agreed in writing between the Company and any or all of the Investors to be borne by any Group Company, each party shall bear its own costs and expenses in relation to the preparation, negotiation and completion of this Agreement.

10.2    All costs and expenses incurred by the Holding Period Trustee in relation to this Agreement shall be subject to the terms of the Holding Period Trust Agreement, in respect of any action taken by the Holding Period Trustee in its capacity as such.

10.3    The Company agrees to reimburse:

(a)     any director with the reasonable costs and out of pocket expenses incurred by them in connection with the performance of their duties as directors of the Company (or other Group Company), including attending meetings of any Group Company or carrying out authorised business on behalf of the Group; and

(b)     any Y Investor Group Board Observer, Z Investor Group Board Observer and Representative with the reasonable costs and out of pocket expenses incurred by them in connection with attending meetings of the Board,

including, for the avoidance of doubt, reasonable costs associated with flights and travel arrangements in line with the Group's expenses policies or as approved by the Remuneration Committee.

10.4    The Company agrees to pay any Investor Director that is not an Employee or an employee of an Investor, a reasonable and customary director's fee which shall be consistent with market practice and subject to an aggregate maximum amount to be determined by the Remuneration Committee per annum per Investor Director (which shall be reduced pro rata for periods of less than a year) payable on each anniversary of the date of this Agreement and immediately prior to an Exit.

10.5    All fees payable under this Agreement shall be exclusive of value added tax or any similar Taxes which shall be chargeable, if applicable, in addition to the fees set out herein.

11.     **EXIT**

11.1    The parties shall co-operate in good faith to work towards an Exit (including determining an appropriate plan to achieve an Exit). Notwithstanding the foregoing, it is acknowledged that no undertaking is given by any party that an Exit will occur.

11.2    It is agreed by the parties that:

(a)     the Board intends to appoint financial advisors (the "**Financial Advisors**") within six (6) months of the date of this Agreement to undertake a strategic review of the operations of the Group including, but not limited to, assessing whether any value accretive or other corporate activities are available to the Company and the Investors (the "**Strategic Review**");

(b)     the Board shall consider and discuss the Strategic Review including, for the avoidance of doubt, the choice of the Financial Advisors to provide the Strategic Review, in good faith at a meeting of the Board;

31

(c)     any actions required to be taken by any Group Company in connection with the Strategic Review including, for the avoidance of doubt, the appointment of the Financial Advisors, but excluding an Exit, shall not require approval from the Investor Directors; and

(d)     the Board shall have no legal obligation pursuant to this Agreement or otherwise to implement the Strategic Review including, for the avoidance of doubt, implementing any value accretive or other corporate activities identified in the Strategic Review but shall discuss and consider the outcome of the Strategic Review in good faith.

11.3    The Board may at any time, and shall, no later than three (3) years following the date of this Agreement, pursue an Exit and, following such decision, the Company (at the cost of the Company) shall appoint relevant advisers to advise on the proposed Exit (as appropriate). The Board shall use reasonable endeavours to complete an Exit no later than the date that is four (4) years following the date of this Agreement (the "**Exit Date**").

11.4    In the event that an Exit has not occurred by the Exit Date and the requirement to implement an Exit has not been waived by two (2) Investor Directors, the Investor Special Majority may serve a notice on the Board to set a new Exit Date (and Clause 11.3 shall apply any such new Exit Date).

11.5    In the event that the Board fails to comply with its obligations in Clause 11.3 or 11.4 or an Exit is not completed by the Exit Date:

(a)     the Investor Special Majority shall be entitled to appoint such minimum number of additional Investor Directors to the Board to implement an Exit (and only for the period in which the Investor Special Majority continues to actively seek to implement an Exit following which such additional Investor Directors shall resign) such that a majority in number of the directors on the Board shall be comprised of directors appointed by the Investor Special Majority (and the Director Quota shall be increased accordingly); and

(b)     notwithstanding any other provision of this Agreement, any action by the Group in connection with an Exit that is contained in Schedule 2 or otherwise shall require the consent of only one Investor Director including, for the avoidance of doubt, the appointment of the Financial Advisors.

11.6    The Investors severally undertake to the Company that, in circumstances where an Investor is directly or indirectly involved in an Exit as the acquirer of Shares, loan notes, securities or debentures (or any rights to acquire Shares, loan notes, securities or debentures) in the Company or any other Group Company, such Investor shall provide the Board with written notice declaring the nature and extent of its interest in the Exit and any Investor Director or Board Observer appointed by such Investor shall recuse himself from any meeting of the Board at which the Exit is discussed or decisions regarding the Exit are determined and where a conflict of interest may arise.

11.7    If the Board proposes an Exit, the Company shall, and shall procure that each Group Company shall, take such steps (as a shareholder, director, Employee or otherwise), execute such documents, pass such resolutions or otherwise give such cooperation and assistance to implement the Exit or any Pre-Exit Reorganisation (as defined below) as is required by the Board. In the case of the Company, such steps shall include the preparation of an information memorandum, the giving of presentations to potential purchasers, investors, financiers and their advisers and the provision of assistance in any syndication process or the voting of any shares or giving of any class consents in accordance with the Board's reasonable requirements as is necessary or desirable to facilitate the Exit or Pre-Exit Reorganisation.

32

11.8    It is agreed by the parties that, in the event of an Exit, the Investors and the Investor Directors will not be required to give any representations, warranties, indemnities or restrictive covenants in connection therewith to any person, save for:

(a)    a warranty given by each Investor as to title to any Shares it is to sell and as to its capacity to sell such Shares; and

(b)    if applicable, a customary leakage indemnity given by each Investor in respect of leakage (as defined in the sale and purchase agreement entered into in connection with the Exit) from the date of the accounts of the Company (or any other Group Company) being used as the locked box accounts up until the date of completion of the Exit, which shall endure for a period of six (6) months from the date of completion of the Exit and which shall be given by each Investor in respect of itself only on a several basis.

11.9    Each of the parties acknowledges and agrees that immediately prior to, but conditional upon, an Exit the share capital of any relevant Group Company may, as reasonably determined by the Board and approved by an Investor Majority, be reorganised for the purpose of enabling or assisting an Exit to occur (a "**Pre-Exit Reorganisation**") and each party agrees to take such action (including voting in favour of relevant resolutions of the Company) and give such cooperation and assistance as the Board may reasonably request to effect a Pre-Exit Reorganisation and shall act reasonably to consider in good faith any other arrangements that may be proposed by the Board or the Investors to facilitate or implement such Exit, in each case, provided that the Pre-Exit Reorganisation would not be materially and/or disproportionately adverse to the economic, tax or legal position of any Investor or its Investor Group as compared to any other Investor or its Investor Group.

11.10    Promptly following an Asset Sale, the Company shall take such steps (insofar as it has the power to do so) as are necessary to achieve a Winding-Up and to distribute the surplus assets of the Group in accordance with the Articles as soon as reasonably practicable following completion of such Asset Sale.

11.11    Where there is an IPO it is the parties' intention that such IPO shall extend to the Shares, or shares in any Group Company or in a New Holding Company that is the subject of the Exit as a result of a Pre-Exit Reorganisation, held by the Investors. The Investors (and their nominees**)** shall be entitled to deal freely in any Shares, or shares in any Group Company or in a New Holding Company that is the subject of the Exit as a result of a Pre-Exit Reorganisation, held by them in respect of which permission has been granted for dealings on any stock exchange, subject to any orderly marketing arrangements required or advised by any underwriter or financial adviser appointed to act for the Company in relation to the IPO.

11.12    Each Investor acknowledges that, in the event of an IPO, they will agree such reasonable restrictions on the disposal of their Shares or shares in any Group Company or in a New Holding Company that is the subject of the IPO as a result of a Pre-Exit Reorganisation (or those held by their permitted transferees) for a reasonable period after the IPO, provided that these restrictions apply to all Investors equally, unless otherwise agreed by an Investor Majority.

11.13    The Company agrees that it will immediately notify the Investor Directors of any bona fide approach from a third party who is potentially interested in acquiring shares or other securities (including debt securities) in any Group Company or acquiring a substantial part of the business or assets of the Group (a "**Prospective Buyer**").

EU-DOCS\29742045.10

11.14   The parties agree that on an Exit all proceeds shall be distributed in accordance with Article [9] (*Return of Capital*) or Article [10] [7]  (*Apportionment of Consideration on a Sale or IPO*) of the Articles and each party shall take such actions as they are reasonably able to give effect thereto.

11.15   In the event that the share capital structure of the Company is replicated in all material respects in a New Holding Company, this Agreement shall apply mutatis mutandis to such New Holding Company as if it was the Company (and the New Holding Company shall agree to adhere to and be bound by the provisions of this Agreement), with such amendments as may be determined by the Board acting in good faith.

## 12.    CONFIDENTIALITY AND ANNOUNCEMENTS

12.1    Subject to Clauses 12.2 to 12.4, each party:

   (a)    shall treat as strictly confidential:

      (i)    the provisions of this Agreement and the process of its negotiation; and

      (ii)    all documents, materials and other information (whether technical, commercial or otherwise) which were received or obtained by him or it as a result of entering into, or pursuant to, this Agreement and which are not in the public domain,

      (together "**Confidential Information**"); and

   (b)    shall not, except with the prior written consent of the party from whom the Confidential Information was obtained (which shall not be unreasonably withheld or delayed), make use of (save for the purposes of performing his or its obligations under this Agreement) or disclose to any person any Confidential Information.

12.2    Subject to compliance with applicable Law, each party may for the purposes contemplated by this Agreement disclose Confidential Information to the following persons ("**Representatives**"):

   (a)    its professional advisers, auditors, bankers, finance providers (including potential finance providers) who have provided financing or are to provide financing in connection with the purchase of any Shares held by an Investor and insurers (in each case, acting as such and where applicable);

   (b)    its partners, directors, officers, employees and consultants;

   (c)    any bona fide investor (or proposed investor) or Prospective Buyer and to their professional advisers;

   (d)    any other Investor, its and their respective Affiliates and each of their respective Representatives;

   (e)    any general partner in, or any trustee, nominee, custodian, operator or manager of, that Investor or any of its Affiliates or any group undertaking of any of the foregoing; and

   (f)    any person holding shares for investment purposes which has the same general partner, trustee, nominee, custodian, operator, manager or adviser as that Investor or any of its

---

[7]**Note:** To be aligned with the Articles.

EU-DOCS\29742045.10

Affiliates or any such fund which is advised, or the assets of which (or some material part thereof) are managed (whether solely or jointly with others), by that Investor or any of its Affiliates,

and further, provided that such recipients are informed of the confidential nature of the Confidential Information and the provisions of this Clause 12, and:

(g)     in the case of the recipients set out in Clause 12.2(a) and 12.2(c), have entered into a confidentiality undertaking with or for the benefit of the Company to comply with this Clause 12 as if they were a party to it;

(h)     in the case of the recipients set out in Clause 12.2(d), 12.2(e) and 12.2(f), have entered into a confidentiality undertaking to comply with this Clause 12 as if they were a party to it or are otherwise bound by requirements of confidentiality to a Group Company in relation to the Confidential Information they receive; or

(i)     in the case of the recipients set out in Clause 12.2(b), are instructed to comply with this Clause 12 as if they were a party to it,

provided that, in each case, the prior written consent of the Company (not to be unreasonably withheld, delayed or conditioned) shall be required before any Confidential Information is disclosed to a Competitor/Supplier Entity pursuant to this Clause 12.

12.3    Each party may disclose Confidential Information if and to the extent requested or required by Law, any securities exchange, Tax Authority, or competent governmental or regulatory authority or any order of any court of competent jurisdiction, provided that (to the extent permitted by Law) such party consults with the Company as to the contents of such disclosure (unless, by reason of any deadlines or other onerous terms or obligations imposed by such requests or orders, it would be unreasonable for such party to consult with the Company, in which case such party must promptly notify the Company of such disclosure) and, in any event, discloses only the minimum amount necessary in order to satisfy such requirement.

12.4    Subject to their respective fiduciary duties to the Company and in compliance with applicable Law, each Investor Director may disclose to the Investors by whom he was appointed, any of its respective Affiliates, or each of its Representatives, such information concerning the Group as he thinks fit, provided that the prior written consent of the Company (not to be unreasonably withheld, delayed or conditioned) shall be required before any Confidential Information is disclosed to a Competitor/Supplier Entity.

12.5    Each of the parties undertakes to the Company and the Investors that he or it shall not make any announcement (otherwise than as required by Law or by the Financial Conduct Authority or by any relevant stock exchange (including the rules relating to The International Stock Exchange)) concerning this Agreement or the Group without the prior written consent of any Investor named in such announcement and the Company. Where an announcement is required by Law or by the Financial Conduct Authority or by any relevant stock exchange the terms of any such announcement shall be the subject of prior consultation between the relevant parties (unless, by reason of any deadlines or other onerous terms or obligations imposed by such requests or orders, it would be unreasonable for the relevant parties to so consult with each other, in which case the party making the announcement must promptly notify the Company and the other Investors of such disclosure). Nothing in this Clause 12 shall prevent any party making an announcement which contains only information which was contained in an announcement previously made in compliance with this Clause 12 or in published accounts of any Group Company.

EU-DOCS\29742045.10

Communications with investors and/or potential investors in any of the Investors, any of their Affiliates, any funds managed by any of the Investors or any of their Affiliates shall not constitute announcements for the purpose of this Clause 12.5.

13.    **STAPLE**

13.1    Notwithstanding any other provisions of this Agreement or the Articles, and subject to the approval of an Investor Special Majority to disapply the effect of this Clause 13 or any equivalent provision under the PIK Facility Agreement or Junior Debt Agreement, each Investor agrees that during the Stapled Period it shall not (and if applicable, shall procure that its Affiliates shall not) transfer to any person:

(a)    any A Ordinary Shares unless at the same time it (or it procures that its Relevant Affiliate(s)) assigns its rights in and/or transfers its rights and obligations under and/or assigns or transfers its economic interest in the PIK Facility or the Additional PIK Facility equal to the Staple Amount to the same transferee (or its Relevant Affiliate(s)) in accordance with the PIK Facility Agreement; and

(b)    any B Ordinary Shares unless at the same time it (or it procures that its Relevant Affiliate(s)) assigns its rights in and/or transfers its rights and obligations under and/or assigns or transfers its economic interest in the Junior Debt equal to the Staple Amount to the same transferee (or its Relevant Affiliate(s)) in accordance with the Junior Debt Agreement.

14.    **RIGHT OF FIRST OFFER**

14.1    Notwithstanding any other provisions of this Agreement or the Articles, any transfer of A Ordinary Shares (other than an Internal Transfer) that represents a number of A Ordinary Shares that is equal to 0.5% or more of the total issued A Ordinary Shares in issue (the "**Sale Shares**") by an A Ordinary Shareholder (a "**Seller**") to a third party shall be subject to the pre-emption rights contained in this Clause 14 and the stapling obligations in Clause 13.1(a).

14.2    A Seller shall, subject to Clause 6.9, before transferring or agreeing to transfer any Sale Shares:

(a)    appoint an agent or broker who shall list the Sale Shares on the Designated Website;

(b)    give notice in writing (a "**Listing Notice**") via the Designated Website specifying:

(i)    the total number of Sale Shares proposed to be transferred by the Seller; and

(ii)    the price per A Ordinary Share at which the Seller wishes to transfer the Sale Shares (the "**Transfer Price**").

14.3    No Listing Notice submitted to the Designated Website pursuant to Clause 14.2 may be withdrawn.

14.4    The A Ordinary Shareholders who are not the Seller (the "**Continuing Shareholders**") shall have ten (10) Business Days following the date that the Listing Notice is published on the Designated Website (the "**Response Period**") to apply in writing, subject to Clause 6.9, via the Designated Website (the "**Response Notice**") for the maximum number of Sale Shares they wish to buy.

14.5    If, at the end of the Response Period, the number of Sale Shares applied for is equal to or exceeds the number of Sale Shares, the Seller shall allocate the Sale Shares to each Continuing

EU-DOCS\29742045.10

Shareholder who has applied for Sale Shares in the proportion (fractional entitlements being rounded to the nearest whole number) which his or its existing holding of A Ordinary Shares bears to the total number of A Ordinary Shares held by those Continuing Shareholders who have applied for Sale Shares. This procedure shall be repeated until all Sale Shares have been allocated but no allocation shall be made to a Continuing Shareholder of more than the maximum number of Sale Shares which he or it has stated he is willing to buy.

14.6    The Seller shall, when offers for all of the Sale Shares have been received or promptly after the Response Period, give written notice to the Continuing Shareholders that have given a Response Notice of the final allocations (subject to Clause 6.9) via the Designated Website (an "**Allocation Notice**"). The Allocation Notice shall specify the number of Sale Shares allocated to each Continuing Shareholder and the place and time (being not less than 10 Business Days nor more than 20 Business Days after the date of the Allocation Notice) for completion of the transfer of the Sale Shares.

14.7    Upon service of an Allocation Notice relating to all of the Sale Shares, the Seller must, subject to receipt of the Transfer Price per A Ordinary Share, transfer the Sale Shares within twenty (20) Business Days of the end of the Response Period (such period to be extended, upon the Seller's request to the Company, if required due to any mandatory anti-trust or regulatory approval period) and in accordance with the requirements specified in it.

14.8    If the Seller does not receive any response to its Listing Notice; or the Allocation Notice delivered to the Seller does not relate to all of the Sale Shares; or a Continuing Shareholder fails to complete the transfer of the Sale Shares in accordance with Clause 14.7 (each a "**Default**"), then, subject to Clause 14.10, the Seller may:

(a)    give notice to relevant Continuing Shareholders who have responded to a Response Notice that there is a Default. If a Default exists the Seller will be entitled to sell the Sale Shares to any person at a price at least equal to the Transfer Price per A Ordinary Share within fifty (50) Business Days after the end of the Response Period (such period to be extended, upon the Seller's request to the Company, if required due to any mandatory anti-trust or regulatory approval period) ("**Completion Period**").

14.9    The right of the Seller to transfer Shares under Clause 14.8 shall not apply if:

(a)    the transferee is a Competitor/Supplier Entity; or

(b)    the sale of the Sale Shares is not bona fide or the price is subject to a deduction, rebate or allowance to the transferee.

14.10    In circumstances where the transfer of the Sale Shares is not completed during the Completion Period, the Seller shall retain the Sale Shares and the Seller shall not be entitled to propose a transfer of his or it's A Ordinary Shares, otherwise than in accordance with Article [12] [8] (*Share Transfers: General*) of the Articles, in the six (6) months following the end of the Completion Period.

14.11    The Seller shall bear its own costs and expenses in relation to the transfer or attempted transfer of any Sale Shares pursuant to Clause 14.

---

[8] **Note:** To be aligned with the Articles.

EU-DOCS\29742045.10

15.    **INCREMENTAL ISSUE**

15.1    From time to time the Company shall automatically issue A Ordinary Shares and B Ordinary Shares ("**Incremental Shares**") to each Additional Facility Lender and each Junior Debt Holder immediately upon receipt by the relevant Group Company of the amount provided by the relevant Additional Facility Lenders pursuant to an Additional Facility Notice ("**Incremental Issue Date**").

15.2    The Incremental Shares shall be automatically issued to the holders of the A Ordinary Shares and B Ordinary Shares on the Incremental Issue Date as follows:

   (a)    the number of A Ordinary Shares equal to each relevant Additional Facility Lender's Relevant Amount; and

   (b)    the number of B Ordinary Shares equal to each Junior Debt Holder's B Incremental Proportion.

15.3    Each party hereby appoints the Company (acting by any director on the Board of the Company) to act as its true and lawful attorney and in its name or otherwise and on its behalf with full power to exercise all its rights and do such acts on its behalf which, in the absolute discretion of the Company acting reasonably and at the direction of the Board, are required in order to issue Incremental Shares pursuant to this Clause 15, including but not limited to:

   (a)    receiving notice of, attending and voting at any general meeting of the shareholders of the Company, including any meeting of the members of any particular class of shareholder of the Company, and all or any adjournment of such meetings, including for the purposes of Schedule 2;

   (b)    signing any resolution as a registered holder of Ordinary Shares;

   (c)    completing and returning proxy cards, consents to short notice and any other documents required to be signed by the registered holder of Ordinary Shares; and

   (d)    otherwise executing, delivering and doing all deeds, instruments and acts in its name insofar as may be done in its capacity as a registered holder of Ordinary Shares.

15.4    Each party appoints any director or company secretary to write up the register of members and allotments upon the issuance of any Incremental Shares.

15.5    The power of attorney in Clause 15 shall be irrevocable.

16.    **GROUP WATERFALL**

16.1    The parties hereby agree and acknowledge that any proceeds received from any Exit shall:

   (a)    first, be applied against any and all amounts outstanding (including but not limited to principal and interest) under any of the Finance Documents in accordance with their terms, where the application and priority of repayment under the Finance Documents is determined in accordance with the Intercreditor Deed or Subordination Agreement (as applicable); and

   (b)    second, be applied in accordance with Article 9 (*Return on Capital*) and/or Article 10 (*Apportionment of Consideration on a Sale or IPO*) or, where an Asset Sale has been

EU-DOCS\29742045.10

completed, such proceeds from the Asset Sale shall be distributed (to the extent permitted by law) by the relevant Group Company to its direct shareholder until such time as Article 9 (Return on Capital) and/or Article 10 (Apportionment of Consideration on a Sale or IPO) will apply.

17.    **ASSIGNMENT**

17.1    Subject to Clause 17.2, no person shall assign, transfer, charge or otherwise deal with all or any of his or its rights under this Agreement nor grant, declare, create or dispose of any right or interest in it.

17.2    Subject to Clause 17.4, if any Shares held by an Investor are transferred in accordance with this Agreement or the Articles, the benefit of this Agreement shall be assignable in whole or in proportionate part to the transferee of such Shares. The Holding Period Trustee may at any time transfer its Shares to the beneficial owners of such Shares in accordance with the terms of the Holding Period Trust Agreement, provided that the transferees comply with Clause 17.4 and enter into a Deed of Adherence as an Investor (if applicable).

17.3    In no event shall any Investor (or any of its Affiliate) transfer or agree to transfer any Shares to a Competitor/Supplier Entity, unless such transfer is permitted under this Agreement or the Articles.

17.4    Notwithstanding any provision of this Agreement or the Articles to the contrary, no Shares shall be transferred or allotted to any person who is not a party to this Agreement (a "**New Shareholder**"), unless at the time of or prior to such transfer or allotment the New Shareholder:

(a)    enters into a Deed of Adherence; and

(b)    satisfies the reasonable requirements that the Company, or any regulated services provider to it, may have for the purposes of (but not limited to) the Money Laundering Regulations 2017, the Joint Money Laundering Steering Group Guidance Notes, the Money Laundering (Jersey) Order 2008 and the Proceeds of Crime (Jersey) Law 1999,

and, for the avoidance of doubt, any New Shareholder who acquires shares from the Holding Period Trustee shall be required to enter into the Deed of Adherence as an Investor.

17.5    A New Shareholder who enters into a Deed of Adherence:

(a)    as an Investor, shall have all the rights and obligations under this Agreement as if it were named in this Agreement as an Investor; and

(b)    in any other case, shall be subject to and have the benefit of this Agreement as set out in the respective Deed of Adherence.

17.6    Where a New Shareholder enters into a Deed of Adherence, the parties to this Agreement (including for this purpose the New Shareholder, but excluding, in the case of a transfer of Shares, the transferor if the transferor retains no Shares after the relevant transfer) agree to adhere to and be bound by the provisions of this Agreement as if the New Shareholder were an original party to the Agreement and, in the case of a transfer, in place of the transferor (in whole or in proportionate part as the case may be) and this Agreement shall have effect accordingly.

EU-DOCS\29742045.10

18.    **DURATION**

18.1    This Agreement shall, except for the provisions of Clauses 12 and 19 to 27 and any rights or liabilities of any party that have accrued prior to that time, cease to have effect:

(a)    with respect to the rights and obligations of any Investor, upon that Investor ceasing to be the legal or beneficial owner of any Shares;

(b)    in the case of the Holding Period Trustee, upon the Holding Period Trustee ceasing to be the legal owner of any Shares,

provided that where such Investor or Holding Period Trustee ceases to be the legal or beneficial owner of any Shares as a result of a transfer of Shares to a transferee, the transferee of such Shares shall have first entered into a Deed of Adherence.

18.2    This Agreement shall, except for the provisions of Clauses 12 and 19 to 27 and any rights or liabilities of any party that have accrued prior to that time, cease to have effect upon an Exit.

19.    **ENTIRE AGREEMENT AND REMEDIES**

19.1    This Agreement together with the other Transaction Documents and any documents expressed to be entered into in connection with them (once entered into) set out the entire agreement between the parties relating to the subject matter of this Agreement and, save to the extent expressly set out in this Agreement, supersede and extinguish (and the parties hereby waive any rights arising from) any prior drafts, agreements, undertakings, representations, warranties, promises, assurances and arrangements of any nature whatsoever, whether or not in writing, relating thereto. This Clause 19.1 shall not exclude any liability for or remedy in respect of fraud.

19.2    In the event of any conflict or inconsistency between the provisions of this Agreement and the Articles the terms of this Agreement shall prevail on all the parties hereto (other than the Company) and, if so requested by an Investor Majority, the parties (other than the Company) shall procure that the terms of the Articles are amended by passing a special resolution in accordance with the Law so as to accord with the provisions of this Agreement.

19.3    The rights, powers, privileges and remedies provided in this Agreement are cumulative and not exclusive of any rights, powers, privileges or remedies provided by Law.

19.4    Save as expressly set out in this Agreement, none of the parties shall be entitled to rescind or terminate this Agreement in any circumstances whatsoever at any time, and the parties waive any rights of rescission or termination they may have other than as expressly set out in this Agreement and in the case of fraud.

19.5    Notwithstanding anything to the contrary contained in this Agreement, the parties agree to treat the sub-fund CQS ACS Fund ("**IACS**") of CQS Global Funds ICAV (the "**Umbrella**") for all purposes as if it were a separate legal entity to the Umbrella and the Umbrella's other sub-funds and any amounts owed to or liabilities incurred by IACS in connection with this Agreement may be satisfied solely from the assets of IACS (the "**Designated Assets**").  If the Designated Assets of IACS are insufficient to meet its payment obligations or liabilities under this Agreement, then, notwithstanding any other provision contained in this Agreement, to the extent any outstanding payment obligation cannot be met from the Designated Assets (such outstanding amount, the "**Shortfall Amount**"), the parties acknowledge and agree that no party shall have a right to bring

any claim, action or proceedings against any other sub-fund of the Umbrella or against the Umbrella itself in relation to such Shortfall Amount.

## 20.    WAIVER AND VARIATION

20.1    A failure or delay by a party to exercise any right or remedy provided under this Agreement or by Law, whether by conduct or otherwise, shall not constitute a waiver of that or any other right or remedy, nor shall it preclude or restrict any further exercise of that or any other right or remedy. No single or partial exercise of any right or remedy provided under this Agreement or by Law, whether by conduct or otherwise, shall preclude or restrict the further exercise of that or any other right or remedy.

20.2    A waiver of any right or remedy under this Agreement shall only be effective if given in writing and shall not be deemed a waiver of any subsequent breach or default.  A party that waives a right or remedy provided under this Agreement or by Law in relation to another party does not affect his or its rights in relation to any other party.

20.3    Each party agrees that this Agreement may be varied or amended by agreement in writing duly executed by an Investor Special Majority. Any variation or amendment effected under this Clause shall be promptly notified to the Company who shall promptly notify the other Investors. and, until the Holding Period Trust Agreement is terminated, the Holding Period Trustee.

20.4    Unless expressly agreed, no variation or amendment shall constitute a general waiver of any provision of this Agreement, nor shall it affect any rights or obligations under or pursuant to this Agreement which have already accrued up to the date of variation or amendment and the rights and obligations under or pursuant to this Agreement shall remain in full force and effect except and only to the extent that they are varied or amended.

## 21.    INVALIDITY

21.1    If any provision of this Agreement is held by any court of competent jurisdiction, or other competent authority, to be illegal, invalid or unenforceable in any respect under the Laws of any relevant jurisdiction then:

(a)    the parties shall negotiate in good faith to replace such provision with a legal, valid and enforceable provision which, as far as possible, has the same commercial effect as the provision which it replaces;

(b)    in default of Sub-clause 21.1(a), if such provision would be held to be legal, valid and enforceable if some part or parts of it were deleted then it shall apply with such deletions as may be necessary to make it legal, valid and enforceable; and

(c)    in default of Sub-clauses 21.1(a) and 21.1(b), such provision shall be deemed to be severed from this Agreement and, where permissible, that shall not affect or impair the legality, validity or enforceability in that, or any other, jurisdiction of any other provision of this Agreement.

## 22.    NO PARTNERSHIP OR AGENCY

Nothing in this Agreement is intended to, nor shall be deemed to, establish any partnership or joint venture between any of the parties, constitute any party the agent of another party, or authorise any party to make or enter into any commitments for or on behalf of any other party.

41

23.     **NOTICES**

23.1    Any notice or other communication given under this Agreement or in connection with the matters contemplated herein shall be in writing in the English language and sent:

    (a)    by hand delivery to the relevant address as provided in Clause 23.2, and shall be deemed to be given to, and received by, the recipient upon delivery;

    (b)    by first class pre-paid post to the relevant address as provided in Clause 23.2 (if within the United Kingdom), and shall be deemed to be given to, and received by, the recipient two (2) Business Days after the date of posting;

    (c)    by air courier to the relevant address as provided in Clause 23.2 (if from or to any place outside the United Kingdom), and shall be deemed to be given to, and received by, the recipient two (2) Business Days after its delivery to a representative of the courier;

    (d)    by pre-paid airmail to the relevant address as provided in Clause 23.2 (if from or to any place outside the United Kingdom), and shall be deemed to be given to, and received by, the recipient five (5) Business Days after the date of posting;

    (e)    by e-mail to the relevant email address as provided in Clause 23.2, and shall be deemed to be given to, and received by, the recipient two (2) hours after it was sent provided that no notification informing the sender that the message has not been delivered is received by the sender; or

    (f)    by means of a Designated Website, and shall be deemed to be given to, and received by, the recipient when the material is first made available on the Designated Website or (if later) when the recipient receives (or is deemed to have received) notice of the fact that the material is available on the Designated Website in accordance with Clause 6.12,

provided that, in the case of Sub-clauses 23.1(a) and 23.1(f) any notice despatched other than between the hours of 9:30 a.m. to 5:30 p.m. on a Business Day ("**Working Hours**") shall be deemed given at the start of the next period of Working Hours.

23.2    Notices under this Agreement shall, subject to Clause 23.3, be sent for the attention of the person and to the address or e-mail address:

    (a)    in the case of a notice to an Investor, as set forth in column 2 next to the name of that Investor in Schedule 1;

    (b)    in the case of the Holding Period Trustee:

| | |
|---|---|
| Name: | Lucid Issuer Services Limited |
| For the attention of: | Victor Parzyjagla |
| Address: | Tankerton Works, 12 Argyle Walk, London WC1H 8HA |
| E-mail address: | newlook@lucid-is.com; |

    (c)    in the case of the Company:

| | |
|---|---|
| Name: | C/O New Look Retailers Limited |

EU-DOCS\29742045.10

|  | For the attention of: | Laura Battley |
|---|---|---|
|  | Address: | New Look House, Mercery Road, Weymouth, Dorset, DT3 5HJ |
|  | E-mail address: | Laura.Battley@NewLook.com; and |

(d)     in the case of any party adhering to this Agreement pursuant to a Deed of Adherence, as set forth in the Deed of Adherence executed by that party.

23.3     Any party to this Agreement may notify the other parties of any change to his or its address or other details specified in Clause 23.2 provided that such notification shall only be effective on the date specified in such notice or five Business Days after the notice is given, whichever is later.

## 24.     RIGHTS OF THIRD PARTIES

24.1     The specified third party beneficiaries of the undertakings referred to in Clauses 12, 13 and 19 shall, in each case, have the right to enforce the relevant terms by reason of the Contracts (Rights of Third Parties) Act 1999.

24.2     Each of an Investor's Affiliates shall, at the discretion of the relevant Investor, be entitled to enforce all rights and benefits of that Investor under this Agreement at all times as if a party to this Agreement.

24.3     Except as provided in Clauses 24.1 and 24.2, a person who is not a party to this Agreement shall have no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

24.4     Notwithstanding the Contracts (Rights of Third Parties) Act 1999, this Agreement may be amended without the consent of any third party.

24.5     Each party represents to the other parties that any rights they each may have to terminate, rescind or agree any amendment, variation, waiver or settlement under this Agreement are not subject to the consent of any person that is not a party to this Agreement.

## 25.     COUNTERPARTS AND EFFECTIVENESS

25.1     This Agreement may be executed in any number of counterparts. Each counterpart shall constitute an original of this Agreement but all the counterparts together shall constitute but one and the same instrument.

## 26.     GOVERNING LAW AND JURISDICTION

26.1     This Agreement and any non-contractual rights or obligations arising out of or in connection with it shall be governed by and construed in accordance with the laws of England and Wales.

26.2     The parties irrevocably agree that the courts of England and Wales shall have exclusive jurisdiction to settle any Disputes, and waive any objection to proceedings before such courts on the grounds of venue or on the grounds that such proceedings have been brought in an inappropriate forum.

26.3     For the purposes of this Clause, "**Dispute**" means any dispute, controversy, claim or difference of whatever nature arising out of, relating to, or having any connection with this Agreement, including a dispute regarding the existence, formation, validity, interpretation, performance or termination of this Agreement or the consequences of its nullity and also including any dispute

EU-DOCS\29742045.10

relating to any non-contractual rights or obligations arising out of, relating to, or having any connection with this Agreement.

27. **PROCESS AGENT**

27.1    Any party that is not incorporated or resident within the United Kingdom (each a "**Relevant Party**") shall appoint and thereafter maintain (for as long as any claim may be brought under or in connection with this Agreement) the appointment of an agent within England for service of proceedings in relation to any matter arising under or in connection with this Agreement (the "**Process Agent**") as soon as practicable and, in any event, within twenty-eight (28) days of becoming a party to this Agreement and service on the Process Agent in accordance with Clause 23.1(a) or 23.1(b) (and the "relevant address" shall be the address of the Process Agent) shall be deemed to be effective service on the Relevant Party.

27.2    A Relevant Party shall notify the other parties in writing of any change in the address of the Process Agent within five Business Days of such change.

27.3    If, notwithstanding the obligations in this Clause 27, it is discovered that:

(a)    a Relevant Party has failed to appoint a Process Agent as required under Clause 27.1; or

(b)    having appointed a Process Agent, such appointment is then terminated or expires for any reason and the Relevant Party has not notified the other parties of a replacement Process Agent,

the Board may notify the Relevant Party of such fact and may, following the expiry of the period of ten Business Days from the date of such notice, appoint a substitute Process Agent with an address in England on behalf of and at the cost of the Relevant Party, and service on such Process Agent in accordance with Clause 23.1(a) or 23.1(b) (and the "relevant address" shall be the address of the Process Agent) shall be deemed to be effective service on the Relevant Party.  The party discovering the omission shall, promptly following the appointment, notify the Relevant Party of the name and address of such substitute Process Agent.

27.4    Failure by any Process Agent appointed under this Clause 27 to notify the Relevant Party of the service of process will not invalidate the proceedings concerned.

27.5    Nothing in this Agreement shall affect the right of service of process in any other manner permitted by Law.

44

**SCHEDULE 1**

**PARTICULARS OF THE INVESTORS**

[*NOTE: SCHEDULE TO BE UPDATED ONCE INVESTORS ARE ASCERTAINED*]

|  | Name<br><br>(1) | Address<br><br>(2) |
|---|---|---|
| **1.** | [Name] | Address: [Address]<br><br>E-mail address: [●]<br><br>CC: [●] |

45

# SCHEDULE 2

## CONDUCT OF BUSINESS AND RESERVED MATTERS

### Part 1

### CONDUCT OF BUSINESS

1.  **CONDUCT OF BUSINESS**

1.1  Except as otherwise expressly required or permitted under this Agreement or with the prior written consent of Board, each Group Company shall:

(a)  comply with all Laws applicable to it in respect of the conduct of its business;

(b)  make no material change in the nature of its business;

(c)  obtain and maintain in full force and effect all licences, consents and authorisations required for the conduct of the whole or any part of its business and ensure that any expansion, development or evolution of the business of the Group, as carried on today, is effected only through the Group Companies;

(d)  properly manages its business, carry on its business only in the ordinary course and take all reasonable steps to preserve and protect its assets and goodwill, including its relationships with customers and suppliers;

(e)  endeavour to develop the Group's business in accordance with the Business Plan (or any other business plan relating to the Group that is adopted by the Company with the consent of the Board from time to time) and the Annual Budget;

(f)  insure and keep insured at all times with reputable insurers the insurable assets and undertakings of the Group in accordance with the recommendations of the Company's insurance brokers and procure that the insurances maintained by the Group are reviewed by the Company's insurance brokers at least once in each calendar year and that all reasonable recommendations made by such insurance brokers in relation to such insurances are complied with and not do anything or, as far as practicable suffer anything to be done whereby any such insurance policies shall become void or voidable or (save for the making of any claim under any such policy of insurance) an increased premium thereon shall become payable;

(g)  comply with its obligations under the Transaction Documents, the Finance Documents, its constitutional documents and shall not, without the consent of the Board, release, compound or compromise any liability to any Group Company by any party thereto or give time or indulgence to any such party and shall not apply for any waiver or consent under the Transaction Documents, the Finance Documents or its constitutional documents or make any amendment thereunder which may reasonably be considered to be prejudicial to the interests of the Investors;

(h)  maintain key man life and permanent incapacity assurance policies with reputable insurers on the lives of such persons as the Board may determine in an amount to remain in force for as long as the insured remains a full-time employee of the Group and to secure payment to the Company as beneficiary thereunder of such sums in the event of his death or permanent incapacity;

46

(i)     maintain director and officer insurance policies with reputable insurers for the benefit of the directors of each Group Company (including the Investor Directors) which shall include appropriate "run off";

(j)     take such action as is necessary under the terms of the Finance Documents to enable all payments due to be paid under the terms of this Agreement and the Articles (or as soon thereafter as cash flows and the terms of the Finance Documents permit);

(k)     maintain effective and appropriate control systems in relation to the financial, accounting, tax and record keeping functions of the Group and conduct such internal audits into its operations and management as the Board directs;

(l)     comply with all Anti-Corruption Laws and maintain and enforce policies and procedures designed to prevent violations of Anti-Corruption Laws;

(m)     not permit any Government Official to serve in any capacity within any Group Company, including as a director, employee, officer or consultant;

(n)     implement proper and appropriate procedures and measures to ensure that no Group Company nor any director, officer, agent, employee, representative, consultant, or any other person acting for or on behalf of any Group Company from time to time is included on a Sanctions List, engaged in any dealings or transactions with any person on a Sanctions List or acts in a manner that is otherwise in violation of any sanctions law;

(o)     cooperate with any compliance procedure, audit or investigation required by a Government Entity and provide all reasonable information and assistance requested upon an investigation or inquiry by a Government Entity directed to any Group Company or any of the Investors;

(p)     take such reasonable steps as are necessary or advisable to protect any Confidential Information;

(q)     enforce to their full extent the obligations of its employees, directors, officers, consultants and exclusive contractors under their respective employment contracts, agreements for the provision of services and consultancy agreements insofar as those obligations:

    (i)     apply following termination of the employment, consultancy or contractorship;

    (ii)     relate to the disclosure of confidential information;

    (iii)     relate to the disclosure of or the ownership of intellectual property or the procedures for vesting and/or perfecting such ownership or rights to intellectual property in the relevant Group Company; or

    (iv)     relate to any interest such employee, director, officer, consultant or exclusive contractor may have in any business, company, partnership or other undertaking or in any contract or other arrangement which is or is reasonably likely to be or become harmful to any Group Company;

(r)     comply with all Antitrust Laws applicable to it in the conduct of its business and maintain effective and appropriate procedures to prevent any employee or any person who acts on its behalf from engaging in any agreement, arrangement, activity, practice or conduct which would constitute an infringement of any applicable

47

Antitrust Laws and procure that no Group Company (or any person on behalf of a Group Company) enters into any agreement, arrangement, activity, practice or conduct which constitutes an infringement or breach of any applicable Antitrust Laws; and

(s)     notify the Investors in advance of any trade association of which it or (to the extent it is aware of their intentions) any of its directors, officers, employees or other such persons acting on its behalf wish to become a member together with a list of the members of such trade association from time to time and a copy of any minutes of the meetings of such trade association from time to time.

EU-DOCS\29742045.10

**Part 2**

**SHAREHOLDER RESERVED MATTERS**

1.    Except as otherwise expressly required or permitted under this Agreement or with the prior written consent of: (i) the Board which shall include the positive affirmative vote of at least one (1) Investor Director; and (ii) an Investor Majority, the Company shall at all times procure that none of the Group Companies:

    (a)    incurs any new borrowings (or modifies the key terms thereof) or enters into foreign exchange contracts, interest rate swaps or other derivative instruments or factors any of its debts (or enters into similar arrangements), in each case in excess of £50,000,000 in aggregate (but excluding refinancing on arm's length terms or trade credit incurred in the usual course of business);

    (b)    acquires (whether by one transaction or by a series of transactions) the whole, or a substantial or material part of the business, undertaking or assets of any other person with a transaction value or purchase price in excess of £25,000,000 or disposes (whether by one transaction or by a series of transactions) of the whole or any substantial or material part of the business, undertaking or any other substantial or material part of its assets of any Group Company) with a transaction value or purchase price in excess of £25,000,000 other than, in each case, in the course of usual trading;

    (c)    except in relation to intra-group transfers, declares, makes or pays a dividend or other distribution (whether in cash, stock or in kind) or makes any reduction of, or other change to, its paid-up share capital;

    (d)    save in respect of retention of title provisions in the ordinary course of trading, creates, grants, issues or varies any Encumbrance over its shares, assets or undertakings (otherwise than in accordance with the Finance Documents or any document to be entered into pursuant to the Finance Documents);

    (e)    makes any material changes to the accounting procedures, practices, policies or principles by reference to which its accounts are prepared or the basis of their application or its accounting reference date or Financial Year end (save as may be necessary to comply with changes in statements of standard accounting practice);

    (f)    enters into any joint venture, partnership or agreement or arrangement for the sharing of profits or assets or other similar arrangement which represents 10% or more of Group consolidated EBITDA as at the date of entering into such arrangements based on the Group's most recently available audited consolidated financial accounts, apart from where already permitted;

    (g)    institutes, engages in, settle or takes any material decision in relation to any threatened or actual legal proceedings, the value or cost of which might reasonably be expected to exceed £3,000,000 in relation to the same matter or thing and in excess of £15,000,000 in aggregate or which might involve criminal liability for any party thereto other than in respect of (i) debt collection in the ordinary course of business; (ii) where any such liability would be covered by an existing Group insurance policy; and (iii) claims brought against the Group in the United Kingdom by employees in the ordinary course of employment relations (other than class/collective actions or where any such employee claim is expected to have a material impact on the business of the Group) or consumers in the ordinary course of business;

49

(h)    enters into, terminates or varies any contracts or arrangements between any Group Company and a Shareholder (or a party related to a Shareholder) of value in excess of £3,000,000 in aggregate, other than termination of the existing receivables financing arrangements pursuant to the Steps Plan; and

(i)    appoints or removes any Non-Executive Director excluding the Minority Non-Executive Director.

2.    Except as otherwise expressly required or permitted under this Agreement or with the prior written consent of: (i) the Board which shall include the positive affirmative vote of at least one (1) Investor Director; and (ii) an Investor Special Majority or, in a 40% Scenario, an Investor Super Majority, the Company shall at all times procure that none of the Group Companies:

(a)    acquires (whether by one transaction or by a series of transactions) the whole, or a substantial or material part of the business, undertaking or assets of any other person which materially change the business proposition of the Group;

(b)    disposes of all or substantially all of the assets of the Group (or other disposals of businesses of the Group generating in excess of 25% of Group consolidated EBITDA (based on the Group's most recently available audited consolidated financial accounts)), either pursuant to one transaction or a series of related transactions;

(c)    enters into any transaction for an amalgamation, reconstruction or merger with a third party or related party;

(d)    makes any material change to the nature of the business of the Group (including the material expansion or development of the Group or any of its businesses);

(e)    takes any steps (other than a bona fide solvent winding up of any Group Company or part of a bona fide Group-wide entity clean up previously approved by the Board or where required pursuant to law) to:

(i)    wind-up, liquidate, or dissolve any Group Company;

(ii)    obtain an administration order in respect of itself;

(iii)    invite any person to appoint a receiver or manager of the whole or any part of its business;

(iv)    make a proposal for a voluntary arrangement under section 1 of the Insolvency Act 1986;

(v)    obtain a compromise or arrangement under Part 18A of the Jersey Companies Law or Part 26 of the Companies Act 2006; or

(vi)    do anything similar or analogous to those things in paragraphs (i) to (v) above, in any other jurisdiction;

(f)    makes any change of any kind to its share capital, including creating, allotting, issuing, redeeming or repurchasing any share, loan capital or other security or grant any options over, or any other right in respect of, any share, loan capital or other security other than matters approved pursuant to sub-paragraph (g) of this paragraph 2 of Schedule 2 below or where already permitted as an intra-Group activity or which otherwise is technical or administrative in nature and is determined by the Board acting in good faith to cause no detriment to any shareholder;

(g)    makes any increase in the aggregate percentage amount of 5% of the C Ordinary Shares or the economic entitlement to 2% of the amount over the Threshold in respect of the D Ordinary Shares shall be entitled to upon an Exit pursuant to the Management Incentive Plan;

(h)    alters this Agreement or the Articles or other constitutional documents or equivalent documents of a Group Company;

(i)    makes any change to the domicile of the Company or change the head office of the Group to a location outside the UK; and

(j)    appoints or removes the CEO or the CFO.

51

## BOARD RESERVED MATTERS

3.      Except as otherwise expressly required or permitted under this Agreement or with the prior written consent of the Board which shall include the positive affirmative vote of at least one (1) Investor Director, the Company shall at all times procure that none of the Group Companies:

(a)      appoints or removes any operational director of the Group, any officer or any member of the executive management committee of the Group or any Employee whose basic annual salary is in excess of £200,000;

(b)      institutes, engages in, settles or takes any material decision in relation to any legal proceedings, where the amount claimed is in excess of £100,000 in relation to the same matter or thing;

(c)      appoints any external advisor where the fees of such external adviser are anticipated to exceed £1,000,000 in any one Financial Year, unless such fees are specifically approved in the Annual Budget;

(d)      makes any public announcement other than in the ordinary course of trading;

(e)      incorporates any new company within the Group;

(f)      appoints any committee of the Board, establishes its terms of reference and regulation of proceedings, or appoints any member to such committee;

(g)      approves the annual consolidated financial accounts of the Group;

(h)      except as provided for in the Forex Policy, incur any new borrowings (or modifies the key terms thereof) or enters into foreign exchange contracts, interest rate swaps or other derivative instruments or factors any of its debts (or enters into similar arrangements), in each case in excess of £5,000,000 in aggregate;

(i)      provide a request for an amount provided under the Additional PIK Facility in an aggregate amount exceeding £10,000,000; and

(j)      commences an Exit process (including selection of advisers) after the Exit Date.

4.      Except as otherwise expressly required or permitted under this Agreement or with the prior written consent of the Board which shall include the positive affirmative vote of at least two (2) Investor Directors, the Company shall at all times procure that none of the Group Companies:

(a)      makes any material changes to the nature or long-term strategy of the business or enters into a new business line (which shall exclude any new product line that is approved by the Board and any business line that is included in the Business Plan);

(b)      approves or amends the Annual Budget, Business Plan or strategic plan of the Group;

(c)      commences an Exit process (including selection of advisors) prior to the Exit Date;

(d)      makes any material amendment to the capital structure of any Group Company and or the constitutional documents of any Group Company;

52

(e)     except as provided for in the Forex Policy, incur any new borrowings (or modifies the key terms thereof) or refinances existing borrowings or enters into foreign exchange contracts, interest rate swaps or other derivative instruments or factors any of its debts (or enters into similar arrangements), in each case in excess of £25,000,000 in aggregate; and

(f)     redeems, exchanges or buybacks any of the Shares of any Group Company (except in relation to the C Ordinary Shares and D Ordinary Shares).

EU-DOCS\29742045.10

## SCHEDULE 3

### INFORMATION OBLIGATIONS

1.      The Company shall provide the Investor Directors:

   (a)      within 120 days after the end of each of New Look Bonds Limited financial years (commencing with the first financial year after the date of this Agreement), the audited consolidated financial statements of New Look Bonds Limited for that financial year (or, at the option of the Company, the audited consolidated financial statements of holding company of New Look Bonds Limited for that financial year), including a balance sheet, profit and loss account, cash flow statement and directors' statement (if any) thereon, and to the extent not already included in the foregoing, information on (i) key performance indicators (including in particular an overview of the main drivers behind sales development, as well as indications on like-for-like results for the combined Republic of Ireland and UK stores footfall, like-for-like sales conversion and the combined Republic of Ireland and UK market performance, and information on website traffic), (ii) selling, general and administrative costs details, (iii) the impact of new IFRS16 (*Leases*), to the extent estimates are available, (iv) changes in trade working capital, (v) changes in provisions (when material) (vi) updates on credit insurers and utilization of Permitted Trade L/C Facilities and (vii) key terms of the Permitted Trade L/C Facilities; and

   (b)      within 60 days (or 75 days in the case of the first such Financial Quarter ending after the 2020 Effective Date) after the end of each Financial Quarter (excluding the final Financial Quarter in each financial year), the consolidated management accounts or interim financial statements of New Look Bonds Limited for that Financial Quarter (or, at the option of the Company, the consolidated management accounts or interim financial statements of a holding company of New Look Bonds Limited for that Financial Quarter), and to the extent not already included in the foregoing, information on (i) key performance indicators (including in particular an overview of the main drivers behind sales development, as well as indications on like-for-like results for the combined Republic of Ireland and UK stores footfall, like-for-like sales conversion and the combined Republic of Ireland and UK market performance, and information on website traffic), (ii) selling, general and administrative costs details, (iii) the impact of new IFRS16 (*Leases*), to the extent estimates are available, (iv) changes in trade working capital, (v) changes in provisions (when material), (vi) updates on credit insurers and utilization of Permitted Trade L/C Facilities and (vii) key terms of the Permitted Trade L/C Facilities.

2.      For the purposes of paragraphs 1(a)and 1(b) of this Schedule 3, any defined term used therein but not defined in this Agreement shall have the meaning given to it in the Finance Documents.

EU-DOCS\29742045.10

## SCHEDULE 4

## DEED OF ADHERENCE

**THIS DEED OF ADHERENCE** is made on [*date*]

1.      **BETWEEN**

(1)     [[*NAME OF TRANSFEROR*] (the "**Transferor**"); and]

(2)     [*NAME OF TRANSFEREE/ALLOTTEE*] (the "**New Shareholder**")

2.      **WHEREAS**

1.1     [The Transferor intends to transfer to the New Shareholder] [The New Shareholder intends to subscribe for] [[ ● ] A Ordinary Shares] (the "**New Shares**") subject to the New Shareholder entering into this Deed of Adherence in favour of the Investors, supplemental to the investment and shareholders' agreement dated [ ● ] 2020 between the Investors and the Company, (each as defined therein) (the "**Investment Agreement**").

        **IT IS AGREED THAT**

1.2     The New Shareholder confirms that it has read a copy of the Investment Agreement and the Articles and covenants with each Investor (which, for the avoidance of doubt, includes any person subsequently entering into a Deed of Adherence pursuant to the Investment Agreement), each of which shall be entitled to enforce the same, to perform and be bound by all the terms of the Investment Agreement in accordance with Clause 17.5 thereof so far as they may remain to be observed and performed as if the New Shareholder were named in the Investment Agreement as an Investor.

1.3     For the purposes of Clause 23.2 of the Investment Agreement, any notice to be given to the New Shareholder shall be sent for the attention of the person and to the address, or e-mail address, subject to Clause 23.3, set out below:

        Name:                           [ ● ]

        For the attention of:           [ ● ]

        Address:                        [ ● ]

        E-mail address:                 [ ● ]

1.4     [*Insert details of any process agent to be appointed by the New Shareholder pursuant to Clause 27*]

1.5     This deed (and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this deed or its formation) shall be governed by and construed in accordance with English law.

1.6     Words and phrases defined in the Investment Agreement shall have the same meaning when used in this deed.

55

This document has been executed as a deed and is delivered and takes effect on the date stated at the beginning of it.

**EXECUTED and DELIVERED**       )

**as a DEED** by       )

**[name of individual]**       )      .....................................................

in the presence of:       )

.....................................................    Signature of Witness

.....................................................    Name of Witness

.....................................................    Address of Witness

.....................................................

.....................................................

.....................................................    Occupation of Witness

**[OR]**

**EXECUTED and DELIVERED**       )

**as a DEED** by       )

**[name of company]**       )

acting by **[director name]**,       )      .....................................................

a director, in the presence of:       )    Director

.....................................................    Signature of Witness

.....................................................    Name of Witness

.....................................................    Address of Witness

.....................................................

.....................................................

.....................................................    Occupation of Witness

EU-DOCS\29742045.10

[**OR**]

| | | |
|---|---|---|
| **EXECUTED AND DELIVERED** | ) | |
| **as a DEED** by | ) | |
| [*name of company*] | ) | |
| acting by [*director name*], | ) | ................................................................ |
| a director | ) | Director |
| and [*director/secretary name*], | ) | ................................................................ |
| [a director]/[its secretary] | ) | Director/Secretary |

EU-DOCS\29742045.10

This Agreement has been executed as a deed and is delivered and takes effect on the date stated at the beginning of it.


**EXECUTED and DELIVERED**                                )

**as a DEED** by                                                     )

**[NEW LOOK RETAIL HOLDINGS**                     )

**LIMITED]**                                                          )

acting by [ ● ],                                                      )            .......................................................

a director, in the presence of:                            )            Director


.....................................................            Signature of Witness

.....................................................            Name of Witness

.....................................................            Address of Witness

.....................................................

.....................................................

.....................................................            Occupation of Witness


[*NOTE: SIGNATURE BLOCKS TO BE POPULATED ONCE SIGNATORIES IDENTIFIED*]

*[Signature page to SHA.]*

**APPENDIX 9**

**FORM OF NEW PARENT ARTICLES**

EU-DOCS\29867510.8

**_____ 2020**

## PUBLIC COMPANY LIMITED BY SHARES

## MEMORANDUM AND ARTICLES OF ASSOCIATION

of

## NEW LOOK RETAIL HOLDINGS LIMITED

Company Number 128640

(Adopted originally by special resolution passed on

3 May 2019 as amended on 17 December 2019

and as subsequently amended by special resolution passed on

_____ 2020)

<div align="center">

**COMPANIES (JERSEY) LAW 1991 (the "Law")**

**MEMORANDUM OF ASSOCIATION**

**OF**

**NEW LOOK RETAIL HOLDINGS LIMITED**

(the "**Company**")

***a no par value limited company***

</div>

## 1.        INTERPRETATION

Words and expressions contained in this Memorandum of Association have the same meanings as in the Law.

## 2.        COMPANY NAME

The name of the Company is New Look Retail Holdings Limited.

## 3.        TYPE OF COMPANY

3.1      The Company is a public company.

3.2      The Company is a no par value company.

## 4.        NUMBER OF SHARES

There shall be no limit on the number of shares which may be issued by the Company and if the share capital structure of the Company is at any time divided into separate classes of share there shall be no limit on the number of shares of any class which may be issued by the Company.

## 5.        LIABILITY OF MEMBERS

The liability of a member arising from the holding of a share in the Company is limited to the amount (if any) unpaid on it.

## TABLE OF CONTENTS

**Article**                                                                                                      **Page**

1.      EXCLUSION OF STANDARD TABLE ..................................................................1

2.      DEFINITIONS AND INTERPRETATION.........................................................1

3.      LIABILITY OF MEMBERS..............................................................................14

4.      SHARE CAPITAL ..............................................................................................15

5.      STATED CAPITAL ACCOUNTS .....................................................................15

6.      ALTERATION OF SHARE CAPITAL .............................................................15

7.      INCOME ............................................................................................................16

8.      VOTING .............................................................................................................17

9.      RETURN OF CAPITAL.....................................................................................17

10.     APPORTIONMENT OF CONSIDERATION ON A SALE OR IPO ..................18

11.     POST-EXIT ADJUSTMENT .............................................................................19

12.     SHARE TRANSFERS: GENERAL....................................................................19

13.     DRAG ALONG RIGHTS ...................................................................................22

14.     TAG ALONG RIGHTS ......................................................................................24

15.     DELAYED TAG ALONG RIGHTS....................................................................26

16.     TRANSMISSION OF SHARES.........................................................................28

17.     EXERCISE OF TRANSMITTEES' RIGHTS.....................................................28

18.     TRANSMITTEES BOUND BY PRIOR NOTICES............................................28

19.     COMPANY'S LIEN OVER PARTLY PAID SHARES ........................................28

20.     ENFORCEMENT OF THE COMPANY'S LIEN................................................29

21.     CALL NOTICES .................................................................................................30

22.     LIABILITY TO PAY CALLS.............................................................................30

23.     WHEN CALL NOTICE NEED NOT BE ISSUED ..................................................30

24.     FAILURE TO COMPLY WITH CALL NOTICE: AUTOMATIC
        CONSEQUENCES ..............................................................................................31

25.     NOTICE OF INTENDED FORFEITURE...........................................................31

26.     DIRECTORS' POWER TO FORFEIT SHARES ................................................32

27.     EFFECT OF FORFEITURE................................................................................32

28.     PROCEDURE FOLLOWING FORFEITURE .........................................................32

29.     SURRENDER OF SHARES................................................................................33

30.     ALLOTMENTS OF SHARES ............................................................................33

31.     POWERS TO ISSUE DIFFERENT CLASSES OF SHARE ................................34

32.     VARIATION OF CLASS RIGHTS.....................................................................34

33.     COMPANY NOT BOUND BY LESS THAN ABSOLUTE INTERESTS ............35

34.     PAYMENT OF COMMISSIONS ON SUBSCRIPTION FOR SHARES.............35

| 35. | **PROCEDURE FOR DISPOSING OF FRACTIONS OF SHARES** | 35 |
|---|---|---|
| 36. | **SHARE CERTIFICATES** | 36 |
| 37. | **REPLACEMENT SHARE CERTIFICATES** | 36 |
| 38. | **REGISTER OF MEMBERS** | 36 |
| 39. | **DIRECTORS' GENERAL AUTHORITY** | 37 |
| 40. | **MEMBERS' RESERVE POWER** | 37 |
| 41. | **DIRECTORS MAY DELEGATE** | 37 |
| 42. | **COMMITTEES** | 37 |
| 43. | **DIRECTORS TO TAKE DECISIONS COLLECTIVELY** | 38 |
| 44. | **UNANIMOUS DECISIONS** | 38 |
| 45. | **CALLING A DIRECTORS' MEETING** | 38 |
| 46. | **PARTICIPATION IN DIRECTORS' MEETINGS** | 39 |
| 47. | **QUORUM FOR DIRECTORS' MEETINGS** | 39 |
| 48. | **CHAIRING OF DIRECTORS' MEETINGS** | 40 |
| 49. | **CASTING VOTE** | 40 |
| 50. | **DIRECTORS' INTERESTS** | 40 |
| 51. | **CONFLICTS OF INTEREST** | 41 |
| 52. | **RECORDS OF DECISIONS TO BE KEPT** | 44 |
| 53. | **DIRECTORS' DISCRETION TO MAKE FURTHER RULES** | 44 |
| 54. | **NUMBER OF DIRECTORS** | 45 |
| 55. | **METHODS OF APPOINTING DIRECTORS** | 45 |
| 56. | **TERMINATION OF DIRECTOR'S APPOINTMENT** | 46 |
| 57. | **DIRECTORS' REMUNERATION** | 46 |
| 58. | **DIRECTORS' EXPENSES** | 47 |
| 59. | **COMPANY SECRETARY** | 47 |
| 60. | **PROCEDURE FOR DECLARING DIVIDENDS** | 47 |
| 61. | **CALCULATION OF DIVIDENDS** | 48 |
| 62. | **PAYMENT OF DIVIDENDS AND OTHER DISTRIBUTIONS** | 48 |
| 63. | **DEDUCTIONS FROM DISTRIBUTIONS IN RESPECT OF SUMS OWED TO THE COMPANY** | 48 |
| 64. | **NO INTEREST ON DISTRIBUTIONS** | 49 |
| 65. | **UNCLAIMED DISTRIBUTIONS** | 49 |
| 66. | **NON-CASH DISTRIBUTIONS** | 49 |
| 67. | **WAIVER OF DISTRIBUTIONS** | 50 |
| 68. | **AUTHORITY TO CAPITALISE AND APPROPRIATION OF CAPITALISED SUMS** | 50 |
| 69. | **CONVENING OF GENERAL MEETINGS** | 51 |
| 70. | **ATTENDANCE AND SPEAKING AT GENERAL MEETINGS** | 51 |

| 71. | CHAIRING GENERAL MEETINGS | 51 |
|-----|---------------------------|-----|
| 72. | ATTENDANCE AND SPEAKING BY DIRECTORS AND NON-MEMBERS | 52 |
| 73. | ADJOURNMENT | 52 |
| 74. | CLASS MEETINGS | 53 |
| 75. | VOTING: GENERAL | 53 |
| 76. | ERRORS AND DISPUTES | 53 |
| 77. | POLL VOTES | 53 |
| 78. | CONTENT OF PROXY NOTICES | 54 |
| 79. | DELIVERY OF PROXY NOTICES | 54 |
| 80. | AMENDMENTS TO RESOLUTIONS | 55 |
| 81. | WRITTEN RESOLUTIONS | 55 |
| 82. | MEANS OF COMMUNICATION TO BE USED | 56 |
| 83. | COMPANY SEALS | 58 |
| 84. | NO RIGHT TO INSPECT ACCOUNTS AND OTHER RECORDS | 58 |
| 85. | PROVISION FOR EMPLOYEES ON CESSATION OF BUSINESS | 58 |
| 86. | ACCOUNTS AND AUDIT | 58 |
| 87. | INDEMNITY | 59 |
| 88. | INSURANCE | 59 |
| 89. | RE-DESIGNATION OF C SHARES  AND D SHARES | 59 |
| 90. | MARKET VALUE | 60 |
| 91. | PRE-EMPTION ON NEW ISSUE | 60 |
| 92. | INCREMENTAL ISSUE | ERROR! BOOKMARK NOT DEFINED. |
| 93. | EXPERT | 63 |

COMPANIES (JERSEY) LAW 1991

PUBLIC COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

of

NEW LOOK RETAIL HOLDINGS LIMITED

Company Number 128640

(the "Company")

Adopted by special resolution passed on 3 May 2019 as amended on 17 December 2019 and as subsequently amended on _____ 2020

INTERPRETATION AND LIMITATION OF LIABILITY

1.      EXCLUSION OF STANDARD TABLE

None of the regulations contained in the Companies (Standard Table) (Jersey) Order 1992 shall apply to the Company and are hereby expressly excluded in their entirety and these Articles alone are the articles of association of the Company.

2.      DEFINITIONS AND INTERPRETATION

2.1     In these Articles, unless expressly stated otherwise:

"**A Ordinary Shares**" means the A ordinary shares in the capital of the Company having the rights and restrictions set out in the Articles;

"**Accelerated Securities Issue**" shall have the meaning given to it in the Shareholders' Agreement;

"**Accelerated Securities Issue Notice**" has the meaning given in Article 91.5;

"**Acceptance Notice**" has the meaning given in Article 91.1(b);

"**Actual Threshold**" has the meaning given in Article 11.4;

"**Adoption Date**" means the date on which these articles of association are adopted by the Company;

"**Affiliate**" means:

(a)     in the case of a person which is a body corporate, any direct or indirect subsidiary undertaking, parent undertaking or nominee of that person and any direct or indirect

subsidiary undertaking of such parent undertaking, or any entity which manages and/or advises that person, is managed and/or advised by that person, or is managed and/or advised by the same entity as that person, in each case from time to time;

(b)     in the case of a person which is an individual, any spouse, co-habitee and/or lineal descendants by blood or adoption or any person or persons acting in its or their capacity as trustee or trustees of a trust of which such individual is the settlor;

(c)     in the case of a person which is a partnership or limited partnership, the partners of the person or their nominees or a nominee or trustee for the person, or any investors in a fund which holds interests, directly or indirectly, in the partnership or limited partnership or any sub-fund or any other partnership in which the partnership holds, directly or indirectly, any interests;

(d)     any Related Fund, branch or controlled co-investment vehicle;

(e)     in the case of a person that is acting as nominee for another person, the person that has appointed or nominated such nominee;

(f)     any entity which manages or advises any entity referred to in paragraphs (c), (d) or (e) above; and

(g)     an Affiliate of any person in paragraphs (a) to (f) above,

excluding in each case any Competitor/Supplier Entity;

"**alternate**" or "**alternate director**" has the meaning given in Article 55.4;

"**appointor**" has the meaning given in Article 55.4;

"**Approved Dividend**" has the meaning given in Article 7.3;

"**Articles**" means the Company's articles of association for the time being in force;

"**Asset Sale**" shall have the meaning given to it in the Shareholders' Agreement;

"**B Ordinary Shares**" means the B ordinary shares in the capital of the Company having the rights and restrictions set out in the Articles;

"**Back Stop**" means the backstop arrangements made pursuant to a backstop letter provided by certain holders of the A Ordinary Shares dated 13 August 2020;

"**Back Stop Affiliate**" means in relation to a Back Stop Holder, any person (together with its Affiliates) holding a direct or indirect equity interest of 25% or more in the capital of a Back Stop Holder, any other body corporate that is Controlled by such person and/or any Affiliate of the foregoing;

"**Back Stop Holder**" means in the case of any holder of A Ordinary Shares that acquired its A Ordinary Shares in connection with the Back Stop;

"**bankruptcy**" includes individual insolvency proceedings in a jurisdiction other than Jersey which have an effect similar to that of bankruptcy and which references shall also have the meaning ascribed to it in the Interpretation (Jersey) Law 1954;

"**Board**" means the board of directors for the time being of the Company;

"**board observer**" means any observers who are entitled to receive notice of and attend meetings of the board pursuant to the Shareholders' Agreement;

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks in the City of London and Jersey are open for ordinary banking business;

"**C Ordinary Amount**" means:

(a)     an amount equal to the C Share Surplus;

      *less*

(b)     an amount equal to the aggregate of all (x) C1 Fixed Amounts and (y) C2 Fixed Amounts to be distributed in accordance with Articles 9.3(ii) and 9.3(iii);

"**C Ordinary Shares**" means the C ordinary shares in the capital of the Company having the rights and restrictions set out in the Articles;

"**C Share Surplus**" means an amount equal to X% of the Surplus Assets where:

$$X = B/(A+B)*100,$$

$A$ = the total number of A Ordinary Shares and B Ordinary Shares (excluding any Incremental Shares) in issue on the Exit Date;

$B$ = the total number of C Ordinary Shares in issue on the Exit Date plus the higher of (i) the total number of C1 Ordinary Shares in issue on the Exit Date; or (ii) the total number of C2 Ordinary Shares in issue on the Exit Date;

"**C Shareholder**" means the person who holds the beneficial interest in any C Shares from time to time;

"**C Shares** " means the C Ordinary Shares, C1 Ordinary Shares and/or C2 Ordinary Shares;

"**C1 Ordinary Shares**" means the C1 ordinary shares in the capital of the Company having the rights and restrictions set out in the Articles, created on a Re-designation Date when Article 89 applies;

"**C1 Fixed Amount**" means, in respect of each C1 Ordinary Share in issue, the lower of:

(a)     the Market Value of a C Ordinary Share on the Re-designation Date of such C1 Ordinary Share; and

(b)     the value of a C Ordinary Share on the Exit Date;

"**C1 Ordinary Shares**" means the C1 ordinary shares in the capital of the Company having the rights and restrictions set out in the Articles, created on a Re-designation Date when Article 89 applies;

"**C2 Fixed Amount**" means, in respect of each C2 Ordinary Share in issue, the higher of:

(a)     an amount equal to (x) the value of a C Ordinary Share on the Exit Date *less* (y) the value equal to the Market Value of the C1 Ordinary Share that was re-designated on the Re-designation Date of such C2 Ordinary Share; or

(b)     zero;

"**C2 Ordinary Shares**" means the C2 ordinary shares in the capital of the Company having the rights and restrictions set out in the Articles, created on a Re-designation Date when Article 89 applies;

"**call**" has the meaning given in Article 21.1;

"**call notice**" has the meaning given in Article 21.1;

"**call payment date**" has the meaning given in Article 24.2;

"**capitalised sum**" has the meaning given in Article 68.1(b);

"**Cash Equivalent Value**" means, in the case of any Non-Cash Consideration (subject always to the proviso of such definition):

(a)     for the purposes of (a), (b) and (c) of the definition of Exit, the cash value as determined by the Remuneration Committee;

(b)     for the purposes of Article 13.6, the cash value as agreed by the Proposed Purchaser and a majority of the Dragged Shareholders who have elected to receive the Cash Equivalent Value of the Non-Cash Consideration, provided that if no agreement is reached within 5 Business Days of the Election Date, the value of the Non-Cash Consideration shall be fair value as determined by an Expert;

(c)     for the purposes of Article 14.2(e), the cash value as agreed by the Proposed Transferee and a majority of the Proposed Transferors who have elected to receive the Cash Equivalent Value of the Non-Cash Consideration, provided that if no agreement is reached within 5 Business Days of the Tag Election Date, the value of the Non-Cash Consideration shall be fair value as determined by an Expert; or

(d)     for the purposes of Article 15.2(d) the cash value as agreed by the Original Shareholder and a majority of the Delayed Tagging Shareholders, provided that if no agreement is reached within 5 Business Days of the Delayed Tag Closing Date, the value of the Non-Cash Consideration shall be fair value as determined by an Expert;

"**Catch-Up Subscription**" has the meaning given in Article 91.5;

"**chairman**" has the meaning given in Article 48.1 (Chairing Of Directors' Meetings);

"**chairman of the meeting**" has the meaning given in Article 71 (Chairing General Meetings);

"**Co-Investment Scheme**" means a scheme under which certain officers, employees or partners of the relevant entity are entitled or required (as individuals or through any other person) directly or indirectly to acquire interests in shares in the Company;

"**Companies Law**" means the Companies (Jersey) Law 1991, as amended;

"**Company Reorganisation**" means the acquisition of the whole of the issued ordinary share capital of the Company ("old shares") by another company ("new company") in circumstances in which:

(a)     the consideration for the old shares consists wholly of the issue of shares ("new shares") in the new company,

(b)     the new shares are issued in consideration of the old shares only at times when there are no issued shares in the new company other than (i) subscriber shares; and (ii) new shares previously issued in consideration of old shares;

(c) the consideration for the new shares of each description consists wholly of old shares of the corresponding description; and

(d) the new shares of each description are issued to holders of old shares of the corresponding description in respect of, and in proportion to, their holdings;

"**company secretary**" means any person (including without limitation associations and bodies of persons, whether corporate or unincorporate) appointed to perform any of the duties of secretary of the Company (including an assistant or deputy secretary) and in the event of two or more such persons being appointed as joint secretaries any one or more of the persons so appointed;

"**Company's lien**" has the meaning given in Article 19.1;

"**Competitor/Supplier Entity**" means:

(a) any person whose business is or seeks to be in competition with the Group's business (being an affordable fashion retailer) as carried on at the relevant time in Europe and Asia; and/or

(b) any person who is or seeks to be a material supplier of the Group's business as carried on at the relevant time;

together with their agents or proxies, or any person who, either alone or acting together with any other person, including any Affiliate of such person, holds greater than 25% direct or indirect ownership or controls more than 25% of the direct or indirect voting rights of any such person in (a) or (b) (but excluding, in each case, (i) any Investor or any of its Affiliates that is, or whose interests are managed by, a bona fide Fund Manager regularly engaged in or established for the purposes of making, purchasing or investing in loans, debt securities or other financial assets and has not been established for the primary or main purpose of investing in the share capital of companies or to obtain a control position in any company, who, either alone or acting together with any other person, including any Affiliate of such person, holds greater than 25% direct or indirect ownership or controls more than 25% of the direct or indirect voting rights in any operating or portfolio company (being a subsidiary undertaking or group of subsidiary undertakings trading as a separate and distinct going concern) that would otherwise be a person falling within (a) or (b) above, and/or (ii) any Affiliate of any Investor where bona fide customary information barriers are in place between such Affiliate and any such Investor which restrict the sharing of information between such Affiliate and such Investor with regards to the Group and such operating or portfolio company);

"**Contingent Consideration**" means any consideration (whether in cash or otherwise) the payment of which is subject to satisfaction of a condition which is to be satisfied after the Exit Date (and which, for the avoidance of doubt, shall include any consideration in the form of an earn-out);

"**Control**" means, in respect of any person or group of persons who are actively co-operating (pursuant to an agreement whether formal or informal), the power, directly or indirectly and by whatever means or arrangement:

(a) to manage or govern such person, or to appoint the managing and governing bodies of such person or a majority of the members of such managing or governing bodies, whether through the ownership of voting securities, by contract or otherwise (for this purpose a limited partnership shall be deemed to be controlled by its general partner or any permanent and exclusive manager or investment adviser of such limited partnership);

(b)    to appoint or remove or control the appointment or removal of:

    (i)    directors on the person's board of directors or its other governing body (including, in the case of a limited partnership, of the board or other governing body of its general partner) who are able (in the aggregate) to exercise more than 50% of the voting power at meetings of that board or governing body in respect of all or substantially all matters;

    (ii)    any managing member of such person;

    (iii)    in the case of a limited partnership, its general partner or any permanent and exclusive manager or investment adviser of such limited partnership; or

    (iv)    in the case of a trust, its trustee and/or manager; or

    (v)    to cast at least 50.1% of the maximum number of votes capable of being cast in any meeting of the members of any person (whether by proxy or by other means in writing);

"**D Ordinary Amount**" means:

(a)    an amount equal to the D Share Surplus[;

    *less*

(b)    an amount equal to the aggregate of all (x) D1 Fixed Amounts and (y) D2 Fixed Amounts to be distributed in accordance with Articles 9.4(ii) and 9.4(iii);

"**D Ordinary Shares**" means the D Ordinary shares in the capital of the Company having the rights and restrictions set out in the Articles;

"**D Share Surplus**" means an amount equal to 2.00% (two per cent.) of any Surplus Assets in excess of the Threshold;

"**D Shareholder**" means the person who holds the beneficial interest in any D Shares from time to time;

"**D Shares**" means the D Ordinary Shares, D1 Ordinary Shares and/or D2 Ordinary Shares;

"**D1 Fixed Amount**" means, in respect of each D1 Ordinary Share in issue, the lower of:

(a)    the Market Value of a D Ordinary Share on the Re-designation Date of such D1 Ordinary Share; or

(b)    the value of a D Ordinary Share on the Exit Date;

"**D1 Ordinary Shares**" means the D1 ordinary shares each in the capital of the Company having the rights and restrictions set out in the Articles, created on a Re-designation Date when Article 89 applies;

"**D2 Fixed Amount**" means, in respect of each D2 Ordinary Share in issue, the higher of:

(a)    an amount equal to (x) the value of a D Ordinary Share on the Exit Date *less* (y) the value equal to the Market Value of the D1 Ordinary Share that was re-designated on the Re-designation Date of such D2 Ordinary Share; or

(b)    zero;

"**D2 Ordinary Shares**" means the D2 ordinary shares in the capital of the Company having the rights and restrictions set out in the Articles, created on a Re-designation Date when Article 89 applies;

"**Delayed Acceptance Notice**" has the meaning given in Article 15.3;

"**Delayed Tag Closing Date**" has the meaning given in Article 15.2(a);

"**Delayed Tag Transfer Date**" has the meaning given in Article 15.4(c);

"**Delayed Tag Offer**" has the meaning given in Article 15.1;

"**Delayed Tagging Shareholders**" has the meaning given in Article 15.1;

"**director**" means a director for the time being of the Company, and includes any person occupying the position of director, by whatever name called;

"**distribution recipient**" has the meaning given in Article 62.2;

"**document**" includes, unless otherwise specified, any document sent or supplied in electronic form;

"**Drag Along Notice**" has the meaning given in Article 13.2;

"**Dragged Shareholders**" has the meaning given in Article 13.1;

"**Dragged Shares**" has the meaning given in Article 13.1;

"**electronic form**" has the meaning given in section 1168 of the UK Companies Act;

"**eligible director**" has the meaning given in Article 44.3;

"**Employee**" means an individual who is employed by, or is a director of, any Group Company from time to time or whose services are otherwise made available to any Group Company from time to time, in each case other than an Investor Director (and "**employment**" shall be construed accordingly);

"**End Date**" has the meaning given in Article 91.1(a);

"**Excess Securities**" has the meaning given in Article 91.1(c);

"**Executive Director**" means any person appointed as an executive director of the Group by the Board from time to time;

"**Existing Valuation**" has the meaning given in Article 90;

"**Exit**" means an IPO, an Asset Sale, a Winding-Up or completion of a Sale;

"**Exit Condition**" means if a legally binding sale and purchase agreement or placing agreement to consummate an Exit has been executed prior to the Tag Long Stop Date and completion of the relevant Exit is scheduled or expected to occur prior to the Exit Condition Long Stop Date;

"**Exit Condition Long Stop Date**" means the date falling 60 months after the Closing Date;

"**Exit Conflict**" has the meaning given in Article 50.5;

"**Exit Date**" means the date of, but conditional upon the occurrence of, an Exit;

"**Exit Value**" means the value of the Company on an Exit, being:

(a)    in the case of a Sale the aggregate consideration (excluding any Contingent Consideration) payable in respect of the Ordinary Shares on completion of the Sale as stated in the acquisition agreement, offer document or other equivalent document(s) in respect of the Sale (as the case may be) including the Cash Equivalent Value of any Non-Cash Consideration;

(b)    in the case of an Asset Sale, the aggregate net distributions to be received by each holder of Ordinary Shares including the Cash Equivalent Value of any Non-Cash Consideration (but excluding any Contingent Consideration);

(c)    in the case of an IPO the price per share at which shares in the Company or other Group Company (as the case may be) are sold or offered in connection with the IPO (in the case of an offer for sale, being the underwritten price or, if an offer for sale by tender, the striking price under such offer or, in the case of a placing, the price at which shares are sold under the placing) multiplied by the number of shares which would be in issue immediately following such IPO, but excluding any shares issued for the purpose of raising additional or replacement capital for the Company or the relevant Group Company as part of the IPO arrangements (whether to refinance the payment of loans or for any other reason whatsoever); or

(d)    in the case of a Winding-Up, the aggregate net distributions to be received by each holder of Ordinary Shares including the Cash Equivalent Value of any Non-Cash Consideration (but excluding any Contingent Consideration);

in each case, less all costs and expenses incurred by the holders of Ordinary Shares (including any C Shareholders and D Shareholders) or any Group Company in connection with the Exit (including legal fees and any other third party fees and expenses, commission, transfer costs, tax payable by any Group Company, in each case to the extent not already taken into account in determining the Exit Value);

"**Expert**" has the meaning given in Article 92;

"**Final Date**" has the meaning given in Article 11.1;

"**Finance Documents**" means any financing or security agreements and documents entered into by any Group Company and which are material to the Group as a whole (including any document identified as a "Finance Document" under the terms of the Shareholders' Agreement), as amended, supplemented or replaced from time to time;

"**fully paid**" in relation to a share, means the full value of the share to be paid (whether in cash or otherwise) to the Company in respect of that share (determined in accordance with Article 5.2), received by the Company or such share in issue credited as fully paid;

"**Fund Manager**" means any appropriately licensed and/or regulated person who acts for and on behalf of third party investors (and related investment arrangements) on a discretionary or non-discretionary basis pursuant to a management or advisory agreement in consideration for receipt of a management fee, advisory fee, carried interest and/or other similar form of remuneration;

"**Group**" means the Company and each of its subsidiary undertakings from time to time including any New Holding Company and "**member of the Group**" and "**Group Company**" shall be construed accordingly;

"**hard copy form**" has the meaning given in section 1168 of the UK Companies Act;

"**holder**" in relation to shares means the person whose name is entered in the register of members as the holder of the shares;

"**Holding Period Trustee**" means Lucid Issuer Services Limited;

"**instrument**" means a document in hard copy form;

"**Internal Transfer**" means a transfer of Shares:

(a)     by a member to any of its Affiliates;

(b)     by a Back Stop Holder to any of its Back Stop Affiliates; or

(c)     by any member to a New Holding Company;

"**Investment Date**" means [●];

"**Investor**" means any holder of A Ordinary shares from time to time;

"**Investor Director**" means a director of the Company who is appointed as an "Investor Director" pursuant to the terms of the Shareholders' Agreement;

"**Investor Majority**" means the holders of a majority in number of the issued A Ordinary Shares acting by way of written consent or direction;

"**Investor Special Majority**" means the holders holding at least two thirds in number of the issued A Ordinary Shares acting by way of written consent or direction;

"**Investor Super Majority**" means:

(a)     the holder and/or their Affiliates holding a number of A Ordinary Shares representing 40% or more of the total issued A Ordinary Shares; and

(b)     any holder and/or their Affiliates holding equal to or more than the Qualifying Shareholding together acting by way of written consent or direction;

"**IPO**" means the effective admission of shares of any Group Company to trading on any investment stock exchange as nominated by Board;

"**Leaver**" means:

(a)     any individual who resigns or gives notice to cease to be an employee or director of any Group Company, other than in circumstances where following the end of the applicable notice period, that individual will continue to be an employee or director (including without limitation a non-executive director) of a Group Company; or

(b)     any individual who ceases for any reason to be an employee or director of any Group Company, and does not continue to be an employee or director (including without limitation a non-executive director) of a Group Company;

"**Leaving Date**" means:

(a)     in circumstances where paragraph (a) of the definition of Leaver applies, the date on which the Leaver resigns or gives notice to cease to be an employee or director of the Group Company;

(b)      in circumstances where paragraph (b) of the definition of Leaver applies, the date on which the Leaver ceases to be an employee or director of the Group Company;

"**Market Value**" has the meaning given in Article 90;

"**member**" means a person who is the holder of a share;

"**New Holding Company**" means a holding company of the Company in which the share capital structure of the Company is replicated in all material respects, save that in the case of an IPO the share capital of any such holding company may comprise a single class of shares the holding of which is apportioned in accordance with Article 10.1;

"**New Issue Notice**" has the meaning given in Article 91.1(a)

"**Nominee**" means any person who, with the consent of the Remuneration Committee, holds the legal title to C Shares on behalf of a C Shareholder or the legal title to D Shares on behalf of a D Shareholder;

"**Non-Cash Consideration**" means any consideration which is payable otherwise than in cash;

"**officer**" includes a secretary but otherwise has the meaning ascribed to it in the Companies Law;

"**ordinary resolution**" means a resolution of the Company in a general meeting of the Company adopted by a simple majority of the votes cast at that meeting;

"**Ordinary Shares**" means the A Ordinary Shares, B Ordinary Shares, C Shares and D Shares or any of them;

"**Original Shareholder**" a holder of A Ordinary Shares where such holder of A Ordinary Shares and/or its Affiliates held any ordinary shares in the capital of the Company as at 13 August 2020;

"**Qualifying Ordinary Shareholder**" means a holder of A Ordinary Shares, B Ordinary Shares or C Ordinary Shares (excluding a Leaver or a nominee of  a Leaver);

"**Qualifying Ordinary Shares**" means the A Ordinary Shares, B Ordinary Shares and C Ordinary Shares;

"**Qualifying Shareholding**" means the number of A Ordinary Shares representing 15% or more of the total issued A Ordinary Shares;

"**paid**" means paid or credited as paid;

"**participate**" in relation to a directors' meeting, has the meaning given in Article 46.1;

"**Participating Shareholder**" has the meaning given in Article 91.1(b);

"**partly paid**" in relation to a share means that part of that share's value at which it was issued which has not been paid to the Company;

"**Permitted Employee Transferee**" has the meaning given in Article 12.3;

"**persons entitled**" has the meaning given in Article 68.1(b);

"**Post-Exit Return Amount**" has the meaning given in Article 11.2;

"**Proposed Purchaser**" has the meaning given in Article 13.1;

"**Proposed Transferee**" has the meaning given in Article 14.1;

"**Proposed Transferors**" has the meaning given in Article 14.1;

"**proxy notice**" has the meaning given in Article 78.1;

"**Re-designation Date**" has the meaning given in Article 89.5;

"**Related Fund**" in relation to a fund (the "**first fund**") means a fund which is managed or advised by the same investment manager or adviser as the first fund or, if it is managed by a different investment manager or adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund;

"**Relevant Entitlement**" means, in the case of each Qualifying Ordinary Shareholder such percentage of the Relevant Securities as equates to his or its pro rata share of the Qualifying Ordinary Shares in issue immediately prior to the allotment and issue of the Relevant Securities (save that an Investor's Relevant Entitlement may instead be subscribed for by an Affiliate of that Investor);

"**Relevant Holder**" means any:

(a)      holder of A Ordinary Shares;

(b)      holder of B Ordinary Shares; and

(c)      a C Shareholder (excluding a Leaver);

"**relevant rate**" has the meaning given in Article 24.2;

"**Remuneration Committee**" shall have the meaning give to it in the Shareholders' Agreement;

"**Revised Equity Proceeds**" has the meaning given in Article 11.3;

"**Relevant Securities**" has the meaning given in Article 91.1

"**Sale**" means the transfer of shares (whether through a single transaction or a series of transactions) as a result of which any person, or persons connected (as defined in section 252 of the UK Companies Act) or acting in concert (as defined in the UK Takeover Code) with such person, holds more than two thirds of the A Ordinary Shares then in issue excluding:

(a)      any Internal Transfer; or

(b)      any transfer made by a holder of A Ordinary Shares in connection with a Company Reorganisation;

"**Second End Date**" has the meaning given in Article 91.1(c);

"**Shareholders' Agreement**" means the Investment and Shareholders' Agreement entered into between certain members and the Company on or around the Adoption Date, as amended from time to time;

"**shares**" means any shares in the capital of the Company of any class;

"**Subsequent Board**" has the meaning given in the Shareholders' Agreement;

"**subsidiary**" has the meaning given in section 1159 of the UK Companies Act;

"**Surplus Assets**" has the meaning given in 9.2;

"**Tag Acceptance Notice**" has the meaning given in Article 14.3;

"**Tag Closing Date**" has the meaning given in Article 14.2;

"**Tag Completion Date**" has the meaning given in Article 14.4;

"**Tag Long Stop Date**" the date being 54 months following [*Tag Long Stop*] 2020;

"**Tag Offer**" has the meaning given in Article 14.1;

"**Tagging Shareholder**" has the meaning given in Article 14.3;

"**Tax**" means all forms of taxation, levy, impost, contribution, duty, liability and charge in the nature of taxation imposed anywhere in the world and all related withholdings or deductions of any nature (including, for the avoidance of doubt, PAYE and National Insurance contribution liabilities in the United Kingdom and corresponding obligations elsewhere) imposed or collected by a Tax Authority whether directly or primarily chargeable against, recoverable from or attributable to any of the Group Companies or another person and all fines, penalties, charges and interest related to any of the foregoing (and "**Taxes**" and "**Taxation**" shall be construed accordingly);

"**Tax Authority**" means a taxing or other governmental (local or central), state or municipal authority (whether within or outside the United Kingdom) competent to impose a liability for or to collect Tax;

"**Threshold**" means an amount equal to:

(a)     an amount equal to the aggregate of:

    (i)     £300,000,000; and

    (ii)    any additional amounts of cash invested by way of a subscription for share capital (including any cash received by the Company for any Incremental Shares) in the Company or any other Group Company from time to time following the Investment Date by the holders (or their nominees) of the A Ordinary Shares, B Ordinary Shares or the C Ordinary Shares (including C Shareholders) up to and including the Exit Date;

    *less*

(b)     an amount equal to the aggregate of the total amount of all cash (without double counting) actually received by the holders (or their nominees) of the A Ordinary Shares, B Ordinary Shares or C Ordinary Shares from the Group (or any third party) in respect of any A Ordinary Shares, B Ordinary Shares or C Ordinary Shares including any repayments, redemptions cash dividends actually paid, cash distributions, or purchases of share capital prior to the Exit Date;

"**Total Equity Proceeds**" means the Exit Value on an Exit;

"**transfer**" has the meaning given in Article 12.1;

"**transmittee**" means a person entitled to a share by reason of the death or bankruptcy of a member or otherwise by operation of law;

"**UK Companies Act**" means the Companies Act 2006 of the United Kingdom;

"**UK Takeover Code**" means the City Code on Takeovers and Mergers of the United Kingdom;

"**Valuer**" has the meaning given in Article 90;

"**Vendor Shareholders**" has the meaning given in Article 13.1;

"**Vendor Shares**" has the meaning given in Article 13.1;

"**Winding-Up**" means a distribution to the holders of Ordinary Shares pursuant to a winding-up, dissolution or liquidation of the Company or a New Holding Company; and

"**writing**" means the representation or reproduction of words, symbols or other information in a visible form by any method or combination of methods, whether sent or supplied in electronic form or otherwise.

2.2     In the Articles, unless the context otherwise requires:

(a)     terms used shall, unless otherwise defined herein, bear the meaning ascribed to them in the Companies Law as in force on the date when the Articles became binding on the Company;

(b)     references to any Jersey legal term shall, for any jurisdiction other than Jersey, be deemed to include a reference to the term which most nearly approximates to the Jersey legal term in that jurisdiction;

(c)     references to United Kingdom statutes, ordinances, regulations or any other instruments having the force of law therein shall be interpreted as if the Company was incorporated in the United Kingdom and subject to such provisions, to the extent the same does not contravene the Companies Law or any other law of Jersey.  Where pursuant to these Articles the Company is said to be authorised or empowered to exercise any authorities, discretions or powers pursuant to any United Kingdom statutes, ordinances, regulations or any other instruments, the Company shall also be authorised and empowered to exercise any similar or analogous authorities, discretions or powers pursuant to the Companies Law or any other law of Jersey.  Any references in these Articles to a legal remedy or legal concept under English law shall be construed as the legal remedy or legal concept under Jersey law which most closely reflects the same;

(d)     in interpreting the terms "holding company", "subsidiary", "group undertaking", "subsidiary undertaking" and "parent undertaking", a company is to be treated as (i) a member of a subsidiary or a subsidiary undertaking (as the case may be) even if its shares are registered in the name of a nominee or any party holding a security over those shares (or that secured party's nominee); or (ii) the holding company or parent undertaking (as the case may be) of another company even if its shares in the other company are registered in the name of a nominee or any party holding security over those shares (or that secured party's nominee);

(e)     references to Articles are references to the relevant article of these Articles unless expressly provided otherwise;

(f)     a reference to a statute, statutory provision or subordinate legislation is a reference to it as it is in force from time to time, taking account of:

(i)     any subordinate legislation from time to time made under it; and

(ii)    any amendment or re-amendment and includes any statute, statutory provision or subordinate legislation which it amends or re-enacts;

(g)     references to the singular include the plural and vice versa and references that are gender neutral or gender specific include each and every gender and no gender;

(h)     references to a "person" include any individual, partnership, company, body corporate, corporation sole or aggregate, firm, joint venture, association, trust, government, state or agency of a state, unincorporated association or organisation, in each case whether or not having separate legal personality and irrespective of the jurisdiction in or under the law of which it was incorporated or exists, and a reference to any of them shall include a reference to the others;

(i)     references to a "company" include any company, corporation or other body corporate wherever and however incorporated or established;

(j)     references to "proportions paid up" and/or "proportions credited as paid up" mean the proportions (whether in cash or other than in cash) paid up or credited as paid up against the relevant share as compared to the total amount to be paid up on each relevant share at the time of issue;

(k)     references to "sterling", "pounds sterling" or "£" are references to the lawful currency from time to time of the United Kingdom, references to "euros", "EUR" or "€" are references to the lawful currency from time to time of the member states of the European Union that have adopted the single currency;

(l)     references to times of the day are to London time unless otherwise stated;

(m)     references to any English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court official or any other legal concept or thing shall in respect of any jurisdiction other than England be deemed to include what most nearly approximates in that jurisdiction to the English legal term;

(n)     words introduced by the word "other" shall not be given a restrictive meaning because they are preceded by words referring to a particular class of acts, matters or things;

(o)     general words shall not be given a restrictive meaning because they are followed by words which are particular examples of the acts, matters or things covered by the general words and the words "includes" and "including" shall be construed without limitation;

(p)     any matter requiring the written consent of the Board may be achieved by the Board resolving to approve such matter by a simple majority at any meeting of the Board; and

(q)     any reference to written consent shall include by e-mail.

2.3     The headings and sub-headings in the Articles are inserted for convenience only and shall not affect the construction of the Articles.

2.4     Where it is expressed in these Articles that the consent, determination or direction of an Investor Majority is required, such consent, determination or direction shall be deemed to have been given if the relevant matter or transaction has been consented to in writing by an Investor Majority.

## 3.     LIABILITY OF MEMBERS

The liability of the members is limited to the amount, if any, unpaid on the shares held by them.

## SHARES - RIGHTS AND RESTRICTIONS

**4.      SHARE CAPITAL**

The share capital of the Company is as specified in the Memorandum of Association and the shares of the Company shall have the rights and be subject to the conditions contained in these Articles.  No share issued by the Company shall have a nominal value.

**5.      STATED CAPITAL ACCOUNTS**

5.1      The Company shall maintain a stated capital account in accordance with the Companies Law for each class of issued share.  A stated capital account may be expressed in any currency.

5.2      Subject to the requirements of the Companies Law, and except as provided in Article 5.3, there shall be transferred to the stated capital account for each class of share:

(a)      the amount of cash received by the Company for the issue of shares of that class;

(b)      the value, as determined by the directors, of the "cause" received by the Company, otherwise than in cash, for the issue of shares of that class; and

(c)      every other amount which is from time to time required by the Companies Law to be transferred to a stated capital account.

5.3      Where the Companies Law permits the Company to refrain from transferring any amount to a stated capital account, that amount need not be so transferred; but the directors may if they think fit nevertheless cause all or any part of such amount to be transferred to the relevant stated capital account.

5.4      The Company may by ordinary resolution transfer an amount to a stated capital account of the Company from any other account of the Company.

5.5      Where, for the purposes of Article 5.2(b), the directors are to determine the value of any "cause" received by the Company they may rely on such indicator or indicators of value as appear to them to be reasonable and practicable in the circumstances.

**6.      ALTERATION OF SHARE CAPITAL**

6.1      Subject to the terms of the Shareholders' Agreement, the Company may alter its share capital as stated in the Memorandum of Association in any manner permitted by the Companies Law.

6.2      Any new shares created on an increase or other alteration of share capital shall be issued upon such terms and conditions as the Company may determine in accordance with the Shareholders' Agreement.

6.3      Any capital raised by the creation of new shares shall, unless otherwise provided by the conditions of issue of the new shares, be considered as part of the original capital and the new shares shall be subject to the provisions of these Articles with reference to the payment of calls, transfer and transmission of shares, lien or otherwise applicable to the existing shares in the Company.

6.4      Subject to the provisions of the Companies Law and the terms of the Shareholders' Agreement, the Company may reduce its capital accounts in any way.

7.    **INCOME**

7.1    The rights as regards income attaching to each class of share shall be as set out in this Article 7 (Income).

7.2    Every dividend shall be apportioned and paid to the appropriate member according to the number of fully paid up or credited as paid up shares of the relevant class held by them during any portion of the period in respect of which the dividend is payable.

7.3    The amounts which are distributable pursuant to the Companies Law and approved at a meeting of the directors by a resolution of the directors to be distributed ("**Approved Dividend**") shall, subject to the provisions of the Companies Law, the Shareholders' Agreement and the Finance Documents be distributed by way of dividend amongst the holders of the Ordinary Shares in accordance with Article 7.4:

7.4    The holders of:

(a)    the A Ordinary Shares and B Ordinary Shares shall be entitled to an amount of the Approved Dividend equal to:

(i)    $((A+B)/(A+B+C2))*D$

where:

A = the number of A Ordinary Shares in issue as at the date of the Approved Dividend;

B = the number of B Ordinary Shares in issue as at the date of the Approved Dividend;

C2 = the number of C2 Ordinary Shares in issue as at the date of the Approved Dividend; and

D = the Approved Dividend,

which shall be distributed in proportion to the numbers of such A Ordinary Shares and B Ordinary Shares held by them respectively;

(b)    the C Ordinary Shares and C2 Ordinary Shares (excluding any C2 Ordinary Shares held by a Leaver) shall be entitled to an amount of the Approved Dividend equal to:

(i)    $((C+C2)/(A+B+C2))*D$

where:

A = the number of A Ordinary Shares in issue as at the date of the Approved Dividend;

B = the number of B Ordinary Shares in issue as at the date of the Approved Dividend;

C = the number of C Ordinary Shares in issue as at the date of the Approved Dividend

C2 = the number of C2 Ordinary Shares in issue as at the date of the Approved Dividend; and

D = the Approved Dividend,

which shall be distributed in proportion to the numbers of such C Ordinary Shares and C2 Ordinary Shares (excluding any C2 Ordinary Shares held by a Leaver) held by them respectively.

7.5    Other than where a dividend is declared in connection with or following an Asset Sale as a result of the operation of Article 10.2, a D Ordinary Share, D1 Ordinary Share or a D2 Ordinary Share shall not entitle its holder to receive any dividend or other distribution or participate in the profits of the Company.

7.6    Other than where a dividend is declared in connection with or following an Asset Sale as a result of the operation of Article 10.2, a C1 Ordinary Share shall not entitle its holder to receive any dividend or other distribution or participate in the profits of the Company.

## 8.    VOTING

8.1    The voting rights attaching to each class of share shall be as set out in this Article 8 (Voting).

8.2    Save as otherwise provided in the Articles, the holders of A Ordinary Shares shall, in respect of the A Ordinary Shares held by them, be entitled to receive notice of, attend and speak at and vote at, general meetings of the Company and on a show of hands each such holder shall have one vote and on a poll or on a written resolution each such holder shall have one vote for each A Ordinary Share held by them.

8.3    The holders of B Ordinary Shares, C Shares and D Shares shall not be entitled to receive notice of, attend or speak at or vote at, general meetings of the Company save that such holders of B Ordinary Shares, C Ordinary Shares and D Ordinary Shares shall be entitled to vote on a written resolution of the Company if, and to the extent that, they are permitted to do so pursuant to Article 32, but in no other circumstances.

## 9.    RETURN OF CAPITAL

9.1    The rights as regards return of capital attaching to each class of share shall be as set out in this Article 9 (Return Of Capital).

9.2    On a return of capital (whether on a Winding-Up, on a liquidation or otherwise) the surplus assets of the Company available for distribution among the members, after the payment of the Company's liabilities (the "**Surplus Assets**") shall be applied in the following manner:

(a)    if the value of the Surplus Assets is less than or equal to the Threshold, then the Surplus Assets shall be distributed in the following order of priority:

(i)    first, the C Share Surplus will be distributed amongst the holders of the C Shares in accordance with Article 9.3;

(ii)    secondly, the balance of the Surplus Assets will be distributed amongst the holders of the A Ordinary Shares and B Ordinary Shares, in proportion to the number of A Ordinary Shares and B Ordinary Shares held by them respectively; and

(iii)    finally, the holders of the D Shares shall not be entitled to receive any of the Surplus Assets.

(b)    if the value of the Surplus Assets exceeds the Threshold then the Surplus Assets shall be distributed in the following order of priority:

(i)    first, the C Share Surplus will be distributed amongst the holders of the C Shares in accordance with Article 9.3;

(ii)    secondly, the D Share Surplus will be distributed amongst the holders of the D Shares in accordance with Article 9.4; and

(iii)   finally, the balance of the Surplus Assets will be distributed amongst the holders of the A Ordinary Shares and B Ordinary Shares in proportion to the number of A Ordinary Share and B Ordinary Shares held by them respectively.

**C Share Allocation**

9.3   The distribution of the C Share Surplus to the holders of the C Shares shall be calculated as follows:

(i)    the holders of the C Ordinary Shares shall be entitled to the C Ordinary Amount which is to be distributed to each holder of a C Ordinary Share in proportion to the number of C Ordinary Shares held;

(ii)   a holder of C1 Ordinary Shares shall be entitled to the aggregate of the C1 Fixed Amounts for each C1 Ordinary Share held by it; and

(iii)  a holder of C2 Ordinary Shares shall be entitled to the aggregate of the C2 Fixed Amounts for each C2 Ordinary Share held by it.

**D Share Allocation**

9.4   The distribution of the D Share Surplus to the holders of the D Shares shall be calculated as follows:

(i)    the holders of the D Ordinary Shares shall be entitled to the D Ordinary Amount which is to be distributed to each holder of a D Ordinary Share in proportion to the number of D Ordinary Shares held;

(ii)   a holder of D1 Ordinary Shares shall be entitled to the aggregate of the D1 Fixed Amounts for each D1 Ordinary Share held by it; and

(iii)  a holder of D2 Ordinary Shares shall be entitled to the aggregate of the D2 Fixed Amounts for each D2 Ordinary Share held by it.

**10.    APPORTIONMENT OF CONSIDERATION ON A SALE OR IPO**

10.1   In the event of an IPO the holders of shares in the Company (immediately prior to such IPO), including any C Shareholders and D Shareholders, shall procure that the shares (or shares in a New Holding Company) that are the subject of the IPO shall be reallocated between them so as to ensure the order of application of the Total Equity Proceeds shall be in the same order of application as set out in Article 9.2 (and, in respect of the C Shareholders and the D Shareholders respectively, Articles 9.3 and 9.4) as if the date of such IPO were the date of the return of capital under such Article and as if the Total Equity Proceeds represented all of the assets of the Company available for distribution to the holders of shares in the Company. Any part or fractional entitlements shall be allocated by the directors acting in good faith.

10.2   In the event of a Sale or an Asset Sale, the holders of shares in the Company (immediately prior to the Sale or Asset Sale), including any C Shareholders and D Shareholders, shall procure that the Total Equity Proceeds attributable to such Sale or Asset Sale shall be distributed between them in the same order of application and on the same basis as set out in Article 9.2 (and, in respect of the C Shareholders and the D Shareholders respectively, Articles 9.3 and 9.4), but subject to Article 11, as if the date of such Sale or Asset Sale were the date of the return of capital under such Article and as if the Total Equity Proceeds represented all of the assets of the Company available for distribution to the holders of shares in the Company. Any part or fractional entitlements shall be allocated by the directors acting in good faith.

## 11.    POST-EXIT ADJUSTMENT

11.1    In the event that there is a Sale or an Asset Sale, and the value of the Total Equity Proceeds attributed to such Sale or Asset Sale is less than the Threshold as a result of any Contingent Consideration, the Remuneration Committee may (acting reasonably and where the Remuneration Committee determines (acting in good faith) that if any Contingent Consideration were to be paid on the Exit Date the value of the Total Equity Proceeds would equal or exceed the Threshold) direct that a proportion of the Total Equity Proceeds payable to the holders of the A Ordinary Shares and B Ordinary Shares is paid into an escrow for a period of 12 months following the Exit Date, or if earlier until such time as the Contingent Consideration has been paid ("**Final Date**"), on such terms as the Remuneration Committee shall deem appropriate.

11.2    If prior to the Final Date any part or all of the Contingent Consideration is released, (such amount being the "**Post-Exit Return Amount**"), the members agree that the Post-Exit Return Amount shall be divided among the holders of the A Ordinary Shares, B Ordinary Shares, the C Shares  and the D Shares (if applicable) in accordance with the provisions of this Article 11, and in accordance with Article 9.2 as in effect on the Exit Date.

11.3    If Article 11.2 applies, the members shall recalculate the Total Equity Proceeds, replacing the value of the Contingent Consideration that was excluded from the Total Equity Proceeds, with the value of the Post-Exit Return Amount (the "**Revised Equity Proceeds**").

11.4    If the value of the Revised Equity Proceeds is equal to or exceeds the Threshold as at the Exit Date (the "**Actual Threshold**"), the holders of the A Ordinary Shares and B Ordinary Shares shall, to the maximum extent possible but only out of amounts (i) held in escrow pursuant to Article 11.1 or (ii) of any Post-Exit Return Amount actually to be received by the holders of the A Ordinary Shares and B Ordinary Shares, agree that such amounts shall be paid, if the Actual Threshold would have resulted in the holders of the D Shares receiving proceeds or additional proceeds, to the holders of the D Shares so that they are in as near a position as possible to that which they would have been in had the Post-Exit Return Amount been used when calculating the entitlement of the D Shares on the Exit Date in accordance with Article  9 as in effect immediately prior to the Exit Date.

11.5    Each calculation under this Article 11 shall take account of prior adjustments made as a result of this Article 11 (if any).

<div align="center">SHARE TRANSFERS</div>

## 12.    SHARE TRANSFERS: GENERAL

12.1    In these Articles references to any "**transfer**" of shares or any similar expression shall be deemed to include:

(a)    any sale or other disposition of the legal or equitable interest in the shares (including any voting rights attached to the shares);

(b)    the creation of any mortgage, charge, pledge or other encumbrance over the legal or equitable interest in the shares (including any voting rights attached to the shares), provided that the terms of any such mortgage, charge pledge or other encumbrance shall provide for its automatic release upon such shares becoming Dragged Shares in accordance with the Drag Right;

(c)    any direction by a person entitled to an allotment or issue of shares that any such shares be allotted or issued to any other person; and

(d)      any grant of an option to acquire either or both of the legal and equitable ownership of any shares by any person entitled to any such shares.

### *A Ordinary Share Transfers and B Ordinary Share Transfers*

12.2    The A Ordinary Shares or B Ordinary Shares may not be transferred to any person (including a Competitor/Supplier Entity) other than:

(a)      in accordance with the Drag Right pursuant to Article 13;

(b)      in accordance with the requirement to issue a Tag Offer or receive a Tag Offer pursuant to Article 14;

(c)      in accordance with the requirements to issue a Delayed Tag Offer or receive a Delayed Tag Offer pursuant to Article 15;

(d)      pursuant to an Internal Transfer

or pursuant to clause 14 of the Shareholders' Agreement (such transfer not being permitted where it could be to a Competitor/Supplier Entity) and, in all cases, transfers must be in accordance with clause 13 of the Shareholders' Agreement.

### *C Share Transfer and D Share Transfer*

12.3    The C Shares and/or the D Shares may not be transferred to any person other than:

(a)      with the consent in writing of the Remuneration Committee, to a spouse or trust for bona fide tax planning purposes;

(b)      with the consent in writing of the Board;

(c)      to any New Holding Company; or

(d)      as may be expressly permitted or required by the Articles, the Shareholders' Agreement or any agreement pursuant to which the C Shares or D Shares were acquired by the C Shareholder or D Shareholder,

in each case a ("**Permitted Employee Transferee**").

12.4    Any transfer in breach of the Articles shall be void and the directors shall decline to register any transfer in breach of the Articles.

12.5    Subject to Articles 12.2, 12.3 and 12.6, the Company shall register any transfer of shares within 14 days of an instrument of transfer in any usual form or any other form approved by the directors, executed by or on behalf of the transferor and, if any of the shares are partly paid, the transferee, being lodged (duly stamped if required) at the Company's registered office accompanied by the relevant share certificate(s) (to the extent certificates have been issued in respect of such shares) and such other evidence as the directors may reasonably require for the Company to satisfy itself acting reasonably that the transfer is not to a Competitor/Supplier Entity, other than where permitted pursuant to Articles 12.2 or 12.3, or to satisfy requirements that the Company or any regulated services provider to it may have for the purposes of (but not limited to) the Money Laundering (Jersey) Order 2008 and Proceeds of Crime (Jersey) Law 1999, the US Securities Act of 1933, as amended or any other applicable securities laws and regulations.

12.6     The directors must decline to register a transfer if the transfer is, as far as the directors are aware, to a Competitor/Supplier Entity, other than on a transfer of shares effected pursuant to Articles 12.2 or 12.3.

12.7     No fee may be charged for registering any instrument of transfer or other document relating to or affecting the title to any share.

12.8     The Company may retain any instrument of transfer which is registered.

12.9     The transferor remains the holder of a share until the transferee's name is entered in the register of members as holder of it.

12.10    If the directors decline to register the transfer of a share in accordance with the Articles, they shall:

     (a)     send to the transferee a notice of refusal, including the reasons for the refusal, as soon as practicable and in any event within two months of the date on which the instrument of transfer was lodged with the Company; and

     (b)     return the instrument of transfer to the transferee with the notice of refusal unless they suspect that the proposed transfer may be fraudulent.

12.11    If a member (which for the purposes of C Shares includes both the C Shareholder and any Nominee, and for the purposes of D Shares includes both the D Shareholder and any Nominee) defaults in transferring any shares that it is required to transfer pursuant to the Articles (including pursuant to Article 13 (*Drag Along Rights*)):

     (a)     a resolution of the Vendor Shareholders may authorise any individual to execute, complete and deliver in the name of and as agent for and irrevocable appointee of the defaulting member any instruments of transfer and other documents necessary to give effect to the transfer of the shares to the transferee, including where applicable a direction to the Nominee to transfer shares, and the relevant member shall thereby be deemed to authorise that execution, completion and delivery, and the Company shall on receipt of the duly executed instrument of transfer and other documents (subject to the transfer being duly stamped if necessary) register the transferee as the holder of the shares in the Company's register of members (whether or not the certificates in respect of such shares (if any) have been delivered to the Company);

     (b)     the Company's receipt of the purchase money shall be a good discharge to the transferee on behalf of the selling member, and the Company shall hold such purchase money on trust for the selling member and pay the proceeds of sale into a separate bank account in the Company's name and (i) to the extent any certificates have been issued in respect of such shares, if and when the transferor shall deliver up its certificates in respect of such shares to the Company (or an indemnity in a form reasonably satisfactory to the Vendor Shareholders in respect of any such lost certificates); or (ii) if no share certificates have been issued in respect of such shares, if and when the transferor shall deliver such evidence of entitlement to shares as the directors may reasonably require, it shall thereupon be paid the purchase money, without interest and less any sums owed to the Company by the holder pursuant to the Articles or otherwise (and if such certificates shall comprise any shares which the holder has not become bound to transfer the Company shall issue to such holder a balance certificate for such shares);

     (c)     once the name of the purchaser has been entered in the register of members in purported exercise of these powers, the validity of the proceedings shall not be questioned by any person and the transferee shall not be bound to see to the application of the consideration; and

(d)     if, in relation to a Drag Along Notice, "consideration" for the purposes of Article 13.6 includes an offer to subscribe for or acquire any share, debt instrument or other security in the capital of the Proposed Purchaser, or any group undertaking of the Proposed Purchaser, as an alternative (whether in whole or in part), the directors shall have full and unfettered discretion to elect which alternative to accept in respect of each defaulting transferor (and may elect for different alternatives for different defaulting transferors) and the directors so acting shall not have any liability to such defaulting transferor in relation thereto.

12.12   To enable the Company to determine whether or not there has been any transfer of shares in breach of the Articles the directors may require any holder (which for the purposes of C Shares includes both the C Shareholder and any Nominee, and for the purposes of D Shares includes both the D Shareholder and any Nominee) or the legal personal representatives of any deceased holder or any person named as transferee in any transfer lodged for registration or such other person as the directors may reasonably believe to have information relevant to such purpose, to furnish to the Company such information and evidence as the directors (acting reasonably) may think fit regarding any matter which they deem relevant to such purpose.  If such information or evidence is not furnished within a reasonable time period to enable the directors to determine to their reasonable satisfaction that no such breach has occurred, or as a result of such information and evidence being furnished the directors are reasonably satisfied that such a breach has occurred, the directors shall forthwith notify the holder of such shares in writing of that fact and, if the holder fails to remedy such breach within 20 days of receipt of such written notice, then the relevant shares shall cease to confer upon the holder thereof any rights to vote (whether on a show of hands or on a poll) or to constitute an eligible member in relation to any proposed written resolution or to receive dividends or other distributions.  These rights may be reinstated by the directors.

12.13   In the event of a Company Reorganisation, the members of the Company immediately prior to such Company Reorganisation, including any C Shareholders and D Shareholders, shall procure that the shares in any New Holding Company that are issued to them in connection with a Company Reorganisation, shall have a value that is substantially the same as the value of the Ordinary Shares held by them prior to the Company Reorganisation having regard to the reasons for such Company Reorganisation when assessing such value.

## 13.    DRAG ALONG RIGHTS

13.1    Where one or more holders of A Ordinary Shares (the "**Vendor Shareholders**") propose to transfer, in one or a series of transactions, two thirds or more in aggregate of the total number of A Ordinary Shares then in issue (together, the "**Vendor Shares**") to a purchaser (other than any Internal Transfer or to another holder of A Ordinary Shares) (the "**Proposed Purchaser**"), the Vendor Shareholders or the Proposed Purchaser shall have the option to require all of the other members (other than any members who are connected (as defined in section 252 of the UK Companies Act) with the Vendor Shareholders or acting in concert (as defined in the UK Takeover Code) with the Proposed Purchaser), and which for the purposes of C Shares includes both the C Shareholder and any Nominee, and for the purposes of D Shares includes both the D Shareholder and any Nominee, (the "**Dragged Shareholders**") to sell and transfer all of their shares (including any shares acquired by them after the Drag Along Notice is served but excluding any shares which are to be redeemed on or prior to the purchase) (the "**Dragged Shares**") to the Proposed Purchaser (or as the Proposed Purchaser shall direct) in accordance with the provisions of this Article 13 (*Drag Along Rights*) (the "**Drag Right**").

13.2    The Vendor Shareholders may exercise the option set out in Article 13.1 by giving written notice to that effect to each of the Dragged Shareholders (or by requiring the Company to give written notice to the Dragged Shareholders) at any time prior to the transfer of the Vendor Shares to the Proposed Purchaser.  Such written notice (a "**Drag Along Notice**") shall specify:

(a)     that the Dragged Shareholders are required to transfer the Dragged Shares pursuant to this Article 13 (*Drag Along Rights*);

(b)     the person to whom the Dragged Shares are to be transferred;

(c)     the consideration for which the Dragged Shares are to be transferred (calculated in accordance with Article 13.6); and

(d)     the proposed timing for the transfer to become effective.

13.3    The Drag Along Notice shall be accompanied by all documents required to be executed by the relevant Dragged Shareholder in order to transfer legal and beneficial title to the Dragged Shares, with full title guarantee, to the Proposed Purchaser free from all encumbrances, which shall include representations and warranties with respect to the Dragged Shareholder's title to, and ownership of, the relevant Dragged Shares, its capacity and authority to enter into such transfer and a customary leakage indemnity with respect to leakage from the date of the accounts being used as the locked box accounts up until the date of completion of such transfer which shall be subject to customary permitted leakage (to the extent applicable) as has been agreed by the Vendor Shareholders (but for the avoidance of doubt, no Dragged Shareholder that is a holder of A Ordinary Shares or B Ordinary Shares or a Nominee shall be required to give any other warranties, representations, indemnities or restrictive covenants) and may include certain conditions as agreed between the Vendor Shareholders and the Proposed Purchaser.

13.4    A Drag Along Notice shall be irrevocable but shall lapse if the Vendor Shares are not sold to the Proposed Purchaser within 60 days from the date of service of the Drag Along Notice (or such longer period as may be (a) required in order to satisfy any mandatory regulatory or anti-trust conditions; or (b) reasonably requested in writing to each of the Dragged Shareholders by the Vendor Shareholders). The Vendor Shareholders may serve (or may require the Company to serve) further Drag Along Notices where any particular Drag Along Notice lapses or where the terms listed in Article 13.2 change.

13.5    Notwithstanding any other provision of these Articles, during the period between service of a Drag Along Notice on a Dragged Shareholder in accordance with Article 13.2 and the Dragged Shares being transferred to the Proposed Purchaser in accordance with this Article 13 (Drag Along Rights), those Dragged Shares may not be transferred other than under this Article 13 (Drag Along Rights).

13.6    The form (in cash or otherwise), amount and manner of payment (including in respect of any deferral or escrow) and any of the payment terms of the consideration payable for each Dragged Share shall be equal to the higher of (i) the highest consideration to be paid for a Vendor Share; or (ii) the amount received for an Ordinary Share by any relevant Vendor Shareholder in the 12 months prior to the date of the definitive agreement for transfer and in each case the consideration shall be in the same form as the consideration to be paid by the Proposed Purchaser for each Vendor Share (together with the relevant proportion of any other consideration (in cash or otherwise) received or receivable by any Vendor Shareholder provided that, if any Non-Cash Consideration is specified in the Drag Along Notice, each Dragged Shareholder shall have the right to elect by giving written notice to the Company or the Vendor Shareholders (as applicable) within 3 Business Days following the date of a Drag Along Notice (the "**Election Date**") to receive a cash amount equal to the Cash Equivalent Value of the Non-Cash Consideration from the Proposed Purchaser in substitution for the Non-Cash Consideration. Notwithstanding the foregoing, the consideration payable shall always be apportioned between members in accordance with Articles 9 and 10.

13.7    Each Dragged Shareholder shall pay its pro rata share (as a deduction from, and calculated by reference to, the gross pre-Tax proceeds to be received by all Vendor Shareholders and Dragged

Shareholders in respect of their shares and other securities to be sold or redeemed in connection with the relevant transaction, without prejudice to any other deductions lawfully required to be made) of costs incurred by the Vendor Shareholders in connection with the transfer of the Vendor Shares and the Dragged Shares.

13.8    The sale of the Dragged Shares shall be completed on the date of completion of the sale of the Vendor Shares unless the Vendor Shareholders and the holders of more than 50 per cent. of the Dragged Shares agree otherwise.  The Dragged Shareholders shall not be required to sell and transfer the Dragged Shares prior to the date on which the Vendor Shares are transferred to the Proposed Purchaser.

13.9    Where any person becomes a member of the Company pursuant to the exercise of a pre-existing option or other right to acquire shares after a Drag Along Notice has been served, such member will be bound to sell and transfer all shares it acquires to the Proposed Purchaser (or as the Proposed Purchaser may direct).  The provisions of Articles 13.1 to 13.8 shall apply (with the necessary changes) to such member, save that if its shares are acquired after the sale of the Dragged Shares has been completed, completion of the sale of such member's shares shall take place immediately following the acquisition of such shares by such member.

13.10   In the event that any Dragged Shareholder has (or has a parent undertaking that has) a premium listing of equity securities on the London Stock Exchange (a "**Listed Dragged Shareholder**"), and does not have sole discretion over whether or not there is to be a transfer of its Dragged Shares pursuant to this Article 13 (Drag Along Rights), the maximum consideration payable to such Listed Dragged Shareholder for its Dragged Shares shall, notwithstanding any provision to the contrary in the Articles, be limited to the minimum amount that would constitute a Class 2 transaction in accordance with the Listing Rules of the London Stock Exchange, less £1.00.  The provision of the foregoing sentence in this Article 13.10 is for the benefit of each Listed Dragged Shareholder alone and may, within 5 Business Days of receipt of any Drag Along Notice by such Listed Dragged Shareholder, be waived by such Listed Dragged Shareholder in respect of itself in its sole discretion (whether entirely or subject to a higher cap determined by it).

## 14.    TAG ALONG RIGHTS

14.1    Other than an Internal Transfer, a transfer pursuant to Article 20 (Enforcement Of The Company's Lien) or Article 13 (Drag Along Rights), no sale or transfer for value of the legal or beneficial interest in A Ordinary Shares shall be made to any person which is an independent third party and is not, for the avoidance of doubt, an Original Shareholder or an Affiliate of an original Shareholder (the "**Proposed Transferee**") that results in the Proposed Transferee (together with its Affiliates) holding two thirds or more of the total number of A Ordinary Shares (in aggregate) (whether in one or a series of related transactions) unless before such transfer is lodged for registration the members proposing to make the transfer (the "**Proposed Transferors**") have procured that a single unconditional offer complying with the provisions of Article 14.2 has been made by the Proposed Transferee to the Company as agent for and on behalf of the holders of the other Ordinary Shares to acquire all of their holdings of Ordinary Shares (the "**Tag Offer**").

14.2    The Tag Offer shall:

(a)    be open for acceptance for a period of at least 15 Business Days following the making of the Tag Offer (such date being the "**Tag Closing Date**");

(b)    be unconditional;

(c)    provide an estimate of the costs to be incurred by the Proposed Transferors and all other holders of shares in connection with the transfers by the Proposed Transferors and the

Tagging Shareholders and the portion of which shall be payable by the Tagging Shareholders for the purposes of Article 14.6 (provided that the Proposed Transferors may update this estimate at any time prior to the Tag Completion Date);

(d)    be on terms that the purchase of any Ordinary Shares in respect of which such offer is accepted shall be completed at the same time as the purchase from the Proposed Transferors; and

(e)    specify the form (in cash or otherwise), amount and manner of payment (including in respect of any deferral or escrow) of the consideration payable for each Ordinary Share which shall be equal to the higher of (i) the highest consideration to be received by a Proposed Transferor (or one of its Affiliates) for an A Ordinary Share or (ii) the amount received by a Proposed Transferor for an A Ordinary Share in the twelve -month period prior to the date of the Tag Offer [(but excluding any transfer, purchase or issuance of Ordinary Shares on the Adoption Date)] together with the relevant proportion of any other consideration (in cash or otherwise) received or receivable by the Proposed Transferors. If any Non-Cash Consideration is specified in the Tag Offer, each Proposed Transferor shall have the right to elect by giving written notice to the Company within 3 Business Days following the date of a Tag Offer (the "**Tag Election Date**") to receive a cash amount equal to the Cash Equivalent Value of the Non-Cash Consideration from the Proposed Transferee in substitution for the Non-Cash Consideration. Notwithstanding the foregoing, the consideration payable shall always be apportioned between members in accordance with Articles 9 and 10.

14.3    The Company shall promptly notify the holders of Ordinary Shares which are the subject of a Tag Offer (being the C Shareholder in respect of C Shares, and the D Shareholder in respect of D Shares) of the terms of the Tag Offer upon receiving notice of the same from the Proposed Transferee, following which any such holder who wishes to transfer all (and not some) of their Ordinary Shares to the Proposed Transferee pursuant to the Tag Offer (a "**Tagging Shareholder**") shall serve notice on the Company to that effect (the "**Tag Acceptance Notice**") at any time before the Tag Closing Date.

14.4    Within three days after the Tag Closing Date:

(a)    the Company shall notify the Proposed Transferee in writing of the names and addresses of the Tagging Shareholders who have accepted the Tag Offer, together with the number of Ordinary Shares the acceptance relates to;

(b)    the Company shall notify each Tagging Shareholder in writing of the identity of the Proposed Transferee; and

(c)    each of the Company's notifications above shall indicate the date, time and place on which the sale and purchase of the Ordinary Shares is to be completed being a date notified by the Proposed Transferee which is not less than seven days and not more than fourteen days after the Tag Closing Date (the "**Tag Completion Date**").

14.5    Each Tagging Shareholder (and the Nominee on behalf of any C Shareholder or D Shareholder who is a Tagging Shareholder) shall transfer (with full title guarantee and free from all encumbrances) the legal and beneficial title to its Ordinary Shares which are the subject of the Tag Acceptance Notice to the Proposed Transferee on the terms set out in this Article 14 (*Tag Along Rights*), by delivering to the Company on or before the Tag Completion Date:

(a)    duly executed stock transfer form(s) in respect of such Ordinary Shares registered in its name;

(b)      to the extent any certificates have been issued in respect of such shares, the relevant share certificate(s) (or an indemnity in respect thereof in a form satisfactory to the directors); and

(c)      a duly executed sale agreement or form of acceptance,

and, to the extent required by the Proposed Transferors, shall sign such other documents as are signed by the Proposed Transferors pursuant to the offer provided that the Tagging Shareholders shall not be required to give any representations, warranties, covenants or indemnities (except with respect to the Tagging Shareholder's title to, and ownership of, the relevant Ordinary Shares, its capacity and authority to enter into such transfer and a customary leakage indemnity with respect to leakage from the date of the accounts being used as the locked box accounts up until the date of completion of such transfer which shall be subject to customary permitted leakage (to the extent applicable)) as has been agreed by the Proposed Transferors all against payment on the Tag Completion Date of the aggregate consideration due to it under the Tag Offer.

14.6    Each Tagging Shareholder shall pay its pro rata share (as a deduction from, and calculated by reference to, the gross pre-Tax proceeds to be received by all Tagging Shareholders in respect of their shares and other securities to be sold or redeemed in connection with the relevant transaction, without prejudice to any other deductions lawfully required to be made) of the costs incurred by the Proposed Transferors and all other holders of shares who accept an offer under this Article 14 (Tag Along Rights) in connection with the transfers by the Proposed Transferors and the Tagging Shareholders, in each case, as have been agreed by the Company.

14.7    No offer shall be required under this Article 14 (Tag Along Rights) if a Drag Along Notice has been served under Article 13 (Drag Along Rights) and has not lapsed.

## 15.    DELAYED TAG ALONG RIGHTS

15.1    Without prejudice to Clause 14 (*Tag Along Rights*), if:

(a)      on the Tag Long Stop Date an Exit Condition does not apply; or

(b)      on the Exit Condition Long Stop Date, the relevant Exit has not occurred,

an Original Shareholder who together with its Affiliates holds two thirds or more of the total number of A Ordinary Shares in issue, the Original Shareholder and/or its Affiliates shall be obligated to give a written notice on the Tag Long Stop Date to the Company as agent for the holders of the Ordinary Shares who are not the Original Shareholders ("**Delayed Tagging Shareholders**") to acquire all of their holdings of Ordinary Shares (the "**Delayed Tag Offer**").

15.2    The Delayed Tag Offer shall:

(a)      be open for acceptance for a period of at least 15 Business Days following the date of notice given by the Company pursuant to Article 15.3 (such date being the "**Delayed Tag Closing Date**");

(b)      provide an estimate of the costs to be incurred by the Delayed Tagging Shareholders and all other holders of shares in connection with the transfers by the Proposed Transferors and the Tagging Shareholders and the portion of which shall be payable by the Tagging Shareholders for the purposes of Article 15.6 (provided that the Original Shareholder may update this estimate at any time prior to the Delayed Tag Transfer Date);

(c)      be unconditional; and

(d)     be for cash at a price per Ordinary Share equal to the highest consideration paid by an Original Shareholder and/or its Affiliates for an A Ordinary Share (including the Cash Equivalent Value of any Non-Cash Consideration paid by an Original Shareholder for an A Ordinary Share) [(but excluding any transfer, purchase or issuance of Ordinary Shares on the Adoption Date)]. Notwithstanding the foregoing, the consideration payable shall always be apportioned between members in accordance with Articles 9 and 10.

15.3    The Company shall promptly notify the Delayed Tagging Shareholders of the terms of the Delayed Tag Offer upon receiving notice of the same from the Original Shareholder or an Affiliate, following which any Delayed Tagging Shareholder who wishes to transfer all (and not some) of their Ordinary Shares to the Original Shareholder or an Affiliate pursuant to the Delayed Tag Offer shall serve notice on the Company to that effect (the "**Delayed Acceptance Notice**") at any time before the Delayed Tag Closing Date.

15.4    Within 2 Business Days after the Delayed Tag Closing Date:

(a)     the Company shall notify the Original Shareholder and/or its Affiliates in writing of the names and addresses of the Delayed Tagging Shareholders who have accepted the Delayed Tag Offer, together with the number of Ordinary Shares the acceptance relates to;

(b)     the Company shall notify each Delayed Tagging Shareholder in writing of the identity of the Original Shareholder and/or its Affiliates; and

(c)     each of the Company's notifications above shall indicate the date, time and place on which the sale and purchase of the Ordinary Shares is to be completed being a date notified by the Original Shareholder which is not less than 10 Business Days and not more than 20 Business Days after the Delayed Tag Closing Date (the "**Delayed Tag Transfer Date**").

15.5    Each Delayed Tagging Shareholder (and the Nominee on behalf of any C Shareholder or D Shareholder who is a Delayed Tagging Shareholder) shall transfer (with full title guarantee and free from all encumbrances) the legal and beneficial title to its Ordinary Shares which are the subject of the Delayed Acceptance Notice to the Original Shareholder and/or its Affiliates on the terms set out in this Article 15 (*Delayed Tag Along Rights*), by delivering to the Company on or before the Delayed Tag Transfer Date:

(a)     duly executed stock transfer form(s) in respect of such Ordinary Shares registered in its name;

(b)     to the extent any certificates have been issued in respect of such shares, the relevant share certificate(s) (or an indemnity in respect thereof in a form satisfactory to the directors); and

(c)     a duly executed sale agreement or form of acceptance.

15.6    Each Delayed Tagging Shareholder shall pay its pro rata share (as a deduction from, and calculated by reference to, the gross pre-Tax proceeds to be received by all Delayed Tagging Shareholders in respect of their shares to be sold or redeemed in connection with the relevant transaction, without prejudice to any other deductions lawfully required to be made) of the costs incurred by the Original Shareholder and all other holders of shares who accept an offer under this Article 15 (*Delayed Tag Along Rights*) in connection with the transfers by the Delayed Tagging Shareholders, in each case, as have been agreed by the Company.

**16.    TRANSMISSION OF SHARES**

16.1    If title to a share passes to a transmittee, the Company may only recognise the transmittee as having any title to that share.

16.2    A transmittee who produces such evidence of entitlement to shares as the directors may properly require:

(a)    may, subject to the Articles, choose either to become the holder of those shares or to have them transferred to another Affiliate of the original holder; and

(b)    subject to the Articles, and pending any transfer of the shares to another Affiliate of the original holder, has the same rights and obligations as the original holder had.

16.3    Subject to Article 55.2, transmittees do not have the right to attend or vote at a general meeting, or to constitute an eligible member in relation to any proposed written resolution, in respect of shares to which they are entitled, by reason of the holder's death or bankruptcy or otherwise, unless they become the holders of those shares.

**17.    EXERCISE OF TRANSMITTEES' RIGHTS**

17.1    Transmittees who wish to become the holders of shares to which they have become entitled must notify the Company in writing of that wish.

17.2    If the transmittee wishes to have a share transferred to another person, the transmittee must execute an instrument of transfer in respect of it.

17.3    Any transfer made or executed under this Article 17 (Exercise Of Transmittee's Rights) is to be treated as if it were made or executed by the person from whom the transmittee has derived rights in respect of the share, and as if the event which gave rise to the transmission had not occurred.

**18.    TRANSMITTEES BOUND BY PRIOR NOTICES**

If a notice is given to a member in respect of shares and a transmittee is entitled to those shares, the transmittee is bound by the notice if it was given to the member before the transmittee's name has been entered in the register of members.

**19.    COMPANY'S LIEN OVER PARTLY PAID SHARES**

19.1    The Company has a lien (the "**Company's lien**") over every share which is partly paid, for all monies (whether presently payable or not) which have not been paid to the Company in respect of that share, and which is payable immediately or at some time in the future, whether or not a call notice has been sent in respect of it.

19.2    The Company's lien over a share:

(a)    takes priority over any third party's interest in that share; and

(b)    extends to any dividend or other money payable by the Company in respect of that share and (if the lien is enforced and the share is sold by the Company) the proceeds of sale of that share.

19.3    The directors may at any time, decide that a share which is or would otherwise be subject to the Company's lien shall not be subject to it, either wholly or in part.

**20.    ENFORCEMENT OF THE COMPANY'S LIEN**

20.1    Subject to the provisions of this Article 20 (Enforcement Of The Company's Lien), if:

(a)    an enforcement notice has been given in respect of a share (a "**lien enforcement notice**"); and

(b)    the person to whom the notice was given has failed to comply with it,

the Company may sell that share in such manner as the directors decide.

20.2    A lien enforcement notice:

(a)    may only be given in respect of a share which is subject to the Company's lien, in respect of which a sum is payable and the due date for payment of that sum has passed;

(b)    must specify the share concerned;

(c)    must require payment of the sum payable within 14 days of the notice;

(d)    must be addressed either to the holder of the share or to a person entitled to it by reason of the holder's death, bankruptcy or otherwise; and

(e)    must state the Company's intention to sell the share if the notice is not complied with.

20.3    Where shares are sold under this Article 20 (Enforcement Of The Company's Lien):

(a)    the directors may authorise any person to execute an instrument of transfer of the shares to the purchaser or a person nominated by the purchaser; and

(b)    the transferee is not bound to see to the application of the consideration, and the transferee's title is not affected by any irregularity in or invalidity of the process leading to the sale.

20.4    The net proceeds of any such sale (after payment of the costs of sale and any other costs of enforcing the lien) must be applied:

(a)    first, in payment of so much of the sum for which the lien exists as was payable at the date of the lien enforcement notice; and

(b)    second, to the person entitled to the shares at the date of the sale, but, to the extent any certificates have been issued in respect of such shares, only after the certificate for the shares sold has been surrendered to the Company for cancellation or an indemnity in lieu of the certificate in a form reasonably satisfactory to the directors has been given for any such lost certificates, and subject to a lien equivalent to the Company's lien over the shares before the sale for any money payable in respect of the shares after the date of the lien enforcement notice.

20.5    A statutory declaration by a director or the company secretary (if any) that the declarant is a director or the company secretary and that a share has been sold to satisfy the Company's lien on a specified date:

(a)    is conclusive evidence of the facts stated in it as against all persons claiming to be entitled to the share; and

(b)    subject to compliance with any other formalities of transfer required by the Articles or by law, constitutes a good title to the share.

**21.    CALL NOTICES**

21.1    Subject to the Articles and the terms on which shares are allotted, the directors may send a notice (a "**call notice**") to a member requiring the member to pay the Company a specified sum of money (a "**call**") which is payable in respect of any amount partly paid or unpaid on the shares which that member holds at the date when the directors decide to send the call notice.

21.2    A call notice:

(a)    may not require a member to pay a call which exceeds the total sum unpaid on that member's shares;

(b)    must state when and how any call to which it relates it is to be paid; and

(c)    may permit or require the call to be paid by instalments.

21.3    A member must comply with the requirements of a call notice, but no member is obliged to pay any call before 14 days have passed since the notice was sent.

21.4    Before the Company has received any call due under a call notice the directors may:

(a)    revoke it wholly or in part; or

(b)    specify a later time for payment than is specified in the call notice,

by a further notice in writing to the member in respect of whose shares the call is made.

**22.    LIABILITY TO PAY CALLS**

22.1    Liability to pay a call is not extinguished or transferred by transferring the shares in respect of which it is required to be paid.

22.2    Joint holders of a share are jointly and severally liable to pay all calls in respect of that share.

22.3    Subject to the terms on which shares are allotted, the directors may, when issuing shares, provide that call notices sent to the holders of those shares may require them:

(a)    to pay calls which are not the same; or

(b)    to pay calls at different times.

**23.    WHEN CALL NOTICE NEED NOT BE ISSUED**

23.1    A call notice need not be issued in respect of sums which are specified, in the terms on which a share is allotted, as being payable to the Company in respect of that share:

(a)    on allotment;

(b)    on the occurrence of a particular event; or

(c)    on a date fixed by or in accordance with the terms of allotment.

23.2    But if the due date for payment of such a sum has passed and it has not been paid, the holder of the share concerned is treated in all respects as having failed to comply with a call notice in respect of that sum, and is liable to the same consequences as regards the payment of interest and forfeiture.

24.    **FAILURE TO COMPLY WITH CALL NOTICE: AUTOMATIC CONSEQUENCES**

24.1    If a person is liable to pay a call and fails to do so by the call payment date:

(a)    the directors may issue a notice of intended forfeiture to that person; and

(b)    until the call is paid, that person must pay the Company interest on the call from the call payment date at the relevant rate.

24.2    For the purposes of this Article 24 (Failure To Comply With Call Notice: Automatic Consequences):

(a)    the "**call payment date**" is the time when the call notice states that a call is payable, unless the directors give a notice specifying a later date, in which case the 'call payment date' is that later date;

(b)    the "**relevant rate**" is:

(i)    the rate fixed by the terms on which the share in respect of which the call is due was allotted;

(ii)    such other rate as was fixed in the call notice which required payment of the call, or has otherwise been determined by the directors; or

(iii)    if no rate is fixed in either of these ways, five per cent. per annum.

24.3    The relevant rate must not exceed by more than five percentage points the base lending rate most recently set by the Monetary Policy Committee of the Bank of England in connection with its responsibilities under Part 2 of the Bank of England Act 1998 of the United Kingdom.

24.4    The directors may waive any obligation to pay interest on a call wholly or in part.

25.    **NOTICE OF INTENDED FORFEITURE**

25.1    A notice of intended forfeiture:

(a)    may be sent in respect of any share in respect of which a call has not been paid as required by a call notice;

(b)    must be sent to the holder of that share or to a person entitled to it by reason of the holder's death, bankruptcy or otherwise;

(c)    must require payment of the call and any accrued interest by a date which is not less than 14 days after the date of the notice;

(d)    may require payment of all costs and expenses that may have been incurred by the Company by reason of such non-payment by a date which is not less than 14 days after the date of the notice;

(e)    must state how the payment is to be made; and

(f)    must state that if the notice is not complied with, the shares in respect of which the call is payable will be liable to be forfeited.

31 EU-DOCS\29888423.7

26.    **DIRECTORS' POWER TO FORFEIT SHARES**

If a notice of intended forfeiture is not complied with before the date by which payment of the call is required in the notice of intended forfeiture, the directors may decide that any share in respect of which it was given is forfeited, and the forfeiture is to include all dividends or other moneys payable in respect of the forfeited shares and not paid before the forfeiture.

27.    **EFFECT OF FORFEITURE**

27.1    Subject to the Articles, the forfeiture of a share extinguishes:

(a)    all interests in that share, and all claims and demands against the Company in respect of it; and

(b)    all other rights and liabilities incidental to the share as between the person whose share it was prior to the forfeiture and the Company.

27.2    Any share which is forfeited in accordance with the Articles:

(a)    is deemed to have been forfeited when the directors decide that it is forfeited;

(b)    is deemed to be the property of the Company; and

(c)    may be sold, re-allotted or otherwise disposed of as the directors think fit.

27.3    If a person's shares have been forfeited:

(a)    the Company must send that person notice that forfeiture has occurred and record it in the register of members;

(b)    that person ceases to be a member in respect of those shares;

(c)    to the extent any certificates have been issued in respect of such shares, that person must surrender the certificate for the shares forfeited to the Company for cancellation;

(d)    that person remains liable to the Company for all sums payable by that person under the Articles at the date of forfeiture in respect of those shares, including any interest (whether accrued before or after the date of forfeiture); and

(e)    the directors may waive payment of such sums wholly or in part or enforce payment without any allowance for the value of the shares at the time of forfeiture or for any consideration received on their disposal.

27.4    At any time before the Company disposes of a forfeited share, the directors may decide to cancel the forfeiture on payment of all calls, interest and costs and expenses (if any) due in respect of it and on such other terms as they think fit.

28.    **PROCEDURE FOLLOWING FORFEITURE**

28.1    If a forfeited share is to be disposed of by being transferred, the Company may receive the consideration for the transfer and the directors may authorise any person to execute the instrument of transfer.

28.2    A statutory declaration by a director or the company secretary (if any) that the declarant is a director or the company secretary and that a share has been forfeited on a specified date:

(a)    is conclusive evidence of the facts stated in it as against all persons claiming to be entitled to the share; and

(b)    subject to compliance with any other formalities of transfer required by the Articles or by law, constitutes a good title to the share.

28.3    A person to whom a forfeited share is transferred is not bound to see to the application of the consideration (if any) nor is that person's title to the share affected by any irregularity in or invalidity of the process leading to the forfeiture or transfer of the share.

28.4    If the Company sells a forfeited share, the person who held it prior to its forfeiture is entitled to receive from the Company the proceeds of such sale, net of any commission, and excluding any amount which:

(a)    was, or would have become, payable; and

(b)    had not, when that share was forfeited, been paid by that person in respect of that share,

but no interest is payable to such a person in respect of such proceeds and the Company is not required to account for any money earned on them.

## 29.    SURRENDER OF SHARES

29.1    A member may surrender any share:

(a)    in respect of which the directors may issue a notice of intended forfeiture;

(b)    which the directors may forfeit; or

(c)    which has been forfeited.

29.2    The directors may accept the surrender of any such share.

29.3    The effect of surrender on a share is the same as the effect of forfeiture on that share.

29.4    A share which has been surrendered may be dealt with in the same way as a share which has been forfeited.

## SHARES - OTHER PROVISIONS

## 30.    ALLOTMENTS OF SHARES

30.1    Subject always to the Shareholders' Agreement and these Articles, the directors are generally and unconditionally authorised to exercise all the powers of the Company to allot, and grant rights to subscribe for or convert any security into, shares in the Company to such persons, at such times, for such consideration and on such terms and conditions as the directors may decide.

30.2    By the authority conferred by this Article 30 (Allotments Of Shares) the directors may, before the authority expires, make an offer or enter into an agreement which would, or might, require shares to be allotted or rights to subscribe for, or to convert any security into, shares to be granted after the expiry of such authority and the directors may allot those shares or grant rights to subscribe for, or to convert any security into, shares in pursuance of that offer or agreement as if such authority had not expired.

**31.    POWERS TO ISSUE DIFFERENT CLASSES OF SHARE**

31.1    Subject to the Articles and the terms of the Shareholders' Agreement, but without prejudice to the rights attached to any existing share, the Company may issue shares with such rights or restrictions as may be determined.

31.2    Subject to the Articles and the terms of the Shareholders' Agreement, the Company may issue shares which are to be redeemed, or are liable to be redeemed at the option of the Company or the holder, and the directors may determine the terms, conditions and manner of redemption of any such shares.

**32.    VARIATION OF CLASS RIGHTS**

32.1    Subject to the terms of the Shareholders' Agreement and the Companies Law:

(a)    the rights attaching to the A Ordinary Shares may be varied or abrogated with the consent in writing of the holders of two thirds of the number of A Ordinary Shares in issue;

(b)    the rights attaching to the B Ordinary Shares may be varied or abrogated with the consent in writing of the holders of two thirds of the number of B Ordinary Shares in issue;

(c)    the rights attaching to the C Shares may be varied or abrogated with the consent in writing of the holders of 50 per cent. of the number of A Ordinary Shares and C Shares in issue as if they constituted one class, save that if the effect of any variation or abrogation of rights is disproportionately prejudicial to the rights attached to any C Shares  in comparison to the rights attached to the A Ordinary Shares, such rights shall only be varied or abrogated with the consent in writing of the holders of 50 per cent. of the number of shares in issue of the class of shares that are disproportionately affected. For the purposes of this Article 32.1(c), any C1 Ordinary Share or C2 Ordinary Share that is in issue shall comprise one-half of a C Ordinary Share; and

(d)    the rights attaching to the D Shares may be varied or abrogated with the consent in writing of the holders of 50 per cent. of the number of A Ordinary Shares and D Shares in issue as if they constituted one class, save that if the effect of any variation or abrogation of rights is disproportionately prejudicial to the rights attached to any D Shares in comparison to the rights attached to the A Ordinary Shares, such rights shall only be varied or abrogated with the consent in writing of the holders of 50 per cent. of the number of shares in issue of the class of shares that are disproportionately affected. For the purposes of this Article 32.1(d), any D1 Ordinary Share or D2 Ordinary Share that is in issue shall comprise one-half of a D Ordinary Share.

32.2    Any such rights may be so varied or abrogated either whilst the Company is a going concern or during or in contemplation of a Winding-Up.

32.3    The rights conferred on the holders of shares of any class shall not, unless otherwise expressly provided by the terms of the shares of that class, be deemed to be varied or abrogated by:

(a)    the creation, allotment or issue of further shares, or securities convertible into shares, ranking subsequent to, or *pari passu* with, or in priority to them, or the issue of any debt securities by any Group Company, or the purchase or redemption by the Company of its own shares (including redeemable shares) in accordance with the Companies Law and the terms of the Shareholders' Agreement; or

(b)      any alteration to these Articles made conditional upon, or otherwise in connection with, a Sale or an IPO or in accordance with Article 32.3(a).

32.4    The foregoing provisions of this Article 32 (*Variation Of Class Rights*) shall apply to the variation or abrogation of the special rights attached to some only of the shares of any class as if each group of shares of the class differently treated formed a separate class.

## 33.    COMPANY NOT BOUND BY LESS THAN ABSOLUTE INTERESTS

Except as required by law, no person is to be recognised by the Company as holding any share upon any trust, and except as otherwise required by law or the Articles, the Company is not in any way to be bound by or recognise any interest in a share other than the holder's absolute ownership of it and all the rights attaching to it.  This Article 32 shall not apply to any C Shares which are held by the Nominee as bare trustee for a C Shareholder or to any D Shares which are held by the Nominee as bare trustee for a D Shareholder.

## 34.    PAYMENT OF COMMISSIONS ON SUBSCRIPTION FOR SHARES

34.1    The Company may pay any person a commission in consideration for that person:

(a)      subscribing, or agreeing to subscribe, for shares; or

(b)      procuring, or agreeing to procure, subscriptions for shares.

34.2    Any such commission may be paid:

(a)      in cash, or in fully paid or partly paid shares or other securities or partly in one way and partly in the other; and

(b)      in respect of a conditional or an absolute subscription.

## 35.    PROCEDURE FOR DISPOSING OF FRACTIONS OF SHARES

35.1    This Article 35 (Procedure for Disposing of Fractions Of Shares) applies where:

(a)      there has been a consolidation or division of shares; and

(b)      as a result, members are entitled to fractions of shares.

35.2    The directors may:

(a)      sell the shares representing the fractions to any person including the Company for the best price reasonably obtainable;

(b)      authorise any person to execute an instrument of transfer of the shares to the purchaser or a person nominated by the purchaser; and

(c)      distribute the net proceeds of sale in due proportion among the holders of the shares.

35.3    The person to whom the shares are transferred is not obliged to ensure that any purchase money is received by the person entitled to the relevant fractions.

35.4    The transferee's title to the shares is not affected by any irregularity in or invalidity of the process leading to their sale.

## 36.    SHARE CERTIFICATES

36.1    If requested by a member to do so, the Company must issue such member, free of charge, with one or more certificates in respect of the shares which that member holds.

36.2    Every certificate must specify:

(a)    in respect of how many shares, of what class, it is issued;

(b)    the extent to which the shares are paid up or, if fully paid up, a statement to that effect; and

(c)    any distinguishing numbers assigned to them.

36.3    No certificate may be issued in respect of shares of more than one class.

36.4    If more than one person holds a share, only one certificate may be issued in respect of it.

36.5    Certificates must:

(a)    have affixed to them the Company's common seal; or

(b)    be otherwise executed in accordance with the Companies Law.

36.6    Every certificate or, where no certificate has been issued in respect of such shares, the register of members, shall contain a legend that the directors deem advisable to ensure compliance with the US Securities Act of 1933, as amended or any other applicable securities laws and regulations provided that the directors shall have the absolute discretion to remove such legend, including upon receipt of an opinion of counsel.

## 37.    REPLACEMENT SHARE CERTIFICATES

37.1    If a certificate issued in respect of a member's shares is:

(a)    damaged or defaced; or

(b)    said to be lost, stolen or destroyed,

that member is entitled to be issued with a replacement certificate in respect of the same shares.

37.2    A member exercising the right to be issued with such a replacement certificate:

(a)    may at the same time exercise the right to be issued with a single certificate or separate certificates;

(b)    must return the certificate which is to be replaced to the Company if it is damaged or defaced; and

(c)    must comply with such conditions as to evidence, indemnity and the payment of a reasonable fee as the directors decide.

## 38.    REGISTER OF MEMBERS

38.1    The directors shall maintain or cause to be maintained a register of members (required to be kept pursuant to Article 41 of the Companies Law) in the manner required by the Companies Law.  The register shall be kept at the Company's registered office or at such other place in Jersey as the directors from time to time determine.  Each year the directors shall prepare or

cause to be prepared and filed an annual return containing the particulars required by the Companies Law.

38.2    The Company shall not be required to enter the names of more than four joint holders in the register.

## DIRECTORS' POWERS AND RESPONSIBILITIES

### 39.    DIRECTORS' GENERAL AUTHORITY

Subject to the Articles, the directors are responsible for the management of the Company's business, for which purpose they may exercise all the powers of the Company.

### 40.    MEMBERS' RESERVE POWER

40.1    The members may, by resolution of those members required pursuant to the Shareholders' Agreement, direct the directors to take, or refrain from taking, specified action.

40.2    No such resolution invalidates anything which the directors have done before the passing of the resolution.

### 41.    DIRECTORS MAY DELEGATE

41.1    Subject to the Articles, the directors may delegate any of the powers which are conferred on them under the Articles:

(a)    to such person or committee;

(b)    by such means (including by power of attorney);

(c)    to such an extent;

(d)    in relation to such matters or territories; and

(e)    on such terms and conditions,

in each case as they think fit.

41.2    If the directors so specify, any such delegation may authorise further delegation of the directors' powers by any person to whom they are delegated.

41.3    The directors may revoke any delegation in whole or part, or alter its terms and conditions.

### 42.    COMMITTEES

42.1    Committees to which the directors delegate any of their powers must follow procedures which are based as far as they are applicable on those provisions of the Articles which govern the taking of decisions by directors.

42.2    The directors may make rules of procedure for all or any committees, which prevail over rules derived from the Articles if they are not consistent with them.

## DECISION-MAKING BY DIRECTORS

### 43.    DIRECTORS TO TAKE DECISIONS COLLECTIVELY

43.1    Subject to the Shareholders' Agreement, the general rule about decision-making by directors is that any decision of the directors must be either a majority decision at a meeting (where each director shall have one vote) or a decision taken in accordance with Article 44 (*Unanimous Decisions*).  Decisions requiring the consent of an Investor Majority may also be passed pursuant to any of the methods set out in Article 2.4.

43.2    If:

(a)    the Company only has one director for the time being and that director is an Investor Director; and

(b)    no provision of the Articles requires it to have more than one director,

the general rule does not apply, and the director may (for so long as he remains the sole director) take decisions without regard to any of the provisions of the Articles relating to directors' decision-making.

### 44.    UNANIMOUS DECISIONS

44.1    A decision of the directors is taken in accordance with this Article 44 (*Unanimous Decisions*) when all eligible directors indicate to each other by any means that they share a common view on a matter.

44.2    Such a decision may take the form of a resolution in writing (which may be in hard copy or electronic form), signed by each eligible director (whether or not each signs the same document) or to which each eligible director has otherwise indicated agreement in writing.

44.3    References in these Articles to an "eligible director" means a director who would have been entitled to vote on the relevant matter had it been proposed as a resolution at a directors' meeting and whose vote would have been counted in respect of such matter.

44.4    A decision may not be taken in accordance with this Article 44 (*Unanimous Decisions*) if the eligible directors would not have formed a quorum at such a meeting.

### 45.    CALLING A DIRECTORS' MEETING

45.1    Any director may call a directors' meeting by giving notice of at least 5 Business Days of the meeting to the directors and any board observers appointed in accordance with the Shareholders' Agreement or by authorising the company secretary (if any) to give such notice, provided that such notice period can be shortened or waived by a simple majority of directors together with the consent of each of the Investor Directors from time to time.  The directors must meet at least eight times per year (and there shall be no more than seven week intervals between each such meeting).

45.2    Notice of any directors' meeting must indicate and include:

(a)    its proposed date and time;

(b)    where it is to take place;

(c)    if it is anticipated that directors participating in the meeting will not be in the same place, how it is proposed that they should communicate with each other during the meeting (including by telephone or electronic dial in or otherwise);

(d)      an agenda; and

(e)      an information pack setting out information relating to the items to be discussed at the meeting and a copy of the Group's latest management accounts and any other information reasonably required by any Investor Director in order to perform his duties as a director of the Company.

45.3    Subject to Article 45.4, notice of a directors' meeting must be given to each director whether or not he is absent from the United Kingdom.

45.4    Notice of a directors' meeting need not be given to directors or board observers who waive their entitlement to notice of that meeting, by giving notice to that effect to the Company prior to or after the date on which the meeting is held.  Where such notice is given after the meeting has been held, that does not affect the validity of the meeting, or of any business conducted at it.  If a director participates in a directors' meeting, the director is taken to have consented to the meeting being held at short notice or to have waived notice of the meeting.

## 46.    PARTICIPATION IN DIRECTORS' MEETINGS

46.1    Subject to the Articles, directors participate in a directors' meeting, or part of a directors' meeting, when:

(a)      the meeting has been called and takes place in accordance with the Articles; and

(b)      they can each communicate to the others any information or opinions they have on any particular item of the business of the meeting.

46.2    In determining whether directors are participating in a directors' meeting, it is irrelevant where any director is or how they communicate with each other.

46.3    If all the directors participating in a meeting are not in the same place, they may decide that the meeting is to be treated as taking place wherever any of them is.

## 47.    QUORUM FOR DIRECTORS' MEETINGS

47.1    The quorum for the transaction of business at a meeting of the Board shall be any five (5) eligible directors which shall include (subject to Article 51.5) each Investor Director appointed from time to time provided that where:

(a)      an Investor Director who has expressly waived their right in writing (including by e-mail) to be part of the quorum of the Board (for either a single meeting of the Board or for any other specified number of meetings of the Board); or

(b)      Investor Directors who are not present at an Adjourned Meeting within one hour from the time appointed for the meeting or cease to be present during any such meeting (other than for an immaterial period);

in each case, the relevant Investor Director(s) shall not be required in order for a meeting of the Board to form a quorum and, in circumstances where no Investor Directors are on the Board at the relevant time, no Investor Directors shall be required in order for a meeting of the Board to form a quorum.

47.2    If:

(a)      requested in writing by an Investor Director to the chairman;

(b)    within one hour from the time appointed for a meeting of the Board a quorum is not present; or

(c)    during any such meeting a quorum ceases to be present,

the meeting shall stand adjourned to the same day in the next week, at the same time and place or to such later date and at such other time (being not less than 7 days' later) and, subject to the provisions of the Shareholders' Agreement, place as determined by the chairman (an "**Adjourned Meeting**").

47.3    If at the Adjourned Meeting a quorum is not present within one hour from the time appointed for the meeting, or during any such meeting a quorum ceases to be present, the directors who are present shall constitute a quorum.

## 48.    CHAIRING OF DIRECTORS' MEETINGS

48.1    The directors shall appoint a non-executive director to chair their meetings as nominated from time to time by an Investor Majority by notice in writing to the Company.  The person so appointed for the time being is known as the chairman.  An Investor Majority may in like manner at any time request that the chairman be removed from office as chairman and the directors shall remove him from such office on receipt of any such written request.

48.2    The chairman shall chair each directors' meeting at which he is present.  If there is no director holding that office, or if the chairman is unwilling to chair the directors' meeting or is not participating in the meeting within ten minutes after the time at which it was to start, the Investor Directors present at the meeting may appoint any director to chair it.

## 49.    CASTING VOTE

If the numbers of votes for and against a proposal at a meeting of directors of the Board are equal, the Chairman or other director chairing the meeting (or part of a meeting) shall have a casting vote subject always to the terms of the Shareholders' Agreement.

## 50.    DIRECTORS' INTERESTS

50.1    A director who is in any way, directly or indirectly, interested in a proposed transaction or arrangement with the Company (including in relation to an Exit) which to a material extent conflicts or may conflict with the interests of the Company and of which he is aware shall disclose the nature and extent of his interest to the other directors before the Company enters into the transaction or arrangement.

50.2    A director who is in any way, directly or indirectly, interested in a transaction or arrangement that has been entered into by the Company which to a material extent conflicts or may conflict with the interests of the Company and of which he is aware shall disclose the nature and extent of his interest to the other directors as soon as is reasonably practicable, unless the interest has already been declared under Article 50.1.

50.3    Any declaration required by Article 50.1 or Article 50.2 must be made in accordance with Article 75(2) of the Companies Law.

50.4    If a declaration made under Article 50.1 or 50.2 proves to be, or becomes, inaccurate or incomplete, a further declaration must be made under Article 50.1 or 50.2, as appropriate.

50.5    A director need not declare an interest under Article 50.1 or 50.2:

(a)    if it cannot reasonably be regarded as likely to give rise to a conflict of interest pursuant to Article 75(1) of the Companies Law;

    (b)    if, or to the extent that, the other directors are already aware of it (and for this purpose the other directors are treated as aware of anything of which they ought reasonably to be aware);

    (c)    if, or to the extent that, it concerns terms of his service contract that have been or are to be considered by a directors' meeting or by a committee of the directors appointed for such purpose under these Articles or the Shareholders' Agreement; or

    (d)    if the director is not aware of his interest or is not aware of the transaction or arrangement in question (and for this purpose a director is treated as being aware of matters of which he ought reasonably to be aware),

provided that where a director is in any way, directly or indirectly, interested in an Exit (an "**Exit Conflict**"), it will be deemed to give rise to a conflict of interest and the director shall be required to declare it under Article 50.1 or 50.2;

50.6    Subject to the provisions of the Companies Law and provided that he has declared the nature and extent of any direct or indirect interest of his in accordance with Article 50.1 or 50.2, or where Articles 51.1 or 51.3 apply, a director notwithstanding his office:

    (a)    may be a party to, or otherwise be interested in, any transaction or arrangement with the Company or in which the Company is otherwise (directly or indirectly) interested;

    (b)    shall be entitled to vote at a meeting of directors (or of a committee of the directors) or participate in any unanimous decision, in respect of such existing or proposed transaction or arrangement in which he is interested (and shall be an eligible director for these purposes);

    (c)    may act by himself or through his firm in a professional capacity for the Company (otherwise than as auditor), and in any such case on such terms as to remuneration and otherwise as the directors may decide; and

    (d)    may be a director or other officer of, or employed or engaged by, or a party to any transaction or arrangement with, or otherwise be interested in, any body corporate in which the Company is otherwise (directly or indirectly) interested.

50.7    A director who has declared an Exit Conflict in accordance with Article 50.1 or 50.2, or where Articles 51.1 or 51.3 apply, shall not be entitled to:

    (a)    attend, and vote at, meetings of the directors (or any committee thereof) at which such matter will or may be discussed, and receive board papers relating thereto;

    (b)    receive confidential information and other documents and information relating to such matter, use and apply such information in performing his duties as an employee, director or officer of, or consultant to, an Investor or an Affiliate of that Investor and disclose that information to third parties in accordance with these Articles or the Shareholders' Agreement; and

    (c)    give or withhold consent or give any direction or approval under these Articles or the Shareholders' Agreement on behalf of the Investors (or any of them) in relation to such matter.

## 51.    CONFLICTS OF INTEREST

51.1    Subject to these Articles, the provisions of sections 170 to 177 of the UK Companies Act shall apply to the Company as if the Company were incorporated in the United Kingdom.

51.2 A director is authorised for the purposes of the UK Companies Act (including sections 173(2) and 175) to act or continue to act as a director of the Company notwithstanding that at the time of his appointment or subsequently he:

(a) holds office as a director of any other Group Company;

(b) holds any other office, employment or engagement with any Group Company;

(c) participates in any scheme, transaction or arrangement for the benefit of persons employed or engaged, or previously employed or engaged, by any Group Company (including any pension fund or retirement, death or disability scheme or other bonus or employee benefit scheme); or

(d) is interested directly or indirectly in any shares, loan notes, securities or debentures (or any rights to acquire shares, loan notes, securities or debentures) in the Company or in any other Group Company.

51.3 Without prejudice to Article 51.1, any Investor Director or other non-executive director is authorised for the purposes of the UK Companies Act (including sections 173(2) and 175) to act or continue to act as a director of the Company notwithstanding that at the time of his appointment or subsequently he:

(a) holds office as a director of a member or of any Affiliate of a member or of any portfolio company of any member or Affiliate;

(b) holds any other office, employment or engagement with a member or any Affiliate of a member or any portfolio company of any such member or Affiliate;

(c) participates in any scheme, transaction or arrangement for the benefit of persons employed or engaged, or previously employed or engaged, by a member or any Affiliate of a member or any portfolio company of any such member or Affiliate (including any pension fund or retirement, death or disability scheme or other bonus or employee benefit scheme);

(d) is interested directly or indirectly (including, for the avoidance of doubt, by virtue of any Co-Investment Scheme) in any shares, loan notes, securities or debentures (or any rights to acquire shares, loan notes, securities or debentures) in a member or any Affiliate of a member or any portfolio company of any such member or Affiliate; or

(e) is acting as a representative of a member for the purposes of monitoring and evaluating its investment in the Group.

51.4 Without limitation, and for all purposes pursuant to these Articles or the Shareholders' Agreement, any authorisation conferred by Articles 51.1 or 51.3 shall permit the relevant director to:

(a) attend, and vote at, meetings of the directors (or any committee thereof) at which any relevant matter will or may be discussed, and receive board papers relating thereto;

(b) receive confidential information and other documents and information relating to the Group, use and apply such information in performing his duties as an employee, director or officer of, or consultant to, a member or an Affiliate of that member and disclose that information to third parties in accordance with these Articles or the Shareholders' Agreement; and

(c)     give or withhold consent or give any direction or approval under these Articles or the Shareholders' Agreement on behalf of the members (or any of them) in relation to any relevant matter.

51.5    The directors may authorise any matter proposed to them which would, if not so authorised, involve a breach of duty by a director under section 175 of the UK Companies Act (and such authorisation may be given on such terms as the directors think fit and may be varied or terminated at any time), provided that any authorisation given under this Article 51.5 shall be effective only if:

(a)     any requirement as to the quorum at the meeting at which the matter is considered is met without counting the director in question or any other director interested in the matter under consideration; and

(b)     the matter was agreed to without such directors voting or would have been agreed to if such directors' votes had not been counted.

51.6    Alternatively and without prejudice to the remainder of these Articles or the Companies Act, the Company may authorise (specifically or generally) any matter proposed to it which would, if not so authorised, involve a breach of duty by a director under section 175 of the UK Companies Act (other than in respect of an Exit Conflict). Such authorisation shall be effected:

(a)     with the consent of an Investor Majority; or

(b)     by an ordinary resolution,

and shall constitute "authorisation by members" for the purposes of this Article 51 (Conflicts Of Interest)

51.7    A director shall be under no duty to the Company with respect to any information which he obtains or has obtained otherwise than as a director of the Company and in respect of which he owes a duty of confidentiality to another person. In particular the director shall not be in breach of the general duties he owes to the Company by virtue of sections 171 to 177 of the UK Companies Act if he:

(a)     fails to disclose any such information to the directors or to any director or other officer or employee of, or consultant to, the Company; or

(b)     does not use or apply any such information in performing his duties as a director of the Company.

However, to the extent that his relationship with that other person gives rise to a conflict of interest or possible conflict of interest, this Article 51.7 applies only if the existence of that relationship has been authorised pursuant to Articles 51.1 or 51.3 or authorised by the directors pursuant to Article 51.5 or authorised by the members pursuant to Article 51.6 (and, in each case, subject to the terms upon which such authorisation was given).

51.8    Where the existence of a director's relationship with another person has been authorised pursuant to Articles 51.1 or 51.3 or authorised by the directors pursuant to Article 51.5 or authorised by the members pursuant to Article 51.6, and his relationship with that person gives rise to a conflict of interest or possible conflict of interest, the director shall not be in breach of the general duties he owes to the Company by virtue of sections 171 to 177 of the UK Companies Act if, at his discretion or at the request or direction of the directors or any committee of the directors, he:

(a)     absents himself from a directors' meeting (or a committee thereof) at which any matter relating to the conflict of interest or possible conflict of interest will or may be discussed, or from the discussion of any such matter at a directors' meeting or otherwise; or

(b)     makes arrangements not to receive documents and information relating to any matter which gives rise to the conflict of interest or possible conflict of interest sent or supplied by or on behalf of the Company or for such documents and information to be received and read by a professional adviser on his behalf,

for so long as he reasonably believes such conflict of interest (or possible conflict of interest) subsists.

51.9    The provisions of Articles 51.7 and 51.8 are without prejudice to any equitable principle or rule of law which may excuse the director from:

(a)     disclosing information, in circumstances where disclosure would otherwise be required under these Articles or the Shareholders' Agreement; or

(b)     attending meetings or discussions or receiving documents and information as referred to in Article 51.8, in circumstances where such attendance or receipt would otherwise be required under these Articles or the Shareholders' Agreement.

51.10   A director shall not, by reason of his office, be accountable to the Company for any remuneration or other benefit which he derives from any office, employment or engagement or from any transaction or arrangement or from any interest in any body corporate:

(a)     the acceptance, entry into or existence of which is authorised pursuant to Articles 51.1 or 51.3 or authorised by the directors pursuant to Article 51.5 or authorised by the members pursuant to Article 51.6 (in each case, subject to the terms upon which such authorisation was given); or

(b)     which he is permitted to hold or enter into pursuant to Article 50.6 or otherwise pursuant to these Articles or the Shareholders' Agreement,

and no such transaction, arrangement or interest shall be liable to be avoided on the ground of any such remuneration or other benefit, nor shall the receipt of any such remuneration or other benefit constitute a breach of his duty under section 176 of the UK Companies Act.

## 52.    RECORDS OF DECISIONS TO BE KEPT

The directors must ensure that the Company keeps a record, in writing, for at least ten years from the date of the decision recorded, of every unanimous or majority decision taken by the directors.

## 53.    DIRECTORS' DISCRETION TO MAKE FURTHER RULES

Subject to the Articles, the directors may make any rule which they think fit about how they take decisions, and about how such rules are to be recorded or communicated to directors.

## APPOINTMENT OF DIRECTORS

### 54.    NUMBER OF DIRECTORS

The number of directors on the Board shall be no more than ten (10) although the directors may reduce (or subsequently increase) this number at any time in accordance with the Shareholders' Agreement (provided that the maximum number of directors shall be no more than ten (10)), and shall include capacity to appoint two Executive Directors.

### 55.    METHODS OF APPOINTING DIRECTORS

55.1    Any person who is willing to act as a director, and is permitted by law to do so, may be appointed to be a director:

(a)    by ordinary resolution;

(b)    a resolution of the Board; or

(c)    by notice in writing to the Company from members entitled to appoint an Investor Director pursuant to the Shareholders' Agreement,

subject to the terms of the Shareholders' Agreement.

55.2    In any case where, as a result of death or bankruptcy, the Company has no members and no directors, the transmittee of the last member to have died or to have a bankruptcy order made against him has the right, by notice in writing, to appoint a person who is willing to act and is permitted to do so, to be a director.

55.3    For the purposes of Article 55.2, where two or more members die in circumstances rendering it uncertain who was the last to die, a younger member is deemed to have survived an older member.

55.4    Any director (the "**appointor**") may appoint as an alternate any other director, or any other person approved by resolution of the directors, to exercise that director's powers, and carry out that director's responsibilities, in relation to the taking of decisions by the directors in the absence of the alternate's appointor.

55.5    Any appointment or removal of an alternate must be effected by notice in writing to the company signed by the appointor, or in any other manner approved by the directors.  The notice must identify the proposed alternate, and, in the case of a notice of appointment, contain a statement signed by the proposed alternate that the proposed alternate is willing to act as the alternate of the director giving the notice.

55.6    An alternate director has the same rights, in relation to any directors' meeting or directors' written resolution, as the alternate's appointor.  Except as the Articles specify otherwise, alternate directors are deemed for all purposes to be directors, are liable for their own acts and omissions, are subject to the same restrictions as their appointors and are not deemed to be agents of or for their appointors.

55.7    A person who is an alternate director but not a director may be counted as participating for the purposes of determining whether a quorum is participating (but only if that person's appointor is not participating), and may sign a written resolution (but only if it is not signed or to be signed by that person's appointor).  No alternate may be counted as more than one director for such purposes.  An alternate director is not entitled to receive any remuneration from the Company for serving as an alternate director.

EU-DOCS\29888423.7

55.8 A director who is also an alternate shall be entitled, in the absence of his appointor, to a separate vote on behalf of his appointor in addition to his own vote and to be counted as part of the quorum for directors' meetings on his own account and in respect of the director for whom he is the alternate (provided that, in each case, that director would have been entitled to vote if they were participating in the directors' meeting).

55.9 An alternate director's appointment as an alternate terminates:

(a) when the alternate's appointor revokes the appointment by notice to the Company in writing specifying when it is to terminate;

(b) on the occurrence in relation to the alternate of any event which, if it occurred in relation to the alternate's appointor, would result in the termination of the appointor's appointment as a director;

(c) on the death of the alternate's appointor; or

(d) when the alternate's appointor's appointment as a director terminates.

## 56.    TERMINATION OF DIRECTOR'S APPOINTMENT

56.1 A person ceases to be a director as soon as:

(a) that person ceases to be a director by virtue of any provision of the Companies Law or is prohibited from being a director by law;

(b) a bankruptcy order is made against that person;

(c) a composition is made with that person's creditors generally in satisfaction of that person's debts;

(d) a registered medical practitioner who is treating that person gives a written opinion to the Company stating that that person has become physically or mentally incapable of acting as a director and may remain so for more than six months;

(e) notification is received by the Company from that person that he is resigning from office, and such resignation has taken effect in accordance with its terms;

(f) that person is convicted of a criminal offence (other than a motoring offence not resulting in disqualification) and the directors resolve that his office be vacated;

(g) notification is received by an Executive Director from the Board pursuant to the Shareholders' Agreement; or

(h) notification is received by the Company from that the member(s) entitled to remove that Investor Director pursuant to the Shareholders' Agreement.

## 57.    DIRECTORS' REMUNERATION

57.1 Directors may undertake any services for the Company that the directors decide.

57.2 Directors who are not employed by any member (or any Affiliate of any member) or the Group shall be entitled to such reasonable and customary remuneration as the directors may from time to time determine which shall be consistent with market practice and subject to an aggregate maximum amount to be determined by the Remuneration Committee:

(a) for their services to the Company as directors; and

(b)    for any other service which they undertake for the Company.

57.3    Subject to the Articles, a director's remuneration may:

(a)    take any form; and

(b)    include any arrangements in connection with the payment of a pension, allowance or gratuity, or any death, sickness or disability benefits, to or in respect of that director.

57.4    Unless the directors decide otherwise, directors' remuneration accrues from day to day.

57.5    Unless the directors decide otherwise, directors are not accountable to the Company for any remuneration or benefits which they receive as directors or other officers or employees of the Company's subsidiary undertakings or of the Company's parent undertakings from time to time or of any other body corporate in which the Company or any such parent undertaking is interested.

## 58.    DIRECTORS' EXPENSES

58.1    Subject to the terms of the Shareholders' Agreement, the Company may pay any reasonable expenses which the directors, and the company secretary (if any) properly incur in connection with their attendance at:

(a)    meetings of directors or committees of directors;

(b)    general meetings; or

(c)    separate meetings of the holders of any class of shares or of debentures of the Company,

or otherwise in connection with the exercise of their powers and the discharge of their responsibilities in relation to the Company.

## 59.    COMPANY SECRETARY

The directors may appoint any person who is willing to act as the company secretary for such term, at such remuneration, and upon such conditions as they may think fit and from time to time remove such person and, if the directors so decide, appoint a replacement, in each case by a decision of the directors.

## DIVIDENDS AND OTHER DISTRIBUTIONS

## 60.    PROCEDURE FOR DECLARING DIVIDENDS

60.1    Subject in each case to Article 7, the provisions of the Companies Law and the terms of the Shareholders' Agreement, the Company may by ordinary resolution declare dividends, and the directors may decide to declare and pay interim dividends.

60.2    A dividend must not be declared unless the directors have made a recommendation as to its amount. Such a dividend must not exceed the amount recommended by the directors.

60.3    No dividend may be declared or paid unless it is in accordance with members' respective rights.

60.4    Unless the members' resolution to declare or directors' decision to pay a dividend, or the terms on which shares are issued, specify otherwise, it must be paid by reference to each member's holding of shares on the date of the resolution or decision to declare or pay it.

**61.    CALCULATION OF DIVIDENDS**

61.1    Except as otherwise provided by the Articles or the rights attached to shares, all dividends must be:

(a)    declared and paid according to the proportions paid up on the shares on which the dividend is paid; and

(b)    apportioned and paid proportionately to the proportions paid up on the shares during any portion or portions of the period in respect of which the dividend is paid.

61.2    If any share is issued on terms providing that it ranks for dividend as from a particular date, that share ranks for dividend accordingly.

61.3    For the purposes of calculating dividends, no account is to be taken of any amount which has been paid up on a share in advance of the due date for payment of that amount.

**62.    PAYMENT OF DIVIDENDS AND OTHER DISTRIBUTIONS**

62.1    Where a dividend or other sum which is a distribution is payable in respect of a share, it must be paid by one or more of the following means:

(a)    transfer to a bank or building society account specified by the distribution recipient either in writing or as the directors may otherwise decide;

(b)    sending a cheque made payable to the distribution recipient by post to the distribution recipient at the distribution recipient's registered address (if the distribution recipient is a holder of the share), or (in any other case) to an address specified by the distribution recipient either in writing or as the directors may otherwise decide;

(c)    sending a cheque made payable to such person by post to such person at such address as the distribution recipient has specified either in writing or as the directors may otherwise decide; or

(d)    any other means of payment as the directors agree with the distribution recipient either in writing or by such other means as the directors decide.

62.2    In the Articles, the "**distribution recipient**" means, in respect of a share in respect of which a dividend or other sum is payable:

(a)    the holder of the share;

(b)    if the share has two or more joint holders, whichever of them is named first in the register of members; or

(c)    if the holder is no longer entitled to the share by reason of death or bankruptcy, or otherwise by operation of law, the transmittee.

**63.    DEDUCTIONS FROM DISTRIBUTIONS IN RESPECT OF SUMS OWED TO THE COMPANY**

63.1    If:

(a)    a share is subject to the Company's lien; and

(b)    the directors are entitled to issue a lien enforcement notice in respect of it,

they may, instead of issuing a lien enforcement notice, deduct from any dividend or other sum payable in respect of the share any sum of money which is payable to the Company in respect of that share to the extent that they are entitled to require payment under a lien enforcement notice.

63.2    Money so deducted must be used to pay any of the sums payable in respect of that share.

63.3    The Company must notify the distribution recipient in writing of:

    (a)    the fact and amount of any such deduction;

    (b)    any non-payment of a dividend or other sum payable in respect of a share resulting from any such deduction; and

    (c)    how the money deducted has been applied.

## 64.    NO INTEREST ON DISTRIBUTIONS

64.1    The Company may not pay interest on any dividend or other sum payable in respect of a share unless otherwise provided by:

    (a)    the terms on which the share was issued; or

    (b)    the provisions of another agreement between the holder of that share and the Company.

## 65.    UNCLAIMED DISTRIBUTIONS

65.1    All dividends or other sums which are:

    (a)    payable in respect of shares; and

    (b)    unclaimed after having been declared or become payable,

may be invested or otherwise made use of by the directors for the benefit of the Company until claimed.

65.2    The payment of any such dividend or other sum into a separate account does not make the Company a trustee in respect of it.

65.3    If:

    (a)    12 years have passed from the date on which a dividend or other sum became due for payment; and

    (b)    the distribution recipient has not claimed it,

the distribution recipient is no longer entitled to that dividend or other sum and it ceases to remain owing by the Company.

## 66.    NON-CASH DISTRIBUTIONS

66.1    Subject to the terms of issue of the share in question, the provisions of the Companies Law and the terms of the Shareholders' Agreement, the Company may, by ordinary resolution on the recommendation of the directors, decide to pay all or part of a dividend or other distribution payable in respect of a share by transferring non-cash assets of equivalent value (including shares or other securities in any company).

66.2    For the purposes of paying a non-cash distribution, the directors may make whatever arrangements they think fit, including, where any difficulty arises regarding the distribution:

(a)    fixing the value of any assets;

(b)    paying cash to any distribution recipient on the basis of that value in order to adjust the rights of recipients; and

(c)    vesting any assets in trustees.

## 67.    WAIVER OF DISTRIBUTIONS

67.1    Distribution recipients may waive their entitlement to a dividend or other distribution payable in respect of a share by giving the Company notice in writing to that effect, but if:

(a)    the share has more than one holder; or

(b)    more than one person is entitled to the share, whether by reason of the death or bankruptcy of one or more joint holders, or otherwise,

the notice is not effective unless it is expressed to be given, and signed, by all the holders or persons otherwise entitled to the share.

## CAPITALISATION OF PROFITS

## 68.    AUTHORITY TO CAPITALISE AND APPROPRIATION OF CAPITALISED SUMS

68.1    Subject to the Articles and the terms of the Shareholders' Agreement, the directors may, if they are so authorised by an ordinary resolution:

(a)    decide to capitalise any profits of the Company, or any sum standing to the credit of any capital or revenue reserve fund of the Company;

(b)    appropriate any sum which they so decide to capitalise ("**capitalised sum**") to the persons who would have been entitled to it if it were distributed by way of dividend ("**persons entitled**") and in the same proportions.

68.2    Capitalised sums must be applied:

(a)    on behalf of the persons entitled; and

(b)    in the same proportions as a dividend would have been distributed to them.

68.3    Any capitalised sum may be applied in paying up new shares of an amount equal to the capitalised sum which are then allotted credited as fully paid to the persons entitled or as they may direct.

68.4    A capitalised sum which was appropriated from amounts which would otherwise have been distributable pursuant to the Companies Law may, subject to compliance with the Companies Law, be applied in or towards paying up any amounts unpaid on existing shares held by the persons entitled or in paying up new debentures of the Company which are then allotted credited as fully paid to the persons entitled or as they may direct.

68.5    Subject to the Articles the directors may:

(a)    apply capitalised sums in accordance with Articles 68.3 and 68.4 partly in one way and partly in another;

(b)   make such arrangements as they think fit to deal with shares or debentures becoming distributable in fractions under this Article 68 (Authority To Capitalise And Appropriation Of Capitalised Sums) (including the issuing of fractional certificates or the making of cash payments); and

(c)   authorise any person to enter into an agreement with the Company on behalf of all the persons entitled which is binding on them in respect of the allotment of shares and debentures to them under this Article 68 (Authority To Capitalise And Appropriation Of Capitalised Sums).

## ORGANISATION OF GENERAL MEETINGS

## 69.    CONVENING OF GENERAL MEETINGS

69.1   The directors, may call general meetings whenever they think fit.

69.2   The directors are required to call a general meeting or hold a shareholder vote in accordance with the terms of the Shareholders' Agreement once the Company has received requests to do so from Investors (together with any of their Affiliates) holding at least 10% in number of the issued A Ordinary Shares.

## 70.    ATTENDANCE AND SPEAKING AT GENERAL MEETINGS

70.1   A person is able to exercise the right to speak at a general meeting when that person is in a position to communicate to all those attending the meeting, during the meeting, any information or opinions which that person has on the business of the meeting.

70.2   A person is able to exercise the right to vote at a general meeting when:

(a)   that person is able to vote, during the meeting, on resolutions put to the vote at the meeting; and

(b)   that person's vote can be taken into account in determining whether or not such resolutions are passed at the same time as the votes of all the other persons attending the meeting.

70.3   The directors may make whatever arrangements they consider appropriate to enable those attending a general meeting to exercise their rights to speak or vote at it.

70.4   In determining attendance at a general meeting, it is immaterial whether any two or more members attending it are in the same place as each other.

70.5   Two or more persons who are not in the same place as each other attend a general meeting if their circumstances are such that if they have (or were to have) rights to speak and vote at that meeting, they are (or would be) able to exercise them.

## 71.    CHAIRING GENERAL MEETINGS

71.1   If the directors have appointed a chairman, the chairman shall chair general meetings if present and willing to do so.

71.2   If the directors have not appointed a chairman, or if the chairman is unwilling to chair the meeting or is not present within ten minutes of the time at which a meeting was due to start:

(a)   the directors present; or

(b)      (if no directors are present), the meeting,

must appoint a director or member to chair the meeting, and the appointment of the chairman of the meeting must be the first business of the meeting.

71.3     The person chairing a meeting in accordance with this Article 71 (Chairing General Meetings) is referred to as the "**chairman of the meeting**".

## 72.      ATTENDANCE AND SPEAKING BY DIRECTORS AND NON-MEMBERS

72.1     Directors may attend and speak at general meetings, whether or not they are members.

72.2     Subject to the Shareholders' Agreement, the chairman of the meeting may permit other persons who are not:

(a)      members; or

(b)      otherwise entitled to exercise the rights of members in relation to general meetings,

to attend and speak at a general meeting.

## 73.      ADJOURNMENT

73.1     If the persons attending a general meeting within half an hour of the time at which the meeting was due to start do not constitute a quorum, or if during a meeting a quorum ceases to be present, the chairman of the meeting must adjourn it.

73.2     The chairman of the meeting may adjourn a general meeting at which a quorum is present if:

(a)      the meeting consents to an adjournment; or

(b)      it appears to the chairman of the meeting that an adjournment is necessary to protect the safety of any person attending the meeting or ensure that the business of the meeting is conducted in an orderly manner.

73.3     The chairman of the meeting must adjourn a general meeting if directed to do so by the meeting.

73.4     When adjourning a general meeting, the chairman of the meeting must:

(a)      either specify the time and place to which it is adjourned or state that it is to continue at a time and place to be fixed by the directors; and

(b)      have regard to any directions as to the time and place of any adjournment which have been given by the meeting.

73.5     If the continuation of an adjourned meeting is to take place more than 14 days after it was adjourned, the Company must give at least seven clear days' notice of it (that is, excluding the day of the adjourned meeting and the day on which the notice is given):

(a)      to the same persons to whom notice of the Company's general meetings is required to be given; and

(b)      containing the same information which such notice is required to contain.

73.6     No business may be transacted at an adjourned general meeting which could not properly have been transacted at the meeting if the adjournment had not taken place.

74.    **CLASS MEETINGS**

Save as otherwise provided in these Articles, all the provisions of these Articles and of the Companies Law relating to general meetings of the Company and to the proceedings thereat shall apply *mutatis mutandis* to separate meetings of the holders of any class of shares, but so that any holder of shares of the class in question present in person or by proxy may demand a poll.

<p align="center"><strong>VOTING AT GENERAL MEETINGS</strong></p>

75.    **VOTING: GENERAL**

75.1    A resolution put to the vote of a general meeting must be decided on a show of hands unless a poll is duly demanded in accordance with the Articles.

75.2    No member shall vote at any general meeting, either in person or by proxy, in respect of any share held by him unless all monies presently payable by him in respect of that share have been paid.

76.    **ERRORS AND DISPUTES**

76.1    No objection may be raised to the qualification of any person voting at a general meeting except at the meeting or adjourned meeting at which the vote objected to is tendered, and every vote not disallowed at the meeting is valid.

76.2    Any such objection must be referred to the chairman of the meeting, whose decision is final.

77.    **POLL VOTES**

77.1    A poll on a resolution may be demanded:

(a)    in advance of the general meeting where it is to be put to the vote; or

(b)    at a general meeting, either before a show of hands on that resolution or immediately after the result of a show of hands on that resolution is declared.

77.2    A poll on a resolution may be demanded by:

(a)    the chairman of the meeting;

(b)    the directors;

(c)    two or more persons having the right to vote on the resolution;

(d)    a person or persons representing not less than one tenth of the total voting rights of all the members having the right to vote on the resolution; or

(e)    a person or persons holding shares conferring a right to vote on the resolution on which not less than one tenth of the total sum paid up on all the shares conferring that right.

77.3    A demand for a poll may be withdrawn if:

(a)    the poll has not yet been taken; and

(b)    the chairman of the meeting consents to the withdrawal.

EU-DOCS\29888423.7

A demand so withdrawn shall not invalidate the result of a show of hands declared before the demand was made.

77.4    Polls must be taken immediately and in such manner as the chairman of the meeting directs.

## 78.    CONTENT OF PROXY NOTICES

78.1    Proxies may only validly be appointed by a notice in writing (a "**proxy notice**") which:

(a)    states the name and address of the member appointing the proxy;

(b)    identifies the person appointed to be that member's proxy and the general meeting in relation to which that person is appointed;

(c)    is signed by or on behalf of the member appointing the proxy, or is authenticated in such manner as the directors may determine; and

(d)    is delivered to the Company in accordance with the Articles and any instructions contained in the notice of the general meeting to which they relate not less than 48 hours before the time appointed for holding the meeting at which the right to vote is to be exercised and in accordance with any instructions contained in the notice of the general meeting to which they relate,

and a proxy notice which is not delivered in such manner shall be invalid unless the directors in their absolute discretion at any time before the start of the meeting otherwise determine.

78.2    In calculating the period referred to in the foregoing Article 78.1(d), no account shall be taken of any part of a day that is not a "working day" within the meaning of Article 96(4B) of the Companies Law.

78.3    The Company may require proxy notices to be delivered in a particular form, and may specify different forms for different purposes.

78.4    Proxy notices may specify how the proxy appointed under them is to vote (or that the proxy is to abstain from voting) on one or more resolutions and the proxy is obliged to vote or abstain from voting in accordance with the specified instructions.  However, the Company is not obliged to check whether a proxy votes or abstains from voting as he has been instructed and shall incur no liability for failing to do so.  Failure by a proxy to vote or abstain from voting as instructed at a meeting shall not invalidate proceedings at that meeting.

78.5    Unless a proxy notice indicates otherwise, it must be treated as:

(a)    allowing the person appointed under it as a proxy discretion as to how to vote on any ancillary or procedural resolutions put to the meeting; and

(b)    appointing that person as a proxy in relation to any adjournment of the general meeting to which it relates as well as the meeting itself.

## 79.    DELIVERY OF PROXY NOTICES

79.1    A person who is entitled to attend, speak or vote (either on a show of hands or on a poll) at a general meeting remains so entitled in respect of that meeting or any adjournment of it, even though a valid proxy notice has been delivered to the Company by or on behalf of that person.

79.2    An appointment under a proxy notice may be revoked by delivering to the Company a notice in writing given by or on behalf of the person by whom or on whose behalf the proxy notice was given.

79.3    A notice revoking a proxy appointment only takes effect if it is delivered before the start of the meeting or adjourned meeting to which it relates.

79.4    If a proxy notice is not executed by the person appointing the proxy, it must be accompanied by written evidence of the authority of the person who executed it to execute it on the appointor's behalf.

**80.    AMENDMENTS TO RESOLUTIONS**

80.1    An ordinary resolution to be proposed at a general meeting may be amended by ordinary resolution if:

(a)     notice of the proposed amendment is given to the Company in writing by a person entitled to vote at the general meeting at which it is to be proposed not less than 48 hours before the meeting is to take place (or such later time as the chairman of the meeting may determine); and

(b)     the proposed amendment does not, in the reasonable opinion of the chairman of the meeting, materially alter the scope of the resolution.

80.2    A special resolution to be proposed at a general meeting may be amended by ordinary resolution, if:

(a)     the chairman of the meeting proposes the amendment at the general meeting at which the resolution is to be proposed; and

(b)     the amendment does not go beyond what is necessary to correct a grammatical or other non-substantive error in the resolution.

80.3    If the chairman of the meeting, acting in good faith, wrongly decides that an amendment to a resolution is out of order, the chairman's error does not invalidate the vote on that resolution.

**81.    WRITTEN RESOLUTIONS**

81.1    Members may, subject to the Shareholders' Agreement and these Articles, pass a resolution in writing (other than in respect of a resolution removing an auditor) without holding a meeting if such resolution in writing is passed:

(a)     by all the members, who at the date that such resolution is deemed to be passed, would be entitled to vote on the resolution if it were proposed at a meeting of the members of the Company, such resolution to be passed by such members:

(i)     signing a document indicating their agreement to the relevant resolution; or

(ii)    signing several documents in the like form each signed by one or more of those members indicating their agreement to the relevant resolution; or

(iii)   indicating their agreement to the relevant resolution on a document (which may be in hard copy or electronic form (including through the use of a website)); or

(b)     by a specified majority of the members who, at the date when that resolution is deemed to be passed, would be entitled to vote on the resolution, to be passed by such members:

(i)     signing a document indicating their agreement to the relevant resolution; or

(ii)    signing several documents in the like form each signed by one or more of those members indicating their agreement to the relevant resolution; or

    (iii)     indicating their agreement to the relevant resolution on a document (which may be in hard copy or electronic form (including through the use of a website)); or

    (iv)     having otherwise signified agreement to the resolution in accordance with Article 95(3B) of the Companies Law, and

for these purposes, a "specified majority" means the higher of (A) the majority specified in Article 90(1A)(a) of the Companies Law; and (B) an Investor Majority, Investor Special Majority or Investor Supermajority (as the case may be, and in each case, subject to the terms of the Shareholders' Agreement), in each case, in respect of members who, at the date when such resolution is deemed to be passed would (subject to the Shareholders' Agreement and these Articles) be entitled to vote on the resolution if it were proposed at a meeting of the Company at which all such members were present,

which resolution may be sent or submitted to members in hard copy or electronic form (or in any other form provided for under Article 82). Such written resolution shall be as effective as if it had been passed at a meeting of all members entitled to vote on the resolution if it were proposed at a meeting of the Company which had been duly convened and held.

81.2    If a written resolution is described as a special resolution or as an ordinary resolution, it has effect accordingly (subject always, in the case of a written resolution passed pursuant to Article 81.1(b), to it having been passed by a specified majority of the relevant members as described therein).

## ADMINISTRATIVE ARRANGEMENTS

## 82.    MEANS OF COMMUNICATION TO BE USED

82.1    Subject to the Articles, anything sent or supplied by or to the Company under the Articles may be sent or supplied in any way in which the UK Companies Act provides for documents or information which are authorised or required by any provision of the UK Companies Act to be sent or supplied by or to the Company.

82.2    Any notice, document or other information shall be deemed served on or delivered to the intended recipient:

    (a)     if properly addressed and sent by prepaid United Kingdom first class pre-post to an address in the United Kingdom, 2 Business Days after the date of posting;

    (b)     if properly addressed and sent by air courier from or to any place outside the United Kingdom, 2 Business Days after its delivery to a representative of the courier;

    (c)     if properly addressed and sent by pre-paid airmail from or to any place outside the United Kingdom, 5 Business Days after the date of posting;

    (d)     if properly addressed and sent by e-mail, two hours after it was sent provided that no notification informing the sender that the message has not been delivered is received by the sender;

    (e)     if properly addressed and delivered by hand, upon delivery; and

    (f)     if sent or supplied by means of a website, when the material is first made available on the website or (if later) when the recipient receives (or is deemed to have received) notice of the fact that the material is available on the website.

For the purposes of this Article 82 (Means Of Communications To Be Used), no account shall be taken of any part of a day that is not a Business Day and any notice despatched other than between the hours of 9:30 a.m. to 5:30 p.m. on a Business Day ("**Working Hours**") shall be deemed given at the start of the next period of Working Hours.

82.3    In proving that any notice, document or other information was properly addressed, it shall be sufficient to show that the notice, document or other information was delivered to an address permitted for the purpose by the UK Companies Act.

82.4    Subject to the Articles, any notice or document to be sent or supplied to a director in connection with the taking of decisions by directors may also be sent or supplied by the means by which that director has asked to be sent or supplied with such notices or documents for the time being.

82.5    A director may agree with the Company that notices or documents sent to that director in a particular way are to be deemed to have been received within a specified time of their being sent, and for the specified time to be less than 48 hours.

82.6    To the extent permitted by applicable law, the Company may satisfy its obligations to deliver any information, notices and/or communication under the Shareholders' Agreement or in connection with the matters contemplated therein in relation to those Investors (the "**Website Investors**") who accept this method of communication (and for the avoidance of doubt each Investor shall be deemed to accept this method of communication unless it has expressly notified the Company to the contrary) by posting (either directly or by way of another Group Company posting) this information, notice and/or other communication onto an electronic website designated by the Company (the "**Designated Website**") if each Website Investor is aware of the address of and any relevant password specifications for the Designated Website.

82.7    If any Investor (a "**Non-Website Investor**") does not agree to the delivery of information through the Designated Website then it shall notify the Company accordingly and the Company shall supply the information to such Non-Website Investor in accordance with Articles 82.2(a) to 82.2(e).

82.8    The Company shall (or shall procure that one of its representatives shall) supply each Website Investor with the address of and any relevant password specifications for the Designated Website following designation of that website by the Company.

82.9    The Company shall promptly upon becoming aware of its occurrence notify (or shall procure notification of) the Website Investors if:

(a)    the Designated Website cannot be accessed due to technical failure;

(b)    the password specifications for the Designated Website change;

(c)    any new information which is required to be provided under the Shareholders' Agreement is posted onto the Designated Website;

(d)    any existing information which has been provided under the Shareholders' Agreement and posted onto the Designated Website is amended; or

(e)    the Company becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

82.10    If the Company notifies (or procures the notification of) the Website Investors under Article 82.9(a) or Article 82.9(e) above, all information to be provided by the Company under the Shareholders' Agreement after the date of that notice shall be supplied in accordance with

EU-DOCS\29888423.7

Articles 82.2(a) to 82.2(e) until the Company is satisfied that the circumstances giving rise to the notification are no longer continuing.

## 83.  COMPANY SEALS

83.1   Any common seal may only be used by the authority of the directors.

83.2   The directors may decide by what means and in what form any common seal is to be used.

83.3   Unless otherwise decided by the directors, if the Company has a common seal and it is affixed to a document, the document must also be signed by at least one authorised person in the presence of a witness who attests the signature.

83.4   For the purposes of this Article 83 (Company Seals), an authorised person is:

(a)   any director of the Company;

(b)   the company secretary (if any); or

(c)   any person authorised by the directors for the purpose of signing documents to which the common seal is applied.

## 84.  NO RIGHT TO INSPECT ACCOUNTS AND OTHER RECORDS

Except as provided by law or authorised by the directors or an ordinary resolution of the Company, no person is entitled to inspect any of the Company's accounting or other records or documents merely by virtue of being a member.

## 85.  PROVISION FOR EMPLOYEES ON CESSATION OF BUSINESS

The directors may decide to make provision for the benefit of persons employed or formerly employed by any Group Company (other than a director or former director or shadow director) in connection with the cessation or transfer to any person of the whole or part of the undertaking of the relevant Group Company.

## 86.  ACCOUNTS AND AUDIT

86.1   The Company shall keep accounting records which are sufficient to show and explain the Company's transactions and:

(a)   disclose with reasonable accuracy at any time the financial position of the Company at that time; and

(b)   enable the directors to ensure that any accounts prepared by the Company comply with requirements of the Companies Law.

86.2   The directors shall prepare accounts of the Company made up to such date in each year as the directors shall from time to time determine in accordance with and subject to the provisions of the Companies Law.

86.3   Subject to the terms of the Shareholders' Agreement, no member shall (as such) have any right to inspect any accounting records or other book or document of the Company except as conferred by the Companies Law or authorised by the directors or by ordinary resolution of the Company.

86.4    Subject to the terms of the Shareholders' Agreement, the directors or the Company by ordinary resolution may from time to time appoint auditors for any period or periods to examine the accounts of the Company and to report thereon in accordance with the Companies Law.

<div align="center">

**OFFICERS' INDEMNITY AND INSURANCE**

</div>

**87.    INDEMNITY**

87.1    Every present or former officer shall be indemnified out of the assets of the Company against any loss or liability incurred by him by reason of being or having been such an officer.

87.2    This Article 87.2 does not authorise any indemnity which would be prohibited or rendered void by any provision of the Companies Law or by any other provision of law.

**88.    INSURANCE**

The directors may authorise the purchase or maintenance by the Company for any officer or any former officer of the Company of any such insurance as is permitted by the Companies Law in respect of any liability which would otherwise attach to such officer or former officer.

<div align="center">

**RE-DESIGNATION OF C SHARES AND D SHARES**

</div>

**89.    RE-DESIGNATION OF C SHARES AND D SHARES**

89.1    If a C Shareholder becomes a Leaver, each C Ordinary Share held by or on behalf of that Leaver shall automatically be re-designated on the Leaving Date, without a further resolution of the members, into one C1 Ordinary Share and one C2 Ordinary Share.

89.2    If a D Shareholder becomes a Leaver, each D Ordinary Share held by or on behalf of that Leaver shall automatically be re-designated on the Leaving Date, without a further resolution of the members, into one D1 Ordinary Share and one D2 Ordinary Share.

89.3    The Board may resolve from time to time, without a further resolution of the members, that any C1 Ordinary Share and C2 Ordinary Share that are held by the same C Shareholder shall be re-designated as one C Ordinary Share.

89.4    The Board may resolve from time to time, without a further resolution of the members, that any D1 Ordinary Share and D2 Ordinary Share that are held by the same D Shareholder shall be re-designated as one D Ordinary Share.

89.5    The date on which:

(a)    a C Ordinary Share is re-designated as one C1 Ordinary Share and one C2 Ordinary Share in accordance with Article 89.1; or

(b)    a D Ordinary Share is re-designated as one D1 Ordinary Share and one D2 Ordinary Share in accordance with Article 89.2,

shall, in respect of such C1 Ordinary Share and C2 Ordinary Share or D1 Ordinary Share and D2 Ordinary Share (as the case may be), be its "**Re-designation Date**".

89.6    The Board shall determine the apportionment of the amounts credited to the stated capital account(s) in respect of any shares that are re-designated pursuant to the foregoing Articles 89.1 to 89.4 following the re-designation of such shares.

90.    **MARKET VALUE**

The market value of a C Share or a D Share ("**Market Value**") shall be determined by a firm of independent chartered accountants or professional valuers appointed by the Company (at the direction of the Remuneration Committee) ("**Valuer**"). The Valuer shall determine the Market Value on the basis which, in its opinion, represents the market value of a Leaver's applicable shares for the purposes of income tax or capital gains tax in the United Kingdom, as at a Leaving Date (or, if a Valuer has previously issued a valuation that remains valid as at a Leaving Date ("**Existing Valuation**"), the Market Value shall be the Existing Valuation), taking into account the rights of the applicable shares under these Articles and such other factors as the Valuer shall consider appropriate. For these purposes only, the value of D1 Ordinary Shares as at the Leaving Date shall be determined assuming that there was an Exit at that Re-designation Date.

91.    **PRE-EMPTION ON NEW ISSUE**

91.1    Subject to Article 91.2, if from time to time a Group Company proposes to issue any Shares, equity securities, other shares, debt securities or debt in the capital of the Company (or other Group Company) or other securities or instruments convertible into any Shares, equity securities, other shares, debt securities or debt in the capital of the Company (or other Group Company) (excluding any debt, loan, facility, asset based lending arrangement, operating facility, capital expenditure facility, forex, hedging or derivative contract that a Group Company requires for the operation of the business in the ordinary course of trading) ("**Relevant Securities**") that has, in each case, been approved by an Investor Special Majority or an Investor Super Majority (as the case may be), the Company shall procure that:

(a)    no such Relevant Securities will be so issued unless such issuance has been made pursuant to this Article 91.2(a) and each Qualifying Ordinary Shareholder has first been given an opportunity which shall remain open for not less than ten (10) Business Days (such date as chosen being the "**End Date**") to subscribe, at the same time and on the same terms (including the same price per Relevant Security), for his or its Relevant Entitlement. Such opportunity shall be offered to each Qualifying Ordinary Shareholder in the form of a notice in writing from the Company (the "**New Issue Notice**");

(b)    the New Issue Notice shall indicate the total number of Relevant Securities to be issued and their respective proportions, the Relevant Entitlement of each Qualifying Ordinary Shareholder and the subscription price of each Relevant Security. If and to the extent that a Qualifying Ordinary Shareholder wishes to accept the offer set out in the New Issue Notice and subscribe for any or all of his or its Relevant Entitlement either through itself or an Affiliate, he or it shall give notice of such acceptance in writing to the Company on or before the End Date (each such notice, an "**Acceptance Notice**" and each Qualifying Ordinary Shareholder giving such Acceptance Notice, a "**Participating Shareholder**"), failing which the Qualifying Ordinary Shareholder (as applicable) shall be deemed to have declined to subscribe for any of his or its Relevant Entitlement in connection with the New Issue Notice. Any Acceptance Notice given by a Participating Shareholder pursuant to this Article 91.2(b) shall be irrevocable;

(c)    if by 5.00 p.m. on the End Date, the Company has not received Acceptance Notices in an amount equal to the Relevant Securities the subject of the New Issue Notice (the Relevant Securities in respect of which no Acceptance Notice has been received being the "**Excess Securities**"), the Board shall offer such Excess Securities to the Participating Shareholders. Such Participating Shareholders shall be given a further reasonable period of time (being not less than five (5) Business Days, such date chosen being the "**Second End Date**") to apply to subscribe for such number of Excess Securities as they wish (save that the Excess Securities may be subscribed for by an Affiliate of such Participating Shareholder in place of that Participating Shareholder)

and on the same terms (including the same price per Relevant Security and the same price per Other Security) on which that Participating Shareholder agreed to subscribe for the Relevant Securities pursuant to the New Issue Notice. If there are applications by Participating Shareholders for, in aggregate, a greater number than the number of Excess Securities, they shall be satisfied pro rata to the numbers applied for by each relevant Participating Shareholder;

(d)    within five (5) Business Days of the End Date (or the Second End Date, as applicable), the Company shall give notice in writing to each Participating Shareholder of:

(i)    the number and price of the Relevant Securities (and Excess Securities, as applicable) for which that Participating Shareholder has committed to subscribe; and

(ii)    the place and time on which the subscription is to be completed and the account details for the telegraphic transfer of the required subscription price; and

(e)    if, following the procedure set out in this Article 91.1, there still remain any Relevant Securities for which Qualifying Ordinary Shareholders have either (i) not committed to subscribe; or (ii) failed to make a payment at the required time in connection with their commitment to subscribe for, then such Relevant Securities may be allotted to such persons (who may or may not be existing shareholders in the Company) (but excluding any Competitor/Supplier Entity) as the Board may nominate, provided that the terms of such allotment are the same as those previously offered to the Qualifying Ordinary Shareholders.

91.2    Each holder of shares agrees that Article 91.1 shall not apply to:

(a)    an issue of Relevant Securities in connection with an Accelerated Securities Issue that has been approved by the Board (such approval requiring the positive affirmative vote of at least one Investor Director), and has received the approval of an Investor Special Majority or an Investor Super Majority (as the case may be) and for the purposes of implementing an Accelerated Securities Issue, the Board (with the approval of an Investor Special Majority or an Investor Super Majority (as the case may be), determine the number of Relevant Securities to be issued and the timing and other terms of that issue;

(b)    an issue of Relevant Securities to any wholly owned Group Company;

(c)    an issue of C Ordinary Shares and D Ordinary Shares as approved by the Remuneration Committee up to a maximum number of [●] C Ordinary Shares and [●] D Ordinary Shares;

(d)    an issue of Relevant Securities that has been approved by the Board (such approval requiring the positive affirmative vote of at least one Investor Director), and has received the approval of an Investor Special Majority or an Investor Super Majority (as the case may be) as non-cash consideration to an independent third party for the purposes of a corporate acquisition, merger or joint venture proposed by the Board on arm's length terms;

(e)    an issue of C Ordinary Shares or D Ordinary Shares in excess of the maximum number specified in Article 91.2(c) provided such issue has been approved by Board (such approval requiring the positive affirmative vote of at least one Investor Director) and an Investor Special Majority or an Investor Super Majority (as the case may be); or

(f)    an issue of Relevant Securities issued:

(i)       pursuant to the Subscription Agreement; or

(ii)      in connection with the Additional PIK Facility (on or around the same time as an advance under the Additional PIK Facility), such issuance being in the same proportion to the Additional PIK Facility as represents the proportion of A Ordinary Shares issued in respect of the PIK Facility.

91.3    If the Board (with the approval of an Investor Special Majority or an Investor Super Majority (as the case may be) proposes an Accelerated Securities Issue it shall, so far as is reasonably practicable (taking into account the urgency of the Group's financing requirements) and permitted under law, give prior written notice of a reasonable period of time (being not less than fifteen (15) Business Days) to each Qualifying Ordinary Shareholder of any such Accelerated Securities Issue and, notwithstanding any other provision in these Articles, holder of shares shall:

(a)      consent to any board or shareholders' meeting of a Group Company being held on short notice to implement the Accelerated Securities Issue and procure that any director appointed by it or him will so consent (subject always to his fiduciary duties);

(b)      vote in favour of all resolutions as a shareholder of the relevant Group Company, which are proposed by the Board to implement the Accelerated Securities Issue; and

(c)      procure the circulation to the board of directors or shareholders of the relevant Group Company of such board or shareholder written resolutions (respectively) proposed by the Board to implement the Accelerated Securities Issue and (subject to their fiduciary duties as a director of the relevant Group Company) to sign (or to the extent permitted by law in the case of a written resolution, to indicate their agreement to) such resolutions and return them (or the relevant indication) to the Company as soon as reasonably practicable.

91.4    If a holder of shares fails to comply with its obligations under Article 91.3, the Board may (and shall, if requested by an Investor Special Majority) authorise any director to execute, complete and deliver as agent for and on behalf of that holder of shares:

(a)      a written consent to any board or shareholders' meeting of any Group Company being held on short notice to implement the Accelerated Securities Issue;

(b)      any shareholder written resolutions of the relevant Group Company which are proposed by the Investor Majority to implement the Accelerated Securities Issue;

(c)      a proxy form appointing any director as that holder of shares proxy to vote in his or its name and on his behalf in favour of all resolutions proposed at a shareholders' meeting of the relevant Group Company which are proposed by the Investor Majority to implement the Accelerated Securities Issue; and

(d)      any other documents required to be signed by or on behalf of that Investor in connection with the Accelerated Securities Issue.

91.5    Within ten (10) Business Days of an Accelerated Securities Issue each Qualifying Ordinary Shareholder shall be given notice (the "**Accelerated Securities Issue Notice**") (such Accelerated Securities Issue Notice shall contain the same information as is required for a New Issue Notice pursuant to Article 91.1(b)) of the opportunity, which shall remain open for not less than twenty (20) Business Days to subscribe for (or otherwise acquire, from those holders of shares that participated in an Accelerated Securities Issue) such number of Relevant Securities (the "**Catch-Up Subscription**") which, if subscribed for or acquired in full, would result in such Qualifying Ordinary Shareholder's proportionate holding of such Relevant

Securities following the Catch-Up Subscription and the Accelerated Securities Issue equalling such Qualifying Ordinary Shareholder's proportionate holding of the Qualifying Ordinary Shares immediately prior to the Accelerated Securities Issue (and assuming for these purposes that any other Qualifying Ordinary Shareholders exercised their subscription rights in full).

91.6    The holders of shares agree and acknowledge that the Holding Period Trustee shall not (and shall not be required by any Investor to) exercise any pre-emption or catch-up rights under this Article 91.

**92.    EXPERT**

For the purposes of Article 13.6, 14.2(e) and 15.2(d), this Article 92 shall apply to determine the fair value of the Cash Equivalent Value of any Non-Cash Consideration. The fair value shall be determined by a firm of independent chartered accountants or professional valuers appointed by the Company (at the direction of the Remuneration Committee) ("**Expert**"). The Expert shall determine the Cash Equivalent Value on the basis which, in its opinion, represents the fair value of the Non-Cash Consideration taking into account any  factors as the Expert shall consider appropriate. The cost of the Expert shall be borne in the proportions as determined by the Expert. The Experts decision shall be final and binding except in the case of fraud or manifest error.

**APPENDIX 10**

**FORM OF SUPPLEMENTAL INDENTURE**

EU-DOCS\29867510.8

**SUPPLEMENTAL INDENTURE**

SUPPLEMENTAL INDENTURE (this "*Supplemental Indenture*"), dated as of [ ● ], 2020 among New Look Financing plc (the "*Issuer*"), New Look Bonds Limited, New Look Limited and New Look Retailers Limited (together, the "*Guarantors*"), GLAS Trustees Limited, as trustee (the "*Trustee*") and GLAS Trust Corporation Limited, as security agent (the "*Security Agent*").

W I T N E S S E T H

WHEREAS, the Issuer has heretofore executed and delivered to the Trustee an indenture (the "*Indenture*"), dated as of May 3, 2019, providing for the issuance of euro-denominated 12% Senior Secured PIK Notes due 2024 (the "*Euro Notes*"), and sterling-denominated 12% Senior Secured PIK Notes due 2024 (the "*Sterling Notes*", and together with the Euro Notes, the "*Notes*");

WHEREAS, on August 13, 2020, New Look Retail Holdings Limited, a company incorporated under the laws of Jersey (the "*Parent*"), announced that the Parent and its subsidiaries (the "*Group*") were seeking to implement a comprehensive recapitalization transaction that would extend the Group's banking and operational facilities, deliver a new money investment and significantly deleverage its balance sheet and that the Parent, the Issuer and other Group companies entered into the Lock-up Agreement (the "*Lock-up Agreement*") with the Group's financial creditors, who agreed to support, implement and consummate the Financial Restructuring, including the Scheme (as defined herein), by, among other things, entering into this Supplemental Indenture. Holders holding over 90% of the then outstanding principal amount of the Notes have entered into or acceded to the Lock-up Agreement.

WHEREAS, pursuant to the Lock-up Agreement, the Holders consented to waive any Default or Event of Default arising as a result of the taking of any steps to make a proposal for, the implementation of and/or the consummation of a company voluntary arrangement under section 1 of the Insolvency Act 1986 by New Look Retailers Limited arising from the recapitalization transaction.

WHEREAS, pursuant to the Scheme of Arrangement (under Part 26 of the United Kingdom Companies Act 2006) relating to the Notes was sanctioned by the English High Court on [ ● ], 2020 (the "*Scheme*") all Holders are deemed to have consented to the reduction of the principal amount of the Notes outstanding to zero, the waiver of all payments of principal and interest under the Indenture due and outstanding, the discharge of the Indenture, the release of all Notes Guarantees thereunder, the release of all Security created or expressed to be created in favor of the Security Agent for the benefit of the Holders pursuant to the Transaction Security Documents and the cancellation of the Notes, in exchange for, in respect of each Holder, its Scheme Creditor Entitlements (as defined in the Scheme).

WHEREAS, pursuant to the Scheme and Sections 9.02(a), 9.02(f), 9.02(h), 9.02(i) and 9.06 of the Indenture and paragraph 12 of the Notes, the Issuer, the Guarantors, the Trustee and the Security Agent are authorized to execute and deliver this Supplemental Indenture.

WHEREAS, in connection with the execution and delivery of this Supplemental Indenture, the Trustee has received an Officers' Certificate and an Opinion of Counsel as contemplated by Sections 7.02(b), 13.02 and 13.03 of the Indenture.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Issuer and the Trustee mutually covenant and agree as follows:

1.    CAPITALIZED TERMS.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture and the Scheme.

2.    REDUCTION OF THE PRINCIPAL AMOUNT AND DISCHARGE OF THE INDENTURE.  In accordance with the Scheme and pursuant to Sections 9.02(a), 9.02(f), 9.02(h), 9.02(i), 10.04(a)(4) and 11.05(a)(6) of the Indenture and paragraph 12 of the Notes, the principal amount of the Notes outstanding is hereby reduced to zero, all payments of principal and interest due and outstanding are

hereby waived in full, the Indenture is hereby discharged, all Notes Guarantees are hereby released, all Security created or expressed to be created in favor of the Security Agent for the benefit of the Holders pursuant to the Transaction Security Documents is hereby released and arrangements will be made for the prompt cancellation of the Notes.

3.     EXECUTION AND DELIVERY.   (a) The parties hereto hereby agree that this Supplemental Indenture shall be sufficient to evidence the reduction of the principal amount of the Notes outstanding to zero, the waiver of all payments due and outstanding of principal and interest in full, the discharge of the Indenture, the release of all Notes Guarantees thereunder, the release of the Security created or expressed to be created in favor of the Security Agent for the benefit of the Holders pursuant to the Transaction Security Documents and the cancellation the Notes, with respect to each Note authenticated and delivered by or on behalf of the Trustee, and the Issuer hereby agrees that this Supplemental Indenture shall be executed on behalf of the Issuer by one of its Directors or Officers.

(b)     If an Officer or a duly authorized signatory pursuant to a board resolution or power of attorney whose signature is on this Supplemental Indenture no longer holds that office at the time the Trustee receives this Supplemental Indenture the Supplemental Indenture shall be valid nevertheless.

(c)     Upon execution of this Supplemental Indenture, the principal amount of the Notes shall be reduced to zero, all payments due and outstanding of principal and interest shall be waived in full, the Indenture, including the Security created or expressed to be created in favor of the Security Agent for the benefit of the Holders pursuant to the Transaction Security Documents, shall be discharged and cease to be of further effect and the Notes shall be canceled in accordance with Sections 9.02(a), 9.02(f), 9.02(h), 9.02(i), 10.04(a)(4) and 11.05(a)(6)  thereof.

4.     NO RECOURSE AGAINST OTHERS.   No past, present or future director, officer, employee, incorporator, stockholder or agent of the Issuer, as such, shall have any liability for any obligations under the Notes, the Indenture, the Notes Guarantees, the Transaction Security Documents or this Supplemental Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation.

5.     THIS SUPPLEMENTAL INDENTURE AND THE RIGHTS AND DUTIES OF THE PARTIES THEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

6.     COUNTERPARTS.   The parties may sign any number of copies of this Supplemental Indenture.   Each signed copy shall be an original, but all of them together represent the same agreement.

7.     EFFECT OF HEADINGS.   The Section headings herein are for convenience only and shall not affect the construction hereof.

8.     THE TRUSTEE AND THE SECURITY AGENT.   Neither the Trustee nor the Security Agent shall be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Issuer and the Guarantors.

2

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

Dated:  [ ● ], 2020

<div style="margin-left:40%">

NEW LOOK FINANCING PLC
as the Issuer


By: _____
      Name: Richard Collyer
      Title: Chief Financial Officer

</div>

NEW LOOK BONDS LIMITED

as the Guarantor


By: _____
    Name: Richard Collyer
    Title: Chief Financial Officer


By: _____
    Name: Nigel Oddy
    Title: Chief Executive Officer

*[Signature page to the Supplemental Indenture.]*

NEW LOOK LIMITED

as the Guarantor


By: _____
    Name: Richard Collyer
    Title: Chief Financial Officer


By: _____
    Name: Nigel Oddy
    Title: Chief Executive Officer

*[Signature page to the Supplemental Indenture.]*

NEW LOOK RETAILERS LIMITED

as the Guarantor


By: _____
     Name: Richard Collyer
     Title: Chief Financial Officer


By: _____
     Name: Nigel Oddy
     Title: Chief Executive Officer

*[Signature page to the Supplemental Indenture.]*

GLAS TRUSTEES LIMITED,
as Trustee

By: _____
     Authorized Signatory

GLAS TRUST CORPORATION LIMITED,
as Security Agent

By: _____
          Authorized Signatory

**APPENDIX 11**

**FORM OF GLAS UNDERTAKING DEED**

EU-DOCS\29867510.8

Dated: _____ 2020

GLAS TRUST CORPORATION LIMITED

and

GLAS TRUSTEES LIMITED

and

GLOBAL LOAN AGENCY SERVICES LIMITED

DEED POLL IN RESPECT OF THE
SCHEME OF ARRANGEMENT

**THIS DEED POLL** is made on: [ ● ] 2020

**By:**

**(1)**    **GLAS TRUST CORPORATION LIMITED** in its capacity: (i) as "Security Agent" under the Intercreditor Agreement (as defined in the Scheme) (the "**Security Agent**"); and (ii) as the prospective "Security Agent" under the Subordination Agreement, (the "**PIK Security Agent**");

**(2)**    **GLAS TRUSTEES LIMITED** in its capacity: as "Trustee" under the SSN Indenture (as defined in the Scheme) (the "**SSN Trustee**"); and

**(3)**    **GLOBAL LOAN AGENCY SERVICES LIMITED** in its capacity: (i) as "Paying Agent" under the SSN Indenture (as defined in the Scheme) (the "**SSN Paying Agent**"); (ii) as the prospective "Facility Agent" under the PIK Facility Agreement (as defined in the Scheme) (the "**PIK Facility Agent**"); and (iii) as the prospective "Facility Agent" under the Shareholder Loan Agreement (as defined in the Scheme) (the "**Shareholder Loan Facility Agent**"),

(together, the "**Grantors**").

**In favour of:**

**(1)**    **NEW LOOK FINANCING PLC**, (registered no. 11911640), a company incorporated in England and Wales whose registered office is at New Look House, Mercery Road, Weymouth, Dorset DT3 5HJ, United Kingdom (the "**Company**");

**(2)**    **THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES** (the "**Court**"); and

**(3)**    **THE SCHEME CREDITORS** as defined in the Scheme;

(together, the "**Beneficiaries**").

**Whereas**

(A)    On 13 August 2020 the Company entered into a lock-up agreement with, among others, the Original Consenting RCF Lenders (as defined therein), the Original Consenting Backstop Parties (as defined therein), the Original Consenting SSN Holders (as defined therein) and the Calculation Agent (as defined therein) in order to facilitate the implementation of a Financial Restructuring (as defined therein), as amended or amended and restated from time to time (the "**Lock-Up Agreement**").

(B)    The parties to the Lock-Up Agreement referred to above have agreed to implement the Financial Restructuring by way of a scheme of arrangement of the Company under Part 26 of the Companies Act 2006 with respect to the Scheme Creditors (the "**Scheme**").

(C)    On 23 September 2020, [●] granted leave to convene a meeting of Scheme Creditors, commencing at [ ● ][p.m.] (London Time) on 16 October 2020 to consider and if thought fit approve the Scheme.

(D)    The Scheme Creditors comprise the SSN Common Depositary, the SSN Trustee (each solely in its capacity as a beneficiary of the covenants to repay principal and interest

on the SSNs pursuant to the SSN Indenture) and the SSN Holders.

(E) The terms of the Scheme are in the form made available to Scheme Creditors on [ ● ] September 2020 as described in further detail in the explanatory statement of the Company (the "**Explanatory Statement**").

(F) Each Grantor has considered the terms of the Scheme (in the form made available on [ ● ]September 2020), the Financial Restructuring Documents (as applicable) and the aforementioned documents prior to entering into this Deed.

(G) Each Grantor's entry into this Deed is contemplated by the terms of the Scheme, and pursuant to the terms of the Scheme, it is instructed by the Scheme Creditors to, amongst other things, undertake such actions as are necessary to give effect to the terms of the Scheme upon the Scheme becoming effective.

(H) Each Grantor has entered into this Deed to: (i) be bound by the Scheme but only upon its sanctioning by the Court; (ii) execute or procure to be executed all Financial Restructuring Documents to which it is a party and to do or procure to be done all such acts and things, as may be necessary or desirable to be executed or done by it, as described in the Scheme, and to implement and consummate the Financial Restructuring; and (iii) without limiting paragraph (ii), in the event the Restructuring Effective Date does not occur prior to the Longstop Date, acting in accordance with Clauses 9.5 (*Failure of all Restructuring Steps to occur before the Longstop Date*) and 9.6 (*Termination of this Scheme*) of the Scheme.

**Definitions and Interpretation**

Unless otherwise defined in this Deed or the content otherwise requires, words and expressions used in this Deed shall have the meanings given to them in the Explanatory Statement.

**This Deed Poll** is made on the date first written above by the Grantors in favour of the Beneficiaries:

1. The Security Agent:

1.1 upon the Scheme being sanctioned by the Court, agrees and undertakes to be bound by Scheme on the terms and conditions and in such form as may be sanctioned by the Court;

1.2 upon the occurrence of the Scheme Effective Date (as defined under the Scheme), shall:

 1.2.1 promptly do or procure to be done all such acts and things as may be reasonably required of it for the purposes of giving effect to the Scheme; and

 1.2.2 promptly execute and be bound by all Financial Restructuring Documents (and related documents) to which it is a party in accordance with Clause 5.3 (*Pre-Restructuring Steps: Execution of the Financial Restructuring Documents*) of the Scheme; and

1.3 subject to the occurrence of the Financial Restructuring Conditions Satisfaction Time (as defined in the Scheme):

1.3.1  agrees that all of the Scheme Steps shall or shall be deemed to take place in the sequence specified in, and in accordance with, Clauses 5 (*Financial Restructuring Implementation*) and 6 (*Restructuring Steps*) of the Scheme;

1.3.2  agrees that each Scheme Step shall be completed as soon as reasonably practicable following completion of the previous Scheme Step; and

1.3.3  without derogating from anything in clauses 1.2 of this Deed, agrees to promptly execute or procure to be executed all such documents, and promptly do or procure to be done all such acts and things, as may be reasonably required of it for the purposes of implementing and giving effect to each Scheme Step, as described in Clause 6 (*Restructuring Steps*) of the Scheme.

2.   The PIK Security Agent:

2.1    upon the Scheme being sanctioned by the Court, agrees and undertakes to be bound by the Scheme on the terms and conditions and in such form as may be sanctioned by the Court;

2.2    upon the occurrence of the Scheme Effective Date (as defined under the Scheme), shall:

2.2.1  promptly do or procure to be done all such acts and things as may be reasonably required of it for the purposes of giving effect to the Scheme; and

2.2.2  promptly execute and be bound by all Financial Restructuring Documents (and related documents) to which it is a party in accordance Clause 5.3 (*Pre-Restructuring Steps: Execution of the Financial Restructuring Documents*) of the Scheme; and

2.3    subject to the occurrence of the Financial Restructuring Conditions Satisfaction Time (as defined in the Scheme):

2.3.1  agrees that all of the Scheme Steps shall or shall be deemed to take place in the sequence specified in, and in accordance with, Clauses 5 (*Financial Restructuring Implementation*) and 6 (*Restructuring Steps*) of the Scheme;

2.3.2  agrees that each Scheme Step shall be completed as soon as reasonably practicable following completion of the previous Scheme Step; and

2.3.3  without derogating from anything in clause 2.2 of this Deed, agrees to promptly execute or procure to be executed all such documents, and promptly do or procure to be done all such acts and things, as may be reasonably required of it for the purposes of implementing and giving effect to each Scheme Step, as described in Clause 6 (*Restructuring Steps*) of the Scheme.

3    The SSN Trustee:

3.1    upon the Scheme being sanctioned by the Court, agrees and undertakes to the extent applicable to it to be bound by the Scheme on the terms and conditions and in such form as may be sanctioned by the Court;

3.2    upon the occurrence of the Scheme Effective Date (as defined under the Scheme),

shall:

3.2.1    promptly do or procure to be done all such acts and things as may be reasonably required of it for the purposes of giving effect to the Scheme; and

3.2.2    promptly execute and be bound by all Financial Restructuring Documents (and related documents) to which it is a party in accordance with Clause 5.3 (*Pre-Restructuring Steps: Execution of the Financial Restructuring Documents*) of the Scheme; and

3.3    subject to the occurrence of the Financial Restructuring Conditions Satisfaction Time (as defined in the Scheme):

3.3.1    agrees that all of the Scheme Steps shall or shall be deemed to take place in the sequence specified in, and in accordance with, Clauses 5 (*Financial Restructuring Implementation*) and 6 (*Restructuring Steps*) of the Scheme;

3.3.2    agrees that each Scheme Step shall be completed as soon as reasonably practicable following completion of the previous Scheme Step; and

3.3.3    without derogating from anything in clause 3.2 of this Deed, agrees to promptly execute or procure to be executed all such documents, and promptly do or procure to be done all such acts and things, as may be reasonably required of it for the purposes of implementing and giving effect to each Scheme Step, as described in Clause 6 (*Restructuring Steps*) of the Scheme.

4    The PIK Facility Agent and Shareholder Loan Facility Agent each:

4.1    upon the Scheme being sanctioned by the Court, agree and undertake to the extent applicable to it to be bound by the Scheme on the terms and conditions and in such form as may be sanctioned by the Court;

4.2    upon the occurrence of the Scheme Effective Date (as defined under the Scheme), shall:

4.2.1    promptly do or procure to be done all such acts and things as may be reasonably required of it for the purposes of giving effect to the Scheme; and

4.2.2    promptly execute and be bound by all Financial Restructuring Documents (and related documents) to which it is a party in accordance with Clause 5.3 (*Pre-Restructuring Steps: Execution of the Financial Restructuring Documents*) of the Scheme; and

4.3    subject to the occurrence of the Financial Restructuring Conditions Satisfaction Time (as defined in the Scheme):

4.3.1    agrees that all of the Scheme Steps shall or shall be deemed to take place in the sequence specified in, and in accordance with, Clauses 5 (*Financial Restructuring Implementation*) and 6 (*Restructuring Steps*) of the Scheme;

4.3.2    agrees that each Scheme Step shall be completed as soon as reasonably practicable following completion of the previous Scheme Step; and

4.3.3    without derogating from anything in clause 4.2 of this Deed, agrees to

promptly execute or procure to be executed all such documents, and promptly do or procure to be done all such acts and things, as may be reasonably required of it for the purposes of implementing and giving effect to each Scheme Step, as described in Clause 6 (*Restructuring Steps*) of the Scheme.

5      The SSN Paying Agent**:**

5.1    upon the Scheme being sanctioned by the Court, agrees and undertakes to the extent applicable to it to be bound by the Scheme on the terms and conditions and in such form as may be sanctioned by the Court;

5.2    upon the occurrence of the Scheme Effective Date (as defined under the Scheme), shall:

5.2.1    promptly do or procure to be done all such acts and things as may be reasonably required of it for the purposes of giving effect to the Scheme; and

5.2.2    promptly execute and be bound by all Financial Restructuring Documents (and related documents) to which it is a party in accordance with Clause 5.3 (*Pre-Restructuring Steps: Execution of the Financial Restructuring Documents*); and

5.3    subject to the occurrence of the Financial Restructuring Conditions Satisfaction Time (as defined in the Scheme):

5.3.1    agrees that all of the Scheme Steps shall or shall be deemed to take place in the sequence specified in, and in accordance with, Clauses 5 (*Financial Restructuring Implementation*) and 6 (*Restructuring Steps*) of the Scheme;

5.3.2    agrees that each Scheme Step shall be completed as soon as reasonably practicable following completion of the previous Scheme Step; and

5.3.3    without derogating from anything in clause 5.2 of this Deed, agrees to promptly execute or procure to be executed all such documents, and promptly do or procure to be done all such acts and things, as may be reasonably required of it for the purposes of implementing and giving effect to each Scheme Step, as described in Clause 6 (*Restructuring Steps*) of the Scheme.

6      The obligations of each of Grantor in this Deed are several. No Grantor is responsible for the obligations of any other Grantor in connection with this Deed.

7      Each Grantor is not obliged to expend or risk any of its own funds or otherwise incur any financial liability in the performance of any acts in relation to the Scheme.

8      This Deed and any non-contractual obligations arising out of or in connection with this Deed shall be governed by, and construed in accordance with, English law.

9      This Deed may be executed in any number of separate counterparts, each of which is an original but all of which taken together shall constitute one and the same instrument.

*[Signatures to be inserted]*

## APPENDIX 12

## FORM OF LUCID DEED OF UNDERTAKING

Dated: _____  2020

LUCID ISSUER SERVICES LIMITED

DEED POLL IN RESPECT OF THE
SCHEME OF ARRANGEMENT

**THIS DEED POLL** is made on: [ ⬤ ] 2020

**By:**

**LUCID ISSUER SERVICES LIMITED** in its capacity: (i) as "Information Agent"  (the "**Information Agent**"); (ii) as "Calculation Agent" (the "**Calculation Agent**"); and (iii) as "Holding Period Trustee" (the "**Holding Period Trustee**") (each as defined in the Scheme).

(the "**Grantor**").

**In favour of:**

(1)     **NEW LOOK FINANCING PLC**, (registered no. 11911640), a company incorporated in England and Wales whose registered office is at New Look House, Mercery Road, Weymouth, Dorset DT3 5HJ, United Kingdom (the "**Company**");

(2)     **THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES** (the "**Court**" ); and

(3)     **THE SCHEME CREDITORS** as defined in the Scheme,

(together, the "**Beneficiaries**" ).

**Whereas**

(A)     On 13 August 2020 the Company entered into a lock-up agreement with, among others, the Original Consenting RCF Lenders (as defined therein), the Original Consenting Backstop Parties (as defined therein), the Original Consenting SSN Holders (as defined therein) and the Calculation Agent (as defined therein) in order to facilitate the implementation of a Financial Restructuring (as defined therein), as amended or amended and restated from time to time (the "**Lock-Up Agreement**").

(B)     The parties to the Lock-Up Agreement referred to above have agreed to implement the Financial Restructuring by way of a scheme of arrangement of the Company under Part 26 of the Companies Act 2006 with respect to the Scheme Creditors (the "**Scheme**").

(C)     On 23 September 2020, [⬤] granted leave to convene a meeting of Scheme Creditors, commencing at [ ⬤ ][p.m.] (London Time) on 16 October 2020 to consider and if thought fit approve the Scheme.

(D)     The Scheme Creditors comprise the SSN Common Depositary, the SSN Trustee (each solely in its capacity as a beneficiary of the covenants to repay principal and interest on the SSNs pursuant to the SSN Indenture) and the SSN Holders.

(E)     The terms of the Scheme are in the form made available to Scheme Creditors on [ ⬤ ] September 2020 as described in further detail in the explanatory statement of the Company (the "**Explanatory Statement**").

(F)     The Grantor has considered the terms of the Scheme (in the form made available on [ ⬤ ] September 2020), the Financial Restructuring Documents (as applicable) and the aforementioned documents prior to entering into this Deed.

(G)     The Grantor's entry into this Deed is contemplated by the terms of the Scheme, and pursuant

to the terms of the Scheme, it is instructed by the Scheme Creditors to, amongst other things, undertake such actions as are necessary to give effect to the terms of the Scheme upon the Scheme becoming effective.

(H)     The Grantor has entered into this Deed to: (i) consent to the Scheme; (ii) be bound by the Scheme upon its sanctioning by the Court; and (iii) execute or procure to be executed all Financial Restructuring Documents to which it is a party and to do or procure to be done all such acts and things, as may be necessary or desirable to be executed or done by it, as described in the Scheme, and to implement and consummate the Financial Restructuring.

**Definitions**

Unless otherwise defined in this Deed or the content otherwise requires, words and expressions used in this Deed shall have the meanings given to them in the Explanatory Statement.

**This Deed Poll** is made on the date first written above by the Grantor in favour of the Beneficiaries:

1       The Grantor, in each of its capacities as Information Agent, Calculation Agent and Holding Period Trustee:

1.1     hereby consents to the Scheme, and, upon the Scheme being sanctioned by the Court, agrees and undertakes to the extent applicable to it to be bound by the Scheme on the terms and conditions and in such form as may be sanctioned by the Court;

1.2     upon the occurrence of the Scheme Effective Date (as defined under the Scheme), shall:

1.2.1     promptly do or procure to be done all such acts and things as may be reasonably required of it for the purposes of giving effect to the Scheme; and

1.2.2     promptly execute and be bound by all Financial Restructuring Documents (and related documents) to which it is a party in accordance with Clause 5.3 (*Pre-Restructuring Steps: Execution of the Financial Restructuring Documents*) of the Scheme;

1.3     subject to the occurrence of the Financial Restructuring Conditions Satisfaction Time (as defined in the Scheme):

1.3.1     agrees that all of the Scheme Steps shall or shall be deemed to take place in the sequence specified in, and in accordance with, Clauses 5 (*Financial Restructuring Implementation*) and 6 (*Restructuring Steps*) of the Scheme;

1.3.2     agrees that each Scheme Step shall be completed as soon as reasonably practicable following completion of the previous Scheme Step; and

1.3.3     without derogating from anything in clause 1.2 of this Deed, agrees to promptly execute or procure to be executed all such documents, and promptly do or procure to be done all such acts and things, as may be reasonably required of it for the purposes of implementing and giving effect to each Scheme Step, as described in Clause 6 (*Restructuring Steps*) of the Scheme.

2        The Grantor is not obliged to expend or risk any of its own funds or otherwise incur any financial liability in the performance of any acts in relation to the Scheme.

3        This Deed and any non-contractual obligations arising out of or in connection with this Deed shall be governed by, and construed in accordance with, English law.

4        This Deed may be executed in any number of separate counterparts, each of which is an original but all of which taken together shall constitute one and the same instrument.

[*Signature to be inserted*]

**APPENDIX 13**

**FORM OF COMPANIES UNDERTAKING DEED**

EU-DOCS\29867510.8

Dated: _____ 2020

NEW LOOK RETAIL HOLDINGS LIMITED

and

[NEW MIDCO]

DEED POLL IN RESPECT OF THE
SCHEME OF ARRANGEMENT

**THIS DEED POLL** is made on: [ ● ] 2020

**By:**

(1)    **NEW LOOK RETAIL HOLDINGS LIMITED,** a company incorporated and registered in Jersey as a private limited company, whose registered number is 128640 and whose registered office is 47 Esplanade St Helier Jersey JE1 08D (the "**Parent**"); and

(2)    **[NEW MIDCO],** a company incorporated and registered in Jersey as a private limited company, whose registered number is [ ● ] and whose registered office is [●],

(together, the "**Grantors**").

**In favour of:**

(1)    **NEW LOOK FINANCING PLC**, a company incorporated in England and Wales. Whose registered number is 11911640 and whose registered office is at New Look House, Mercery Road, Weymouth, Dorset DT3 5HJ, United Kingdom (the "**Company**");

(2)    **THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES** (the "**Court**"); and

(3)    **THE SCHEME CREDITORS** as defined in the Scheme;

(together, the" **Beneficiaries''**).

**Whereas**

(A)    On 13 August 2020 the Company and Parent entered into a lock-up agreement with, among others, the Original Consenting RCF Lenders (as defined therein), the Original Consenting Backstop Parties (as defined therein), the Original Consenting SSN Holders (as defined therein) and the Calculation Agent (as defined therein) in order to facilitate the implementation of a Financial Restructuring (as defined therein), as amended or amended and restated from time to time (the "**Lock-Up Agreement**").

(B)    The parties to the Lock-Up Agreement referred to above have agreed to implement the Financial  Restructuring by way of a scheme of arrangement of the Company under Part 26 of the Companies Act 2006 with respect to the Scheme Creditors (the "**Scheme**").

(C)    On 23 September 2020, [●] granted leave to convene a meeting of Scheme Creditors, commencing at [ ● ][p.m.] (London Time) on 16 October 2020 to consider and if thought fit approve the Scheme.

(D)    The Scheme Creditors comprise the SSN Common Depositary, the SSN Trustee (each solely in its capacity as a beneficiary of the covenants to repay principal and interest on the SSNs pursuant to the SSN Indenture) and the SSN Holders.

(E)    The terms of the Scheme are in the form made available to Scheme Creditors on [ ● ] September 2020, as described in further detail in the explanatory statement of the Company (the "**Explanatory Statement**").

(F)    Each Grantor has considered the terms of the Scheme (in the form made available on [ ● ] September 2020), the Explanatory Statement, the Financial Restructuring

1

Documents (as applicable) and the aforementioned documents prior to entering into this Deed.

(G)   Each Grantor has entered into this Deed to: (i) consent to the Scheme; (ii) be bound by the Scheme upon its sanctioning by the Court; and (iii) execute or procure to be executed all Financial Restructuring Documents to which it is a party and to do or procure to be done all such acts and things, as may be necessary or desirable to be executed or done by it, as described in the Scheme, and to implement and consummate the Financial Restructuring.

## Definitions and Interpretation

Unless otherwise defined in this Deed or the context otherwise requires, words and expressions used in this Deed shall have the meanings given to them in the Explanatory Statement.

**This Deed Poll** is made on the date first written above by the Grantors in favour of the Beneficiaries:

1      Each of the Grantors:

1.1    hereby consents to the Scheme, and upon the Scheme being sanctioned by the Court, agrees and undertakes to be bound by the Scheme on the terms and conditions and in such form as may be sanctioned by the Court;

1.2    upon the occurrence of the Scheme Effective Date (as defined under the Scheme), shall:

1.2.1   promptly do or procure to be done all such acts and things as may be reasonably required of it for the purposes of giving effect to the Scheme; and

1.2.2   execute all Restructuring Documents to which it is a party in accordance with Clause 5.3 (*Pre-Restructuring Steps: Execution of the Financial Restructuring Documents*) of the Scheme;

1.3    subject to the occurrence of the Financial Restructuring Conditions Satisfaction Time (as defined in the Scheme):

1.3.1   acknowledges that all of the Scheme Steps shall or shall be deemed to take place in the sequence specified in, and in accordance with, Clauses 5 (*Financial Restructuring Implementation*) and 6 (*Restructuring Steps*) of the Scheme;

1.3.2   acknowledges that each Scheme Step shall be completed as soon as reasonably practicable following completion of the previous Scheme Step; and

1.3.3   without derogating from anything in clause 1.2 of this Deed, agrees to promptly execute or procure to be executed all such documents, and promptly do or procure to be done all such acts and things, as may be reasonably required of it for the purposes of implementing and giving effect to each Scheme Step, as described in Clause 6 (*Restructuring Steps*) of the Scheme;

1.4    irrevocably appoints the Company to be its attorney, on its behalf and in its name or otherwise, at such time and in such manner as the attorney, acting reasonably and in good faith, thinks fit to do anything which that Grantor is obliged to do in connection with the Scheme (including to do all such acts or execute all Financial Restructuring Documents

2

(as applicable) to which that Grantor is a party and such documents, notices, instructions, filings and registrations in such form as the Company may reasonably require to implement the Scheme); and

1.5    ratifies and confirms and agrees to ratify and confirm whatever the Company as attorney shall do in the exercise or purported exercise of the power of attorney granted by it in clause 1.4 of this Deed (as applicable).

2    The obligations of each of the Grantors in this Deed are several. No Grantor is responsible for the obligations of any other Grantor in connection with this Deed.

3    The Grantors are not obliged to expend or risk any of their own funds or otherwise incur any financial liability in the performance of any acts in relation to the Scheme.

4    This Deed and any non-contractual obligations arising out of or in connection with this Deed shall be governed by, and construed in accordance with, English law.

5    This Deed may be executed in any number of separate counterparts, each of which is an original but all of which taken together shall constitute one and the same instrument.

.

[*Signatures to be inserted*]

3

# APPENDIX 14

## SIMPLIFIED GROUP STRUCTURE CHART

This is a simplified structure chart and does not include every entity in the Group. This information should not be relied upon.

# New Look – Simplified Group Structure Chart

*Privileged & Confidential*

