Adam J. Goldberg
Tianjiao ("TJ") Li
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  adam.goldberg@lw.com
          tj.li@lw.com

Jeramy D. Webb (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email:   jeramy.webb@lw.com

Benjamin Roth (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email:  ben.roth@lw.com

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| New Look Financing plc,[1] | Case No. 20-12297 (MEW) |
| Debtor in a Foreign Proceeding. | |

<div align="center">

**DECLARATION OF YEN SUM**
**IN SUPPORT OF VERIFIED PETITION UNDER CHAPTER 15 FOR**
**RECOGNITION OF A FOREIGN MAIN PROCEEDING AND RELATED RELIEF**

</div>

I, Yen Sum, declare under penalty of perjury as follows to the best of my knowledge,

information and belief:

1.      I am a solicitor duly admitted to practice in England and Wales and a partner in the

law firm of Latham & Watkins LLP ("Latham"), located at 99 Bishopsgate, Cornhill, London

EC2M 3XF, United Kingdom.  I submit this declaration (the "Declaration") in support of the

---

[1]  The last four digits of the Debtor's England and Wales company registration number are 1640. The location of the
     Debtor's registered office is New Look House, Mercery Road, Weymouth, Dorset, DT3 5HJ, United Kingdom.

*Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* (together with the Form of Voluntary Petition filed contemporaneously herewith, the "Petition") filed in the above-captioned chapter 15 case.[2]  The Petition seeks, among other relief, chapter 15 recognition of a scheme of arrangement (the "Scheme") proposed by New Look Financing plc (the "Debtor"), a public limited company incorporated in England and Wales, to its Scheme Creditors (as defined in paragraph 2 below) under Part 26 of the Companies Act 2006 of the United Kingdom (the "Companies Act") to the extent that such Scheme is duly approved by the requisite majority of affected creditors and sanctioned by the Business and Property Courts of the High Court of Justice, sitting in London, England (the "High Court"), all in accordance with applicable English law.  As of the date hereof, the Scheme is pending (the "English Proceeding") before the High Court.

2.      The Debtor was incorporated in England and Wales as a public limited company, which is a corporation under English law.  The Debtor is a wholly-owned indirect subsidiary of New Look Retail Holdings Limited (the "Parent," and together with its affiliates, the "Group").  The Debtor is the issuer of the £400,131,636 senior secured notes (the "Sterling SSNs") and €45,209,687 senior secured notes (the "Euro SSNs" together with the Sterling SSNs, the "SSNs") pursuant to an indenture dated as of May 3, 2019 (as amended and supplemented from time to time, the "Indenture"), by and among the Debtor; New Look Bonds Limited, New Look Limited, and New Look Retailers Limited, as guarantors (collectively, the "Guarantors"); GLAS Trustees Limited, as trustee (the "Trustee"); and GLAS Trust Corporation Limited, as security agent (the "Security Agent").  As set forth in more detail in the Petition, the Scheme is intended to implement

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed in, as applicable, the Petition and the *Declaration of Richard John Collyer in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* (the "Foreign Representative Declaration"), filed contemporaneously herewith.

the proposed restructuring of certain obligations owed to the holders of the SSNs (the "Scheme Creditors") under the Indenture, as long as the requisite majorities of the Scheme Creditors vote for the Scheme and certain conditions precedent are satisfied.  The Scheme forms part of a wider restructuring of the existing debt obligations of certain entities in the Group.  Pursuant to the Scheme, Scheme Creditors will exchange their SSNs in consideration for a participation in a shareholder loan (the "Shareholder Loan") and B ordinary shares in the Parent representing 20% of the share capital of the Parent on a fully-diluted basis, each as more fully described in the Foreign Representative Declaration.

3.      In this Declaration, after describing my background and qualifications, I provide a description of English law and practice relevant to this Court's consideration of the Petition.  I also wish to advise this Court of the procedures and schedule of events relating to the Scheme underway with respect to the Debtor.

4.      In preparing this Declaration, I have reviewed the Petition and relevant provisions of the Companies Act, the Insolvency Act 1986 of the United Kingdom, and other relevant provisions of English and EU law as I consider may relate to chapter 15 and other aspects of U.S. bankruptcy law.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

5.      Relevant aspects of my legal background are as follows: I earned my Bachelor of Commerce (Economics) from Monash University in Australia in 1995 and my Bachelor of Laws (Hons) from the same university in 1998, and I subsequently undertook a post-graduate Diploma in Applied Finance and Investment at the Financial Services Institute of Australia in 2002 and I am a Fellow of the Financial Services Institute of Australia.  I undertook my Articled Clerkship with the firm of Allens Arthur Robinson (formerly Arthur Robinson & Hedderwicks) in 1999 and was admitted to practice as a solicitor and barrister of the Supreme Court of Victoria, Australia

and to the roll of practitioners on the High Court of Australia on May 1, 2000. I was admitted to practice as a solicitor of the higher courts of England and Wales on November 1, 2004. I am currently a partner in the Restructuring & Special Situations group in the London office of Latham and am primarily engaged in providing advice on domestic and cross-border restructuring and insolvency as well as financing matters.

6.     I have considerable experience in matters related to English insolvency law. In particular, I have advised debtors, creditors, and insolvency practitioners in a significant number of formal insolvency proceedings, out-of-court restructurings, and other related matters. I have advised a number of debtor companies on the proposal of schemes of arrangement to their creditors under the Companies Act.

7.     I, together with other partners and associates in my firm, have been advising the Debtor and its subsidiaries on all legal aspects of the Debtor's restructuring, conduct of the Scheme and the extraterritorial effects and recognition of the same since March 2020, and we have been advising the Debtor and its subsidiaries on corporate matters since July 2019.[3]

## STATEMENTS ON ENGLISH LAW AND PRACTICE

8.     A scheme of arrangement is a proceeding under the laws of England and Wales that allows a company to effect compromises or arrangements, including by way of restructuring debt liabilities, with their members (*i.e.*, shareholders) or creditors (or any class of them). One of the uses for schemes of arrangement is the restructuring of debts of companies that are in financial distress, even if those companies are not, in fact, insolvent or in a formal insolvency process. Schemes are particularly useful in circumstances in which hold-out creditors seek an advantage as

---

[3] The information concerning the Scheme provided herein is drawn either from public documents or from my personal knowledge. Furthermore, I have not relied on any confidential attorney-client communications or on confidential documents prepared in anticipation of litigation.

against similarly-ranked creditors in work-out negotiations, as they enable companies and their creditors in certain instances to obtain court sanction to effect restructuring measures without having to obtain approval from 100% of affected creditors.  Such schemes of arrangement are often referred to as "creditor schemes" to distinguish them from schemes relating to shareholders (often referred to as "member schemes").  As the Scheme proposed by the Debtor in the English Proceeding relates only to a class of its creditors, the remainder of this Declaration will refer to schemes only in that context.

9.      Sections 895 to 899 of the Companies Act permit a "compromise or arrangement" (commonly, a "scheme of arrangement" or "scheme") to be proposed between a company and its creditors or any class of them.  Attached hereto as **Exhibit A** is a true copy of Sections 895 to 901 of the Companies Act.  A scheme must be a genuine and effective arrangement or compromise. There must be some sort of advantage gained by those creditors of the company that participate in the scheme that compensates them for the scheme's alteration of their rights.  A proposal that simply seeks to expropriate the rights of creditors cannot be a compromise or arrangement within the meaning of the Companies Act.

10.     A creditor scheme can be initiated by the debtor company applying to the High Court in England for permission to convene a meeting of the relevant creditors whose rights will be affected by the creditor scheme (commonly known as "scheme creditors") to consider and vote on whether to approve the creditor scheme.  The hearing to consider this application is commonly referred to as the "convening hearing."  In accordance with the Practice Statement of the High Court dated as of April 15, 2002, the debtor should give notice of the intended promotion of the scheme to all such scheme creditors so as to give them the opportunity of attending the initial hearing to raise any objections related to the proposed classification of the affected scheme

creditors or any issues relating to the jurisdiction of the High Court to hear the scheme.  In this case, on or about September 2, 2020, Lucid Issuer Services Limited (the "Information Agent") via the clearing systems of Euroclear S.A./N.V. and Clearstream Banking, *société anonyme* provided a Practice Statement Letter along with the applicable term sheets, steps plans and other documents relating to the Scheme (the "Scheme PSL") to the Scheme Creditors.  The Scheme PSL notified creditors of their right to attend court hearings regarding, and raise objections to, the Scheme.  A copy of the Scheme PSL is attached hereto as **Exhibit B**.

11.     Classification of the affected scheme creditors is an important consideration for the High Court.  Each class of creditors included within the scheme is required to approve the scheme. The class test is based on similarity or dissimilarity of legal rights against the debtor company, both as they exist before the scheme and afterwards.  The class test is not based upon a similarity of economic interests or objectives.  Creditors whose rights are so dissimilar that they cannot sensibly consult together with a view to their common interest must be placed into separate classes for voting purposes and must be given separate meetings to consider and vote on the scheme.

12.     In the present case, the rights of each of the Scheme Creditors against the Debtor are materially the same and will be compromised pursuant to the Scheme in materially the same way.  Accordingly, the Scheme has only one class of Scheme Creditors and only one meeting of Scheme Creditors (the "Scheme Meeting") will be convened.

13.     When deciding whether to give permission to convene the creditors' meetings, the High Court will also consider whether it has jurisdiction over the scheme company.  Section 895(2)(b) of the Companies Act defines those companies which can be subject to a scheme of arrangement.  It provides that for the purposes of sections 895 to 899 of the Companies Act, a "company" means "any company liable to be wound up under the Insolvency Act 1986."  The

Debtor is a company that was formed and registered under the Companies Act. Part IV of the Insolvency Act 1986 provides the statutory basis pursuant to which companies that are formed and registered under the Companies Act can be wound up by the English courts, and the Debtor is such a company. Accordingly, the English courts have *prima facie* jurisdiction to wind the Debtor up. Finally, the High Court will also consider whether there is any reason why it should not exercise its discretion to order the convening of the requested meetings, for example by reference to reasons of public policy.

14.    Once permission to convene the scheme meetings has been granted by the High Court, the Debtor will then send notice of the scheme meetings and an explanatory statement (which will include the terms of the Scheme) to all Scheme Creditors. Section 897 of the Companies Act sets out what information must be contained in the explanatory statement. The explanatory statement must contain a sufficient explanation of the effect of the compromise or arrangement for a typical creditor whose claim is being affected by the terms of the scheme to make a reasonable decision about whether or not to support the scheme. In the present case, notice of the Scheme Meeting and an explanatory statement explaining the terms of the Scheme (including the Releases (as defined below)) were sent to Scheme Creditors on September 24, 2020.

15.    After an appropriate period approved by the High Court, the meetings of scheme creditors will be held. Here, the Scheme Meeting is to be held on or around October 16, 2020. All Scheme Creditors are entitled to attend the Scheme Meeting and ask questions about the Scheme. For a scheme of arrangement to become effective, a simple majority in number representing at least 75% in value of claims held by Scheme Creditors present and voting (including by way of proxy) at the Scheme Meeting must vote in favor of the scheme.

16.     The voting tallies are not required to be scrutinized or confirmed by an independent third party (it being the duty of the chairman to report to the High Court on the outcome of the relevant meeting), but in this case, they will be scrutinized by the Information Agent.  Richard John Collyer (the Debtor's Foreign Representative), Jessica Walker (a Partner at Latham & Watkins, London), or I will chair the Scheme Meeting.

17.     If the meeting results in the approval of the Scheme by the Scheme Creditors, the Debtor will apply for the High Court to sanction the Scheme at a further hearing of the High Court (commonly known as the "sanction hearing").  The explanatory statement is required to include the proposed date for the sanction hearing, and the High Court will publish the hearing times of cases heard before it on its website.  Scheme Creditors and other interested persons may appear in person or by counsel and be heard, raise objections and present evidence at the sanction hearing.

18.     The sanction hearing is not a mere formality.  The High Court has discretion as to whether to sanction the Scheme, and it can hear arguments at this stage both from the Scheme Creditors whose rights would be overtly affected by the Scheme and from other persons whose rights were not overtly affected but who claim they would be prejudiced by the Scheme if it were sanctioned.   In particular, the High Court will examine whether (a) the Companies Act requirements have been satisfied; (b) the Scheme Creditors subject to the Scheme were fairly represented by those who attended the meeting, and the requisite majorities are acting in good faith and are not coercing the minority in order to promote interests that are collateral or different to those of the class of Scheme Creditors in general; and (c) the arrangement is such that an intelligent and honest man, a member of the class of Scheme Creditors concerned and acting in respect of his own interest, might reasonably approve.

19.     When considering whether to sanction the Scheme, the High Court will not substitute its own commercial view on the terms of the Scheme for the views of the Scheme Creditors, as the High Court considers that such commercial decisions are best made by those whose commercial interests are at stake, but the High Court is concerned as to whether the terms are such that Scheme Creditors could reasonably approve them.  If the High Court thinks that ulterior motives influenced the approval, it may decide not to sanction the Scheme.  However, if the Scheme appears to the High Court to be ostensibly fair, the High Court will not otherwise judge its commercial merit.

20.     If sanctioned by the High Court, the Scheme will become effective once a certified copy of the High Court's order approving the Scheme has been submitted to the Registrar of Companies for England and Wales, and in accordance with the provisions of the Scheme itself. Each of the Scheme Creditors will be bound by the Scheme, whether or not a particular Scheme Creditor participated in the Scheme Meeting or voted in favor of the Scheme.  In the present case, if the Scheme Creditors vote to approve the Scheme at the Scheme Meeting, then it is proposed that the sanction hearing will take place on or around October 23, 2020.

21.     It is well established that a company through an English scheme may cause the release of third-party rights and obligations that are reasonably connected to the scheme and the facts and circumstances giving rise to it.  In accordance with the applicable case law, the High Court will only consider the release of claims that:

(a)     are closely connected with Scheme Creditors' rights as creditors against the scheme company;

(b)     are personal and not proprietary rights;

(c)     if exercised and leading to a payment by the third-party guarantor, would result in a reduction of Scheme Creditors' claims against the company; and

(d)    are "necessary and ancillary" to the Scheme (which would almost always exclude the release of liabilities arising from fraud or willful misconduct).

22.    These stringent tests ensure that the ability to release third-party claims through a scheme is appropriately circumscribed, unlikely to be exploited or abused, and within the jurisdiction of the High Court.  In this case, these tests are met.  Here, each Scheme Creditor will release (pursuant to the Scheme) any and all claims against the Debtor and each of the following (in each case, in their capacities as such):

- The Guarantors;

- the advisors to the Debtor, the Scheme Creditors and other Scheme parties in interest;

- the Information Agent;

- the Trustee;

- the Security Agent;

- the paying agent in respect of the SSNs;

- the facility agent in respect of the Shareholder Loan; and

- any other Scheme Creditor (or its nominee) or such Scheme Creditor's affiliated entities (collectively, the "Released Parties")

in connection with the finance and security documents in respect of the SSNs (collectively, the "SSN Finance Documents"), the Scheme Creditors' claims against the Debtor in connection with the SSN Finance Documents, the negotiation and implementation of the Scheme and the Group's restructuring (the "Releases").  The Scheme Creditors do not, by virtue of the Releases, waive their rights or remedies under the Scheme or the documents that implement the Group's restructuring, and do not waive their claims arising out of fraud or willful misconduct by any Released Party.

23.    The Releases are broadly consistent with third-party releases previously approved by the High Court in similar circumstances.  In addition, the Releases are necessary to the Scheme

because they form an integral part of the bargain between the Debtor and the Scheme Creditors to achieve a consensual resolution of the Debtor's financial difficulties, without recourse to an unplanned and non-consensual insolvency process.  At the sanction hearing, Scheme Creditors and other interested persons may present evidence and raise objections to the Scheme, including the Releases.

24.    The convening hearing took place before the High Court on September 23, 2020. No Scheme Creditor objected to the relief requested.  The High Court granted the relief sought by the Debtor, (a) ordering that it convene the meeting of its Scheme Creditors on October 16, 2020, to consider and vote on the Scheme and (b) approving the appointment of the Foreign Representative.  A copy of the order made by the High Court at the convening hearing is attached hereto as **Exhibit C**.

*[Remainder of Page Intentionally Left Blank]*

## **CONCLUSION**

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 28th day of September, 2020

London, United Kingdom                     */s/ Yen Sum*_____
                                                         Yen Sum
                                                         Partner, Latham & Watkins LLP

# **EXHIBIT A**

Sections 895 to 899 of the Companies Act

# Companies Act 2006 c. 46

## Part 26 ARRANGEMENTS AND RECONSTRUCTIONS

### Application of this Part

This version in force from: **April 6, 2008** to **present**

(version 1 of 1)

## 895 Application of this Part

(1) The provisions of this Part apply where a compromise or arrangement is proposed between a company and–

    (a) its creditors, or any class of them, or

    (b) its members, or any class of them.

(2) In this Part–

    *"arrangement"* includes a reorganisation of the company's share capital by the consolidation of shares of different classes or by the division of shares into shares of different classes, or by both of those methods; and

    *"company"* –

    (a) in section 900 (powers of court to facilitate reconstruction or amalgamation) means a company within the meaning of this Act, and

    (b) elsewhere in this Part means any company liable to be wound up under the Insolvency Act 1986 (c. 45) or the Insolvency (Northern Ireland) Order 1989 (S.I. 1989/2405 (N.I. 19)).

(3) The provisions of this Part have effect subject to Part 27 (mergers and divisions of public companies) where that Part applies (see sections 902 and 903).

**Subject:** Company law

**Keywords:** Classes of creditors; Companies; Creditors; Interpretation; Reorganisation of capital; Schemes of arrangement; Shareholders

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

## Companies Act 2006 c. 46

## Part 26 ARRANGEMENTS AND RECONSTRUCTIONS

### Meeting of creditors or members

This version in force from: **April 6, 2008** to **present**

(version 2 of 2)

### 896 Court order for holding of meeting

(1) The court may, on an application under this section, order a meeting of the creditors or class of creditors, or of the members of the company or class of members (as the case may be), to be summoned in such manner as the court directs.

(2) An application under this section may be made by–

(a) the company,

(b) any creditor or member of the company, [...] [1]

[

(c) if the company is being wound up, the liquidator, or

(d) if the company is in administration, the administrator.

] [1]

[

(3) Section 323 (representation of corporations at meetings) applies to a meeting of creditors under this section as to a meeting of the company (references to a member of the company being read as references to a creditor).

] [2]

---

## Notes

[1] .
S.896(2)(c)-(d) substituted for s.896(2)(c) subject to savings specified in SI 2008/948 arts 11 and 12 by Companies Act 2006 (Consequential Amendments etc) Order 2008/948 Sch.1(2) para.249(2) (April 6, 2008)

[2] .
Inserted subject to savings specified in SI 2008/948 arts 11 and 12 by Companies Act 2006 (Consequential Amendments etc) Order 2008/948 Sch.1(2) para.249(3) (April 6, 2008)

**Subject:** Company law

**Keywords:** Applications; Classes of creditors; Creditors' meetings; Judgments and orders; Meetings; Schemes of arrangement; Shareholders

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

# Companies Act 2006 c. 46

## Part 26 ARRANGEMENTS AND RECONSTRUCTIONS

### Meeting of creditors or members

This version in force from: **April 6, 2008** to **present**

(version 1 of 1)

## 897 Statement to be circulated or made available

(1) Where a meeting is summoned under section 896–

(a) every notice summoning the meeting that is sent to a creditor or member must be accompanied by a statement complying with this section, and

(b) every notice summoning the meeting that is given by advertisement must either–

(i) include such a statement, or

(ii) state where and how creditors or members entitled to attend the meeting may obtain copies of such a statement.

(2) The statement must–

(a) explain the effect of the compromise or arrangement, and

(b) in particular, state–

(i) any material interests of the directors of the company (whether as directors or as members or as creditors of the company or otherwise), and

(ii) the effect on those interests of the compromise or arrangement, in so far as it is different from the effect on the like interests of other persons.

(3) Where the compromise or arrangement affects the rights of debenture holders of the company, the statement must give the like explanation as respects the trustees of any deed for securing the issue of the debentures as it is required to give as respects the company's directors.

(4) Where a notice given by advertisement states that copies of an explanatory statement can be obtained by creditors or members entitled to attend the meeting, every such creditor or member is entitled, on making application in the manner indicated by the notice, to be provided by the company with a copy of the statement free of charge.

(5) If a company makes default in complying with any requirement of this section, an offence is committed by–

(a) the company, and

(b) every officer of the company who is in default.

This is subject to subsection (7) below.

(6) For this purpose the following are treated as officers of the company–

   (a) a liquidator or administrator of the company, and

   (b) a trustee of a deed for securing the issue of debentures of the company.

(7) A person is not guilty of an offence under this section if he shows that the default was due to the refusal of a director or trustee for debenture holders to supply the necessary particulars of his interests.

(8) A person guilty of an offence under this section is liable–

   (a) on conviction on indictment, to a fine;

   (b) on summary conviction, to a fine not exceeding the statutory maximum.

**Subject:** Company law **Other related subjects:** Criminal law

**Keywords:** Creditors' meetings; Meetings; Notices; Offences; Schemes of arrangement; Shareholders; Statements

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

## Companies Act 2006 c. 46

## Part 26 ARRANGEMENTS AND RECONSTRUCTIONS

## Meeting of creditors or members

This version in force from: **April 6, 2008** to **present**

(version 1 of 1)

### 898 Duty of directors and trustees to provide information

(1) It is the duty of–

(a) any director of the company, and

(b) any trustee for its debenture holders,

to give notice to the company of such matters relating to himself as may be necessary for the purposes of section 897 (explanatory statement to be circulated or made available).

(2) Any person who makes default in complying with this section commits an offence.

(3) A person guilty of an offence under this section is liable on summary conviction to a fine not exceeding level 3 on the standard scale.

**Subject:** Company law **Other related subjects:** Criminal law

**Keywords:** Companies; Debenture holders; Directors' powers and duties; Disclosure; Meetings; Offences; Schemes of arrangement; Trustees' powers and duties

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

# Companies Act 2006 c. 46

## Part 26 ARRANGEMENTS AND RECONSTRUCTIONS

### Court sanction for compromise or arrangement

This version in force from: **May 12, 2011** to **present**

(version 3 of 3)

## 899 Court sanction for compromise or arrangement

(1) If a majority in number representing 75% in value of the creditors or class of creditors or members or class of members (as the case may be), present and voting either in person or by proxy at the meeting summoned under section 896, agree a compromise or arrangement, the court may, on an application under this section, sanction the compromise or arrangement.

(2) An application under this section may be made by–

(a) the company,

(b) any creditor or member of the company, [...] [1]

[

(c) if the company is being wound up, the liquidator, or

(d) if the company is in administration, the administrator.

] [1]

(3) A compromise or [arrangement] [2] sanctioned by the court is binding on–

(a) all creditors or the class of creditors or on the members or class of members (as the case may be), and

(b) the company or, in the case of a company in the course of being wound up, the liquidator and contributories of the company.

(4) The court's order has no effect until a copy of it has been delivered to the registrar.

[

(5) Section 323 (representation of corporations at meetings) applies to a meeting of creditors under this section as to a meeting of the company (references to a member of the company being read as references to a creditor).

] [3]

---

**Notes**

[1] .
S.899(2)(c)-(d) substituted for s.899(2)(c) subject to savings specified in SI 2008/948 arts 11 and 12 by Companies Act 2006 (Consequential Amendments etc) Order 2008/948 Sch.1(2) para.250(2) (April 6, 2008)

[2] .
Word substituted by Companies Act 2006 (Consequential Amendments and Transitional Provisions) Order 2011/1265 art.28(3) (May 12, 2011)

[3] .
Inserted subject to savings specified in SI 2008/948 arts 11 and 12 by Companies Act 2006 (Consequential Amendments etc) Order 2008/948 Sch.1(2) para.250(3) (April 6, 2008)

**Subject:** Company law

**Keywords:** Applications; Classes of creditors; Companies; Consent orders; Meetings; Schemes of arrangement

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

**<u>Exhibit B</u>**

**Scheme PSL**

# N E W   L O O K

THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU MAY THEREFORE WISH TO TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS

THIS LETTER DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES. NONE OF THE SECURITIES REFERRED TO IN THIS LETTER MAY BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.

SECURITIES MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES UNLESS THE OFFERING OR SALE OF SUCH SECURITIES IS REGISTERED UNDER THE US SECURITIES ACT OF 1933, AS AMENDED (THE "**US SECURITIES ACT**") OR SUCH SECURITIES ARE ISSUED IN TRANSACTIONS EXEMPT FROM SUCH REGISTRATION. THE SECURITIES PROPOSED TO BE ISSUED OR TRANSFERRED PURSUANT TO THE SCHEME HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE US SECURITIES ACT OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR ANY OTHER JURISDICTION OF THE UNITED STATES, AND MAY NOT BE OFFERED, SOLD OR RESOLD IN THE UNITED STATES EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE US SECURITIES ACT. THE SECURITIES THAT ARE B ORDINARY SHARES OF THE PARENT WILL BE ISSUED IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION PROVIDED BY SECTION 3(A)(10) OF THE US SECURITIES ACT. THE APPROVAL OF THE HIGH COURT OF JUSTICE IN ENGLAND AND WALES PROVIDES THE BASIS FOR THE B ORDINARY SHARES OF THE PARENT TO BE ISSUED WITHOUT REGISTRATION UNDER THE US SECURITIES

1

ACT, IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE US SECURITIES ACT PROVIDED BY SECTION 3(A)(10).

THE SCHEME CREDITORS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE SCHEME, INCLUDING THE MERITS AND RISKS INVOLVED. THE SCHEME CREDITORS RESIDENT IN THE UNITED STATES SHOULD CONSULT THEIR OWN LEGAL, FINANCIAL AND TAX ADVISORS WITH RESPECT TO LEGAL, FINANCIAL AND TAX CONSEQUENCES OF THE SCHEME IN THEIR PARTICULAR CIRCUMSTANCES. THIS LETTER WILL NOT BE FILED WITH THE US SECURITIES AND EXCHANGE COMMISSION ("**SEC**"), ANY US STATE SECURITIES AUTHORITY OR THE SECURITIES AUTHORITY OF ANY OTHER JURISDICTION, AND WE DO NOT EXPECT THAT THE SCHEME DOCUMENTS WILL BE REVIEWED BY THE SEC, ANY US STATE SECURITIES AUTHORITY OR THE SECURITIES AUTHORITY OF ANY OTHER JURISDICTION AND NONE OF THEM HAS OR WILL APPROVE, DISAPPROVE, PASS JUDGMENT UPON OR ENDORSE THE MERITS OR FAIRNESS OF THE SCHEME NOR THE ACCURACY, ADEQUACY OR COMPLETENESS OF THIS LETTER OR THE SCHEME DOCUMENTS. THE SECURITIES REFERRED TO HEREIN HAVE NOT BEEN RECOMMENDED BY ANY US FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE IN THE US.

EU-DOCS\29762145.5

# PRACTICE STATEMENT LETTER

| | |
|---|---|
| From: | **New Look Financing plc (**the **"Company"**)** |
| To: | The Scheme Creditors (as defined below) |
| Cc: | **Lucid Issuer Services Limited** (the "**Information Agent**") |
| | Tankerton Works |
| | 12 Argyle Walk |
| | London |
| | WC1H 8HA |
| | United Kingdom |

Date: 2 September 2020

Dear Sir or Madam,

**Proposed creditors' scheme of arrangement between the Company and the Scheme Creditors (as defined below).**

**THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU MAY THEREFORE WISH TO TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.**

## 1.    INTRODUCTION

1.1    As you may be aware from the announcement issued by the New Look Retail Holdings Limited (the "**Parent**") on 13 August 2020, the Group (as defined below) is seeking to implement a comprehensive recapitalisation transaction that will extend the Group's banking and operational facilities, deliver a new money investment of £40,000,000 and significantly de-leverage its balance sheet (the "**Transaction**").

1.2    The Company is sending you this letter in accordance with the practice statement issued on 26 June 2020 (the "**Practice Statement**") by the Chancellor of the High Court of Justice of England and Wales (the "**Court**"), in relation to a proposed scheme of arrangement under Part 26 of the Companies Act 2006 between the Company and the Scheme Creditors (as defined in paragraph 4.9 below) (the "**Scheme**").[1]

1.3    The Scheme relates to the £400,131,636 senior secured notes (the "**Sterling SSNs**") and €45,209,687 senior secured notes (the "**Euro SSNs**" and together with the Sterling SSNs, the "**SSNs**") issued by the Company pursuant to an indenture dated 3 May 2019 and made between, among others, the Company, New Look Bonds Limited, New Look Limited and New Look Retailers Limited ("**NLRL**") as guarantors and GLAS Trustees Limited as trustee (the

---

[1]    Practice Statement (Companies: Scheme of Arrangement under Part 26 and Part 26A of the Companies Act 2006).

"**Trustee**") and GLAS Trust Corporation Limited as security agent (the "**Security Agent**"), as amended and supplemented from time to time (the "**Indenture**").

1.4    You are being contacted as the Company believes that you are a Scheme Creditor entitled to vote in the Scheme. The claims of each Scheme Creditor against the Company will be affected by the Scheme.

1.5    The purpose of this letter is to inform you:

(a)    that the Company intends to apply to the Court at a court hearing (the "**Convening Hearing**") to be held on 23 September 2020 (which may take place remotely, using Skype for Business or a similar format) for an order granting the Company certain directions in relation to the Scheme, including permission to convene a meeting of the Scheme Creditors (the "**Scheme Meeting**") for the purpose of considering and, if thought fit, approving the Scheme;

(b)    of the background to and the objectives that the Scheme is designed to achieve;

(c)    of the composition of the meeting of the Scheme Creditors that the Company proposes to convene for the purpose of voting on the Scheme;

(d)    the composition of a single class of Scheme Creditors for the purposes of such meeting; and

(e)    of the reason why the Company considers the Court has jurisdiction to sanction the Scheme.

1.6    This letter is being sent to Scheme Creditors in electronic format by:

(a)    making it available at https://www.lucid-is.com/newlook (the "**Scheme Website**"). If any Scheme Creditors have difficulty accessing the Scheme Website, please contact the Information Agent and/or the Group's solicitors, via email at newlook@lucid-is.com and projecttone.lwteam@lw.com respectively; and

(b)    the Information Agent who will send it to Scheme Creditors via Euroclear Bank S.A./N.V. and/or Clearstream Banking, société anonyme.

1.7    *If you have assigned, sold or otherwise transferred your interests in the SSNs, or intend to do so before the Scheme Meeting, you should forward a copy of this letter to the person or persons to whom you have assigned, sold or otherwise transferred, or the person or persons to whom you intend to assign, sell or transfer, such interests. The date of the Scheme Meeting will be confirmed in the Explanatory Statement which, provided the Court gives its permission to convene the Scheme Meeting, will be circulated to Scheme Creditors shortly after the Court has ordered the Scheme Meeting to be convened*.

2.    **SCHEME OF ARRANGEMENT**

2.1    A scheme of arrangement of the kind proposed by the Company is a compromise or arrangement provided for under Part 26 of the Companies Act 2006. A scheme of arrangement will take effect between a company and its creditors (or any class of them) and become binding on all the creditors to whom it applies if:

(a)     the scheme is approved by a majority in number (more than 50%) representing 75% in value of the creditors (or each class of creditors) present and voting, either in person or by proxy, at each meeting convened to consider the scheme;

(b)     the scheme is subsequently sanctioned by the Court at a specific hearing (the "**Sanction Hearing**"); and

(c)     a copy of the order sanctioning the scheme is delivered to the Registrar of Companies for England and Wales.

2.2     An overview of the purpose and key features of the Scheme is set out at paragraphs 4.9 to 4.12 of this letter. Further information in relation to the steps to be taken for the Scheme to become effective, and the consequences for Scheme Creditors if the Scheme do become effective, is set out at paragraph 5 of this letter.

3.      **BACKGROUND TO THE GROUP**

*The Company*

3.1     The Company is a public limited liability company incorporated in England and Wales and is a wholly-owned subsidiary of the Parent. The Parent and its subsidiaries are referred to in this letter as the "**Group**".

*Business of the Group*

3.2     The Group is a leading multichannel retailer operating in the value segment of the clothing and footwear market in the United Kingdom and Republic of Ireland. The 'New Look' brand is distinct and trusted in the United Kingdom, and is one of the market leaders in the value-fashion category for women aged 18 to 44 by value[2].

3.3     The Group principally sells clothing, footwear and accessories in the United Kingdom and Republic of Ireland. The Group operates a multichannel model which includes:

(a)     496 New Look-branded directly operated stores in the United Kingdom and Republic of Ireland, with a broad geographical coverage;

(b)     the Group's e-commerce platform serving customers in around 68 countries across the globe; and

(c)     the third-party e-commerce arrangements through which the Group sells its products on websites of key third-party e-commerce retailers, including ASOS and Zalando, and which currently serve customers worldwide.

3.4     The Group has 11,261 employees (as at 25 August 2020).

*Group financing arrangements*

3.5     The Group's debt structure is as follows:

(a)     the Company is the issuer of the SSNs pursuant to the Indenture; and

---

[2]      Source: Kantar Worldpanel published data 52 weeks ended 28 June 2020 (Womenswear by value).

5

(b)    NLRL is the borrower of:

(i)    a £100 million revolving credit facility (the "**RCF**") pursuant to a senior facilities agreement dated 25 June 2015 (as amended and/or restated from time to time) (the "**Senior Facilities Agreement**"); and

(ii)    up to £65 million of operating facilities (the "**Operating Facilities**") incurred under a trade finance facilities agreement dated 16 March 2018 between, amongst others, NLRL, New Look Bonds Limited, HSBC Bank plc as Facility Agent and HSBC Bank plc as Issuing Bank (as amended and/or restated from time to time) (the "**TFFA**").

3.6    The Group's total financial indebtedness incurred under the SSNs, the RCF and the Operating Facilities was approximately £595,328,087 as of 22 August 2020. This breaks down as follows:

| Instrument | Amount Outstanding (22 August 2020) | Amount Outstanding (GBP – 22 August 2020) |
|---|---|---|
| **Senior Facilities Agreement** | **£100,000,000** | **£100,000,000** |
| **TFFA** | **£44,000,000 (rounded)** | **£44,000,000 (rounded)** |
| **Overdraft (incurred under the TFFA)** | **£10,000,000** | **£10,000,000** |
| **Buyer's Agreement[3]** | **£500,000 (rounded)** | **£500,000 (rounded)** |
| **Sterling SSNs** | **£400,131,636** | **£400,131,636** |
| **Euro SSNs** | **€45,209,687** | **£40,696,451** |
| **Total** | **n.m.** | **£595,328,087** |

## 4.    THE RESTRUCTURING

### *Impact of Covid-19 on the Group's operations*

4.1    The ongoing global pandemic of COVID-19 recognised by the World Health Organisation on 11 March 2020 (the "**COVID-19 Pandemic**") has caused a rapid and unprecedented impact on the global retail industry and has significantly impacted the Group's business.

4.2    During March 2020, the Group experienced a significant decline in footfall within its stores, with like for like sales declining 32% in UK retail stores compared to the prior year. On 20 March 2020, the Group's management team took the voluntary decision to close all stores in the Republic of Ireland and on 21 March 2020, all stores in the UK were also closed in light of safety concerns for its staff and customers and the reduced footfall in the preceding weeks.

4.3    Following this, and the official lockdown being introduced by the Government in the UK on 23 March 2020 and in the Republic of Ireland on 24 March 2020, the Group's revenue from its stores fell to nil. The impact of the COVID-19 Pandemic on the revenue of the Group therefore has been significant. Throughout the closure of the Group's stores, the Group was only able to trade through its e-commerce channels, which historically had accounted for circa 22% of the Group's revenue. Phased store re-openings began on 1 June 2020.

---

[3]    A buyer agreement dated 10 February 2010 and between, amongst others, NLRL and HSBC Invoice Finance (UK) Limited (as amended and/or restated from time to time) which as at the date of this letter has been terminated.

6

4.4    The Group took proactive actions to preserve cash and safeguard the value of the business as a result of the COVID-19 Pandemic and continues to be proactive in this regard. This included significantly reducing marketing costs, reviewing and revising production with suppliers, delaying all significant capital expenditure projects, halting all recruitment, reorganising and streamlining the workforce which resulted in the commencement of a redundancy programme, reducing employee salaries, utilising the UK and Republic of Ireland's Job Retention Schemes and requesting a holiday, deferral and discounts on certain payments to strategic suppliers and counterparties. This ensured that the Group could continue to trade online and ensured business continuity once stores re-opened. In addition, although the Group explored available avenues to bolster liquidity, including government loan schemes, none were available to the Group due to specific eligibility criteria required to access them.

4.1    Various actions that the Group had to take are set out below and the Group's stakeholders have been largely supportive of these actions, which has enabled the Group to continue to trade.

    (a)    *Suppliers*

        (i)    The Group has remained in regular dialogue with key suppliers during this period of uncertainty.

        (ii)    Suppliers have continued to be supportive, with support including offering extended payment terms, repayment plans and in some cases discounts to support the business during the COVID-19 Pandemic.

    (b)    *Employees*

        (i)    In the UK and Republic of Ireland, 85% of the Group's workforce were furloughed as at 1 April 2020, 81% of the workforce were furloughed as at 1 May 2020, 37% of the workforce were furloughed as at 1 June 2020 and 30% of the workforce were furloughed as at 1 July 2020.

        (ii)    As part of an ongoing redundancy consultation, NLRL has to date removed 203 roles from the structure (including vacancies) and has made 73 compulsory redundancies and 17 voluntary redundancies, resulting in total annualised savings of £5.9 million although there will be an expected £1.3 million redundancy costs.

    (c)    *Government and taxation*

        (i)    The Group has agreed a Time to Pay Arrangement with HMRC for deferred taxes.

        (ii)    The Group has secured business rates relief for the period April 2020 to March 2021, which was automatically applied to all stores where permissible.

        (iii)    The Group has received grants from local authorities for low-rated stores up to a €800,000 cap.

    (d)    *Rent*

        (i)    In line with many other businesses in the retail sector, the Group took the decision to withhold payment of rent and service charge across its store portfolio from 22 March 2020.

7

(ii)    From the re-opening date of a premises (other than the distribution centres where certain bilateral creditor agreement were entered into), NLRL has been paying a contribution to the rent payments due on a turnover basis and service charge payments have been paid in accordance with contractual terms.

4.2    The Group reopened two stores on 1 June 2020 in Isle of Man and Jersey, five of its Republic of Ireland stores and its Guernsey store reopened on 8 June 2020 and since 15 June 2020, 460 UK stores and all remaining Republic of Ireland stores have reopened under a phased approach. On a like for like basis performance is down by 38% from the prior year, driven largely by declines in footfall which have been partially offset by an increase in sale conversion rates. As stores reopen, management will continue its focus on the health, safety and wellbeing of customers and employees, as well as ensuring that the Group generates and preserves cash.

4.3    Notwithstanding the measures taken to date by the Group, the COVID-19 Pandemic is expected to have a permanent impact on its business. The Group has forecasted that as a result of a permanent structural shift in customer spend and behaviour from stores to online, in-store footfall and sales will significantly reduce resulting in many stores likely becoming unprofitable to run without securing significant changes to the economics of the Group's liabilities (including financial and lease liabilities). As a result, the Group needs to make permanent adjustments to its operating model.

*The Company Voluntary Arrangement*

4.4    Therefore, the directors of NLRL proposed a company voluntary arrangement pursuant to section 1 of the Insolvency Act 1986 on 26 August 2020 (the "**CVA**") with the overall objective to restore the Group's viability through a combination of, among other things:

(a)    compromising rent arrears across certain premises and leases;

(b)    moving to a turnover based rent model for certain premises;

(c)    moving to nil rent and service charge after two months for certain premises; and

(d)    compromising certain non-critical liabilities which are commercially onerous and from which NLRL obtains no benefit.

*Financial Restructuring*

4.5    On 13 August 2020, the Parent, the Company and other Group companies entered into a lock-up agreement with the Group's financial creditors (the "**Lock-up Agreement**"). A copy of the Lock-up Agreement was made available to all Scheme Creditors on the Scheme Website on 13 August 2020. The parties to the Lock-up Agreement, which include, among others, the Group's lenders under the RCF and the Operating Facilities, have agreed to support, implement and consummate the proposed transaction on the terms set out in the steps plan and the equity and debt term sheets scheduled to the Lock-up Agreement (a copy of the equity and debt term sheet which has previously been provided is attached at Appendix B hereto for reference (the "**Equity and New Money Term Sheet**")) and as summarised in paragraph 4.8 below (the "**Financial Restructuring**").

4.6    All Scheme Creditors (extending to those that were not already party to the Lock-up Agreement) were given the opportunity to accede to the Lock-up Agreement and were provided with instructions for doing so, and contact details for any queries. As of the date of this letter,

over 91% of the Scheme Creditors have consented to the Financial Restructuring and entered into or acceded to the Lock-up Agreement (the "**Consenting SSN Holders**").

4.7     Pursuant to the Lock-up Agreement, Consenting SSN Holders are, amongst other things, required to take all actions that they are able to take and which are necessary or reasonably desirable to support, facilitate, implement, consummate or otherwise give effect to the Financial Restructuring, including by voting in favour of any scheme of arrangement proposed by any member of the Group. This includes voting in favour of the Scheme at the Scheme Meeting.

4.8     The terms of the Financial Restructuring are summarised as follows:

(a)     the exchange of the SSNs in consideration for:

(i)     the incurrence by a newly incorporated direct subsidiary of the Parent and holding company for the remaining members of the Group (the "**New HoldCo**") of a £40 million nine year subordinated shareholder loan on a cashless basis (the "**Shareholder Loan**"); and

(ii)     the issuance by the Parent of B ordinary shares (which shall be non-voting shares) representing 20% of the post-Financial Restructuring share capital of the Parent on a fully diluted basis (subject to the allocation of the MIP set out in paragraph (f) below),

in each case to the holders of the SSNs (the "**SSN Holders**"), rateably in proportion to the amount of SSNs held by each SSN Holder (the "**SSN Exchange**");

(b)     a seven year new money term loan which will be cash funded in an amount equal to £40 million (the "**New Money Term Loan**") shall be borrowed by the New HoldCo and provided by (i) SSN Holders who agreed to participate in the New Money Term Loan as contemplated by the Lock-Up Agreement on or prior to the end of a subscription period beginning on the date of the Lock-Up Agreement and ending on 14 September 2020 (as extended pursuant to the terms of the Lock-Up Agreement) and (ii) to the extent that not all SSN Holders participate in the New Money Term Loan, certain backstop parties that agreed to participate the New Money Term Loan pursuant to a backstop letter dated 13 August 2020 (together, the "**New Money Lenders**");

(c)     the Parent shall issue A ordinary shares (which shall be voting shares) representing 80% of the post-Financial Restructuring share capital of the Parent on a fully diluted basis (subject to the allocation of the MIP set out in paragraph (f) below) to the New Money Lenders rateably in proportion to their commitment under the New Money Term Loan;

(d)     the RCF will be converted into a term loan, the termination date under the RCF shall be extended from 25 June 2021 to 30 June 2024, and certain other amendments to the RCF shall be made (attached at Appendix B for reference only is the debt term sheet attached to the Lock-up Agreement which sets out the relevant amendments(the "**Debt Term Sheet**");

(e)     the Operating Facilities shall be extended to 30 June 2023 and the aggregate commitment shall be increased to £70 million (which will be subject to certain step downs from 30 June 2021) and other amendments shall be made as set out in more detail under the Debt Term Sheet; and

9

(f)     the existing management incentive plan will be replaced with a new management incentive plan (the "**MIP**") whereby certain of the management of the Group will be entitled to C ordinary shares of the Parent, which shall represent 5% of the post-Financial Restructuring ordinary share capital of the Parent on a fully diluted basis (and diluting the A ordinary shares of the Parent and the B ordinary shares of the Parent on a *pro rata* basis) and D ordinary shares of the Parent, which shall entitle holders to 2% of the equity value of the Group upon an exit above a threshold of £300,000,000 (and such entitlement shall dilute the entitlement of the A ordinary shares of the Parent and the B ordinary shares of the Parent on a *pro rata* basis) as more particularly set out in the Equity and New Money Term Sheet.

### The Scheme

4.9     The primary objective of the Scheme will be to facilitate the implementation of the SSN Exchange and the Financial Restructuring with respect to the SSNs. The Scheme will alter the rights of the Scheme Creditors, being the common depositary as holder of the SSNs, the Trustee and the SSN Holders (together, the "**Scheme Creditors**").

4.10    The Scheme will only become effective and legally binding on the Company and the Scheme Creditors, in accordance with its terms, following (amongst other things):

(a)     the approval of a majority in number representing 75% in value of the Scheme Creditors present and voting at the Scheme Meeting (in person or by proxy);

(b)     the Court making an order sanctioning the Scheme under section 899 of the Companies Act 2006; and

(c)     a copy of the Final Court Order being delivered to the Registrar of Companies in England and Wales.

4.11    The Scheme will provide for:

(a)     the SSN Exchange;

(b)     the release of claims of the SSN Holders against the Company and the guarantors of the SSNs for the full amount of the SSNs; and

(a)     authority to the Security Agent to enter into the documentation relating to the Financial Restructuring on behalf of the lenders under the Shareholder Loan.

4.12    Further details of the Scheme will be set out in the Explanatory Statement. Provided that the Court gives its permission to convene the Scheme Meeting, the Explanatory Statement will be made available to Scheme Creditors on the Scheme Website shortly after the Convening Hearing.

## 5.    EFFECTIVENESS OF THE SCHEME AND THE TRANSACTION

### Effectiveness of the Scheme

5.1     In order for the Scheme to become effective in accordance with their terms and legally binding on the Company and the Scheme Creditors:

(a)     each Scheme must be approved by a majority in number (more than 50%) representing at least 75% in value of each class of Scheme Creditors present and voting, either in

10

person or by proxy, at the Scheme Meeting convened for the purpose of considering and, if thought fit, approving the Scheme;

(b)      each Scheme must be sanctioned by the Court; and

(c)      an office copy of the court order sanctioning the Scheme must be delivered to the Registrar of Companies for England and Wales.

5.2      If the Scheme becomes effective, it will affect all Scheme Creditors. All Scheme Creditors (including those who did not vote in favour of the Scheme or those who did not vote at all) will be bound by the terms of the Scheme as a matter of English law, irrespective of the jurisdiction in which such Scheme Creditors resides or has their seat, along with the Company and each (whose guarantee liabilities will be compromised under the Scheme as third parties).

5.3      Because the SSNs are governed by New York Law, the Company intends to apply to the United States Bankruptcy Court in the Southern District of New York (the "**US Bankruptcy Court**") shortly after the Convening Hearing for recognition of the Scheme under chapter 15 of the US Bankruptcy Code. The Chapter 15 application will request that the US Bankruptcy Court recognises the Scheme as a "foreign main proceeding" and grants other related relief, including recognition and enforcement of the Scheme.

## 6.      JURISDICTION OF THE ENGLISH COURT

6.1      The Company considers that the Court has jurisdiction to sanction the Scheme given that the Company is a "company" for the purpose of Part 26 of the Companies Act 2006 being a company incorporated and registered in England and Wales, with its assets located in the United Kingdom and its centre of main interests at its registered office, being New Look House, Mercery Road, Weymouth, Dorset, DT3 5HJ. Accordingly, the Company understands that there are no jurisdictional issues regarding the Scheme.

6.2      The Court may consider, amongst other issues, whether Part II of Regulation 1215/2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the "**Judgments Regulation**") applies to the Scheme. Part II of the Judgments Regulation requires that a person domiciled in a member state of the European Union be "sued" in the courts of that member state, subject to certain exceptions including article 8 (which, broadly, allows persons to be sued in the courts of a member state in which a number of defendants are domiciled, if it is expedient to do so). The Company has concluded, and will submit to the Court that, should the Judgments Regulation apply to the Scheme, article 8 of the Judgments Regulation would be an applicable except to the general requirement that a person domiciled in a member state of the European Union be "sued" in the courts of that member state because a number of the Scheme Creditors are understood to be domiciled in the United Kingdom and it is therefore expedient for the Court to hear the claim.

## 7.      PROPOSED CLASS CONSTITUTION OF SCHEME CREDITORS

7.1      In accordance with the Practice Statement, it is the responsibility of the Company to formulate the classes of creditors for the purposes of convening the Scheme Meeting to consider and, if thought fit, approve the proposed Scheme.

7.2      Where creditors affected by a scheme of arrangement have rights which are so dissimilar, or would be affected so differently by the scheme, as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes, and a separate meeting must be held for each class of creditor.

11

7.3    The Company has considered the current rights of each of the Scheme Creditors against the Company and the way in which those rights will be affected by the Scheme. Having taken legal advice (privilege for which is not waived), it has concluded that the Scheme Creditors fall into a single class for the purposes of voting on the Scheme.

7.4    The Company considers that notwithstanding the Sterling SSNs are denominated in sterling and the Euro SSNs are denominated in euro, the rights of the Scheme Creditors are not so dissimilar as to make it impossible to from them to consult together with a view to its common interest. On the contrary:

(a)    they each have materially the same rights against the Company and the Group, in so far as the claims of the Scheme Creditors rank *pari passu* as between themselves in all scenarios and are secured pursuant to a common security package;

(b)    the alternative to the Scheme is a formal insolvency proceeding in which the sterling and euro denominated notes will be converted to a common currency (sterling) at the official rate in respect of any distributions;

(c)    if the Scheme becomes effective, those rights will be compromised in materially the same way; and

(d)    in all the circumstances, there is more to unite than divide all of the Scheme Creditors, so as to make any further classes unnecessary.

7.5    In addition, while SSN Holders who will become New Money Lenders will receive a larger proportion of the post-Financial Restructuring equity of the Parent than the other SSN Holders (as described at paragraphs 4.8(a)(ii) and 4.8(c) above), the Company considers that this does not require the prospective New Money Lenders to vote in a separate class to the other SSN Holders. This is because all SSN Holders will have had the same right to elect to subscribe for a *pro rata* share of the New Money Term Loan pursuant to the terms of the Lock-up Agreement.

7.6    Likewise, no class issue arises from the allotment of A ordinary voting shares to SSN Holders who elect to participate in the provision of new money as compared to SSN Holders who have elected not to participate in the New Money Term Loan having had four weeks to decide whether to participate, or not.  Further, all A ordinary voting shares have the same rights and it is irrelevant that shareholders with the most or second most shares subject to a minimum threshold (as calculated in accordance with the Equity and New Money Term Sheet) shall have certain board appointment rights.

7.7    Accordingly, it is proposed that a single Scheme Meeting of the Scheme Creditors be convened for the purposes of considering and, if the Scheme Creditors think fit, approving the Scheme.

7.8    Therefore, in order for the Scheme to become effective, it must be approved by more than a majority in number representing not less than 75% in value of the Scheme Creditors who vote (in person or by proxy) at the Scheme Meeting.

**Important: if any Scheme Creditor has comments as to the proposed class constitution of Scheme Creditors, or any other concerns which they consider should be raised with the Court, they should in the first instance contact Latham & Watkins, legal advisers to the Group, using the contact details set out at the end of this letter.**

12

8.    **CREDITOR ISSUES**

8.1    This letter is intended to provide Scheme Creditors with sufficient information regarding the Scheme and the proposals for convening the Scheme Meeting so that, should they wish to raise any issues in relation to the jurisdiction of the Court to sanction the Scheme or to raise any other issues in relation to the constitution of the Scheme Meeting or which might otherwise affect the conduct of such Scheme Meeting ("**Creditor Issues**"), they may attend and be represented before the Court at the Convening Hearing. Details of the Convening Hearing are set out at paragraphs 9.1 to 9.4 of this letter.

8.2    Scheme Creditors should consider taking advice from their professional advisers if they have any concerns in relation to the matters set out in this letter.

8.3    Scheme Creditors should be aware that, under the terms of the Practice Statement, the Court has indicated that Creditor Issues should be raised at the Convening Hearing. If Scheme Creditors fail to raise these matters at the Convening Hearing, whilst they will still be able to appear and raise objections at the Sanction Hearing, the Court at the Sanction Hearing will expect those Scheme Creditors to provide good reason why they did not raise any Creditor Issues at an earlier stage.

8.4    Scheme Creditors are therefore requested to raise any Creditor Issues they have at the Convening Hearing.

9.    **NEXT STEPS FOR SCHEME CREDITORS**

*Convening Hearing*

9.1    The Company intends to apply to the Court at the Convening Hearing for an order granting the Company certain directions in relation to the Scheme, including permission to convene the Scheme Meeting and to circulate the Explanatory Statement.

9.2    The Convening Hearing is currently anticipated to be held on Wednesday 23 September 2020. The Company will notify Scheme Creditors of the precise time of the Convening Hearing via the Information Agent and the Scheme Website and will communicate any change to the date of the Convening Hearing in the same manner.

9.3    The Company' applications at the Convening Hearing will be heard by a High Court Judge of the Chancery Division, Companies Court of the High Court of Justice of England and Wales at the Rolls Buildings Courts, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL, or via video link in light of the COVID-19 Pandemic.

9.4    Scheme Creditors are entitled to attend the Convening Hearing in person or through counsel and to make representations at the Convening Hearing, although they are not obliged to do so. Scheme Creditors who wish to attend the Convening Hearing in person or through counsel should contact Latham & Watkins (using the contact details below) to obtain instructions for attending the Convening Hearing. At the Convening Hearing, the Company will also draw to the Court's attention any issues raised by any Scheme Creditors in response to this letter.

*Publication of Scheme Documents and Scheme Meeting*

9.5    Following the Convening Hearing, provided that the Court grants the Convening Order, the Company will:

13

(a)     convene the Scheme Meeting by notifying their respective Scheme Creditors in accordance with the directions of the Court of the time and date of and means of attending the Scheme Meeting; and

(b)     make available to Scheme Creditors the following important scheme documents:

(i)     the Explanatory Statement;

(ii)    the Scheme; and

(iii)   a voting and proxy form that Scheme Creditors will need to complete in order to vote at or appoint a proxy to attend and vote on their behalf at the Scheme Meeting,

(the "**Scheme Documents**").

9.6     The Scheme Meeting is currently anticipated to be held on or around Friday 16 October 2020. The Company will notify Scheme Creditors of the precise time and date of the Scheme Meeting via the Information Agent and the Scheme Website and will communicate any change to the date of the Scheme Meeting in the same manner.

9.7     Scheme Creditors will be able to view and download the Scheme Documents in electronic format via the Scheme Website. In addition, a notice directing Scheme Creditors to the copies of the Scheme Documents available at the Scheme Website.

*Sanction Hearing*

9.8     Following the Scheme Meeting, provided that the requisite majorities of Scheme Creditors vote in favour of the Scheme, the Company intend to apply at the Sanction Hearing for an order sanctioning the Scheme.

9.9     The Sanction Hearing is currently anticipated to be held on Friday 23 October 2020. The Company will notify Scheme Creditors of the precise time of the Sanction Hearing via the Information Agent and the Scheme Website and will communicate any change to the date of the Sanction Hearing in the same manner.

9.10    Scheme Creditors are entitled to attend the Sanction Hearing in person or through counsel and to make representations at the Sanction Hearing, although they are not obliged to do so. Scheme Creditors who wish to attend the Sanction Hearing in person or through counsel should contact Latham & Watkins (using the contact details below) to obtain instructions for attending the Convening Hearing.

10.     **ENQUIRIES AND FURTHER INFORMATION**

If you have any questions in relation to this letter, the Scheme or the Transaction, please contact either the Information Agent or Latham & Watkins using the contact details below:

| **Lucid Issuer Services Limited** | **Latham & Watkins** |
|---|---|
| Information Agent | Legal advisers to the Company |
| | |
| Contact: Victor Parzyjagla / Oliver Slyfield | Contact: Yen Sum, Hugo Bowkett, Husni Almousli |
| Tel: +44 20 7704 0880 | Tel: 020 7710 1000 |

14

E-mail: newlook@lucid-is.com                    E-mail: projecttone.lwteam@lw.com

Tankerton Works, 12 Argyle Walk, London          99 Bishopsgate, London, EC2M 3XF,
WC1H 8HA, United Kingdom                         United Kingdom

The Information Agent has set up the Scheme Website (https://www.lucid-is.com/newlook) to disseminate information and communications about the Scheme.

## 11.    CONCLUDING REMARKS

The board of directors of the Company unanimously support the proposals set out in this letter, believing that entry into the arrangements contemplated by the Scheme is in the best interests of the Company and the Scheme Creditors. Accordingly, the board of the Company seek your support for the Scheme and recommend that you vote in favour of the Scheme at the Scheme Meeting.

EU-DOCS\29762145.5

Yours faithfully,

New Look Financing plc

Richard Collyer

Director

Appendix A

**Equity and New Money Term Sheet**

**STRICTLY PRIVATE & CONFIDENTIAL**

---

# EQUITY AND NEW MONEY TERM SHEET

---

## LATHAM&WATKINS

99 Bishopsgate
London EC2M 3XF
United Kingdom
Tel: +44.20.7710.1000
www.lw.com

EU-DOCS\28960059.30

# PART 1

# EQUITY TERM SHEET

| 1. | **INTRODUCTION** | |
|---|---|---|
| 1.1 | **Equity Issuance:** | This term sheet sets out a summary of the key terms on which: |
| | | (a) the holders of the €45,209,687 12% Senior Secured PIK Notes due 2024 and the £400,131,636 12% Senior Secured PIK Notes due 2024 (together the "**SSNs**") issued by New Look Financing plc (the "**SSN Holders**"); and |
| | | (b) the lenders under the New Money Loan (as defined in the Lock-up Agreement) (the "**New Money Lenders**"), |
| | | shall be issued with shares in the Company (the "**Equity Issuance**"). |
| | | The SSN Holders shall be referred to herein as the "**Equitized Holders**". |
| | | The SSN Holders and the New Money Lenders shall be referred to herein as the "**Investors**". |
| | | The "**Closing Date**" means the date on which the Equity Issuance completes. |
| 1.2 | **Company:** | A no par value share Jersey company or where appropriate, the holding company of the group as at the relevant date (the "**Company**")[1]. |
| 1.3 | **Group:** | The Company and its subsidiaries and "**Group Company**" shall be interpreted accordingly. |
| 1.4 | **Governing Documents:** | The terms of the Investors' investment in the Company will be governed by: |
| | | (a) a shareholders' agreement in relation to the Group to be executed by the New Money Lenders[2], and the Company (the "**Shareholders' Agreement**") which shall governed by the laws of England and Wales; and |

---

[1] **Note**: In the event that the Financial Restructuring is implemented in accordance with Plan A (as defined in the Steps Plan), the Company for the purposes of this Term Sheet shall be New Look Retail Holdings Limited and the existing ordinary class A shares of the Company shall be redeemed in accordance with the Steps Plan and the terms set out in this Term Sheet shall be replicated within the existing Group.

[2] **Note**: In the event that the Financial Restructuring is implemented in accordance with Plan A (as defined in the Steps Plan), the Equitised Holders will also enter into the Shareholders' Agreement.

EU-DOCS\28960059.30

| | | (b) | articles of association of the Company (the "**Articles of Association**") which shall be governed by the laws of Jersey. |
|---|---|---|---|
| **2.** | **CAPITAL STRUCTURE** | | |
| **2.1** | **Share Classes and Share Rights:** | The Company's share capital structure shall be comprised of: | |

<div style="margin-left: 2em">

(a)     A ordinary shares (the "**A Ordinary Shares**");

(b)     B ordinary shares (the "**B Ordinary Shares**");

(c)     C ordinary shares (the "**C Ordinary Shares**"); and

(d)     D ordinary shares ("**D Ordinary Shares**"),

</div>

in the case of (b), (c), (d) and (e) (the "**Ordinary Shares**"), in the case of (d) and (e) (the "**MIP Shares**") and in each case of (a), (b), (c), (d) and (e) subject to confirmation from a tax and structuring perspective.

**A Ordinary Shares**

The A Ordinary Shares will be issued to New Money Lenders. On a return of capital or an Exit the A Ordinary Shares shall rank *pari passu* with the B Ordinary Shares and the MIP Shares, subject in respect of the D Ordinary Shares to the Threshold being achieved. The A Ordinary Shares shall represent 80% of the total issued ordinary share capital of the Company as at the Closing Date. The proportion of A Ordinary Shares to be issued to each applicable New Money Lender shall be calculated pro rata to their commitment under the New Money Loan at a time calculated immediately prior to the Closing Date (or at any other time set as per the relevant implementation plan in the Lock-up Agreement).

The A Ordinary Shares shall have a right (i) to dividends, distributions and profits on a winding up of the Company provided that no dividend or distribution shall be paid or made until such time as (a) the Shareholder Loan (as defined in the Lock-up Agreement) has been repaid; and (b) the New Money Loan (including Incremental Facilities) has been repaid; and (ii) to one vote per A Ordinary Share. The A Ordinary Shares shall be non-redeemable.

**B Ordinary Shares**

The B Ordinary Shares will be issued to the Equitized Holders. On a return of capital or an Exit the B Ordinary Shares shall rank *pari passu* with the A Ordinary Shares and the MIP Shares, subject in respect of the D Ordinary Shares to the Threshold being achieved. The B Ordinary Shares shall represent 20% of the total issued ordinary share capital of the Company as at the Closing Date. The proportion of B Ordinary Shares to be held by an Equitized Holder shall be calculated pro rata to their existing proportion of the aggregate principal amount of the SSNs immediately prior to the Closing Date (or at a time set as per the relevant implementation plan in the Lock-up Agreement).

The B Ordinary shares have a right to dividends, distributions and profits on a winding up of the Company provided that no dividend

| | | |
|---|---|---|
| | | or distribution shall be paid or made until such time as (a) the Shareholder Loan has been repaid; and (b) the New Money Loan (including Incremental Facilities) has been repaid. The B Ordinary Shares shall not be entitled to vote or receive notice of a resolution that requires the approval of the shareholders. The B Ordinary Shares shall be non-redeemable.<br><br>**MIP Shares**<br><br>The MIP Shares are described in further detail in section 2.2 below.<br><br>Each Investor shall have the right to nominate any of its affiliates and/or related funds, branches or controlled co-investment vehicles ("**Investor Group**") to receive any A Ordinary Shares or B Ordinary Shares on its behalf. Those persons who hold more than 50% of the A Ordinary Shares for the time being in issue are referred to as (the "**Investor Majority**"). |
| 2.2 | **Management Incentive Plan ("MIP") and MIP Shares:** | The Remuneration Committee in consultation with the Board shall approve the formation of a MIP constituted by the MIP Shares (to be available to both executive directors, non-executive directors and employees of the Group).<br><br>**C Ordinary Shares**<br><br>On a return or capital or an Exit the C Ordinary shares shall rank *pari passu* with the A Ordinary Shares, B Ordinary Shares and, subject to the Threshold being achieved, the D Ordinary Shares. The C Ordinary Shares shall represent 5% of the total issued ordinary share capital of the Company on a fully diluted basis following the issue of shares on the Closing Date and on any Incremental Facility being entered into. The issue of the C Ordinary Shares shall dilute the A Ordinary Shares and B Ordinary Shares pro rata to their respective shareholdings.<br><br>The C Ordinary Shares shall have a right to dividends, distributions and profits on a winding up of the Company provided that no dividend or distribution shall be paid or made until such time as (a) the Shareholder Loan has been repaid; and (b) the New Money Loan (including Incremental Facilities) has been repaid. The C Ordinary Shares shall not be entitled to vote or receive notice of a resolution that requires the approval of the shareholders. The C Ordinary Shares shall be non-redeemable.<br><br>**D Ordinary Shares**<br><br>Provided the holders of the A Ordinary Shares, B Ordinary Shares and C Ordinary Shares have realized an aggregate amount equal to £300,000,000 ("**Threshold**") of cash proceeds (including any proceeds from an Exit) in respect of their A Ordinary Shares, B Ordinary Shares and C Ordinary Shares on or before the date of an Exit, on a return of capital or an Exit the D Ordinary Shares shall rank *pari passu* with the A Ordinary Shares, B Ordinary Shares and C Ordinary Shares. Subject to the Threshold being achieved, on an Exit, return of capital or distribution of profits on a winding up the D Ordinary Shares shall be entitled to 2% of the equity value in excess of the Threshold, and such entitlement of the D Ordinary Shares shall dilute the entitlement of the A Ordinary |

EU-DOCS\28960059.30

| | | |
|---|---|---|
| | | Shares and B Ordinary Shares pro rata to their respective shareholdings.<br><br>Except as provided for in the preceding paragraph, the D Ordinary Shares shall have no right to dividends. The D Ordinary Shares shall not be entitled to vote or receive notice of a resolution that requires the approval of the shareholders. The D Ordinary Shares shall be non-redeemable.<br><br>The Threshold shall increase as a result of any issuances (including an Incremental Issue) of equity securities to the Investors. The Threshold shall reduce as a result of any dividends, distributions, buybacks or redemptions to the Investors occurring prior to the date of an Exit.<br><br>Allocations of the MIP Shares are to be agreed following the Closing Date. |
| 2.3 | Incremental Share Issue: | If the holders of the A Ordinary Shares participate ("**Incremental Participants**") in the funding of new debt commitments pursuant to the Incremental Facilities for the Group following the Closing Date, the Incremental Participants shall be issued with A Ordinary Shares ("**Incremental Issue**") in the same proportions of the Incremental Issue as represents the proportion of A Ordinary Shares issued to them in relation to the Equity Issuance undertaken as at the Closing Date. |
| 2.4 | Pre-emptive Rights on Issue of Further Shares: | If following the Closing Date there is a proposal to issue any equity or debt securities or any debt in any Group Company (other than to another Group Company), each holder of A Ordinary Shares, B Ordinary Shares and C Ordinary Shares shall be given an opportunity to subscribe, at the same time and on the same terms, for such percentage of the securities or debt to be issued as equates to its pro rata share of the total number of ordinary shares of the Company (excluding the D Ordinary Shares) that are in issue, save where an issue of securities is:<br><br>(a)    required in accordance with an emergency fundraising and such other Investors are given the opportunity to "catch-up" within a reasonable period of time and the Company shall, so far as is reasonably practicable (taking into account the urgency of the Group's financing requirements) and permitted under applicable laws, give reasonable notice (being not less than 15 business days) of any such emergency fundraising to the Investors that consent to receive such information;<br><br>(b)    to an independent third party for non-cash consideration for the purposes of funding of a corporate acquisition, merger or joint venture entered into on arms' length terms;<br><br>(c)    to executive directors, non-executive directors or employees pursuant to the MIP;<br><br>(d)    approved pursuant to paragraph (f) or (g) of Part B of Schedule 1; and |

EU-DOCS\28960059.30

| | | (e) | in connection with the Incremental Facilities, such issuance(s) being in accordance with this term sheet, the Lock-up Agreement and/or terms set out therein. |
|---|---|---|---|
| | | | The D Ordinary Shares shall not receive rights of pre-emption in connection with the issuance of any debt or equity securities or any debt by any Group Company. |
| **3.** | **CORPORATE GOVERNANCE** | | |
| 3.1 | **Board     Composition and Appointment:** | | The board of directors of the Company (the "**Board**") will be comprised of up to a maximum of ten directors ("**Director Quota**"). |
| | | | There shall always be available for appointment to the Board: |
| | | (a) | two positions within the Director Quota for the chief executive officer ("**CEO**") and the chief financial officer ("**CFO**") to be appointed to the Board ("**Executive Directors**"); |
| | | (b) | one position within the Director Quota for a non-executive chairperson ("**Chairperson**"); |
| | | (c) | up to five positions within the Director Quota for non-executive directors ("**NEDs**"); and |
| | | (d) | two positions within the Director Quota for investor directors ("**Investor Directors**"). |
| | | | The Executive Directors, Chairperson, NEDs and Investor Directors may be appointed to, and removed from, the Board in the following manner: |
| | | (e) | subject to section 3.8, an Executive Director may be appointed to and removed from the Board by a resolution of the Board to approve such appointment or removal; |
| | | (f) | a Chairperson may be appointed to and removed from the Board by an Investor Majority (in its sole discretion) giving written notice to the Company of such appointment or removal; |
| | | (g) | a NED may be appointed to and removed from the Board by an Investor Majority (in its sole discretion, and in the case of the appointment of one NED by an Investor Majority ("**Minority NED**"), such appointment or removal to the Board of the Minority NED shall not require the positive affirmative vote of any of the Investor Directors and for the purposes of this paragraph only, the Investor Majority shall be calculated by reference to a majority of the A Ordinary Shares excluding each and all of the A Ordinary Shares beneficially owned or held by the A Investor Group and the B Investor Group) giving written notice to the Company of such appointment or removal; and |

EU-DOCS\28960059.30

|  |  | (h) | Investor Directors may be appointed and removed from the Board in accordance with section 3.2. |
|  |  |  |  |

| | | The Minority NED may be nominated or proposed by an Investor Group or Investor Groups (other than any of the A Investor Group or the B Investor Group) who individually or together represent no less than 5% of the A Ordinary Shares. Further mechanisms to restrict frivolous nominations to the Board by a shareholder as well as the logistics and (as the case may be) the timing of such nominations, appointments, removals and/or retirements, shall be included in the Shareholders' Agreement and/or Articles (as applicable). |
| 3.2 | **Investor Director Appointments:** | At the Closing Date one Investor Director ("**A Investor Director**") shall be appointed by the Investor Group who would be entitled to the most Ordinary Shares by reference to the Company's pro forma share capital structure as derived from the number of SSNs held by each Investor as per the Bondholder Identification Exercise[3] ("**A Investor Group**") and one Investor Director ("**B Investor Director**") shall be appointed by the Investor Group who would be entitled to the second most Ordinary Shares by reference to the Company's pro forma share capital structure as derived from the number of SSNs held by each Investor as per the Bondholder Identification Exercise ("**B Investor Group**").

The A Investor Group may (in its sole discretion) appoint or remove from the Board the A Investor Director by giving written notice to the Company of such appointment or removal.

The B Investor Group may (in its sole discretion) appoint or remove from the Board the B Investor Director by giving written notice to the Company of such appointment or removal.

If at any time the A Investor Group or B Investor Group holds less than 15% of the total number of A Ordinary Shares in issue, each such A Investor Group or B Investor Group shall no longer be entitled to appoint or remove their respective A Investor Director or the B Investor Director (as the case may be), and any such A Investor Director or B Investor Director appointee shall immediately resign from their position. As a result of the A Investor Director or B Investor Director appointee resigning, until such time as two Investor Directors are appointed to the Board in accordance with the following paragraph, any matter that requires the positive affirmative vote of two Investor Directors shall only require the positive affirmative vote of one Investor Director.

If at any time the A Investor Group and B Investor Group each hold less than 15% of the total number of A Ordinary Shares in issue, such A Investor Group and B Investor Group shall no longer be entitled to appoint or remove from the Board the A Investor Director and the B Investor Director (as the case may be), and any |

---

[3]     "**Bondholder Identification Exercise**" means the bondholder identification exercise as of 25 August 2020 conducted by Lucid Issuer Services Limited on or prior to 27 August 2020 on the instructions of the Group with the purpose to determine the identity and holdings of the SSN Holders as of 25 August 2020. As at 25 August 2020, SSN Holders representing over 91 per cent. by value of the aggregate SSN Debt  are party or have acceded to the Lock-up Agreement.

| | | |
|---|---|---|
| | | such A Investor Director or B Investor Director appointee shall immediately resign from their position.<br><br>If the A Investor Group and B Investor Group are both no longer entitled to appoint the A Investor Director or the B Investor Director, the right to appoint the Investor Directors shall be available to the two Investors or Investor Groups that hold the highest number of A Ordinary Shares (which may include the A Investor Group or B Investor Group), provided that if at any time an Investor or Investor Group subsequently holds more than 15% of the total number of A Ordinary Shares in issue ("**Relevant Investor**"), in circumstances where the A Ordinary Shareholder(s) with existing Investor Director representatives on the Board hold less than 15%, such Relevant Investor shall be entitled to appoint and remove from the Board the Investor Director appointed by the shareholder with the fewest number of A Ordinary Shares (and this process shall be repeated if a second holder of A Ordinary Shares comes to own more than 15% of the A Ordinary Shares), and any Investor Director previously appointed by the two Investors or Investor Groups holding the highest number of A Ordinary Shares in issue (but less than 15% thereof) shall resign from their position if so directed by the Relevant Investor.<br><br>Failure to appoint an Investor Director shall not be deemed to constitute a waiver of the right to make an appointment, nor will it prohibit the Company from otherwise adhering to the terms of the Shareholders' Agreement and the Articles.<br><br>Each Investor having the right to appoint a director to the Board shall have the right to appoint a director to the board of directors of each other Group Company and the provisions set out above shall apply to the board of directors of each Group Company *mutatis mutandis* (to the extent permitted by law in the relevant jurisdiction of each Group Company). |
| 3.3 | **Board at Closing:** | At the Closing Date the Board shall be comprised of up to nine directors constituted by:<br><br>(a)    Nigel Oddy and Richard Collyer as the two Executive Directors;<br><br>(b)    Alistair McGeorge as the Chairperson;<br><br>(c)    certain persons appointed as the NEDs;<br><br>(d)    a certain person appointed as the A Investor Director; and<br><br>(e)    Stuart MacKenzie or Bruce Baisley as the B Investor Director. |
| 3.4 | **Board Observer:** | For so long as the A Investor Group holds at least 15% of the total number of A Ordinary Shares in issue, the A Investor Group shall be entitled (but have no obligation) to appoint an observer to attend meetings of the Board. If at any time the A Investor Group holds less than 15% of the total number of A Ordinary Shares in issue, any such observer appointed shall be removed and no longer be permitted to attend meetings of the Board. |

EU-DOCS\28960059.30

| | | |
|---|---|---|
| | | For so long as the B Investor Group holds at least 15% of the total number of A Ordinary Shares in issue, the B Investor Group shall be entitled (but have no obligation) to appoint an observer to attend meetings of the Board. If at any time the B Investor Group holds less than 15% of the total number of A Ordinary Shares in issue, any such observer appointed shall be removed and no longer be permitted to attend meetings of the Board.<br><br>Any such person attending as an observer shall not be entitled to vote and shall not count towards the quorum.<br><br>Each observer will receive reimbursement of reasonable out-of-pocket expenses (including for the avoidance of doubt flight / travel arrangements for board meetings) in line with the Group's expenses policy. |
| 3.5 | Fees and Expenses of Investor Directors and NEDs: | Each director (including an Investor Director) that is not an employee of the Group will receive a reasonable and customary director's fee in line with market practice and subject to an aggregate maximum amount to be determined by the Remuneration Committee. Each Director will receive reimbursement of reasonable out-of-pocket expenses (including for the avoidance of doubt flight / travel arrangements for Board meetings) in line with the Group's expenses policy or as approved by the Remuneration Committee. |
| 3.6 | Board Meetings: | The frequency of Board meetings shall be determined by the Board but shall be at least eight times per year. In addition, any director may call a directors' meeting by giving notice of the meeting to the directors or by authorising the company secretary (if any) to give such notice. Unless otherwise agreed by all directors, Board meetings shall be convened on a minimum of 5 days' notice and shall be adjourned by 7 days (or such other period as may be agreed by all directors) if requested by any Investor Director.<br><br>Board information pack, agenda and copies of the latest management accounts will be circulated with notice of the meeting and agenda at least five days before each meeting, and such notice period can be shortened or waived by a simple majority of the directors together with the consent of two Investor Directors (or one Investor Director, if there is only one Investor Director appointed) from time to time.<br><br>The quorum for the transaction of business of the Board shall be any five eligible directors (including each Investor Director provided that if an Investor Director expressly waives their right to be part of the quorum of the Board then such Investor Director shall not be required in order for a meeting of the Board to form a quorum).<br><br>Each member of the Board has one vote provided that any proposed resolution of the Board shall require the affirmative vote of one Investor Director in order for such resolution to be passed. The Chairperson shall have the casting vote.<br><br>A mechanism shall be included in the Shareholders' Agreement to avoid a frustration event that may occur as a result of the |

9

| | | |
|---|---|---|
| | | requirement for the attendance at, and the vote of, Investor Directors at meetings of the Board.

The Board may also pass resolutions with the unanimous written consent of all the directors (which shall include responding by e-mail). |
| 3.7 | **Audit and Remuneration Committee:** | Standing committees of the Board will be established called the remuneration committee ("**Remuneration Committee**") and the audit committee ("**Audit Committee**").

The Remuneration Committee and Audit Committee shall be constituted by at least one NED, one Executive Director and up to two Investor Directors. One of the relevant NEDs shall chair meetings of the Remuneration Committee and the Audit Committee. Each member of the Remuneration Committee and Audit Committee shall have one vote provided that any proposed resolution shall require the affirmative vote of one Investor Director in order for such resolution to be passed.

The CFO will be invited to attend and speak at any meeting of the Audit Committee but shall not be counted for the purposes of quorum, and shall not be entitled to vote on any resolution of the Audit Committee.

Each of the Remuneration Committee and Audit Committee shall adopt terms of reference that have been approved by the Board. |
| 3.8 | **Matters Requiring Consent:** | All decisions of the Group will be resolved by the Board, subject to any delegation of day to day management of the business to senior management in the ordinary course of business.  For the avoidance of doubt, subject to the provisions of law in the relevant jurisdiction of each Group Company, the Board shall be consulted on and shall take all major decisions affecting the Group and, in any event, the matters listed in Schedule 2 must be brought to the attention of the Board. Subject to section 4.5, a proposal by the Board in relation to:

(i)    the matters listed in Part A of Schedule 2 shall require a simple majority approval of the Board (such approval to include the positive affirmative vote of at least one Investor Director); and

(ii)    the matters listed in Part B of Schedule 2 shall require a simple majority approval of the Board (such approval shall include the positive affirmative vote of at least two Investor Directors provided that an Exit process and/or Exit after the fourth anniversary of the Closing Date shall only require the positive affirmative vote of only one Investor Director).

In addition to the matters referred to in (i) and (ii) of this section 3.8, the matters in (iii) and (iv) of this section 3.8 shall also require a simple majority approval of the Board (such approval to include the positive affirmative vote of at least one Investor Director) and: |

| | | |
|---|---|---|
| | | (iii) in the case of the matters set out in Part A of Schedule 1, such matters shall also require the prior written consent of the Investor Majority; |
| | | (iv) in the case of the matters set out in Part B of Schedule 1, such matters shall also require the prior written consent of the Investors holding at least 66.67% of the A Ordinary Shares in issue provided that if one Investor or Investor Group holds at least 40% of the A Ordinary Shares in issue, such matters set out in Part B of Schedule 1 shall also require the prior written consent of any other Investor holding at least 15% of the A Ordinary Shares in issue. |
| | | The Board shall be consulted on and shall be required to approve the matters set out in Part A and Part B of Schedule 1 (but, for these purposes, ignoring any monetary thresholds or materiality thresholds set out therein). |
| | | A vote by the Board in relation to any matter referred to in (i), (ii), (iii) and (iv) of this section 3.8 shall exclude the vote of any director who is directly or indirectly interested in such matter. If at any time, no Investor Directors have been appointed, the quorum and other requirements for Board meetings shall not require an Investor Director and the approval of an Investor Director of any matters in this term sheet shall not be required. |
| 3.9 | Provision of Information: | The Company shall be required to supply the Investor Directors with the financial statements as set forth in the definitive documentation for the Reinstated Facilities (or the documentation for any refinancing of the Reinstated Facilities). Any Investor or Investor Group will receive a copy of the quarterly information pack (which shall include quarterly accounts of the Group). |
| | | In addition, the A Investor Group and B Investor Group shall be entitled to receive such information concerning the Group as it reasonably requires in order to comply with any reporting requirements as a public company and in order to disclose information to the extent that it has done historically and to disclose information publicly to such extent. |
| | | The Company shall notify the other Investors in the event that any of the A Investor Group or B Investor Group holds less than 15% of the total number of A Ordinary Shares in issue. |
| 3.10 | Ability to Communicate Information: | Subject to compliance with applicable laws, the Investor Directors shall be entitled to pass any information received by them that relates to the Company to the Investors they are appointed by and to any of their professional advisers. |
| | | Subject to compliance with applicable laws, the Investors shall be entitled to pass any information received by them that relates to the Company to various persons on a confidential basis, including to any affiliate of that Investor, to any bona fide investor in, or purchaser of shares in or assets of, the Group and any of their professional advisers and actual or potential lenders who have |

11

<table>
<tr><td colspan="2"></td><td>provided financing or are to provide financing in connection with the purchase of any shares held by an Investor (subject to any such lender having executed a customary confidentiality agreement with the Investor (which shall allow the Company to enforce the provisions of the confidentiality agreement against the counterparty thereto) prior to the disclosure of such information), provided that the sharing of any Group confidential information with any third party material direct competitor (European and Asian affordable fashion retailers) or material supplier of the Group shall require the prior consent of the Company (not to be unreasonably withheld, delayed or conditioned).  In addition, subject to each Investor's rights as a shareholder under law, the Company may decide to withhold information from an Investor that is a Competitor or Supplier (as defined below), including information such person(s). might otherwise receive in relation to the matters in Schedule 1. In addition, the A Investor Group and B Investor Group shall be entitled to disclose information as set out in section 3.9 to extent applicable.</td></tr>
</table>

| 4. | **TRANSFERS** | |
|---|---|---|
| 4.1 | **Transfers of Shares and Stapling:** | Any transfers shall be subject to the Tag Offer, Delayed Tag Offer, Drag Right and RoFO (as set out below) unless it is a Permitted Transfer (as defined below). |

Legal and/or beneficial title to an Ordinary Share shall be freely transferable:

(a)     in the case of an Investor, to an affiliate of that Investor (for as long as it remains the relevant Investor's affiliate);

(b)     in the case of Ordinary Shares acquired in connection with the backstop, to an affiliate of an Investor, provided that, for the purposes of this paragraph 4.1(b) only, "affiliate" shall mean a person holding 25% or more, directly or indirectly, of the equity share capital in an Investor and companies controlled by such person;

(c)     to a new holding company of the Company of which the shareholders are the same as those of the Company and hold shares in the same proportions; or

(d)     in the case of a holder of a MIP Share, (i) with the prior written consent of the Remuneration Committee to a spouse or trust for bona fide tax planning purposes; or (ii) with the prior written consent of the Board,

each a ("**Permitted Transfer**").

Transfers to competitors (European and Asian affordable fashion retailers) or any material supplier of the Group, in each case together with any persons whose primary business is that of being a competitor or material supplier of the Group (together, any such persons being referred to herein as a "**Competitor or Supplier**") shall not be permitted, except where disposing of sufficient shares

EU-DOCS\28960059.30

|   |   |   |
|---|---|---|
|   |   | to trigger a Tag Offer or Drag Right. Transfers of Ordinary Shares to an affiliate that is, or directly or indirectly controls, a Competitor or Supplier shall also be prohibited.<br><br>The A Ordinary Shares shall be stapled to the New Money Loan such that any transfer of A Ordinary Shares to any person shall require the holder of such A Ordinary Shares to simultaneously transfer a pro rata proportion of its holding of New Money Loan to such person and vice versa.<br><br>The B Ordinary Shares shall be stapled to the Shareholder Loan such that any transfer of B Ordinary Shares to any person shall require the holder of such B Ordinary Shares to simultaneously transfer a pro rata proportion of its holding of Shareholder Loan to such person and vice versa. |
| 4.2 | **Right of First Offer ("RoFO"):** | If a holder ("**Seller**") of A Ordinary Shares wishes to transfer an amount equal to 0.5% or more of the total number of A Ordinary Shares ("**Sale Shares**") to a third party (provided that such third party is not a Competitor or Supplier, in which case such transfer shall not be permitted), the Seller shall, in priority to entering into a legally binding agreement for transfer with any third party, appoint an agent or broker who shall list the Sale Shares for sale (through the Company's designated online portal if practicable) ("**Listing Notice**"). The Listing Notice shall specify the number of Sale Shares being sold and the price per Sale Share. The other holders of A Ordinary Shares ("**Non-Sellers**") shall have 10 business days ("**Response Period**") from the date of the Listing Notice to respond in writing ("**Response Notice**") (through the Company's designated online portal if practicable) to the Listing Notice as to whether a Non-Seller would like to purchase the Sale Shares. Each Non-Seller that gives a Response Notice shall be entitled to its pro rata proportion of the Sale Shares and to the extent there are any excess Sale Shares remaining following the allocation of such entitlement to the Non-Sellers who give a Response Notice, such excess Sale Shares shall be allocated pro rata as between the relevant Non-Sellers who state that they wish to purchase excess Sale Shares, and if Non-Sellers elect to purchase less than all of the Sale Shares, the Seller shall be entitled to sell the excess Sale Shares to a third party in accordance with this paragraph or at its discretion to reject the Response Notices and sell all of the Sale Shares to a third party in accordance with this paragraph.<br><br>If a Seller does not receive a response to the Listing Notice, or does not receive Response Notices for all of the Sale Shares and wishes to reject them, or following a Response Notice the relevant Non-Seller fails to complete the transfer of Sale Shares within 20 business days of the last day of the Response Period, the Seller shall have 50 business days thereafter (extended, if required, due to any mandatory anti-trust or regulatory period) ("**Completion Period**") to complete the transfer of the Sale Shares provided that the price paid for the Sale Shares by a third party is equal to or more than the price specified for the Sale Shares in the Listing Notice. If the transfer of Sale Shares is not completed during the Completion Period, the Seller shall retain the Sale Shares and the Seller (including its affiliates) shall not be entitled to propose a transfer of their A Ordinary Shares (except for Permitted |

| | | |
|---|---|---|
| | | Transfers) for a period of 6 months following the last day of the Completion Period. |
| | | A Seller shall be responsible for all of its own costs related to the transfer of any A Ordinary Shares. |
| | | Any A Ordinary Shares transferred pursuant to this section shall also be subject to the stapling provisions in section 4.1. |
| **4.3** | **Tag Offer:** | Save for Permitted Transfers and subject to the stapling requirements set out in section 4.1, if an independent third party purchaser and/or its affiliates ("**Purchaser**"), which is not and whose affiliates are not an existing shareholder of the Company on the date of the Lock-up Agreement, would hold more than 66.67% of A Ordinary Shares following a bona fide sale (whether in one or a series of transactions) by one or more shareholders of the Company, the Purchaser is obligated to submit a one-time offer in writing to buy all of the Ordinary Shares (a "**Tag Offer**"). A holder of Ordinary Shares shall have the option to accept or reject the Tag Offer. |
| | | The consideration payable under the Tag Offer shall be equal to the highest consideration paid as part of the proposed sale (or if higher, received from a buyer for shares in the 12 months prior to the date of the Tag Offer): |
| | |     (a)    in the same form or, at the election of each tagging shareholder, for the cash equivalent of the fair value of any non-cash consideration; and |
| | |     (b)    subject to the same payment terms, |
| | | as offered for each Ordinary Share which is the subject of the sale of Ordinary Shares triggering the Tag Offer. The consideration payable for any shares shall be specified in the Tag Offer. |
| | | If after 54 months of the Closing Date (the "**Tag Longstop Date**") an A Ordinary Shareholder and/or its affiliates hold 66.67% of the A Ordinary Shares, and such A Ordinary Shareholder and/or its affiliates are an existing shareholder of the Company on the date of the Lock-up Agreement (an "**Original Shareholder**"), then the Original Shareholder shall be obligated to submit a Tag Offer (a "**Delayed Tag Offer**") upon the Tag Longstop Date. A holder of Ordinary Shares shall have the option to accept or reject the Delayed Tag Offer. |
| | | A Delayed Tag Offer shall not be required if on or before the Tag Longstop Date a legally binding agreement has been executed to consummate an Exit provided that it closes within 60 months after the Closing Date (failing which the Delayed Tag Offer shall be made immediately thereafter). |
| | | The consideration payable under the Delayed Tag Offer shall be in cash and shall be a price per Ordinary Share equal to the highest consideration paid by the Original Shareholder and/or its affiliates for an A Ordinary Share (either in cash or if any consideration paid was non-cash, an amount equal to the fair value of such non-cash consideration). |
| | | Each tagging shareholder shall pay its pro rata share of the costs incurred in connection with the proposed sale but shall not be |

14

| | |
|---|---|
| | required to give any warranties, indemnities, covenants or undertakings in connection therewith to any person, save for warranties as to its title to, and capacity to sell, such shares and leakage.<br><br>Fair value for any non-cash consideration shall be the amount as determined between the Purchaser or, as the case may be, Original Shareholder and a majority of the tagging shareholders that have elected to receive cash consideration or if there is no agreement, an amount determined by an independent expert. A mechanism will be included to apportion the costs of the independent expert to encourage agreement between the parties. |
| **4.4    Drag Right:** | Save for Permitted Transfers, and subject to the stapling requirements set out in section 4.1, if one or more holders of A Ordinary Shares propose to sell (whether in one or a series of transactions) to a Purchaser which is not an existing shareholder or an affiliate of an existing shareholder in a bona fide transaction, between them, more than 66.67% of the A Ordinary Shares in the Company (which shall constitute an Exit and be subject to (ii) of section 3.8 and section 4.5)), the proposed buyer or the proposed seller may, following execution of a binding agreement (whether conditional or unconditional) for the sale of Ordinary Shares (the "**Sale Agreement**"), require each other holder of Ordinary Shares to transfer all their Ordinary Shares (the "**Drag Shares**").<br><br>The consideration payable for each Drag Share shall be:<br><br>(a)    equal to the higher of (i) the highest consideration paid as part of this proposed sale; or (ii) the amount received by the relevant sellers in the 12 months prior to the date of the Sale Agreement;<br><br>(b)    in the same form or, at the election of each dragged shareholder, for the cash equivalent of the fair value of any non-cash consideration; and<br><br>(c)    subject to the same payment terms,<br><br>as offered for each A Ordinary Share in the Sale Agreement.<br><br>Each dragged shareholder shall pay its pro rata share of the costs incurred in connection with the proposed sale and shall give warranties with respect to its title to, and ownership of, the relevant Drag Shares but shall not be required to give any other warranties, indemnities, covenants or undertakings.<br><br>Fair value for any non-cash consideration shall be the amount as determined between the Purchaser and a majority of the dragged shareholders that have elected to receive cash consideration or if there is no agreement, an amount determined by an independent expert. A mechanism will be included to apportion the costs of the independent expert to encourage agreement between the parties. |
| **4.5    Exit:** | The Investors shall co-operate in good faith to determine an appropriate plan to achieve a sale or other disposal (whether through an IPO, an asset sale, a share sale, a winding-up or otherwise) of the Company (an "**Exit**"). |

15

Within 6 months of the Closing Date the Board intends to appoint financial advisors to undertake a strategic review of the operations of the Group, and in particular whether any value accretive corporate activities are available for the Company and/or its shareholders. Following Closing, the Board shall discuss the foregoing in good faith, including the choice of financial adviser. The Board shall be under no obligation to pursue any accretive or other activities identified in the review but shall discuss and consider the outcome of the review in good faith.

Notwithstanding anything to the contrary in this term sheet, no approval of an Investor Director (whether pursuant to Schedules 1 or 2 or otherwise) shall be required in respect of the above strategic review or any matters connected with it (including the appointment of financial advisors), but without prejudice to the consent of Investor Directors required in respect of executing agreements in respect of the actual Exit.

The Board intends to commence the Exit process no later than 3 years after the Closing Date by appointing an independent investment bank and/or M&A advisor. The Board intends to complete the Exit no later than 4 years after the Closing Date.

In the event that an Exit has not occurred by the fourth anniversary of the Closing Date, and the requirement to do so has not been waived by at least two Investor Directors, the Investors holding 66.67% of the A Ordinary Shares in issue can serve notice on the Board requiring it to complete an Exit by a new date.

In the event that the Board fails to comply with its obligations in relation to an Exit process or an Exit is not completed by the fourth anniversary of the Closing date:

(a)     provided that they are doing so in order to implement an Exit, the Investors holding 66.67% shall be entitled to appoint such minimum number of additional directors to the Board that will allow such Investors to control the Board for as long as they are continuing to seek to implement an Exit; and

(b)     notwithstanding anything to the contrary in this term sheet, the approval of only one Investor Director (whether pursuant to Schedules 1 or 2 or otherwise) shall be required in respect of any matters connected with an Exit after the fourth anniversary of the Closing Date, including for the avoidance of doubt the appointment of financial advisors and approval of the actual Exit itself.

In the event that an existing Investor is involved in the Exit process directly or indirectly as an acquirer of any shares, loan notes, securities or debentures (or any rights to acquire shares, loan notes, securities or debentures) in the Company or in any other Group Company, it shall be required to declare the nature and extent of any such interest and any Investor Director (or Board observer) appointed by such Investor shall be required to recuse him/herself

16

| | from any such Board discussions on the sell-side Exit process where a conflict may arise. |
|---|---|

EU-DOCS\28960059.30

## SCHEDULE 1

## SHAREHOLDER RESERVED MATTERS

Part A

(a)     incurs any new borrowings (or modifies the key terms thereof) or enters into foreign exchange contracts, interest rate swaps or other derivative instruments or factors any of its debts (or enters into similar arrangements), in each case in excess of £50,000,000 in aggregate (but excluding refinancing on arm's length terms or trade credit incurred in the usual course of business);

(b)     acquires (whether by one transaction or by a series of transactions) the whole, or a substantial or material part of the business, undertaking or assets of any other person with a transaction value or purchase price in excess of £25,000,000 or disposes (whether by one transaction or by a series of transactions) of the whole or any substantial or material part of the business, undertaking or any other substantial or material part of its assets of any Group Company) with a transaction value or purchase price in excess of £25,000,000 other than, in each case, in the course of usual trading;

(c)     except in relation to intra-group transfers, declares, makes or pays a dividend or other distribution (whether in cash, stock or in kind) or makes any reduction of, or other change to, its paid-up share capital;

(d)     save in respect of retention of title provisions in the ordinary course of trading, creates, grants, issues or varies any Encumbrance over its shares, assets or undertakings (otherwise than in accordance with the Finance Documents or any document to be entered into pursuant to the Finance Documents);

(e)     makes any material changes to the accounting procedures, practices, policies or principles by reference to which its accounts are prepared or the basis of their application or its accounting reference date or Financial Year end (save as may be necessary to comply with changes in statements of standard accounting practice);

(f)     enters into any joint venture, partnership or agreement or arrangement for the sharing of profits or assets or other similar arrangement which represents 10% or more of Group consolidated EBITDA as at the date of entering into such arrangements based on the Group's most recently available audited consolidated financial accounts, apart from where already permitted;

(g)     institutes, engages in, settle or takes any material decision in relation to any threatened or actual legal proceedings, the value or cost of which might reasonably be expected to exceed £3,000,000 in relation to the same matter or thing and in excess of £15,000,000 in aggregate or which might involve criminal liability for any party thereto other than in respect of (i) debt collection in the ordinary course of business; (ii) where any such liability would be covered by an existing Group insurance policy; and (iii) claims brought against the Group in the United Kingdom by employees in the ordinary course of employment relations (other than class/collective actions or where any such employee claim is expected to have a material impact on the business of the Group) or consumers in the ordinary course of business;

(h)     enters into, terminates or varies any contracts or arrangements between any Group Company and a Shareholder (or a party related to a Shareholder) of value in excess of £3,000,000 in aggregate; and

(i)     appoints or removes any NED (excluding the Minority NED) of any Group Company.

Part B

(a)     acquires (whether by one transaction or by a series of transactions) the whole, or a substantial or material part of the business, undertaking or assets of any other person which materially change the business proposition of the Group;

(b)     disposes of all or substantially all of the assets of the Group (or other disposals of businesses of the Group generating in excess of 25% of Group consolidated EBITDA (based on the Group's most recently available audited consolidated financial accounts)), either pursuant to one transaction or a series of related transactions;

(c)     enters into any transaction for an amalgamation, reconstruction or merger with a third party or related party;

(d)     makes any material change to the nature of the business of the Group (including the material expansion or development of the Group or any of its businesses);

(e)     takes any steps (other than a bona fide solvent winding up of any Group Company or part of a bona fide Group-wide entity clean up previously approved by the board or where required pursuant to law) to:

    (i)     wind-up, liquidate, or dissolve any Group Company;

    (ii)     obtain an administration order in respect of itself;

    (iii)     invite any person to appoint a receiver or manager of the whole or any part of its business;

    (iv)     make a proposal for a voluntary arrangement under section 1 of the Insolvency Act 1986;

    (v)     obtain a compromise or arrangement under Part 18A of the Jersey Companies Law or Part 26 of the Companies Act 2006;

    (vi)     do anything similar or analogous to those things in paragraphs (i) to (v) above, in any other jurisdiction.

(f)     makes any change of any kind to its share capital, including creating, allotting, issuing, redeeming or repurchasing any share, loan capital or other security or grant any options over, or any other right in respect of, any share, loan capital or other security other than matters approved pursuant to sub-paragraph (g) below or where already permitted as an intra-Group activity or which otherwise is technical or administrative in nature and is determined by the Board acting in good faith to cause no detriment to any shareholder;

(g)     makes any increase in the aggregate percentage amount of 5% of the Ordinary Shares for Management and 2% of the Ordinary Shares that the holders of Growth Shares (as defined in the Equity Term Sheet) shall be entitled to upon an Exit pursuant to the Management Incentive Plan;

(h)     alters the Shareholders' Agreement or Articles of Association or other constitutional documents or equivalent documents of a Group Company;

(i)     makes any change to the domicile of the Company or change the head office of the Group to a location outside the UK; and

(j)     appoints or removes the Chief Executive Officer or the Chief Financial Officer.

19

## SCHEDULE 2

## BOARD RESERVED MATTERS

### Part A

(a)     appoints or removes any operational director of the Group, any officer or any member of the executive management committee of the Group or any Employee whose base annual salary is in excess of £200,000;

(b)     institutes, engages in, settles or takes any material decision in relation to any legal proceedings, where the amount claimed is in excess of £100,000 in relation to the same matter or thing;

(c)     appoints any external advisor where the fees of such external adviser are anticipated to exceed £1,000,000 in any one Financial Year, unless such fees are specifically approved in the Annual Budget;

(d)     makes any public announcement other than in the ordinary course of trading;

(e)     incorporates any new company within the Group;

(f)     appoints any committee of the Board, establishes its terms of reference and regulation of proceedings, or appoints any member to such committee;

(g)     approves the annual consolidated financial accounts of the Group;

(h)     except as provided for the in Forex Policy[4], incur any new borrowings (or modifies the key terms thereof) or enters into foreign exchange contracts, interest rate swaps or other derivative instruments or factors any of its debts (or enters into similar arrangements), in each case in excess of £5,000,000 in aggregate; and

(i)     utilisation of the Incremental Facility in an aggregate amount exceeding £10,000,000.

### Part B

(j)     makes any material changes to the nature or long-term strategy of the business or enters into a new business line (which shall exclude any new product line that is approved by the Board and any business line that is included in the Business Plan);

(k)     approves or amends the Annual Budget, Business Plan or strategic plan of the Group;

(l)     save to the extent set out in paragraph 4.5, commences an Exit process (including selection of advisers);

(m)     any material amendment to the capital structure of any Group Company and or the constitutional documents of any Group Company;

(n)     except as provided for the in Forex Policy, including incurring any new borrowings (or modifies the key terms thereof) or refinancing existing borrowings or enters into foreign exchange contracts, interest rate swaps or other derivative instruments or factors any of its debts (or enters into similar arrangements), in each case in excess of £25,000,000 in aggregate; and

(o)     redeems, exchanges or buybacks any of the Shares of any Group Company (except in relation to the MIP Shares).

---

[4] **LW Note**: Forex Policy to be agreed form document in the long form documents.

**PART 2**

**NEW MONEY TERM SHEET**

### A.    Overview

| Newco Structure | - New holding companies incorporated in Jersey ("**Newco 1**", its immediate subsidiary "**Newco 2**" and Newco 2's immediate subsidiary "**Newco 3**")[1] |
|---|---|
| | - Newco 2 funded with £40m proceeds of New Money Term Loan |
| | - 80% of the A Ordinary Shares in Newco 1 held by New Money Providers (as defined below) pro rata to participation; the remaining 20% to be issued to existing SSN holders pro rata to holdings at the restructuring effective date in the form of B Ordinary Shares |
| | - £40m of SSNs to be reinstated in the form of a loan at Newco 2 (the "**Shareholder Loan**"), which is contractually subordinated in all respects to the New Money Term Loan |
| | - MIP at Newco 1 |

### B.    New Money Term Loan

| Key Economic Terms | Initial amount: £40m of net cash proceeds to be fully drawn at closing |
|---|---|
| | Interest: 16.5% PIK |
| | OID: 5% (to be capitalised and added to the principal amount of the New Money Term Loan on the restructuring effective date) |
| | Currency: GBP |
| Allocation | To be allocated to participating SSN holders pro rata to their SSN holdings (the "**New Money Providers**"). Backstop parties to backstop any entitlements not taken up by SSN holders. |
| Instrument | Term loan |
| Borrower | Newco 2 |
| Guarantors | None |
| Facility Agent / Security Agent | GLAS (subject to fee quote approval) |
| Use of Proceeds | To be used for: |
| | - general corporate purposes of the New Look group; and |
| | - payment of agreed transaction and adviser costs |
| Final Redemption Date | 7 years from closing |
| Repayment | Bullet |
| Conditions | - An officer's certificate (signed by an authorised signatory) confirming that the CVA has been approved (and the relevant challenge period has expired) to achieve a rent reduction not materially more adverse than the estimated rental value as set out in the business plan |
| | - Applicable regulatory consents, licences and registrations |
| | - Anti-trust clearance |
| | - Other customary documentary conditions precedent for a financing of this nature |
| Incremental Facilities | Up to £50m in new commitments to be offered pro rata to existing lenders of the New Money Term Loan at time of borrowing. |

---

[1] NTD: in the event of a "Plan A" implementation where the existing capital structure is retained, Newco 1 will be replaced by New Look Retail Holdings Limited, Newco 2 will be a newly-incorporated Jersey company and Newco 3 will be New Look Investment Limited

|  | Maturity, availability period, pricing to be agreed between Newco 2 and the lenders of the Incremental Facilities (though in any case maturity shall be no earlier than the New Money Term Loan). |
|---|---|
|  | Incremental Facilities to rank pari passu with the New Money Term Loan. |
|  | £1m minimum incremental amount. Drawdown notice period of three business days. |
|  | Participating lenders to receive newly issued A Ordinary Shares in the same proportion to the applicable Incremental Facility as represents the proportion of A Ordinary Shares issued in respect of the New Money Term Loan |
| **Interest Payment Dates** | Semi-annual, to be capitalised |
| **Default Interest** | 1% |
| **Financial covenants** | None |
| **Information Undertakings** | Financial Statements (as such term is defined in the Senior Facilities Agreement) as set forth in the Senior Facilities Agreement and the Operating Facility Agreement, in each case as amended by and in accordance with the Debt Term Sheet (the facilities under such amended Senior Facilities Agreement and the Operating Facility Agreement being the "**Reinstated Facilities**") (or the documentation for any refinancing of the Reinstated Facilities) |
| **Restrictive Covenants** | Customary restrictive covenants which are in any case no more restrictive than those set forth in the definitive documentation for the Reinstated Facilities (or the documentation for any refinancing of the Reinstated Facilities), modified to reflect customary holding company permissions and *de minimis* baskets and to include: |
|  | - baskets to permit the transactions contemplated by this term sheet; |
|  | - a restriction on the insertion of any further intermediate holding companies between Newco 2 and New Look Limited; and |
|  | - customary anti-layering protection |
| **Representations and Warranties** | Customary representations and warranties |
| **Events of Default** | Non-payment, including cross acceleration of the Reinstated Facilities |
| **Security** | Share pledge over Newco 2's shares in Newco 3 |
|  | Assignment of intercompany receivables owed to Newco 2 by Newco 3 |
|  | Floating charge (or equivalent) over Newco 2 bank accounts |
| **Ranking** | New Money Term Loan to be senior to the Shareholder Loan in all respects. New Money Term Loan to rank structurally junior to the Reinstated Facilities. The New Money Term Loan would not benefit from any guarantees or security from Newco 3 or its subsidiaries. |
| **Stapling** | Stapled to A Ordinary Shares |
| **Transfer Restrictions** | As applicable to A Ordinary Shares in Part 1 of the Equity and New Money Term Sheet. |
| **Amendments and waivers** | Changes to key economic terms require at least 66⅔% lender (and Newco 2) consent |
|  | Acceleration / enforcement 66⅔% lender consent |
|  | Other terms require simple majority lender (and Newco 2) consent |
| **Documentation** | Loan Agreement, security agreement, in each case as customary for a financing of this nature |
| **Governing law** | English law except for any share security agreement which shall be governed by the laws of the jurisdiction of incorporation of Newco 2 or bank account security agreement which shall be governed by the laws of the jurisdiction where the relevant bank account is held. |
| **Listing** | None |

C.   **Shareholder Loan**

| | |
|---|---|
| **Principal** | £40m (on a cashless basis as reinstatement of SSNs) |
| **Interest** | None |
| **Allocation** | To be allocated to each SSN holder *pro rata* to their SSN holdings |
| **Instrument** | Term loan |
| **Borrower** | Newco 2 |
| **Guarantors** | None |
| **Facility Agent** | GLAS (subject to fee quote approval) |
| **Redemption Date** | 9 years from closing (however the Borrower may voluntarily prepay the Shareholder Loan at any time following the repayment in full of the New Money Term Loan for cash without any fee or prepayment premia) |
| **Repayment** | Bullet |
| **Conditions** | None |
| **Interest Payment Dates** | N/A |
| **Default Interest** | None |
| **Financial covenants** | None |
| **Information Undertakings** | Financial statements as set forth in the New Money Term Loan |
| **Restrictive Covenants** | None |
| **Representations and Warranties** | Customary representations and warranties |
| **Events of Default** | Non-payment and cross acceleration of the New Money Term Loan only |
| **Security** | None |
| **Ranking** | Shareholder Loan to be contractually subordinated in all respects to the New Money Term Loan |
| **Stapling** | Stapled to B Ordinary Shares |
| **Transfer Restrictions** | As applicable to B Ordinary Shares in Part 1 of the Equity and New Money Term Sheet. |
| **Amendments and waivers** | Changes to key economic terms require at least 66⅔% lender (and Newco 2) consent<br>Acceleration requires 66⅔% lender consent<br>Other terms require simple majority lender (and Newco 2) consent |
| **Documentation** | Loan Agreement as customary for a financing of this nature |
| **Governing law** | English law |
| **Listing** | None |

Appendix B

**Debt Term Sheet**

EU-DOCS\29762145.5

**STRICTLY PRIVATE & CONFIDENTIAL**



---

**DEBT TERM SHEET**

---

# LATHAM&WATKINS

99 Bishopsgate
London EC2M 3XF
United Kingdom
Tel: +44.20.7710.1000
www.lw.com



This term sheet is the "Debt Term Sheet" referred to in, and is subject to the terms of, the lock up agreement dated 12 August 2020 (the "**Lock-up Agreement**") among New Look Bonds Limited, certain consenting RCF lenders, certain consenting operating facility lenders and others.

## PART 1

### GENERAL

| | |
|---|---|
| **Documentation:** | The Senior Facilities Agreement, Trade Finance Facilities Agreement and Buyer Agreement (each a "**Relevant Facilities Agreement**") shall be amended to reflect the changes set out in this Term Sheet (and otherwise shall continue on their current terms except as modified by this Term Sheet(and "Financial Restructuring" as it appears in the Relevant Facilities Agreement shall include the Financial Restructuring), provided that if the Company and HSBC agree, each reference to Buyer Agreement in this Term Sheet shall be to any replacement of the existing Buyer Agreement with a new buyer agreement which is otherwise consistent with the terms set out in this Term Sheet as applicable to the Buyer Agreement). |
| **Definitions:** | Definitions used but not defined in this Term Sheet shall have the meanings given to them in the Lock-up Agreement, the Senior Facilities Agreement or Operating Facility Agreement (as applicable). |

## PART 2

### PARTIES

| | |
|---|---|
| **Parent:** | New Look Bonds Limited or, if the Financial Restructuring is implemented in accordance with "Plan B" of the Steps Plan, New Look Limited (in which case, the definition of "Legacy Group" shall be expanded to include any Group member prior to the Financial Restructuring implemented in accordance with "Plan B" of the Steps Plan that is not a subsidiary of New Look Limited after such implementation). |
| **Guarantors:** | As per the existing Senior Facilities Agreement and Operating Facility Agreement, but set at 85 per cent. of Consolidated EBITDA and 85 per cent. of the total assets of the Group.  The Parent shall add New Look Retailers (Ireland) Ltd as a Guarantor within 45 days of the end of its examinership or, if no examinership has been commenced in |

NEW
LOOK

| | |
|---|---|
| | respect of New Look Retailers (Ireland) Ltd as at the Restructuring Effective Date, within 45 days of the Restructuring Effective Date, in each case provided it is a Material Company at such time (by reference to the most recent consolidated management accounts or interim financial statements) and otherwise on the terms of the existing Senior Facilities Agreement. |
| **Springing Guarantee Covenant:** | If a member of the Group that is not a Guarantor provides a guarantee for any Indebtedness incurred by a Guarantor, such non-Guarantor shall, subject to the Agreed Security Principles, accede as a Guarantor under the Senior Facilities Agreement as soon as reasonably practicable and no later than forty-five days of such guarantee. |
| **Group:** | The Parent and its Subsidiaries. The concept of Unrestricted Subsidiaries will be removed. |

## PART 3

## KEY TERMS

| | |
|---|---|
| **Total Commitment:** | |
| *Senior Facilities Agreement:* | £100,000,000 fully drawn term loan facility, plus the applicable arrangement fee set out below. |
| *Trade Finance Facilities Agreement:* | £70,000,000, stepping down to £60,000,000 on 30 June 2021 (the "**First Step Down Date**") and stepping down to £50,000,000 on 31 December 2021 (the "**Second Step Down Date**"). |
| | The Total Commitments shall initially be made up of Total RCF Commitments of £10,500,000 and Total Import Facility Commitments of £59,500,000, provided that the Original Borrower may, on not less than three Business Days' written notice to the Facility Agent, re-allocate any Available Commitments in respect of the Import Facility to the Revolving Credit Facility (and vice versa) from time to time in its sole discretion, provided always that any re-allocation which would have the effect that the Total RCF Commitments exceed £15,000,000 (as reduced pro rata on each step down date) shall require the prior written consent of the Facility Agent). |
| *Buyer Agreement:* | BA Exposure Limit: £10,000,000. |
| **Aggregate Trade Exposure:** | The aggregate principal amount of outstanding Utilisations and Ancillary Outstandings under the Trade Finance |

NEW
LOOK

Facilities Agreement shall not, when aggregated with the aggregate principal amounts outstanding under the Buyer Agreement exceed:

(a)     prior to the First Step Down Date, £70,000,000 (the "**First Step-Down**");

(b)     on and from the First Step Down Date to the Second Step Down Date, £60,000,000 (the "**Second Step-Down**"); and

(c)     on and from the Second Step Down Date, £50,000,000.

(the "**Aggregate Trade Exposure**").

The Original Borrower shall confirm to the Facility Agent under the Trade Finance Facilities Agreement in writing by no later than (i) in relation to the First Step-Down, 10 Business Days prior to the First Step Down Date or (ii) in relation to the Second Step-Down, 10 Business Days the Second Step Down Date, the allocation of the step down amount between the Trade Finance Facilities Agreement and the Buyer Agreement, provided that the Buyer (under and as defined in the Buyers Agreement) has entered into consultation with HSBC (under and as defined in the Buyer Agreement) by no later than the date falling 20 Business Days prior to the First Step Down Date (in the case of the First Step-Down) or 20 Business Days prior to the Second Step Down Date (in the case of the Second Step-Down) regarding the proposed allocation, provided further that if the Facility Agent under the Trade Finance Facilities Agreement does not agree to such allocation prior to the date falling 5 Business Days prior to the First Step Down Date (in the case of the First Step-Down) or 5 Business Days prior to the Second Step Down Date (in the case of the Second Step-Down) then the Facility Agent under the Trade Finance Facilities Agreement shall determine each such allocation.

**Transaction Security:**

In accordance with the Agreed Security Principles:

(a)     the same Transaction Security as provided for in the existing Senior Facilities Agreement and Operating Facility Agreement; and

(b)     if the Financial Restructuring is implemented in accordance with "Plan B" of the Steps Plan, Transaction Security over the shares owned by [Newco 3] in New Look Limited, together with any intercompany receivables owed by New Look Limited to [Newco 3].

| | |
|---|---|
| **Ranking:** | |
| *Senior Facilities Agreement:* | Senior secured and *pari passu* with the Operating Facility Agreement, except to the extent set out in the Intercreditor Principles. |
| *Operating Facility Agreement:* | Senior secured and *pari passu* with the Senior Facilities Agreement, except to the extent set out in the Intercreditor Principles. |
| **Termination Date:** | |
| *Senior Facilities Agreement:* | 30 June 2024. |
| *Trade Finance Facilities Agreement:* | 30 June 2023. Existing Buyer Agreement to terminate on 28 August 2020. |
| *Operating Facility Refinancing:* | Unless the Parent determines (in the reasonable opinion of the Board of Directors of the Group) that the Operating Facility is not required for the business of the Group (any such determination to be evidenced to the Facility Agent under the Senior Facilities Agreement by delivery to the Facility Agent under the Senior Facilities Agreement of an Officer's Certificate certifying that determination together with a pro forma forecast demonstrating that the Group will be in compliance with the financial covenants referred to in this Term Sheet for the next 12 months):<br>(a) the Parent shall provide a commercial heads of terms for the refinancing of the Operating Facility to the Facility Agent under the Senior Facilities Agreement for its information purposes only not less than three months prior to the Termination Date applicable to the Operating Facility. The terms of such refinancing may be on a committed or non-committed basis and may be provided by the existing lender under the Operating Facility or any other finance provider acceptable to the Parent; and<br>(b) if the Parent fails to provide such heads of terms to the Facility Agent under the Senior Facilities Agreement in the prescribed time, no Event of Default shall occur, however, the Facility Agent under the Senior Facilities Agreement shall be entitled to appoint a single Financial Advisor at the reasonable cost of the Group, which Financial Advisor shall be permitted access at reasonable times during normal business hours and on reasonable notice to meet and discuss matters with |

NEW
LOOK

senior management of the Group with regards to refinancing the Operating Facility and, to the extent necessary for such purposes, reasonable access to the books and records of the Group, and if the Parent so requires in the presence of a representative of the Group, provided that such access is not exercised in a manner which is materially adverse to the running of the business and all information obtained as a result of such access shall be subject to confidentiality restrictions, and provided that, failure to provide the Financial Advisor with such access shall constitute an Event of Default under the Senior Facilities Agreement and the Operating Facility Agreement.

**Covenants, representations, undertakings, events of default and other terms:**

Subject to the below, on the same terms as applicable to the Senior Facilities Agreement and the Trade Finance Facilities Agreement as at the date of this Agreement (and to include market-standard sanctions and anti-corruption representations and warranty and undertakings in the form attached in Appendix C (*Sanctions and Anti-corruption rider*).

*Covenants:*

*Baskets:*

Unless otherwise stated in Appendix A (*Baskets table*), all baskets are as provided for in the existing Senior Facilities Agreement and/or Operating Facility Agreement.

*Information Undertakings*

From the Restructuring Effective Date, on the terms of the Senior Facilities Agreement and the Operating Facility Agreement subject to the following changes:

Within 14 days of delivering the consolidated management accounts or interim financial statements for each Financial Quarter or financial half-year (as may be applicable), the Parent shall hold a conference call with Lenders about the financial performance of the Group.

Paragraph (b) of clause 26.8 (*Information: miscellaneous*) of the LMA Senior Multicurrency Term and Revolving Facilities Agreement for Leveraged Acquisition Finance Transactions (Senior/Mezzanine) (the "**LMA SFA**") shall be included as an additional information undertaking in clause 23 of the Senior Facilities Agreement and clause 22 of the Trade Finance Facilities Agreement, but only with respect to any such proceedings that are reasonably likely to be adversely determined and which, if adversely determined,

NEW
LOOK

would be reasonably likely to have a Material Adverse Effect.

"**Business Plan**" shall be defined as the financial model for the business of the Group in the form agreed between the Parent and the Lenders under the Senior Facilities Agreement and Trade Finance Facilities Agreement on or prior to the date of this Term Sheet and as may be adjusted for any final terms of the CVA and as may be further adjusted to the extent not materially adverse to the Finance Parties.

An additional information undertaking shall be included in the Senior Facilities Agreement only requiring the Parent to confirm to the Facility Agent (email confirmation being sufficient from any Officer of the Parent) the aggregate principal amount of outstanding Utilisations and Ancillary Outstandings under the Operating Facility (broken down between each type of facility):

(a)     on the Restructuring Effective Date;

(b)     on each monthly reporting date pursuant to paragraph (c) of clause 23.1 (*Financial Statements*) of the Senior Facilities Agreement.

*Minimum liquidity:*

The minimum liquidity covenant set out at (i) Section 1.12 (*Minimum Liquidity*) of Schedule 19 (*Covenants*) to the Senior Facilities Agreement and (ii) Section 1.12 (*Minimum Liquidity*) of Schedule 15 (*Covenants*) to the Trade Finance Facilities Agreement shall be amended to reflect the following:

(a)     tested monthly on the basis of the 13-week cash flow forecast provided under the existing Senior Facilities Agreement and Trade Finance Facilities Agreement;

(b)     if Available Liquidity is forecast to be below £30,000,000 for at least two consecutive weeks of the relevant 13-week cash flow forecast, (i) the Facility Agent under the Senior Facilities Agreement and the Facility Agent under the Trade Finance Facilities Agreement shall be entitled to jointly appoint a single joint Financial Advisor at the reasonable cost of the Group, which Financial Advisor shall be permitted access at reasonable times during normal business hours and on reasonable notice to meet and discuss matters with senior management of the Group with regards to Available Liquidity and, to the extent necessary for such purposes, reasonable access to the books and

NEW
LOOK

records of the Group and, if the Parent so requires in the presence of a representative of the Group, provided that such access is not exercised in a manner which is materially adverse to the running of the business and all information obtained as a result of such access such be subject to confidentiality restrictions, and (ii) the Parent will be obliged to provide the 13-week cash flow forecast on a weekly basis to the relevant Facility Agent and the minimum liquidity covenant shall be tested on a weekly basis, with the weekly 13-week cash flow forecast being delivered to the each Facility agent as soon as practicable and no later than 5 Business Days after the end of the applicable week provided that if the Available Liquidity is subsequently forecast to be equal to or more than £30,000,000 for the duration of the most recently delivered 13-week cash flow forecast, the rights in favour of the Facility Agent detailed at subparagraphs (i) and (ii) above shall automatically and immediately, without further action from any party, cease to apply (until, for the avoidance of doubt, the Available Liquidity is again forecast to be below £30,000,000 for at least two consecutive weeks of the relevant 13-week cash flow forecast); and

(c) if Available Liquidity is forecast to be below £20,000,000 for a period of two consecutive weeks in the first 6 weeks of the relevant 13-week cash flow forecast (the "**Relevant Weekly Forecast**"), an Event of Default shall occur, provided that no Event of Default will occur if, within 10 Business Days after delivery to the Facility Agent of the Relevant Weekly Forecast, the Parent has received the proceeds of any New Equity or Permitted Subordinated Debt in an amount sufficient to ensure that the Available Liquidity for the relevant period would be £20,000,000 or more.

"**Available Liquidity**" means the aggregate of cash and Cash Equivalent Investments of the Group, excluding cash in tills and in transit.

"**Financial Advisor**" shall be an independent third party financial advisor as agreed between the Parent and the Facility Agent in writing (each acting reasonably), and which has delivered to the Parent a confidentiality undertaking in favour of the Parent and any other relevant member of the

NEW
LOOK

Group prior to receiving access. For the avoidance of doubt, if a Financial Advisor has been appointed pursuant to the terms of this Term Sheet, the Finance Parties shall be obliged to rely on the existing appointment and may not appoint a separate Financial Advisor pursuant to a separate term of this Term Sheet without express written consent from the Parent.

*Minimum capex:*

The following minimum capex covenants will be added to the Senior Facilities Agreement and Trade Finance Facilities Agreement:

If, in any financial year after the financial year ended [27] March 2021 (a "**Relevant Financial Year**"):

(a)     the Group fails to spend (i) for the financial year ending [26] March 2022, at least £27,500,000 (or its equivalent)[1] and (i) for the financial year ending [26] March 2023, at least £22,500,000 (or its equivalent),[2] in each case as determined within 120 days after the end of such financial year by reference to the annual financial statements of the Group (the difference between the actual capex spend for that financial year and the applicable minimum capex amount specified in sub-paragraphs (a)(i) and (a)(ii) above (as applicable), the "**Unused Capex Amount**"); and

(b)     a period of two months after such determination has elapsed during which time the Group has not spent the Unused Capex Amount on capex,

the Facility Agent under the Senior Facilities Agreement and the Facility Agent under the Trade Finance Facilities Agreement shall be entitled to jointly appoint a single joint Financial Advisor at the reasonable cost of the Group, which Financial Advisor shall be permitted access at reasonable times during normal business hours and on reasonable notice to meet and discuss matters with senior management of the Group with regards to capex spend and, to the extent necessary for such purposes, reasonable access to the books and records of the Group, and if the Parent so requires in the presence of a representative of the Group, provided that such access is not exercised in a manner which is materially adverse to the running of the business and all information obtained as a result of such access shall be subject to confidentiality restrictions.

---

[1]     Set at 50% of the forecast capex spend for that financial year pursuant to the Business Plan

[2]     Set at 50% of the forecast capex spend for that financial year pursuant to the Business Plan

NEW
LOOK

|  | Notwithstanding the above, a failure by the Group to spend at least £20,000,000 on capex (the "**Capex Floor**") in any Relevant Financial Year (as determined within 120 days after the end of such financial year by reference to the annual financial statements of the Group) (the difference between the actual capex spend for that financial year and the Capex Floor being, the "**Shortfall Amount**"), will, if a period of two months after such determination has elapsed and the Group has not spent the Shortfall Amount on capex within such period, constitute an Event of Default under the Senior Facilities Agreement and the Trade Finance Facilities Agreement. |
|  | No such access rights shall apply or Event of Default shall occur or be continuing if, within two months of the determination of the Unused Capex Amount or Shortfall Amount (as applicable), 50% of the Unused Capex Amount or Shortfall Amounts (as applicable) is applied in reduction of the Senior Facilities Agreement and the Operating Facility Agreement on a pro rata basis. |
| *Minimum EBITDA:* | The following minimum EBITDA covenant will be added to the Senior Facilities Agreement and Trade Finance Facilities Agreement: |
|  | Minimum EBITDA to be set with 30% headroom to the Business Plan (adjusted for the effect of the CVA) and tested quarterly on an LTM basis, with the first test to commence in respect of the Financial Quarter ending [25] December 2021. |
|  | Any failure to comply with such covenant shall not result in an Event of Default but shall entitle the lenders under the Senior Facilities Agreement and Trade Finance Facilities Agreement to appoint a single joint Financial Advisor at the reasonable cost of the Group, which Financial Advisor shall be permitted access at reasonable times during normal business hours and on reasonable notice to meet and discuss matters with senior management of the Group with regards to the profitability of the Group and, to the extent necessary for such purposes, reasonable access to the books and records of the Group, and if the Parent so requires in the presence of a representative of the Group, provided that such access is not exercised in a manner which is materially adverse to the running of the business and all information obtained as a result of such access shall be subject to confidentiality restrictions. |

NEW
LOOK

| | |
|---|---|
| *Notes-related covenants:* | Clause 25.5 (*Notes Debt*) and clause 25.8 (*Consultation with Lenders regarding prepayment of Senior Notes*) of the Senior Facilities Agreement and clause 25.12 (*Consultation with Lenders regarding prepayment of Senior Notes*) of the Trade Finance Facilities Agreement to be deleted. |
| *Most Favoured Nation:* | The Senior Facilities Agreement shall be amended to include a 'most favoured nation' covenant in relation to the Operating Facility Documents (as defined in the Intercreditor Agreement) on the following terms: |

If:

(a)     any financial covenant (as set out in this Term Sheet) or information undertaking, in each case, under the Trade Finance Facilities Agreement which is replicated in substantially identical form (subject to necessary changes) in the Senior Facilities Agreement is amended; or

(b)     any additional Security or assurance against loss is granted by any member of the Group in favour of an Operating Facility Lender (as defined in the Intercreditor Agreement), in each case, to the extent such amendment is not in relation to any cash cover permitted under the Senior Facilities Agreement, the relevant Permitted Senior Financing Agreement or the relevant Operating Facility Document (as the case may be) relating to any Ancillary Facility or for any Letter of Credit issued by an Issuing Bank (each capitalised term in the foregoing as defined in the Intercreditor Agreement),

(each such provision in paragraphs (a) or (b), an "**MFN Provision**") in each case, after the Restructuring Effective Date,

(c)     the Parent:

(i)     shall, on or before the date such amendment to an MFN Provision is entered into, deliver a notice to the Facility Agent under the Senior Facilities Agreement together with a signed copy of the document evidencing such amendment, and

(ii)     may request that the relevant provision in the Senior Facilities Agreement be amended to reflect the equivalent MFN Provision(s) in

NEW
LOOK

the relevant Operating Facility Document, in which case, the consent of the Finance Parties to such amendments shall not be unreasonably delayed or withheld, and, provided that no Default is continuing, upon receipt of such consent, the Senior Facilities Agreement shall be deemed to be so amended; and

(d)    the Facility Agent (on the instructions of the Majority Lenders) under the Senior Facilities Agreement may notify the Parent that it requires that (as applicable) the relevant provision in the Senior Facilities Agreement be amended to reflect the equivalent MFN Provision(s) in the relevant Operating Facility Document, in which case, upon such notification, the Senior Facilities Agreement shall be deemed to be so amended,

and, in each case, the Parties shall promptly enter into any amendment documentation to evidence such amendments or, as applicable, the Parent shall procure that the relevant members of the Group promptly enter into any additional documentation to reflect such additional Security or assurance against loss as required by the Facility Agent (acting reasonably).

*Representations:*

The following additional representations shall be included in clause 22 (*Representations*) of the Senior Facilities Agreement and clause 21 (*Representations*) of the Trade Finance Facilities Agreement:

1.    paragraph (a)(ii) of clause 25.6 (*Validity and admissibility in evidence*) of the LMA SFA shall be included within clause 22.5(a) of the Senior Facilities Agreement and clause 21.5(A) of the Trade Finance Facilities Agreement;*

2.    subject to Legal Reservations and Perfection Requirements, clause 25.7 (*Governing law and enforcement*) of the LMA SFA shall be included as a new representation and warranty in clause 22 (*Representations*) of the Senior Facilities Agreement and clause 21 (*Representations*) of the Trade Finance Facilities Agreement;*

N E W
L O O K

3.      paragraph (f) of clause 25.13 (*Financial statements*) of the LMA SFA shall be included as a new representation and warranty in clause 22 (*Representations*) of the Senior Facilities Agreement and clause 21 (*Representations*) of the Trade Finance Facilities Agreement;*

4.      paragraphs (a) to (e) (inclusive, but by reference to the Business Plan only) and paragraph (g) of 25.12 (*No misleading information*) of the LMA SFA (including appropriate knowledge qualifiers (based on the best of its knowledge and belief, after having made due enquiries)) shall be included as a new representation and warranty in clause 22 (*Representations*) of the Senior Facilities Agreement and clause 21 (*Representations*) of the Trade Finance Facilities Agreement; and

5.      clause 25.24 of the LMA SFA (*Intellectual Property*) (including materiality and MAE qualifiers) shall be included as a new representation and warranty in clause 22 (*Representations*) of the Senior Facilities Agreement and clause 21 (*Representations*) of the Trade Finance Facilities Agreement.

The representations and warranties above shall be made on the Restructuring Effective Date and those marked with an * above shall repeat on the date of each Utilisation Request and the first day of each Interest Period.

*Events of Default:*

The following Events of Default to be included and/or amended in Clause 26 (*Events of Default*) and Schedule 20 (*Defaults*) of the Senior Facilities Agreement and Clause 26 (*Events of Default*) and Schedule 16 (*Defaults*) of the Trade Finance Facilities Agreement:

1.      paragraph (a) of Schedule 20 (*Defaults*) of the Senior Facilities Agreement and Schedule 16 (*Defaults*) of the Trade Finance Facilities Agreement shall be amended to apply with respect to any amounts due and payable under the Senior Finance Documents (and not paid for 10 Business Days);

2.      paragraph (e) of Schedule 20 (*Defaults*) of the Senior Facilities Agreement and paragraph (d) of Schedule 16 (*Defaults*) of the Trade Finance Facilities Agreement (as applicable) shall be amended so that the "60 days" reference therein is shortened to "20 Business Days" for any failure by the Parent to

NEW
LOOK

comply with the additional information or access undertakings set out in this Term Sheet to the extent such undertaking expressly applies to that Relevant Facilities Agreement;

3.    clause 29.8 (*Creditors' process*) of the LMA SFA will be included, but only to the extent applicable to the Parent or a Significant Subsidiary or group of Subsidiaries that, taken together (as of the latest audited consolidated financial statements for the Parent and its Subsidiaries), would constitute a Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law and subject to a £20,000,000 *de minimis* threshold and a 30 day grace period;

4.    clause 29.10 (*Intercreditor Agreement*) of the LMA SFA, but applicable only to a Debtor or Investor (each as defined in the Intercreditor Agreement) and subject to customary materiality thresholds and a 30 Business Day grace period; and

5.    Clause 26.2 (*Unlawfulness, invalidity, rescission and repudiation*) of the Senior Facilities Agreement and Trade Finance Facilities Agreement to be updated to include, subject to the Legal Reservations and Perfection Requirements and the existing proviso of such clause, the invalidity of Transaction Security and subordination created under the Intercreditor Agreement or either of the same ceasing to be legal, valid, binding, enforceable or effective or being alleged to be ineffective by any member of the Group.

6.    an Event of Default shall occur under the Senior Facilities Agreement if the Operating Facility is not refinanced by the date falling 14 days prior to the Termination Date (as defined in the Operating Facility Agreement), unless the Parent determines (in the reasonable opinion of the Board of Directors of the Group) that the Operating Facility is not required for the business of the Group (any such determination to be evidenced to the Facility Agent under the Senior Facilities Agreement by delivery to the Facility Agent under the Senior Facilities Agreement of an Officer's Certificate certifying that determination together with a pro forma forecast demonstrating that the Group will be in compliance with the financial covenants referred to in this Term

NEW
LOOK

|  |  |
|---|---|
|  | Sheet for the next 12 months). Such Event of Default will be subject to a 14 day grace period. |
| **Voluntary Prepayment – call protection:** | |
| *Senior Facilities Agreement:* | 1.    Prior to 1 October 2021, no prepayment fee shall be payable; |
|  | 2.    on or after 1 October 2021 but prior to 30 September 2022, an amount equal to 2.00% of the principal amount of such prepayment; |
|  | 3.    on or after 30 September 2022 but prior to 30 September 2023, an amount equal to 1.00% of the principal amount of such prepayment; and |
|  | 4.    on or after 1 October 2023, , no prepayment fee shall be payable. |
| *Operating Facility Agreement:* | None. |
| **Mandatory Prepayment:** | |
| *Change of Control:* | As per the existing Senior Facilities Agreement and Operating Facility Agreement, except that there shall be no mandatory prepayment or entitlement to require a mandatory prepayment as a result of any Change of Control due to the Financial Restructuring. |
| **Assignment and Transfers by Lenders:** | |
| *Senior Facilities Agreement:* | As per the existing Senior Facilities Agreement, except that clause 27.2(b)(i) and (ii)(A) shall be deleted. |
| *Trade Finance Facilities Agreement:* | As per the existing Trade Finance Facilities Agreement, except that clause 27.2(a)(i) shall be deleted. |
| **Replacement of screen rate:** | Clause 14 (*Changes to Calculation of Interest*) of the Senior Facilities Agreement and the Trade Finance Facilities Agreement to be retained, save for the removal of Clause 14.3 (*Alternative Reference Bank Rate*) of each of the Senior Facilities Agreement and Trade Finance Facilities Agreement. Replacement of Screen Rate language in accordance with Clause 42.5 (*Replacement of Screen Rate*) of the LMA SFA (with Majority Lender thresholds) to be included. |

NEW
LOOK

| | |
|---|---|
| **Intercreditor Principles:** | The Intercreditor Agreement will be amended to reflect the principles set out in Appendix B (*Intercreditor Principles*). |
| **Miscellaneous Provisions:** | Qualified financial contract (QFC) and contractual recognition of bail in language to be included. |
| **Tax:** | Clause 16 (*Tax gross-up and indemnities*) of the Senior Facilities Agreement and the Trade Finance Facilities Agreement to be amended as follows: |

1.      Qualifying Lender provisions should only relate to the Original Borrower jurisdictions.

2.      Treaty Lender wording to be updated given the Original Obligors are all in the UK (other than the Jersey). Obligation on Lenders to produce a certificate of residence to the Borrower on request to be removed.

3.      Bank Levies should be limited to known bank levies only, in each case, in force or publicly announced as at Restructuring Effective Date.

| | |
|---|---|
| **Conditions precedent** | As per clause 4.1 and paragraphs 1, 2(a) (being the Relevant Facilities Agreement, Intercreditor Agreement and applicable fee letters) and 3 of Part 1 of Schedule 2 (Closing Date Conditions Precedent) of the existing Senior Facilities Agreement and: |

1.   An Officer's Certificate from the Parent (signed by an authorised signatory) confirming that: (a) the CVA has been approved; (b) no creditor entitled to vote on the CVA has applied to court to challenge the CVA within the period of 28 days of the date on which the CVA Approval has been reported to the court (or if any such application has been made, that it has been withdrawn); and (c) the CVA provides for the achievement of a rent reduction which is not materially more adverse than the estimated rental value as set out in the initial financial model (being the financial forecast dated 12 June 2020 delivered by or on behalf of the Parent to the Lenders and reviewed by A&M), on the basis confirmed in writing by the Parent to the Lenders on or before the date of the Lock-

NEW
LOOK

up Agreement (for this purpose "**CVA**" means the company voluntary arrangement as referred to in the Steps Plan and "**CVA Approval**" means that the CVA has been approved by the requisite creditors in accordance with Part I of the Insolvency Act 1986);

2.    re-confirmation of existing security;

3.    a structure chart describing the borrowers and guarantors of all outstanding debt in the Group to be subject to the Intercreditor Agreement;

4.    a funds flow statement for information purposes only setting out use of proceeds and showing the liquidity position of the Group post funding.



## PART 4

## PRICING

| **Margin:** | |
|---|---|
| *Senior Facilities Agreement:* | |

| Leverage Ratio | Facility Margin p.a. |
|---|---|
| > 2.00:1 | 6.00% |
| ≤ 2.00:1 | 5.00% |

provided that in respect of any Interest Period for a Loan ending prior to 31 December 2021:

(a)     the highest rate specified in the table above shall be applicable to that Loan; and

(b)     an additional 50 bps Margin ("**PIK Margin**") shall accrue in respect of each Loan and shall not be paid in cash but shall instead be capitalised and added to the outstanding principal amount of the relevant Loan on the last day of the relevant interest period applicable to that Loan and subsequently treated for all purposes as part of the principal amount of that Loan.

"**Leverage Ratio**" for the purposes of the Margin shall have the meaning given to it in the Senior Facilities Agreement and the Trade Finance Facilities Agreement where the reference to "Consolidated Net Leverage Ratio" shall be as defined in the Senior Notes Indenture provided that only Indebtedness under the Senior Facilities Agreement and cash loans under the Operating Facility Agreement shall be included for the purposes of "Consolidated Leverage" under paragraph (i)(x) of the definition "Consolidated Net Leverage" (as defined in the Senior Notes Indenture) and the aggregate of cash and Cash Equivalents of the Group in excess of £30,000,000 may be deducted from "Consolidated Leverage" for the purposes of paragraph (i)(y) of the definition of "Consolidated Net Leverage" (as defined in the Senior Notes Indenture) and there shall be no adjustments for lost revenue directly resulting from the COVID-19 pandemic and any adjustments for one-off expenses occurred as a result of the COVID-19 pandemic shall be capped at £10,000,000 in aggregate.

18



| | |
|---|---|
| *Trade Finance Facility Agreement:* | On the same terms as applicable to the Trade Finance Facility Agreement as at the date of this Agreement, subject to a 0.50 per cent increase on the Margin applicable to any Loan. |
| **Applicable fees in connection with transaction:** | |
| *Senior Facilities Agreement:* | 1.00 per cent arrangement fee (not paid in cash but capitalised on the Restructuring Effective Date). |
| *Operating Facility Agreement:* | 1.00 per cent exit fee (paid in cash on the Termination Date). |



## APPENDIX A

## BASKETS TABLE

Except as amended below, all baskets are as provided for in the existing Senior Facilities Agreement and/or Trade Finance Facilities Agreement.

| | Amended baskets to Senior Facilities Agreement and Operating Facility Agreement |
| --- | --- |
| **DEBT COVENANT** | |
| *Existing Notes* | Existing basket to be removed. |
| *Credit Facilities* | £100 million.<br><br>To the extent funds are raised from Credit Facilities outside the Senior Facilities Agreement, the net cash proceeds of such funds will be used to pay down Senior Facilities Agreement on a pound for pound basis, subject to the Refinancing Consent Rights. |
| *Cap Leases / Purchase money debt* | £10 million. |
| *Permitted Trade L/C Facilities* | £100 million, incurrence limited to operational and working capital purposes, provided that, if the Group's LTM EBITDA is less than £50 million at that time, the prior consent of the Facility Agent under the Trade Finance Facilities Agreement is required for any incurrence of a secured Trade L/C Facility where the Trade L/C Facility Amounts then outstanding exceeds (or would following incurrence of such new Trade L/C Facility exceed) £70 million, subject to the Refinancing Consent Rights. For the avoidance of doubt, no pound for pound reduction. |
| *Permitted Qualified Receivables Financing* | £30 million, incurrence limited to operational and working capital purposes, provided that the Facility Agent under the Trade Finance Facilities Agreement has given it's prior consent to such incurrence.<br>The net cash proceeds of such financing will be used to pay down the Senior Facilities Agreement on a pound for pound basis. |
| *Permitted Inventory Financing* | £50 million for inventory financing to be incurred on customary terms which has sole recourse to the assets financed by such financing (and to which the Parent has shared the substantially agreed term sheet in respect of such financing with the Facility Agent under the Senior Facilities Agreement), provided that the Facility Agent under the Trade Finance Facilities Agreement has given it's prior consent to such incurrence.<br>The net cash proceeds of such financing will be used to pay down the Senior Facilities Agreement on a pound for pound basis. |
| *General basket* | £60 million (to rank junior on the Transaction Security or unsecured (together "**Junior Debt**")) and subject to non-Guarantor cap of £10 million, provided that any Junior Debt does not mature prior to the date which is 3 months after the latest maturity date under the Senior Facilities Agreement and the Security Agent receives copies of the Junior Debt documentation as soon as reasonably practicable after the relevant Junior Debt is incurred. |

NEW
LOOK

|  | **Amended baskets to Senior Facilities Agreement and Operating Facility Agreement** |
|---|---|
|  | An additional undertaking shall be included in the Senior Facilities Agreement and Operating Facility Agreement requiring the Parent to provide copies of any amendments entered into in respect of the Junior Debt documentation, promptly after entering into such documentation. |
| *Refinancing Indebtedness* | No Refinancing Indebtedness may have a maturity that is earlier than the maturity of the debt under the Senior Facilities Agreement or Trade Finance Facilities Agreement. |
| *Refinancing Consent Rights* | To the extent the proceeds of any Additional Debt used to refinance all or any part of any Refinanced Facility (and not, for the avoidance of doubt, both Refinanced Facilities) in an amount greater than £20 million in aggregate at any time prior to the first anniversary of the Restructuring Effective Date or at any time the Parent is in breach of the financial covenants set out in this Term Sheet, such Additional Debt may not be incurred without the prior written consent of the Facility Agent under the Non-Refinanced Facility. |
|  | For the avoidance of doubt, the net cash proceeds of any Additional Debt which is less than £20 million in aggregate will not be used to pay down Trade Finance Facilities Agreement during any of the periods referred to in the preceding paragraph. |
|  | For this purpose: |
|  | "**Additional Debt**" means any additional Financial Indebtedness incurred under the Credit Facilities basket or the Permitted Trade L/C Facilities basket which either ranks "super senior" under the Intercreditor Agreement, is Pari Passu Indebtedness or is secured by a Lien on the Collateral. |
|  | "**Refinanced Facility**" means any facility made available under (a) the Senior Facilities Agreement or (b) the Trade Finance Facilities Agreement, in each case, which is refinanced with the proceeds of any Additional Debt. |
|  | "**Non-Refinanced Facility**" means any facility made available under the Senior Facilities Agreement or the Trade Finance Facilities Agreement which is not a Refinanced Facility. |
|  | The lender under the Operating Facility shall be notified and consulted in advance on any Additional Debt which is to be applied in prepayment of the Operating Facility. |
| **RESTRICTED PAYMENTS COVENANT** | |
| *General* | Limitation on paying down any Subordinated Indebtedness to cover any second lien debt (not just debt subordinated in right of payment). |

NEW
LOOK

| | Amended baskets to Senior Facilities Agreement and Operating Facility Agreement |
|---|---|
| *General RP basket* | £7.5 million provided that such basket cannot be used for any direct or indirect dividends, share buybacks, payments or distributions to any direct or indirect shareholders or Permitted Holders. |
| *Holding company payments* | Ordinary course, including holding company overheads, fees, costs and expenses capped at £1 million p.a. + related taxes<br><br>Note, a new basket will be added to cover fees, costs and expenses related to the Financial Restructuring. |
| *General Permitted Investment basket* | £12.5 million provided that such basket cannot be used for any direct or indirect dividends, share buybacks, payments or distributions to any direct or indirect shareholders or Permitted Holders. |
| **ASSET SALES** | |
| *De minimis exception* | £5 million. |
| *Cash consideration requirement - Permitted Asset Swap carve out* | Carve out for cash consideration requirements for Permitted Asset Swap to be limited to a Permitted Asset Swap in respect of non-current assets only. |
| *Designated non-cash consideration* | £10 million. |
| *Threshold for tender offer* | £20 million. |
| **LIENS** | |
| *Permitted Collateral Liens* | The words "*or which are secured on assets that are subject to a floating charge in favour of the Finance Parties*" will be deleted in (A)(i) of the definition of "Permitted Collateral Liens" and the following proviso shall be added to the definition of "Collateral": "*provided that any property or asset subject only to a floating charge (and not any other Lien) under any Transaction Security Document to the extent such charge has not crystallized into a fixed charge shall not be deemed "Collateral" for the purposes of determining whether a Permitted Lien is permitted over such asset or property*" |
| **FINANCIAL DEFINITIONS** | |
| *Pro forma adjustments* | For Consolidated EBITDA, as calculated in "Consolidated Leverage Ratio" (as defined in the Senior Notes Indenture) subject to a 10% cap. |



## APPENDIX B

### INTERCREDITOR PRINCIPLES

**Documentation:**      The Intercreditor Agreement will be amended to reflect the capital structure contemplated by this Term Sheet, including such amendments as are set out in this Appendix.

**Instructing Group:**      On or prior to the Senior Discharge Date, the "Instructing Group" shall be constituted by the Majority Senior Creditors provided that:

(a)     for the purposes of the definition of the "Instructing Group", the definitions of "Senior Creditors", "Senior Credit Participations" and "Senior Creditor Discharge Date" shall include the Operating Facility Lenders, their Aggregate Trade Exposure and the Operating Facility Liabilities, respectively; and

(b)     if at any time any one Senior Creditor (as adjusted in accordance with paragraph (a) above) holds 33 1/3 per. cent or more of the total aggregate amount of all Exposure (being, in relation to a Senior Creditor at any time, the aggregate amount of its participation in all utilisations outstanding under the Senior Facilities Agreement and the Operating Facility Agreement (whether by loan, letter of credit or otherwise but only to the extent that SFA Cash Cover has not been provided by a Debtor in respect of those amounts) (excluding the Super Priority Liabilities)) at that time (the "**Predominant Creditor**"):

(i)     any instruction to the Security Agent to enforce the Transaction Security, take any other Enforcement Action or exercise any other right, power, authority or discretion (each, a "**Positive Instruction**") by the Predominant Creditor shall be taken into account for the purposes of determining the Instructing Group only if either (1) at least two Senior Creditors (who are not the same entity as, or an Affiliate of, the Predominant Creditor) or (2) those Senior Creditors (who are not the same entity as, or an Affiliate of, the Predominant Creditor) whose Exposure at that time aggregate 15 per cent or more of the total Exposure, at that time, are also providing same Positive Instruction to the Security Agent as the Predominant Creditor; and

(ii)     any instruction to the Security Agent to refrain or cease from enforcing the Transaction Security, taking any other Enforcement Action or exercising any other right, power, authority or discretion (including, failing to give instruction in relation to any such matter) (each, a "**Negative Instruction**") by the Predominant Creditor shall be taken into account for the purposes of determining the Instructing Group only if either (1) at least two Senior Creditors (who are not the same entity as, or an Affiliate of, the Predominant Creditor) or (2) those Senior Creditors (who are not the same entity as, or an Affiliate of, the Predominant Creditor) whose Exposure at that time aggregate 10 per cent or more of the total Exposure, at that



time, are also providing the same Negative Instruction to the Security Agent as the Predominant Creditor.

After the Senior Discharge Date, the "Instructing Group" shall be constituted by the Majority Second Lien Creditors.

**Application of Proceeds:**    As per the Intercreditor Agreement, provided that:

(a)    until 30 June 2021, while the Total Commitments under the Operating Facilities exceed £60,000,000 Recoveries up to the lesser of (i) the amount of the outstanding Utilisations under the Operating Facilities in excess of £60,000,000 and (ii) of £10,000,000; and

(b)    on and from 30 June 2021 until 31 December 2021, while the Total Commitments under the Operating Facilities exceed £50,000,000, Recoveries up to the lesser of (i) the amount of the outstanding Utilisations under the Operating Facilities in excess of £50,000,000 and (ii) £10,000,000,

shall be applied by the Security Agent in payment to the Operating Facility Lenders for application towards the discharge of the Operating Facility Liabilities (such amount of the Operating Facility Liabilities being the "**Super Priority Liabilities**"), to the extent permitted by applicable law (and, in all other respects, subject to the provisions of clause 13 of the Intercreditor Agreement), in priority to the Senior Lender Liabilities, the Hedging Liabilities and the remaining Operating Facility Liabilities.

**Senior Notes Liabilities:**    The category of Senior Notes Liabilities (and associated references) shall be deleted.

**Senior Parent Liabilities:**    The category of Senior Parent Liabilities (and associated references) will be replaced by the category of Second Lien Liabilities (and associated references), with the following principles reflected:

(a)    Second Lien Liabilities may be constituted by loan or note liabilities;

(b)    the Senior Secured Liabilities and Operating Facility Liabilities shall rank in right and priority of payment to the Second Lien Liabilities and the Transaction Security shall secure the Senior Secured Liabilities and Operating Facility Liabilities in priority to the Second Lien Liabilities; and

(c)    any Payment of the Second Lien Liabilities shall be as provided for in "Second Lien – Permitted Payments" below and any Enforcement Action in respect of Second Lien Liabilities shall be as provided for in "*Second Lien – Enforcement*" below.

**Second Lien - Permitted Payments:**    As per clause 5.2 of the Intercreditor Agreement, subject to the following changes:

(a)    Payments shall be permitted in respect of principal amounts in accordance with clauses under the Second Lien Finance Documents relating to repayment or prepayment of Second Lien Creditors on: (1) illegality (provided that the relevant illegality does not arise as a result of action taken by a Second Lien Creditor

24

which is taken with the intention of triggering a prepayment under such provision); (2) to the extent required to cancel and repay or prepay a single lender in relation to a tax gross-up, tax indemnity or increased costs; or (3) to the extent an equivalent payment has been made or will be made simultaneously under a Senior Financing Agreement or Operating Facility Document (in relation to any creditor thereunder exercising its right to be prepaid), change of control / sale of all or substantially all of the assets of the Group, provided that in each case (other than in respect of illegality) no Event of Default is continuing and no Second Lien Payment Stop Notice has been issued or Senior Payment Default has occurred;

(b)     Payments of non-cash interest made by means of capitalisation of interest or the issue of an instrument subordinated to the Senior Secured Liabilities on the same terms as the Second Lien Liabilities shall not be subject to any Second Lien Payment Stop Notice or Senior Payment Default block;

(c)     if an Event of Default is continuing under the Second Lien Finance Documents, Payments shall be permitted in respect of commercially reasonable work fees and professional fees, costs and expenses for restructuring advice and valuations (including legal advice and the advice of other appropriate financial/restructuring advisors), provided that such fees paid in cash do not exceed 1.00 per cent of the total commitment under the Second Lien Finance Documents but excluding any fees or costs incurred in connection with any current, threatened or pending litigation against any Senior Secured Creditor or Operating Facility Lender);

(d)     Payments shall be permitted in respect of amounts due under the original form of any fee/OID letter or any compensation relating to the Second Lien Finance Documents in relation to an increase in the principal amount of the Second Lien Liabilities that is not prohibited by the terms of the Senior Financing Agreements, provided that such fee paid in cash does not exceed 1.00 per cent of the total commitments under such Second Lien Finance Document and in each case no Second Lien Payment Stop Notice has been issued or Senior Payment Default has occurred;

(e)     Payments shall be permitted in respect of consent and/or waiver fees in respect of any consent granted under, or waiver or amendment of any provisions of, a Second Lien Finance Document (provided those fees do not exceed, on a percentage basis, any corresponding fees paid to the Senior Secured Creditors or Operating Facility Lenders);

(f)     Payments shall be permitted in respect of an amount that is outstanding as a result of the accrual of cash interest payable in respect of the Second Lien Liabilities during a period when a Second Lien Payment Stop Notice was outstanding (provided that such Second Lien Payment Stop Notice is no longer outstanding); or

(g)     Payments shall be permitted if an Event of Default is continuing under the Second Lien Finance Documents and provided that the Payment is of all or part of the Second Lien Liabilities as a result of those Second Lien Liabilities being released or otherwise



discharged solely in consideration of the issue of shares in any holding company of the Company (each a "**Debt for Equity Swap**") provided that (i) no cash or cash equivalent payment is made in respect of the Second Lien Liabilities, (ii) any Liabilities owed by a member of the Group to another member of the Group, the Investors or any other holding company of the Company that arise as a result of any Debt for Equity Swap are subordinated to the Senior Secured Liabilities pursuant to the Intercreditor Agreement and (iii) any Liabilities owed by a member of the Group to another member of the Group arising as a result of such Debt for Equity Swap are subject to Transaction Security.

On or after the Senior Discharge Date payments may be made to the Second Lien Creditors in accordance with the relevant Second Lien Finance Documents.

**Second Lien Payment Stop Notice:**     As per clause 5.3 of the Intercreditor Agreement, subject to the following changes:

(a)      a Second Lien Payment Stop Notice may only be served from the date which is one Business Day after:

    (i)      the date of any of the following Events of Default referred to in paragraphs (A) and (B) below under the Senior Facilities Agreement (or any equivalent in any other Senior Financing Agreement) is continuing or an event under paragraph (C) below is continuing :

        (A)      an Event of Default relating to the breach of the minimum liquidity covenant or breach of the minimum capex covenant in the section entitled "*Covenants*" in this Term Sheet, an Event of Default under clause 26.2 (*Unlawfulness, invalidity, rescission and repudiation*) (as amended in accordance with this Term Sheet and only to the extent that the unlawfulness or invalidity relates to a Transaction Security Document or the Intercreditor Agreement), an Event of Default referred to in paragraphs 2 or 3 of the section entitled "*Events of Default*" in this Term Sheet, an Event of Default under paragraph (d) of Schedule 20 (*Defaults*) relating to the non-provision of any annual or quarterly financial statements or any accompanying Compliance Certificates or an Event of Default under paragraphs (e) or (f) of Schedule 20 (*Defaults*); or

        (B)      any other Event of Default (other than under paragraph (a) of Schedule 20 (Defaults)) which has or is reasonably likely to have a Material Adverse Effect;

        (C)      an acceleration of the Senior Facilities Agreement or Operating Facility; or



       (ii)    breach of the minimum EBITDA covenant set out in the section entitled "*Covenants*" in this Term Sheet;

(b)    the reference to "179 days" shall be replaced by a reference to "120 days"; and

(c)    the reference to "45 days" shall be replaced by a reference to "90 days"

**Second Lien – Enforcement:**    As per clauses 5.9 and 5.10 of the Intercreditor Agreement, subject to clause 5.10(a) of the Intercreditor Agreement being deleted and replaced with the following and clause 5.10(f) of the Intercreditor Agreement being deleted:

"*(a)*

       (i)    *120 days after the Second Lien Standstill Start Date, in the case of non-payment of any amount of principal, interest or fees in respect of the relevant Second Lien Liabilities or in the case of any financial covenant breach under the relevant Second Lien Financing Agreement; and*

       (i)    *150 days after the Second Lien Standstill Start Date, in the case of any other event of default under the relevant Second Lien Financing Agreement;*"

**Consultation:**    As per Clause 11.7 (*Consultation Period*) of the Intercreditor Agreement, subject to the following changes (and the disenfranchisement provisions in the Intercreditor Agreement):

(a)    the obligation to consult in paragraph (a) of clause 11.7 of the Intercreditor Agreement shall extend to consulting with each Agent of the Second Lien Creditors provided that the 30-day time period specified therein shall be reduced to 15 days; and

(b)    paragraphs (b) and (c) of clause 11.7 shall be deleted.

**Distressed Disposals:**    Clause 12.2 (*Distressed Disposals*) of the Intercreditor Agreement shall be modified by the addition of the following value protection provisions for the Second Lien Liabilities:

If a Distressed Disposal is being effected such that the guarantees/Security benefitting the Second Lien Creditors would be released, it is a condition to such release that:

(a)    each Agent of the Second Lien Creditors has approved the release; or

(b)    where the shares/assets of a guarantor or borrower of Second Lien Liabilities are sold:

       (i)    the proceeds of such sale or disposal are:

          (A)    in cash (or substantially in cash); or

          (B)    (only if the consideration in respect of each other cash offer received for those shares or assets is less than the aggregate par value of the outstanding Senior Secured Liabilities and Operating Facility



Liabilities) not in cash (or substantially in cash), provided that the requirements of paragraph (C)(II) below are satisfied;

(ii)     all claims of the Senior Secured Creditors and the Operating Facility Lenders (other than in relation to performance bonds or guarantees or similar instruments) against a member of the Group (if any) all of whose shares (other than any minority interest not owned by members of the Group) are sold or disposed of pursuant to such Enforcement Action, are unconditionally released and discharged or sold or disposed of concurrently with such sale (and are not assumed by the purchaser or one of its Affiliates) and all Security under the Security Documents in respect of the assets that are sold or disposed of is simultaneously and unconditionally released and discharged concurrently with such sale, provided that if each Senior Agent (acting reasonably and in good faith):

(A)     determines that the Senior Secured Creditors will recover a greater amount if any such claim is sold or otherwise transferred to the purchaser or one of its Affiliates and not released and discharged; and

(B)     serves a written notice on the Security Agent confirming the same,

the Security Agent shall be entitled to sell or otherwise transfer such claim to the purchaser or one of its Affiliates; and

(iii)     such sale or disposal is made:

(A)     pursuant to a Public Auction in respect of which the Primary Creditors are entitled to participate; or

(B)     where a Financial Advisor selected by the Security Agent has delivered an opinion in respect of such sale or disposal that the amount received in connection therewith is fair from a financial point of view, taking into account all relevant circumstances, including the method of enforcement, provided that the liability of such Financial Advisor may be limited to the amount of its fees in respect of such engagement (it being acknowledged that the Security Agent shall have no obligation to select or engage any Financial Advisor unless it shall have been indemnified and/or secured and/or prefunded to its satisfaction).

**Amendments and waivers: Senior Secured Liabilities and Operating Facility Liabilities:**     The Senior Secured Creditors and Operating Facility Lenders shall be entitled to amend their applicable Debt Documents in accordance with their terms provided that any amendment which results in any increase to the principal amount of such Liabilities may only be made with the prior consent of the Majority Second Lien Creditors but excluding any increase



which is permitted under the original form of such applicable Debt Documents.

The Senior Secured Creditors, the Operating Facility Lenders Creditors and the Parent will not designate a document as a Debt Document without the prior consent of the Majority Second Lien Creditors if the terms of that document effect a change which would otherwise require the consent of the Majority Second Lien Creditors.

**Amendments and waivers: Second Lien Liabilities**

The Second Lien Creditors shall be entitled to amend the Second Lien Finance Documents in accordance with their terms provided that any amendment to the Second Lien Finance Documents which results in any increase to the principal amount of the Second Lien Liabilities (as set out in the original form of the applicable Second Lien Financing Agreement) may only be made with the prior consent of the Majority Senior Creditors but excluding any increase which is permitted under the original form of the applicable Second Lien Financing Agreement.

The Second Lien Creditors and the Parent will not designate a document as a Second Lien Finance Document without the prior consent of the Majority Senior Creditors (which for the purposes of this provision, shall include the Operating Facility Lenders, their Aggregate Trade Exposure and the Operating Facility Liabilities, respectively) if the terms of that document effect a change which would otherwise require the consent of the Majority Senior Creditors.



## APPENDIX C

### SANCTIONS AND ANTI-CORRUPTION

*Definitions:*

**Anti-Corruption Laws** means all laws, rules and regulations of any jurisdiction concerning or relating to bribery or corruption, including, but not limited to, the US Foreign Corrupt Practices Act of 1977 or the UK Bribery Act 2010.

**Anti-Money Laundering Laws** means all applicable financial record keeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency.

**Blocking Law** means:

(a)    any provision of Council Regulation (EC) No 2271/1996 of 22 November 1996 (or any law or regulation implementing such Regulation in any member state of the European Union or the United Kingdom);

(b)    section 7 of the German Foreign Trade Regulation (*Außenwirtschaftsverordnung*); or

(c)    any other applicable blocking or anti-boycott law in any country having jurisdiction over any Lender or Obligor.

**Prohibited Payment** means any bribe, rebate, payoff, influence payment, kickback or other payment or gift of money or anything of value (including meals or entertainment) to any officer, employee or ceremonial office holder of any government or instrumentality thereof, any political party or supra-national organization (such as the United Nations), any political candidate, any royal family member or any other person who is connected or associated personally with any of the foregoing or any other person that is prohibited under any applicable law or regulation.

**Restricted Country** means: a country or territory that is, or whose government is, the subject of general export, import, financial, investment or trade embargos by any Sanctioning Authority, which as at the date of the Agreement, includes Cuba, Iran, the Region of Crimea, North Korea, Sudan and Syria.

**Restricted Entity** means any person, entity or other party that is:

(a)    a government of a Restricted Country,

(b)    located, domiciled, resident, incorporated in a Restricted Country;

(c)    named on any Sanctions List administered by a Sanctioning Authority; or

(d)    controlled or owned by a person, entity or other party referred to in paragraphs (a) to (c) above.

**Sanctioning Authority** means:

(a)    the United Nations;

(b)    the US government or any US government agency (including the Office of Foreign Asset Control);

(c)    the European Union or any present or future member state thereof; or



(d)     the UK government or any UK government agency (including the Foreign and Commonwealth Office of the United Kingdom and Her Majesty's Treasury);

in each case, as amended, supplemented or substituted from time to time.

**Sanctions** means any economic or financial sanctions or trade embargoes administered, enacted or enforced by any Sanctioning Authority.

**Sanctions Lists** means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, the Consolidated List of Asset Freeze Targets maintained by Her Majesty's Treasury or any equivalent list of designated persons and/or entitles maintained by or public announcement of a Sanctions designation made by a Sanctioning Authority, each as amended, supplemented or substituted from time to time.

### *Representations:*

**1.1     Anti-Corruption Laws and Anti-Money Laundering Laws**

(a)     It and each of its Subsidiaries:

(i)     has conducted its businesses and is in compliance with all Anti-Corruption Laws and Anti-Money Laundering Laws and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving it or any of its Subsidiaries with respect to the Anti-Corruption Laws or Anti-Money Laundering Laws is pending or, to the best of its knowledge and belief, threatened or contemplated;

(ii)     has instituted and maintains policies and procedures reasonably designed to promote and achieve compliance with such laws applicable to it in the jurisdictions in which it operates;

(iii)     has not made, offered to make, promised to make or authorised any Prohibited Payment; and

(iv)     has not been subject to any investigation by any governmental entity with regard to any actual or alleged Prohibited Payment.

(b)     No funds or other consideration it contributes in connection with any transaction under the Finance Documents will have been derived from or related to any activity that violates or is deemed criminal under the Anti-Corruption Laws or Anti-Money Laundering Laws.

**1.2     Sanctions**

(a)     Neither it nor any of its Subsidiaries, directors or officers or, to the best of its knowledge and belief, any of its or their employees:

(i)     is a Restricted Entity;

(ii)     is or has ever been subject to any claim, proceeding, formal notice or investigation with respect to Sanctions;

(iii)     is engaging or has engaged (since the date of this Agreement) in any transaction that evades or avoids or has the purpose of evading or avoiding or breaches or attempts to breach any Sanctions; or



(iv)     has engaged (since the date of this Agreement) or is engaging, directly or indirectly, in any trade, business or other activity with it for the benefit of any Restricted Country or Restricted Entity in breach of applicable Sanctions.

(b)     Paragraph (a) above will not apply if and to the extent that it results in a violation of or conflict with, or exposes any party to this Agreement or any directors, officers or employees of the foregoing to liability under any Blocking Law applicable to that person.

*Undertakings:*

**1.3     Anti-Corruption Laws and Anti-Money Laundering Laws**

(a)     Each Obligor must maintain in effect and enforce policies and procedures designed to ensure compliance by it and its respective directors, officers, employees and agents with Anti-Corruption Laws and Anti-Money Laundering Laws.

(b)     Each Obligor must not (and must ensure that none of its respective directors, officers, employees will) use the proceeds of any Loan in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of any Anti-Corruption Laws and Anti-Money Laundering Laws.

**1.4     Sanctions**

(a)     Each Obligor shall not and shall ensure that none of its Subsidiaries will:

(i)     use, lend, contribute or otherwise make available any part of the proceeds of the Facility or other transaction contemplated by the Finance Documents directly or knowingly indirectly:

(A)     for the purpose of any trade, business or other activities involving or for the benefit of any Restricted Entity or Restricted Country in breach of any Sanctions; or

(B)     in any other manner that would result in any person being in breach of Sanctions;

(ii)     engage in any transaction that evades or avoids or has the purpose of evading or avoiding or breaches or attempts to breach, directly or indirectly, any Sanctions; or

(iii)     fund all or part of any payment in connection with a Finance Document out of proceeds derived from business or transactions with a Restricted Entity or involving business with a Restricted Country that is in breach of applicable Sanctions, or from any action which is in breach of Sanctions.

(b)     Each Obligor shall, and shall use its best efforts to procure that its Subsidiaries will, comply with all Sanctions.

(c)     Each Obligor shall promptly upon written notice of the same, supply to the Facility Agent details of any claim, action, suit, proceedings or investigations against it by a Sanctioning Authority with respect to Sanctions.

(d)     Paragraphs (a) to (c) above shall not apply if and to the extent that they result in a violation of or conflict with, or expose any party to this Agreement or any directors, officers or employees of the foregoing to liability under any Blocking Law applicable to that person.

**<u>Exhibit C</u>**

**Convening Order**

**Claim No. CR-2020-003752**

CR-2020-003752

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**INSOLVENCY AND COMPANIES LIST (ChD)**


**IN THE MATTER OF NEW LOOK FINANCING PLC**

**AND IN THE MATTER OF THE COMPANIES ACT 2006**

**Before Mr Justice Miles**

**On the 23rd day of September 2020**

---

### MINUTE OF ORDER

---

**UPON THE APPLICATION OF** New Look Financing plc (the "**Scheme Company**") whose registered office is New Look House, Mercery Road, Weymouth, Dorset, United Kingdom,  DT3 5HJ by a Part 8 Claim Form dated 28 August 2019 (the "**Claim Form**")

**UPON READING** the Claim Form and the witness statements of Richard John Collyer, a director of the Scheme Company, and Victor Parzyjagla of Lucid Issuer Services Limited (the "**Information Agent**");

**UPON READING** the evidence including the scheme of arrangement between the Scheme Company and its Scheme Creditors (the "**Scheme**") and the explanatory statement in relation thereto given pursuant to section 897 of the Companies Act 2006 (the "**Explanatory Statement**");

**UPON HEARING** Felicity Toube QC leading Adam Al- Attar for the Scheme Company;

**UPON** the Scheme Company having resolved to appoint Richard John Collyer to act as the Scheme Company's foreign representative in respect of any proceedings under Chapter 15 of the U.S. Bankruptcy Code and any other recognition proceedings;

**UPON** the Court adopting in this Order (save where terms are otherwise expressly defined) the abbreviations, words, definitions and phrases contained in the Explanatory Statement and the Scheme;

**UPON** the Court being satisfied that it has jurisdiction in relation to the Scheme on the basis that the Scheme Company is a "company" for the purposes of Part 26 of the Companies Act 2006;

**IT IS ORDERED AND DIRECTED THAT:**

1. The Scheme Company be at liberty to convene a meeting of its Scheme Creditors to be held on 16 October 2020 at 2:00 p.m. (London time) (which may take place remotely, using Skype for Business or a similar format) for the purpose of considering and if thought fit approving (with or without modification) the Scheme proposed to be made between the Scheme Company and the Scheme Creditors (the "**Scheme Meeting**").  The Scheme Meeting shall be conducted by means that also provide Scheme Creditors a parallel facility (in addition to the main meeting) to discuss matters amongst themselves and which shall not be accessible to the Scheme Company or its representatives (a virtual breakout room).

2. The Scheme Meeting convened pursuant to paragraph 1 of this Order shall be held at 2:00 p.m. (London time) on 16 October 2020 (or at such time or date within three weeks thereafter as the Scheme Company may decide and communicate to the Scheme Creditors).

3. Copies of (i) the notice convening the Scheme Meeting; (ii) the Scheme; (iii) the Explanatory Statement; and (iv) the Account Holder Letter, including guidance notes for the completion thereof (together referred to as the "**Scheme Documents**") shall be sent by e- mail to the Information Agent, for the purposes of:

   a. posting such Scheme Documents to the website hosted by the Information Agent at https://www.lucid-is.com/newlook (the "**Scheme Website**"); and

   b. sending such Scheme Documents by electronic mail to the 'corporate actions' areas within each of Euroclear and Clearstream with an instruction that they will forward them directly to their account holders for further distribution to their underlying clients.

4. Copies of the Scheme Documents shall also be made available to any of the Scheme Creditors upon request to the Scheme Company through contacting Victor Parzyjagla  or Oliver Slyfield of the Information Agent (address: Tankerton Works, 12 Argyle Walk, London, England, WC1H 8HA, United Kingdom; telephone: +44 20 7704 0880; website: www.lucid-is.com/newlook; email: newlook@lucid-is.com) and when so requested shall be provided free of charge.

5. The Scheme Documents shall be in the form or substantially in the form of the drafts submitted to the Court (in particular, as filed at pages 74 to 526 of the third volume of the hearing bundle) (subject

to completion of blanks, the correction of typographical errors, any modifications to conform with this Order and such minor or immaterial modifications as counsel to the Scheme Company may advise).

6.   In order to vote on the Scheme, the Scheme Creditors shall:

  a. block their SSNs by delivery of a Custody Instruction to the relevant Clearing System by 5 p.m. (London time) on 13 October 2020; and

  b. return their duly completed Account Holder Letter online via the Information Agent as soon as possible and in any event to be received no later than 5 p.m. (London time) on 14 October 2020 (the "**Voting Submission Deadline**").

7. Unless the Court orders otherwise, the accidental omission to serve any Scheme Creditor with notice of the Scheme Meeting or the non-receipt of notice of the Scheme Meeting by any Scheme Creditor shall not invalidate the proceedings at the Scheme Meeting.

8. Richard John Collyer, a director of the Scheme Company, or, if for any reason he is unable so to act, either Yen Sum of Latham & Watkins (London) LLP or Jessica Walker of Latham & Watkins (London) LLP, shall be appointed to act as chair of the Scheme Meeting (the "**Chair**") and shall report the results of the Scheme Meeting to the Court.

9. The Chair shall be at liberty to adjourn the Scheme Meeting provided that, if adjourned, the Scheme Meeting recommences as soon as reasonably practicable thereafter.

10.      The Chair shall be at liberty to rely on the signatures on the Account Holder Letters as a warranty that the signatory has been duly authorised by the relevant Scheme Creditor to sign the Account Holder Letter on behalf of the Scheme Creditor.

11.      The Chair shall be at liberty to accept an otherwise incomplete or late Account Holder Letter after the Voting Submission Deadline, provided that any such Account Holder Letter is received before the Scheme Meeting is closed.

12.      The Chair shall be at liberty to exclude from the Scheme Meeting any person who is not a Scheme Creditor (or an adviser thereto) or a person invited to attend the Scheme Meeting by the Scheme Company.

13.      The Chair shall be at liberty to permit the attendance of persons who are not otherwise entitled to attend and vote at the Scheme Meeting as observers, unless an objection is taken by a Scheme

Creditor entitled to attend and vote at the Scheme Meeting, provided that such a person shall not be entitled to speak without permission.

14. The Chair may, for voting purposes only, reject in whole or in part the value attributed to a Scheme Creditor's Scheme Claim if the Chair considers that it does not constitute a fair and reasonable assessment of the relevant sums owed to the relevant Scheme Creditor under the SSNs, as applicable, or if the relevant Scheme Creditor has not complied with the applicable voting procedures or instructions set out in the Explanatory Statement and Account Holder Letter.

15. The Chair shall have the discretion to accept the value of the claim in respect of which a Scheme Creditor seeks to vote, in whole or in part, notwithstanding failure by such Scheme Creditor to comply with the requirements contained in their Account Holder Letter, if sufficient information has been provided in their Account Holder Letter, or by some other means to enable the Chair to assess the fairness of the value of the claim in respect of which such Scheme Creditor should be permitted to vote.

16. The Chair shall have permission to apply for such further direction in this matter as  may be considered necessary or appropriate.

17. If the Scheme is approved at the Scheme Meeting by the required statutory majority, the Claim Form shall be restored and a further Court hearing at which the Scheme Company shall seek the sanction of the Court for the Scheme shall be listed.

18. Pursuant to rules 5.4B, 5.4C(4) and 5.4D(2) of the Civil Procedure Rules 1998, the documents specified below with references to the pages of the bundle for the hearing (the "**Sealed Documents**") shall not be open to inspection on the Court file by any person without the permission of the Court (with any such application to be made on three business days' notice to the Scheme Company). The Sealed Documents comprise paragraphs 55 and 74 of the witness statement of Richard John Collyer dated 18 September 2020 and the following other documents:

| Document | Bundle Reference (Volume/Pages) |
|---|---|
| 2020 CVA Proposal | 2/751 – 1053 |
| Lock-Up Agreement | 2/1059 – 1222 |
| FY21 Cashflow Forecast | 2/1236 – 1237 |
| Equity and New Money Term Sheet | 3/207 – 230 |
| Debt Term Sheet | 3/231 – 263 |
| Form of Shareholder Loan Agreement | 3/264 – 306 |

| Form of Subordination Agreement | 3/307 – 367 |
| Form of Shareholders' Agreement | 3/368 – 429 |
| Form of Supplemental Indenture | 3/499 - 507 |

19.      Pursuant to rules 5.4B and 5.4C(4) of the Civil Procedure Rules 1998, none of the Sealed Documents shall appear on any Electronic Working Case File (as defined in paragraph 2.4 of Practice Direction 51O) or on any part of the Website (as defined in paragraph 2.3(a) of Practice Direction 51O).

20.      There be permission to apply.

**AND IT IS DECLARED THAT:-**

21.      Richard John Collyer is the appointed foreign representative authorised in these proceedings to act as a foreign representative (the "**Foreign Representative**") in any Chapter 15 proceedings in the U.S. Bankruptcy Court in respect of the Scheme Company.

22.      The Foreign Representative is authorised on behalf of the Scheme Company to take any and all actions to execute, deliver, certify, file, record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, or certificates, and to take any and all steps deemed by the Foreign Representative to be necessary or desirable to carry out the purpose and intent of the Scheme including, for the avoidance of doubt and to the extent required, to apply to any court in the U.S. for the recognition of the Scheme, the enforcement of this order or the sanction order (if made) and other related relief under Chapter 15 of the U.S. Bankruptcy Code.

DATED _____

**IN THE HIGH COURT OF JUSTICE**                    Claim    No.    CR-2020-003752

**BUSINESS AND PROPERTY COURTS**

**OF ENGLAND AND WALES**

**INSOLVENCY AND COMPANIES LIST (ChD)**

**Before Mr Justice Miles**

**On the 23rd day of September 2020**


## IN THE MATTER OF NEW LOOK FINANCING PLC


## AND IN THE MATTER OF THE COMPANIES ACT 2006


_____

## ORDER

_____


The Court sent this order and sealed copies for service to:-

Latham & Watkins (London) LLP

99 Bishopsgate, London, EC2M 3XF

FAO: Yen Sum and Jessica Walker

Tel: (+44) 20 7710 1000


Solicitors for the Applicant Company